# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 25-3066

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

SHANE BRIAN LAMOND,

*Defendant-Appellant.*

Appeal from the United States District Court for the District of Columbia,
No. 1:23-cr-00177-ABJ-1 (Hon. Amy Berman Jackson)

## OPENING BRIEF FOR DEFENDANT-APPELLANT
## SHANE BRIAN LAMOND

ANDREW E. GOLDSMITH
RENO G. VARGHESE
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
agoldsmith@kellogghansen.com
rvarghese@kellogghansen.com

*Appointed Counsel for Defendant-Appellant Shane Brian Lamond*

May 8, 2026

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Defendant-Appellant Shane Brian Lamond certifies as follows:

## A. Parties and Amici

Plaintiff in the district court and Appellee in this Court is the United States of America.

Defendant in the district court and Appellant in this Court is Shane Brian Lamond.

No intervenors or amici appeared in the district court proceedings, and there are no intervenors or amici before this Court.

## B. Rulings Under Review

The ruling under review is the district court's June 10, 2025 judgment in Case No. 1:23-cr-00177-ABJ-1. A79-A85.

## C. Related Cases

Counsel is aware of no related cases as contemplated by Circuit Rule 28(a)(1)(C).

**TABLE OF CONTENTS**

Page

CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES ..................................................................................i

TABLE OF AUTHORITIES ...........................................................................v

GLOSSARY....................................................................................................ix

INTRODUCTION ..........................................................................................1

JURISDICTIONAL STATEMENT ...............................................................3

STATEMENT OF THE ISSUES.....................................................................3

STATUTES ....................................................................................................4

STATEMENT OF THE CASE........................................................................4

I.      Factual Background ............................................................................4

        A.      Lamond's Service and Intelligence Assignment...................5

        B.      Before Election Day, Tarrio Was a Known Source of
                Intelligence ...........................................................................6

        C.      After Election Day, Lamond Continued To Obtain and
                Relay Information...................................................................7

        D.      Lamond Assisted the Banner-Burning Investigation ...........9

        E.      Tarrio's Arrest Warrant, Travel, and January 4 Arrest .......12

        F.      Lamond's June 2, 2021 Interview ........................................15

II.     Procedural Background ....................................................................18

SUMMARY OF ARGUMENT ....................................................................20

ARGUMENT ...............................................................................................22

I. Lamond Must Be Acquitted of Obstruction Because § 22-722(a)(6) Does Not Cover a Pre-Charge Police Investigation ......................22

    A. The Issue Is Preserved and Warrants De Novo Review ......................22

    B. Section 22-722(a)(6) Reaches Only Obstruction of a Judicial or Similarly Adjudicative Proceeding ......................24

    C. The Trial Record Confirms the Absence of Any Covered Proceeding ......................28

II. Count 1 Separately Fails Because Internal MPD Policies Cannot Supply Corrupt Intent ......................33

    A. "Corruptly" Is a Significant, Proceeding-Directed Mens Rea—Not an Internal-Compliance Standard ......................33

    B. The District Court Used MPD Policies as the Proof of Corrupt Intent ......................35

    C. The Remaining Evidence Does Not Prove Corrupt Intent Beyond a Reasonable Doubt ......................37

III. Counts 2 and 3 Fail Because the Charged Phrases Are Too Indeterminate To Support § 1001 Convictions ......................42

    A. The Government Must Prove Both a Determinate Meaning and Falsity in That Meaning ......................43

    B. Count 2 Fails Because "[M]ore, You Know, One-Sided" Was a Hedged Characterization, Not a Determinate Factual Denial ......................44

    C. Count 3 Fails Because "Without Tipping Him Off" Is a Subjective, Judgment-Laden Description of Lamond's Aim, Not a Precise Factual Denial ......................49

IV. Count 4 Rests on Speculation, Not Proof Beyond a Reasonable Doubt ......................53

V.      In the Alternative, Reversal of Count 1 Requires Vacatur of
        Counts 2 Through 4 ...................................................................................58

CONCLUSION..................................................................................................59

CERTIFICATE OF COMPLIANCE

ADDENDUM

**CASES**

\* *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005)............................34, 41

*Blair-Bey v. Quick*, 151 F.3d 1036 (D.C. Cir. 1998)...............................................27

\* *Bronston v. United States*, 409 U.S. 352 (1973)..................................43, 44, 47, 49

\* *Brown v. United States*, 89 A.3d 98 (D.C. 2014) .................................................31, 32

*Chicago Council of Laws. v. Bauer*, 522 F.2d 242 (7th Cir. 1975)........................26

\* *Decuir v. United States*, 285 A.3d 512 (D.C. 2022)............................................31, 32

*Ditto v. McCurdy*, 510 F.3d 1070 (9th Cir. 2007) ....................................................24

*Doe v. Burke*, 133 A.3d 569 (D.C. 2016) ................................................................27

\* *Elonis v. United States*, 575 U.S. 723 (2015) ........................................................34

\* *Fischer v. United States*, 603 U.S. 480 (2024) ......................................................34

*Jackson v. Virginia*, 443 U.S. 307 (1979)................................................................22

*Jennings v. United States*, 351 A.3d 1075 (D.C. 2026).............................................32

*Mason v. United States*, 170 A.3d 182 (D.C. 2017) ...............................................28

*McDonnell v. United States*, 579 U.S. 550 (2016) ..................................................20

*Meiggs v. Associated Builders, Inc.*, 545 A.2d 631 (D.C. 1988)............................24

*Mitchell v. District of Columbia*, 741 A.2d 1049 (D.C. 1999)...............................24

*People v. Cepeda*, 851 F.2d 1564 (9th Cir. 1988) ...................................................58

Authorities principally relied upon are designated by an asterisk (\*).

*Pilon v. DOJ*, 73 F.3d 1111 (D.C. Cir. 1996)................................................24

*Pugin v. Garland*, 599 U.S. 600 (2023).......................................................24

*Smith v. United States*, 68 A.3d 729 (D.C. 2013).......................................34

\* *United States v. Aguilar*, 515 U.S. 593 (1995) ..........................25, 31, 34

*United States v. Baker*, 494 F.2d 1262 (6th Cir. 1974) ..................... 34-35

*United States v. Burroughs*, 810 F.3d 833 (D.C. Cir. 2016) ......................23

*United States v. Campos*, 137 F.4th 840 (D.C. Cir. 2025) ........................23

*United States v. Cohen*, 301 F.3d 152 (3d Cir. 2002).................................30

\* *United States v. Davis*, 183 F.3d 231 (3d Cir. 1999)........................25, 30

*United States v. Dorman*, 860 F.3d 675 (D.C. Cir. 2017) .........................53

\* *United States v. Gaskins*, 690 F.3d 569 (D.C. Cir. 2012)....................4, 53

\* *United States v. Harra*, 985 F.3d 196 (3d Cir. 2021) .........................44, 48

\* *United States v. Jones*, 713 F.3d 336 (7th Cir. 2013).................50, 53, 54

*United States v. Landau*, 737 F. Supp. 778 (S.D.N.Y. 1990)....................45

\* *United States v. Lighte*, 782 F.2d 367 (2d Cir. 1986)..............................43

*United States v. Martellano*, 675 F.2d 940 (7th Cir. 1982).......................44

*United States v. Milton*, 8 F.3d 39 (D.C. Cir. 1993)..................................43

*United States v. North*, 910 F.2d 843 (D.C. Cir.), *op. withdrawn and superseded in part on reh'g*, 920 F.2d 940 (D.C. Cir. 1990) ......................................................................................26, 35

*United States v. Pelullo*, 14 F.3d 881 (3d Cir. 1994)................................59

*United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991)...................34

*United States v. Razzaia*, 370 F. Supp. 577 (D. Conn. 1973)....................................45

*United States v. Reveron Martinez*, 836 F.2d 684 (1st Cir. 1988).....................43, 44

*United States v. Robertson*, 610 F. Supp. 3d 229 (D.D.C. 2022) ...........................26

*United States v. Rose*, 215 F.2d 617 (3d Cir. 1954) ...............................................57

*United States v. Sarwari*, 669 F.3d 401 (4th Cir. 2012) .........................................44

*United States v. Scott*, 705 F.3d 410 (9th Cir. 2012) ..............................................23

*United States v. Serafini*, 167 F.3d 812 (3d Cir. 1999) ......................................47, 50

*United States v. Shmuckler*, 792 F.3d 158 (D.C. Cir. 2015)....................................33

*United States v. Simmons*, 591 F.2d 206 (3d Cir. 1979).........................................25

*United States v. Simpson*, 813 F.2d 1462 (9th Cir. 1987) ......................................38

*United States v. Sitzmann*, 893 F.3d 811 (D.C. Cir. 2018)............................... 22-23

\* *United States v. Smith*, 729 F. Supp. 1380 (D.D.C. 1990) ..............................26, 31

*United States v. Strohm*, 671 F.3d 1173 (10th Cir. 2011) ............................... 43-44

*United States v. Vasquez*, 899 F.3d 363 (5th Cir. 2018)..........................................23

*Webb v. United States*, 318 A.3d 502 (D.C. 2024)..................................................28

\* *Wynn v. United States*, 48 A.3d 181 (D.C. 2012)............... 23, 24, 27, 28, 29, 31, 35

**STATUTES AND RULES**

18 U.S.C.:

§ 1001......................................................... 2, 3, 18, 21, 42, 43, 49, 52, 55, 57

§ 1503.............................................................................................25, 26

§ 1503(a) ...................................................................................20, 24

§ 1505 ...............................................................................................26

§ 1512(c)(2) ......................................................................................26

§ 3231 .................................................................................................3

28 U.S.C. § 1291 ........................................................................................3

D.C. Code:

§ 22-721 ............................................................................................27

§ 22-721(3) .......................................................................................27

§ 22-721(4) .......................................................................................27

§ 22-722 .....................................................................................25, 28

§ 22-722(a)(4) .............................................................................27, 28

§ 22-722(a)(6) ............... 1, 3, 18, 19, 20, 22, 24, 26, 27, 28, 31, 32, 33, 37, 42

§ 22-723 ............................................................................................28

§ 22-723(a) ........................................................................................28

Fed. R. Crim. P. 29 .................................................................................50

## OTHER MATERIALS

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* (5th ed.) .................................................................................23

# GLOSSARY

MPD                                   D.C. Metropolitan Police Department

NYPD                               New York Police Department

# INTRODUCTION

For decades, the Supreme Court has refused prosecutors' attempts to turn obstruction and false-statement statutes into free-floating bans on disfavored conduct or a catchall criminal code. Obstruction charges require the government to prove a nexus to a proceeding covered by the statute. And false-statement law punishes falsehood, not imprecision.

Shane Lamond's convictions cross those lines. Lamond was an intelligence lieutenant with the D.C. Metropolitan Police Department ("MPD"). He was responsible for learning militant groups' plans and preventing violence, and he used Enrique Tarrio, the chairman of Proud Boys, as one of his sources, with his supervisor's full knowledge and support. Developing and maintaining that relationship required give-and-take.

To convict Lamond, the government recast that give-and-take as felony obstruction. But the government never showed interference with a judicial proceeding when it charged Lamond with a violation of D.C. Code § 22-722(a)(6), which reaches only corrupt obstruction of "the due administration of justice in any official proceeding." The government pointed only to purported obstruction of MPD's investigation into Tarrio's burning of a political banner. Lamond's conviction required expanding a targeted obstruction statute into a general police-investigation statute and rested on conjecture about what judicial process might

follow, flying in the face of decades of safeguards the Supreme Court has erected around obstruction statutes.

The district court also made internal MPD policies do the work of criminal mens rea. Although it acknowledged those policies lacked the force of law—and Lamond was not on trial for violating them—it relied on them as proof Lamond acted "corruptly." That collapsed workplace violations into felonies. At most, Lamond improperly handled a difficult source under internal MPD rules. But internal policy is not criminal law, and tradecraft lapses do not prove the nexus or mens rea that obstruction requires.

The false statement counts rest on the same overreach. Months after Tarrio was arrested for the banner-burning, agents conversationally interviewed Lamond about his relationship with Tarrio. The government took two indeterminate phrases from that discussion—"more ... one-sided" and "without tipping him off"—assigned them rigid meanings never otherwise supplied or established, and (in Counts Two and Three) charged Lamond with violating 18 U.S.C. § 1001. The court then rewrote his answers to convict, recognizing the questioning never achieved the clarity the statute requires. Those convictions cannot stand. Nor can the final false-statement count, which rests on inference-stacked-on-inference that Lamond told Tarrio his arrest warrant had been signed.

Lamond may fairly be criticized for his handling of Tarrio during a volatile period in Washington. But the charged statutes do not convert every imprecise interview answer or questionable judgment call into a felony. The Court should reverse with instructions to enter a judgment of acquittal and/or vacate the convictions.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. § 3231. After a bench trial, the court entered judgment against Lamond on June 10, 2025. *See* A79-A85. Lamond timely filed a notice of appeal on June 24, 2025. A86. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Whether D.C. Code § 22-722(a)(6), which prohibits obstruction of "the due administration of justice in any official proceeding," applies to a pre-charge police investigation with no pending judicial proceeding.

2.      Whether the district court erred by treating violations of internal MPD General Orders—rules it acknowledged lack the force of law—as proof of "corrupt" intent.

3.      Whether the charged statements in Counts 2 and 3—"one-sided" and "without tipping him off"—were too indeterminate for conviction under 18 U.S.C. § 1001.

4. Whether the circumstantial evidence the district court relied on for the Count 4 conviction was too speculative to prove guilt beyond a reasonable doubt.

5. Whether reversal of Count 1 requires vacatur of Counts 2 through 4 because the district court's findings rested on the obstruction theory.

## STATUTES

Pertinent statutes appear in the addendum to this brief.

## STATEMENT OF THE CASE[1]

### I. Factual Background

This case turns on a professional intelligence relationship that MPD knew about, used, and benefited from in managing volatile political demonstrations. Shane Lamond was the MPD officer responsible for learning where politically charged groups would gather and what they planned. One of his regular contacts was Enrique Tarrio, national chairman of Proud Boys, a right-wing militant organization. That relationship was no secret. Chief Jeffrey Carroll knew about it. Lamond's direct supervisor, Director Carolyn Montagna, knew about it. And other law-enforcement agencies knew about it. From July 2019 through January 2021, they regularly asked Lamond to gather information about demonstrations from Tarrio. Lamond did so, seeking information from Tarrio and passing it to supervisors and partner agencies.

---

[1] This Statement reflects the trial evidence in the light most favorable to the government. *United States v. Gaskins*, 690 F.3d 569, 577 (D.C. Cir. 2012).

4

### A. Lamond's Service and Intelligence Assignment

Lamond was a decorated law-enforcement officer: a six-year Air Force veteran, a 23-year MPD veteran, and a lieutenant since 2009. A1059; A1061; A1434. By 2020, he led MPD's Intelligence Branch. A1059-A1062, A1129. His work focused on First Amendment activity—gathering information about demonstrations, so MPD and partner agencies could know who was coming to D.C. and where conflict might arise. A1063-A1066. That work grew more urgent by late 2020 as D.C. saw increased demonstrations, street violence, and election-related unrest. A608; A1070, A1081-A1082; A1582, A1585, A1594.

Lamond first contacted Tarrio in July 2019, after Tarrio raised security concerns about threats to Proud Boys. They agreed that Tarrio would alert Lamond when Proud Boys visited Washington so police could prepare for counterdemonstrations. A1663-A1664.

Lamond did not hide the relationship from Carroll, Montagna, or others in MPD. *See, e.g.*, A1581, A1585, A1593; A275, A392-A393; A1656-A1657. Other officers knew Lamond had "a source at PB" and asked him to share what he learned. A538-A542; A1573, A1612. The government introduced no evidence that any supervisor told Lamond to stop meeting with Tarrio, register him as a source, or log his communications—even though MPD General Orders may have required such steps. *See, e.g.*, A1543; A1557.

## B. Before Election Day, Tarrio Was a Known Source of Intelligence

Lamond would ask Tarrio when, where, and how many Proud Boys would gather and whether clothing, colors, or other identifiers could help MPD monitor and separate groups. Lamond would then relay that information to his supervisors and law-enforcement partners, including Park Police, the Secret Service, and Virginia State Police. The record contains over 30 instances where Lamond obtained information about Proud Boys' activities from Tarrio. *See generally* A1564-A1618.

The relationship always involved give-and-take. From 2019 to 2020, Lamond repeatedly asked Tarrio whether Proud Boys planned to attend upcoming events and for details about their attendance. *See*, *e.g.*, A1565-A1567. In return, Lamond ensured coverage of Proud Boys events, dispatched detectives to follow up on alleged crimes against members, and occasionally provided pertinent information regarding their activities. *See*, *e.g.*, A1565.

As an example of this give-and-take, in July 2020 during the George Floyd protests, Tarrio sent coordinates for Harry's, a Proud Boys gathering spot, and told Lamond they were meeting there.[2] A374; A1569. Lamond later told Tarrio that

---

[2] Tarrio sent those coordinates via Telegram on July 3, 2020, making it the first Telegram message between Tarrio and Lamond—contrary to the district court's determination that the "first use [of Telegram] was by Lamond, in July of 2020." A1569; A1381.

Harry's had received an "ABC [alcohol beverage control law] violation" and that he would find out about any sanctions. A375; A1569; A1349.

This relationship was known, valuable, and important for public order. In October 2020, Lamond identified Tarrio to an NYPD counterpart as his source for information about a planned rally; the officer complimented, "Definitely a Great Source my Man." A1574-A1575; A1656-A1657. During election week, Lamond reported a Proud Boys protest to Montagna, passed information from Tarrio to NYPD about Proud Boys' activities near polling sites, and, after multiple Proud Boys were stabbed, told Tarrio that detectives were working on a BOLO ("be-on-the-lookout") and pulling security footage. A1580-A1582.

### C. After Election Day, Lamond Continued To Obtain and Relay Information

The government did not charge Lamond's pre-election communications with Tarrio as obstruction. Instead, it alleged the relationship changed "at least as of November 7th," when "the flow of information changed from a one-way road to a two-way street" and Lamond became a "double agent." A144-A145. Yet Lamond's communications before and after the election never changed.

On November 7, 2020, after officers heard that Proud Boys were using Parler (a social media platform) to mobilize, Lamond offered to go "straight to the source." Separately, Ben Tyler, a Virginia State Police officer, suggested that Lamond contact

Tarrio, and Lamond reported back that Proud Boys had nothing planned in Washington and were not coming "as of yet anyway." A1584; A1656-A1657.

Over the next several weeks, Lamond continued gathering intelligence from Tarrio. Tarrio estimated that 150-200 Proud Boys would attend the Million MAGA March, and Lamond relayed that estimate to Virginia State Police. A1585-A1588. On November 14, Chief Carroll asked Lamond to confirm when Proud Boys were leaving town and whether they planned to attend an event with an activist; Lamond reported that he had "just talked to" Tarrio and that they were not attending. A1589. On November 17, December 7, and December 9, partners asked Lamond to check with Tarrio about upcoming events, which he did. A1589-A1592.

Lamond told Tarrio that he kept messaging because "the more details we have . . . the better we can plan to keep separation between the groups." A1587. The same pattern continued before Tarrio burned the banner on December 12. On December 11, Tarrio told Lamond that Proud Boys would brief at the National Mall and then march from a hotel; minutes later, Lamond sent that to an MPD leadership thread including Carroll and Montagna, and shared it with Park Police. A1592. On December 12, before the banner-burning, Lamond asked where Proud Boys were headed and forwarded Tarrio's answer internally, identifying it as "[f]rom ET." A1593.

### D.   Lamond Assisted the Banner-Burning Investigation

On December 12, Tarrio and other Proud Boys tore down a Black Lives Matter banner from a church and burned it in the street. The incident was recorded and quickly went viral. MPD assigned Detective Ashan Mufti as lead investigator. A1323; A156, A158. Mufti testified he was to identify a suspect, develop probable cause, and obtain an arrest warrant. A158-A161.

Before Lamond discussed the banner-burning with Tarrio, the FBI announced they were investigating it as a hate crime.[3] A1594-A1595; A560. The evening of the 13th, Lamond and Tarrio exchanged messages about the prior night's violence and complaints against Harry's, a bar frequented by Proud Boys. The two did not discuss the banner-burning. A1595. When Tarrio asked about the "general consensus" within MPD, Lamond suggested that they speak in person. A1595.

On December 15, Lamond met Tarrio at the Dubliner. The day before, he told Montagna, "I know what happened" and "I'm having drinks with ET tomorrow afternoon to discuss some things with him." She asked whether that was "smart," but gave assent. A1596. That afternoon, Chief Carroll asked whether Proud Boys planned to attend the inauguration. Lamond replied that he was meeting Tarrio in person and would confirm. After the meeting, Lamond reported that Tarrio said

---

[3] Lamond had no role in deciding whether the misdemeanor would carry a hate-crime enhancement. A534; A1167-A1169.

Proud Boys were not planning to attend. Carroll also asked whether Tarrio could identify people shown in flyers of the banner-burning. Lamond stated that Tarrio claimed not to recognize them. A1596-A1597.

On December 18, Tarrio claimed responsibility for the banner-burning across media. *See* A1598; A1563 (Parler); A1519 ("War Boys" podcast); A1518-A1521, A1560-A1562 (*Washington Post/DCist*). And a Crime Solvers tip also identified Tarrio as responsible. A1598.

When Lamond's supervisor forwarded the tip that morning, Lamond responded, "Yes! Remember what he told me?"[4] A1598. He then asked Tarrio whether he had called in the tip. Tarrio answered, "I did more than that. Its [sic] on my social media." A1599. Lamond emailed Commander Parsons, Captain Hong, and others that Tarrio had "just publicly admitted" responsibility. A1600; A1656-A1657. He also emailed Montagna and Parsons about the tip, attached Tarrio's picture, and wrote, "Please let me know if you need anything related to this. I know him so I can probably fill in any blanks you may have." A1600.

---

[4] The district court found Tarrio had "confessed" to Lamond based on a message Tarrio sent on December 15 alleging he admitted the banner-burning to an officer. A1363-A1366; A1597. It did not address Lamond's contemporaneous message to his supervisor or do more than acknowledge that Tarrio may not have "straight up confess[ed]" and may have qualified his account: "Well, if I was there, this is what happened[.]" A1368-A1369.

On December 19, after Detective Franklyn Then requested Tarrio's phone number, Lamond asked Tarrio for a good number but did not wait for a response; he emailed Detective Then with Tarrio's date of birth, phone number, and images. A1106-A1107; A1603-A1604. At this time, Lamond was informed about the possibility of a major protest occurring on January 6. He immediately asked Tarrio, "Is this legit," if Proud Boys would attend, and relayed both answers to his superiors. A1602-A1603.

Separate from MPD, Miami police reached out to Tarrio about the banner-burning. A1604.

No officer messaged Tarrio until December 21—two days after Lamond had provided Tarrio's phone number. Tarrio invoked his rights, and Mufti documented that exchange in the warrant materials he submitted for review that same day. A172-A173; A1605-A1606; A1516.

While Mufti waited to contact Tarrio, Lamond helped identify him. On December 20, Commander Parsons asked whether Lamond could identify Tarrio in a photograph from the banner-burning. Lamond first said he could not do so with "100% certainty" from that image alone because the full face was not visible. After reviewing more photographs and video, he stated, "I believe this is ... Tarrio

11

kneeling down next to the banner."[5] A1494; A1604. Lamond also identified Tarrio's voice from a podcast. A1498; A1606.

### E. Tarrio's Arrest Warrant, Travel, and January 4 Arrest

The warrant process developed while Lamond maintained contact with Tarrio and relayed information to law enforcement. On December 25, Lamond sent a message central to the government's obstruction theory: "CID had me ID you *from a photo you posted on Parler* kneeling down next to the BLM banner so they may be submitting an arrest warrant to US Attorney's Office." A1607 (emphasis added). The message was sent *five days* after Lamond identified Tarrio, and *four days* after Mufti submitted the warrant for review, with a hate-crime designation. A1503, A1536.

On December 28, Tarrio booked a January 4 flight to Washington and told an associate, "I have a feeling DC Metro is going to pick me up at the airport." A1607. The next day, Lamond told Ben Tyler that, per Tarrio, Proud Boys were planning to attend the January 6 protest and that an arrest warrant for Tarrio was pending. A1607-A1608.

---

[5] The court did not find the photo was clear enough to support an identification; it instead relied on Tarrio's supposed prior confession to Lamond. A1431.

A judge signed the warrant on December 30. A1609. Shortly afterward, Tarrio texted, "My contact just called me," and the "DA hasn't signed it yet." A1609; A1337. That same day, Lamond circulated that January 6 participants appeared to be changing their tactics in the lead-up to the protests. A1608.

By the evening of December 31, the district court found that Lamond knew the warrant was signed. A1376-A1377. Later that evening, Chief Carroll requested Lamond's help facilitating Tarrio's arrest. A436-A438; A1610. On January 1, Lamond texted U.S. Capitol Police that MPD had obtained a warrant for Tarrio. A1610.

Because the warrant was for a misdemeanor, it was non-extraditable. A613-A614. MPD therefore could not arrest Tarrio unless he entered D.C. Relying on Lamond's information that Tarrio planned to come to the city for the January 6 protest, MPD "devise[d] a plan" to "get him into custody the moment he stepped foot . . . into the District." A1607; A613-A614.

Because Lamond had not informed Tarrio there was a signed arrest warrant, let alone one submitted with a hate-crime designation, Tarrio still flew to Washington. As his messages show, Tarrio did not believe the warrant had been signed: he told one associate the "DA hasn't signed it yet," and when asked for an update he said, "They can't sign it till [January 4]"; on January 2 he told another, "Won't know until I land." A1609, A1612-A1613.

13

Simultaneously, MPD was working to locate Tarrio's flight. Commander Haines asked Lamond for flight information. Lamond said he did not know the specific flight but understood Tarrio would fly into Reagan National Airport on January 4. After TSA provided him information, Lamond forwarded it to Chief Carroll, Commander Parsons, and Haines. A1612-A1613. Carroll and Haines testified that this helped them execute the arrest plan. A616-A617; A672-A673. On January 4, after Tarrio missed his first flight and rebooked, Lamond told Ben Tyler that Tarrio's arrival had shifted and that MPD would be "picking him up as soon as he enters the city." A1614.

Tarrio's flight left Miami at 12:55 p.m. A1613-A1614. At 1:02 p.m., Lamond opened the parties' Telegram communications and shortened the retention limit from 30 seconds to 10 seconds. A1614; A1336-A1338. During the flight, Tarrio messaged associates that the "[w]arrant for my arrest was just signed," but remained unaware of MPD's arrest plan, speculating that police might arrest him on stage at the January 6 rally. A1614. MPD instead arrested Tarrio after he landed and entered D.C. A511. Although Tarrio purportedly knew about the arrest warrant, MPD found him carrying illegal firearm magazines, a felony offense. A461-A462; A680-A681. After his release on January 5, Tarrio told associates that "[h]e texted me in the air," without specifying who. A1338.

Even after Tarrio's arrest, Lamond continued to plumb him for information. After the January 6 riots, Lamond messaged Tarrio: "I need you to be totally honest with me. Are there any plans for PB to be in DC anytime between January 16-20?" A1616. And throughout January, Lamond continued pressing Tarrio whether Proud Boys planned to attend future events in D.C. A1615-A1618.

### F.      Lamond's June 2, 2021 Interview

Six months later, Special Agents Bryan Molnar and Sean Ricardi interviewed Lamond. Molnar said they had information that Tarrio and others "[m]ay have been getting information that they shouldn't have had," so they were trying to determine "who talked to who." He added that other agencies suggested speaking with Lamond because he had been running MPD intelligence. A1659-A1661.

Lamond immediately acknowledged the relationship: "Well me, definitely. So he was a source—. . . [Tarrio] was a source of mine." A1661. Lamond also acknowledged that he had never formally registered Tarrio as a source or documented their communications, but his chain of command knew about the relationship. A1665; A1673.

The interview was conversational. Molnar asked about Lamond's job, how the Tarrio relationship worked, whether Tarrio would "fish" for information, what happened during the banner-burning period, and, later, the warrant and arrest plan. The three § 1001 counts came from those exchanges.

Count 2 was based on a question near the end of a discussion about Tarrio and January 6. A37 (¶ 76). After Lamond informed Molnar that Tarrio never really spoke about January 6, he also stated, "I think he started giving me some misinformation." A1674. Molnar then asked, "How do your interactions with him work? Like, do you see him as someone who would potentially be able to socially engineer?" A1674.

Lamond responded by discussing January 6 (for three transcript pages), and Molnar repeated the question: "Yes. So when he would reach out and ask questions—when he would be engaging, would he be—would it be common for him to fish?" A1678. Lamond answered:

> No, not really. He never really asked me questions about, like, you know what we were doing or anything. It was more, you know, one-sided with just him telling me, you know, what their plans were.

Lamond continued Tarrio "would normally tell me, like, where he was planning on staying at. And it was kind of a back door conversation so I could let our, like, SOD know." A1678. Molnar never clarified the period, what he meant by "fish," or what Lamond meant by "one-sided."

Count 3 was based on a question about the period between the banner-burning and January 4. A38 (¶ 78). After asking whether Lamond registered Tarrio as a source, Molnar asked whether Lamond talked to Tarrio between the banner-burning and his arrest, adding: "What were those conversations like? Were [sic] he prepping you for what was coming . . . ?" Lamond responded:

16

That was part of it, and the other part was I was trying to find out without tipping him off to the MPD investigation. So we had some still photos of him being as part of the rally, but we didn't have any, like, confirmation that he was the one who burned the banner.

A1667.

When Molnar said Tarrio had publicly admitted to burning the banner before meeting with Lamond, Lamond corrected him.

AGENT MOLNAR: . . . [T]he guy gets on the radio and does an interview and he's like, yeah, I did it, and they can come get me. And then you talked to him and it was—

MR. LAMOND: Well, it was actually before that when he went there. Because he was very noncommittal when I first talked to him about . . .

AGENT MOLNAR: Oh, so you talked to him before the interview?

MR. LAMOND: Yes, and he said, you know, *hypothetically*, you know, *if I was there*, but he would never commit.

A1669 (emphasis added).

Molnar never clarified his questions or requested further details on Lamond's answer. Ricardi later acknowledged that neither agent clarified what "tipped off" meant or asked Lamond what he meant. A758-A761, A768-A769.

Count 4 was based on a discussion about the warrant. A38 (¶ 80). Molnar asked whether MPD decided to arrest Tarrio "without him knowing or to try to get him to turn himself in." A1670. Lamond answered that another department made that decision and said, "[B]ut I know that I didn't, you know, inform him that he had an arrest warrant." A1670-A1671.

## II. Procedural Background

A grand jury returned a four-count indictment against Lamond on May 18, 2023. Count 1 charged obstruction of justice under D.C. Code § 22-722(a)(6), alleging that between December 13, 2020, and January 4, 2021, Lamond obstructed and impeded "the investigation and prosecution" of Tarrio's misdemeanor property offense. Counts 2 through 4 charged false statements under 18 U.S.C. § 1001 based on Lamond's interview statements. A23-A39.

At the bench trial, the government relied on Lamond's Telegram messages with Tarrio, his interview, and testimony that his communications with Tarrio—as well as his use of Telegram and his documentation and message-retention practices—violated MPD General Orders and the MPD Code of Ethics. The government did not call Molnar. At the close of the government's case, the defense moved for a judgment of acquittal, arguing that § 22-722(a)(6) does not reach a pre-charge police investigation and that the evidence was insufficient on all counts. A861-A886. The court reserved ruling. A886. Lamond renewed the motion after the defense case and again post-verdict. A1229-A1230; A1387.

The district court found at the outset of the verdict that there was "no suggestion" that Lamond personally benefited from the alleged conduct. A1315-A1317.

The court then addressed the acquittal motion. It rejected the defense's argument that the charged MPD investigation was not covered within the meaning of D.C. Code § 22-722(a)(6). On the merits, the court reasoned that the banner-burning investigation was a high-profile investigation by MPD with warrant applications submitted in preparation for a future prosecution, and therefore was a proceeding covered by the statute. A1318-A1329.

The court also addressed MPD's General Orders and code of ethics. It emphasized that Lamond was not on trial for violating the General Orders and that it was not necessary to find whether he violated them. But the court held that their existence bore on whether he made false statements knowingly and willfully and on whether he acted knowingly and corruptly for Count 1. A1331-A1333. The court then rejected Lamond's insufficiency arguments for all counts. A1338, A1359-A1360, A1362-A1363.

The court found Lamond guilty on all four counts. On Count 1, it found he obstructed the banner-burning investigation by withholding Tarrio's alleged confession at the Dubliner and giving Tarrio information about the investigation. A1362-A1369, A1374-A1378. On Count 2, it found Lamond's "one-sided" statement was knowingly false because Lamond's communications showed information flowing from Lamond to Tarrio from July 2020 onward. A1346-A1350. On Count 3, it found Lamond's "without tipping him off" statement was false

19

because Lamond had provided information about the investigation and warrant process to Tarrio. A1359-A1362. On Count 4, it relied on circumstantial evidence to find that Lamond told Tarrio the warrant was signed on Tarrio's January 4 flight. A1336-A1346, A1376-A1378.

The court imposed 18 months' imprisonment on Count 1 and six months on each of Counts 2, 3, and 4, with the false-statement sentences consecutive with one another but concurrent with Count 1. A1440-A1442.

## SUMMARY OF ARGUMENT

Lamond's convictions have two core defects: the obstruction statute does not reach the charged conduct, and the false-statement convictions rest on ambiguous and speculative statements. Nor is the evidence sufficient for conviction on any count.

**Obstruction of justice.** An anti-obstruction statute "that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter." *McDonnell v. United States*, 579 U.S. 550, 576 (2016). The district court chose the meat axe, creating two separate legal errors.

*First*, D.C. Code § 22-722(a)(6) does not reach interference with a police investigation. Obstruction of "due administration of justice" has carried the same meaning since Congress enacted its federal analogue, 18 U.S.C. § 1503(a): obstruction of a judicial or similarly adjudicative proceeding. Because the charged

20

period predated any filed charges, pending case, or adjudicative proceeding, the government proved only interference with an investigation. Count 1 fails as a matter of law.

*Second*, the government proved no corrupt intent. The district court acknowledged that MPD General Orders lack the force of law and disclaimed putting Lamond on trial for violating them. Yet it treated those violations as central proof of consciousness of wrongdoing. Internal policy violations cannot prove the mens rea or nexus the obstruction statute requires. Without that policy framework, the remaining evidence does not prove corrupt obstruction beyond a reasonable doubt.

**False statements.** The false-statement convictions under 18 U.S.C. § 1001 are independently infirm. Counts 2 and 3 rest on imprecise phrases—"more, you know, one-sided" and "without tipping him off"—that admit multiple reasonable interpretations and cannot support a finding of knowing falsity. Count 4 fails because the government did not prove Lamond informed Tarrio a warrant had issued. The evidence showed warrant-related discussions, but not the content of any message on January 4. Stacking inference upon inference cannot replace proof beyond a reasonable doubt.

In the alternative, after reversing Count 1, the Court should vacate Counts 2 through 4 because the district court evaluated those counts through the erroneous obstruction framework.

21

**ARGUMENT**

**I.**   **Lamond Must Be Acquitted of Obstruction Because § 22-722(a)(6) Does Not Cover a Pre-Charge Police Investigation**

Lamond was convicted under a statute that does not reach the conduct charged. Section 22-722(a)(6) prohibits the corrupt obstruction of "the due administration of justice in any official proceeding," and both halves of that phrase carry independent meaning. The district court gave weight only to "official proceeding" and none to "due administration of justice," reasoning that the case involved a "high priority, high profile investigation" with contemplated warrant submissions. A1320-A1324. But that is a policy ruling unmoored from the text. Nothing in § 22-722(a)(6) turns on how important or deliberate an investigation is. The limiter is "administration of justice," which requires a judicial proceeding.

That error is dispositive. The charged period and the trial proof predated any judicial proceedings: no filed charging document, no pending case, no grand-jury proceeding, no indictment. Because the charged conduct is not a crime, no rational factfinder could convict. This Court should direct entry of a judgment of acquittal. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979).

**A.**   **The Issue Is Preserved and Warrants De Novo Review**

This Court reviews "legal determinations" and the "denial of a motion for judgment of acquittal *de novo*." *United States v. Sitzmann*, 893 F.3d 811, 821 (D.C.

22

Cir. 2018) (per curiam). Trial counsel preserved the issue. A861, A871-A875; A1229-A1230; A1318-A1319.

The government may contend Lamond waived this challenge by not filing a Rule 12(b)(3) challenge to the indictment. But the indictment charged obstruction of the "investigation *and* prosecution" of Tarrio's banner-burning. A37 (¶ 74) (emphasis added). Proof that Lamond interfered with a grand jury or with the later prosecution would have supported that charge. *See Wynn v. United States*, 48 A.3d 181, 189 (D.C. 2012) (grand-jury investigation "comfortably" fits the definition of "official proceeding"). Only after the government failed to prove any prosecution did Lamond's challenge become timely.

Even if the challenge was untimely, because the district court resolved the statutory question on the merits, A886; A1318-A1329, it "implicitly conclude[d] that there [wa]s adequate cause to grant relief from a waiver." *United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012); *see also* Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 194 (5th ed.).

At minimum, the Court can review for plain error.[6] *See, e.g., United States v. Vasquez*, 899 F.3d 363, 371-73 (5th Cir. 2018). And a conviction for conduct the

---

[6] This Circuit has not held that an untimely Rule 12(b)(3) challenge is waived absent good cause. *United States v. Burroughs*, 810 F.3d 833, 838 (D.C. Cir. 2016); *United States v. Campos*, 137 F.4th 840, 847 (D.C. Cir. 2025). If this Court determines the issue is waived, good cause exists because the district court reviewed

law does not criminalize is both plain error and "a miscarriage of justice." *Mitchell v. District of Columbia*, 741 A.2d 1049, 1052-53 (D.C. 1999); *Wynn*, 48 A.3d at 188 (vacating an erroneous § 22-722(a)(6) conviction under plain error).

**B.      Section 22-722(a)(6) Reaches Only Obstruction of a Judicial or Similarly Adjudicative Proceeding**

**1.**      The starting point with all exercises in statutory construction is "the text of the provision in question." *Pilon v. DOJ*, 73 F.3d 1111, 1118 (D.C. Cir. 1996). Subsection (a)(6) does not prohibit obstruction of an "official proceeding." It prohibits obstruction of "the due administration of justice in any official proceeding." That limiting phrase is not surplusage. "Due administration of justice" narrows the statute to proceedings in which justice is being adjudicatively administered.

That reading follows the phrase's settled pedigree. "Due administration of justice" is the signature phrase of the federal omnibus obstruction statute, 18 U.S.C. § 1503(a): "Whoever corruptly . . . obstructs, . . . or endeavors to . . . obstruct, . . . the due administration of justice." *Id.* When the D.C. Council borrowed that phrase, it borrowed the judicial construction. *Meiggs v. Associated Builders, Inc.*, 545 A.2d 631, 635 (D.C. 1988); *Pugin v. Garland*, 599 U.S. 600, 617, 626 n.10 (2023)

---

the issue on the merits. *See, e.g.*, *Ditto v. McCurdy*, 510 F.3d 1070, 1078 n.9 (9th Cir. 2007).

(Sotomayor, J., dissenting) (identifying § 22-722 as a state analogue to § 1503). And "[d]ue administration of justice" does not refer to "an investigation *simpliciter*"; a "pending judicial proceeding" is a "necessary prerequisite" to a conviction. *United States v. Davis*, 183 F.3d 231, 239 (3d Cir. 1999).

To convict under § 1503, "[t]he action taken by the accused must be with an intent to influence judicial or grand jury proceedings"; "it is not enough that there be an intent to influence some ancillary proceeding, such as an investigation independent of the court's or grand jury's authority." *United States v. Aguilar*, 515 U.S. 593, 599 (1995). Reaching that conclusion, the Court rejected the government's theory that "uttering false statements to an investigating agent . . . who might or might not testify before a grand jury" suffices. *Id.* at 600.

Nor does a future proceeding satisfy the statute: "[A]n endeavor to obstruct proceedings that did not exist would not violate the statute" because "obstruction can only arise when justice is being administered." *Id.* at 610 n.1 (Scalia, J., concurring in part and dissenting in part). Courts have been consistent that mere investigation by law enforcement is insufficient. *Davis*, 183 F.3d at 239 (Treasury Department investigation insufficient); *United States v. Simmons*, 591 F.2d 206, 208 (3d Cir. 1979) (FBI is not "administering justice").

Those principles govern here. If federal law requires a nexus to a judicial or grand-jury proceeding under § 1503, then D.C. Code § 22-722(a)(6)—which contains the same limiting phrase—cannot sensibly be read more broadly.

Moreover, this Circuit recognizes other obstruction statutes cover what § 1503 does not. The "companion statute," 18 U.S.C. § 1505, sweeps more broadly by reaching obstruction of "the due and proper administration of the law under which any pending proceeding is being had." *United States v. North*, 910 F.2d 843, 882 (D.C. Cir.), *op. withdrawn and superseded in part on reh'g*, 920 F.2d 940 (D.C. Cir. 1990); *see also United States v. Robertson*, 610 F. Supp. 3d 229, 232 (D.D.C. 2022) (18 U.S.C. § 1512(c)(2) reaches more broadly than § 1503 because it does not require a "court-like" proceeding).

The contrary theory has no limiting principle. If imminent arrest or a contemplated warrant were enough, then "almost by definition, anything a police officer does in investigating a case and making an arrest potentially affects an 'imminent' judicial proceeding." *United States v. Smith*, 729 F. Supp. 1380, 1385 (D.D.C. 1990) (rejecting § 1503 liability because "any offender aware of his imminent arrest and prosecution . . . could potentially be charged"). Courts have uniformly rejected this boundless construction. *See, e.g.*, *Chicago Council of Laws. v. Bauer*, 522 F.2d 242, 253 (7th Cir. 1975) ("The investigatory stage is not actually a part of the judicial process.").

The D.C. Court of Appeals reached the same conclusion in *Wynn*.[7] There, prosecutors charged three individuals with obstruction for hiding guns immediately after a shooting. The court rejected the charges. Although "official proceeding," in isolation, might be read broadly, "the due administration of justice in any official proceeding" is narrower and "used primarily, if not exclusively, to describe the proper functioning and integrity of a court or hearing." 48 A.3d at 190-91.

**2.** Section 22-721's statutory structure confirms the point. The D.C. Code does not treat all investigations alike. It separately defines "official proceeding" and "criminal investigation." *Compare* D.C. Code § 22-721(4), *with id.* § 22-721(3). Where the Council meant to address police investigations, it said so: § 22-722(a)(4) uses the term "criminal investigation"; subsection (a)(6) uses the more limited phrase "the due administration of justice in any official proceeding." The Court must honor that textual choice. *See Doe v. Burke*, 133 A.3d 569, 574 (D.C. 2016) ("Th[e] distinction between what the Council required in one of two companion provisions but not the other must be assumed to be deliberate[.]").

Only the distinction adopted in *Wynn* avoids surplusage and gives meaning to the entire statute. *See* 48 A.3d at 189-91. *Wynn* explains that, although the definition of "official proceeding" includes the word "investigation," the Council included the

---

[7] The Court must "follow interpretations of D.C. law by the D.C. Court of Appeals." *Blair-Bey v. Quick*, 151 F.3d 1036, 1050 (D.C. Cir. 1998).

term to reach *formal investigations*—such as those conducted by a grand jury or the Council—not ordinary police work. *Id.* at 189-90. That makes sense of the whole statute as § 22-722(a)(4) already addresses conduct affecting a "criminal investigation." The Council had no reason to use that separate term if subsection (a)(6) already covered the same conduct. *See id.* at 190-91.

Section 22-723(a) reinforces the distinction. It addresses tampering with physical evidence when an official proceeding "has begun" or is "likely to be instituted," without the narrowing phrase "due administration of justice." Thus, it extends much more broadly than § 22-722(a)(6). And the D.C. Court of Appeals has even described §§ 22-722 and 22-723 as "two complimentary halves." *Webb v. United States*, 318 A.3d 502, 505 (D.C. 2024); *see also Mason v. United States*, 170 A.3d 182, 191 (D.C. 2017) (an MPD investigation may qualify as an "official proceeding" for § 22-723, even though *Wynn* held the opposite for § 22-722). Reading § 22-722(a)(6) to cover any action during a police investigation would blur that line beyond recognition.

### C. The Trial Record Confirms the Absence of Any Covered Proceeding

The government proved, at most, interference with an MPD investigation. It introduced no evidence of a grand-jury proceeding, filed charge, or other adjudicative process during the charged period, and no evidence that Lamond obstructed Tarrio's prosecution after the January 4 arrest. Even the government's

fallback theory—that Lamond's conduct could have affected the later prosecution of Tarrio—rested solely on pre-charge acts potentially affecting a future case. That cannot establish the required judicial nexus.

1.      In closing, the government described Count 1 as obstruction of the "banner-burning investigation" and walked through Lamond's allegedly illicit acts. A1245-A1252. The government never mentioned a prosecution in its closing, let alone argued that Lamond obstructed Tarrio's. A1243-A1263. The verdict tracked the same theory, finding that Lamond withheld information from investigators and provided Tarrio information about what was happening "inside the investigation." A1362-A1385. The evidence and the verdict fail to identify any judicial or grand-jury proceeding during the charged period.

The dates confirm the point. The indictment and district court defined the charged period as December 13, 2020, through January 4, 2021. A37 (¶ 74); A1319-A1320. During that period, detectives were still investigating Tarrio. No witness and no exhibit identified a pending judicial or similarly adjudicative proceeding during that window, nor any actions Lamond took to interfere with such a proceeding.

2.      The district court's reasoning only underscores the error. It distinguished *Wynn* on the ground that this was a "high priority, high profile investigation," overseen at senior levels and directed toward obtaining warrants from the Superior Court. A1322-A1324. But that is the very theory the federal cases reject.

29

No case suggests that internal measures of "priority" determine whether a judicial proceeding is underway.[8] Nothing in the statute transforms pre-indictment police work into "the due administration of justice" based on subjective judgments about the investigation's importance and the likelihood of eventual judicial review.

*Davis* is especially instructive. There, the government argued that a wiretap investigation qualified as a "judicial proceeding" because it was subject to active judicial supervision. The Third Circuit disagreed: "[J]udicial supervision is not the test; the test is whether there is a judicial proceeding," and a wiretap order is "more like a search warrant than it is like a grand jury." 183 F.3d at 240.

So too here. An arrest warrant application may require presentation to a judge, but it remains an investigative step. It does not implicate the "due administration of justice" in an obstruction statute. *See United States v. Cohen*, 301 F.3d 152, 157-58 (3d Cir. 2002) (Alito, J.) (rejecting contention that a warrant application initiated a "judicial proceeding").

The district court also posited that the warrant presentation or later case against Tarrio would have been stronger had the judge known more about Lamond's communications. A1374-A1375. But failing to make a future case "stronger" is not

---

[8] The investigation Lamond allegedly obstructed concerned a misdemeanor property offense—which Tarrio publicly admitted to at least five times. The district court's approach would therefore sweep in virtually any investigation, no matter how minor.

the same as obstructing "the proper functioning and integrity of a court or hearing" already underway. *Wynn*, 48 A.3d at 191. A contemplated future prosecution does not implicate the present administration of justice. *Aguilar*, 515 U.S. at 600 (lying to an agent who "might . . . testify before a grand jury" insufficient for liability); *Smith*, 729 F. Supp. at 1385 (destruction of evidence before arrest insufficient for liability).

**3.** Contrary to the district court's conclusion, the two D.C. cases it invoked—*Brown v. United States* and *Decuir v. United States*—reinforce Lamond's position. A1326-A1328. Both involved defendants who knew a prosecution was already extant; both courts upheld convictions because the defendant's conduct threatened an existing judicial proceeding. Neither held that a pre-charge police investigation satisfies § 22-722(a)(6). In *Brown*, the defendant lied to detectives about a shooter's identity—but only after the shooter "had already been arrested" and a "pending criminal prosecution" was underway. 89 A.3d 98, 103 (D.C. 2014). Indeed, Brown "testified before a grand jury . . . investigating the shooting" the next day. *Id.* at 100. The court upheld the conviction precisely because Brown knew his lies "could obstruct or impede the due administration of justice in [that] official proceeding." *Id.* at 103. That reasoning confirms the limiting principle Lamond invokes: Once a prosecution is pending, lies to detectives can obstruct it. But *Brown*

did not hold—and its logic does not support—that actions taken during a pre-charge investigation alone suffice.

Like *Brown*, *Decuir* involved an existing prosecution—not a pre-charge investigation. There the defendant was already in jail on murder charges when he directed others to hide firearms from investigators. 285 A.3d 512, 522 (D.C. 2022).[9] The relevant proceeding was "a pending criminal case in the Superior Court," not a pre-charge investigation. *Id.* Neither *Brown* nor *Decuir* supports converting routine investigative work into the "due administration of justice."[10] Their logic points the other way: Obstruction can only occur once a prosecution exists.

The district court converted § 22-722(a)(6) into a broad prohibition on *any* (undefined) interference with *any* police investigation that may *eventually* result in charges. But that is not the statute the Council enacted. Before arrest, charges, a pending case, grand-jury empanelment, or a judicial proceeding, there is no "due administration of justice in any official proceeding" to obstruct. Count 1 fails as a

---

[9] The defendant only argued on appeal that the statute "[did] not apply to the concealment of physical evidence," a theory distinct from the argument here. 285 A.3d at 522.

[10] This year, the D.C. Court of Appeals again declined to follow the district court's reasoning. *Jennings v. United States*, 351 A.3d 1075, 1106 (D.C. 2026) ("declin[ing] to decide whether a person can be convicted of obstructing justice for interfering with a police investigation").

matter of law, and this Court should reverse and direct entry of a judgment of acquittal.

## II. Count 1 Separately Fails Because Internal MPD Policies Cannot Supply Corrupt Intent

Count 1 fails for an additional, independent reason. Even if the government had identified a covered proceeding, it did not prove that Lamond acted "corruptly" within the meaning of § 22-722(a)(6). The district court acknowledged that Lamond was "not on trial for the violation of MPD General Orders" and those rules do not "have the force of law." A1331, A1382. But it then treated violations of those rules as the principal proof of corrupt intent. That reasoning cannot sustain a felony conviction. "Corruptly" requires a culpable purpose to subvert the integrity of a protected proceeding—not a departure from workplace expectations. Without that policy proxy, the remaining evidence does not establish the required mens rea beyond a reasonable doubt.[11]

### A. "Corruptly" Is a Significant, Proceeding-Directed Mens Rea—Not an Internal-Compliance Standard

Section 22-722(a)(6) is not a workplace-integrity statute. It punishes corrupt obstruction. And courts have long treated "corruptly" as a critical limiter—not an

---

[11] Lamond preserved this sufficiency challenge. A861, A875. The standard of review is whether, "viewing the evidence in the light most favorable to the prosecution," any rational factfinder could find the essential elements beyond a reasonable doubt. *United States v. Shmuckler*, 792 F.3d 158, 161-62 (D.C. Cir. 2015).

invitation for open-ended judgments about professional propriety. The Supreme Court requires (1) a concrete nexus to the proceeding the statute protects, not an intent to influence some "ancillary" investigation, *Aguilar*, 515 U.S. at 599; and (2) culpability that reflects real criminal wrongdoing, not a free-floating improper purpose.

In *Arthur Andersen LLP v. United States*, the Court explained that "[o]nly persons conscious of wrongdoing can be said to 'knowingly . . . corruptly'" act. 544 U.S. 696, 706 (2005); *see also Elonis v. United States*, 575 U.S. 723, 736-37 (2015) (mental state must attach to "the crucial element separating legal innocence from wrongful conduct"). Similarly, in *Fischer v. United States*, the Court rejected an obstruction reading that would turn a targeted provision into a "coverall statute" sweeping in "prosaic conduct" and swallowing neighboring provisions. 603 U.S. 480, 496 (2024).

D.C. courts have applied the same principle, requiring an "intent to undermine the integrity of the pending [grand jury] investigation" in § 22-722(a)(6)—not just general misconduct. *Smith v. United States*, 68 A.3d 729, 734, 742 (D.C. 2013) (upholding conviction for false testimony *to the grand jury*). This Circuit, too, has insisted that "'corruption' [under § 1503] is something more specific than . . . 'any immoral method used to influence a proceeding.'" *United States v. Poindexter*, 951 F.2d 369, 382 (D.C. Cir. 1991); *accord United States v. Baker*, 494 F.2d 1262, 1265

(6th Cir. 1974) (a proceeding's existence does not "establish . . . any inference that the . . . proceeding was the focus" of the defendant's actions). As Judge Silberman aptly observed, an undisciplined construction of obstruction statutes would "convert all of Washington's office buildings into prisons." *North*, 910 F.2d at 942 (Silberman, J., concurring in part).

### B. The District Court Used MPD Policies as the Proof of Corrupt Intent

The verdict's structure reveals the error. After erroneously resolving the threshold *Wynn* question, the court turned to mens rea and used three categories of internal-policy violations to find that Lamond acted "knowingly and corruptly, with consciousness of wrongdoing." A1318-A1329, A1345-A1363.

*First*, the court invoked a General Order (A1542) forbidding officers from interviewing suspects or initiating inquiries into another officer's case without permission, and measured Lamond's communications with Tarrio against that rule. A1332-A1334, A1378-A1379, A1381. *Second*, the court relied on the MPD Officer Code of Ethics (A1555) requiring officers to keep information of a "confidential nature . . . secret unless revelation is necessary in the performance of [their] duty," emphasized that it uses "shall," and treated Lamond's sharing of information— photo-ID requests, discussion of a possible hate-crime enhancement, warrant-related information—as violations of that code. A1331-A1333, A1378-A1382. And *third*, the court leaned on General Order 601.02 (A1557), requiring preservation of

materials that "may constitute evidence," and Lamond's use of Telegram's auto-delete features as proof of "consciousness of wrongdoing." A1334, A1380, A1384.

That reasoning collapses an internal-discipline case into felony obstruction. Lamond's continued communications with Tarrio during Mufti's investigation may show poor tradecraft or even violations of MPD policy. But policy violations do not establish a criminal purpose to obstruct a covered proceeding. Nor can an ethics code supply the "unlawful means" or "wrongful purpose" needed to prove corrupt intent. An officer's awareness that conduct may violate a department manual is not the same as consciousness of criminal wrongdoing under the obstruction statute.

The court itself framed the dispositive question: "So the next element I have to find is did the defendant do this corruptly? How do we know beyond a reasonable doubt that he knew all this was wrong?" A1382. But it only pointed to evidence that certain of Lamond's conduct was "not permitted" by MPD. A1383. That is a workplace-violation finding, not a criminal one. At no point did the court connect those violations to a corrupt intent to obstruct a protected judicial proceeding—because the evidence does not permit that connection.[12]

---

[12] The court found that Lamond "went into the app and deleted the ongoing secret chat with Tarrio that he initiated." A1385. But Lamond did not first initiate the use of Telegram. A1569. Nor did the government provide evidence that it was even analyzing the same phone Lamond was using in January. A1294.

If an internal General Order could supply the "unlawful means" or "wrongful purpose" that makes conduct "corrupt," then the scope of a 3-to-30-year felony would turn on internal agency drafting choices. That is exactly the kind of vagueness and overbreadth problem that "corruptly" is supposed to prevent. And it would divorce the mens rea from what § 22-722(a)(6) protects—the integrity of a covered proceeding—and replace it with a question about whether an employee followed workplace rules.

### C. The Remaining Evidence Does Not Prove Corrupt Intent Beyond a Reasonable Doubt

The evidence does not establish corrupt intent beyond a reasonable doubt.

**1.** Lamond acted as an intelligence officer, not as a case detective. He cultivated contacts, gathered information about demonstrations, and passed that information along. Tarrio was a longtime contact, and much of the conduct the district court viewed as inherently suspicious post-banner-burning—maintaining rapport, using informal channels to communicate, and sharing police information—occurred throughout Lamond's relationship with Tarrio.

For instance, Lamond had:

- Assisted Tarrio after a Proud Boy was assaulted in November 2019. A1565.

- Used Telegram after Tarrio initiated a conversation there in July 2020. A374; A1569.

- Told Tarrio in July 2020 Harry's had received an alcohol violation. A1569; A1349.

- In November 2020, told Tarrio detectives were working on a BOLO and pulling security footage after Proud Boys were stabbed. A1580-A1582.

The General Orders may not have permitted that. Yet courts have understood intelligence work requires "win[ning] a suspect's confidence" and "overtures of friendship and trust" and officers "must enjoy a great deal of freedom in deciding how best to establish a rapport." *United States v. Simpson*, 813 F.2d 1462, 1466 (9th Cir. 1987). Lamond's professional judgment calls in an intelligence relationship his supervisors knew about are not proof of corrupt intent.

That relationship also existed against the backdrop of the volatile post-election period. Days before January 6, Lamond was circulating useful intelligence, including that participants were changing tactics, avoiding advance social-media posts, securing communications, and keeping a lower profile.[13] A1608. And there

---

[13] The district court said that "during [December] 18th to January 7th, a pretty critical time for the country, we're not seeing a lot of valuable intel being collected." A1380. The record contradicts that finding. For example:

- December 19: Lamond circulates information regarding "possible big demo on January 6th," and then informs Carroll and Montagna of Tarrio's response. A1602.

- December 22: Lamond circulates a list of right-wing extremists. A1606.

was "no suggestion" that Lamond personally benefited from the alleged conduct—contrary to the government's inflammatory claim Lamond was a "double agent." A144; A1315-A1317. Corrupt-intent obstruction cases ordinarily have the opposite—copious evidence of personal benefit.

**2.** Lamond advanced the banner-burning investigation. At Chief Carroll's request, Lamond questioned Tarrio to identify suspects. Lamond also circulated Tarrio's admissions, provided information used in the warrant, made a photo identification, and helped coordinate Tarrio's arrest.

That evidence is difficult to square with corrupt intent. If he was trying to help Tarrio avoid prosecution, Lamond could have refused to identify Tarrio, provided no information on Tarrio's flight, or told Tarrio MPD planned to arrest him when he entered D.C. Instead, Lamond helped make the arrest possible.

Nor is there evidence that Lamond's disclosures harmed or influenced the investigation, let alone the prosecution. The FBI had already announced that it was investigating the banner-burning as a possible hate-crime before Lamond and Tarrio discussed that issue. A1594-A1595; A560. Lamond's view whether the misdemeanor warranted a hate-crime enhancement was irrelevant: he had no

---

- December 29: Lamond shares that Proud Boys will attend the January 6 protests. A1607.

- January 1: Lamond shares that Proud Boys are not staying in Virginia for the January 6 protests. A1612.

authority over that charging decision, and Mufti submitted the warrant with a hate-crime designation anyway. A534; A1167-A1169; A1503, A1536.

The district court also emphasized that Lamond asked Tarrio for a good phone number after Detective Then requested Tarrio's contact information, reasoning that this deprived investigators of surprise. A1375. But Tarrio had already confessed publicly—"let me make this simple. I did it"—and Mufti waited two days to contact him, after Miami police had already contacted Tarrio. A1563. Tarrio still came to D.C. voluntarily, made no effort to evade arrest, was arrested without incident while carrying illegal firearm paraphernalia, and ultimately pleaded guilty. A569-A570; A1615.

**3.** The timeline undercuts corrupt intent. The district court found Lamond knew the warrant had been signed by December 31. A1376-A1378. Yet Tarrio said on January 1 that the warrant could not be signed until January 4. A1337-A1338, A1376-A1378. Meanwhile, Lamond was telling colleagues he might "lose [Tarrio] as a source soon" and was helping MPD obtain Tarrio's flight information for his arrest in D.C. A1610. If Lamond knew by December 31 that the warrant had been signed and intended to help Tarrio evade prosecution, why wait days, help coordinate the arrest, and only then supposedly reveal it after Tarrio was airborne? The court said it "need not" explain that inexplicable gap. A1362-A1363. That failure of proof requires reversal.

**4.** The court also overstated key facts. It inferred Tarrio confessed directly to Lamond from the December 15 Dubliner meeting. But Lamond told Agent Molnar that Tarrio "would never commit." A1669-A1670. Lamond's contemporaneous exchange with his supervisor reflected the same uncertainty. When Montagna sent the Crime Solvers tip, Lamond did not respond as though he were sitting on a confession. He said, "Yes! Remember what he told me?" A1598. In other words, Tarrio discussed the banner-burning in some capacity with Lamond, and Lamond *had reported it* to his superior. And while Tarrio may have said something *inculpatory*, it did not rise to a direct confession.

The court discredited Lamond's qualified identification of Tarrio in the banner-burning photograph, because Lamond could "put [Tarrio] on the scene." A1373. But Tarrio never confessed *directly to Lamond* he had burned the banner. Tarrio only admitted he called the tip in on himself, which Lamond had reported. A1598. Lamond's initial inability to conclusively identify a partially obscured image was neither remarkable nor incriminating.

**5.** The deletion evidence also cannot carry the weight the court placed on it. *Arthur Andersen* rejected the notion that suspicious record handling, viewed in hindsight, can substitute for requisite proof of culpable purpose. 544 U.S. at 708. The government introduced no evidence that Lamond had in mind any covered proceeding in which the messages would be material, much less that any deletion

41

was undertaken to affect it. Nor could anyone explain why Lamond would delete messages if he both knew Tarrio would be arrested and "was unaware at the start [of the June 2 interview] that the agents had already seen his communications with Tarrio." A1359. At most, the deletion evidence shows a violation of the separate tampering statute, § 22-723. But the government chose not to charge that statute.

\* \* \* \* \*

Lamond may have exercised poor judgment and breached MPD policies. But § 22-722(a)(6) does not criminalize poor judgment or policy violations. It criminalizes corrupt obstruction of the due administration of justice. Without the policy overlay, the remaining proof does not establish corrupt intent beyond a reasonable doubt. Count 1 should be reversed, and this Court should direct entry of a judgment of acquittal.

### III. Counts 2 and 3 Fail Because the Charged Phrases Are Too Indeterminate To Support § 1001 Convictions

Counts 2 and 3 fail because 18 U.S.C. § 1001 only punishes materially false statements, not conversational characterizations. Yet the charged phrases—"more . . . one-sided" and "without tipping him off"—were colloquial, hedged, and context-dependent. Molnar never pinned Lamond down to the concrete propositions the government later claimed he denied.

The court skipped the first step in any § 1001 analysis. Rather than fix a determinate meaning and test falsity against that meaning, it concluded Lamond had

improperly shared information and treated that as sufficient to find falsity. But § 1001 requires the government to ask a non-ambiguous question and then pin the defendant to a clear answer, because "a federal perjury prosecution is medicine too powerful to be dispensed . . . as a . . . fix for unresponsiveness." *United States v. Reveron Martinez*, 836 F.2d 684, 691 (1st Cir. 1988). The government failed that task here.[14]

### A. The Government Must Prove Both a Determinate Meaning and Falsity in That Meaning

"Precise questioning is imperative" before criminal liability may attach. *Bronston v. United States*, 409 U.S. 352, 362 (1973). If a question or answer is so indefinite that people of ordinary intellect could not agree on its meaning, it cannot support conviction. *Lighte*, 782 F.2d at 375. "Courts . . . require[] near-absolute clarity from the questioner . . . to support a perjury charge," and have applied that requirement to analogous false-statement charges. *United States v. Strohm*, 671 F.3d 1173, 1178 (10th Cir. 2011). "A defendant may not be assumed into the penitentiary." *United States v. Martellano*, 675 F.2d 940, 946 (7th Cir. 1982).

---

[14] Whether a charged statement is so indefinite that it cannot support a false-statement conviction is a legal question this Court reviews de novo when preserved. *United States v. Lighte*, 782 F.2d 367, 373, 375 (2d Cir. 1986) (issue preserved when "court was properly apprised [the questions] . . . were ambiguous"). Lamond preserved that challenge, and a challenge to the sufficiency of the evidence. A861-A871; A1330. *See United States v. Milton*, 8 F.3d 39, 45 (D.C. Cir. 1993).

That requirement places the burden of precision on the government, which controls the interview. It can specify dates, define terms, demand yes-or-no answers, and follow up on qualified responses. But it cannot leave an exchange imprecise and later adopt the most incriminating interpretation to prosecute the witness. Instead, the government must prove that the defendant understood the question in the government's chosen sense and answered falsely in that same sense. *Bronston*, 409 U.S. at 360, 362; *United States v. Sarwari*, 669 F.3d 401, 409 (4th Cir. 2012). And the government must prove objective falsity, not merely evasiveness or misdirection. *See United States v. Harra*, 985 F.3d 196, 211-14 (3d Cir. 2021) (reversing § 1001 conviction even though "defendant . . . believed [his own statement] was untrue"); *Reveron Martinez*, 836 F.2d at 691 ("When a witness bobs and weaves, it is the questioner's obligation to get the proper bearings[.]").

### B. Count 2 Fails Because "[M]ore, You Know, One-Sided" Was a Hedged Characterization, Not a Determinate Factual Denial

Count 2 rests on one exchange. Molnar asked whether it was common for Tarrio to "fish." Lamond answered: "No, not really. He never really asked me questions about . . . what we were doing or anything. It was more . . . one-sided with just him telling me . . . what their plans were." A1678. That answer cannot sustain a felony conviction.

**1.** Molnar asked an informal question. Lamond's answer was equally informal and hedged. Lamond did not say just that the relationship was "one-sided."

He said it was "more . . . one-sided." He did not say he had never given Tarrio any information. He did not say Tarrio had never asked him anything. He answered an impressionistic question with an impressionistic characterization.

Courts have long looked askance at holding witnesses to either blanket or imprecise characterizations. *United States v. Landau*, 737 F. Supp. 778, 778 (S.D.N.Y. 1990) ("never" question ambiguous). It is on the questioner to "focus[] the witness's attention on [a] particular" time. *United States v. Razzaia*, 370 F. Supp. 577, 579 (D. Conn. 1973); *id.* ("ever" question ambiguous because it demands perfect memory).

Instead, the government asked for Lamond's subjective characterization of Tarrio's questioning style over several years. Ricardi admitted at trial that "one-sided" is "a figure of speech," that the terms could carry different meanings, and that neither he nor Molnar clarified "fish," "one-sided," or Lamond's response. A767-A771. The court recognized the problem: "We don't know what he meant by, 'Did he ever fish?'" A1276.

That uncertainty matters. "Fish" can mean probing for inside information, sounding someone out, asking general questions, or seeking operational detail. And "one-sided" can refer to, *inter alia*, who sought information more often, who benefited more from the relationship, or the overall tenor of the exchanges. Add Lamond's qualifier "more" and repeated hedges "you know" and "really," and the

answer becomes even less definite. That unclear exchange cannot bear the weight of a felony conviction.

**2.** The district court's own treatment of Count 2 illustrates the error. At verdict, the court said Lamond was asked a factual question—"Did Tarrio seek information from you?"—and answered, "No." A1355. But Molnar actually asked whether it would be "common" for Tarrio to "fish." A1678. Likewise, the court characterized Lamond as saying the relationship "was one-sided, with just him telling me and not the other way around." A1355. But that was not Lamond's answer either. He said it was "*more*" one-sided, and he never added "and not the other way around." The court rewrote both sides of the exchange: it turned Molnar's tentative question into a direct one and Lamond's hedged answer into an absolute denial.

Once the court dropped "No, not really," dropped "more," and added language Lamond never used, the answer became easy to label false. Notably, *the court* said, "He could have just said, 'No, not really'"—suggesting that answer alone would have been acceptable—even though Lamond *did* use exactly that qualifier. A1348. The court then faulted him for "bolster[ing]" his answer with the statement, "He never asked me for information." A1348. That stripped out Lamond's *second* qualifier: "He never *really* asked me questions." The court rewrote two qualified answers into categorical denials Lamond never gave.

Molnar bore the burden to pin Lamond down; Lamond bore no similar burden. *Bronston*, 409 U.S. at 360, 362. And if a person cannot be charged by "lifting a statement . . . out of its immediate context and . . . giving it a meaning wholly different than that which its context clearly shows," *United States v. Serafini*, 167 F.3d 812, 820 (3d Cir. 1999), he certainly cannot be convicted where his statements must be rewritten to provide the requisite clarity.

**3.**     As a matter of law, the exchange was too indefinite to support conviction. But even if this Court concludes otherwise, the evidence was still insufficient. The government proved, at most, that since July 2020, Lamond sometimes gave Tarrio information. That is not the same as proving beyond a reasonable doubt that Lamond's characterization of the relationship as "more . . . one-sided" was false. If Lamond understood the question to concern Tarrio's usual efforts to elicit operational protest-planning information, his answer was a permissible—and potentially literally true—characterization.

The interview and the record confirm the point. Molnar asked Lamond about his interactions with Tarrio as a whole—from 2019 through 2021—before asking about the information flow. Lamond had previously elicited substantial information (over 30 times) from Tarrio regarding Proud Boys' activities in D.C. throughout that time, and the relationship purportedly began to change only after Election Day. *See generally* A1564-A1618. Before then, the most significant information Lamond

provided Tarrio concerned an alcohol violation at a bar Proud Boys frequented. A1349. The government never provided evidence Lamond was not considering the quantity and direction of those pre-Election Day interactions in his answer. And that would apply *even if Lamond intentionally misled Molnar*. *See Harra*, 985 F.3d at 211 (courts cannot "collapse[] subjective falsity—the defendant's intent to lie—with objective falsity, i.e., the untruth of the statement in question").

For years, Lamond had solicited and received details about Proud Boys from Tarrio, and he channeled those details to law enforcement agencies. *See generally* A1564-A1618. Against that backdrop, the government did not—and could not— negate the reasonable, literally true interpretation of "more . . . one-sided," without follow-up.

The district court, however, flipped the burden onto Lamond. At verdict, it called the question "straightforward" and concluded that Lamond "understood perfectly." A1347-A1348. At sentencing, it went further, saying there was "nothing even the tiniest bit confusing" about the question because Lamond's answer was "responsive." A1425-A1427. But even if the court had not distorted Lamond's answers, responsiveness is not the test. A witness can respond to a vague question without resolving its vagueness. That is why the *questioner* bears the burden to pin the witness down. *Bronston*, 409 U.S. at 360, 362. And the court's misunderstanding

48

of Lamond's answer contradicts its later conclusion that Lamond "understood perfectly."

The court compounded the problem by using other supposed deficiencies in Lamond's answers to bolster Count 2, citing "other self-serving false statements" and Lamond's hedging about using Telegram as support for the conclusion that Lamond's answer was willfully false. A1347-A1348; A1426-A1427. That reasoning is backwards. Other perceived misstatements may go to credibility only after the government has shown that the statement charged had a definite meaning. *See*, *e.g.*, *Bronston*, 409 U.S. at 359 ("It is no answer to say that here the jury found that petitioner intended to mislead his examiner. [The factfinder] [cannot] engage in conjecture whether an unresponsive answer, true and complete on its face, was intended to mislead[.]"). The government cannot *post facto* supply the missing precision, nor can it convert an impressionistic characterization into a knowingly false factual assertion. The Court should reverse and direct entry of a judgment of acquittal.

### C. Count 3 Fails Because "Without Tipping Him Off" Is a Subjective, Judgment-Laden Description of Lamond's Aim, Not a Precise Factual Denial

Count 3 fails for the same reason. Section 1001 does not criminalize informal characterizations. The government must prove the charged statement was false in a determinate sense. Here, Lamond's statement that he hoped to find things out from

Tarrio "without tipping him off to the MPD investigation" was a subjective, judgment-laden description of Lamond's goals. Without any follow-up, the "consequences" of "imprecision" "must be laid at the table of the questioner, not the questioned." *Serafini*, 167 F.3d at 824; *cf. United States v. Jones*, 713 F.3d 336, 350 (7th Cir. 2013) (acquittal required where an "ambiguous statement" must be "over-interpret[ed]" to prove guilt beyond a reasonable doubt).

Molnar asked about Lamond's conversations with Tarrio between the banner-burning and January 4 and whether Tarrio was "prepping" him for what was coming. Lamond answered: "That was part of it," and he was "trying to find out without tipping him off to the MPD investigation." A1666-A1667. That statement did not categorically deny that Lamond had ever conveyed information another listener might later describe as a "tip," or that Lamond had been successful. It described Lamond's objective, in elastic terms. Not "tipping him off" could mean not mentioning the investigation, not materially compromising it, or not providing information that could prevent arrest. But the government never clarified. Ricardi acknowledged that one could "split hairs onto the size of that tip," agreed that the phrase could carry different nuances, and admitted that neither he nor Molnar clarified what Lamond meant by "tipped off." A767-A769. The Rule 29 colloquy exposed the same problem. The district court recognized that "without tipping him

off" could be a characterization of whether Lamond believed he was materially alerting Tarrio. A865-A866.

The circumstances surrounding Tarrio's investigation only reinforce the point. Tarrio had publicly admitted to the banner-burning no fewer than five times. And because the crime was a non-extraditable misdemeanor, Tarrio had to travel to D.C. to be arrested. There is no question Lamond never provided information to Tarrio regarding the MPD's arrest plans. Lamond could have meant "tipping him off" to mean alerting him to the arrest plans—not merely saying anything that, in hindsight, could be helpful to the suspect.

But the district court found the statement false because it was "belied by" the exchanges discussed under Count 2, plus the December 19 message that "[p]olice want to talk to you about the banner" and the December 25 "heads-up" about a possible warrant submission. A1354, A1359-A1360. The court may have thought those messages were tip-offs, but, without a single established meaning, the court lacked proof beyond a reasonable doubt that Lamond's statement was false in the sense he used it. A factfinder's conclusion that some of the information shared should not have been does not make the statement "I was trying to find out, without tipping him off" false. That confuses a disputed characterization with an objectively false fact. It does not prove that Lamond's more qualified statement—about trying

51

to find things out "without tipping him off"—was *objectively* false in the sense he understood it.

* * * * *

At sentencing, the district court said the Telegram record, "and nothing else," was the basis for Lamond's false-statement convictions. A1425. But under § 1001, the court first had to determine what the charged statements meant—and whether they were too ambiguous to be false as a matter of law. The court did not do that. Instead, it treated Lamond's Telegram messages as the controlling baseline, used the surrounding conduct to assign specific meanings to "fish," "more . . . one-sided," and "without tipping him off," and then used that same conduct to prove falsity. That collapsed the ambiguity inquiry into a credibility finding. A1345-A1348; A1359-A1360; A1425-A1427. Yet Molnar never asked the follow-up questions necessary to convert Lamond and Molnar's colloquial exchanges into clear propositions. The government asked informal questions, received informal answers, and criminalized them based on its preferred after-the-fact meaning.

The district court consistently simplified or rewrote Agent Molnar's qualified questions into blunt, direct ones; stripped Lamond's answers of their hedging language; and treated qualified characterizations as categorical factual assertions. Section 1001 does not tolerate conviction by semantic expansion. The Court should reverse Counts 2 and 3 with directions to enter a judgment of acquittal.

52

## IV. Count 4 Rests on Speculation, Not Proof Beyond a Reasonable Doubt

Count 4 fails for a different reason: the government did not prove beyond a reasonable doubt Lamond "inform[ed]" Tarrio he "had an arrest warrant." The proof showed, at most, that Lamond and Tarrio discussed the warrant process and may have been in contact on January 4. That is insufficient under § 1001. The statute punishes false statements, not suspicious timing or a course of troubling-in-hindsight conduct. And where the government relies on circumstantial proof, the line between inference and speculation is dispositive. *See United States v. Gaskins*, 690 F.3d 569, 578 n.3 (D.C. Cir. 2012) (directing acquittal where the government's theory required multiple levels of inferences, "cross[ing] the line . . . to improper speculation"); *United States v. Dorman*, 860 F.3d 675, 683 (D.C. Cir. 2017) (insufficient evidence because factfinders had only "[s]uspicion, much less speculation").[15] Even a "high level of suspicious activity and circumstantial evidence" is insufficient to prove guilt beyond a reasonable doubt when relying on an "impermissibly speculative" "chain of inferences." *Jones*, 713 F.3d at 347.

The government only charged Lamond with the statement, "I know that I didn't inform [Tarrio] that he had an arrest warrant." In other words, he denied conveying the operative fact that a warrant had issued. He did not deny earlier

---

[15] Lamond preserved a challenge to the sufficiency of the evidence. A861-A871; A1330.

discussions about whether a warrant might be sought, submitted, or signed. But until the completion of each of those steps, Tarrio did not *have* an arrest warrant.

At most, the government proved that, by January 4, Tarrio knew the government had begun the warrant process. On December 25, Lamond gave the "heads up" that MPD "may be submitting" a warrant. By January 1, Tarrio said a warrant was submitted, but he did not think it would be signed. His awareness of the pending warrant process cannot prove that Lamond later conveyed that the warrant had been signed.

The January 4 evidence did not supply that missing content. The district court relied on the sequence that (1) Lamond opened his Telegram chat with Tarrio and shortened the retention timer; (2) Tarrio later obtained in-flight WiFi; (3) by about 1:30 p.m. Tarrio began messaging others that the warrant "was just signed"; and (4) later said, "[h]e texted me in the air." A1337-A1338, A1376-A1378. Even taken at face value, the sequence does not prove the content of any unseen message. The timer change does not prove even Lamond sent a message, let alone that it conveyed the warrant had issued.[16] "[C]onjecture camouflaged as evidence" cannot sustain a conviction. *Jones*, 713 F.3d at 340, 352 (reversing because speculative inferences cannot supply the "near certitude" required for conviction).

---

[16] The court ignored Tarrio's frequent lies about Lamond, including that Lamond was FBI. A1568, A1577, A1603.

The government's theory also maps poorly onto the chronology. Tarrio's messages show he already expected arrest in Washington, telling associates a week earlier that MPD likely would pick him up at the airport. A1607. His January 4 messages therefore do not necessarily show that Lamond told him a warrant had issued. They can reflect Tarrio boasting that events were unfolding as he had predicted. And, as discussed, the district court provided no rationale for why Lamond would have sat on his knowledge of the warrant's issuance from December 31 until after Tarrio's *delayed* takeoff on January 4.

The court impermissibly stacked one inference atop another: that Lamond messaged Tarrio; his message concerned the warrant, his message affirmatively stated the warrant had been signed; and Lamond had sat on that knowledge for days despite wanting to help Tarrio. That is exactly the kind of inferential bootstrapping that liability under § 1001 cannot rely on.

The district court's mischaracterization of Lamond's interview further weakens those inferences. It treated Lamond's denial as incriminating because "the defendant was the first one to bring up the subject," claiming Lamond had raised not telling Tarrio about the warrant when "that question wasn't on the table." A1339-A1340. But the interview transcript shows the subject was already in play. Immediately before Lamond's statement, Agent Molnar asked whether the decision had been made "to do it, kind of, without him knowing or to try to get him to turn

himself in," and Lamond explained that another department handled that decision. A1670-A1671. Only then did Lamond say, "[B]ut I know that I didn't, you know, inform him that he had an arrest warrant." A1670-A1671. Lamond did not interject, randomly on some unrelated subject. He added color as part of an ongoing discussion about the warrant, the arrest plan, and whether Tarrio knew what was coming. Indeed, if the plan had been to get Tarrio to turn himself in, Lamond was the obvious point-of-contact.

To be sure, the district court later noted that Molnar did not say expressly that "one of the[ ] concerns [i]s that Tarrio was aware of the warrant" until after Lamond's statement. A1339-A1340; A1671. But that is a different point. The question is not whether the agents had spelled out their precise concern. The question is whether the warrant topic was already on the table. It was. By framing Lamond's statement as if it came out of the blue, the court overstated its incriminating force.

Reasonable competing inferences remained. By January 4, Tarrio had already publicly claimed responsibility, been contacted by MPD, been contacted by Miami police, and shown he would come to Washington regardless. On that record, Tarrio's later statement that the warrant "was just signed" did not depend on a new message from Lamond conveying that fact. The government did not need to disprove every imaginable alternative; it did need to do more than show the plausibility of its preferred explanation. For the "crime of perjury," there must be "moral certainty,"

and "[e]vidence which is merely probable is not enough." *United States v. Rose*, 215 F.2d 617, 623 (3d Cir. 1954).

The district court's reasoning at verdict, illustrated at sentencing, did not close that gap. The court reasoned that Tarrio consistently disseminated what Lamond had just told him and that there was no evidence of any other "contact." A1337-A1338, A1376-A1378. At sentencing, the court stressed the same pattern, plus Lamond's shortening of the Telegram retention timer. A1428-A1429. But that analysis begs too much and proves too little. A pattern of prior information-sharing may support *suspicion*. But it does not establish the content of a later-unseen message. Nor does the absence of an identified alternative source relieve the government of its burden to prove the existence and contents of the charged communication. The court used Lamond's and Tarrio's broader course of conduct to supply the missing content of the assumed January 4 message, then used that same course of conduct to prove falsity. Section 1001 does not permit conviction by that sort of speculation. *See Dorman*, 860 F.3d at 683 ("The trouble with absence of evidence is that it is consistent with *any* hypothesis.").

Count 4 rests on inference-stacked-upon-inference. The government proved, at most, that Lamond and Tarrio communicated about the warrant process before the warrant's issue, that Lamond used Telegram, and that Tarrio later said the warrant had been signed. It did not prove beyond a reasonable doubt that Lamond informed

Tarrio that the warrant had been issued. That is not enough. This Court should reverse with directions to enter a judgment of acquittal.[17]

## V. In the Alternative, Reversal of Count 1 Requires Vacatur of Counts 2 Through 4

If the Court does not direct acquittal on Counts 2 through 4, it should vacate them if it reverses Count 1. The government tried the case as a single narrative: Lamond obstructed the banner-burning investigation, then lied to conceal it. And the district court's findings all rested on that premise.

Once the court treated Lamond's underlying conduct as criminal obstruction, it was easy to construe statements like "one-sided" and "without tipping him off" as deliberate lies rather than imprecise characterizations or minimizations. The same is true of Count 4: the obstruction theory supplied the lens through which the court turned a stacked chain of inferences into guilt.

If that premise falls, the false-statement findings should be reconsidered without it. *See, e.g., People v. Cepeda*, 851 F.2d 1564, 1568 (9th Cir. 1988) (ordering new trial where evidence on invalid count may have influenced remaining counts);

---

[17] In the alternative, the Court should vacate Count 4 because the district court never independently analyzed it. Its reasoning rested on the same premises underlying Counts 1 through 3: that Lamond shared information, used Telegram to conceal it, and lied to cover up obstruction. *See, e.g.,* A1337-A1338, A1345-A1348, A1359-A1360, A1362-A1363, A1376-A1378; A1425-A1429. The court inferred the January 4 message's content from that narrative—and used it to reinforce the narrative itself.

*United States v. Pelullo*, 14 F.3d 881, 900 (3d Cir. 1994) ("totality of the circumstances" and error on one count required new trial for the remaining 48 counts).

## CONCLUSION

This Court should reverse all convictions and enter a judgment of acquittal, or, in the alternative, vacate all convictions.

Respectfully submitted,

 /s/ *Reno G. Varghese*
ANDREW E. GOLDSMITH
RENO G. VARGHESE
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
agoldsmith@kellogghansen.com
rvarghese@kellogghansen.com

*Appointed Counsel for Defendant-*
*Appellant Shane Brian Lamond*

May 8, 2026

# CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 32(g), that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the portions of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), the brief contains 12,998 words.

I further certify that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared using Microsoft Word in a proportionally spaced typeface (Times New Roman, 14 point).

/s/ *Reno G. Varghese*
Reno G. Varghese

May 8, 2026

# ADDENDUM

# TABLE OF CONTENTS

Page

D.C. Code § 22-721 (excerpt)..................................................................Add. 1

D.C. Code § 22-722 (excerpt)..................................................................Add. 1

D.C. Code § 22-723 (excerpt)..................................................................Add. 2

18 U.S.C. § 1001 (excerpt)......................................................................Add. 2

18 U.S.C. § 1503 (excerpt)......................................................................Add. 3

18 U.S.C. § 1505 (excerpt)......................................................................Add. 3

18 U.S.C. § 1512 (excerpt)......................................................................Add. 4

## D.C. Code § 22-721. Definitions.

For the purpose of this subchapter, the term:

* * * * *

(3) "Criminal investigation" means an investigation of a violation of any criminal statute in effect in the District of Columbia.

(4) "Official proceeding" means any trial, hearing, investigation, or other proceeding in a court of the District of Columbia or conducted by the Council of the District of Columbia or an agency or department of the District of Columbia government, or a grand jury proceeding.


## D.C. Code § 22-722. Prohibited acts; penalty.

(a) A person commits the offense of obstruction of justice if that person:

* * * * *

(4) Injures or threatens to injure any person or his or her property on account of the person or any other person giving to a criminal investigator in the course of any criminal investigation information related to a violation of any criminal statute in effect in the District of Columbia.

* * * * *

(6) Corruptly, or by threats of force, any way obstructs or impedes or endeavors to obstruct or impede the due administration of justice in any official proceeding.

\* \* \* \* \*

**D.C. Code § 22-723. Tampering with physical evidence; penalty.**

(a) A person commits the offense of tampering with physical evidence if, knowing or having reason to believe an official proceeding has begun or knowing that an official proceeding is likely to be instituted, that person alters, destroys, mutilates, conceals, or removes a record, document, or other object, with intent to impair its integrity or its availability for use in the official proceeding.

\* \* \* \* \*

**18 U.S.C. § 1001. Statements or entries generally.**

(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—

\* \* \* \* \*

(2) makes any materially false, fictitious, or fraudulent statement or representation

\* \* \* \* \*

shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both. If the matter relates to an offense under chapter 109A, 109B, 110, or 117, or section 1591, then the term of imprisonment imposed under this section shall be not more than 8 years.

\* \* \* \* \*

**18 U.S.C. § 1503. Influencing or injuring officer or juror generally.**

(a) Whoever . . . corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection (b). . . .

\* \* \* \* \*

**18 U.S.C. § 1505. Obstruction of proceedings before
departments, agencies, and committees.**

\* \* \* \* \*

Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States, or the

Add. 3

due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress—

Shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both.

## 18 U.S.C. § 1512. Tampering with a witness, victim, or an informant.

\* \* \* \* \*

(c) Whoever corruptly—

(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

(2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

\* \* \* \* \*

**CERTIFICATE OF SERVICE**

I hereby certify that, on May 8, 2026, I caused to be filed electronically the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

 /s/ *Reno G. Varghese*
Reno G. Varghese

Add. 1