**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

No. 25-3066

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

SHANE BRIAN LAMOND,

*Defendant-Appellant*.

Appeal from the United States District Court for the District of Columbia,
No. 1:23-cr-00177-ABJ-1 (Hon. Amy Berman Jackson)

**APPENDIX FOR DEFENDANT-APPELLANT**
**SHANE BRIAN LAMOND**
**Volume II of V, pp. A87-A631**

ANDREW E. GOLDSMITH
RENO G. VARGHESE
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
agoldsmith@kellogghansen.com
rvarghese@kellogghansen.com

*Appointed Counsel for Defendant-Appellant Shane Brian Lamond*

May 8, 2026

## TABLE OF CONTENTS

Page

### Volume I

Docket Sheet, *United States v. Lamond*, No. 1:23-cr-00177-ABJ-1 (D.D.C.) .......... A1

Indictment (May 18, 2023), Dkt. No. 1 .......... A23

Joint Pretrial Statement (Jan. 22, 2024), Dkt. No. 41 .......... A40

Exhibit 1: Government's Exhibit List, Dkt. No. 41-1 .......... A63

Exhibit 2: Government's Proposed Verdict Form, Dkt. No. 41-2 .......... A70

Exhibit 3: Defendant's Proposed Verdict Form, Dkt. No. 41-3 .......... A72

Notice of Filing (Nov. 5, 2024), Dkt. No. 80 .......... A74

Defendant's Waiver of Trial by Jury, Dkt. No. 80-1 .......... A75

Elements of the Offenses (Dec. 9, 2024), Dkt. No. 86 .......... A76

Judgment (June 10, 2025), Dkt. No. 110 .......... A79

Notice of Appeal (June 24, 2025), Dkt. No. 112 .......... A86

### Volume II

(Transcript Volumes II-IV)

Transcript of Status Conference Held On September 24, 2024 [Redacted] .......... A87

Transcript of Jury Trial Day 1 Held On December 2, 2024 .......... A133

Transcript of Jury Trial Day 2 Held On December 3, 2024 .......... A397

### Volume III

Transcript of Jury Trial Day 3 Held On December 4, 2024 .......... A632

Transcript of Jury Trial Day 4 Held On December 5, 2024 .......... A892

**Volume IV**

Transcript of Jury Trial Day 5 Held On December 6, 2024 .............................A1057

Transcript of Jury Trial Day 6 Held On December 9, 2024 .............................A1225

Transcript of Jury Trial Day 7 Held On December 10, 2024 ...........................A1242

Transcript of Verdict Held On December 23, 2024. Dkt. No. 99 ....................A1314

Transcript of Sentencing Held On June 6, 2025, Dkt. No. 122 ........................A1389

**Volume V**

(Admitted Trial Exhibits)

Exhibit 1004: Lamond Phone Forensic Report_Timeline ...............................A1447

Exhibit 1006: Forensic Examination Report (Manicini) 1B2 Part One Final, dated Feb. 2, 2023 .......................................................................A1484

Exhibit 1006A: Email from Shane Lamond to Commander Parsons FW: Subject in Photo, dated Dec. 20, 2020 ..........................................A1494

Exhibit 1006B: Email from Shane Lamond to Kelly O'Meara re: BLM signs, dated Dec. 13, 2020 .........................................................A1496

Exhibit 1006C: Email from Shane Lamond to Commander Parsons re: Podcast, dated Dec. 20, 2020 .........................................................A1498

Exhibit 1006D: Email from Shane Lamond to Franklyn Then re: Subject in Photo, dated Dec. 20, 2020..................................................A1500

Exhibit 1014: Email from Ahsan Mufti, re: Resubmission, dated Dec. 29, 2020 ..................................................................A1503

Exhibit 3002: Metropolitan Police, District of Columbia, General Order 201.26 – Duties, Responsibilities and Conduct of Members in the Department .............................................................A1542

Exhibit 3003: Metropolitan Police, District of Columbia, General Order 201.36 – Sworn Law Enforcement Officer Code of Ethics .........................................................................................A1554

Exhibit 3005: Metropolitan Police, District of Columbia, General Order 601.02 – Preservation of Potentially Discoverable Material .......... A1557

Exhibit 4001: Article: *Proud Boys Leader Says He Burned Black Lives Matter Banner Stolen from Church During Demonstrations in D.C.*, Wash. Post (Dec. 18, 2020) .......... A1560

Exhibit 4004: Parler Post by @NobleLead, dated Dec. 18, 2020 .......... A1563

Exhibit 4006: Timeline Final – Summary Chart of Communications 10.24.2019 - 1.27.2021 .......... A1564

Exhibit 4018: Summary Chart 11.14.2020, 730PM – 12.20.2020 .......... A1619

Exhibit 4026: Timeline – Summary Chart Shane Lamond's Contacts .......... A1656

Exhibit 5006: Shane Lamond Interview Transcript Held On June 2, 2021 .......... A1658

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America,<br>Plaintiff,<br><br>vs.<br><br>Shane Brian Lamond,<br>Defendant. | Criminal Action<br>No. 23-cr-177<br><br>STATUS CONFERENCE<br><br>Washington, DC<br>September 24, 2024<br>Time: 9:43 a.m. |

TRANSCRIPT OF STATUS CONFERENCE
HELD BEFORE
THE HONORABLE JUDGE AMY BERMAN JACKSON
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S

For Plaintiff: Rebecca G. Ross
Joshua Rothstein
UNITED STATES ATTORNEY'S OFFICE
610 D Street NW
Washington, DC 20530
(202) 252-6937
Email: Rebecca.Ross2@usdoj.gov
Email: Joshua.Rothstein@usdoj.gov

For Defendant: Mark E. Schamel
Ana L. Jara
VENABLE LLP
600 Massachusetts Avenue NW
Washington, DC 20001
(202) 344-4631
Email: MESchamel@venable.com
Email: ALJara@venable.com

Court Reporter: Janice E. Dickman, RMR, CRR, CRC
Official Court Reporter
United States Courthouse, Room 6523
333 Constitution Avenue, NW
Washington, DC 20001
202-354-3267

* * * * * * *P R O C E E D I N G S* * * * * * *

THE COURTROOM DEPUTY: We're on the record with criminal case 23-177, United States of America versus Shane Brian Lamond.

Counsel, starting with the government, please state your appearance for the record.

MR. ROTHSTEIN: Good morning, Your Honor. Josh Rothstein on behalf of the United States. With me at counsel table is AUSA Rebecca Rothman and paralegal Lisa Abbe.

THE COURT: Good morning.

MR. SCHAMEL: Good morning, Your Honor. Mark Schamel, Ana Jara on behalf of Mr. Lamond, who is present.

Let me begin with an apology. When last we spoke, I was being yelled at by TSA during our status hearing and forced to get off the phone during the phone conference Your Honor had scheduled. I apologize. I'm sorry that happened.

THE COURT: I was a little frustrated that for the entire day the day before we couldn't get a schedule out of you as to when we could talk. It seemed like it wasn't impossible to fly to the West Coast and also send an email in the same 24-hour period, but --

MR. SCHAMEL: I thought --

THE COURT: -- we're past that now.

MR. SCHAMEL: -- I had responded. I literally flew out and spent all day with the client and with the U.S.

Attorney's Office and running through the airport.

THE COURT: The next day.

MR. SCHAMEL: And Your Honor did accommodate my schedule. And I'm sorry that happened. So I apologize for that.

THE COURT: We had a pretrial conference in this case, I believe most of the items have been resolved. I just want to tick through the things that I have left to speak about and then I'll ask you if there's anything else.

MR. SCHAMEL: And it's your courtroom, so I don't want to presuppose, but I have an issue that came up last evening at about 6 p.m., it involves defense theory. I've actually consulted with a couple of colleagues and I think probably the most appropriate way is to raise it ex-parte with Your Honor, for Your Honor to decide how you want to deal with it.

It's a significant issue and I just wanted to flag it for Your Honor. I don't know if you want to start with that or end with it, but I didn't want Your Honor to think that I was holding back or sandbagging, we get through everything else and then I raise this issue.

THE COURT: If it's a legal matter that I'm going to have to rule on, do you think it would be better to submit it to me in writing ex parte than to come up to the bench and try to talk about it without anything further?

MR. SCHAMEL: Yeah, I thought about that when it, sort of, happened last evening. And I literally got a phone call on the way here, I got a lot more detail on it. I do think I should at lease raise it with you briefly at the bench.

THE COURT: I'll make sure we take that up before we complete the day.

MR. SCHAMEL: Thank you, Your Honor.

THE COURT: Starting just at the beginning with respect to the schedule we're going to follow in the trial, after thinking more about everything we discussed during the phone conference, I revised the schedule, I issued a minute order, and I want to make sure that everybody understands we're going to do our best to get through as much of the voir dire as possible on October 2nd, breaking somewhere around 4:30ish. We will not sit on the 3rd or the 4th, instead of waiting until the 2nd to decide if we're sitting on the 4th. And we will start again on the 7th where we will either begin with openings, if we have already picked a jury.

I imagine that even if we're wildly efficient, we'll be at the point of exercising preemptory strikes by that morning. But if we do that, be prepared that we will likely roll right into your openings, if we have a jury in the box on Monday, the 7th.

With respect to voir dire, does anybody have any questions about the procedure that we're going to follow? You

all got written instructions about this. I will read the questions to all the jurors, they'll be taken to another courtroom, we will bring them back one at a time for follow-up voir dire, which generally I will conduct. If you think I've missed something, I will let you ask questions. If it gets harassing or too lengthy, then you'll lose your privileges of doing that. I expect people will be able to do it.

As soon as we have qualified a sufficient number of jurors, the others will be excused. The qualified jurors will be brought back and they will be seated in the audience in the same order that they're listed on the jury panel list. And then when we exercise our strikes, they're just going to sit there. We're not going to have the first 12 come in the box and you strike them, they have to climb over everybody, get out and go back. It's embarrassing, it's cumbersome, it's time-consuming.

That also means you can exercise your strike for the 13th, 14th, 15th person in the row if you like them less then anyone in the first 12. You don't have to only strike from the first 12. And we will continue that process. If somebody passes, they have passed for good. That's it, they are done. And if both sides pass, we're all done.

One question I had was recently I tried something that other judges in the building have been doing, which is if you have something that you think might be kind of a hot button

issue, machine guns or January 6, starting the voir dire before you even give them the index cards and asking the questions with a general question saying this is what the case is about. Now that you know that and now I tell you what the burden of proof is and beyond a reasonable doubt and the presumption of innocence, is there anybody who, because of what this case is about, feels like they just simply can't be fair? And if they stand up at that point, after that instruction, they're just gone. There's no follow up. There's no attempt to rehabilitate them.

I don't have a strong point of view one way or the other. The time I have tried it, we ended up losing about three or four people, I think. But that's about 15, 20 minutes worth of voir dire. So I circulated a sample preliminary question and I just wonder if the parties want me to use it or not? And if you don't both want me to use it, then I'm not going to use it. Mr. Rothstein?

MR. ROTHSTEIN: Thank you, Your Honor. Your Honor, we thought the instruction was fine as read in, but it's our preference that it not be given. We believe that questions 19, 20, and 21 would cover that and would be done in private and we think that might be more appropriate. We're just afraid about the potential to lose a lot of jurors, if you see that if you stand up, you'll be excluded for that question.

THE COURT: I guess it sort of lets you know at an

early stage whether you need to get some more. But, okay.

What's your point of view about it?

MR. SCHAMEL: I've actually seen, Your Honor, something like that, although I don't know that it's been sort of this hot-button issue of January 6. I think it's a great way to do it, to start with that. I don't share Mr. Rothstein's concern about people jumping on the band wagon. I think we raise this issue, let's get these people out of the room right out of the gate so we can focus on the other people to make a decision. I think that's a great idea.

THE COURT: I just said I wasn't going to do it if both sides didn't want to do it. I don't think I can back off of that. If the government thinks about it between now and then and you think it might be a good idea, I'll have it and I'll use it. You can talk to some of your colleagues where it's come up in trials and see what you think.

All right. Now, I don't believe there's any motions in limine to be resolved. And I'm having a little trouble determining whether there are any issues with respect to exhibits to be resolved. I asked, send me an exhibit list and tell me if there are any objections by yesterday. I got it yesterday. Now there's a motion to admit certain exhibits and I just can't tell from the motion, unless I sit down and go side by side with the list, are they on the list, are they objected to, is this new, is this old, what is this?

MS. ROSS: Your Honor, since the last time we met and Your Honor issued the order and pre-admitted certain exhibits, we have updated some of those which were already admitted, so they're not the exact same, and then we added some new exhibits. In the exhibit list that we attached as Attachment A to the filing yesterday, it indicates which exhibits were updated and which exhibits are new.

Defense counsel did not object to any of the updated exhibits or any of the new exhibits. So it's our position that you can just admit all of them.

THE COURT: Okay. So this document that you entitled Second Notice of Updated Exhibits and Motion to Admit in Advance of Trial just pulls out from the updated exhibit list that I asked for, the ones that are updated and the ones that are new, and asks me to move them in evidence?

MS. ROSS: Yes, Your Honor.

THE COURT: Do you have any objection?

MR. SCHAMEL: I don't think we do, but I -- I apologize, Your Honor. Didn't they just file something this morning?

THE COURT: What she's saying is that this is just a repetition of the same things from the day before. Is that correct?

MR. SCHAMEL: If that's the case, I don't think we do, but I'm just -- I was driving in this morning, I came right

in, spent an hour with my friends at the front desk to get through metal detectors. I haven't had a chance to open my computer and look at it.

THE COURT: I don't think you had to file a motion. That was the whole point of yesterday, to let me know if there was anything new.

MS. ROSS: That's right, Your Honor. We didn't file anything this morning. We provided a copy of that updated exhibit list indicating the new exhibits and the updated exhibits to defense counsel yesterday. They agreed with what is written on that exhibit list. And I certainly just only attached a motion so that Your Honor understood what we were asking for with respect to those new and updated exhibits.

THE COURT: All right. Well, assuming -- and I'm going to have to sit down with the exhibit list and go back and forth -- that everything in this docket 26, which calls itself a motion, in addition to a notice, is the same as what was Exhibit 68-1, the exhibit list you attached in which you presented what the defendant's position was, and there's no different one, there's nothing new here, correct?

MS. ROSS: There is nothing -- there is also docket 63, which was the first notice. So between 63 and 68, that encompasses everything that is on that updated exhibit list that's attached as Attachment A.

THE COURT: You mean 68-1?

MS. ROSS: Yes, 68-1, Your Honor.

THE COURT: That's why I had you do it, because as I went through the docket, there were so many updated exhibit lists. I wanted to make sure everybody was working from the same exhibit list. I'm going to assume that the only exhibit list is now docket 68-1, which lists everything the government is seeking to admit, identifies the ones that weren't on previous exhibit lists, and represents that the defendant has no objection to any of them. If that's not the case, defense needs to let me know by tomorrow. Otherwise, they'll all be admitted in evidence.

MS. ROSS: And just to be clear, we -- so that defense counsel knows as well, that is the exact document we shared with them yesterday and that they agreed to. There were no changes.

THE COURT: Okay. All right.

MS. ROSS: So it should be accurate.

THE COURT: I was just receiving it -- for some reason the motion got docketed again, like this morning, even though you filed it yesterday. So it became a little confusing to us, too. So I can understand why the defense was confused.

MS. ROSS: I'm sorry I missed that, Your Honor. I didn't even realize it had been documented twice.

MR. SCHAMEL: Your Honor, assuming we don't have any objections -- but I'm not anticipating we will -- can I just

confirm that with an email to chambers, or do you want me to file something on the record?

THE COURT: If you have an objection, put that in writing on the docket, not in an email to chambers. We don't do this by email to chambers. And if you don't have any objection, just file a notice that says we don't object to any exhibit in docket 68 --

MR. SHAMEL: So notice?

THE COURT: Yes, that would be helpful.

MS. ROSS: Just one more thing to flag related to that. There were two exhibits that we did not previously provide Your Honor that were updated and we have copies of those that we will provide you now, as well as defense counsel.

THE COURT: Okay. We will need those on the flash drive that goes to my courtroom deputy and chambers.

MS. ROSS: No problem, Your Honor. We'll make sure we do that.

THE COURT: Now, we have a witness who has been writted here. And I guess one question I have is: Have you gone over your -- this anticipated testimony with his counsel and do we know whether there's any concern about whether he has a Fifth Amendment privilege with respect to any of it and whether he's getting advice about that?

MR. SCHAMEL: Maybe this is the moment we should approach?

THE COURT: All right. This is the one you want to come up ex parte?

MR. SCHAMEL: Yes.

THE COURT: All right. I'm going to let him do that right now. I don't think he has to reveal his defense to the government. But if then there's some aspect of it that I think the government needs to know about, I'll let you know.

All right. You can come up. And this part of the transcript will be sealed. And, Mr. Schamel, you can come approach the bench.

MR. SCHAMEL: May I bring Ms. Jara?

THE COURTROOM DEPUTY: The panel just went out.

THE COURT: Okay. And we can get the headphones for your client. And Ms. Jara can come, too.

MR. SCHAMEL: May I get headphones for my client?

THE COURT: You're coming.

MR. SCHAMEL: But for my client.

THE COURT: We're waiting for the system to come up. We may.

With respect to the jury instructions, I went ahead and drafted and circulated instructions covering the elements of the offenses. There were very little -- very few areas of differences between the parties in terms of what the instruction should say. And I think what I've circulated is consistent with the law, which means we're not adding a

corruptly element to the 1001 count, since it's not an element. The word doesn't appear in the statute. But it does appear to be an element of the D.C. Code offense, at least the portion with which he's charged. So I have a definition of corruptly now in that instruction.

And I also had a question with respect to the false statements. The indictment tracks all the language of 1001, that he made a false, fictitious, or fraudulent statement. But I think all the jury instructions that were given by both sides just use the term "false." And I don't think we're talking about a scheme to defraud here, so I wasn't sure if you wanted that language or if you just wanted me to say "false."

So, Mr. Rothstein?

MR. ROTHSTEIN: Yes, Your Honor, I think we're fine with it just saying "false."

THE COURT: Okay.

MR. ROTHSTEIN: Since that's the defined term also below.

THE COURT: Right. I had definitions for the other, but I just wasn't sure if we needed them and decided not to put them in, since you hadn't. But I just wanted to make sure. So we'll make it track, that we will just say "false." Anything in brackets were things that I wasn't sure if we were going to say. And then that's all that we'll define.

And the way I think you had it was the defendant

acted willfully, knowing the statement was false. But the statute actually says, "Whoever knowingly, willfully," and so I think it's preferable that in doing -- the second element would be, "that in doing so the defendant acted knowingly and willfully," and then we define those terms. And I have had previous false statement trials where even in the definition of false, it included that he knew it. I don't think that's necessarily redundant.

MR. ROTHSTEIN: That's fine with the government, Your Honor.

THE COURT: All right.

MR. ROTHSTEIN: Your Honor, the government -- sorry, had two additional --

THE COURT: Yes. Now, I know you wanted me to put the false statement in context, that he said this in that blah, blah, blah, blah, and this is what. But I don't think that's how it goes for false statement. That's your case, that's what you're going to prove, you're going to explain it. But I don't think it's part of the jury instruction.

MR. ROTHSTEIN: Yes, Your Honor. The government just had two additional points I wanted to make. It says, "Finally, with respect to the third element, you are instructed that the FBI," but it should be, I believe, the U.S. Attorney's Office, or even the Department of Justice because the acts that the false statement were made to were investigators with the U.S.

Attorney's Office, which is part of the Department of Justice, so it's not --

THE COURT: Okay. I think this is what you all had proposed.

MR. ROTHSTEIN: Yeah, my fault, Your Honor. I think it should say --

THE COURT: What were they, they were agents within the Department of Justice?

MR. ROTHSTEIN: They're investigators at the U.S. Attorney's Office, which is part of the DOJ. So I think you could just say: With respect to the third element, you are instructed that the Department of Justice is part of the executive branch of the government of the United States and we can elicit from the witness that he works for the U.S. Attorney's Office.

THE COURT: What if I said: With respect to the third element, you are instructed that the U.S. Attorney's Office, within the Department of Justice, is a part of the executive branch of the government of the United States?

MR. ROTHSTEIN: That works for the government, Your Honor.

THE COURT: All right. Any other changes?

MR. ROTHSTEIN: Yes. In the next paragraph, at the end, Your Honor, we believe it should have said, "It is not relevant whether the statement actually influenced the actions

of the agency." And that comes from *United States versus Moore*, 612 F.3d 698 at 702, where it's quoted as proof of actual relevance of statement is not required. And that was cited in our jury instructions and we believe that's consistent with instructions given in this.

THE COURT: I'm not sure you had that language though. I think you had this language and then that was in a footnote. But that's final. They're both consistent with the law.

MR. ROTHSTEIN: Yes, Your Honor.

THE COURT: All right.

MR. SCHAMEL: Can I just understand? I was trying to follow what Mr. Rothstein was saying. May I just have a moment, Your Honor, just so I understand.

THE COURT: Yes.

(Off-the-record discussion between counsel.)

MR. SCHAMEL: That's probably okay, but I'm going to read more, Your Honor. If I have an issue, I will put it in the same notice I file tomorrow, if that's all right with the Court.

THE COURT: All right. What the government's original proposal said was, "The government does not need to prove that the defendant had a purpose to mislead the federal agency or that the agency was in fact deceived or misled. It is not relevant whether the statement influenced the actions of

the agency." You have the whole thing together and the defendant said the same thing. And it's -- your last paragraph in your proposal was, "The government does not need to prove that the defendant had a purpose to mislead the federal agency or that the agency was in fact deceived or misled. It is not relevant whether the statement influenced the actions of the agency." So basically that was not the aspect of their proposal that you objected to?

MR. SCHAMEL: I think it's probably -- I don't have my --

THE COURT: I can add that sentence.

MR. SCHAMEL: I just wanted to alert you to that.

THE COURT: Does anybody else have any objections to the obstruction of justice instruction? Which is slightly different than the one I lifted from -- that you proposed from the Red Book because it didn't define corruptly and I think it needs to be in there. And then I think the defense was concerned if we combined a single instruction for Counts 1 through 4, that the jury be told that it has to find beyond a reasonable doubt as to each statement. I think that's pretty clear, and there's going to be a multiple-counts instruction, too.

MR. ROTHSTEIN: No objection from the government, Your Honor.

THE COURT: All right. Mr. Schamel, do you all have

any other objections to these jury instructions?

MR. SCHAMEL: I'm sorry, Your Honor. Just one moment.

(Pause.)

MR. SCHAMEL: I don't think we do. I have one question, as far as circle back around, I'll raise it, Your Honor. As it relates -- the draft, it would be the second element under the obstruction of justice count, where it talks about the integrity of the investigation, and I just want to take one final look at where -- how it was charged. Because I don't remember if they talked about just the warrant or the investigation itself as a variation --

THE COURT: I believe they did. I had the indictment in front of me when I did the language, but we can look at it. I've got it here.

MR. SCHAMEL: If I may stand here with Ms. Ross? She's got it up.

THE COURT: I'm just looking for Count 1.

(Off-the-record discussion between counsel.)

THE COURT: Count 1, "Shane Lamond, willfully and knowingly, did corruptly obstruct and impede and endeavored to obstruct the due administration of justice in an official proceeding, that is, the investigation and prosecution of destruction of property arising from the December 12th burning of a banner."

MR. SCHAMEL: I would like to add, if I may, Your Honor, "and prosecution," to be consistent with the indictment.

THE COURT: All right. Well, since you are talking to people in the prosecutor's office, given the way it's alleged, I think that's --

MR. ROTHSTEIN: I'm sorry, Your Honor, what would --

THE COURT: We've got, in Count 1, the elements. The first element we say what you alleged, that he corrupted or impeded an official proceeding, that is, the investigation and prosecution of a charge. And then what he's saying is with respect to the second element, that he did so with the intent to undermine the integrity of the -- I've got "investigation," and he's saying it should say, "investigation and prosecution."

MR. ROTHSTEIN: Your Honor, I believe it would have to say "or prosecution" because we charge in the conjunctive, but we instruct in the disjunctive.

THE COURT: Right. And then I was going to say we have the "and" means "or" issue. So I think they could both be "or," but they both need to be there.

MR. ROTHSTEIN: The government is fine with it being there, but it would have to be "or."

THE COURT: That's easier than telling the jury that and means or.

MR. SCHAMEL: I'm looking at the actual indictment.

THE COURT: Right. And it said "and," because that's

what they do. But there's case law all over the place that that means "or."

MR. SCHAMEL: Then Your Honor would put "and/or," is that what you're going to put?

THE COURT: I'm okay with and/or.

MR. ROTHSTEIN: Your Honor, I believe that "and" -- I think it has to say "or," just like the earlier instruction where we were talking about false, fraudulent, or fictitious. We charged it as "and," but it would have to be "or" because if it has "and" there it could lead the jury to believe that the government has to prove that they obstructed the investigation and the prosecution. And we believe that it has to be "or" because it could be one or the other.

THE COURT: I believe that's a correct statement of the law. And I think that's better than trying to instruct the jury that "and" means "or." I think we should tell them what the law requires.

MR. SCHAMEL: Understood. Thank you.

THE COURT: All right. So everything else otherwise, this is what we'll do. The rest of your instructions were largely standard instructions that we'll put together in a packet for the instructions conference to figure out which ones we need and which ones we don't.

There was one issue where I asked you to submit proposed limiting instructions for evidence that I permitted in

for a limited purpose and you both submitted proposals. And I'm going to go with the government's proposal because it was more consistent with my ruling, and that was on docket 60. They're not very different, but I'm going to use the second one that I was provided with.

So I think we're -- we'll have a jury instructions conference, but I think we know, at least going in, what the instructions are going to be. To the extent you want to make sure you know what the elements are before you give your opening, I wanted to make sure everybody knew what was happening.

I also tweaked the voir dire questions a little bit, and you've gotten the final version of that. I've now taken out the stuff about the schedule and Thursday and Friday and made it conform with what the new schedule is. But otherwise, the questions I ask the jury with the index cards will be the ones that I've previously circulated to you.

How are we doing with the husher?

THE COURTROOM DEPUTY: It's working.

THE COURT: All right. So, Mr. Schamel, why don't you come up and raise whatever issue you need to raise.

MR. SCHAMEL: Where would you like me, Your Honor?

THE COURT: At the bench, come this way.

(Sealed bench discussion with defense counsel:)

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

(Open court:)

THE COURT: All right. I can say, for the benefit of the government, that nothing was decided and I'm not issuing any orders as a result of the bench conference. I was simply advised of the status of issues related to the witness, which appear to be in flux. And if there comes a point where I'm being asked to do something, I want to be asked to do it in writing. And whether the government needs to be involved in the resolution of any such motion, we'll figure out at the time. So I don't think there's anything further to discuss.

But I think we have some issues in connection with the schedule of the trial, the schedule of the testimony or the possibility of the testimony is about as much as I can say at this point.

Which brings me to the only other thing I had on my list of things to do. And I can't quite recall if we did this at the last status conference, but if there has been a plea offer and if it's been communicated to the defendant and if the defendant has rejected it all needs to be part of the record in a criminal case.

MR. ROTHSTEIN: Yes, Your Honor. There's been no plea offer and there will not be a plea offer.

THE COURT: And that is because? The offer was just you can plead to the indictment?

MR. ROTHSTEIN: Correct.

THE COURT: All right. Was that because you were told there was no interest in a plea offer or there's just not been one?

MR. ROTHSTEIN: I believe that there were -- there may have been some prior discussions that I wasn't a part of pre-indictment, but I know that since the time of the indictment we have not been asked for a plea offer and the government did not intend to make one on its own, so that's --

THE COURT: All right. Can you put -- have you done a guidelines calculation as to what the guidelines would recommend as a sentence in this case if the defendant were to

go to trial and to be convicted?

MR. ROTHSTEIN: Your Honor, that would have been in our prosecution memo. So I can go back and look at it. So it was done, but I don't believe that that was -- what that calculation was was ever communicated to the defense.

THE COURT: Okay. Can you state for the record, if he went to trial and he was convicted of the obstruction count, what the maximum sentence would be?

MR. ROTHSTEIN: I can go back and get that -- off the top of my head I don't know, Your Honor.

THE COURT: Do you agree that under the *Frye* case we need to put this on the record? Or we only need to put it on the record if there was a plea offer extended?

MR. ROTHSTEIN: Your Honor, I've not encountered this issue, so I -- typically I've just been asked have we extended an offer.

THE COURT: I've never had a case where you hadn't, so this has never come up for me before.

MR. ROTHSTEIN: Your Honor, we can look into it. We can send a letter, potentially, to the defense or communicate with them about whether or not -- first of all, I think the question is whether or not they're interested in a plea offer to the charges that are in the indictment. So I would ask Mr. Schamel whether they are and then I can take it back to my office and determine what our response is and we can put it on

the record before the -- before we start jury selection.

THE COURT: All right. Mr. Schamel, do you have a position as to whether the Court is required to conduct a *Frye* inquiry in this particular case?

MR. SCHAMEL: It's new to me, too. I've never had a case where no plea offer was made.

THE COURT: Is that your understanding, that you've never gotten one in this case?

MR. SCHAMEL: That's my understanding.

THE COURT: And have you expressed to the government whether you would have any interest in one, or have you expressed a clear lack of interest in one?

MR. SCHAMEL: Not to be cute, but it's not in my interest. I think, every case I've ever had, I want my clients to know what the other options are. I always -- in fact, the one thing I was going to raise when we were done is this exact issue. I think the government has to put on the record whatever their position is and a potential plea that they would offer him, and I think he has to be advised, to make our record proper, so that we're not back here after, should we lose.

But I think it's premature to make an inquiry when they never made -- I thought we were going to get one, candidly, after our last hearing when Your Honor raised this. I can tell you, before I was dealing with Mr. Rothstein I was dealing with other people in the office, we were talking about

whether or not they were going to indite him. And, candidly, I didn't anticipate, sort of, how they were going to do it or what they were going to do. I didn't even think we would be in federal court on this. But they indicted in federal court and they've never once said anything other than he can plead to the indictment.

And if that's their plea offer, if that's their plea offer, is he can plead to the indictment and here's what our proposed sentence guidelines are, I think Your Honor can conduct the inquiry. I'm fine to do that on the morning of jury selection, if they want to do that, but I think they do have to put something in writing, even if it's to say we're not making a plea offer.

THE COURT: All right. Well, he would still get, at least within the guidelines, the three points for acceptance of responsibility. There's some question about whether the guidelines would aggregate the counts. So I think it's fundamental that the government put its position as to what the defendant's options are on the record. I certainly don't want this to be what comes back and haunts us in the future.

MR. SCHAMEL: As I've found, it's always better to work with people smarter than yourself, so I have Ms. Jara and she reminds me that maybe my representation and my memory are incorrect. She seems to recall, long before the current government trial team, that there was a discussion. I don't

know that it was ever in writing, but the possibility of pleading to one false statement of his choosing and a guideline of zero to six months. I don't recall that. And I don't know that either of the government counsel ever are aware of it.

THE COURT: All right. I have a note that at a status conference on July 17 of 2023 you said the case is heading to trial, there's no plea offer on the table. The defendant has no intentions of pleading --

MR. SCHAMEL: As I say --

THE COURT: -- then back in June of 2023, the first criminal status conference, I asked: Has there been any plea offer? And the answer was: Not since the indictment. So that's all the information I have in my notes.

(Off-the-record discussion between defense counsel.)

MR. SCHAMEL: I'm going to go back and try to recreate it because Miss Jara's recollection is this was pre-indictment in an email. Now, that was at a prior firm, so I don't know -- I'll have to try and track that down.

THE COURT: Right. And my note: Not since the indictment. Suggested there was something pre-indictment. And the government seems to think there might have been something by the prior team pre-indictment.

But you're furrowing your brows. If there's something that you just looked up and you want to tell me --

MR. ROTHSTEIN: Yes, Your Honor. We were just

looking up -- we remembered you bringing this up after the last hearing and we were thinking about whether or not we had sent an email essentially saying you can plead to the indictment, but we are unable to access the internet to search. But, before the next hearing, Your Honor, we can send defense counsel a letter essentially stating that, that the plea offer is the indictment. We can set forth what the maximum sentence is and what our calculation is. And we can send that offer before jury selection.

THE COURT: All right. I think that would be helpful. We'll put it on the record prior to selecting a jury. If someone reads the *Frye* case and believes it is not necessary, you can tell me that in a written submission before that date -- and that means like before close of business on the day before, not at 11:30 the night before -- and I'll do what's necessary that morning. But I feel like this could be a problem and, so, I just want to make sure that we dot all our Is and cross all our Ts.

MR. ROTHSTEIN: Absolutely, Your Honor.

Just to go back to the jury instructions.

THE COURT: Yes.

MR. ROTHSTEIN: Sorry. While the ex parte conversation was occurring, Ms. Ross and I went back and looked at it. We actually think it should say, "false, fictitious or fraudulent." Because one of the statements, there's an

argument, could be fictitious, for instance.

THE COURT: All right. Well, I did a prior false statements trial and when we got to the definitions, it actually had kind of the same definition for false and fictitious.

MR. ROTHSTEIN: Okay.

THE COURT: But then fraudulent was slightly different. And I don't know if I brought that in with me or not, but I had a prior false statement trial where we said the third element that the government must prove beyond a reasonable doubt is that the statement or representation was false, fictitious, or fraudulent. A statement or representation is false or fictitious if it was untrue when made and known at the time to be untrue by the person making it or causing it to be made. A statement or representation is fraudulent if it was untrue when made and was made or caused to be made with the intent to deceive the person to whom it was made. It's not necessary for the government to prove that they were in fact misled.

But if you would like to submit a definition for fictitious or fraudulent, you can do that. You did allege all three in the indictment, it's just you never mentioned it again in your jury instructions, so that's why I wrote them the way I wrote them.

MR. ROTHSTEIN: Yes, Your Honor. The government is

actually fine with the instruction that Your Honor just read --

THE COURT: Okay.

MR. ROTHSTEIN: -- as that being the language. We think it should say exactly what you said.

THE COURT: All right. What's your position as to whether that is an appropriate definition of -- false, essentially, and fictitious are defined the way you have defined false. If it was untrue when made and known at the time to be untrue -- which you wanted included -- by the person making it or causing it to be made. And then fraudulent is if it was untrue when made and was made with the intent to deceive.

They're all very similar, frankly, but --

MR. SCHAMEL: Similar and confusing. Could Your Honor just email that to us and we can weigh in on that?

THE COURT: Yes, I will do that.

MR. SCHAMEL: I would appreciate that. And we'll also respond to that by tomorrow.

THE COURT: All right. Is there anything else that the government believes we need to raise at this time?

MS. ROSS: Your Honor, hopefully four quick things. We did raise with defense counsel earlier that Special Agent Elizabeth Hadley, who is the case agent on the team, we were hoping that she would be allowed to sit at counsel table through the trial. And defense counsel indicated he had no

objection to that.

THE COURT: Okay. That's fine.

MS. ROSS: The second witness, whose name is Paulina Murphy, she's also a special agent with the FBI and was, like, an assisting co-case agent. She is on defense counsel's witness list, but would also like to sit in, not at table, but in the courtroom. Defense counsel indicated he would likely have no objection, but he's going to give it a little bit more thought. And I just wanted to flag that now and then hopefully before jury selection we can -- or, before trial starts we can come to a resolution on that.

THE COURT: All right. And if you don't agree, we can talk about that when the trial starts.

MS. ROSS: Thank you, Your Honor. And then the next question, Your Honor, is with respect to notifying the parties about witness lists or upcoming witnesses, we would ask Your Honor to implement a 48-hour rule to give -- what I've had different judges in this courthouse do is actually email the clerk or chambers the upcoming witnesses that we anticipate calling, and that that rule would apply for both parties. That way, the 48-hour rule gives -- you know, there's no sandbagging, everybody is clear about who is coming next. And emailing it through chambers and CCing opposing counsel, just to make sure that's done on time. And we're wondering if Your Honor had any objection to implementing something similar?

THE COURT: Well, I might want to keep my chambers out of it. But what's your point about that, Mr. Schamel?

MR. SCHAMEL: I don't know. I've ever seen a judge issue an order. But what I've seen done is 24 hours. So on Monday the government says these are my witnesses for Tuesday, and we do the same. It becomes a little complicated, particularly if this looks like it's going -- I think the government's estimate is still three or four days.

MS. ROSS: To try this case, the government's case.

MR. SCHAMEL: Yeah. So we're going to have a little hiccup -- I don't know what it's going to look like, but if we start witnesses on the 7th and they go, 7, 8, 9, 10, right? then I'll probably know who I'm going to call on Friday, the 11th. But I don't know that I'm going to know who I'm going to call on Tuesday. And I always consider the weekend as sort of the next day.

We're not playing games. You know, I don't think there's going to be any big surprises. I think we know who they are going to call, and I think they tell us the day before so we know and we'll do the same.

THE COURT: I think if the government wants to provide notice within 48 hours, that's fine. Certainly no less than 24 hours. You can send an email to Mr. Schamel with a copy to the courtroom deputy. As we get close to the end of your case, and certainly when you rest, you should be able to

tell the government at that point who your first witness is, whether it's going to be the next day or the following Monday.

And I guess I have this very lengthy list that you gave me a long time ago of potential witnesses for both sides. Has there been any reduction in any of those names that I don't -- some of them I can take off?

MR. SCHAMEL: We're getting close, Your Honor. I think we're paring it down. And we'll be happy to let the government know by the end of this week for sure what our witness list is.

THE COURT: If the parties could, again, prior to my bringing the jury in on October 2nd, so by October 1st, if there's a shorter list of names for me to read -- and I understand that these have to be overinclusive, but if there's anybody you know you're not calling, I don't think I need to read their names.

MR. SCHAMEL: We'll definitely do that.

THE COURT: Do I have the names of the reporters that you were thinking of calling? Are they named here?

MR. SCHAMEL: I think they are, but I'll double check.

MS. ROSS: No.

MR. SCHAMEL: Okay. We'll add them.

On scheduling, if the government is going to go five days and we're going into that three-day weekend -- so Monday

is a federal holiday. So we go 7 -- Monday the 7th, right, finish jury selection and start opening?

THE COURT: And I think we're only going to do a half day on Friday because I scheduled some things on my own on Friday afternoon.

MR. SCHAMEL: So, Your Honor doesn't have to answer this this second, but for the purposes of our scheduling, if the government says it could go five days, but three or four at least, that gives us from the 7th to that Friday afternoon and then we have the three-day weekend, can I just tell my witnesses I'm not going to need anybody before that Tuesday? Is that safe --

THE COURT: I don't know how long you think your case is going to take at this point. I think you should probably have your first witness -- I think we'll know more on Monday. We don't even know yet if we will have our jury picked by the end of Tuesday. I've always thought that was ambitious and now we're thinking about the things we have to do before we even start the process. So it may be that we don't even open until the afternoon of Monday, the 7th. And then I think we'll have a better idea by about Wednesday whether that's a fair statement or not. I'm not going to require them to tell you today whether you need a witness on Friday.

MR. SCHAMEL: No, I wasn't -- I was just alerting Your Honor of an issue, because if we get to Friday, I don't

want to put somebody on and then have them down for three days before we finish their testimony or before they finish their testimony.

THE COURT: We'll think about what the most logical way is to proceed, no matter who has got a witness on Friday. If the government is going and there's a short one we can fit in, fine. If there's one where their testimony is going to be broken up and they don't want to do that, we'll all be flexible on Friday.

MR. SCHAMEL: I just was wondering, Your Honor.

THE COURT: Anything else, Ms. Ross?

MS. ROSS: Just to make sure I'm tracking correctly, we will make sure we provide defense counsel with our expected witnesses testifying at least 24 hours in advance, and defense counsel has represented he will do the same. We would ask that he provide the 24-hour notice if the defendant himself intends to testify, understanding, of course, that he could change his mind. So I just want to clarify that. I just wanted to make sure that was included in, kind of, the understanding.

THE COURT: All right. Well, I really don't know that he has to commit one way or the other. I think if you're sure that he's going to testify, it would be appropriate to let them know. But I don't think you really have to do that until it gets close.

MS. ROTH: Your Honor, if he does end up deciding to

testifying without, kind of, notice, we would ask for some time to make sure that we are prepared for that.

THE COURT: You should be preparing for that right now, Ms. Ross. Come on, cross-examining the defendant is something most prosecutors don't get to do, and if you don't have that written out already, I would be shocked.

MS. ROSS: Okay. Your Honor, one last thing on the list, which is hopefully quick. We did provide notice of expert testimony and we do intend to tender the CART examiner as a witness, and I know different judges have different directives on how we go about that.

THE COURT: As the what examiner? I'm sorry.

MS. ROSS: It's the FBI CART examiner. So she's the digital forensics expert. I know different judges have different thoughts on how that's best done, whether that's done on the record or whether that should be -- you know, the questions are done, but then sort of off the record -- you know, or not in front of the jury, she is noticed as an expert, if that makes sense. I've had some discussion --

THE COURT: Do you have any objection to that witness qualifying as an expert?

MR. SCHAMEL: Court's indulgence.

(Off-the-record discussion between defense counsel.)

MR. SCHAMEL: No, I -- I mean, I'm not even sure why they need her, but I don't --

THE COURT: That's a yes or no question.

MR. SCHAMEL: No, we don't.

THE COURT: Then you can bring out her qualifications on direct, in front of the jury, and move that she be qualified to testify as an expert and I'll rule at that time.

MS. ROSS: Okay. Thank you, Your Honor.

THE COURT: All right. All right. I'm not suggesting that the defense can hold out until the last minute and then suddenly, by surprise, call Mr. Lamond. But certainly they could decide at the last minute not to call Mr. Lamond. And I think if you get to the point where you know you are going to call him, you should let the government know. But, I think it's prudent, going into this trial, to prepare for both contingencies.

All right. I will read anything you send me in the interim. Otherwise, I will see you on October 2nd and hopefully we'll be able to make some progress with the jury on that day. Thank you.

* * *

CERTIFICATE OF OFFICIAL COURT REPORTER

I, JANICE DICKMAN, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 2nd day of February, 2026

/s/_________________________________

Janice E. Dickman, CRR, CMR, CCR
Official Court Reporter
Room 6523
333 Constitution Avenue, N.W.
Washington, D.C. 20001

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| United States of America, | ) | Criminal Action |
| | ) | No. 23-cr-177 |
| Plaintiff, | ) | |
| | ) | JURY TRIAL |
| vs. | ) | Day 1 |
| | ) | |
| Shane Brian Lamond, | ) | Washington, DC |
| | ) | December 2, 2024 |
| Defendant. | ) | Time: 10:51 a.m. |

TRANSCRIPT OF JURY TRIAL
HELD BEFORE
THE HONORABLE JUDGE AMY BERMAN JACKSON
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S

For Plaintiff: Rebecca G. Ross
Joshua Rothstein
UNITED STATES ATTORNEY'S OFFICE
610 D Street NW
Washington, DC 20530
(202) 252-6937
Email: Rebecca.Ross2@usdoj.gov
Email: Joshua.Rothstein@usdoj.gov

For Defendant: Mark E. Schamel
Ana L. Jara
VENABLE LLP
600 Massachusetts Avenue NW
Washington, DC 20001
(202) 344-4631
Email: MESchamel@venable.com
Email: ALJara@venable.com

Court Reporter: Janice E. Dickman, RMR, CRR, CRC
Official Court Reporter
United States Courthouse, Room 6523
333 Constitution Avenue, NW
Washington, DC 20001
202-354-3267

* * * * * * *P R O C E E D I N G S* * * * * * *

THE COURTROOM DEPUTY: We are on the record with criminal case 23-177, United States of America versus Shane Brian Lamond.

Counsel, starting with the government, please approach and state your appearance for the record.

MR. ROTHSTEIN: Good morning, Your Honor. Joshua Rothstein on behalf of the United States. With me at counsel table is AUSA Rebecca Ross, paralegal Lisa Abbe, and FBI Special Agent Elizabeth Hadley, and Paulina Murphy, from the FBI.

MR. SCHAMEL: Good morning, Your Honor. Mark Schamel and Ana Jara here with Mr. Lamond, who is present before the Court. And I apologize, We just -- I don't know if your honor knows, there's two swearings-in today. And Mr. Hinger, our parallel, who is going to be at counsel table, he's just coming through the metal detector. He's been there for over an hour.

THE COURT: All right. He can come in and set up. Whatever we're doing, I don't have a problem with him coming in and setting up.

Yes, Mr. Rothstein?

MR. ROTHSTEIN: Your Honor had inquired at the last hearing about whether or not the government had extended a plea offer. And we have located that plea offer. It was January 31st, 2024. And Mr. Schamel has confirmed that he had received

it and it had been rejected. So it has been made.

THE COURT: Okay. I feel like we talked about that at the last trial date, but maybe we didn't.

But, Mr. Schamel, are you familiar with the plea offer that was extended?

MR. SCHAMEL: I don't think any of us had recalled that. I think it was Ms. Ross that actually found it from before. Yeah, we emailed about it and are familiar with it. Again, I spoke to Mr. Lamond about it. I thought that was a settled issue at our last hearing, but I'm happy to bring Mr. Lamond up, if you want to make inquiry of him on the record.

THE COURT: I do need to ask Mr. Lamond.

Have you been shown what this plea offer was that had been extended to you through your counsel?

THE DEFENDANT: Yes, Your Honor, I have.

THE COURT: Without telling me what the two of you have discussed, have you had the opportunity to discuss it with your lawyer?

THE DEFENDANT: Yes, Your Honor, I have.

THE COURT: All right. And are you rejecting the plea offer and you want to move forward to trial today?

THE DEFENDANT: Yes, Your Honor, I would like to go to trial.

THE COURT: All right. I think we're all right in

that situation.

Mr. Schamel, are there any other preliminary matters we need to take up?

MR. SCHAMEL: Two. One while I have Mr. Lamond here, and I don't know if Your Honor wants to make any inquiry about the waiver. I know that based on the minute order yesterday, we're all of the understanding Your Honor is signing off and we are moving forward with a bench trial. I didn't know if Your Honor was going to make any inquiry.

THE COURT: Not usually. We have a written waiver.

Mr. Lamond, you understand that you have a constitutional right to have a trial by jury in this case? Twelve citizens from the District of Columbia would be the ones who decide whether the government has proved its case beyond a reasonable doubt. And I understand from your written waiver that you're prepared to give up that right and be tried by me in this case. Is that indeed your desire?

THE DEFENDANT: Yes, it is my decision.

THE COURT: You've also discussed that with your lawyers, and the pros and cons of proceeding in each manner?

THE DEFENDANT: Yes, I have, Your Honor.

THE COURT: It's my understanding, ever since this was docketed, that this is going to be a bench trial. So you can be seated.

THE DEFENDANT: Thank you, Your Honor.

MR. SCHAMEL: I wasn't sure if Your Honor would announce that or not.

The only thing is sort of a scheduling question. The government came to us, I think last week -- within the last ten days or so and indicated that they are down to nine witnesses and they're estimating the length of trial to be two and a half days. They think they're going to be done on Wednesday. Obviously, we had been preparing all along that we were not even going to touch the defense case until next week.

Mr. Tarrio -- you're not going to believe this -- he's still not in the District of Columbia, as of my conversation last evening with his lawyer, Mr. Hassan. Mr. Hassan -- I understand from the government that they had been assured that Mr. Tarrio is going to arrive tomorrow, the 3rd, and will be at the D.C. jail. Mr. Hassan has made arrangements -- he has a commitment every single day this week in a courthouse or someplace until Friday.

He's coming up on Saturday to see Mr. Tarrio, to meet with Mr. Tarrio. He said that he's going to, obviously, discuss again the Fifth issue and he's going to make Mr. Tarrio available to us as a witness, and we would like to meet with him in advance.

He would like -- Mr. Hassan has asked me to ask Your Honor to have Mr. Tarrio called on Monday. I am asking Your Honor to have Mr. Tarrio called on Monday, have him

testify on Monday so that we can get --

THE COURT: I have a jury trial scheduled for Monday. This trial is scheduled for today.

MR. SCHAMEL: I understand that. Mr. Tarrio is still not here. I haven't been able to see him and his lawyer hasn't been able to speak to him in seven months because he's been moved all around.

THE COURT: Well, he's been somewhere where you could have seen him. This trial was continued on October 1st for today. And I understand Mr. Tarrio was going to see how the election turned out before he decided whether he wanted to testify today, and that happened a month ago. And you all have had the opportunity to bring this up to me, to meet with Mr. Tarrio, certainly Mr. Tarrio's lawyer. Mr. Tarrio has had an opportunity to speak since the election, but --

MR. SCHAMEL: I understand.

THE COURT: -- they haven't. I told you, when I continued this case, that this is when this case is going to go to trial. And we're going to move through it efficiently. There's no jury. I don't think it's even going to take two and a half days, frankly.

MR. SCHAMEL: Nor do I.

THE COURT: So you need to talk to Mr. Hassan and be ready to proceed.

MR. SCHAMEL: I'm just telling Your Honor that

Mr. Hassan informed me last evening --

THE COURT: Okay. Well, Mr. Hassan doesn't control my calendar.

MR. SCHAMEL: Understood.

THE COURT: I've got another defendant who has been waiting since 2021 for his trial, and it starts Monday. Now, there's nothing I can do about that.

MR. SCHAMEL: Well, I'm not accusing anybody of hiding Mr. Tarrio or moving him around, but apparently he's been moved six or seven times.

THE COURT: I'm not accusing anybody of anything. I'm just letting you know that you and Mr. Hassan cannot agree over the weekend how this courtroom schedule is going to operate. This trial starts today and it's going to proceed until it's finished. And if it is still going on Monday, that's one thing, but I can't just take a break and put off another trial with somebody else who is traveling a distance to be here.

MR. SCHAMEL: I'm not suggesting that I'm controlling Your Honor's calendar. And I'm telling Your Honor what Mr. Hassan has told me, and I have been in constant communication with him.

THE COURT: You need to let Mr. Hassan know what he's known since October 1st, which is this trial starts today.

MR. SCHAMEL: Correct.

THE COURT: All right.

MR. SCHAMEL: And Mr. Hassan and the defense have always believed the government's estimate of two weeks, that he was going to be testifying next week.

THE COURT: I don't think we've been talking about a two-week trial for a long time.

But at any rate, is there anything else I need to discuss before I hear the parties' opening statements?

MR. SCHAMEL: No, I think that's it. That was my issue.

THE COURT: All righty. All right. Is the government prepared -- is there anything else you need to bring up before we start?

MR. ROTHSTEIN: No, Your Honor.

THE COURT: I'm sorry to take the wind out of your sails late night, but I thought it seemed kinder to do it last night than this morning. But, this is a bench trial and it seemed inefficient to show me all your exhibits and then show me all your exhibits and then probably do it again in closings. So I've opted for twice, instead of three times. I'm happy to hear a general opening statement as to what you intend to prove in this case.

MR. ROTHSTEIN: Sure, Your Honor. Your Honor, we've just cut it back to one slide. So we took your guidance and that's why we've also scaled back our case to just be, we

think, within the next two and a half, three days.

The defendant, former Washington, D.C. Metropolitan Police Department Lieutenant Shane Lamond leaked sensitive police information to a criminal suspect and then lied about it to federal investigators. If any officer did this in any case it would be illegal. Here, it was even worse, even more problematic because the defendant was providing sensitive law enforcement information to Enrique Tarrio, the leader of the Proud Boys, a right-wing hate group.

Specifically, the defendant provided police intelligence related to MPD's investigation into the burning of a Black Lives Matter banner by Enrique Tarrio and the Proud Boys. For this the defendant is charged with one count of D.C. code obstruction. And when confronted about his relationship and communications with Tarrio, the defendant lied about it. For this the defendant is charged with making three false statements to law enforcement.

One, he lied when he said that his relationship with Tarrio was, quote, was more, you know, one-sided, with just him telling me, you know, what their plans were, unquote. The evidence will show that it was not one-sided, that the defendant was providing Tarrio with police information.

Two, he lied when he said that he tried to find out information from Tarrio about his involvement in the December 12th, 2020 destruction of the BLM banner, quote, without

tipping him off to the MPD, unquote. The evidence will show that the defendant was providing Tarrio with realtime updates as to the evidence against him and the status of the investigation.

Three, he lied when he said that he, quote, didn't, you know, inform him that he had an arrest warrant, unquote, for Tarrio's participation in the December 12, 2020 destruction of the BLM banner. The evidence will show the defendant alerted Tarrio about the arrest warrant on January 4th, while Tarrio was on a flight from Miami to D.C.

The evidence will show that the defendant made these false statements because he knew that he had passed law enforcement information to Tarrio about the investigation and he knew it was a crime. But I want to briefly take a step back to discuss what the evidence will show about who the defendant is and why he was helping Tarrio.

The defendant was not a cadet just out of the academy. He was a 24-year veteran of the Washington, D.C. Metropolitan Police Department. He was a lieutenant. The defendant knew police procedures. He knew the difference between right and wrong and he knew that it was a crime to lie to law enforcement.

However, despite knowing all of these things, the defendant made a choice; a choice to betrayed his oath, a choice to destroy evidence and, when confronted, a choice to

lie to federal law enforcement. Why did he do this? As the evidence will show, the defendant was a Proud Boy sympathizer. On January 8th, two days after the attack on the Capitol, the defendant sent Tarrio a message via Telegram secret chat, quote, Of course I can't say it officially, but personally I support you all and don't want to see your group's name or reputation dragged through the mud, unquote. And that sympathy led him to obstruct an investigation into the burning of the Black Lives Matter banner, a crime committed by Tarrio.

Understanding the defendant's crimes requires learning a little bit more about the nature of the defendant and Tarrio's relationship. The defendant was previously assigned to MPD's Homeland Security Bureau, HSB. At the time, one of the defendant's responsibilities was to reach out to leaders of groups engaged in First Amendment activities to find out their plans so he could coordinate with other members of law enforcement.

The information was to flow one way, from the leaders of those groups to the defendant and then on to other members of law enforcement. The purpose of the information was to keep politically adverse groups separated. The defendant, as part of his job, made contact with Tarrio in late 2019 and had sporadic contact with him over the next few months because the Proud Boys were coming to D.C. to support political activist Roger Stone, who was on trial in this court.

The defendant contacted Tarrio through phone calls, text messages, iMessages, and Google voice messages, methods of communication for which there could be records that could be retained and used by law enforcement.

But, the defendant's relationship with Tarrio began to change after the 2020 election. Specifically, after November 7th, 2020, when Joe Biden was declared the president-elect. Your Honor will see that at least as of November 7th the flow of information changed from a one-way road to a two-way street, with the defendant providing Tarrio with law enforcement information he should not know.

The defendant became a double agent for the Proud Boys, funneling police information to them through covert means. The way in which the defendant and Tarrio communicated largely depended on whether the defendant was seeking information, in which the case the communications occurred over iMessage, or if the defendant was providing sensitive law enforcement information, then the communications occurred over the encrypted platform Telegram, which was not a method of communication that MPD officials were supposed to use because, as the defendant knew, it could be used to destroy evidence.

Between November 7th, 2020 and December 12th, 2020, the defendant and Tarrio exchanged 109 iMessages and 40 Telegram private chats. After December 12th, 2020, all of the defendant's communications with Tarrio occurred over Telegram,

using a higher level of encryption. Why? Because on December 12th Tarrio and the Proud Boys became suspects in a crime.

In the fall of 2020 the Proud Boys came to D.C. to search for and fight individuals associated with antifa or the Black Lives Matter, known as BLM, movement. On December 12th, 2020 Tarrio and the Proud Boys tore down a BLM banner from the Asbury United Methodist Church, an historic Black church. Tarrio and the Proud Boys laid the banner in the street, doused it with lighter fluid and then lit it on fire.

The banner burning was captured on video and posted online. MPD immediately assigned detectives from the riot task force to investigate and work with prosecutors to file charges. Detectives from that investigation will tell this Court how they worked around the clock for the next two weeks. It was a high priority for MPD to bring the perpetrators to justice as quickly as possible.

They will explain that to arrest the person who burned the banner, to get a warrant they needed two things: One, probable cause that a crime had been committed and, two, either a positive identification of the perpetrator or a confession from the perpetrator to a law enforcement officer. Here, they had probable cause because the crime was committed on camera. But they still needed a positive identification or a confession. So given the video of the incident, they worked to get a positive ID.

The evidence will show that unbeknownst to investigators working on the case, on December 15th, 2020, three days after the banner burning, at around 4:30 p.m., the defendant met up with Tarrio and Tarrio admitted to burning the banner. In other words, Tarrio gave the defendant the confession law enforcement was looking for. But what did he do? Nothing. He never notified the defendants (sic) on the case that he had met with Tarrio, that he had discussed banner burning, or that Tarrio had confessed to burning it.

And you will hear other ways in which the defendant interfered with the investigation. For instance, you will hear that MPD was evaluating whether the banner burning should be investigated and charged as a hate crime, carrying more serious consequences.

The defendant was one of five people who sat on a panel to make that determination. And you will see evidence that Tarrio was adamant in his discussions with the defendant that it should not be charged as a hate crime. You will see that, consistent with Tarrio's wishes, the defendant advocated against it being charged as a hate crime.

The defendant provided Tarrio with realtime updates on those internal deliberations. This play-by-play information allowed the Proud Boys to be one step ahead of law enforcement, to counter them in real time. The evidence will show that the information the defendant gave to Tarrio was so useful to the

Proud Boys that Tarrio would sometimes copy his entire text from the defendant and send it out to the Proud Boys' group chat, sometimes within a minute of receiving the information.

As the flag burning investigation progressed, the defendant started providing Tarrio with live updates on investigative steps that were being taken, what evidence had been collected, and a status of an arrest warrant for the defendant's arrest. And as the evidence will show, the defendant tipped off Tarrio once the warrant was obtained.

A warrant for Tarrio's arrest was signed on December 30th, 2020. The MPD official who planned the arrest will testify that the plan was to arrest Tarrio on January 4th, when they knew he had plans to fly into the District. The arrest was intended to be a surprise, to prevent Tarrio from evading arrest, from destroying evidence, and also for officer safety.

Flight records will show that on January 4th, 2020, Tarrio boarded American Airlines flight 925 from Miami to Washington, D.C. The flight took off at 12:55 p.m., and while onboard Tarrio purchased WiFi access. The defendant was monitoring Tarrio's travel that day. Approximately 7 minutes into the flight the defendant went into his Telegram application. He set his self-destruct timer down from 30 seconds to 10 seconds because he had something really important to tell Tarrio, that the warrant had been signed.

And Your Honor won't see the actual message because,

as the defendant intended, it self-destructed 10 seconds after it was read. And just as he did in the past, when Tarrio received important information about the investigation or the warrant from the defendant, Tarrio immediately relayed the message from the defendant to the rest of the Proud Boys.

The evidence will show that the defendant was the only person with access to that piece of critical information, who also contacted Tarrio while he was in flight. Later that afternoon Tarrio was arrested, once he entered the District.

So how did law enforcement figure out that the defendant was Tarrio's source for police information? Following the January 6, 2021 attack on the Capitol, law enforcement began to investigate those who were involved as part of the investigation. Law enforcement obtained screenshots of messages indicating that Tarrio, the leader of Proud Boys, may have been receiving inside information from law enforcement officers in the days and weeks leading up to the January 6th attack.

One of the screen shots appeared to be of a Telegram messages between Tarrio and someone named, quote, Shane FBI Police. Law enforcement identified Shane FBI Police as the defendant, MPD Lieutenant Shane Lamond. Because of this, on January 2nd -- sorry. On June 2nd, 2021, the defendant was interviewed by federal investigators from the United States Attorney's Office. Although the defendant did not know it at

the time, the interview was recorded. And Your Honor will hear that interview. You will hear that when confronted by investigators, Lamond lied, over and over again. He didn't misunderstand the questions. He chose to lie.

The defendant chose loyalty to Enrique Tarrio, the head of the Proud Boys. The defendant chose to betray his fellow officers and his community. The defendant chose to violate the law he swore to uphold. The defendant knew it was wrong to withhold information, he chose to do it anyway. The defendant knew it was wrong to destroy evidence, he chose to do it anyway. And the defendant knew the truth and he chose to lie anyway.

So, Your Honor, after this Court hears from all the witnesses and sees all the evidence, we ask that the defendant be held accountable for his choices to violate the law and that the Court return the only verdict consistent with the evidence, guilty on all four counts. Thank you.

THE COURT: Thank you.

Mr. Schamel, do you want to give an opening statement or -- Mr. Jara?

MS. JARA: I would, Your Honor. Thank you. I am actually not using any slides.

Before I start my opening, I would just ask to move to strike a couple things from that opening. First, the Proud Boys sympathizer language is inflammatory, prejudicial, and

simply not true. And also the reference to the January 6 trial in this court is also improper, inflammatory, prejudicial and simply not true about our client, so I would ask to move to strike.

THE COURT: I don't know that is.

MS. JARA: In the opening, in his opening --

THE COURT: He doesn't say anything about the January 6th trial in this court. I think he talked about --

MS. JARA: Roger Stone.

THE COURT: He doesn't need to say that for me to know.

MS. JARA: Right, right.

THE COURT: All right. I don't think we need to strike anything from the opening. I understand there's no jury here, that this is not evidence and it's just an outline of what the evidence will be. I appreciate the motion, but I don't think it's necessary under the circumstances that we have right now, which is that I'm the finder of fact. But you can proceed.

MS. JARA: I understand, Your Honor.

Context matters, especially in conversations; what someone says, when someone says it, how they say it, to whom they say it. All of that matters to figure out what is happening and what the people mean in the conversation. And that is what we would ask the Court to focus on in this trial.

The government, on the other hand, as you just heard, wants the Court to look at the evidence in a vacuum. They want the Court to focus on about a three-month period of time and a handful of text messages between Lamond and Tarrio. As the slide demonstrates just now, they also want the Court to focus only on some of Lamond's answers, as opposed to some of the questions and the conversation that was occurring with the AUSA investigators.

The problem with this type of cherry-picking is that in looking at only a select few text messages for a specified period in time, instead of the full picture, the government misinterprets some of the conversations, which brings us here today. We believe that in looking at the context of the communications here, the evidence will show that Lamond did not commit a crime and that Lamond did not think he was committing a crime either.

So let's start with the obstruction charge. I would ask the Court to focus on two things here. One, the context of the communications between Tarrio and Lamond. And, two, the context of the communications between Lamond and other MPD officers.

So with respect to the first, the communications between Tarrio and Lamond, the Court will see text exchanges where Lamond used Tarrio as a contact to get information about where the Proud Boys were demonstrating, how large those

demonstrations were, who was going to be there, where it was going to be, and then Lamond used that information to do his job, which was to gather intel into First Amendment demonstrations in the District to ensure that the police response was appropriate.

During these communications with Tarrio that you will see, Lamond did not disclose any information to Tarrio that was protected by any statute or regulation. The government referenced today some sensitive law enforcement information. I'm not sure what that is, but Lamond did not disclose that either.

During these communications, you'll see that Lamond did not withhold any information from D.C. MPD that he received from Tarrio and during these communications Lamond did not violate any D.C. MPD general order. In fact, at the time D.C. MPD did not have any sort of general order restricting the use of Telegram. As the evidence will show, the government actually knew all of this. They knew they had a bit of a problem and they struggled in some respects to nail down a theory on this part.

The second thing that I ask the Court to focus on on the obstruction charge is the communications between Lamond and the MPD officers. So you'll hear testimony that Lamond told one of his supervisors at MPD that before the flag burning Lamond disclosed that he was working with Tarrio as a contact

for First Amendment demonstration information. You'll also see text messages and hear testimony about how that same supervisor was aware that Lamond was meeting with Tarrio during the flag burning. And you'll see text messages where Tarrio referenced a social media post where he confessed to burning the flag and, on the same day, you'll see an email where Lamond tells D.C. MPD investigators who are looking into the flag burning.

You'll also see emails where Lamond tells the flag burning investigator that he knows Tarrio, that he can help. Lamond also identified Tarrio, and he was sure that he could. So D.C. MPD had the information that Lamond had and Lamond did not intentionally hide or keep anything from the investigators on the flag burning case. So that's the obstruction charge.

Finally, with respect to the false statement charges, I would ask the Court to focus on the questions being asked of Lamond and the context of the discussion between the AUSA investigator Brian Molnar and Lamond. You'll hear the recording of the meeting between Molnar and Lamond. You'll also have the transcript. And in both, I would ask the Court to think about the context again.

Molnar and Lamond are talking about intel, about how Lamond does his job, about what information Tarrio and Lamond discussed. We ask that you review the entirety of the transcript and also the recordings and not just the government's cherry-picked selections. Perhaps Lamond wasn't

as eloquent as he could be and perhaps Molnar didn't ask specific and precise questions, as he should have. But Lamond did not lie or intentionally mislead the investigators. He did not knowingly and willfully make false statements to the investigators. He was simply answering the questions Molnar asked him to the best of his ability.

So we, again, would ask you to consider the context here, the communications between Tarrio and Lamond, the communications between Lamond and the MPD officers, and the communications between Molnar and Lamond. And when you do so and after you hear the testimony and review all of the evidence, my colleague, Mark Schamel, is going to come back up here and ask the Court to do just as I'm doing right now, which is to find Lamond not guilty of the charges of obstruction and making false statements to investigators.

Thank you for your time, Your Honor.

THE COURT: I take it the entire interview is marked as an exhibit and the transcript is also an exhibit, so I'll have those, even if you don't play the entire thing in the courtroom?

MR. ROTHSTEIN: Yes, Your Honor.

THE COURT: All right.

MR. ROTHSTEIN: We have the entire thing and then we have sub-exhibits for the selections that we're playing.

THE COURT: And the defense can play whatever

selections it wants to play also.

MR. SCHAMEL: Yes. I mean, the Court can have all of it and then --

THE COURT REPORTER: Please use the mic.

MR. SCHAMEL: Is this not on?

THE COURT: We do have all of it. Okay.

MR. SCHAMEL: As long as they're all admitted, that's all we want.

THE COURT: The exhibits have already been admitted at the pretrial conference.

So, Mr. Rothstein, you can call your first witness. Or, Ms. Ross. I'll get this wrong. I'll just call you the government and the defense.

MS. ROSS: Good morning. The government's first witness is going to be Lieutenant Mufti. We're just getting him right now.

ASHAN MUFTI,

was called as a witness and, having been first duly sworn, was examined and testified as follows:

THE WITNESS: Good morning.

THE COURT: Good morning. I'm going to ask you -- the chair moves, the microphone doesn't particularly. But if you can try to speak into it as much as possible, that would be helpful.

THE WITNESS: Will do, Your Honor.

THE COURT: All right.

DIRECT EXAMINATION

BY MS. ROSS:

Q. Good morning, Lieutenant. Can you please state and spell your name for the court reporter?

A. Good morning, ma'am. Full name is Ashan Mufti. And I'll spell it for you. A-S-H-A-N. Last name is Mufti, M-U-F-T-I.

Q. Lieutenant, you where do you work?

A. I work for the Metropolitan Police Department.

Q. How long have you worked for the Metropolitan Police Department?

A. Approximately 12 years now.

Q. And what is your current title?

A. I am a detective lieutenant.

Q. Where are you --

THE COURT: Can you try to get the microphone and you --

THE WITNESS: Sure. Closer. No problem.

THE COURT: Thank you.

BY MS. ROSS:

Q. Where are you currently assigned to work?

A. I'm assigned to the district investigation division at the First District detectives' office.

Q. I'm going to focus back on 2020. What was your title at that point?

A. 2020, I was a Detective, ma'am.
Q. And when were you promoted to detective?
A. I was promoted to detective in 2018.
Q. When you were first promoted to detective, where were you assigned?
A. I was first assigned to the Third District detectives' office, ma'am.
Q. And at some point were you transferred from the Third District?
A. I was.
Q. Where were you transferred to?
A. In 2020 I was transferred to the task force that's downtown.
Q. Was that the riot task force?
A. That is correct, yes.
Q. And when was that riot task force established?
A. The riot task force was established in the summer of 2020, during the protests in reference to George Floyd.
Q. Can you explain why it was established?
A. Sure. So during the protest, ma'am, District of Columbia, just like the nationwide, we experienced a large number of protests in the city. With that protest we also had numerous businesses that were broken into, there was a lot of offenses that occurred. So due to the sheer volume of the offenses, we were tasked with working on those cases specifically. So we

were all collected and sent downtown for that investigations.
Q. As a detective assigned to the riot task force, what were some of your responsibilities and duties?
A. The riot task force, ma'am, we were -- our primary response was, and responsibility, was to work on all the offenses that were coming from First Amendment assemblies. So burglaries, assault on police officers, any type of crime that you can imagine that would transpire from cases related to protests.
Q. And at that time who did you report to?
A. I directly reported to Sergeant -- at that time, Sergeant Nicole Copeland.
Q. I'm going to shift gears a little bit to December of 2020. And at that time, did Detective Sergeant Copeland assign you to an investigation involving the burning of a Black Lives Matter banner?
A. Yes, ma'am. It was a little bit later than the summertime. It was closer to the end of the year it was assigned to me.
Q. December of 2020, does that sound about right?
A. December of 2020, yes.
Q. Who was in charge of that investigation?
A. I was in charge of that investigation.
Q. Who else was involved?
A. So, just like all the other cases, the task force was assisting me with that case.
Q. And can you explain what that investigation was for?

A. The case was, ma'am, for destruction of property. There was some banners that were taken from churches in the District of Columbia and we were considering those cases destruction of property/hate crime, was the charge at that time.

Q. And was the banner burning investigation a significant investigation for MPD?

MR. SCHAMEL: Objection.

THE COURT: Can you rephrase? That's a little leading.

BY MS. ROSS:

Q. In your experience, Lieutenant Mufti --

MR. SCHAMEL: (Stands up.)

THE COURT: Just ask the question in a little bit less leading fashion, I think that was the objection. I don't think it really matters without a jury here, but I think that you can rephrase the question. You don't need to repeat the question.

BY MS. ROSS:

Q. In your experience, Lieutenant Mufti, how did MPD view the banner-burning investigation?

A. So it was a high profile --

MR. SCHAMEL: Objection.

THE COURT: You have to put the microphone closer to you. I think, given his role in the investigation, he can answer the question. Overruled.

MR. SCHAMEL: Sorry.
THE COURT: All right. I overruled the objection. Go ahead.
A. So due to the case getting a lot of social media attention and being in the news, it was a high priority case for us. And also, the hate crime enhancement was also, we were looking into it very strongly.
BY MS. ROSS:
Q. And what steps did you take to investigate who was responsible for burning the Black Lives Matter banner?
A. Sure. Just like any other investigation, ma'am, my primary objective was to identify a suspect and draw up an arrest warrant, make an arrest in the case.
Q. And through those investigative steps were you able to identify a suspect?
A. Yes, ma'am, we were.
Q. And who was that suspect?
A. The suspect that we were able to identify was Enrique Tarrio.
Q. And who is Enrique Tarrio?
A. Enrique Tarrio, based on our investigation, we were able to find that he's a leader of -- chairman of the Proud Boys organization at that time, and he also admitted to these crimes on social media.
Q. Are you familiar with someone --

MR. SCHAMEL: I didn't hear the answer.
THE COURT: He said, "And he also admitted to this crime on social media."
MR. SCHAMEL: Social media. Thank you.
BY MS. ROSS:
Q. Are you familiar with someone named Shane Lamond?
A. Yes, ma'am.
Q. How are you familiar with him?
A. I knew that he was a lieutenant with our department.
Q. Was he involved in your investigation into the burning of the Black Lives Matter banner?
A. He was, ma'am.
Q. When was he involved in that investigation?
A. Sure. He actually was the first one to come forward and let us know that he knew defendant -- I'm sorry, Enrique Tarrio.
Q. Did you ever contact Lamond directly about the investigation?
A. No, ma'am.
Q. How did you contact him or how did you learn information from him?
A. So the information was brought to my attention by my superiors at that time.
Q. Have you ever been in contact with Shane Lamond outside of the banner-burning investigation?

A. No, ma'am.
Q. So I want to talk more specifically about Lamond's role in your investigation. Did you participate in any meetings with Lamond about the investigation?
A. Sure. Yes.
Q. Was that over the telephone?
A. Yes, ma'am.
Q. Do you remember who else participated in that meeting?
A. Yes, ma'am. So the meeting consisted of my supervisor, the U.S. Attorney's Office, and Lieutenant Shane Lamond.
Q. What was the purpose of that meeting?
A. The purpose of the meeting was to gather information on the suspect at that time, to get as much information as we can about the suspect and try to identify him for the case.
Q. Do you remember what the defendant said during that meeting?
A. Sure. He advised that he knew Enrique Tarrio from his past communications.
Q. Based on what Lamond told you during that telephonic meeting, did you think that the defendant was in regular contact with Tarrio?
A. At the time, no.
Q. Based on what the defendant told you during that telephonic meeting, how did you think the defendant knew Tarrio?
A. Based on his past experiences and meetings.

Q. Based on what the defendant told you during that telephonic meeting, did you think that the defendant was still in contact with Tarrio?
A. No, ma'am.
Q. Did the defendant provide information about Tarrio that you used to help draft an arrest warrant?
A. Yes, ma'am.
Q. In the course of your work, do you often have to draft arrest warrants?
A. Yes, ma'am.
Q. And can you just explain what MPD's process is for obtaining an arrest warrant in D.C. Superior Court?
A. Sure, ma'am. So once a probable cause has been established, you draft an arrest warrant. It has to go through your supervisors. Once a sergeant approves it, then it goes to a lieutenant. A lieutenant has to approve the arrest warrant, then it makes it way to U.S. Attorney's Office. And after the U.S. Attorney's Office decides to sponsor the arrest warrant, it goes to the judge's chamber.
Q. In other words, the U.S. Attorney's Office also has to approve the warrant before it gets sent to the court?
A. Correct, ma'am. Yes.
Q. And do you work with the U.S. Attorney's Office to have an approved draft?
A. Yes.

Q. Did you draft an arrest warrant in the banner-burning investigation?
A. I did, ma'am.
Q. Can we please pull up what has been marked as Government Exhibit 1012, and to stay on page 1, please.
Do you recognize this email, Lieutenant?
A. Yes, ma'am, I do.
Q. Did you send this email?
A. I did.
Q. And what is attached to this email?
A. The attachment, as it says, it's an arrest warrant in PDF attachment.
Q. Is this an arrest warrant you drafted for Enrique Tarrio?
A. Yes, ma'am.
Q. Can we go to page 2, please.
Is this the arrest warrant you drafted?
A. Correct.
Q. And generally, what was the purpose of this arrest warrant?
A. The purpose was to take Henry Enrique Tarrio into custody.
Q. Can we go to page 5, please. Can we just zoom in on the text there.
So we see here that you referenced a *Washington Post* article in which you referenced various statements that Tarrio made. Generally, when you are seeking approval for an arrest warrant, is a public confession to the media, such as *The*

*Washington Post*, enough to get that approval?
A. You would need additional information, more than the admission.
Q. Why is that?
A. So to make sure that we are catching the right person in the case.
Q. And can we go to page 6, please.
And we see here that you referenced a podcast in which Tarrio discussed the Proud Boys and other things related to the Proud Boys' actions. Generally, when you're seeking approval for an arrest warrant, is a confession on a podcast generally enough to get approval?
A. Solely on the admission on a podcast, ma'am, no. You would need additional information.
Q. And we see here that you wrote that Lieutenant Lamond identified Tarrio's voice on the podcast. Was that enough to seek approval for an arrest warrant?
A. That would be bare minimum to get an arrest warrant signed, yes, ma'am.
MR. SCHAMEL: Objection as to bare minimum.
THE COURT: Overruled.
BY MS. ROSS:
Q. Lieutenant Mufti, can you explain why you would need more information than just a positive ID of somebody's voice?
A. Sure. People can have -- people have similar voices. You

need someone to identify identity of a person based on their voice, somebody who has past interactions with them or they knew them or the family members.

Q. And can we go to page 7, please.

So we see here that you wrote about a public post on the platform Parler. First, what is Parler?

A. Parler, at the time, ma'am, was a social media account just like Twitter, where people used to post their opinions.

Q. And generally, when you're seeking approval for an arrest warrant, is a public confession on social media enough to get that approval?

A. No, ma'am.

Q. And why not?

A. You would have to confirm who the profile belongs to, the person behind who the profile is, confirm the identification.

Q. If you knew that Tarrio admitted to Lieutenant Lamond that he was the one who posted the confession on Parler, would that have been something you would have included in your search warrant?

A. Yes, ma'am.

Q. And why is that?

A. Admission to a law enforcement officer would be critical in the case for me.

Q. And can we go to page 8, please.

And, I'm sorry, just to follow up on that, Lieutenant

Mufti. You said it would be critical. What do you mean by that?

A. So admission to an average citizen holds weight, but admission to a law enforcement officer would hold more weight in a court of law.

Q. And did Lamond ever tell you that Tarrio had accepted responsibility for personally posting that confession on Parler?

A. No.

Q. To your knowledge, did he tell anyone that Tarrio had told him that he had posted the confession on Parler?

A. To my knowledge, ma'am, no.

Q. And now, looking here at page 8 of this exhibit, we see here that you wrote the defendant Tarrio also attached a photograph to his Parler post which appears to depict him crouching by the sign with an unknown item in his hand. Do you know, did the defendant look at that photograph with the investigative team?

A. Yes, ma'am.

Q. Was the defendant able to identify Tarrio in that specific photograph?

A. No, ma'am.

Q. What was the point of having the defendant try to identify Tarrio in that photograph?

A. Since the defendant -- at that time Tarrio was right next

to the burning of the banner. I wanted to get an identification from a person in reference to that case.
Q. If the defendant had been able to identify Tarrio in that specific photograph, would that have been helpful?
A. Yes.
Q. Why is that?
A. That would actually place him on the scene of an offense, committing the crime.
Q. Can we go to page 9 of this exhibit, please.
And can you just read that first paragraph? Just that very top paragraph.
A. Sure. "Lieutenant Lamond added that he has known defendant Henry Tarrio for almost 1.5 years, since meeting him while working Demand Free Speech First Amendment event in July 6th, 2019. Lieutenant Lamond has seen defendant Henry Tarrio in person and spoken to him approximately five to six times since first meeting him in July 2019."
Q. Why was this important to the arrest warrant?
A. So this is a standard practice, ma'am, whenever we put identification that a person's -- how familiar our witness is to the defendant. So it goes towards showing what kind of interactions they had.
Q. If you had known that the defendant had communicated with Tarrio hundreds of time, would you have included that in the arrest warrant?

A. Yes, ma'am.
Q. Why is that?
A. Just like putting "five to six times," showing that if the person met with the defendant hundreds of times, that would go towards my probable cause.
Q. Lieutenant Mufti, was this the file draft of the arrest warrant?
A. No, ma'am.
Q. Did you have to add additional information to this arrest warrant?
A. I did, ma'am.
Q. Did that take additional time?
A. It did.
Q. If you had information that Tarrio had confessed to burning the banner to the defendant, would that have been helpful?
A. Yes, ma'am.
Q. Would you have included that in this draft of the arrest warrant?
A. I would have.
Q. And why would you have done that?
A. That would have made my case more stronger.
Q. Did the defendant ever tell you that Tarrio had confessed to burning the banner?
A. No, ma'am.
Q. Thank you. We can take this exhibit down.

Did a judge ultimately approve an arrest warrant for Tarrio?

A. Yes, ma'am.

Q. Between this first draft of the arrest warrant that you sent to the U.S. Attorney's Office on December 22nd and the time that your arrest warrant was approved to go to the court for the judge's approval, did you have to investigate further?

A. Yes, ma'am, I did.

Q. Why?

A. We needed more information to build our probable cause.

Q. After the arrest warrant was signed, was it kept under seal?

A. Yes, ma'am.

Q. Why was it kept under seal?

A. So the suspect cannot make good on his escape or we don't have evidence destroyed in the case.

Q. In this case, what happened after the judge signed off on the arrest warrant?

A. Once the arrest warrant was signed, ma'am, I notified my supervisors that the arrest warrant has been signed.

Q. Were people not part of the investigative team notified of the arrest warrant?

A. No, ma'am.

Q. Why not?

A. Because this is a need-to-know basis, so we don't need to

inform other people of the status.

Q. If more people than necessary know that an arrest warrant had been signed, what sort of risks is that -- or, how might that impact the investigation?

MR. SCHAMEL: Objection.

THE COURT: I'm sorry. Can you repeat the question?

MS. ROSS: If people that are not need-to-know, so people who don't have to know that an arrest warrant has been signed learn about an arrest warrant, what sort of risks does that potentially cause your investigation?

THE COURT: And what's your objection?

MR. SCHAMEL: Well, it calls for speculation and I don't know that he is in a position -- he's not an expert, he's an officer. So he's using terms that don't even make sense. It's not need to know, it wasn't under seal, so -- I guess I can do it on cross.

THE COURT: All right. You can answer the question. I think you already answered the question as to why the warrant was sealed, which is kind of the same question. But, why was the information shared with only a small group of people?

THE WITNESS: Just like any other arrest warrant, ma'am, it's not shared to the public at that time.

BY MS. ROSS:

Q. And generally why is it not shared with the public?

A. Because the suspect cannot be arrested as -- or, they can

make good on their escape, evidence can be destroyed.
Q. And who is responsible for arresting Tarrio?
A. Usually, with our department, ma'am, when we have arrest warrants, we send it through CAU, which is Criminal Apprehension Unit, who are tasked with apprehending fugitives.
Q. After Tarrio was arrested, what happened after that?
A. Once Tarrio was arrested, I was notified by my supervisors. I subsequently responded and conducted a custodial interview with the defendant Tarrio.
Q. Prior to Tarrio's arrest, was there any discussion of Tarrio's self-surrendering?
A. No, ma'am.
Q. At any point did you direct the defendant to notify Tarrio about the arrest warrant?
A. No, ma'am.
Q. At any point, to your knowledge, did anybody else direct the defendant to notify Tarrio about the arrest warrant?
A. No, ma'am.
Q. Did you ever notify Tarrio that there was a warrant for his arrest?
A. No, ma'am.
Q. And why did you not do that?
A. It was not necessary to notify him so we can place him under arrest.
Q. Now, outside of the defendant's help to try to identify

Tarrio, did the defendant also provide the investigative team with Tarrio's phone number?
A. I believe he did, yes.
Q. And why did the investigative team need Tarrio's phone number?
A. I needed to get in contact with him to get a statement from Tarrio at that time.
Q. Did you ever direct the defendant to message Tarrio and ask Tarrio which number to provide you?
A. Can you repeat the question, ma'am?
Q. Did you ever direct the defendant to message Tarrio directly to ask him which phone number the defendant should provide to you?
A. No, ma'am.
Q. Do you know if anybody else directed the defendant to do that?
A. No.
Q. Did you use the number the defendant provided the investigative team to text Tarrio?
A. I did.
Q. What happened after you texted Tarrio?
A. When I texted Tarrio and I got a response from him that he will not be providing a statement, I documented that text message in our law enforcement database and I made it part of my arrest warrant.

Q. You said you documented it, why did you have to document it?

A. So --

MR. SCHAMEL: Objection.

THE COURT: Overruled. I think she's -- you can answer it.

A. Yes, ma'am. Any communication that you have in the case, related to the case, per our general orders, we have to document that.

BY MS. ROSS:

Q. Were there any talks about whether to charge the banner burning with a hate crime enhancement?

A. Yes, ma'am.

Q. Does charging someone with a hate crime enhancement impact the consequences of the crime?

A. Yes, ma'am.

Q. Does it increase potential punishment?

A. Yes, ma'am.

Q. Was the defendant ever involved, to your knowledge, in discussion about whether to charge the banner burning as a hate crime?

A. I saw an email that he had a discussion about that.

Q. Do you remember what the defendant's position was with respect to whether Tarrio should be charged with a hate crime enhancement?

A. I believe the email stated that he took a different stance, that people who were also arrested in the George Floyd protest should also be charged with hate crime.
Q. In other words, was the defendant against charging Tarrio with a hate crime enhancement?
A. Yes, ma'am.
Q. Are you familiar with MPD's rules and policy for running sources?
A. I am.
Q. Can you describe that policy?
A. Sure. So it's a -- we have a general order, just like anything else, for sources. It very specifically states you have to document your communication, you have to get an approval from your supervisor. If the source is a opposite sex, you have to have the same gender with you at that time.
Q. Why is it important to document communications and contacts and sources?
A. So you can build up on your investigation.
Q. How about communications with suspects of crimes, is it important to document those as well?
A. Yes, ma'am.
Q. Why is that?
A. Based on my training and experience, any communication related to the investigation, including communications with the defendant, it's a part of your case jacket and has to be

revealed in the court of law.

Q. Did the defendant ever provide you with any documentation of his communications with Tarrio?

A. No, ma'am.

Q. To your knowledge, did he provide anyone with any documentation of his communications with Tarrio?

A. No, ma'am.

Q. At any point did the defendant provide you with text messages he was exchanging with Tarrio?

A. No, ma'am.

Q. At any point did the defendant tell you that he was exchanging Telegram messages with Tarrio?

A. No, ma'am.

Q. At any point did the defendant provide you with Telegram messages he was exchanging with Tarrio related to the banner burning?

A. No, ma'am.

Q. At any point did the defendant tell you that he was destroying messages he was exchanging with Tarrio on Telegram?

A. No, ma'am.

Q. At any point did the defendant tell you that he had met up with Tarrio for drinks?

A. No, ma'am.

Q. At any point did the defendant tell you he had spoken with Tarrio about the banner-burning investigation?

A. No, ma'am.
Q. At any point did the defendant tell you that he was updating Tarrio on the status of your investigation?
A. No, ma'am.
Q. At any point did the defendant tell you that Tarrio had confessed to being involved in the banner burning?
A. No, ma'am.
Q. Would it have assisted your investigation if the defendant told you that Tarrio had confessed to him that he had burned the banner?
A. Yes.
Q. How?
A. That would have helped me develop more probable cause and add it to my arrest affidavit.
MS. ROSS: Thank you. No further questions.
THE COURT: All right. Cross-examination.

CROSS-EXAMINATION

BY MR. SCHAMEL:
Q. Hi, lieutenant.
A. Hi.
Q. We've never met before?
A. I don't think so.
Q. Nice to meet you.
A. Nice to meet you, too.
Q. Mufti?

A. Mufti.
Q. Just wanted to make sure. I'm Mark Schamel. I'm one of Shane's lawyers.
Let me ask you a couple questions before we get into the substance of what you just testified to, okay?
A. Yes, sir.
Q. If you have any questions about anything I'm asking you -- I am always accused of talking too fast.
THE COURT: Can you just ask a question?
MR. SCHAMEL: Sure.
THE COURT: Okay.
BY MR. SCHAMEL:
Q. So how many times did you met the government in preparation for your trial here today?
A. At least three times.
Q. And when you were meeting with them, are they taking notes, are they writing things down? Well, let me ask you this: Who is in the room when you met with the government? When I say the government --
A. Who was in the room?
Q. Yeah, who did you meet with?
A. The U.S. attorneys, AUSA.
Q. Mr. Rothstein?
A. Yes.
Q. Ms. Ross?

A. Yes.
Q. Mr. Hooks, who is someplace, floating back there. Anybody else?
A. Not familiar with this one, but the female who is sitting here -- I don't know her name -- yes, she was in one or two meetings.
Q. Some FBI agents?
A. Yes.
Q. During the course of those meetings, how long did they last?
A. Say, like 20, 25 minutes, 30 minutes.
Q. Each one?
A. I wouldn't be able to give you exact time, sir.
Q. Okay. When you were meeting, you met also with Ms. Vaughn, another AUSA, is that right?
A. Ms. Vaughn?
Q. Do you remember meeting with her?
A. This has been going on from 2020, forgive me if I'm forgetting someone.
Q. That's fine. I'm really not trying to trick you here. I'm trying to figure out who you met with and how many times you met with them.
A. Sure.
Q. So you think you met with some group of the government, prosecutors and agents, about three times?

A. More or less, yes.
Q. When you would meet with them, was somebody, probably an FBI agent, taking notes?
A. I wasn't really paying attention if they were taking notes. It's not fair for me to say if they were taking notes or not taking notes.
Q. When people were meeting with you, did they have computers?
A. Yes.
Q. Notepads and pens?
A. Yes.
Q. Okay. Did they ask you to repeat things?
A. Yes.
Q. Did they ask you specific questions?
A. Yes. Now that it's refreshing my memory, FBI agents were taking notes, yes.
Q. They would ask you to go back over things maybe and repeat something to make sure they got it right?
A. Sure.

MR. SCHAMEL: Okay. I think that's sufficient on a *Jencks* inquiry, Your Honor.

I would like to ask the government, I don't have the raw notes for all the meetings from Mr. Mufti, Lieutenant Mufti, and I just would renew any request, if there's raw notes. I have a couple, but I can't tell what.

THE COURT: All right. Has the government provided

everything it has in terms of notes with respect to this witness? And we should have talked about this before trial. We've had, like, three pretrial conferences, that's the purpose of them. Yes?

MS. ROSS: Your Honor, it is the government's practice, along with FBI, to include all handwritten notes attached to the typewritten MOI as part of a 1A file. And we have turned our -- all those over. We can confirm that it has been included in every single production. But that is our typical practice.

THE COURT: All right.

BY MR. SCHAMEL:

Q. Ms. Ross asked you some questions, Lieutenant Mufti, about your background at the Metropolitan Police Department. Do you remember she started off with that?

A. Yes.

Q. The divisions you've worked in?

A. Yes.

Q. Those have all been criminal investigative positions, correct?

A. Correct.

Q. You went from patrol, right?

A. Yes.

Q. Then you take the sergeant exam, presumably?

A. I did.

Q. Then the lieutenant exam?
A. Yes.
Q. Always in a criminal capacity, correct?
A. I'm not sure what you --
Q. Have you ever worked in the intelligence division?
A. I did not. Never did.
Q. Never assigned to the intelligence division?
A. Not with MPD, no, sir.
Q. Were you assigned with the intelligence division with a different law enforcement agency?
A. I worked with military, yeah, the contractor. So, yeah.
Q. Okay. When you were in the military?
A. I was not in military, but I was a contractor with the military.
Q. Did you have a role in an intelligence-gathering function as a contractor?
A. Yes. Yes.
Q. Tell me a little bit about that.
A. Sure. So my role in a -- in military gathering information, mostly it was over-the-radio transmissions. So I was basically doing culture advisor stuff. So transcribing, translating, that type of -- if information is particular that needs to move up, that kind of stuff.
Q. So you have a basic familiarity with intelligence-gathering function from your role as a contractor in the military?

A. Yes, sir. Many moons ago.
Q. Many moons ago.
I'm sorry, I didn't mean to talk over you. And you understand there's a difference between being in the intelligence division of the Metropolitan Police Department and doing criminal investigations, correct?
A. Sure. Yes.
Q. Yes?
A. Yes.
Q. But you have no training on doing intelligence work for the Metropolitan Police Department, correct?
A. I don't.
Q. And so you don't know what the rules and regulations are for the intelligence division at MPD, correct?
A. Whatever the general orders are about the intelligence, other than that, I don't. So for my study materials when I take the test and I come across, I do read general orders on that.
Q. Fair. I'm not asking you about general orders. I'm asking you about any work or what happens within the intelligence division.
A. No, sir, I wouldn't be able to tell you.
Q. So we're clear, the entirety of the time that Lieutenant Lamond had anything to do with Mr. Tarrio, it's your understanding he was in the intelligence division, correct?

A. He was, yes.
Q. Okay. And all of your discussions with him and, in fact, until he left the Metropolitan Police Department and retired, he was a lieutenant in the intelligence division, correct?
A. To my knowledge, yes.
Q. And as lieutenant, he was the ranking MPD officer in the intelligence division, correct?
A. Correct.
Q. Okay. And is it your understanding that the intelligence division was interested in First Amendment protests?
A. Correct.
Q. Okay. So this riot task force that you described, you probably did some work with the intelligence division, correct?
A. Me directly, no.
Q. Okay. You said the riot task force was formed in 2020, is that right?
A. Correct.
Q. You got pulled out of 3D?
A. Yes.
Q. When you got pulled over into the riot task force, was this flag-burning case one of the first ones you investigated in the riot task force?
A. No.
Q. You'd done others?
A. Yes.

Q. You don't have any understanding, because you weren't in intelligence, about what Lieutenant Lamond's role was as it related to the intelligence gathering, particularly with Mr. Tarrio and the Proud Boys, do you?
A. Correct. I didn't.
Q. And as you start -- you got assigned this investigation by Copeland, correct?
A. Correct.
Q. Copeland gives you the investigation, you start doing the investigation. Is it Copeland that tells you that Lamond knows Tarrio?
A. It was sent in an email to me, yes.
Q. Correct. Which was a forward of an emailed where Lamond self-identified, "I know Tarrio"?
A. Correct.
Q. Right. He came to you?
A. Correct.
Q. You're the lead on the banner-burning investigation?
A. Correct.
Q. You knew that he had known him for a year and a half because he told you?
A. Correct.
Q. You knew that he'd had multiple meetings with him because he told you?
A. Correct.

Q. All right. And we went through the whole document, so let me see if I can talk about it quickly. All right?

Mr. Lamond, he told you with 100 percent certainty that some of the photos you had of Mr. Tarrio from the protests in December were Mr. Tarrio, correct?

A. Correct.

Q. He just wasn't certain of the photograph where Mr. Tarrio was kneeling, because of the angle, that that was Mr. Tarrio, correct?

A. Correct.

Q. There was a follow-up that he subsequently said because I -- he went and did some additional work, right?

A. Sure.

Q. Don't "sure." We need --

A. Yeah. No, I mean, there was a response from him in an email, that's what I'm recollecting in my mind, too. So give me a little bit of a leeway, if I have to go back all the way to 2020.

Q. I talk fast. I'm not trying to --

A. That's fine. I'm trying to think fast.

THE COURT: Why don't you both slow down, how about that?

MR. SCHAMEL: We'll do the best. Sorry, Judge.

BY MR. SCHAMEL:

Q. So as it relates -- let's talk about the different ways

Mr. Lamond helped you to identify Mr. Tarrio and to get an arrest warrant for Mr. Tarrio. I want to focus on that for a minute.
A. He did.
Q. That's our category. Hundred percent identification on the voice, right?
A. Yes.
Q. And you said, to Miss Ross's questions, that was important, right, because voices could sound similar, you wanted to make sure that was him?
A. Correct.
Q. And Mr. Lamond is actually the person who forwarded the Parler on-line admission from Mr. Tarrio that he had burned the flag, correct?
A. If there's something that would refresh my recollection -- I don't remember that he forwarded a -- you know, you're asking a very specific question, sir, and I would like to have that in front of me.
Q. I'm going to ask Mr. Hinger -- who is better at this than I am -- to pull it up and I'll show it to you.
A. All right.
Q. But you had the Parler -- you're not certain right now if it came from Mr. Lamond, but you had the Parler?
A. Yes, I did.
Q. And Mr. Lamond, he confirmed that that was Mr. Tarrio's

Parler account, right?
A. Yes.
Q. Okay. And you confirmed it was Mr. Tarrio's authenticated Parler account, correct?
A. Yes.
Q. All right. So there's no misunderstanding whose Parler account that was and that it was Mr. Tarrio's. And I'm going to show you a document about whether or not you became aware of that from Mr. Lamond.
A. Okay.
Q. All right. On the voice recognition, you had the interview, right, the on-line interview?
A. Yes.
Q. And there was a voice on it?
A. Yes.
Q. And you wanted to be sure that that was Mr. Tarrio's voice?
A. Yes, on the podcast.
Q. And Mr. Lamond confirmed that for you?
A. He did.
Q. Okay. Now, on the photographs -- I'm just focusing on the photos -- we have the photo where he's kneeling down, Mr. Tarrio is kneeling down with other individuals near the -- I think it's described as a flag with an accelerant, right?
A. Correct.
Q. Other photos became available from social media and

elsewhere of Mr. Tarrio at and around that time of that particular protest, correct?
A. Yeah. Correct.
Q. Mr. Lamond specifically said, I think that's him, but I can't say it with 100 percent certainty, right, about the kneeling photo?
A. Correct.
Q. But then Mr. Lamond went back and looked at other photographs, right?
A. Correct.
Q. Came back and said, Based on the facial hair, the things he's wearing, the drink on his vest, I am certain that that's Mr. Tarrio?
A. Correct.
Q. So he did not impede that in any way, the identification of the voice or the photo of Mr. Tarrio, correct?
A. Correct.
Q. He was, in fact, quite helpful?
A. He was.
Q. Okay. You had said something in your direct, and I want to make sure I heard it correctly, about the destruction of property. You said, I think, some churches, plural?
A. Yeah, there were two churches.
Q. There were two churches that involved flag burning?
A. Yes.

Q. Was Mr. Tarrio suspected in the other?
A. So I was dealing with -- the circumstances around the two churches were very similar; the time, place, and the circumstances were at the same time. So it could have been the same group doing both the churches, but we still -- we weren't able to identify any suspect in those cases.
Q. Was that also your investigation?
A. That was, yes.
Q. Did you ask Mr. Lamond any questions about that, the other --
A. The other investigation? No, because nothing led me to believe Lieutenant Lamond had any information on those.
Q. Okay. But let me ask you this question: You're the lead on this investigation, correct?
A. Yes.
Q. You knew Lamond had voluntarily come forward to say I can help?
A. Yes.
Q. Right. And help he did?
A. He did.
Q. Okay. You never called him?
A. No.
Q. You never sent him a personal email to meet with him?
A. No.
Q. You never went to his office to talk to him?

A. No.
Q. You were on the phone with a number of people during that telephone call in late December, right? You said the conference call.
A. Yes.
Q. Prosecutors and other people in the task force?
A. Yes.
Q. You didn't even speak during that, did you?
A. I don't believe I spoke.
Q. I can show you the 302. Isn't it your testimony -- or, previously you'd said I didn't ask any questions?
A. Yeah.
Q. You were the lead?
A. I am the lead, yes.
Q. Okay. So when you say in your -- in the affidavit, five or six -- and I want to pull that up and show it to you.

This is Exhibit 1012. I want to make sure I have the page right. Page 9. Billy, can you pull up 1012, page 9? Or do I have to ask the government counsel? May I approach the --

(Off-the-record discussion between Mr. Schamel and government counsel.)

MR. SCHAMEL: They're going to help. We'll get it figured out for the next one. Sorry.

THE COURT: 1012, page 9, you had it there before.

BY MR. SCHAMEL:

Q. Do you see it, Lieutenant Mufti?
A. Yes, it's up now.
Q. Are you able to read it? And I draw your attention particularly -- this is admitted -- the first paragraph in the narrative section.
A. Sure.
Q. Starts with, "Lieutenant Lamond."
A. Sure.
Q. Okay. Just take a second. When you've read that, you can look up for me.
A. The first paragraph?
Q. Yes, please.
A. Yes.
Q. And the second sentence there says, "Lieutenant Lamond has seen defendant Henry Tarrio in person and spoken to him approximately five to six times since first meeting him in July 2019," correct?
A. Correct.
Q. Because Lieutenant Lamond told you he had met Mr. Tarrio in person approximately five to six times since 2019, correct?
A. Correct.
Q. So nowhere does it say anything about telephone calls?
A. Correct.
Q. Nothing about emails or text?
A. No.

Q. And you never asked?
A. Correct.
Q. You had him on the phone?
A. Yes.
Q. You knew his email?
A. Yes.
Q. You knew his phone number?
A. Yes.
Q. I presume you knew where the intelligence division was at.
A. Yes.
Q. Wasn't hiding from you?
A. Sure.
Q. You just didn't ask?
A. I didn't ask because I thought this was the only time he spoke to him.
Q. You thought that, but he didn't tell you that. You're nodding, but I think you're saying, Yes, he didn't tell you that?
A. (No response.)
THE COURT: Which one of those was the question.
BY MR. SCHAMEL:
Q. Did -- Lieutenant Lamond never told you he only had five or six contacts with Mr. Tarrio, did he?
A. Spoken to him approximately five to six times since his first meeting in July 2019.

Q. It says in person and spoken to him approximately five to six times, correct?
A. Correct.
Q. So your understanding when you wrote this was exactly what Lieutenant Lamond told you, which is he had met him in person five to six times since 2019, correct?
A. Correct.
Q. And you never asked a follow-up question about any other forms of communication?
A. I did not.
Q. And you never went to him in any way, shape, or form to get clarification?
A. I did not.
Q. This is your understanding of what you took from listening in the room to the one time that anybody talked to Lieutenant Lamond in your presence, correct?
A. Correct.
Q. And have you done any follow-up investigation to learn whether or not that is accurate, that Mr. Lamond met with Mr. Tarrio five to six times between 2019 and the writing of this warrant?
A. I did not.
Q. So you don't know that that's actually accurate, do you?
A. Well, I did apply for a search warrant for his cell phone and the laptop for Enrique Tarrio.

Q. Okay. And did that tell you how many times they met in person?
A. No, because those --
Q. No?
A. -- was made available to U.S. Attorney's Office.
Q. I'm asking you: Did you come to learn at any time, as you sit here today, that his statement to you that he met with Mr. Tarrio in person five to six times is anything other than exactly right?
A. Can you repeat that question, sir?
Q. You're sitting here testifying?
A. Yes.
Q. He's sitting right there (indicating). Do you have any evidence to show he met with Mr. Tarrio in person more than five to six times?
A. At that time, no, that was the only time.
Q. How about now? Do you know that he's met with Mr. Tarrio more than five or six times between 2019 and the writing of this warrant?
A. No.
Q. That's accurate, isn't it?
A. Yeah.
Q. Yes?
A. Yes. Yes.
Q. Thank you. The reason Mr. Tarrio was identified as a

suspect was because he was the head of the Proud Boys, correct?
A. The reason he was identified?
Q. Um-hum.
A. I think his admission to the crimes, he was identified based on that.
Q. So he basically -- when he came out and publicly said --
A. Yes.
Q. -- I did it, he became your suspect?
A. Yes.
Q. That doesn't happen very often?
A. I was surprised, too.
Q. Yeah, right? And he did it in a whole bunch of ways. We talked about he did it in Parler, sort of like Twitter?
A. (Nods head.)
Q. He did it in a podcast?
A. True.
Q. Okay. Ms. Ross asked you a number of questions about how important it would have been to have a confession to a member of the Metropolitan Police Department. Do you remember asking that?
A. Yes, sir.
Q. As you sit here today, have you ever interviewed Mr. Tarrio?
A. I'm sorry?
Q. Have you ever interviewed Mr. Tarrio?

A. Post his arrest, I did.
Q. You did and he invoked?
A. No, actually he gave a statement. Yep.
Q. What did he tell you in the statement?
A. Basically we talked about his role in the burning of the banner, and also he was found in possession of high capacity magazines, so I spoke to him about that.
Q. Because he had those two -- they're like laser-etched Proud Boys, basically, paraphernalia, right? Those high capacity magazines are -- he brands them?
A. Not correct. He was actually bringing them in to sell them in D.C., which is --
Q. At the time he had, like, an online store. Are you aware of that?
A. Yes, he did.
Q. And somebody had purchased them who was going to be at the January 6, so he brought them up to that person?
A. Right, which is illegal.
Q. In the District of Columbia?
A. In the District of Columbia, yes.
Q. But not in Virginia?
A. I'm not a law enforcement officer there.
Q. So you don't know if they were illegal in Virginia or in Florida?
A. No.

Q. And he traveled with them on the airplane, presumably?
A. He did.
Q. Okay. And he told you he didn't know they were illegal when he brought them in the District, right?
A. Yes.
Q. But he didn't bring -- never mind. Strike that.
Just so I understand the timeline, Tarrio identifies himself as the person who burned at least one of the two BLM flags, right?
A. Yes.
Q. Then the first person that came forward on that was Mr. Lamond?
A. Correct.
Q. He comes forward, says I know him and helps you with the photo and audio identification, right?
A. He does.
Q. All right. And then ultimately you arrest Mr. Tarrio without incident?
A. Correct.
Q. But you weren't involved in the arrest?
A. I was not part of the arrest team, correct.
Q. In fact, I think, didn't you say during your interview you didn't even know he was getting arrested, did you?
A. Correct.
Q. You thought they were going to arrest him in Florida?

A. Correct.
Q. Were you aware it was a non-extraditable misdemeanor?
A. I was aware it was a misdemeanor, but due to the hate crime I was still -- I didn't have a enough time to entertain that theory, but I thought they were going to make it extraditable. But we didn't get to that point.
Q. Because Tarrio had come forward in all these different mediums and said I did it, I'll pay for my own flight to D.C.? It's your -- I can show you in the affidavit. Do you remember saying that?
A. Yeah, it rings a bell.
Q. Yes. And Miss Ross asked you about a confession, which you ultimately essentially got at the arrest, correct?
A. Confession from Tarrio?
Q. Right.
A. Yes.
Q. Are you aware of any other confession that he made prior to that date, that confession to you on January 4th?
A. Other than social media, no.
Q. So you don't know that he confessed to anybody at MPD?
A. No.
Q. Still as you sit here today?
A. I don't, actually, right.
Q. So as my grandmother would say, if wishes were horses, beggars would ride. It may have helped, but you weren't aware

it existed, right?
A. Correct.
Q. The phone number for Mr. Tarrio came from Lieutenant Lamond?
A. I believe so, yes.
Q. And it was accurate?
A. Yes.
Q. Okay. Ms. Ross asked you questions about whether or not you knew that Lieutenant Lamond was talking to Mr. Tarrio at the time he was providing you this information, correct?
A. Can you repeat that question, sir? Sorry.
Q. Ms. Ross asked you if you knew that Mr. Tarrio and Mr. Lamond were still in communication while this investigation was going on?
A. Correct, she asked me that.
Q. And you did not?
A. I did not.
Q. And you never asked Mr. Lamond that, did you?
A. I did not.
Q. When you had him on the phone, you sat quietly in that conference call, it never came up?
A. No.
Q. Nobody else asked him in your presence?
A. Yeah, I don't remember anyone asking him.
Q. How many people in the room with that conference call with Lieutenant Lamond?

A. In the room or on the conference call?
Q. Well, I assumed you were all in the same room together. Were you not?
A. No, no. It was on the phone.
Q. It was COVID, you were all in different places?
A. Yes. Correct.
Q. Do you know how many people from the investigative group, the investigative team, MPD and U.S. Attorney's Office, et cetera, were on that call?
A. Yes. It was myself for sure, Sergeant Nicole Copeland, U.S. Attorney's Office.
Q. So at least four?
A. At least four, yes.
Q. Did anybody else ask Mr. Lamond in your presence about whether he was still talking to Mr. Tarrio?
A. No.
Q. Anybody else ask Mr. Lamond if he was still communicating with Mr. Tarrio?
A. No.
Q. Anybody else ask Mr. Lamond if he had ever texted or chatted by any sort of -- I'll call it computer technology with Mr. Tarrio?
A. No, sir. All the conversation was in the past tense, so that's what I thought it was, in the past. But you're right, I did not ask.

Q. Would have been great if you had, right?
A. Yes.
Q. You were asked by Ms. Ross about the self-surrender. You said it was never discussed, correct?
A. Self-surrender of Enrique Tarrio?
Q. Yes, sir.
A. I'm not quite sure of your question.
Q. Miss Ross asked you a question about whether or not MPD --
A. Oh, no. Yes.
Q. You never discussed that you were going to do that?
A. That he was going to self-surrender. At least to my knowledge, nobody came to me that he was going to self-surrender.
Q. But you had the quote from him where he said, "Charge me. I'll come up and pay my own ticket"?
A. Right.
Q. When Ms. Ross asked you questions about preserving evidence --
A. Right.
Q. -- and about flight, was Mr. Tarrio a risk of flight, in your estimation?
A. It's a hypothetical question, sir. I mean, I can't really answer. It's different for --
Q. You answered her hypos.
THE COURT: Let's not argue with the witness.

A. I would love to give you an answer, sir, but --
BY MR. SCHAMEL:
Q. You don't --
A. I don't know in that situation, once he found out that, you know, he was a suspect -- I have identified him as a suspect in the case.
Q. What do you mean, once he found out?
A. That I have a actual arrest warrant for him?
Q. Right.
A. Could have destroyed his cell phones, his laptop, you know.
Q. Okay. How much time passed between when Mr. Tarrio outed himself as being the person who burned the flag and the obtaining of the arrest warrant?
A. Not more than, like, three weeks.
Q. About three weeks?
A. Yeah, three weeks.
Q. He outed himself in all these various social media ways we talked about, right?
A. Correct.
Q. You called him and you texted?
A. I texted him.
Q. You didn't call him first, you just texted?
A. I never called him.
Q. Okay. And you texted him, identified who you were?
A. Yes.

Q. That's in the affidavit?
A. Correct.
Q. And he said, I'll save it -- he said, I don't have a lawyer, but I'll save you the trouble, I'm going to invoke?
A. Yes.
Q. What was the date of that? Do you remember?
A. I don't remember the date, sir, but it should be in the affidavit.
Q. Okay. But it's after the affidavit -- excuse me, it was before the warrant had been sworn?
A. Correct.
Q. When you did that, you were clear that you were a member of Metropolitan Police Department?
A. I did.
Q. And you were clear that you were investigating the flag burning?
A. Yes.
Q. Okay. So it's not like some of the things that you investigate where he didn't know he was a suspect, right?
A. Correct.
Q. You knew that he knew that he was a suspect?
A. Correct.
Q. Okay. One of the questions Ms. Ross asked you about, the issuance of the warrant. You said, "under seal." Do you remember saying that?

A. Correct.
Q. What did you mean by that?
A. So the arrest warrant is not open for public to view until the defendant is placed under arrest.
Q. Well, let's talk about arrest warrants. You talked about the process, right? Goes from the investigating officer to the sergeant, to the lieutenant, to the U.S. Attorney's Office, to the judge, correct?
A. Correct.
Q. And when that happens and the judge signs it, the next step is you get a number for it, correct?
A. Correct.
Q. And you can put it -- once it has a number it becomes part of the court docket, correct? It goes into the system?
A. Correct.
Q. One of the things that you can do -- how many years have you been an officer?
A. An officer?
Q. How many years have you been in MPD?
A. MPD, about 12 years now.
Q. Twelve years. Okay. So let me ask you this question: You're aware, during the 12 years, that you can get a warrant, not put a number on it and it doesn't go in, so it's not available to anybody, correct?
A. Correct.

Q. That's a normal process?
A. In my experience, sir, it doesn't happen intentionally. It's when the court is closed or over the weekend, stuff like that. I've never seen it --
Q. You're not aware of that having been done intentionally?
A. Intentionally, I've seen there -- I'm trying to remember the time where we don't -- we didn't put a number on it and that was -- the only times I can think of is when the court was closed or weekend, that sort of stuff.
THE COURT: Was the implication of your question that if it gets a number and it goes into the system, that anyone who has access to the court docket can see an arrest warrant?
MR. SCHAMEL: That's where I'm headed.
THE COURT: Okay. Go ahead then.
BY MR. SCHAMEL:
Q. So once it gets a number and goes into the system, if you want to keep it from being released, there's a process where you go to the court and you ask the warrant be placed under seal, correct?
A. Yes.
Q. That's a formal process where the court acts to put something formally under seal, correct?
A. Correct.
Q. Was that done here?
A. No, sir.

Q. So when you said it was under seal, it wasn't actually under seal, was it?
A. Not open for public to see.
Q. That's not the question I asked you. Let me ask again.
When you said under seal, it wasn't actually under seal?
A. If I said under seal, that's not correct.
Q. That's not correct?
A. Yeah.
Q. In fact, it would be more of a keeping it within a pretty tight-knit group?
A. Correct.
Q. That was your prior conversation with law enforcement when they talked to you about --
THE COURT: What's the process where a member of the public can just pull up the court's docket and the arrest warrants?
MR. SCHAMEL: I'm sorry, Your Honor?
THE COURT: What is the process whereby a member of the public can just go to the court's docket and pull up arrest warrants?
MR. SCHAMEL: As I understand it, until such time as the warrant has actually been served and the person has been arrested, it's not on the public docket. But there's a very distinct difference. You can have a warrant that doesn't get a number, so it doesn't become part of something that everybody

in law enforcement can see. But once it gets a number, literally everybody -- and that's what I'm going to ask him next -- everybody in law enforcement can see it. Everybody.

THE COURT: In law enforcement?

MR. SCHAMEL: In law enforcement, correct.

THE COURT: You can ask him.

BY MR. SCHAMEL:

Q. Did I state that correctly?

A. Can you repeat your question?

Q. Once you get the warrant and it gets a number, anybody in law enforcement can access that warrant, correct?

A. With or without number, anyone in MPD can review that warrant because it's going to be attached to the case and in the law enforcement data base.

Q. Correct. But once it actually has a number, FBI can see it, the marshals can see it, U.S. attorneys, everybody can see it?

A. I don't know that much, sir, about the number, the court proceedings and stuff like that. I can only talk about the MPD's process of obtaining warrants and who can view or who cannot view.

Q. But so we're clear, this was not under seal?

A. It was not under seal.

Q. No special steps were taken to keep this from being released?

A. Correct.

Q. Your I-want-it-in-a-close-knit-group is sort of your feeling about what you wanted?

A. I never thought of making it under seal at that time.

Q. Okay.

A. I didn't think of it, that it was necessary.

Q. And then you went on to say, to Ms. Ross's questions, quote, it was on a need to know. What does that mean?

A. So it's not like if this information is here -- usually what happens is once we get a arrest affidavit for a suspect, we put out a BOLO, which is be on the lookout, for all law enforcement, that we have an arrest warrant secured, we can go ahead and place the individual under arrest. But in this particular case we did not do that, even though there was so much media attention to this. So it was -- when I say need-to-know basis, it was within the group that there was an arrest warrant for him.

Q. Who was in that group?

A. The riot task force, my officials.

Q. How many people?

A. At that time we were about six detectives, one sergeant, one captain, and one commander.

Q. Okay. But you understand "need to know" is actually a term of art, right?

A. Correct.

Q. And it means a certain classification for something that it would be improper to share outside the group, correct?
A. Correct.
Q. All right. This was not need to know?
A. All right. So the reason I use "need to know" was basically it was part of the group. It was not to be disseminated to the whole department, that we have an arrest warrant out.
Q. So I think you said previously when interviewed, "under wraps"?
A. That sounds a better word, I guess.
Q. It is better, right? Because "need to know" has significance for an actual process, right?
A. Correct.
Q. And you're not actually even in a position to make a determination if something should be identified as need to know, are you?
A. Correct. At that time I wasn't.
Q. Are you now?
A. As a lieutenant?
Q. Yeah.
A. Yeah, I can make that determination within my unit.
Q. So as a lieutenant, if you had been a lieutenant at this time you could have categorized this as need to know, correct?
A. Correct.

Q. Who was lieutenant? Copeland?
A. Well, she was heading our -- so you can say she was the supervisor.
Q. I don't want to say.
A. Yeah, she was the supervisor. So we didn't have a lieutenant at that time, but we had our ranks -- the structure of our rank was sergeant, captain, and then the commander.
Q. Right. And so the lieutenant and the captain both could have made the determination that this was need to know, correct?
A. Correct.
Q. They did not do so, correct?
A. No, sir.
Q. So when you said "need to know," that was incorrect?
A. In my head, need to know was --
THE COURT: I think we've covered this.
BY MR. SCHAMEL:
Q. You mentioned a CAU. What does that stand for?
A. The Criminal Apprehension Unit.
Q. It had a name prior to that, before it was called CAU?
A. Not that I can think of. The warrant squad, or maybe -- yeah, the warrant squad.
Q. Did you ever serve on the warrant squad?
A. I have not had the pleasure.
Q. So the answer is no?

A. No.
Q. Are you aware that the warrant squad, the CAU, regularly calls people and tells them they have warrants?
A. I don't know if that -- I've never part of it, so I don't know.
Q. I'm sorry, were you done?
A. I'm done.
Q. In your 12 years, ever called somebody and told them they had a warrant?
A. Sitting back here, no, sir, I can't think of any time I called a suspect and I told them, Hey, you have a warrant.
Q. You never arranged for somebody to come in and self surrender?
A. No.
Q. Okay. We talked a little bit about the hate crime. You mentioned that a couple times on direct and again on cross, right?
A. Yes.
Q. What's the penalty for destruction of property? Misdemeanor?
A. Misdemeanors, yeah.
Q. What's the penalty?
A. Misdemeanor is less than a year. Less than one year jail time.
Q. It's actually 90 days for obstruction of property, correct?

A. Ninety days up to a year.
Q. You think the maximum penalty for destruction of property is up to a year?
A. I don't know, but misdemeanors is less than a year.
Q. Okay. Is this the only time you've ever done an arrest for destruction of property?
A. An arrest warrant? No, I'm sure I've done arrest warrants. But as a law enforcement officer, sir, we don't get into the -- that's the court's job and U.S. attorney's. My job is to identify the suspect, make a lockup, get them off the street.
Q. Well, actually, your job is to do the investigation, right?
A. Do the investigation.
Q. Call people who might have information, meet with them?
A. Yes.
Q. Like Lieutenant Lamond?
A. Yes.
Q. Which you didn't do?
A. I did talk to him. I mean, we had a conference call, so --
Q. So 90 days? If I told you 90 days was the maximum penalty for destruction of property, does that sound right?
A. Sure, I'll take your word.
Q. Okay. What is your understanding of what a hate crime does to that?
A. Hate crime enhances it, enhances the penalty.
Q. Doesn't make it a felony though, right?

A. Does not make it a felony.
Q. It adds 50 percent maximum penalties or an additional --
A. Fifty, or one and a half times, yeah. So 50 percent more.
Q. Fifty percent more. I hope we weren't going to get into math.
And you mentioned the hate crime. You said Mr. Lamond was sort of against this being a hate crime, correct?
A. Based on the email thread that I saw, yes.
Q. And there's actually a group that assesses whether or not to make a determination about whether something is a hate crime, is that right?
A. Correct.
Q. That group met to discuss this case, correct?
A. Correct.
Q. And there's five individuals on that group?
A. That I don't know, sir, how many people are in that group. But it's comprised of special liaison division --
Q. Okay.
A. -- members of special liaison division.
Q. Did you present to them whether this should be a hate crime? What is the process for that?
A. Whenever the report is taken and the patrol officer marks it as a hate crime, it automatically goes to them. And I did seek FBI's assistance in hate crime enhancement at that time.
Q. I'm sorry. Say it again.

A. At the time when I was investigating, I did reach out to the FBI, my team, to look at the investigation as a hate crime.
Q. Okay. And then ultimately it was declined internally as a hate crime, is that right?
A. I would have to look at the paper, sir.
Q. Was it charged as a hate crime?
A. It was not charged as a hate crime.
Q. So it wasn't approved as a hate crime?
A. I can't say particular -- you're talking about a different unit and I don't want to get into their --
Q. You don't know that there are five individuals that vote whether or not it's a hate crime and it requires three votes?
A. I'm sorry to cut you off. I don't know the number, sir, but there is a group that sits and they evaluate if this is a hate crime or not.
Q. And Mr. Lamond was on that group, correct?
A. Hate crime panel?
Q. Yeah.
A. I believe so, yes.
Q. So he's one of the five that actually part of his job is to analyze whether or not this was a hate crime, correct?
A. Correct.
Q. So it wasn't like he was just weighing in because he wanted to, he actually was part of group that assesses whether something is a hate crime, correct?

A. Correct.
Q. And he's one of five votes to determine whether it's a hate crime, correct?
A. Correct.
Q. So he could light himself on fire and if the other four say it's a hate crime, it doesn't matter because then it would be a hate crime, is that right?
A. Correct.
Q. So Mr. Lamond and two other MPD officers not on trial were part of that decision that this was not a hate crime, is that right?
THE COURT: He just said he didn't know at least four times.
MR. SCHAMEL: Okay.
THE COURT: Okay.
BY MR. SCHAMEL:
Q. You were asked questions about sources for general -- in the general orders and questions about sources.
A. Correct.
Q. You said you've worked sources?
A. I've never worked sources, but I've read about them in general orders, yes.
Q. So you don't have any firsthand experience with working a source?
A. I don't.

Q. You don't know whether or not you're required to do a PD854 as it relates to a source?

MS. ROSS: Your Honor --

MR. SCHAMEL: I asked if he knows about a PD8 form.

THE COURT: I think you asked some of these questions already.

Go ahead. You don't know what documentation you have to fill out if you're working with a source, correct?

THE WITNESS: Correct.

THE COURT: Next.

BY MR. SCHAMEL:

Q. Do you need a water?

A. No, I'm okay.

Q. You're okay?

A. I'll get it when I'm done.

Q. And you've never worked sources, not only not in criminal, but not in intelligence, right?

A. Correct.

Q. Do you know about the difference between working with a contact in the intelligence section and working with someone in a criminal investigation?

A. I don't, sir, since I've never worked sources.

Q. Right. So when Ms. Ross was asking you why you documented everything, you document everything because you were putting together a criminal investigation, right?

A. Are you asking that -- I was just speaking on the general order, sir. From what I remember is any sources, it could be -- you could be in any different unit, you have to document as per our general order.
Q. Your understanding is that in the intelligence division, that they have to document all contact that they have with anybody, any civilian who is giving them information about First Amendment events?
A. The general order applies to all units of the MPD, not just criminal.
Q. So your view of intelligence is your interpretation of the general orders as it relates to all MPD personnel?
A. Correct.
Q. So you wouldn't have any understanding that if you're talking to somebody as a contact in a First Amendment context, it would be different than talking to someone in the context of a criminal context?
A. Sure. Yes.
Q. Yes, you agree that's different?
A. It's different, yes.
Q. Different set of rules?
A. Yes.
Q. Okay. You made an interesting conversation. You said if you'd had a confession to an MPD officer, there would be more probable cause?

A. It would hold more value, yes.
Q. But you did get approved for the warrant for the arrest with probable cause with what you had, particularly with the assistance of Mr. Lamond, correct?
A. I did, sir, yes.
Q. And to your knowledge, Mr. Lamond didn't do anything or say anything or write you anything asking you not to charge Mr. Tarrio, did he?
A. Correct, he did not.
Q. Mr. Lamond never said Mr. Tarrio didn't do it?
A. He did not.
Q. He never said you shouldn't charge him because he's my contact, nothing like that?
A. Correct, he did not.
MR. SCHAMEL: Court's indulgence. I think I'm close, Your Honor.
THE COURT: All right.
(Pause.)
BY MR. SCHAMEL:
Q. Would you consider that -- the way Mr. Lamond characterized his knowledge of Mr. Tarrio was a little bit bragging?
A. Bragging?
Q. Yeah, bragging. I know Tarrio, I can help you, I can --
A. I didn't think --
Q. Didn't think of it that way?

A. No.

Q. Again, in looking at the application for the affidavit, you indicated -- and you wrote this, right? You wrote this affidavit?

A. Yes, I did.

Q. It's your handiwork.

I should have asked this, I don't think Mr. Ross did: Henry Tarrio, that's the legal name of Enrique Tarrio, right?

A. Correct.

Q. Let's see. Bear with me for one second. I'm sorry.

Oh, I think I asked you -- if I did, I apologize. I'm going to ask again. You indicated in the application for arrest warrant that Parler belonged to defendant Enrique Tarrio, currently the chairman of the Proud Boys group. Like Twitter's verified users, Parler confirms the authenticity of profiles with a yellow badge labeled as "influencer," correct?

A. Correct.

Q. You knew that had happened for Mr. Tarrio's Parler, so you were quite confident that was his Parler with the admission?

A. Correct. Yes.

THE COURT: You did ask that before.

MR. SCHAMEL: I did?

THE COURT: Yes.

MR. SCHAMEL: I didn't know I did. Sorry.

BY MR. SCHAMEL:

Q. Did you come to learn, as the lead investigator of this, how it was that MPD became aware of Mr. Tarrio's flight information?
A. I was not -- still not aware.
Q. You don't know that that came from Shane Lamond?
MS. ROSS: Your Honor, he just said he didn't know. There's no foundation here.
THE COURT: All right. If he doesn't know, then he doesn't know.
BY MR. SCHAMEL:
Q. Do you know that Mr. Lamond was part of the arrest group that was coordinating the arrest of Mr. Tarrio when he came to Washington?
A. I did not, sir.
Q. You did not until just now?
A. Until just now, yes.
THE COURT: He still doesn't know.
A. Yeah. I'll take your word for it.
BY MR. SCHAMEL:
Q. Thanks.
After the arrest, you stayed the lead officer until Mr. Tarrio pled guilty?
A. I'm sorry, sir. Can you repeat that question?
Q. Did you stay the lead officer until Mr. Tarrio pled guilty to the charge?

A. Yes, he did.
Q. "He did." But I'm asking: Did you continue in your role in that case?
A. I did.
Q. Okay. So you're familiar with what happened after the arrest of Mr. Tarrio through to his -- through his prosecution and subsequent plea, correct?
A. Once he was arrested, sir, the case was closed from our end. Other than applying for search warrants for his electronic equipment, I did not do anything else.
Q. So you didn't meet with the government and you didn't know about what -- about the circumstances of the plea or any of those things?
A. No. Not the plea agreement, no. Not the plea agreement, but, you know, some of the other stuff, like the electronic stuff, I did.
Q. Did you become aware at any point following his arrest that Mr. Tarrio publicly stated that it was obvious to him he was being followed at the airport when he landed at National airport?
A. This is the first time I'm hearing this.
Q. That's the first time you're hearing that?
A. Yeah.
Q. So you didn't do the arrest report of Mr. Tarrio when he was arrested, correct?

A. I did not.
Q. That was Michael Reese. Okay. I just didn't know if you had played a role in that because of your position in the investigation.
A. No, sir, I did not. I did not --
THE COURT: He doesn't need to know why you're asking the question. You can just ask the question. He said no. Ask the next question.
BY MR. SCHAMEL:
Q. One question that you were asked, one other line of questions was about the term "law enforcement sensitive." Do you remember that, being asked that question?
MS. ROSS: Your Honor, I didn't ask that question.
BY MR. SCHAMEL:
Q. Are you familiar with that term, "law enforcement sensitive"?
A. Sure, I've heard that term.
Q. Okay. And that's also like under seal, need to know. It's a term of art, correct?
A. Correct.
Q. This case was never identified as law enforcement sensitive, was it?
A. I believe all our communication, if it's not been approved via FOIA request, is law enforcement sensitive.
Q. You believe everything within MPD communicating about a

case is law enforcement sensitive?
A. Yes. If it's directly connected to a case, yes.
Q. Okay. And what -- is there a general order that makes you have that belief?
A. Yes.
Q. Which is it?
A. 304.01.
Q. Say again?
A. 304.01.
Q. 304.01. You believe that that means all MPD communications are, by definition, law enforcement sensitive?
A. No. Any communication that is related to the department or criminal investigations is not open for public, so the term law enforcement sensitive is, by definition, is that it's not open for public.
Q. So if an officer goes and talks to a subject of an investigation and tells them something, they need to have written pre-approval to do that under your definition of law enforcement sensitive?
A. If an officer goes and talks to a defendant of a case, absolutely they have to document that, yes.
Q. Absolutely what?
A. They have to document that, yes. You said that they're law -- it's law enforcement sensitive?
Q. No, no. I'm not asking you about documentation. We'll

cover that in a second. What I'm asking you is if you, as an officer, get information from another officer about a case about anything MPD related and you go and tell somebody outside of MPD, your position that that's violating MPD general order 304.01?

A. Well, it depends on what the information is.

Q. Okay. Tell me more.

A. I mean, if it's regarding -- if it's open to -- some of our general orders actually would -- most of our general orders are open for public, they can read them. Some are law enforcement, it's classified under law enforcement dissemination, so they're not open for public.

Q. Right.

A. But if I'm hearing your question correctly, obviously if you're talking about the roll call times or when the station is closed, that is not law enforcement sensitive, it's open to the public. But something that relates to an investigation, specifically I think you presented that a officer speaks to a defendant --

Q. I didn't say "defendant." But, yeah, a target of an investigation.

A. I would say that is law enforcement sensitive.

Q. You believe that's law enforcement sensitive?

A. A hundred percent.

Q. But you just said, as it relates to general orders, there

are things that are classified, right?

A. Yes.

Q. And that's an actual process, just like putting something under seal or labeling something as need to know?

A. Correct.

Q. Because in your role you couldn't label something you didn't know, you had to be at a certain level?

A. Correct.

Q. And same for law enforcement sensitive, that's a classification that has to be affirmatively placed on something, correct?

A. Correct.

Q. Because if you told me, as another officer, hey, I've got a warrant for Josh and I go tell Josh he's got a warrant, I haven't violated any MPD general order, have I?

A. I mean --

Q. It's a yes or no.

A. All right. So let me think this through. You're saying that if I have an arrest warrant for someone, it's out for someone, and you go and tell them that they have an arrest warrant?

Q. (Nods head.)

A. You're not violating the general order, no.

Q. No.

MR. SCHAMEL: Court's indulgence.

(Pause.)

MR. SCHAMEL: Very nice to meet you. Nothing else. Take care.

THE WITNESS: Nice to meet you, too, sir.

THE COURT: All right. Any redirect.

REDIRECT EXAMINATION

BY MS. ROSS:

Q. Just a few questions, Lieutenant.

First, defense counsel asked you about your familiarity with the intelligence division, right?

A. Correct.

Q. And you're not part of that division, are you?

A. I'm not, ma'am.

Q. And defense counsel asked you about MPD general orders, right?

A. Correct.

Q. But you don't need to be part of the intelligence division to be familiar with those orders, correct?

A. No, you don't.

Q. Is it fair to say that familiarity with those orders is a requirement of all MPD officers?

A. Yes, ma'am.

Q. And just to be clear, are you familiar with them?

A. I am.

Q. And so you know that there are orders that say that

officers should document communications with sources?
A. Yes.
Q. And document communications with suspects of crimes?
A. Correct.
Q. And are there any general orders that permit an officer to destroy evidence?
A. No.
Q. Are there any general orders that permit officers to destroy communications with a suspect?
A. No, ma'am.
Q. Are there any general orders that would permit officers to communicate with a suspect and not document those communications?
A. I can't think of any general order that says that.
Q. And generally, if an officer is following and abiding by the general orders, they should not be leaking information to a suspect of a crime, right?
A. No, ma'am.
Q. The defense counsel also asked you questions about Parler. Do you remember those questions?
A. Yes, ma'am.
Q. Now, there was a post on Parler on Tarrio's account which he confessed to burning the banner, right?
A. Yes, ma'am.
Q. But even when a confession is posted on social media, you

could not know for sure that Tarrio posted it, right?
A. Correct.
Q. For example, social media accounts get hacked, right?
A. Yes, ma'am.
Q. And people can log into other people's accounts and play pranks, right?
A. Absolutely.
Q. So just because the confession was on Tarrio's account, you had no way of knowing that he was the one that posted that confession, right?
A. No, ma'am. Like I stated before, that you have to do a little bit more follow up to confirm the identity.
Q. Does that mean if the suspect of a crime took responsibility and admitted that he was the one who posted a confession on social media, that that would be helpful to know?
A. Yes, ma'am.
Q. Would it be helpful because that would mean that the post could be directly attributed to the account that posted it?
A. Absolutely.
Q. And to the person who confessed, right?
A. Yes, ma'am.
Q. In this case, you never knew that Tarrio had taken responsibility and told the defendant that he was the one who posted the confession on Parler, correct?
A. Yes.

Q. And there was -- defense counsel asked you a couple questions about the defendant identifying Tarrio in photos, right?
A. Correct.
Q. I just want to make sure it's clear because I think there was some conflation of the photos, so I just want to make sure. So the defendant, if you know, was he asked to identify Tarrio in multiple photos?
A. Yes.
Q. And was he able to identify Tarrio in some of those photos?
A. He was able to identify some of the photos, yes.
Q. But was he able to identify Tarrio in the photo that depicted various Proud Boys kneeling next to the banner burning?
A. He was not.
Q. Defense counsel also asked you about information that the defendant provided the investigative team, right?
A. Yes.
Q. Was some of that information helpful?
A. It was.
Q. Now, you mentioned you had a telephonic meeting with the defendant. And during that meeting, defense counsel asked you if you asked any follow-up questions, right?
A. Correct.
Q. And you didn't, right?

A. I did not.
Q. Is that because when you are communicating with a fellow law enforcement officer about what he knows about a suspect of a crime, you trust that he will be entirely forthcoming?
A. Yes, ma'am.
Q. And when you were talking with the defendant during that telephonic meeting, did you think that he was withholding information?
A. I did not, ma'am.
Q. Did you think that the defendant was providing all helpful information that he had with respect to the banner-burning investigation?
A. I did.
Q. And did you understand the defendant to be providing all useful information that he had with respect to the banner-burning investigation?
A. I did, ma'am.
Q. So after that call, were you left with the impression that the defendant had given you all the information he had about Tarrio?
A. I did.
Q. And all the information that he had about the banner-burning investigation?
A. I did, ma'am.
Q. Did you trust that he had been truthful?

A. Yes.
Q. And forthcoming?
A. Yes.
Q. I want to talk a little bit about the arrest warrant. Your first draft that we looked at today, just to be clear, that draft was not approved, right?
A. That was not approved.
Q. You had to get more information?
A. Yes, it was sent back to me and I had to get more -- do more digging in the case.
Q. And information that would have been helpful was that the defendant knew that Tarrio had taken responsibility for a Parler post, right?
A. Can you repeat that question, ma'am?
Q. So if you knew that Tarrio had told the defendant that he posted the confession on Parler, you would have included that in the arrest warrant, right?
A. Absolutely. Right. Yes, ma'am.
Q. And if you knew that Tarrio had confessed directly to the defendant, you would have also included that in the arrest warrant, right?
A. Yes, ma'am, I would have.
Q. In your opinion, if you had that information in the arrest warrant, would your draft have been approved?
MR. SCHAMEL: Objection, Your Honor.

THE COURT: Yes or no, if he can answer that. But I think that point has been made, probably a lot. He said he didn't have that information, that he would have included it, if he had it, and he thought it would have enhanced the strength of the warrant.

BY MS. ROSS:

Q. In your experience, Lieutenant, you testified before that you had written many arrest warrants, right?

A. I did.

Q. In other arrest warrants that you have written, did you include the fact when a suspect had confessed to a crime?

MR. SCHAMEL: Objection.

THE COURT: You can answer that.

A. Yes, I have.

BY MS. ROSS:

Q. And in those instances when you were able to write in the arrest warrant that a suspect had confessed to the crime to a law enforcement officer, was that arrest warrant approved?

A. Yes.

Q. Defense counsel asked you some questions about whether the arrest warrant was under seal. Do you remember those?

A. Yes, ma'am.

Q. Regardless of whether an arrest warrant was under seal, do you trust that nobody who knows about the warrant at MPD will tell the subject of the warrant that there is a signed arrest

warrant?
A. No.
Q. I'm sorry. Do you trust that other MPD officers --
A. Yes.
Q. -- will tell the subject there is an arrest warrant?
A. I do trust, yes, nobody would.
Q. In this specific case did you have any reason to believe that a law enforcement officer would leak the fact that an arrest warrant for Tarrio had been signed?
A. No, ma'am.
Q. And leaking the fact of an arrest warrant has a number of risks, right?
A. Yes, ma'am.
Q. And so those risks, they include a subject could flee, right?
A. Yes.
THE COURT: Okay. I just want to say that redirect is redirect, does not have to repeat the direct. I'm here. I'm listening. I'm taking notes. Both of you, even in the course of your direct and even -- are asking the same questions over and over again. I could get up and do it now for both of you. It's not necessary. I'm listening. Redirect is supposed to be focused on something that came up in cross. And you don't have to make your whole closing argument by asking him questions and having him answer them just like he answered them on direct.

So just with that background, you can continue your redirect. But I think he's already testified as to what the risks are of leaking to a suspect; they could destroy evidence, they could flee.

BY MS. ROSS:

Q. Just a couple more questions, Lieutenant. Defense counsel also asked you some questions about whether something was labeled classified or sensitive. Do you remember those questions?

A. Yes, ma'am.

Q. And just because something isn't necessarily labeled classified or sensitive, are you allowed to share investigative information with a suspect of a crime?

MR. SCHAMEL: Objection.

THE COURT: Well, he can answer it to the best --

A. No, you cannot.

BY MS. ROSS:

Q. And when you said that something was need to know, is it fair to say that the suspect of that investigation does not need to know information about your investigation?

MR. SCHAMEL: Objection.

THE COURT: Overruled.

A. No, ma'am.

BY MS. ROSS:

Q. And when you said need to know, is it your understanding

that the subject of an arrest warrant does not need to know that there is a warrant for his arrest?

A. Correct.

MS. ROSS: No further questions. Thank you, Your Honor.

THE COURT: All righty. Thank you. All right. This witness can be excused. Thank you.

Ms. Ross, what I think I'm going to do is take a ten-minute break and then if the next witness is short, try to get one more witness in before lunch.

MR. ROTHSTEIN: Yes, Your Honor. We anticipate the next witness will be pretty short.

THE COURT: All right. Okay. We'll do that.

(Recess from 12:51 p.m. to 1:06 p.m.)

THE COURTROOM DEPUTY: We are back on the record with criminal case 23-177, United States of America versus Shane Brian Lamond.

THE COURT: All right. Mr. Rothstein, before you ask your first question -- you may be seated -- I do just want to remind everyone, also, that there's the usual rule in place in this courtroom that the testimony is what the witness says, and what counsel says is not evidence. So if the witness has no knowledge of something, you can't say, So, you don't know this fact or you don't know that fact, and you don't know this fact, because they don't know those facts and they're not in evidence

just because the lawyer said them. Doesn't matter whether it's a bench trial or jury trial. If a witness doesn't know anything, I would wait until you get the witness that knows something to ask those questions because they are objectionable.

Go ahead.

MR. ROTHSTEIN: Thank you, Your Honor.

THE COURTROOM DEPUTY: Mr. Ciapa please stand, raise your right hand.

GARY CIAPA,

was called as a witness and, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ROTHSTEIN:

Q. Good morning. Would you please state your name and spell it for the court reporter?

A. My name is Agent Gary Ciapa. It's G-A-R-Y, C-I-A-P-A.

Q. Where are you currently employed?

A. I'm currently employed with MPD.

Q. And when did you start with MPD?

A. I started with MPD in 2007.

Q. Okay. Just move the microphone a little closer.

THE COURT: It really is tough, but speak right into it, it's a whole lot easier to hear you. Thank you.

THE WITNESS: Thank you.

BY MR. ROTHSTEIN:

Q. Can you walk us through your professional history at MPD?
A. Sure. I started off my career in the First District in patrol. Around 2013 or '14 I was promoted to sergeant, where I moved to the Fourth District patrol. I also worked in the crime suppression team in the Fourth District. And in 2018 I was assigned to the internal affairs division.
Q. Okay. And what's your current role?
A. My current role, I am a task force officer on a FBI-led public corruption unit.
Q. Okay. Are you also a member of MPD's internal affairs division?
A. Yes, I'm currently assigned to internal affairs.
Q. What are your duties and responsibilities there?
A. I conduct various administrative criminal investigations into police misconduct, as well as use-of-force incidents.
Q. Now, are you familiar with MPD general orders?
A. Yes.
Q. What is a MPD general order?
A. General order is just a guide on how to handle various situations in your day-to-day activities as a MPD employee.
Q. Are there rules and regulations?
A. Yes.
Q. Now, as a MPD IAD officer, how familiar are you with those general orders?
A. Very familiar.

Q. Okay. What are a MPD employee's responsibilities with respect to these general orders?
A. They're expected to know them and to implement them in their duties.
Q. Is there a general order that covers the duties, responsibilities, and conduct of MPD members?
A. Yes.
Q. Showing you what's been admitted into evidence as Government Exhibit 3002. Blowing up the top.
Are you familiar with this general order?
A. Yes.
Q. What is it?
A. The general order related to the duties, responsibilities, and conduct of members of the department.
Q. Was this general order in place in 2020, 2021?
A. Yes.
Q. Going to page 2 of Exhibit 3002. Can you blow up Section V, please?
A. Section V is the roles and responsibilities of members.
Q. Going to page 4 of Exhibit 3002. Under Section V, can you bring up item 16, please.
Can you read item 16?
A. Sure. "Members shall not interview subjects, suspects, conduct any investigation or initiate any inquiries into the case of another member without the consent of that member or

authorization from the commanding officer.
Q. Now, based on your training and experience, what does that mean regarding the interview of subjects or suspects?
A. Without authorization from the investigating member or a supervisor, you cannot initiate any investigative steps.
Q. Once an individual is identified as a suspect or a subject, if it is not in your investigation, under these general orders are you permitted to have contact with them?
A. According to these orders, no.
Q. Now, going to item 19. Can we blow that up, please.
Can you read item 19 for the Court?
A. Sure. "Member shall respond truthfully when questioned by superior officer in matters relating to the official business of the MPD. Members, during the course of an investigation, shall respond truthfully to questions asked by any agent or official of the internal affairs, even if the IAD agent is not of superior rank."
Q. So does this order require officers to respond truthfully to their superiors?
A. Yes.
Q. No matter what?
A. Yes.
Q. Is there a general order that covers the code of ethics for law enforcement officers?
A. Yes.

Q. Showing you what's been admitted into evidence as Government Exhibit 3003. What is this?
A. This is the MPD general order for Metropolitan sworn law enforcement officers, code of ethics.
Q. Was this general order in place in 2020 and 2021?
A. Yes.
Q. Now, going to page 2, can you read the last sentence of the paragraph that starts, "I will keep." It's the second -- yep.
A. "I will keep my private life unsullied as an example to all and I will behave in a manner that does not bring discredit to me or to my agency. I will maintain courageous calm in the face of danger, scorn, or ridicule; develop self-restraint and be constantly mindful of the welfare of others. Honest in thought and deed in both my personal and professional life, I will be exemplary in obeying the law and regulations of my department. Whatever I see or hear of a confidential nature or that is confided in me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty."
Q. Now, consistent with this regulation, are officers -- looking at the last sentence of this, consistent with this regulation, are officers permitted to share information that is not necessary to the performance of their official duty?
A. No.
Q. Okay. Is there a general order -- now can you read the

first -- going to the next paragraph. Can you read the first sentence?
A. "I will never act officiously or permit personal feelings, prejudices, political beliefs, aspirations, animosities, or friendships to influence my decisions."
THE COURT: Slow down a little when you're reading.
BY MR. ROTHSTEIN:
Q. One more time.
A. "I will never act officiously or permit personal feelings, prejudices, political beliefs, aspirations, animosities, or friendships to influence my decisions."
Q. Okay. Do you know what discoverable material is?
A. Yes.
Q. Is there a general order that covers the preservation of potentially discoverable material of MPD?
A. Yes.
Q. Showing you what's been admitted into evidence as Government Exhibit 3005. If we can blow up the top.
What is this?
A. This is the MPD general order regarding preservation of potentially discoverable material.
Q. And was this general order in place in 2020, 2021?
A. Yes.
Q. Now going to page 1 of Exhibit 3005. Can we highlight Section I, please.

Can you read Section I?

A. "To ensure the integrity of any criminal investigation, all potentially discoverable material that comes into possession of the Metropolitan Police Department must be properly maintained and preserved so that the prosecuting authority may disclose such material in criminal judicial proceedings. D.C. Superior Court Criminal Rule 16 states that the government must disclose certain material to a defendant in a criminal judicial proceeding upon request."

Q. Based on your understanding of this regulation, where it says "all potentially discoverable material," does that include communications with a suspect?

A. Yes.

Q. Can you read -- just to go back to that for a second, is there any carve-out here if a suspect is also a source for an intelligence officer?

A. The policy is the policy, sir. There's -- it doesn't specifically say who the suspect is.

Q. So do these regulations apply to everyone, regardless if you are in the intelligence division or you're in the criminal investigative division?

A. Yes.

Q. Okay. Now let's go to Section II, please.

Can you read this, under "Policy"?

A. "The policy of the Metropolitan Police Department is to

preserve all material which may constitute evidence or may otherwise be pertinent in a subsequent criminal judicial proceeding."

Q. Based on this policy, what is required for communications with a suspect in a crime?

A. To preserve the material.

Q. Would use of a communication system that deletes messages violate that policy?

A. Yes.

Q. Is there any carve-out here that allows an officer to set his communications with a suspect to self-destruct?

A. No, not in the policy.

Q. Can you read Section III under definitions? Can you read it down to the bottom of the page, please?

A. "For the purpose of this directive, the following term shall have designated meaning: Potentially discoverable material includes, but is not necessarily limited to, such items as tangible documents, reports, video/audio tapes, transcripts of video/audio tapes, and photographs.

"The following are examples:

"A. Any written statements made by a witness, defendant, co-defendant and signed or otherwise adopted or approved by him/her.

"B. Any mechanical, electronic, electrical, or other recording or transcription thereof which is a substantially

verbatim recital of an oral statement made by a prospective witness, defendant, or co-defendant which is recorded contemporaneously with such oral statement."

Q. Are text messages discoverable material?

A. Yes.

Q. Does that include encrypted text messages?

A. Yes.

Q. Does this include audio messages?

A. Yes.

Q. Going to page 2 of Exhibit 3005, and highlighting Section IV, paragraph A. Can you read that?

A. "Members of the department shall preserve all potentially discoverable material, including any such material which may prove favorable to an accused, in a manner prescribed in this directive."

Q. Would the destruction of text messages, encrypted messages, or audio messages violate that policy?

A. Yes, anything related to a criminal investigation.

Q. Okay. Are you familiar with the term "source"?

A. Yes.

Q. What is that?

A. It's an individual that the police department uses to provide information to further a criminal investigation or it can provide intelligence to the department.

MR. SCHAMEL: I didn't hear the answer. Can you

please repeat it?

THE COURT: Just try to get the microphone a little closer.

THE WITNESS: Sorry.

A. Yes, they can provide information to further a criminal investigation, or any information, it can include intelligence.

BY MR. ROTHSTEIN:

Q. Are you familiar with something called the central source registry system?

A. Yes.

Q. What is that?

A. That is a database that we store MPD source information in.

Q. What is the purpose?

A. Just to keep a trail and document our registered sources.

Q. Are you familiar -- now, do you know the defendant in this case, Shane Lamond?

A. Yes.

Q. And did you review the central source registry system to determine if anyone at MPD had registered Tarrio as a source?

A. Yes.

Q. Showing you what's been marked as Government Exhibit 3011, what is this document?

A. That is the -- looks like the search page for the central source registry system used by MPD.

Q. What does this show regarding Mr. Tarrio?

A. It has Mr. Tarrio's name entered into the system and there's no records to display.

Q. So according to this, was anybody at MPD using him as a source and registering them in the system?

A. No, not according to the database.

Q. Now, are you familiar with MPD's investigation into the BLM banner burning?

A. Yes.

Q. According to MPD regulations, was the defendant required to pass along any information that he collected from Tarrio to the detectives investigating the BLM banner burning?

A. Yes, per MPD policy.

Q. Can you describe for the Court what the policy is if a member of law enforcement has contact with a suspect in somebody else's investigation?

A. Well, I would -- I would have -- well, I would say the departmental policy is clear, that even to have contact with the suspect, you would have to have approval from a supervisor or you would have to make some sort of notification to the investigator assigned to the case.

Q. Okay. And are you familiar with the concept of law enforcement sensitive information?

A. Yes.

Q. Okay. Is there -- are you aware of any policy that permits somebody to provide law enforcement sensitive information to a

suspect in a crime?
A. I would cite the code of ethics, that anything that's confidential in nature -- I wouldn't disclose it.
Q. Is there anything in the MPD general orders that permits a law enforcement officer to tell a subject what evidence has been collected against them, other than in furtherance of the case?
A. Again, that would fall under the policy of, you know, the code of ethics. Anything that may be law enforcement sensitive or confidential in nature, you know, you need to keep it secret.
MR. ROTHSTEIN: Nothing further, Your Honor.
THE COURT: All right. Any cross-examination?
MR. SCHAMEL: You said?
THE COURT: He said he has no further questions and I asked if you had any cross-examination.
MR. SCHAMEL: This thing -- maybe my hearing is bad. I didn't hear what you said.
THE COURT: Okay. I'm sorry.
MR. SCHAMEL: No, it's my fault.
THE COURT: I'll lean into my microphone.

CROSS-EXAMINATION

MR. SCHAMEL:
Q. How are you?
A. Good.

Q. Nice to see you. We met just before the hearing, right? Before the trial, out in the hallway?
A. Yes.
Q. Couple questions for you. You said -- you talked a little bit about your background and some of the stuff you're doing in public corruption. You've never been in the intelligence division, correct?
A. No, sir. I've never been assigned to intelligence division.
Q. I'll make you a promise. I'll try to talk louder and slower. Will you --
THE COURT: Slower. Definitely slower. Someone is trying to type what you say.
BY MR. SCHAMEL:
Q. I'll talk louder and slower and you do a little bit louder.
A. Roger.
Q. Okay. All right. And you said you've done criminal investigations and you've been in internal affairs, correct?
A. I've been -- yeah, I've conducted criminal investigations with internal affairs, yes.
Q. You were shown a number of documents. And I can -- I'm happy to pull them back up, if you would like to, to talk about them. But in particular, we were talking about confidential. Do you remember being asked by Mr. Rothstein about confidential documents, confidential information?

A. Yes.
Q. What does that mean?
A. It's law enforcement sensitive information. You know, it wouldn't be reasonable to share information with the community, you know, related to ongoing criminal investigations.
Q. You said law enforcement sensitive. That was my next question. What is the definition of law enforcement sensitive information?
A. It would be a need-to-know basis within the law enforcement community.
Q. Okay. And "need to know" is a term of art, correct?
A. Can you repeat, sir?
Q. It's a term of art, like marking something top secret is a term of art, right? You don't just randomly put "top secret" on a document. There's a process for it, right?
A. Some of it would be your experience as a law enforcement officer, knowing exactly what, you know, you should and shouldn't do regarding a criminal investigation.
Q. Okay. That's not the question I'm asking. So maybe I'll ask a better question. If something is labeled need to know, that is a term of art that has a significance? That's a formal term, need to know, correct?
A. Yes.
Q. You have to be a lieutenant or higher to make that designation, correct?

A. Not exactly, sir.
Q. Can a patrol officer identify something as need to know?
A. You don't -- that's not a practice, a need to know practice. I've never even heard that, need to know, or even seen it on any MPD documents as a need to know.
Q. I've never seen it either, but you used it, so that's what I'm trying to figure out. Is it just sort of a vernacular term that you use, that we should give it to people we think should know about it?
A. Well, sworn members. Sworn members should know --
Q. Should?
A. -- that's actively involved in the investigation.
Q. But again, you're talking about the general orders, right?
A. Yes.
Q. And the things that dictate what police officers can and cannot do, right?
A. Yes.
Q. Is "need to know" a formal term that limits what police officers can share either with other police officers or in the general community?
A. It depends.
THE COURT: All right. Did we see anything with the words either "need to know" or "law enforcement sensitive" in any of the general orders? I don't think so.
MR. ROTHSTEIN: Your Honor, I think we looked at the

general order that just talked about it, has to be in furtherance of a law enforcement purpose. And I think that's --

THE COURT: Why don't we stick with the language of the general orders that we're talking about, if we're cross-examining about the general orders.

BY MR. SCHAMEL:

Q. So just to make sure we understand what the judge is saying. There's no legal significance to "need to know"? It's not in the general orders, correct?

A. No.

Q. There's no legal significance to "law enforcement sensitive" in the sense of the general orders, correct?

A. I don't know, sir.

Q. You don't know?

A. No, sir.

Q. All right. But "confidential" is the word that is in the section that Mr. Rothstein just talked about?

A. Yes.

Q. Things of a confidential nature which are not to be shared except in furtherance of a law enforcement purpose, correct?

A. Yes.

Q. And "confidential" is a legally significant term, correct?

A. Yes.

MR. ROTHSTEIN: Objection, Your Honor, to "legally

significant."

THE COURT: Okay. Confidential is either in there or not. Let's ask the next question.

MR. SCHAMEL:

Q. So documents that are confidential, material that is confidential is labeled confidential?

A. No, sir.

Q. How is a confidential designation determined?

A. Well, I could speak from my experience.

Q. Nope. I would like you to tell me -- we've been talking about the general orders, it references confidential, and I want to know where in the general orders it tells members of the Metropolitan Police Department what that means?

A. So members are assigned cases and if you are not assigned a case, the member that's working on the assigned case shouldn't disclose or share information related to their case.

Q. So according to you?

A. According to me, yes.

Q. According to you.

A. Yes.

Q. Where is that in the general orders?

A. I don't think it's in there, sir.

Q. I apologize. I'm just not hearing you. You don't think it's in there?

A. No, sir.

Q. So it says "confidential," but you're not aware of anywhere in the general orders that defines what is confidential, correct?

MR. ROTHSTEIN: Objection, Your Honor. He keeps referring to a document that says the word --

THE COURT REPORTER: Your microphone.

MR. ROTHSTEIN: Objection, Your Honor. Defense counsel keeps referencing a document that says the word "confidential," but he's not actually showing it to the witness to allow him to answer it. He's just essentially asking him to answer it from memory and not citing to an actual document, the one we showed him.

THE COURT: Why don't you pull it up, because I remember a longer sentence.

MR. SCHAMEL: Correct. Can I ask -- we haven't been able to figure out how to pull it up yet. We'll do that over the lunch break. Can I ask government counsel if they would be so kind --

THE COURT: Yes, please. Government paralegal --

MR. SCHAMEL: -- as to pull up 3003, page 2, Section III that talks about confidential. I believe it's page 3.

I gave you the wrong one.

MR. ROTHSTEIN: Your Honor, we have a hard copy of the document, if he wants to provide it to the witness so he can see the entire document.

MR. SCHAMEL: That would be awesome. Thank you, Judge.

Hard copies we have. Give me one second, we'll pull that up.

THE COURT: All right. We can be old school here.

(Pause.)

THE COURT: I think the quote was, "Whatever is confided to me in my official capacity is secret, unless revelation is necessary in performance of my duty," was the one he was shown. I don't think it had the word "confidential" in it.

(Pause.)

BY MR. SCHAMEL:

Q. Okay. All right. Do you see it?

A. Yes, sir.

Q. Okay. In that section it starts -- it's the second indented paragraph. It starts -- we're looking on page 2 of 3 of the Code of Ethics under Section -- oh, thank you. Thank you.

Do you see that?

A. Yes.

Q. And it says, "Whatever I see or hear of a confidential nature, or that is confided to me in my official capacity, will be kept secret unless revelation is necessary in the performance of my duty." But what I'm asking you, when you

read something like that, is: What is the definition of "confidential nature"?
A. I would say the order doesn't clearly define it, sir.
Q. You got to --
A. The order doesn't clearly define it, sir.
Q. The order doesn't say what "confidential nature" is?
A. Doesn't clearly define it.
Q. Okay. And it doesn't say anything about "confided to me," what that means either, correct?
A. No, sir.
Q. Is there anything at MPD where they officially stamp things confidential?
A. I'm unaware of that practice, sir.
Q. Okay. So how would a person that's working at MPD know by these general orders what is confidential?
A. It would be their training and experience and, you know, it would just -- it's hard to explain it, sir.
Q. I'm sorry?
A. Working in the law enforcement community, there's things you don't reveal to the public and there's things you keep internal. And through your trainings and experience -- although the order is not clear, through your experience you know what you can reveal and what you can't reveal.
Q. In other words, you think you know what that means?
A. Yes.

Q. That could be as different as however many officers there are in law enforcement at Metropolitan Police Department?
A. Yes.
Q. Each officer could have a different set of training, different training person. General orders, they change, correct?
A. Yes. Yes.
Q. The training officers change?
A. Yes.
Q. The exams change?
A. Yes.
Q. The study materials change?
A. Yes.
Q. And officers have significantly different experiences, correct?
A. Yes.
Q. And you would admit that the experience of being a lieutenant in charge of the intel section is different than being, I don't know, an officer in the internal affairs section?
A. Yes, it would be two different jobs.
Q. Totally different jobs. Being a criminal investigator for the 3rd D detectives, significantly different than being a lead from the intel division?
A. Yes.
Q. What I'm talking about, these are all MPD jobs; fair?

A. Yes.
Q. What I'm asking you is: Where in any of your investigation is there a single email or document that indicates that the existence of the investigation into Mr. Tarrio is confidential?
A. I did not find anything stamped confidential in my investigation.
Q. You're the guy, you were in charge of this. You wrote the big report, right?
A. Yes.
Q. Okay. You were the one that made the conclusions and the recommendations under the guidelines for administrative action against Mr. Lamond?
A. Yes.
Q. Buck stops with you, as they say?
A. (No response.)
Q. I mean, there was nobody else that was doing this?
A. It goes through the review process, but I'm the author of the final investigative report.
Q. You didn't find anything that indicates that any of the documents related to Mr. Tarrio's investigation for the role in the Black Lives Matter flag burning were stamped confidential, correct?
A. No.
Q. You're not aware of any conversations where anybody says this is confidential, correct?

A. I am unaware of any conversations.
Q. Okay. And when somebody obtains a warrant, in this case officer -- now Lieutenant Mufti, there's an option with getting a warrant to ask for it to be under seal, correct?
A. Yes.
Q. You're familiar with that process?
A. Yes.
Q. This warrant was not under seal?
A. I am unsure, sir. I don't remember.
Q. Is there anything I could show you that would help refresh your recollection?
A. If you show me the warrant, it usually should say "under seal" on the front page.

MR. SCHAMEL: Court's indulgence. Unless the government would like to stipulate?

MR. ROTHSTEIN: Show him the document.

BY MR. SCHAMEL:
Q. You've seen the warrant in this case before, correct?
A. Yes.

MR. SCHAMEL: It's an exhibit, but I'm having a little trouble with the electronics, Your Honor, so may I just hand this up?

THE COURT: Yes, you may. You don't have to ask to approach the witness.

BY MR. SCHAMEL:

Q. Here's the complaint. Let me see if I can find the rest of the warrant.
(Pause.)
MR. SCHAMEL: May I approach?
THE COURT: Yes. You don't have to ask to approach the witness.
MR. SCHAMEL: I'm sorry.
BY MR. SCHAMEL:
Q. Take a second to look at that, would you?
(Pause.)
You've looked at it?
A. Yes, sir.
Q. Having refreshed your recollection, was this warrant under seal?
A. No, sir.
Q. It was an option. You could -- the officer, now Lieutenant Mufti, could have applied to have it under seal, correct?
A. Yes.
Q. Are you aware that anybody applied for it to be under seal?
A. I'm unaware if anybody applied for it to be under seal, sir.
Q. And to be clear, there's nothing on that marking that is confidential, correct?
A. No, sir.
Q. Not publicly available, just out in the world, right?

A. It would be stored at our report management system.
Q. Okay. And any officer would have access to it?
A. Yes. However, I will reference our report management system general order, which clearly states, you know, unless there's a law enforcement purpose, you cannot access reports.
Q. I appreciate the advocacy. But the question was --
THE COURT: Stop it. That was not necessary.
MR. SCHAMEL: His answer was nonresponsive, Your Honor.
BY MR. SCHAMEL:
Q. I'm asking you: Any officer of MPD could have had access to that warrant, correct?
A. Yes.
Q. Okay. And there's nothing about that that separates it from any other misdemeanor warrant as being confidential, close hold, law enforcement sensitive, need to know, right?
A. Correct.
Q. And so any officer, for example, from the warrant squad could call up the person in the warrant and say, There's a warrant for you, come on in, right?
A. Yes.
Q. And they wouldn't be violating any MPD policy, correct?
A. In the context you just presented it, no.
Q. Right. Because you're saying it's a law enforcement purpose and they can do that, right?

A. Yes.
Q. Okay. What are the intel duties of a lieutenant in the intel section? Where are those listed? Did you find those in your investigation?
A. I don't -- they're not in the general order, sir.
Q. I'm sorry?
A. There's intel general orders, but I'm unfamiliar with the general order regarding the lieutenant-specific duties at intel.
Q. You actually did quite a bit of research into this as part of your investigation when you were investigating Lieutenant Lamond, correct?
A. Yes.
Q. And you came to learn there's no roll call for intelligence, correct?
A. Correct, sir.
Q. And you didn't know that before, did you?
A. No, sir.
Q. And there's no specific assignments for an intelligence lieutenant, correct?
A. Correct, sir.
Q. You went and looked for it because you didn't know that either, did you?
A. Correct.
Q. Okay. There's no job description for lieutenant of intel,

is there?
A. I don't recall if I --
Q. I can show you the email, if it helps. You went and looked for it and you found there's no job description, is there?
A. Could you show me the email, sir?
Q. Sure.
MR. SCHAMEL: Let's see. Probably the best way to do this -- I'm just going to show it to him.
THE COURT: All right. Yes. Yes, you have permission to approach the witness and show him things. If you're cross-examining him with the document, you know the government has it, yes, you need to tell them what you're using.
MR. SCHAMEL: I apologize. It is highlighted. That's my fault.
A. Yes.
BY MR. SCHAMEL:
Q. So my question is -- Ciapa?
A. Yes, sir.
Q. Ciapa?
A. Ciapa, yes.
Q. Ciapa. I apologize. I want to get it right.
My question for you, Mr. Ciapa, is there is no job description for an intelligence branch lieutenant, correct?
A. Correct.

Q. And you didn't know that either before you started this investigation?
A. No, sir, I did not know that.
Q. You were asked a question about 3011, it was the central source registry. Do you remember being asked that question by Mr. Rothstein?
A. Yes.
Q. You're the one that did that?
A. I was -- there is a police lieutenant that controls the system and I was next to him when he accessed the system.
Q. Bill tells me I have it here.
Take a look at that again.
A. Yes.
Q. Somebody ran that for Mr. Tarrio?
A. Yes, Lieutenant Greene.
Q. Enrique Tarrio.
A. Yes.
Q. Who is that?
A. The defendant in Lieutenant Mufti's case.
Q. Is it? What's his actual name?
A. I'm unsure, sir.
Q. You don't know Mr. Tarrio's real name?
A. I believe it's in my final investigative report, but I'm unsure right now.
Q. It's not Enrique, is it?

A. I don't believe so.
Q. I mean, I'm not going to suggest that you're going to find Henry Tarrio either, but that's not even a person that you are aware of, is it?
A. I'm unsure, sir.
Q. So you don't know the various roles of an intelligence division and when you went and looked. That's a pretty important document, right? You're trying to show that there was no source.
MR. ROTHSTEIN: Your Honor --
MR. SCHAMEL: I'll withdraw.
THE COURT: You can stop arguing with him. I think you made your point.
MR. ROTHSTEIN: Your Honor, I would also note that we had -- during our pretrial conference we had a lot of discussion about the central source registry documents and we were only permitted to bring in one. And defense counsel well knows that there is no document that MPD has listing Henry Tarrio or Enrique Tarrio as a source. And for him to stand up here and try to lead the Court to believe that, that there's something about this document that is misleading, I think is inappropriate.
MR. SCHAMEL: What I said very clearly, Your Honor, is I'm not representing to you that there's a Henry Tarrio --
THE COURT: Well, you're not representing anything

because this is the witness and you are not. So this document says Enrique Tarrio.

MR. SCHAMEL: And --

THE COURT: If there's some other document that you now need to introduce with respect to other names, we can talk about that. But let's pretend that there's a jury in the box or something, so that people stop trying to argue things at the same time as they're trying to elicit testimony.

So ask your next question. The piece of paper said "Enrique." Next.

MR. SCHAMEL: You said something, Your Honor.

THE COURT: I said, the piece of paper said Enrique and he doesn't know what his actual full name is at this point. Next question.

BY MR. SCHAMEL:

Q. As it relates to the duties of which you are uncertain of an intelligence lieutenant, what do you know about what then Lieutenant Lamond was supposed to be doing with contacts with individuals involved in First Amendment protests?

A. I do know the order specifically states that if you have contact with a source, you're required to document it.

Q. "If you have contact with a source." And a source is someone -- there's a source -- the general orders defines these terms, correct?

A. Yes.

Q. A source, right, is one category?
A. Yes.
Q. Confidential informant is another category?
A. Yes.
Q. And a witness is a category, correct?
A. I believe so, yes.
Q. And the witness is somebody who has a pending case that's trying to work off and you can't pay them, they're sort of different, right?
A. I would need to review the order, but it sounds accurate.
Q. And a confidential informant is somebody that you sign up, you go through the confidential informant process, get the approvals, and you can actually pay that person, correct?
A. Yes.
Q. Part of the guidance on that is you have to let that person know they may get a 1099 if they're getting paid, right?
A. I'm unfamiliar with that process, but it sounds accurate.
Q. Did you ever work any confidential informants?
A. I personally have not signed up any confidential informants.
Q. Okay. Did you ever work any witnesses in any of your investigations who were trying to work off a charge in something else?
A. No.
Q. That leaves us with the third category, which is a source.

What is a source?
A. A source is an individual used by the police department to further their investigation.
Q. To further an investigation. Okay. And is it your understanding that Mr. Lamond was having contact with Mr. Tarrio as part of furthering investigations?
THE COURT: When?
MR. SCHAMEL: That's a fair question, Your Honor.
BY MR. SCHAMEL:
Q. Anytime before 2021, January 4, 2021, was Mr. Lamond in contact with Mr. Tarrio in furtherance of an investigation?
A. Based off of my investigation, I believe at that time there was a reference to Fourth Amendment -- or, demonstrations and assemblies.
Q. And, again. I'm sorry.
A. Sorry. I believe during that time period, before the banner burning incident, I believe he was in contact with him related to assemblies in the District of Columbia.
Q. Assemblies, protests, things -- marches, things of that nature, correct?
A. Yes.
Q. The banner-burning investigation was December 12, 2020? That's when that occurred?
A. Yes.
Q. Okay. So -- and you know that Mr. Tarrio and Mr. Lamond

were in contact going back to 2019, correct?
A. Yes.
Q. And that was well known. His supervisor knew it, correct?
MR. ROTHSTEIN: Objection, Your Honor. This is well beyond the scope of direct.
THE COURT: Yes, it is. It is.
MR. ROTHSTEIN: Your Honor, I would also raise the fact that I think defense counsel -- he's actually going into the IAD investigation.
THE COURT: He has been, probably for the past 15 minutes, yes.
MR. ROTHSTEIN: And I think he has opened the door to a lot of other things that Mr. Ciapa could testify to that the government did not intend to get into. We were very limited in what we brought up on direct.
THE COURT: All right. We'll see what happens when you get to your redirect about that. But, I think this has all been based on your initial question about giving information for a law enforcement purpose. Okay. And, so, you asked generally a question: Was he a source prior to January 4th? And he's answered that question. So what's your next question.
BY MR. SCHAMEL:
Q. Is your understanding that Mr. Lamond's duties were to have contact with people like Mr. Tarrio as -- before January 4th as the lieutenant in charge of the intel division?

A. I wouldn't say Lieutenant Lamond specifically, but that unit, the unit as a whole would have been responsible for making contact with individuals related to demonstrations and assembly.

Q. Correct. Is it your understanding that Mr. Lamond and Mr. Tarrio, before the banner burning, were having contact about that particular thing?

MR. ROTHSTEIN: Objection, Your Honor. This is beyond the scope. The government only put in the document from the central source registry to show that no other MPD officer had registered him as a source. This is what we told the Court we were going to do in our pretrial conference. We did not -- and there was a lot of discussion at the pretrial conference about whether we were going to get into the fact of whether or not Officer Lamond had appropriately treated him as a source or registered him correctly. We stayed away from that. And I think this is going well beyond what we did on direct.

THE COURT: And I'm not sure what the relevance is about whether he was a source or whether he wasn't a source prior to the banner burning.

MR. SCHAMEL: The government put in a document that talked about confidential. We now know this was not. But you're only supposed to share things with people for a law enforcement purpose. This gentleman doesn't know what Mr. Lamond's duties were. And so what I'm trying to figure out

is if I can get him there, because Mr. Lamond's duties were specifically to be dealing with Mr. Tarrio, and people like him, to get information about the various protests that were going on in the city.

THE COURT: Prior to the banner-burning incident?

MR. SCHAMEL: Correct.

THE COURT: I think the only communications that they're talking about here are the communications that occurred after the banner-burning incident and, in particular, communications with respect to the arrest warrant. So are you suggesting that those communications were in furtherance of his intelligence-gathering responsibilities?

MR. SCHAMEL: Yes, I am. Absolutely.

THE COURT: Okay. Well, I think you're going to have to bring that in through a witness with knowledge.

MR. SCHAMEL: And then be forced to recall him?

THE COURT: This witness has personal knowledge of what Mr. Lamond's intelligent-gathering responsibilities were on January 4th?

MR. SCHAMEL: Government stood before Your Honor and told the Court that Mr. Lamond is somehow -- he likes the Proud Boys and he supports them, and that's what this is about.

THE COURT: Putting that aside, I just want to know what you're doing with this witness.

MR. SCHAMEL: I'm establishing with this witness that

Mr. Lamond, in 2019, up until he left -- until Mr. Tarrio was arrested and ceased communications, was working with Mr. Tarrio to get information about the various events that he was responsible for covering in his capacity.

THE COURT: Okay. What the witness said was prior to the banner burning he was in communication with him about assemblies and protests.

MR. SCHAMEL: Correct.

THE COURT: So I don't know if we have anything that has what his responsibilities were between December -- after December 12th, during this investigation. So if he knows.

BY MR. SCHAMEL:

Q. Do you know what happened on January 6?

A. No, sir.

Q. Do you know about -- that there was a plan for a large demonstration in the District of Columbia on January 6, 2021?

A. Yes.

Q. Do you know that that large demonstration had a list of people who were to participate with then President Trump in that demonstration?

A. I'm unfamiliar with the list, sir.

Q. Do you know -- do you know if Mr. Tarrio had any role for the January 6 events that were planned in 2021?

A. I don't remember, sir.

Q. You don't remember or you don't know?

A. I don't know, sir.
Q. Do you know if there was a concern or there was a thought that the Proud Boys were going to appear in the District of Columbia as part of the January 6th, 2021 protest and event?
THE COURT: Is there any evidence going to be introduced about communications after December 12th between Mr. Lamond and Mr. Tarrio related to January 6?
MR. SCHAMEL: Yes.
THE COURT: Okay. What does that have to do with what we're talking about though, which is --
MR. SCHAMEL: Everything, Judge.
THE COURT: I'm sorry. I think if you want to use this witness as your witness, you may have to call him as your witness. But all this witness -- this witness conducted an investigation as to Mr. Lamond's duties. So is he the witness with knowledge about that?
MR. SCHAMEL: The government put him up on direct examination, asked him a serious of questions about general orders to make it look like Mr. Lamond was doing things outside of his law enforcement duties when he was communicating with Mr. Tarrio.
THE COURT: About a particular subject. Not talking to him at all.
MR. SCHAMEL: But you --
THE COURT: I mean, that's what they're telling. I'm

just trying to figure out where this fits --

MR. SCHAMEL: It's context. It's context, that Mr. Lamond --

THE COURT: -- had a reason to talk to Mr. Tarrio?

MR. SCHAMEL: (Nods head.)

THE COURT: All right. And this witness apparently doesn't know.

BY MR. SCHAMEL:

Q. Do you know what the MPD general orders say about use of apps like Parler or other apps that have a feature that allows for automatic deletion after sending?

A. Are you referring back to that time period or currently?

Q. Well, they currently do, correct?

A. Yes.

Q. They didn't then?

A. No.

Q. They didn't have any guidance on the use of Parler or any of these different apps that are secret, essentially, right?

A. No, there's no policy.

Q. No policy. In fact, you recommended, as part of your investigation, that they should have a policy?

A. Yes.

Q. They subsequently have made one?

A. Yes.

Q. So the use of the Parler app or the -- it just went out of

my head.

THE COURT: Telegram.

MR. SCHAMEL: Telegram. Thank you, Your Honor.

BY MR. SCHAMEL:

Q. The use of the Telegram app was not addressed in any MPD guidance, whether or not officers were allowed to use that, correct?

A. Correct.

Q. So there was nothing improper, that you're aware of, in 2020 or early 2021 to prevent Mr. Lamond or any members of MPD from communicating with Mr. Tarrio or anybody else using the Telegram app, correct?

A. Correct.

Q. The guidance that you referred to in your direct examination about destruction is to actually destroy documents, correct?

A. Yes, and electronic evidence as well.

Q. Right. It's like you have a rule that says you're supposed to carry a notebook as a police officer?

A. Yes.

Q. And you're supposed to keep those for three years?

A. Yes.

Q. Right. It's a preservation rule, right?

A. Yes.

Q. And MPD didn't have anything for Telegram?

A. Not specifically Telegram, but we do have a policy in place for discoverable material.
Q. For discoverable material?
A. Yes.
Q. You would think for criminal investigations, correct?
A. Yes.
Q. So if there was something about a criminal investigation that somebody in the intel section had, you would want them to keep that?
A. Yes.
Q. But information about whether or not you're coming to D.C. to protest, that's not related to a criminal investigation, correct?
A. Yes, but you should -- per policy, you need to document your contact with sources.
Q. Right. If you have a source that you're getting information from to make a case, right?
A. I don't believe the order specific -- just says you're required to document your contacts, all contacts of a source.
Q. Right. And in the context that you're talking about a source, you're talking about a source who is giving information to law enforcement for the purposes of a criminal investigation?
A. It also could be intelligence as well, sir.
Q. Right. Intelligence, like something is going to happen?

A. Yes.
Q. Not -- would you consider somebody saying I'm coming to D.C. with a thousand of my friends to march as a source or just a contact letting you know that's going to happen?
A. Per policy, you should document that.
Q. You should document that somebody -- somebody tells you they're coming to D.C. for First Amendment protected event, that should be documented?
A. Yes.
Q. In an A54?
A. Yes.
Q. Did you look through the A54s and see if anybody in the intel section has ever documented anything like that?
A. The scope of my investigation was related to Lieutenant Lamond, so I spoke with his direct supervisor related to his A54s.
Q. Who is that?
A. Carolyn Montagna.
Q. And she knew that he was talking to Mr. Lamond?
A. Yes.
Q. Or, Mr. Tarrio, right?
A. Yes.
Q. And other people in the intel section knew that he was talking to Mr. Tarrio, correct?
A. I don't recall, sir.

Q. Mr. Copeland. Copeland knew?
A. Are you talking about Nicole Copeland?
Q. Yes.
A. Yes.
Q. He knew?
A. She.
Q. She. I get that screwed up.
Parsons knew?
A. I did not interview Assistant Chief Parsons.
Q. You didn't talk to Parsons?
A. No.
Q. Parsons was involved in that email chain where Lamond came forward and said I'm working with Tarrio, right?

MR. ROTHSTEIN: Objection, Your Honor. Relevance. We're talking about two different -- he's doing his cross-examination about a case that the government isn't even presenting about whether or not he was providing police information, and specifically about the investigation into Mr. Tarrio. I'm not exactly sure what he's doing.

THE COURT: Okay. Well, I think whatever it is, it's gone -- I've given you lot of leeway to go well beyond the scope of direct and I think a little bit down the road into some stuff that's irrelevant, but I think now we need to get back to your cross-examination based on the direct.

MR. SCHAMEL: I think he's essentially the case

agent, Your Honor, and that gives me a lot of leeway.

THE COURT: He testified about certain general orders. He did not testify about his investigation of Mr. Lamond. He was not called to testify about his investigation about Mr. Lamond. If you're going to need him for that, then you may have to recall him --

MR. SCHAMEL: That's what I'll do.

THE COURT: -- I think that's -- whether he ever -- he is not on trial for talking to Mr. Tarrio in general. He's not on trial for talking to Mr. Tarrio about January 6. He's not on trial for talking to Mr. Tarrio prior to December 22nd. I think you, yourself, have used the word in this court that he was "a source." So that seems to be clear, they spoke.

Ask your next question.

MR. SCHAMEL: Nope, I'm going to make him subject to recall and I'll call him in the defense case, Your Honor. That's fine.

THE COURT: All right.

MR. ROTHSTEIN: Very briefly, Your Honor.

THE COURT: All right.

REDIRECT EXAMINATION

BY MR. ROTHSTEIN:

Q. Is there a common law enforcement understanding of confidential, what that means?

A. Yes.

Q. And how many years have you been a cop?
A. Approximately 17 and 1/2 years.
Q. How many years has he been a cop, the defendant?
A. He's retired, sir, so at least 25 years.
Q. Okay. And you understand what confidential information is, correct?
A. Yes.
Q. Okay. What is your understanding, based on your training and experience, what the common law enforcement understanding of confidential is?
MR. SCHAMEL: Objection.
THE COURT: I think the sentence said confidential information or information that was confided in you in your capacity as a law enforcement officer. And none of those terms are defined terms in the general order, is that correct?
THE WITNESS: Correct.
THE COURT: Okay. So with respect to what any of them mean, we have to rely on our common understanding of what those words mean, particularly what those words mean together in a sentence.
THE WITNESS: Yes.
BY MR. ROTHSTEIN:
Q. Is that informed by --
THE COURT: I think asking him what he thinks it means and asking somebody else what they think it means --

MR. ROTHSTEIN: I understand that, Your Honor. My -- defense counsel tried to make the point, if it's not defined, nobody can understand what it means, it's totally amorphous. My only point is -- I'm not asking what he thinks Mr. Lamond understood confidential to mean, I'm asking if he understands -- based on his training and experience and 17 years in the force, he understands what confidential means in law enforcement information. That's all I'm asking him.

THE COURT: And what's your objection?

MR. SCHAMEL: What does that have to do with what Mr. Lamond knows? His understanding is not the issue. It's undefined. You're the fact finder. It's undefined. He doesn't get to say what it means, attribute it to Mr. Lamond because he's somehow --

THE COURT REPORTER: Please use the microphone.

THE COURT: All right. I think this witness has given his understanding. I think this witness has been cross-examined about his understanding. I'm not sure why we need to ask him again what his understanding is.

I'll let you answer the question. Go ahead.

THE WITNESS: My understanding of confidential law enforcement sensitive information is anything that could be leaked out of the law enforcement community that could compromise a criminal investigation.

BY MR. ROTHSTEIN:

Q. Does that include evidence that's been collected?
A. Yes.
Q. Does that include arrest warrants?
A. Yes.
Q. Does that include police reports?
A. Yes.
Q. Does that include warrants?
A. Yes.
Q. Okay. Now, you were asked some questions by defense counsel about warrants being under seal. Do you remember that?
A. Yes.
Q. Okay. Now, if a warrant is not, quote, under seal, does that mean that anybody at MPD can disclose a warrant to a suspect?
A. No.
Q. Who can disclose a warrant to a suspect?
A. When they're making the arrest.
Q. And although Mr. Lamond was the lieutenant of HSB, is he the top official at MPD?
A. No.
Q. Are there other individuals above him?
A. Yes.
Q. Did that include Mrs. Montagna?
A. Yes.
Q. Did that include Jeffery Carroll?

A. Yes.
Q. And so he is under their supervision, correct?
A. Yes.
Q. And he operates under the general orders, correct?
A. Yes.
Q. There's not a carve-out in the general orders that says intelligence officers can operate outside of this, correct?
A. Correct.
Q. Okay. Now, you were asked some questions about there not being a policy regarding the use of Telegram. Do you recall that?
A. Yes.
Q. Was there a policy regarding the destruction of evidence?
A. Yes.
Q. Was there a policy regarding the preservation of evidence?
A. Yes.
Q. Did all of those apply to conversations that would have occurred on Telegram?
A. Yes.
MR. ROTHSTEIN: One second, Your Honor.
MR. SCHAMEL: I have one question.
THE COURT: He's not done.
MR. SCHAMEL: I thought he was done.
THE COURT: No, he wasn't.
MR. ROTHSTEIN: Nothing further. Thank you,

Your Honor.

THE COURT: All right. Ask your one question.

RECROSS-EXAMINATION

BY MR. SCHAMEL:

Q. You were asked a question about who can disclose the warrant to a suspect. Do you remember that question?

A. Yes.

Q. Where in the general orders does it say who makes that decision?

A. I'm unfamiliar if there is a general order regarding that.

MR. SCHAMEL: Thank you.

THE COURT: All right.

MR. ROTHSTEIN: Your Honor?

THE COURT: Okay.

MR. ROTHSTEIN: Sorry.

FURTHER REDIRECT EXAMINATION

BY MR. ROTHSTEIN:

Q. In the course of your -- in the course of your investigation, did you see any documents that indicated that Shane Lamond was authorized to disclose the warrant to Enrique Tarrio?

A. No.

MR. ROTHSTEIN: Nothing further, Your Honor.

MR. SCHAMEL: Move to strike. Presupposes --

THE COURT REPORTER: I can't hear you.

THE COURT: All right. Let's do this: If you want to make an objection, since there's no jury here -- and usually I have people stand up so I actually know they're making an objection, but every time you stand up you lose the microphone. So if you want to move the microphone closer to you and make them loudly and clearly in the microphone, I think that will help the court reporter and I think I'll still know that you're objecting. You are excused from having to stand up when you make an objection from counsel table.

MR. SCHAMEL: Thank you, Your Honor. I'll do my best not to stand up and just --

THE COURT: Well, it's fine.

MR. SCHAMEL: I move to strike.

THE COURT: Okay. You gave me a reason and if you want to repeat it again. I thought I heard it, but you can say the reason.

MR. SCHAMEL: It presuppose that there's an authorization required. I asked him, he said nobody makes the decision. So to say was he authorized, there's no authorization.

THE COURT: All right. Well, I think he just asked: Did you see any evidence of whether it was authorized? So I'm not going to strike it. I've heard a lot of testimony back and forth about whether people can call the suspect and tell them there's a warrant for them. And so all of it is in the record

at this point.

All right. This witness can step down. I advise you that the defense may choose to call you in their case, if they put on a case. And so if you are asked to return, you need to return.

And you will communicate through the government if you need this witness back.

All righty. Thank you.

MR. SCHAMEL: I will, Your Honor.

THE COURT: Okay. I think we'll take a lunch break and we will resume at 2 p.m.

Do you have more witnesses? Just would like them to continue to be ready to go.

MS. ROSS: They're here, Your Honor, and they're ready.

THE COURT: All right. I'll see everybody at 2.

(Noon recess from 1:07 p.m. to 2:05 p.m.)

THE COURTROOM DEPUTY: We are back on the record in criminal case 23-177, United States of America versus Shane Brian Lamond.

THE COURT: All right. Are you prepared to call your next witness?

MS. ROSS: Thank you, Your Honor. The next witness is Jennifer Katherine Cain. She just went to get her. She'll be right in.

JENNIFER CAIN,

was called as a witness and, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSS:

Q. Good afternoon.
A. Hello.
Q. Can you please state and spell your name for the record?
A. Jenner Katherine Cain, C-A-I-N.
Q. Where do you work?
A. I work for the Federal Bureau of Investigation, in our Knoxville division.
Q. How long have you been with the FBI?
A. Twelve years.
Q. What is your title?
A. I am a senior digital forensic examiner.
Q. What are some of the responsibilities of the -- and I'm sorry, do you work with the CART team?
A. I do.
Q. What does CART team stand for?
A. It stands for Computer Analysis Response Team.
Q. What are some of the responsibilities of the CART team?
A. We will handle all aspects of digital evidence, to include computers, laptops, mobile devices, tablets, and anything that could attach to any of those items.

Q. How long have you been with the CART team?
A. Seven years.
Q. And what are some of your duties as a CART examiner?
A. Well, as I mentioned, we handle all those digital evidence items, and our responsibility is to take in those items and inventory them. We perform a physical analysis of them and then extract those devices and then turn that extraction into a usable format for our investigative team to review.
Q. What is your educational background?
A. I have a bachelor of science in business administration from the University of North Carolina and a master's in cybersecurity, with a concentration in digital forensics, from the University of South Florida.
Q. What kind of trainings are you required to do as a CART examiner with the FBI?
A. Our training starts out with about 400 hours of in-person, classroom-led instruction training to become a certified examiner with the bureau. And then after that we undergo around 100 hours per year of additional training.
Q. Do you also conduct trainings?
A. I do. I'm one of our instructors.
Q. What kind of trainings do you conduct?
A. I teach our forensic examiner trainees digital evidence fundamentals and incident response, as well as SQLite and mobile forensics.

Q. Can you describe the process of examining a cell phone?
A. Sure. When I receive a cell phone, I take a physical inventory of the device and that helps me to determine the best way to proceed with that device. For instance, is there -- is the device powered on or powered off? Do we have the pass code for that device? And then I will hook that device to one of our commercial or in-house tools to extract the information off of the device.
And when I say "extract," we are just taking a copy of that data right off, and it usually is preserved in a file system. And then I process that data into a usable format, because when it comes off the phone, it is typically in its native state, which is databases or spreadsheets and binary files, and translate that into something usable for our investigative team to review.
Q. You mentioned that there are different tools that are used to extract information from a phone. Can you just describe how those tools extract the information?
A. Yes. I would hook up a mobile device to one of our tools -- which is essentially a computer with a cable attached to it -- and the hardware guides the extraction process.
Q. And you said that extraction was essentially a copy of the phone. Why do you use a copy of the phone?
A. We use it for two reasons, and the first is to preserve that original evidence as best we can so that we are not

returning to that original item. And the second is because when we make an extraction of that device, we are actually getting far more data than what's available for the user to see if you were to just look at the phone. We are getting all of the system files and all of the data files behind the applications on that device.

Q. Can you describe in a little bit more detail, when you get the copy of a phone, what type of information do you get?

A. It's all proprietary to the way each application decides to store that information. Most commonly is that applications store information in databases, which is a series of tables or spreadsheets, if you will, and then I will translate that data into a usable format. For instance, if we were looking at text messages and it was in a table format, I would pull out the timestamp, who the message was from, who the message was to, what the body of the message was, if there was an attachment, and so forth.

Q. Do you do both the copying of a phone and then the analysis?

A. I do.

Q. Are there times where you will analyze a copy of a phone that someone else made?

A. Yes.

Q. And in those situations, how do you determine if a copy of the phone is accurate?

A. When the extraction is complete, our hardware tools take what we call a hash value of that data, and essentially it's a digital fingerprint, and that digital fingerprint is comprised of everything in that file. And so if one item, anything, even inserting something as small as a period into that phone were to change, it would change that entire digital fingerprint. So all I have to do is when I receive that copy, I validate that hash value, validate that digital fingerprint, and as long as it matches, then I'm working off of an exact copy.
Q. After you have copied the data from the phone, what do you do next?
A. I process that into a usable format for our investigative team, such as taking the databases and translating them into a text message string that you could view -- that would be similar to how you would view it on a phone.
Q. And from the copies of a phone, do you create a report that helps to organize some of the things that were on the phone, such as emails and text messages, phone calls and things like that?
A. I do, yes.
Q. And do those reports contain true and accurate information from the copies of the cell phone?
A. They do, yes.
Q. How many copies -- or, how many cell phones would you say you have examined and analyzed in your career?

A. Over 1,000.
Q. And have you been qualified as an expert in digital forensics in federal court?
A. I have.
Q. And how many times have you been qualified as an expert?
A. Four times.
MS. ROSS: Your Honor, at this point the government would like to tender Examiner Cain as an expert in cell phone forensics.
THE COURT: Any objection?
MS. JARA: We have no objection, Your Honor.
THE COURT: All right. This witness will be qualified as an expert. I don't think I need to instruct myself as to what that means.
MS. ROSS: Thank you, Your Honor.
BY MS. ROSS:
Q. Examiner Cain, in connection with this matter, were you asked to examine the copies of two devices?
A. I was.
Q. Did one of those devices include an iPhone belonging to Shane Lamond, the defendant?
A. Yes, ma'am.
Q. And as part of your examination, were you asked to determine if the defendant had any communications with Enrique Tarrio?

A. I was.
Q. And the second device that you were asked to examine, was that a device belonging to Enrique Tarrio?
A. It was.
Q. And as part of your examination of that device, were you asked to determine if Enrique Tarrio had any communications with the defendant?
A. I was.
Q. Now, as part of your examination of the defendant's phone and Mr. Tarrio's phone, were you asked to determine if the defendant had any encrypted messaging applications?
A. Yes.
Q. Can you provide some examples of encrypted messaging applications?
A. The could include WhatsApp, Signal, Telegram, or Viber, as some examples.
Q. Are you familiar with how encrypted messaging applications work?
A. I am.
Q. Can we please bring up what's been marked for identification purposes only as Government Exhibit 5008, please.
Examiner Cain, is this a demonstrative exhibit that you helped prepare and verify to aid the Court in understanding how encrypted messaging works?

A. Yes, it is.

Q. Examiner Cain, can you just walk us through, first, how a phone would send a normal text message?

A. Yes. When a phone sends a text message, the message is delivered to the tower, the home tower of that cell phone, it is then transmitted to the cell phone tower of the recipient and that tower delivers it to the final destination.

Q. Examiner Cain, focusing specifically on Telegram, is that an encrypted messaging application?

A. It is, yes.

Q. And focussing just on Telegram, does Telegram allow users to send messages that are encrypted from end to end?

A. It does, yes.

Q. Can you describe how end-to-end encryption works?

A. Sure. When a phone sends an encrypted message --

Q. Can you leave that up, please. Thank you.

A. In Telegram, those are called secret chats. So when it sends -- when a phone sends a secret chat in Telegram, it is encrypted using two different keys, a public one and a private one that only the user has. The public key is sent through the Telegram servers and -- along with the encrypted message, which is then received on the recipient's device. And the recipient's device then uses their private key and that public key that was sent along with it to decrypt their message on their end. So the message from the first device to the final

device is scrambled in transit during that entire time.
Q. And how does that differ from sending a normal text message?
A. When you send a normal text message, it is sent in plain text. So if it were to be intercepted, say, on a cell phone tower, you could read the contents of that.
Q. Can Telegram messages be sent using WiFi?
A. They can, yes.
Q. So as an example, if someone is on an airplane with their phone on airplane mode or without cell reception, if they were able to connect to WiFi on the plane, can they send a Telegram message?
A. Yes, they can.
Q. Would they also be able to receive a Telegram message?
A. Yes, they can.
Q. And did you find any encrypted messaging applications on the defendant's phone?
A. I did.
Q. Did that include Telegram?
A. It did, yes.
Q. Did you find any encrypted messaging applications on Tarrio's phone?
A. I did.
Q. Did that also include Telegram?
A. Yes.

Q. Thank you. We can take that exhibit down. Thank you.
When you extract data from a cell phone, what does a Telegram extraction look like?
A. It's essentially a folder structure, just like you could see on any computer that you use. It has a main folder that is labeled with the application's name or identifier, and then all of the data inside that application is organized and containerized to just that folder.
Q. If the Telegram application has been deleted from a device, what does that mean in terms of the data that is stored in the Telegram folder or database on the phone?
A. For the messages database, when it is deleted from the phone, that message's database is removed completely from the device.
Q. If the Telegram application has been deleted from a device, would you be able to recover any messages sent or received using that Telegram application?
A. No, we would not.
Q. Would you be able to recover any messages if a person deletes a specific Telegram chat from the Telegram application on his phone?
A. Yes. Potentially, yes.
Q. What is the difference?
A. When you delete the entire application, that entire folder structure is removed from the device. However, if you just

delete a particular message or message thread, because the Telegram application is still live on that device, you're just singling out either a single message or a single chat thread to delete.

Q. Does it guarantee that you'll be able to recover all the messages from the chat thread?

A. No.

Q. Is it -- does it just say that there's a higher likelihood you'll be able to recover at least some messages?

A. Yes.

Q. I want to focus --

THE COURT: I'm actually confused by your answer.

THE WITNESS: Okay.

THE COURT: If the app has been deleted, all the database, the messages are deleted?

THE WITNESS: Yes, ma'am.

THE COURT: If a particular thread has been deleted, I take it that doesn't interfere with the other messages, they're still there. But what about the messages that were contained in the thread?

THE WITNESS: So the deleted messages, depending on how long they have been deleted in the database, we can potentially recover some of those. Probably not all of them, but we do have the potential to recover some messages that have been deleted.

THE COURT: Is there an indication that there was a message, but that the content is deleted?

THE WITNESS: Sometimes. The data is preserved in varying degrees, so I could be able to recover, say, an entire message that contains a timestamp and the recipient and the content. But in some cases, depending on how the database is cleaning up after itself, all that may remain is a simple timestamp. And so we know a timestamp of a message, but we don't have any of the other components. So there are varying degrees of recovery.

THE COURT: Thank you.

BY MS. ROSS:

Q. I want to talk a little more in-depth about your examination into the defendant's iPhone. So you mentioned earlier that when you create an examination of a phone, you can create reports that contain information from a cell phone that are relevant to an investigation. In this case, did you create a report of the defendant's iPhone?

A. I did.

Q. Can we please bring up for the witness what has been admitted as Government's Exhibit 1004. And can with please go briefly to page 2 of this exhibit. And then can with we zoom in on the top there.

And can you provide just a general overview of what is in this report?

A. Yes. This is the communications timeline report and it includes all communications that our investigative team found relevant to this investigation.

Q. And then, Examiner Cain, back on page 1 of this exhibit, is this just the cover page to the exhibit?

A. It is, yes.

Q. And can you explain what the cover page indicates?

A. It just details the evidence item number, some of the device identifiers, and who it belongs to.

Q. And on all of your reports, does it contain a cover page?

A. It does, yes.

Q. Okay. So focusing, now, on the messages that are contained in this report, looking at kind of the top message here --

Can we zoom in on the top of this document, please.

What type of message was this first message here?

A. This is a standard text message, an SMS message.

Q. Who did it say the message was to?

A. It's to Enrique Tarrio.

Q. And the phone number that we see there, (305) 766-8213, were you able to confirm that that was a number that Enrique Tarrio used?

A. Yes.

Q. Is that a Google Voice number?

A. Yes.

Q. And what is Google Voice?

A. Google Voice is a third-party application that a user can download. And the user has to have a current active cell phone, existing cell phone number and cell phone plan, but then the user can use Google Voice to choose a secondary phone number to receive and send text messages and calls from.
Q. And what is the date of this top message here?
A. October 24th, 2019.
Q. Is October 24th, 2019 the date of the first message that you were able to recover between the defendant and Mr. Tarrio?
A. Yes, it is.
Q. And can we go to page 37 of this exhibit, please.
And what is the date of the last message on this report?
Can we just zoom in there. Thank you.
A. It is January 27th, 2021.
Q. And was that the last date of -- was that the date of the last communication you were able to recover between the defendant and Tarrio on the defendant's phone?
A. Yes, it was.
Q. In addition to this report, Examiner Cain, did you also create another report for the defendant's phone?
A. I did.
Q. Does that report focus just on Telegram communications?
A. Yes, it does.
Q. Can we please bring up Government Exhibit 1001, please. And can we please go to page 2.

And focusing just on the top there. Can you provide a general overview of what this report shows?

A. Yes. This is a Telegram secret chat, which is an end-to-end encrypted chat, between Enrique Tarrio and Shane Lamond. And it is from Shane Lamond's device.

Q. And I want to focus on some of the information that's in this report. So can we zoom in just on the top five columns, or five rows of this exhibit, please.

So first focusing on this top row, do you see the name Enrique Tarrio with the numbers after it?

A. I do.

Q. And can you read those numbers?

A. 581632416.

Q. What do those numbers indicate?

A. This is his Telegram identifier.

Q. What is a Telegram identifier?

A. When a user signs up for Telegram, Telegram automatically assigns a numeric identifier to that user, which is unique to just that user.

Q. In other words, can anybody else have this Telegram ID?

A. No, they cannot.

Q. And now we see, at the top here, it also says BikNBil with some numbers after it. What is BikNBil?

A. That is the Telegram user name of the account on Shane Lamond's device.

Q. Those numbers after BikNBil, 869476955, what are those numbers?
A. That is the Telegram identifier for that user name.
Q. And would that have been unique to the defendant?
A. Yes.
Q. Now, looking at the second row here under Enrique Tarrio, do you see the message sent on January 7, 2021, where it says message ID 1?
A. I do.
Q. What is a message ID?
A. In a Telegram secret chat each message sent by each party is given an automatic number, starting with No. 1. And each party, every time you send a message, it increases by one. So the first message Tarrio would have sent would have been message ID No. 1, the second one would be message ID No. 2. And then, likewise, on the BikNBil side, his first message would have message ID No. 1 and message ID No. 2, and it would also increase incrementally by one for each message he sends.
Q. So we see that the dates on these messages were January 7th, 2021. Just to be clear, Examiner Cain, were you able to recover any Telegram messages on the defendant's phone between the defendant and Enrique Tarrio prior to January 7th, 2021?
A. No.
Q. Did you find evidence elsewhere that the defendant and Enrique Tarrio used Telegram to communicate prior to January

7th, 2021?

A. Yes.

Q. And was that on Enrique Tarrio's phone?

A. Yes.

Q. Based on your review of the defendant's device and Tarrio's device, what is -- what are some reasons why you were not able to recover any Telegram communications prior to January 7, 2021 on the defendant's phone?

A. Some of the reasons could be that the messages were deleted before we received them. For the defendant's phone, it would be that the messages were deleted.

Q. Is it possible that the defendant had deleted the Telegram app that contained the original communications of Enrique Tarrio prior to January 7, 2021?

A. Not the Telegram application.

Q. Just the specific chat?

A. Just the specific chat threads, yes.

Q. Can we please go to page 3 of Government Exhibit 1001, please.

And looking at the top, kind of, few rows here, looking at message ID 15 and message ID 16 under Enrique Tarrio, can you explain what that indicates?

A. These two messages contain attachments that are audio files. So audio messages that were attached.

Q. And are audio files sent in Telegram recoverable?

A. They are potentially recoverable.
Q. And what are some reasons why they may not be recoverable?
A. If the message had been deleted and the attachment had been removed and cleaned up, then the actual attachment itself would no longer be attached to that message content.
Q. Can we please go to page 4 of this exhibit.
Do you see under Tarrio where it says message ID 28? That's the last box there.
A. I do, yes.
Q. And what does it say after message ID 28?
A. Enrique set the self-destruct timer to 30 seconds.
Q. What does it mean to set a self-destruct timer?
A. A self-destruct timer in Telegram means that the message, upon the other party reading the message, will self-destruct and auto delete from that message thread. This one is set to 30 seconds. They can range from one second all the way up to one week.
Q. Are the other people in the chat -- so in this case the defendant -- would he have been notified that Enrique Tarrio set the self-destruct timer at 30 seconds?
A. Yes. It would actually say this exact phrase on the device, it would say, "Enrique set the self-destruct timer to 30 seconds."
Q. Does this indicate whether a message has actually been sent?

A. No, it does not.
Q. Now, looking under the right column under BikNBil, do you see message IDs 28 to 33, where it says potential self-destruct timer?
A. I do.
Q. And can you just describe what that means?
A. Yes. So on January 12th -- I'm sorry, can you -- could I see the entire screen, both parties' sides?
Okay. So we can see that the defendant sent a message on January 12th and that did not have a self-destruct timer on it. And then I can see, on the left-hand side, that Mr. Tarrio set a self-destruct timer on January 13th and that self-destruct timer was for 30 seconds. So depending on when the defendant sent messages 28 through 33, they could have potentially had a timer on them.
So if he had sent them between January 12th and January 13th, they would not have had a timer, but if those messages had come in between January 13th and January 16th, then they would have had a timer. And there's just no way to tell if they were sent before Tarrio's timer took place or if they were sent after the timer.
Q. But to be clear, do you know that the defendant sent messages between January 12th, '21, at 16:44:29, and January 16th, '21, at 18:47:02?
A. Yes. There were six messages sent between that timeframe,

because on January 16th the next message ID that is assigned to his message is No. 34. Therefore, 28 through 33 have been removed from this chat.

Q. And just to be clear, messages 28 to 33 were not recoverable?

A. They were not.

Q. And in order to set a self-destruct timer in Telegram, what does a person have to do?

A. You actually have to go into the chat thread with the other person. Across the bottom of the screen where you would type a message, you bring up that area where you would type a message into and there is a little timer icon that you click on and then set the self-destruct timer by scrolling through and selecting the interval that you want to use, whether it's one second, two seconds, all the way up to a week.

Q. Now we'll talk in a little bit more detail about the information that you obtained through your examination.

THE COURT: You both have to do it or --

THE WITNESS: No, ma'am, just the person that sets the timer. However, when the timer is set, it applies to both parties. So when Tarrio sets the timer to 30 seconds, that applies for every message going forward for both parties. So now anything the defendant would send, even though he didn't set the timer, is also on that 30-second timer.

THE COURT: Okay.

BY MS. ROSS:

Q. Can we bring up Government Exhibit 5007, please.

We're going to talk in a little more detail about what you found on the defendant's phone.

So starting here on page 1. First, looking at the dates on the top there, October 24, 2019 to January 27, 2021. Why was -- did your review of the defendant's phone only include those dates, between those dates?

A. October 24th, 2019 was the first communication between these two parties that I found on the device. And January 27th, 2021 was the last communication between the two parties found on the device.

Q. Based on your review of the phone, what was the phone number that the defendant was using?

A. (202) 437-0434.

Q. And can you explain what your examination of the defendant's phone revealed with respect to Enrique Tarrio in the phone book on his phone?

A. Yes. There were two phone numbers saved for Enrique Tarrio. The first was (786) 961-6789. And the second phone number was (305) 766-8213.

Q. Were you able to determine why the defendant had two numbers for Tarrio?

A. Yes.

Q. Why was that?

A. One of the phone numbers, as we discussed earlier, the one with area code 305, was attributed to Mr. Tarrio's Google Voice account. The 786 area code was the phone number actually on his cell phone with his cell phone provider.
Q. Now, looking at the blue icon there, what is that?
A. That is the Telegram application.
Q. And can you please explain to the Court what you've learned about the defendant's communications with Tarrio using Telegram from his phone?
A. Yes. He -- the defendant's Telegram account contained two contacts or two users for Enrique Tarrio. The user IDs were 1150826464 and the second user ID was 581632416.
Q. And why were there two user IDs?
A. Mr. Tarrio had two different Telegram accounts.
Q. Focusing next on the green icon, what is that?
A. That is WhatsApp.
Q. Did you recover any communications between the defendant and Tarrio using WhatsApp?
A. I did not.
Q. That's another encrypted messaging application, is that right?
A. That is correct.
Q. And then we see at the bottom the Viber icon. What is Viber?
A. It is another encrypted chat application, similar to

WhatsApp.
Q. Did you recover any communications between the defendant and Tarrio using Viber?
A. I did not.
Q. Now looking at page 2 -- first, Examiner Cain, what is an iMessage?
A. An iMessage is a message transmitted between two iPhone users, and it is encrypted -- end-to-end encrypted message.
Q. And how does an iMessage differ from a regular SMS message?
A. A regular SMS message will be sent through the cell phone towers, as we looked at earlier. And an iMessage can be sent over data.
Q. And can you explain what your examination of the defendant's phone revealed with respect to SMS and iMessage communications with Tarrio?
A. Yes. There were 94 messages that were transmitted over SMS. All of them were attributed to the phone number with the 305 area code. And there were 294 iMessages with Mr. Tarrio. All of them were attributed to the phone number with area code 786.
Q. Now, it looks like there is a gap in the date range. So you indicated you found 94 message between October 24 th, 2019, and July 3rd, 2020, and then did not find any iMessages until August 20th, 2020. What are some explanations for why there may be a gap there?

A. Either the messages that they exchanged during that time period had been deleted or they simply did not communicate during that timeframe.
Q. And we see that with respect to iPhone messages and text messages, the date range ends at December 12th, 2020. Does that mean that you didn't find any iMessages or text messages exchanged between the defendant and Tarrio after December 12, 2020?
A. That is correct.
Q. Can we go to page 3 of this exhibit, please.
Looking first at the Telegram icon there in the middle of the page, what did your review of the defendant's phone indicate with respect to his user name and Telegram ID?
A. The user name on the device was BikNBil and the ID that goes along with that user name is 869476955.
Q. Did you find evidence that the defendant used those unique Telegram identifiers to communicate with Tarrio?
A. Yes.
Q. Can you walk us through that, please?
A. I'm sorry, can you repeat that?
Q. Can you just walk us through what it showed?
A. Oh, the two accounts that Mr. Tarrio had that we found on the device were -- the first one, the user name was BannerN, with the rest of that has been redacted. The phone number attributed to that user name is 1 (786) 961-6789, and the

Telegram ID, 1150826464.

The second account for Mr. Tarrio, the user name was NobleLead, the phone number was 1 (305) 766-8213, with the Telegram identifier 581632416.

Q. And can we go to page 4, please? Just looking here, based on your review of the defendant's Telegram application on his phone, what did it indicate with respect to the group chat Christian Nationalists?

A. There were 32 messages from NobleLead and one message from BannerN. All of those messages took place on November 9th, 2020.

Q. And what is a Telegram group chat?

A. A group chat is when multiple users come together and form a group. And you can have as many -- or, as few as two members in that group chat, up to in the hundreds of thousands. I believe 200,000 was the last size limitation that they had. And in a group chat users can exchange media messages and audio and voice calls and attachments.

Q. And did your review of the defendant's phone indicate that he was a member of that group chat?

A. Yes, it did.

Q. And did your review of the defendant's phone also indicate that Tarrio was a member of that group chat?

A. Yes, it did.

Q. Now, looking at the first secret chat with NobleLead --

again, who used the NobleLead user name?
A. Enrique Tarrio.
Q. And what is a secret chat?
A. A secret chat is an end-to-end encrypted chat.
Q. What did your investigation or your review of the defendant's phone reveal with respect to that specific chat?
A. I was able to find one chat which had been completely deleted from the device. From that chat I was able to recover 19 messages and one audio file, all of that taking place on December 18th, 2020.
Q. So you indicate here that there was a deleted chat. Can you explain how you were able to know there was a deleted chat?
A. There is an indication in the database, a flag, that says if a chat has been marked for deletion or not, and this one had been marked for deletion.
Q. Now, looking at the next secret chat between the defendant and Tarrio, dated January 7, 2021 to January 27, 2021, is this a different secret chat than the one we just discussed?
A. Yes, it is.
Q. Can you explain how you know that it was a different secret chat?
A. When a secret chat is initiated between two users, Telegram automatically assigns that chat a numeric identifier. Much like it assigns a user name and identifier, that specific secret chat gets its own identifier. And each one of these had

a unique identifier.

Q. And what explains the reason that the defendant and Tarrio had two different secret chats?

A. Because the chats are end-to-end encrypted, they are only able to be transmitted between -- they're only able to live on one device at a time. Mr. Tarrio's iPhone was seized by law enforcement on January 4th. Therefore, he received a new phone after January 4th and every message that Shane Lamond sent to him after that timeframe would have been assigned a new secret chat, simply because it's going to a new device.

Q. And can you walk us through what you recovered from that second secret chat on the defendant's phone?

A. Yes. Fifty-eight messages. Six messages I was not able to recover. And I was able to recover one audio file.

Q. Those six unrecovered messages, can you explain why they were not recoverable?

A. Either they were manually deleted by the user or they had a self-destruct timer attached to them which auto deleted them from the chat.

Q. Now, looking at this last item here, the Telegram call, what is a Telegram call?

A. It's simply a voice call, a voice or a video call, where the user calls the other party. It's extremely similar to just making a phone call.

Q. And can you just tell the Court what you found with respect

to the Telegram call?
A. Yes. There was one call on January 2nd, 2021, and it lasted about 25 minutes.
Q. And finally, looking at page 5, can you just explain what your examination of the defendant's phone revealed with respect to the communications between the defendant and Tarrio overall?
A. Yes. There were roughly 500 communications between the defendant and Enrique Tarrio, and those communications took place in the form of Telegram private chats, secret chats, group chats, and Telegram calls, as well as SMS text messages and iMessages.
THE COURT: Going back to when you told me the difference between SMS messages and iMessages, did you say, with respect to iMessages, that they were encrypted end-to-end?
THE WITNESS: Yes, ma'am.
THE COURT: Okay.
BY MS. ROSS:
Q. And, Examiner Cain, just to be clear, these are just the communications or messages that you could recover from the defendant's phone between October 24th, 2019, and January 27th, 2021?
A. Yes, ma'am.
Q. So now we can take that exhibit down. Thank you.
So now I want to shift gears and talk a little more in-depth about your examination on Tarrio's iPhone. In this

case, in addition to creating a report of the defendant's phone, did you also create a report of Tarrio's iPhone?
A. I did.
Q. Can we please bring up what's been admitted as Exhibit 1003, please. Can we please go to page 2 of this exhibit.
Can you provide just a general overview of what is in this report?
A. Yes. This is a communications timeline report that just details any relevant communications that our team found relevant to the investigation.
Q. And looking at the top message there on the "from" line, who does it say it was from?
A. Shane FBI D.C. Police.
Q. And why does it say it was from Shane FBI D.C. Police?
A. That is how this particular contact was stored in Mr. Tarrio's device.
Q. And what is the date of that first message?
A. February 10th, 2020.
Q. What is the significance of that date with respect to Tarrio's phone?
A. That is the first communication I found between these two parties.
Q. And can we go to the last page of this exhibit, page 35, please.
And, Examiner Cain, what is the date of this last

message here?
A. January 4th, 2021.
Q. What is the significance of that date as relates to your report of Tarrio's phone?
A. This is one of the last messages found in Mr. Tarrio's device.
Q. In addition to this report, Examiner Cain, did you also create another report for Tarrio's phone that focused just on the Telegram communications between Tarrio and the defendant?
A. I did.
Q. Can we please bring up Government Exhibit 1002 and go to page 2, please.
1002, please. Thank you.
Can you provide just a general overview of what this report shows?
A. Yes. This is a Telegram secret chat, so an end-to-end encrypted chat, between Mr. Tarrio and the defendant.
Q. And then focusing on the chart here, we see at the top row, in the left-hand corner, we see the contact name NobleLead. Why does it appear like that?
A. That is the user name that Mr. Tarrio selected when he created his Telegram account.
Q. And who used that Telegram user name?
A. Enrique Tarrio.
Q. And those numbers that appear after that, is that the same

Telegram ID we saw from the report on the defendant's phone that correspond to Enrique Tarrio?
A. It is, yes.
Q. And Shane FBI Police, why does it appear like that?
A. This is how this particular contact was stored in the device contact book. So when you create a Telegram account, you have to have a phone number. So when a user has that same phone number stored in their device contacts, Telegram will populate the name in the Telegram application to match what is in the device's contact book.
Q. And those numbers after Shane FBI Police, again, are those the same Telegram ID numbers that we saw from the report on the defendant's phone that correspond to his Telegram account?
A. They are the same, yes.
Q. And looking at the date of that top message we saw, December 18th, 2020, what is the significance of that date as it relates to your report?
A. That is the first message in this chat.
Q. And can we just zoom in on the top few rows of this chart, please.
And can we scroll down a little bit more, please. About halfway down.
So we see here message ID -- under Shane FBI Police, we see message ID 5, 6, 7, 8. Can you explain why there are message IDs there but no message content?

A. Those messages have been deleted.
Q. And can you explain how you know that those messages were sent, even if they had been deleted?
A. Because on December 18th, at and 10:08, message ID No. 4 is sent. And on that same day, at 10:42, message ID No. 9 is sent. And they always increase by one every time you send a message.
Q. And can we please scroll through on page 3 and page 4 of this exhibit, please.
Stop at page 4, at the end there.
So I want to spend some time on this page. We see in the left-hand -- in the left column, under NobleLead, we see message ID 30. What did Tarrio do there?
A. I believe it says he set the self-destruct timer to 30 seconds.
Q. And after he set this self-destruct timer to 30 seconds, what happens in message IDs 31 to 49?
A. All of those messages, from 31 to 49, would also have that 30-second self-destruct timer on them.
Q. Were you able to recover those messages?
A. No, I was not.
Q. And why not?
A. They had been deleted and removed entirely from the database.
Q. In message IDs 28 through 36, under Shane FBI Police, what

happened in those messages?

A. Prior to this screen, on the previous page, a self-destruct timer had been set for 5 seconds. And then we see on this page that NobleLead sets a new self-destruct timer to 30 seconds. So messages 28 through 36, all of those messages had been deleted from the database. I was not able to recover them. However, I can tell that they would have either had a 5-second timer or a 30-second timer, just depending on when those messages were sent, if they were sent with Lamond's original 5-second timer or if they were sent after Tarrio changed the timer to 30 seconds.

Q. Can we just zoom in?

So we see at the top, on December 22nd, 2020, at 8:10:26, a message ID 27. What happened there?

A. Shane FBI Police set a self-destruct timer to 5 seconds.

Q. So does that explain why messages 27 to -- I'm sorry, 28 through 36 were either self-destructed after 5 seconds or 30 seconds?

A. Yes, it does.

Q. Did the defendant set the self-destruct timer before Enrique Tarrio did?

A. Yes, he did.

Q. So we see here, in message ID 37, under Shane Lamond Police (sic), we see the self-destruct timer was set to 30 seconds, but that there's content there. Can you just explain that?

A. I was simply able to recover the content of this message, where I was not able to recover it from -- for most of the other messages on this page.
Q. Why is that?
A. It's simply a glitch. It's just what remained.
Q. So looking at, kind of, the rest of this page here, we see under message ID 37, that message IDs 37 to 92 under Shane FBI Police, that there is a self-destruct timer. Were you able to recover any of those messages?
A. No, I was not.
Q. And how do you know they were sent?
And can you just zoom in on that entire bottom of the page, please? Including those.
A. As you can see on the bottom of this page, on January 4th, message ID No. 93, Shane FBI Police set the self-destruct timer to 10 seconds. And the act of setting that self-destruct timer had the -- had message ID No. 93 auto assigned to it, meaning that there were 92 messages preceding that one. So messages from ID 38 to 92 were unrecoverable.
Q. So after the defendant set the self-destruct timer to 10 seconds on January 4th, 2021. Are you able to tell if he sent a message?
A. No, I am not.
Q. Why not?
A. Simply because the messages are gone from the database and

any traces of those message IDs are also gone.

Q. Now, prior to the defendant setting a self-destruct timer to 10 seconds, what was the self-destruct timer that was on before that?

A. The last self-destruct timer that was set was done by Mr. Tarrio on January 1st and it was set to 30 seconds.

Q. So in order to change the self-destruct timer from 30 seconds to 10 seconds, what would the defendant have had to do?

A. You have to actively go into that chat thread, open up the chat, go into the box where you would compose a message, click on the self-destruct timer icon and set a new interval for that timer to be set to.

Q. Now, when the defendant went into this chat and set this timer, would that have deleted any messages that came after that self-destruct timer?

A. It would, depending on -- it would delete everything after 10 seconds, yes.

Q. And so January 4th, 2021, what is the significance of that date with respect to your review of Tarrio's phone?

A. That's the last communication I was able to find between the two parties.

Q. Okay. Can we bring up Government Exhibit --

THE COURT: I'm a little confused. There were other times when they set the timer to delete, but you have indications that deleted messages were sent. But then you said

when he set it to 10 seconds there aren't even indications that messages were sent that were deleted.

THE WITNESS: That is correct.

THE COURT: What's the difference?

THE WITNESS: The difference is, is because messages always came after that. So I was able to tell -- for instance, when we looked at the series of six messages, I was able to tell that those six messages weren't there because there was another message that came after it that had a message identifier on it. For this one, the last message in the chat was a self-destruct timer, so there was nothing I was able to recover after that that had any message identifier. That was simply the last message identifier that I received.

THE COURT: So it's not because of the length of time of the deletion period --

THE WITNESS: Correct.

THE COURT: Okay.

THE WITNESS: Yeah, you're correct.

BY MS. ROSS:

Q. Just to follow up on that and clarify a little bit. So if after January 4th, 2021, let's say, the defendant and Tarrio had exchanged additional messages, they would have been deleted, right? You couldn't have recovered them?

A. Correct.

Q. But let's say at a later date, let's say the next day, if

the defendant or Tarrio had gone into that chat and changed a setting, would you have been able to tell if they'd communicated between those two changed settings?

A. Yes. If they had set another timer, that timer would have been given another message identifier. So this one ended at 93, if ten messages had been sent and then another timer had been set, that would been given message 104 or 103. This one, 93, is simply the last one that we were able to find.

Q. And what happened to Tarrio's phone shortly after 1:02 on January 4th, 2021?

A. Just a couple hours after that his phone was seized by law enforcement.

Q. So there would have been no additional way to recover from Tarrio's phone, whether settings had been changed after that or any messages had been sent after that, is that correct?

A. That is correct. I believe law enforcement put his phone into airplane mode, thus cutting off all incoming messages after that point.

Q. Okay. Can we please pull up Government Exhibit 5009, please.

So, again, I want to walk through in a little more detail what you were able to recover from Tarrio's phone. Is this a demonstrative that you helped create and verify to aid the Court in understanding the information that you found on Tarrio's phone?

A. Yes, it.
Q. So just looking here, at page 1, so we see the date range there, it's February 10th, 2020 to January 4th, 2021. Why did your review of Tarrio's phone cover that time period?
A. February 10th, 2020 was the first communication between those two parties and January 4th, 2021 was the last communication.
Q. And what telephone number did your review of Tarrio's phone indicate he was using?
A. (786) 961-6789.
Q. And looking at the contact saved on Tarrio's phone, what did it indicate with respect to the defendant?
A. He was saved as Shane FBI D.C. Police, with phone number (202) 437-0434.
Q. Focusing next on the green icon at the top there, what is that?
A. That is the Google Voice icon.
Q. What did your review of Tarrio's phone reveal with respect to that application and the defendant?
A. He communicated with the defendant using Google Voice under the same phone number, area code 202.
Q. And can you just walk us through the rest of the applications on this page?
A. Yes. The second one is the Telegram application, and that is that same 202 area code phone number, with the user ID

869476955. The third one is the iMessage application, the same contact number, with that same 202 area code phone number. The third -- or, the fourth one is WhatsApp and also Shane FBI D.C. Police with the 202 phone number, and the last one is Skype with that same contact information.

Q. And can we go to page 2, please.

So this displays information relating to Tarrio's phone and the use of Google Voice. And can you just walk the Court through what your examination of Tarrio's phone revealed with respect to Google Voice communications and the defendant?

A. Yes. There were 56 messages and 5 phone calls in Google Voice and that was -- and his Google Voice account was active from January 2020 to January 2021.

Q. And the Google voice number that Tarrio was using, was that (305) 766-8213?

A. Yes, it is.

Q. And can we go to page 3, please.

Can you walk us through what your examination of Tarrio's phone revealed with respect to iPhone messages and the defendant?

A. Yes. In -- the defendant was saved in the contact book as Shane FBI D.C. Police, with the 202 area code phone number. That entry was created on November 11th, 2019. He communicated roughly 294 iMessages with the defendant between the timeframe of August 20th, 2020 to December 12th, 2020.

Q. I'm going to focus on the date that the entry for Shane FBI Police was created. What is that date?
A. That is when that particular contact was added to the device contact.
Q. And we see that there was a gap between when that entry was created and when the first iPhone message was exchanged. What may explain that?
A. Most likely the messages have been word-deleted between those two time frames.
Q. Now, you testified that this information relates only to iPhone messages. Did you find any text messages or SMS messages exchanged between Tarrio and the defendant on Tarrio's phone?
A. No. Not aside from the Google Voice, no.
Q. And can you explain why you found SMS messages on the defendant's phone between the defendant and Tarrio then?
A. When Tarrio uses the Google Voice application on his phone he is -- it is actually transmitting to the defendant's phone as an SMS message.
Q. Okay. Can we go to page 4 of this exhibit, please.
Looking first at the Telegram icons there in the middle of the page, what did your review of Tarrio's phone indicate with respect to his use of Telegram?
A. He had two Telegram accounts on his device. The first one, the account was called DeathFromAbove, with number 1150826464,

and the second account was NobleLead, with the Telegram identifier 581632416. And both of them had Shane FBI Police as a contact info through those users.

Q. This is the first time that we've seen the DeathFromAbove account. Can you just explain that?

A. When you create a Telegram account, you can actually change the display name behind that account. So this display name had simply been changed from the time of when we extracted it from Tarrio's phone from when we extracted it from the defendant's phone. The same Telegram identifier, it's consistent between the two devices, that 1150826464, that number remained consistent. However, at some point the user name had changed from BannerN to DeathFromAbove and that's why they displayed differently on both of those devices.

Q. Can we go to page 5, please.

Can you explain what your review of Tarrio's iPhone revealed with respect to the group chat Christian Nationalists?

A. Yes. This group chat was present on his device in this account and it had an entry in it on November 9th, 2020 that said Shane FBI Police has joined this group. There were no messages posted by him in that group, however.

Q. So, again, we see this DeathFromAbove account and we see that it joined this group Christian Nationalists. But were there any communications between DeathFromAbove and the defendant?

A. No, there were not.
Q. Now going to page 6, please.
Focusing first here on the private cloud chat. Can you explain, what is a private cloud chat?
A. So that is just a chat initiated by two users on Telegram. It is not end-to-end encrypted by default. It uses Telegram standard encryption, which is encrypts the message from the device to Telegram servers. So it's not end-to-end, so it's not from device to device like a secret chat would be, it just encrypts it in transit to Telegram servers.
Q. Are private cloud chats assigned message IDs?
A. They are -- they are not assigned message IDs, no. Sorry. They are assigned chat identifiers.
Q. And did you find any evidence of a private cloud chat between the defendant and NobleLead on the defendant's phone?
A. I did. Oh, not on the defendant's phone, sorry. I did on Mr. Tarrio's phone.
Q. So the only evidence you found of the private cloud chat communications were on Tarrio's phone?
A. That is correct.
Q. Can you explain that?
A. They had simply been deleted from the defendant's device.
Q. Now looking at the secret chat between NobleLead and BikNBil, what date did that secret chat begin?
A. December 18th, 2020.

Q. And can you walk us through what your review of that secret chat revealed?
A. Yes. I was able to recover 44 messages and I was able to tell that there were an additional 101 messages in that chat that had been deleted that I was unable to recover.
Q. And why was there evidence of only one secret chat with the defendant and Tarrio on Tarrio's phone, but two on the defendant's phone?
A. When Tarrio's device was seized by law enforcement on January 4th, that secret -- the first secret chat ended. Tarrio then gets a new device and when him and the defendant start communicating, because Tarrio has a new device, a new secret chat, the second secret chat is started and that's why the defendant's phone shows two secret chats.
Q. And how about the Telegram calls there, what did your examination reveal?
A. There were two calls. One took place on December 20th, 2020, lasted 7 minutes. And one took place on December 30th, 2020, that lasted 14 minutes.
Q. And what explains why you were able to recover those Telegram calls from Tarrio's phone but not from the defendant's phone?
A. The records had just been deleted from the defendant's device.
Q. And can we go to page 7, please.

Can you explain what your examination of Tarrio's phone revealed about his communications with the defendant overall?

A. Yes. There were roughly 500 communications in total and that took place in the form of voice calls, Telegram chats -- to include private, secret, and group chats -- as well as Telegram calls, SMS and iMessages and Google Voice messages and calls.

Q. You testified earlier that you were able to recover approximately 500 communications between the defendant and Tarrio from the defendant's phone. And you just testified that you were able to recover approximately 500 communications between Tarrio and the defendant from Tarrio's phone. Were those communications the exact same?

A. No, they were not.

Q. Why were they not?

A. Depending on when users had deleted certain communications off of certain devices, and then because Tarrio switched devices in January 2021, the communications were just not the same between the two.

MS. ROSS: Thank you. No further questions.

THE COURT: All right. Cross-examination.

CROSS-EXAMINATION

BY MS. JARA:

Q. Hi, Miss Cain. My name Ana Jara, I represent the defendant, Shane Lamond. It's nice to meet you.

A. Nice to meet you.
Q. I'm hoping I just have a couple of questions, so hopefully I'll be quick.
You testified that, I believe, you had about 400 hours of training, is that right?
A. To become initially certified as a forensic examiner.
Q. Okay. And then after that it's about 100 hours every year?
A. Yes, ma'am.
Q. Okay. Of those hours of training that you've done, how much specifically has focused on Telegram-specific training?
A. I don't receive Telegram-specific training. That is testing and research. That's research and analysis, it's different than training.
Q. Okay. Understood.
You testified -- and I'm hoping that my colleague can pull up the exhibit, Exhibit 1004.
Okay. So this is Exhibit 1004. And, Bill, if you -- could you scroll down just to the first page of that? Okay. Great.
And I believe that you testified that these communications that are in this report are based on files that your investigative team found to be relevant, is that right?
A. Yes, ma'am.
Q. Okay. How did your team determine what was relevant or not?

A. I was not part of the investigative team that looked into all aspects of what this case comprised. My job is to simply provide the technical information to them and then they made the judgment call as to what messages were relevant.

Q. I see. So when -- I'm sorry. I'm so sorry.

THE COURT: That's all right. But were the search terms all communications between the two of them, and then they got the first and the last and that's it? Or did some that were between the two of them not appear on this list because -- what do you mean by "relevant"? I thought, initially --

THE WITNESS: Sorry. Okay.

THE COURT: -- you were saying all communications between the two.

THE WITNESS: So this report does include all communications between the defendant and Mr. Tarrio. In addition to that, it could include additional relevant communications with other parties. For instance, emails with colleagues or emails to other relevant people. For instance, in -- with respect to Mr. Tarrio's phone, it could include communications between Mr. Tarrio and some of his Proud Boys with the defendant's phone. It could include communications between the defendant and his colleagues.

So it includes all communications between Tarrio and the defendant, and then additional communications that the team found relevant with other third parties.

THE COURT: But then the only thing you've pulled out of that for all of the slides that came later with the numbers were just the ones between the two of them?

THE WITNESS: Those were specific secret chats, just between the two of them. But this communications report includes all of those chats and then, in addition to that, it includes any relevant third-party chats.

THE COURT: All right. Ask your question.

BY MS. JARA:

Q. So in the chats that you pulled out, the secret chats, those secret chats, there may be more secret chats that Tarrio had with other parties, the same with Lamond, is that right?

A. Yes. The chat that we had is just between these two parties, Lamond and Tarrio.

Q. Okay. And so you pulled just those chats between Lamond and Tarrio, right?

A. I pulled all of the chats from the phone. So my job is to pull all of the Telegram, all of the Google Voice, all of the chats on that device, and then our team, the investigative team, makes the determination which one of those to present in court.

Q. Okay. Understood. And when you say "the investigative team," who is that?

A. The agents that I work with.

Q. I see. Okay. So the agents that you work with are the

ones who made the determination about what was relevant or not to include when it came to the third-party chats or to the secret chats. But you pulled -- from a forensic perspective, you pulled everything, right?

A. Yes, ma'am.

Q. Got it. Thank you for clearing that up.

You can take that down, Bill. Thank you.

THE COURT: And that was like that five binder-full Cellebrite report?

MS. JARA: Yes.

THE COURT: That was shared with the defense, that we had?

MS. JARA: Yes, I'm assuming --

THE WITNESS: That sounds like what it was, yes, a very large report.

MS. ROSS: Your Honor, just to be clear, we did turn over the entire Cellebrite report. So that would have everything in it.

THE COURT: It all got marked as an exhibit at one point, but then we decided against that. All right. Thank you.

BY MS. JARA:

Q. Okay. You also testified about how to set a self-destruct timer. And I believe that it was about -- like, there was a timer icon and you select that icon and then you can select the

amount of time that you wanted to set, is that right?
A. Yes, ma'am.
Q. Is that how it works now?
A. Yes, it is.
Q. Is that how it worked in 2020?
A. It is.
Q. Okay. How do you know that?
A. Because I tested from 2020 on. One of my roles at the FBI is to test the Telegram application, so I test almost every version of it.
Q. I see. So you had the 2020 version and you tested that version?
A. Yes.
Q. Okay. And then did you test the 2021 version, the 2022 version, and so on?
A. Well, they're not -- they don't come out in yearly increments. But, I test them. But, yes, over the years I have done multiple tests on it, yes, ma'am.
Q. Okay. Got it.
Bill, can you please pull up Exhibit 1002?
I think it's going to be the last page.
I just have one question about this, or, perhaps, maybe some clarifying questions.
This last entry here, 1-4-21, 13:02, where it says Shane FBI Police set the self-destruct timer to 10 seconds. Do you

see that?
A. Yes, ma'am.
Q. Is it your testimony that that is simply him just setting a timer, that there's no way to tell if he actually sent a message?
A. Yes.
MS. JARA: Okay. Court's indulgence.
(Pause.)
MS. JARA: I have no further questions, Ms. Cain. Thank you.
THE COURT: All right. Any redirect of this witness?
MS. ROSS: Very briefly, Your Honor.

REDIRECT EXAMINATION

BY MS. ROSS:
Q. Can we bring up Government Exhibit 1004, please. And can we please go to page 35. I just wanted to clarify one thing here.
Just looking at the top there, Examiner Cain, we see a Telegram call, right?
A. Yes, I do.
Q. At the very top. The very top.
And so we see here that the Telegram call between Enrique Tarrio and BikNBil was on January 9th, 2021, right?
A. That is correct.
Q. So if you testified earlier it was January 2nd, 2021, that

was just a mistake, right?
A. Yes, it was.
Q. Okay. And can we go to Exhibit 1002, please. And can we go to page 4.
So defense counsel asked you some questions about this last message -- or, this last action here on January 4th, right?
A. Yes.
Q. And so after the defendant changed the self-destruct timer from 30 seconds to 10 seconds, you didn't recover a subsequent message, correct?
A. Correct.
Q. But that doesn't mean he didn't send a message, right?
A. That is also correct.
Q. It just means any message sent after that would have self-destructed?
A. Yes.
Q. It also means, as you testified earlier, that Tarrio's phone was seized shortly after this, right?
A. It was.
Q. So that means that there was no subsequent action that would have been changed within this chat to indicate whether there were message IDs sent after January 4th, 2021, at 13:02, and whatever that subsequent action would have been?
A. That is correct.

MS. JARA: Objection.

THE COURT: I think it just reiterated the end of the direct. But what was the objection, that it was leading?

MS. JARA: Yes.

THE COURT: Okay. Anyway, I'm not sure it clarified anything because we already established that. So I'm going to overrule the objection.

BY MS. ROSS:

Q. Can we zoom in just on the top half of this page, please.

So in the prior instance that you were able to recover, in which the defendant set the self-destruct timer, we see here that was on December 22nd, 2020, right?

A. Yes.

Q. And we see, in message ID 27, that the defendant set the self-destruct timer, right?

A. Yes, that is correct.

Q. And immediately after that -- or, after that he sent messages, right?

A. Yes.

Q. So in the prior example of the defendant going into the Telegram app, opening a specific chat with Tarrio, changing the self-destruct timer, he did send a message, is that right?

A. That is correct.

MS. ROSS: Thank you. No further questions.

THE COURT: All right. You have no further

questions, is that what that "thank you" was?

MS. ROSS: Sorry. I was probably walking away as I said it. No further questions. Thank you.

THE COURT: Okay. All right. Can this witness be excused? All righty. Thank you very much.

Should we take a short break before we -- yes, we should? Before the next witness, we'll do that, and we'll resume at 3:30. Thank you.

(Recess from 3:20 p.m. to 3:40 p.m.)

THE COURT: All right.

THE COURTROOM DEPUTY: We're on the record in criminal case 23-177, United States of America versus Shane Brian Lamond.

THE COURT: All right. Call your next witness.

MS. ROSS: Your Honor, the next witness is Special Agent Elizabeth Hadley.

ELIZABETH HADLEY,

was called as a witness and, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSS:

Q. Good afternoon, Agent Hadley. Can you please state and spell your name for the record?

A. Sure. Elizabeth Hadley. E-L-I-Z-A-B-E-T-H, H-A-D-L-E-Y.

Q. Where do you currently work?

A. For the Federal Bureau of Investigation.
Q. What do you do for the FBI?
A. I'm a special agent.
Q. How long have you been a FBI special agent?
A. A little over 15 years.
Q. What did you do before becoming a special agent?
A. I was a certified public accountant.
Q. As an FBI special agent, are you assigned to a specific squad?
A. I am. Currently it's Squad CR-10, which is a criminal squad that investigates various federal violations, including public corruption of D.C. and federal officials, fraud against the government, and violations of civil rights.
Q. And what are some of your specific duties as a special agent assigned to CR-10?
A. My primary duty is as a case agent, which means opening and investigating cases, collecting evidence and working with the United States Attorney's Office on prosecution.
Q. You mentioned that one of the offenses that CR-10 investigates is public corruption, is that right?
A. I did.
Q. Does that mean sometimes you investigate other law enforcement officers?
A. It does.
Q. Are you one of the case agents assigned to the

investigation involving the defendant, Shane Lamond?
A. I am.
Q. What exactly does the case agent do?
A. Case agent directs the investigation and works, like I said, with the United States Attorney's Office to present that evidence.
Q. And when you were investigating the defendant, where did he work?
A. He worked for the Metropolitan Police Department in D.C.
Q. Have you met Shane Lamond in person before?
A. I have.
Q. Do you recognize him in the courtroom today?
A. I do.
Q. Can you identify him, please, by where he is sitting and an article of clothing?
A. He's at the defendant's table, gentleman in the gray suit.
MS. ROSS: May the record reflect that Agent Hadley identified the defendant as Shane Lamond?
THE COURT: Any objection?
MR. SCHAMEL: No objection.
THE COURT: The record will reflect he's been identified.
BY MS. ROSS:
Q. As one of the case agents assigned to investigating the defendant, what was your role?

A. My role was to, like I said, collect evidence. Collect evidence in the case and work with my co-case agents, work with forensic examiners, conduct interviews, review evidence, and then present the evidence we've collected to the United States Attorney's Office.
Q. What were you investigating?
A. I was investigating whether a D.C. police lieutenant, Shane Lamond, had leaked information about an MPD investigation to the subject of that investigation. So, more specifically, the MPD was investigating whether Enrique Tarrio, the national chairman of the Proud Boys, had burned a Black Lives Matter banner stolen from a church in D.C. We had information that the defendant had given Tarrio information, confidential police information about that investigation to the subject of that case, Enrique Tarrio, unbeknownst to the rest of MPD.
Q. I'm going to start by asking you: What were the dates of the focus of your investigation?
A. The focus of the investigation was December 2020, January 2021.
Q. Why is that?
A. Because the Black Lives Matter banner was burned on December 12th, 2020 and Enrique Tarrio was arrested for that destruction of property on January 4th, 2021.
Q. Who is Enrique Tarrio?
A. At the time, he was the national chairman for an

organization called the Proud Boys.
Q. And who are the Proud Boys?
A. Proud Boys are a right-wing extremist group. They called themselves western chauvinists. They generally -- or, they were involved in multiple violent altercations, conflicts in D.C. in late 2020, early 2021.
Q. I want to talk about your investigation now in a little bit more detail. What type of evidence did you collect?
A. I served and collected information pursuant to grand jury subpoenas, including digital devices, toll records, emails. I reviewed that information, I conducted witness interviews, I listened to an interview that the defendant had provided to U.S. Attorney's Office.
Q. Did you create a summary cart of all of the evidence that you collected in this case?
A. I did.
Q. Can we please bring up Government Exhibit 4006, please.
Agent Hadley, what is this exhibit?
A. This exhibit is that master summary chart, specifically page 1.
Q. Just generally, what is this exhibit?
A. The master summary chart.
Q. And then can you just briefly describe what is on page 1? What is the purpose of this first page?
A. Page 1 is a type of legend where you have -- shows, with

using various colors, how the different information in the chart is categorized, and as well as some of the naming conventions that we use in the chart for certain users.
Q. And can we go to page 2 of this exhibit, please.
What date does this summary chart begin?
A. October 24th, 2019.
Q. And was that the first recovered communication between the defendant and Enrique Tarrio?
A. It was.
Q. And can we go to page 55, please. And what is the date of this last message?
A. January 27th, 2021.
Q. And what is the significance of that date?
A. That was the last communication between the defendant and Tarrio that we recovered.
Q. Thank you. We can bring that exhibit down.
Okay. Now I want to break down the information that is in this summary chart. As part of your investigation, did you and other case agents issue grand jury subpoenas?
A. We did.
Q. Did that include grand jury subpoenas to telephone service providers seeking historical toll records?
A. It did.
Q. And in this case did you determine whether the defendant used a personal cell phone?

A. We did.
Q. And were you able to verify his personal cell phone number?
A. Yes.
Q. Was that (703) 863-9829?
A. It was.
Q. And how about an MPD work phone? Were you able to verify the defendant's MPD work cell phone number?
A. Yes.
Q. And was that number (202) 437-0434?
A. It was.
Q. And so earlier we talked -- you mentioned historical toll records. Did you obtain historical toll records for the defendant's work cell phone?
A. We did.
Q. How did you obtain those records?
A. We served a grand jury subpoena on the provider for the cell phone number, which was AT&T at the time.
Q. So looking here at Government Exhibit 2002, are these the historical toll records you received from AT&T?
A. Yes, they are.
Q. We see here that the time of the calls in these records is in UTC. Do you know the standard conversion of UTC to the Eastern Time zone?
A. Yes, it's minus five hours on standard time in the winter and minus four during daylight savings time in the summer.

Q. And, Agent Hadley, just to be clear, what time zone is the master summary chart in?
A. It's all in Eastern Time.
Q. But do some of the records that we will see during your testimony use UTC and then do others use Eastern Time zone?
A. Yes.
Q. Did you convert any time zone that wasn't in the Eastern Time zone to Eastern Time zone for purposes of the master summary chart?
A. Yes.
Q. During your investigation were you able to verify Enrique Tarrio's personal phone number?
A. Yes.
Q. Take that exhibit down. Thank you.
And was that number (786) 961-6789.
A. Yes.
Q. During your investigation did you also verify a Google Voice number that Tarrio used?
A. Yes.
Q. Was that number (305) 766-8213?
A. Yes.
Q. As part of your investigation in this case, did you go through the defendant's historical telephone records for his work phone to see if he was communicating with Tarrio?
A. Yes.

Q. Are all those communications that you found in the historical toll records between October 24th, 2019 and January 27, 2021 in the master summary chart we looked at earlier?
A. They are.
Q. In addition to subpoenaing AT&T for the defendant's telephone records, did you also subpoena T-Mobile for the defendant's personal phone records with Sprint?
A. Yes.
Q. Why did you subpoena T-Mobile for Sprint records?
A. Sprint was owned by T-Mobile at the time.
Q. And as we see in Government's Exhibit 2006, are those the defendant's personal phone records?
A. Yes.
Q. And as part of your subpoena response, did you also receive subscriber records for that phone number?
A. Yes.
Q. And are those marked as Government Exhibit 2004?
A. Yes.
Q. Did those records confirm that (703) 863-9829 is the defendant's personal phone number?
A. Yes.
Q. And did you go through the defendant's historical telephone records for his personal phone to see if he was communicating with Tarrio?
A. I did.

Q. And what did you learn with respect to the defendant's person phone and communications with Tarrio?
A. We could not find any communications with Tarrio on his personal phone.
Q. In addition to issuing grand jury subpoenas to telephone service providers, did you also issue a grand jury subpoena to American Airlines?
A. I did.
Q. And why did you do that?
A. Because Enrique Tarrio flew into D.C. on January 4th, the day he was arrested for the destruction on property, on an American Airlines flight and we wanted to know where he was throughout the day and as he was receiving communications from different people, including the defendant.
Q. Looking here, what's been admitted into evidence as Government Exhibit 2001, what is this document?
A. This document is an American Airlines record of a ticket in the name of Henry Tarrio.
Q. We're going to look at this exhibit in a little bit more detail later. But who is Henry Tarrio?
A. That is another name that Enrique Tarrio -- same person.
Q. And what were the dates of the tickets here?
A. The dates of the tickets are December 10th, 2020 from Miami to D.C., and then a return flight to Miami on December 17th, 2020.

Q. What relevance did those dates have to your investigation?
A. They included or encompassed the December 12th, 2020 date on which the banner was burned.
Q. Now, turning to page 2. What were the dates of these tickets?
A. This is another ticket for Henry Tarrio, flights on January 4th, 2021 and January 9th, 2021, also from Miami.
Q. Now, looking at the flight number for the January 4th flight 4782, was that the flight number -- or, the flight that Tarrio ended up taking from Miami to Washington, D.C.?
A. It is not.
Q. Why not?
A. Because Tarrio was late for that flight 4782 and was put on a flight for later that day.
Q. Can we please pull up Government Exhibit 2005, please.
What is this document?
A. This document is a record of the flight on which Tarrio traveled from Miami to D.C. on January 4th, 2021.
Q. And what time does it say he was scheduled to leave on that flight?
A. 12:29 p.m.
Q. And what flight number was he on?
A. Flight 925.
Q. And is that because he missed his earlier flight?
A. It is.

Q. Is this information that we just looked at that you obtained from American Airlines also in the master summary chart?
A. It is.
Q. Did you also obtain information from the Federal Aviation Association, or the FAA?
A. Yes, I think it's Aviation Administration.
Q. Thank you. Federal Aviation Administration, or the FAA?
A. Yes.
Q. Why did you do that?
A. Because that information would have more specific information about when the flight actually took off and landed.
Q. And we see here on the screen Government Exhibit 2007. What is this document?
A. This is an excerpt of the FAA information that shows when the flight took off and where it was at certain points throughout the flight before landing in D.C.
Q. Now, just looking at the target ID column there, what information was this flight for?
A. American Airlines flight 925.
Q. Is that the same flight that Tarrio was on from Miami to D.C. that we saw in American Airlines records in Exhibit 2005?
A. It is.
Q. We will also look at this in a little more depth later. But we see the times here are from 12:55:20 p.m. to 2:52:43

p.m. on January 4th, 2021. What are the relevance of those times to your investigation?
A. Those are the times that the flight took off and landed.
Q. And why was that relevant?
A. Because it shows the time that Enrique Tarrio was actually on the plane, in the air.
Q. And is the information you learned from these FAA records also in the master summary chart?
A. It is --
Q. As part of your investigation --
A. -- in part.
Q. As part of your investigation, did you also receive bank records?
A. Yes.
Q. Did that include bank records for Tarrio?
A. Yes.
Q. And can we pull up Government Exhibit 2008, please.
What is this exhibit?
A. This is a bank account statement for January 2021 in the name of Jazu Transport, LLC.
Q. What is Jazu?
THE COURT: What is the exhibit number? Sorry.
MS. ROSS: 2008, Your Honor.
THE COURT: Thank you.
BY MS. ROSS:

Q. What is Jazu Transport, LLC?
A. It's an LLC registered in Florida, owned by Enrique Tarrio's mother.
Q. Did Tarrio use this account?
A. He did.
Q. And again, we'll look in this -- at this document in more detail later. But zooming in on the statement period, what is the date of this statement?
A. January 1st, 2021 to January 31st, 2021.
Q. And why is that relevant to your investigation?
A. Because that encompassed the January 4th, 2021 flight that Enrique Tarrio took.
Q. Did you also issue grand jury subpoenas to the Metropolitan Police Department?
A. I did.
Q. For what?
A. For emails, for the defendant's mobile devices, for his computers, and for his personnel file.
Q. Focusing first on the cell phone. Did you search the defendant's work phone for information relevant to your investigation?
A. I did.
Q. How did you do that search?
A. I started with the extraction that the CART forensic examiner prepared. So reviewed it through the forensic

software and did search terms. I looked for specific timeframes that were relevant to my investigation and just reviewed all the communications for those time periods. Just looking for anything that would be relevant to either the Black Lives Matter banner burning and/or the nature of the relation between the defendant and Enrique Tarrio.
Q. Are all of those communications that you found also in the master summary chart?
A. Yes.
Q. Now I'm going to ask you about the defendant's computers. How many computers did you obtain from MPD?
A. Two.
Q. And what were you looking for on those computers?
A. The exact same thing as on the phone.
Q. And did you find emails on the defendant's work computers that were relevant to your investigation?
A. I did.
Q. Can we pull up Government Exhibit 1006, please. So this -- contained in this is also 1006 A through D.
Can we just scroll briefly through this to page 3, please. Those first three pages there, are those just the cover page?
A. Yes.
Q. Coverage pages.
A. Yes.

Q. Did those just indicate what device was searched and what went into this report?
A. Yes.
Q. And, Agent Hadley, is this exhibit a report of emails you obtained from one of the defendant's work computers?
A. Yes.
Q. Now, I'm not going to pull up each of these exhibits, but just to be clear, Agent Hadley, are Government Exhibits 1007 and the sub-exhibits and 1008 and those sub-exhibits, are those also additional reports of emails you obtained from the defendant's work computers?
A. Yes.
Q. And we're going to look at those in more depth later. But can you just explain what relevance those emails had to your investigation?
A. These were emails that discussed the Black -- the MPD's investigation of the Black Lives Matter banner burning.
Q. And are all of those relevant substantive emails also in the master summary chart?
A. Yes.
Q. And, Agent Hadley, prior to your testimony here today, did you have an opportunity to review Government Exhibits 1015 and 1017 through 1022?
A. Yes.
Q. And are those additional emails that you found on the

defendant's work computers?
A. Yes.
Q. And are all the relevant substantive emails from those exhibits also incorporated into the master summary chart?
A. They are.
Q. I'll talk a little bit more about emails. So in addition to the emails that you obtained from the defendant's work computers pursuant to a subpoena, did you also receive voluntary productions of emails?
A. Yes.
Q. And prior to your testimony here today, did you have an opportunity to review Government Exhibits 1005 and 1009 through -14?
A. Yes.
Q. And were those all emails you obtained through voluntary productions?
A. Yes.
Q. Were those emails involving the assistant United States attorneys in the District of Columbia about the Black Lives Matter banner-burning investigation?
A. Yes.
Q. And are those relevant substantive emails in Government Exhibits 1005 and 1009 through -14 also in the master summary chart?
A. Yes.

Q. Okay. So we just talked a lot about the different evidence you obtained in this investigation. So now I'm going to go back to Government Exhibit 4006, which we've been referring to and I'll continue to refer to as the master summary chart. I just want to go over this in a little bit more detail.

And can we go to page 2, please.

Again, what is the first date on this chart?

A. October 24th, 2019.

Q. And we see here that everything on this page is coded in orange. What does that mean?

A. Everything in orange represents communications between the defendant and Enrique Tarrio exchanged on platforms other than Telegram.

Q. And can we go to page 55 of this exhibit, please. And again, what is the date of the last message here?

A. January 27th, 2021.

Q. And we see that everything on this page is in red. What does that mean?

A. Anything in red on the chart represents communications between the defendant and Enrique Tarrio exchanged through the Telegram platform.

Q. So the date of the first recovered communication was October 24th, 2019, and we see here the date of the last recovered communication was January 27, 2021. What is in this chart between those two dates?

A. The evidence that I found that was relevant to my investigation through all the methods I've discussed, including communications between the defendant -- all communication between the defendant and Tarrio, as well as communications between the defendant and others or Tarrio and others related to the Black Lives Matter banner burning, as well as non-communication information I received from grand jury subpoenas, including information from the MPD case file, American Airlines that are pertinent to the investigation.
Q. And just to be clear, Agent Hadley, does this master summary chart contain any of the communications that the CART examiners were unable to recover from the defendant's device and from Tarrio's device?
A. It does not.
Q. All right. Now I want to start walking through your investigation chronologically as much as possible. And so I'm going to focus on specific date ranges within this master spreadsheet. So we're going to start at the beginning.
And can we please bring up Government Exhibit 4005, please.
And what is this document?
A. This document includes all entries from the master summary chart that are dated October 24th, 2019 to June 22nd, 2020.
Q. And is everything in Government Exhibit 4005 also contained in the master spreadsheet?

A. Yes.
Q. And so starting here on page 1, what is the date that this exchange begins?
A. October 24th, 2019.
Q. And can you please just read these exchanges here?
A. Sure. First one is from the defendant to Tarrio. It's a text message. He says, "Enrique, what's going on, brother? I hope all is well with you. I have a question to ask you. You able to give me a call sometime?" Tarrio responded, "Now good?"
This is a week later. Defendant sent another text message to Tarrio. It said, "Hey, Enrique, no changes from when we talked? You planning on heading in tomorrow?" Tarrio replied, "Judiciary Square station, like seven of us. All cool." Defendant said, "Copy. Thanks. I've got my guys around, if you need anything. You wearing your Fred Perry's?" Tarrio responded, "Negative."
Q. Agent Hadley, what was the flow of information here?
A. It is from Tarrio to the defendant.
Q. And what method of communication was the defendant Tarrio using?
A. Using text message -- text message or Google voice, depending on the device.
Q. And can we turn to page 2, please.
And can you read the messages on this page, please?

A. Sure. The first message -- sorry, it's a little blurry, a little hard to read. Any way you can zoom in?

Thank you. First message is from the defendant to Enrique Tarrio it says, "Copy." Tarrio replied, "I think we're going to steer clear of it through the trial." Defendant replied, "I see. That's probably a good idea. You planning on attending the Heritage Foundation event on Thurs.?"

Tarrio replied, "Don't even know what that is." The defendant said, "Gotcha. Andy Ngo is giving a lecture there. Wasn't sure if you were going. Stone got sick and left early. You planning on going there tomorrow?"

Q. And can we go to page 3, please.

Can you please continue reading?

A. Sure. Tarrio replied, "We'll be there every day." The defendant said, "Copy."

Couple days later Tarrio sent a text message to the defendant and said, "My campaign manager just got punched in the face in front of Trump." Defendant replied, "Ugh. What's his name? I was out there earlier with the protesters, but I'm gone now. I will check with the officers on scene."

Tarrio replied, "Okay, cool. We have video of her face." Defendant said, "Can you send it to me?" Tarrio replied, "Waiting to get it in."

Q. And can we go to page 4, please.

And can you please continue reading?

A. Defendant sent another text message to Tarrio, it said, "Great. What's the name of your manager?" Tarrio replied, "Jacob Engels." Defendant said, "Got it. I just spoke with our detective lieutenant. He is ensuring a detective talks to him immediately. Did he report the assault to an officer?"

Tarrio replied, "Yes. Initially they weren't doing the report." Defendant said, "The hell they aren't. Is he still there now? 1D detective is en route."

Q. Stopping you there, Agent Haley. When the defendant wrote, "1D detective en route," if you know, what is "1D" referring to?

A. It refers to the First District, which is one of the districts of MPD -- how MPD divides up the city.

Q. And can we go to page 5, please.

And can you just read the messages on this page?

A. Defendant said --

THE COURT: For the record, when the date changes of the communications, like the first ones were October 24th and now we're -- I think they've all been November 7th. At some point when you ask her to tell you what they say, it would be useful to have the date in her testimony. I don't think we have it. When we switched to November, I was trying to figure out what was going on. All right. Thank you.

THE WITNESS: Absolutely. The first message is from the defendant to Enrique Tarrio on November 7th, 2019. He

said, "Is your campaign manager still there?" Tarrio replied, "Jacob Engels, Z4, zone 4." And then various information, including telephone numbers, email address, web address, and birth dates. And then Tarrio said, "He's at Trump."

Defendant replied, "Thanks. Just spoke to him. He is heading in for the night, so I will have detective follow up on the morning." Tarrio responded, "Really appreciate that." Defendant said, "Anytime."

BY MS. ROSS:

Q. And now going to page 6, please.

Can you please continue reading?

A. So this is several months later, January 16th, 2020. Defendant sent a text message to Tarrio that said, "Enrique, how are you? I hope you had a great New Year. Are you or your group coming to VA on Monday for Lobby Day?" Tarrio responded, "Yes, sir. I'll be there and I believe we have a small group." And then Tarrio called the defendant and that call was connected for 6 minutes, 39 seconds.

The next day Tarrio called the defendant again and that call was connected for 5 minutes, 32 seconds.

Q. We see here, Agent Hadley, that there were some incoming and outgoing calls. How were you able to determine that there were ingoing and outgoing calls?

A. It was based on the call detail records that we looked over earlier from the cell phone provider. They have a column for

originating number and terminating number. You can tell incoming and outgoing based on those two columns.
Q. Were those the historical telephone records that we looked at earlier?
A. Yes.
Q. Can we go to the next page, please? So page 7.
And can you please continue reading?
A. I don't think we finished page 6. Would you like me to?
Q. Oh, I'm sorry.
A. Just the last three. Next entry is on January 20th, 2020. Defendant tried to call Tarrio but the call was not answered. And then a little bit later that morning he sent a text message to Tarrio that said, "Hey, brother, you down here?" Tarrio replied two days later, on January 22nd, with a phone call that lasted 7 minutes, 33 seconds.
Q. Now going to page 7. Can you please continue reading?
A. The first three entries are a series of phone calls on January 22nd, the first from Tarrio to the defendant, lasts for 4 minutes, 41 seconds. And the defendant returned a call, that call was connected for 8 seconds. And Tarrio called again, that call was connected for a minute and 4 seconds. At 7:30 p.m. on January 22nd the defendant sent a text message to Tarrio, it reads, "Special Agent Ben Tyler, Virginia state police, (703) 431-5078."
The next entry, several weeks later, February 9th,

2020, Tarrio called the defendant and that call was connected for 6 minutes, 42 seconds. The next day, February 10th, the defendant sent a Google Voice message, text message to Tarrio that said, "Hey, bother, any of your guys planning on attending the March for Life in Richmond on the 13th?" Tarrio replied, "I'll find out, but I haven't heard anything."

Q. Can we go to page 8, please. And can you continue reading?

A. Same day, the defendant replied, "Thanks." The next day Tarrio sent a Google Voice message to the defendant that said, "They don't have any plans of attending as of now." Defendant replied, "Copy. Thanks, brother."

And then on February 20th, the defendant sent another message to Tarrio that said, "Morning, brother. What time are you heading over to courthouse this morning? Are you moving as a group or going over individually?"

Tarrio replied, "We're leaving the house in like ten. We have a small group. Going to hold some flags outside and then go into the courtroom for the sentencing."

Q. And can we go to the next page, page 9. And can you please continue reading?

A. Defendant replied, "Copy. Thank you. About how many in group? I'm going have a plain clothes detective in front of courthouse, making sure no counter-demonstrators show up." Tarrio replied, "About six to nine of us. We're in regular clothes, no markings." Defendant said, "Got it. Thanks,

brother. If you need anything at all, hit me up."

Then later that morning defendant sent another message that said, "Infowars just showed up outside."

Tarrio replied, "LOL. I was on their show for a bit." The next day, February 21st, defendant sent a message to Tarrio that said, "Hey, brother, do you know when Roger has to report to jail?"

Q. And can we go to page 10. And can you read just the top four messages on page 10, please. And I have a few questions.

A. First one, also February 21st, 2020, Tarrio sent a message to the defendant that said, "Right now it's pending a motion. That's TBA. After the decision on the motion, he's supposed to report two weeks after. So my guess, no later than 60 days." Defendant replied, "Gotcha. Thank you."

A week later, February 28th, 2020, defendant sent another message to Tarrio that said, "Hey, brother, was your group at CPAC yesterday? Or did individuals go there on their own? Some D.C. antifa shit heads tracked Gavin and posted it all over social media, but they also said PB were up there."

Q. So stopping you there, Agent Hadley. We see the defendant says, "D.C. antifa shit heads tracked Gavin and posted it all over social media." But they also said "PB were up there." If you know, what did D.C. antifa refer to?

A. Antifa is a loosely-organized left-wing extremists. They generally oppose right-wing ideology and frequently blend

anarchist and communist ideologies.

Q. And were they often in conflict with the Proud Boys?

A. Yes.

Q. And, second, if you know, "PB" in this context, what does that generally refer to?

A. Proud Boys.

Q. Can you please continue reading just the rest of this page?

A. Tarrio responded to the defendant, "Only PBs here is myself and one more. Actually, three of us total. Besides my face, they wouldn't know the other two."

Q. Can we go to page 11, please, and can you please continue reading?

A. Defendant replied, "I gotcha. Appreciate it. Let me know if you have any issues, but they are pulling one antifa guy's pass." Tarrio replied, "Thanks, bro. I haven't had an issue since I've been here. I'll let you know if that changes, but I doubt it." Defendant said, "I think you will be good, too. Enjoy your trip." Tarrio replied, "Enjoy catching bad guys." Defendant responded, "LOL. Thanks, brother."

And so we have the -- now, three months later, May 30th, 2020, Tarrio sent a Google Voice message to the defendant that said, "Prayers to you guys. Hope you're safe." And the defendant replied, "Thanks, brother. Busy, but we are safe here. I appreciate you reaching out."

Q. Stopping you at the end of the page there, Agent Hadley.

We see that there was a large gap in communications here, so from February 28th 2020 to May 30th, 2020. First, Agent Hadley, what were the defendant and Tarrio communicating about in February 2020?
A. They were communicating about a political conference that was occurring in Maryland at the time.
Q. And then here, on March -- on May 30th, 2020, Tarrio reached out to defendant and said, "Prayers to you guys. Hope you are safe." Agent Hadley, if you know, what was happening around the time that Tarrio sent this message?
A. There were various riots and protests in Washington, D.C. related to the George Floyd incident.
Q. And between February 2020 when Tarrio was here in the District and May 2020, did you recover any communications between Tarrio and the defendant?
A. We did not.
Q. And now can we go to page 12, please. And can you please continue reading?
A. First message is still on May 30th. Tarrio wrote to the defendant, "They're using many channels on Telegram, not only to organize, but to dox police officers," and then a link to a web address, "including BLM protests." Defendant replied, "Thank you. We saw this earlier today."
About a week later, on June 5th, the defendant sent another Google Voice message to Tarrio that says, "Hey,

Enrique, just wanted to check with you to see if any of your people are planning on going to D.C. or Richmond for the protests?" Tarrio replied, "I'll check, but I've issued a stay-at-home for the entire org with these events."

Tarrio sent another message that said, "D.C., I can pretty much say are staying completely away." Defendant replied, "I figured that would be the case. Probably a good move. Thanks, brother." And Tarrio said, "It would just make a huge mess and probably put us on some stupid list."

Q. And next, on page 13, can you please just continue reading?

A. Defendant replied, "No list with us. But if anything happened, would definitely be some bad press for your org. Sincerely, though, I really appreciate you communicating and working with me. Makes things go smoother and hassle-free whenever you want to plan something in D.C." Tarrio replied, "I'm actually going to call you in a sec and give you more deets. Cool?"

Defendant replied, "Sure. Send it." And then next entry is a call from Tarrio to the defendant that lasted 730 seconds. It was a Google Voice call. And then two weeks later a Google Voice message where Tarrio said, "That statue."

Q. Can you go to page 14 of that exhibit, please.

So now we're going to go to page 14. And can you just read the messages on this page, please -- or, the one message on this page, please?

A. Yes. June 22nd, 2020, defendant sent a message to Tarrio that read, "Yep. And they just tried getting the Jackson statue in Lafayette Square, but we were able to save that one."

Q. And what is the date of this last message, Agent Hadley?

A. June 22nd, 2020.

Q. So, Agent Hadley, we just looked at the messages between the defendant and Enrique Tarrio between October 24th and June 22nd, 2020. Generally, what was the flow of information here?

A. The flow was from Enrique Tarrio to the defendant.

Q. So all these messages occurred between October 24th, 2019 and June 22nd, 2020, is that right?

A. Yes.

Q. So in this approximately seven-month period, did you count how many times Tarrio and the defendant communicated?

A. Yes.

Q. And how many times did they communicate during that approximately seven-month period?

A. Ninety times.

Q. So you found about 90 communications in that seven-month period. Did the frequency with which the defendant and Tarrio communicated begin to increase over the course of your investigation?

A. Yes.

Q. And based on your review of the evidence, did the flow of information also begin to change?

A. Yes.
Q. And how did that change?
A. It began to be more two-sided, with information going back and forth, and then eventually it became more one-sided, going from the defendant to Tarrio.
Q. And could we please bring up Government Exhibit 4007, please.
What is this document?
A. This is all entries from the master summary chart, dated June 26, 2020 through July 8th, 2020.
Q. And starting here, on page 1, I'm just going to look at the top five messages here. What is the date that this exchange begins?
A. June 26, 2020.
Q. And can you read just these top five messages, please?
A. Yes. The first is a message from the defendant to Tarrio. He said, "Hey, brother, can you give me a call when you get a chance? Nothing urgent, but want to talk to you about your plans next weekend. Thanks."
Tarrio responded with a phone call that lasted 781 seconds, or about 12 and 1/2 minutes. Then the next entry is from the defendant to Tarrio. It says, "One thing I forgot to ask you. Any other big names planning on coming?" Tarrio replied, "Not with us or that I know of. And as far as other groups go, haven't heard anything." Defendant responded,

"Awesome. Thanks."

Q. And now looking at the bottom two messages here. We see that this is in this yellowish color. What does that indicate?

A. Anything in yellow indicates a communication between Enrique Tarrio and a contact other than the defendant.

Q. And what do these messages say, Agent Hadley?

A. The first one is a Telegram private chat on that same date, June 26th, from Tarrio to a contact of his, Tara MAGA. It says, "While we're there, we'll make posts. But I got off the phone with the FBI a bit ago. They're afraid we might get attacked."

Next entry, a week later, July 1st, 2020, from a user Joe Oak PB to Tarrio and several others. It says, "Enrique, have you talked any more to local PD?"

Q. Focusing here on these communications, so looking at this first one here -- can we zoom back in on those bottom two, please.

So looking at this message, first, from Tarrio to Tara MAGA. It says, "I got off the phone with FBI a bit ago. They're afraid we might get attacked." Did you search for evidence of any communications between Tarrio and the FBI on June 22nd, 2020?

A. June 26th, yes.

Q. June 26. I'm sorry.

A. Yes.

Q. And how did you do that search?
A. Searched Tarrio's phone, looking through all his communications on various platforms, as well as the call log in the phone.
Q. And did you find any evidence that Tarrio communicated with anyone from FBI that day?
A. No.
Q. But did the defendant and Tarrio speak that day?
A. Yes.
Q. Did they speak on the phone?
A. Yes.
Q. How soon after the defendant and Tarrio spoke on the phone did Tarrio send this message to Tara MAGA?
A. It was about an hour and a half.
Q. And, Agent Hadley, this may sound like a silly question, but what does MAGA stand for?
A. Make America Great Again, President Trump campaign slogan.
Q. The next message -- and can we zoom back in on the bottom two messages. Looking at the message from Joe PB again, generally in this context, if you know, what does "PB" refer to?
A. It refers to Proud Boys.
Q. And after asking if Enrique Tarrio had talked to any more local PD, how does Tarrio respond?
Can we go to page 2, please, and just look at that top

message.

Page 2 of Exhibit 4007.

Looking at that top message there, how did Enrique Tarrio respond?

A. He radio responded, "Metro and FBI. No new news."

Q. And stopping you there. Generally, if you know, do people sometimes refer to the Metropolitan Police Department as Metro?

A. Yes.

Q. Can you please continue reading the rest of the messages on this page, please?

A. The next entry is from the defendant to Enrique Tarrio on July 2nd, 2020. It's a message that says, "Looks like word is getting out about you all coming to town. Got that from a contact at a security company here in D.C." And then there's an image which looks like a screenshot, but I can't read it in this size.

Q. Can you continue reading?

A. Oh, I'm sorry. Next entry is from Enrique Tarrio to the defendant, July 2nd, 2020. He said, "Well, Oak shouldn't have put the bar thing on there. He has a small audience, so hopefully it doesn't turn into a big thing." Defendant replied, "Copy that. Just wanted to send for your awareness." Tarrio replied, "Just landed."

Q. And continue on to page 4. Can you please continue reading?

A. Defendant replied --
Q. I'm sorry. Page 3. I'm sorry.
A. Defendant replied, "Welcome back to the area." Tarrio said, "Love this city. I need to get a condo here." The next day, July 3rd, 2020, the defendant sent a message to Tarrio that said, "Hey, brother, any idea what time you all are meeting at Trump Hotel?" And then about four hours later another message, "Hey, brother, you still planning on meeting up at Trump this evening?"
Tarrio replied, "Just saw these." And then Tarrio called the defendant and that call was connected for 154 seconds, or about 2 1/2 minutes. A few hours later, 9:34 that night, defendant called Tarrio. That call was connected for 1 minute, 10 seconds.
Q. So stopping at the bottom of the page here, approximately what time would that call between Tarrio and the defendant have ended?
A. About 9:35 p.m.
Q. Now turning to page 4 of Government Exhibit 4007 and stopping here for a second, what is the time of the message at the top of the page?
A. It's 9:36 p.m.
Q. Approximately how long after Tarrio and the defendant hung up would this have been?
A. Within a minute.

Q. And you see here the color of the message is red. What does that mean?
A. Red indicates communications between the defendant and Tarrio within the Telegram application.
Q. Is this the first recovered Telegram communication between Tarrio and the defendant?
A. It is.
Q. And what did Tarrio send the defendant here?
A. Sent him a set of latitude/longitude coordinates.
Q. Did you investigate what those coordinates were for?
A. Yes, they're at or near Harry's Bar in Washington, D.C.
Q. What is Harry's Bar?
A. It is a bar connected to Hotel Harrington in Washington, D.C. that was frequented by the Proud Boys at the time.
Q. And can you please continue reading?
A. Next message is from the defendant to Tarrio on July 4th, 2020. It's in Telegram. It says, "Hey, brother, you still planning on march today around 11 to 12?"
Q. And then just continuing the rest of the page, please.
A. The next entry is the same day, defendant called Tarrio and that call was connected for 2 minutes and 3 seconds.
Next entry, a little bit later that day, Tarrio returned defendant's call, that call was connected for 33 seconds. And then there's three more phone calls, all on July 4th, from the defendant to Tarrio, lasting 26 seconds,

3 seconds, and 55 seconds.
Q. And can we go to page 5, please. And can you read just the top three boxes there on page 5?
A. Yes. The first two are additional phone calls. First one is from the defendant to Tarrio, lasting 17 seconds. And the next one is from Tarrio to the defendant, lasting 3 minutes and 20 seconds, both on the evening of July 4th, 2020.
The next entry, several days later, July 8th, 2020, is Telegram private chat from the defendant to Tarrio. It says, "Morning, brother. An ABC violation report was filed for Harry's. I'm working on finding out what sanctions might be imposed. As soon as I find out, I will let you know."
Q. So just stooping you there. We see the defendant wrote, "An ABC violation report was filed for Harry's." If you know, what is an ABC violation report?
A. It is a report filed regarding an alcohol beverage control law violation.
Q. And what application did the defendant use to send this to Tarrio?
A. Telegram.
Q. And how did Tarrio respond? Can you read just the last message on this page?
A. Tarrio responded by saying, "Ugh. Thanks, brother."
Q. What application did he use to send this message?
A. Telegram as well.

Q. Okay. Now, looking at the messages here on this page, what is the flow of information, Agent Hadley?
A. The last two messages, the flow of information was from the defendant to Tarrio.
Q. So that brings us to July 8th, 2020, Agent Hadley.
Can we please bring up Government Exhibit 4006, please, and go to page 6.
So, Agent Hadley, have you walked us through everything in this chart up to July 8th, 2020?
A. Yes.
Q. Can we go to page 7, please.
Did the defendant and Tarrio continue speaking after July 8th?
A. Yes.
Q. And then can we go to page 8, please. And page 9.
Agent Hadley, this brings us to October 4th, 2020. And I'm not going to make you read everything that's in this master summary chart and all the communications, but, Agent Hadley, from where we left off on July 8th, 2020, Government's Exhibit 4007, to October 4th which we see here, did the defendant use only iMessage and phone calls to communicate?
A. Would you mind scrolling back just one page?
Yes.
Q. And at some point did the method that the defendant Tarrio used to communicate, did that begin to change?

A. Yes.
Q. So now I wanted to focus on some of the defendant's communications on and after October 4th, 2020.
Can we please bring up Government Exhibit 4008, please.
And what is this document, Agent Hadley?
A. This document are all entries from the master summary chart dated October 4th, 2020 through October 19th, 2020.
Q. Can you just read this first page, please?
A. The first is an iMessage from the defendant to Enrique Tarrio on October 4th, 2020. It is a meme that says, "The new sights for my AR came in today."
Next message is two days later, October 6th, 2020, from Tarrio to the defendant on iMessage. It says, "I'm in town, brother. Last minute trip." Defendant replied, "Copy. How long you in town for?"
Tarrio responded, "Thursday a.m. Staying in Harrington. Going to be at Harry's tonight and I have some interviews tomorrow." Defendant replied, "I gotcha. I've got plans tonight, but if you are free tomorrow afternoon, you interested in meeting up for drinks at Harry's?"
Q. Stopping you at the end of this page, Agent Hadley. We see here that Tarrio says he's stay in Harrington. If you know, what is "Harrington" referring to?
A. It's a hotel in Washington, D.C.
Q. And in that last text, the 2:36 p.m., we see the defendant

asked Tarrio, "If you are free tomorrow afternoon, you interested in meeting up for drinks at Harry's?" If you know, where is the Harrington in relation to Harry's?

A. It's connect to it.

Q. Can we go to page 2 of Government Exhibit 4008, please.

And can you please continue reading?

A. Tarrio replied, "Yes, sir. I have to go to Maryland at 5." The next day, October 7th, 2020, defendant sent an iMessage to Tarrio, "Hey, brother, I've got a meeting at 3. If it is over within time, I can meet you at Harry's for a drink. You still have to go to MD at 5?" Tarrio responded at 9:10 p.m., later that night, with a phone call that lasted 6 minutes and 24 seconds.

Also that evening, October 7th, Tarrio sent an iMessage to the defendant. It's a link to a news article from the DCist.com. The title is D.C. Alcoholic Beverage Regulation Administration investigating Harry's after viral video shows packed bar. Next day, October 8th, 2020, this entry is a WhatsApp message from individual Daren DeMarco to the defendant, it says, "Now the Boogaloo Boi are trying to rally another groups with them to protest at the Michigan state capitol and governor residence. They are calling it a unite rally. They are inviting the Proud Boys, antifa, and BLM.

Q. We see in this next message, Agent Hadley, a message from Daren DeMarco and a reference to the Boogaloo Bois. If you

know, what are the Boogaloo Bois?
A. It's a loosely organized, far right anti-government extremist movement.
Q. And Daren DeMarco, who is that?
A. He's an individual who worked for the New York Police Department at the time.
Q. Can we go to page 3 of Exhibit 4008, please.
And can you read the messages on this page?
A. First message is a WhatsApp message. The defendant replied to Daren DeMarco. "I heard they executed a SW and arrested one person in Delaware who was their explosives guy. Also executed two SW in Baltimore on two suspected associates, but they weren't part of indictment. They were not arrested." And then, "Interesting. I will check with my PB source, but there's no way they will link up with antifa and BLM." DeMarco replied, "I was thinking the same."
Next entry is from the defendant to Jeffery Carroll, who was the assistant chief of the Homeland Security Bureau at the time. It's a link to a news article that is titled, "Plans to Kidnap Whitmer. Overthrow government spoiled, officials say." Next entry is from DeMarco to the defendant, same day. It says, "Please advise on PB."
Q. And going to page 4, can you please read that page?
A. Next entry is from the defendant to Carolyn Montagna, the director of MPD's joint strategic and tactical command center

at the time and the defendant's supervisor. It says, "This is interesting," and has a link to that same article. And the defendant replied to Daren DeMarco, "Will do."

Next entry is from the defendant to Enrique Tarrio, also October 8th, 2020, a link to the same article, and then a message that says, "From a LE source. Now the Boogaloo Bois are trying to rally other groups with them to protest at the Michigan state capitol and governor residence. They are calling it a unite rally. They are inviting the Proud Boys, antifa, and BLM."

Q. Agent Hadley, you just read some exchanges on page 3 and here on page 4 between the defendant and Carolyn Montagna and Jeffery Carroll. And you were able to identify those people, right?

A. Yes.

Q. You've testified to who they are?

A. Yes.

Q. Can we please bring up Government Exhibit 4026, please.

Agent Hadley, what is this exhibit?

A. This exhibit is another legend that provides a little bit more information about all the individuals that communicated with the defendant in the master summary chart. So it includes their position, division, and their agency, if known, that they worked for.

Q. I'm not going to come back to this exhibit every time we

come across someone new, but does this chart help identify everyone the defendant communicates with in the master summary chart?

A. Yes.

Q. Thank you. We can take Government Exhibit 4026 down. And can go back to Exhibit 4008, please, and go to page 5.

And, Agent Hadley, can you please continue reading?

A. The first message is from the defendant to Tarrio, it's an iMessage on October 8th. It said, "Have you heard anything about this?" Tarrio replied, "Do you have a date? I'm on the phone with Michigan pres. He says he knows nothing of this." Defendant responded, "No date for it, but the operation went down last night. I will see if I can get the proposed date now." Then the defendant sent a WhatsApp message to Daren DeMarco that said, "Talking to my PB source now. Any idea on the proposed date for that unite rally?"

Next entry is a phone call from Tarrio to the defendant, 12:02 p.m. on October 8. Call lasted 14 minutes, 41 seconds. And then there's a WhatsApp message from Daren DeMarco to the defendant that said, "Not yet. This is all unfolding as we speak. Will advise." And then four minutes later another message from Daren DeMarco to the defendant, "October 17. FBI started picking up chatter last night on this rally."

Q. And can we please go to page 6.

And can you please continue, Agent Hadley?

A. Defendant replied, "Just got the" -- I'm sorry. Defendant replied to Enrique Tarrio, "Just got the date. October 17th." Tarrio responded, "Confirmed they knew nothing of the event. And they don't plan on attending anything that has to do with antifa or whatever this Boogaloo thing is." Defendant replied, "Copy. Thanks, brother."

A little bit later that day the defendant sent another WhatsApp message to Daren DeMarco. It says, "From my source: Confirmed they," parenthesis, "Michigan PB president," end parenthesis, "knew nothing of the event and they don't plan on attending anything that has to do with antifa or whatever this Boogaloo thing is." DeMarco replied to the defendant, "Will send over. Thank you very much."

Q. Agent Hadley, stopping you at the end of this page, what is the flow of this information here?

A. From Tarrio to the defendant to one of the defendant's law enforcement contacts.

Q. And what method of communication did the defendant use to obtain this information from Tarrio?

A. iMessage.

Q. And can we please go to page 7. And can you please continue reading?

A. This is still on October 8, 2020. First message is from Tarrio to the defendant. He said, "One of my guys sent the

flyer. LOL." And there's an image of a flyer for the Unity Rally. Defendant replied, "Haha, that's it." And Tarrio said, "Look at his comment to me in the bottom." Defendant replied, "I saw. Hilarious. That flyer is one of the funniest things ever. But they are family." Laughing to crying emoji.

Q. And can we go to page 8, please. And can you read just the top two messages on this page?

A. This is still October 8th, 2020. It's from the defendant to Daren DeMarco via WhatsApp. He said, "Flyer for the rally you told me about," with an image of the Unity Rally flyer. And then later -- sorry, 9 p.m. that night the defendant replied to Enrique Tarrio, "They even included the NFAC."

Q. Agent Hadley, if you know, what is the NFAC?

A. It stands for the Not Fucking Around Coalition.

Q. And can you please continue reading the rest of the page?

A. Next entry, still October 8th, from the defendant to a contact, Dave Engel. He said, "Look what Boogaloo Bois are promoting after last night's raids," and then an image of the Unity Rally flyer. Dave Engel replied, "Interesting. I wonder if it is legit or a catfishing scheme to get people to show up. I font see Proud Boys and antifa hanging out as friends." Defendant replied, "Definitely not. Boogaloo Bois are inviting everyone they can. I got that from Proud Boys. Source said they'd never hang out in same circles as antifa."

Q. Agent Hadley, we see here a Dave Engel. Were you able to

identify Dave Engel?

A. Yes. He worked for the Maryland State Police at the time.

Q. Can we go to page 9, please. And can you please continue reading?

A. Next entry is from the defendant to Assistant Chief Jeffery Carroll. Still on October 8th. He said, "This is interesting. Boogaloo Bois promoting an event the day after FBI conducted that big raid on Wolverine Watchmen in Michigan," with the image of the Unity Rally flyer attached. Assistant Chief Carroll replied, "Strange."

Then the next entry is Daren DeMarco replying to the defendant, "Thank you very much." Defendant replied, "You're welcome, brother." And DeMarco said: Thumbs-up emoji, American flag emoji. Defendant replied to that, "Got that from my Proud Boys source. They are definitely not participating."

Q. Can we go to page 10, please. And can you read just the top four message on this page?

A. DeMarco replied to the defendant, "Thank you very much, my bother. Definitely a great source, my man." Defendant replied, "That's for sure. Between you and me, because I trust you completely, it's Enrique Tarrio, the current leader of the PB." DeMarco replied, "Good for you." Bicep curl emoji.

Q. Stopping you there, Agent Hadley. We see that on October 8th, 2020 the defendant identifies Enrique Tarrio as his source to Daren DeMarco. Up until this point, how are the defendant

and Tarrio primarily communicating?
A. Via iMessage or text message.
Q. Can you just read the rest of this page, please?
A. Next entry, October 13th, 2020, from Tarrio to the defendant. It says, "In town. At the Supreme Court." Defendant replied, "Copy. How long you going to be in town?" Tarrio said, "Tomorrow a.m."
Q. And can we please go to page 11. And can you please read this page?
A. October 19th, 2020, defendant sent Tarrio a screen image, screenshot of what looks like possibly a social media post. Tarrio responded with another screenshot, same post, possibly with additional information on it. I can't read it.
Defendant replied to Tarrio, "LOL. Nice response." Tarrio said, "I was walking to get in a car with AC." Defendant replied, "They're idiots."
Q. Agent Hadley, what is the date of that last message there?
A. October 19th, 2020.
Q. So all these messages occurred between October 4th, 2020 and October 19th, 2020, is that correct?
A. Yes.
Q. And are all those messages in the master summary chart?
A. They are.
Q. And all the messages we saw in orange in this exhibit, what does that indicate?

A. Orange indicates communications between the defendant and Tarrio on platforms other than Telegram.

Q. Can we please bring up the master summary chart, Government Exhibit 4006, and go to page 12.

So this brings us up to October 19th, 2020. Do the defendant and Tarrio continue communicating after that?

A. They did, yes.

Q. Can we scroll through page 13, please. And then to page 14. And then on to page 15, please. And then can we stop on page 16.

This brings us up to October 29th. So we've moved forward in time. And again, I'm not going to make you read everything in this massive summary chart between October 19th and October 29th, 2020. But again, I want to ask you: Between October 19th and October 29th, 2020, which we see here, did the defendant Tarrio only use iMessage and phone calls to communicate?

A. Yes.

Q. And so now I want to focus on some of the defendant's communications on and after October 29, 2020 specifically.

Can we please bring up Government Exhibit 4009, please.

And what is this exhibit?

A. This exhibit is all entries from the master summary chart, dated October 29th, 2020.

Q. And then starting here on page 1, can you please just read

that first message?
A. This is a message from contact Carl Holmberg to the defendant via iMessage. It says, "Are you guys getting any info on events for Saturday? Proud Boys in the area of Freedom Plaza and the monument grounds?"
Q. So stopping you there. Agent Hadley, if you know, who is Carl Holmberg?
A. He was an employee of the United States Park Police at the time.
Q. And are you familiar with Freedom Plaza?
A. Yes.
Q. Where is that?
A. It is a plaza in Washington, D.C., around Pennsylvania and 12th.
Q. And what was the significance of Freedom Plaza to your investigation?
A. It was an area where many people congregated for rallies leading up to the presidential election in 2020.
Q. And can you just read the next four messages on this page, please?
A. Sure. The defendant, he replied to Carl Holmberg. He said, "No, I haven't heard anything about that. Do you know where that info is coming from? I've got a good PB source I can check with. Holmberg replied, "Comes from a source. Hopefully not the same one. Sent the info a week or so ago,

saying PB leader would be here with large numbers at Freedom in response to the assaults by skateboarders after the rally several weeks ago. Source said they weren't advertising the event. No permit."

The next entry, same day, October 29th, defendant sent an iMessage to Tarrio that said, "Hey, brother, are you aware of any plans by your group to hold a rally at Freedom Plaza this Saturday?"

Q. So stopping you there. Agent Hadley, just to be clear, when the defendant reached out to Tarrio for information about the rally, what type of message is that?

A. iMessage.

Q. And then after sending that iMessage to Tarrio, what does the defendant tell Carl Holmberg? Can you just read that next message?

A. Sure. He sent a message that said, "I just asked my source. Will let you know once I get a response."

Q. And can we go to page 2 of Exhibit 4009. Can you please read this page, Agent Hadley?

A. Holmberg replied, "Copy. Thanks." The defendant responded, "No, thank you. Let's hope it isn't true." Holmberg said, "Yeah, I could use the day off to rest up for next week."

Next entry is from Tarrio to the defendant. He said, "Let me ask. I haven't heard anything." And then a few

minutes later. "Negative." Defendant replied, "Thanks. I will forward the text I received." Tarrio responded, "Not holding or attending an event."
Q. Could we go to page 3, please. And can you read that first message on this page, Agent Hadley?
A. Defendant sent another iMessage to Tarrio that said, "Comes from a source. Sent the info a week or so ago, saying PB leader would be here with large numbers at Freedom in response to the assaults by skateboarders after the rally several weeks ago."
Q. And, Agent Hadley, is this the information that the defendant received from Carl Holmberg?
A. It is.
Q. And what is the flow of information that we see here?
A. This particular text is from the defendant to Tarrio.
Q. And did he provide Tarrio with information he received from Carl Holmberg?
A. He did.
Q. And he's a law enforcement officer, correct?
A. He is.
Q. And did Tarrio respond to that message?
A. Yes. He replied, "LOL. I was. I was on my own, but not to patrol a park, haha. I will be there Sunday through Thursday." Defendant replied, "LOL. Sounds like someone is leaking your info, although sounds like they have the numbers

way off." Tarrio responded, "If they count my fingers and toes, there was 20 of us." Defendant replied with a laughing-to-crying emoji.

Q. And I think there's one more message. Can you just read that one?

A. This is from the defendant to Carl Holmberg. He said, "I'm hearing one PB will be in town, but it will be Sunday through Thursday. No large numbers and no rally at FP."

Q. And can we go to page 4.

And can you please read this page?

A. Holmberg replied, "Copy. Thanks. I'll pass to my command."

Next entry is from the defendant to Tarrio, an iMessage, "I haven't been able to link up with you the last few times you were up here, but let's catch up next week for beers before you go back." Tarrio replied, "I'm in."

Q. Stopping here, Agent Hadley. We see in this exchange that the defendant and Tarrio were exchanging information about potential events in Freedom Plaza. What application were they using?

A. iMessage.

Q. And this is October 2020. If you know, can you describe generally what these events in the District of Columbia involving the Proud Boys were?

A. They were events leading up to the 2020 presidential

election, in support of President Donald Trump.
Q. So this brings us to October 29, 2020. And I'm going to jump in time a bit to November 2nd, 2020. And I'm not going to keep bringing back up the master summary chart every time we jump forward a little bit. But does the master summary chart contain additional information and communications that we will not necessarily speak about in detail?
A. Yes.
THE COURT: All right. Ms. Ross, we should probably have a logical breaking point in this chronology and in this witness's testimony before we break for the evening. As we're bearing down on November, is there a good one, or is the next date just a short set of communications?
MS. ROSS: I think the next exhibit is just two pages. It is a new exhibit, so we can stop here or I can just get through the next exhibit.
THE COURT: All right. Let's do the next two-page exhibit and then we'll break.
MS. ROSS: Thank you, Your Honor.
BY MS. ROSS:
Q. So can we please bring up Government Exhibit 4010, please. Agent Hadley, what is this exhibit?
A. All entries to the master summary chart dated November 2nd, 2020.
Q. And, Agent Hadley, if you know, what was happening during

this time period, that first week in November?
A. That was the week of the 2020 presidential election.
Q. And starting here, with this first page, can you just read that, please?
A. First is a phone call from Tarrio to the defendant. That went to voicemail. The next entry is from the defendant to Tarrio, an iMessage that said, "Hey, brother, tied up on a conference call right now, but will call you back when I'm free. You in town now?" Tarrio replied, "Yes, sir. We're doing a small popup event in front of CNN." Defendant responded, "Copy. When is that taking place?"
Tarrio replied, "2 p.m." Defendant said, "Copy. I appreciate the heads up. Any idea on size of your group?" Tarrio said, "With Black Republican Club. Only me and another guy will be the only PBs. Not in our gear."
Q. And now going to page 2.
Can you read page 2, please?
A. Then Tarrio said to the defendant, "Ehhhh, I'd say no more than 20." Defendant replied, "Perfect. I'm going to let SOD know for their awareness, so they don't freak out. We will have a unit or two there to monitor and we dev have to catch up for drinks before you leave." Tarrio replied, "10-4. I'll be at Harry's every night." Defendant responded, "LOL. That's what I figured."
The next entry is from the defendant to a text group

chat that included his boss, Carolyn Montagna, and her boss, Jeffery Carroll, as well as others. It said, "Just got a heads-up that PB and Black Repub Club will have a demo outside CNN, 820 First Street, Northeast, today at 1400 hours. Group less than 20 people."

Q. Just a couple last questions to end the day, Agent Hadley.

So stopping here, we see in the defendant's message to Tarrio, we saw -- can you zoom -- sorry. Can you zoom?

So we saw the message to Tarrio at 12:27 p.m. that he wrote, "I'm going to let SOD know for their awareness so they don't freak out." If you know, what is SOD?

A. It stands for Special Operations Division. It's a division within MPD that assists patrol operations with tactical teams.

Q. And we see in that last email here the defendant included Carolan Montagna and Jeffery Carroll. Were they in the defendant's chain of command?

A. They were, yes.

Q. And in these communications, what was the flow of information here?

A. This is -- the flow is from Tarrio to the defendant to the defendant's chain of command.

Q. And what application were Tarrio and the defendant using to communicate?

A. iMessage.

MS. ROSS: And I think that is a good stopping point

for today, Your Honor.

THE COURT: All right. We'll resume tomorrow morning at 9:30. I have a status conference at 9:15, but hopefully it will be over in time for you to spread out and take your seats and do everything you need to do.

Yes?

MR. SCHAMEL: Can we start just a hair later? I'm responsible parent for drop-off this week. Will that be okay with Your Honor?

THE COURT: What does that mean, "hair later"?

MR. SCHAMEL: Means I have to take my kids to school.

THE COURT: No, I know that part.

MR. SCHAMEL: I'm sorry. I drop them off at 8 -- before 8:20, and takes me about an hour to get here, depending on traffic.

THE COURT: All right. Well, we'll shoot for 9:30 and we'll see how it goes. That's the goal.

MR. SCHAMEL: Okay.

MS. ROSS: Thank you, Your Honor.

THE COURT: Thank you.

* * *

CERTIFICATE OF OFFICIAL COURT REPORTER

I, JANICE DICKMAN, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 1st day of January, 2026

________________________________

Janice E. Dickman, CRR, CMR, CCR
Official Court Reporter
Room 6523
333 Constitution Avenue, N.W.
Washington, D.C. 20001

INDEX

WITNESSES:

ASHAN MUFTI
Direct Examination By Ms. Ross.................... 24
Cross-Examination By Mr. Schamel.................. 45
Redirect Examination By Ms. Ross.................. 95

GARY CIAPA
Direct Examination By Mr. Rothstein...............105
Cross-Examination By Mr. Schamel..................116
Redirect Examination By Mr. Rothstein.............147
Recross-Examination By Mr. Schamel................152
Further Redirect Examination By Mr. Rothstein.....152

JENNIFER CAIN
Direct Examination By Ms. Ross....................155
Cross-Examination By Ms. Jara.....................198
Redirect Examination By Ms. Ross..................204

ELIZABETH HADLEY
Direct Examination By Ms. Ross....................207

* * *

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

United States of America, Plaintiff,

vs.

Shane Brian Lamond, Defendant.

Criminal Action No. 23-cr-177

JURY TRIAL
Day 2

Washington, DC
December 3, 2024
Time: 9:43 a.m.

---

TRANSCRIPT OF JURY TRIAL
HELD BEFORE
THE HONORABLE JUDGE AMY BERMAN JACKSON
UNITED STATES DISTRICT JUDGE

---

A P P E A R A N C E S

For Plaintiff: Rebecca G. Ross
Joshua Rothstein
UNITED STATES ATTORNEY'S OFFICE
610 D Street NW
Washington, DC 20530
(202) 252-6937
Email: Rebecca.Ross2@usdoj.gov
Email: Joshua.Rothstein@usdoj.gov

For Defendant: Mark E. Schamel
Ana L. Jara
VENABLE LLP
600 Massachusetts Avenue NW
Washington, DC 20001
(202) 344-4631
Email: MESchamel@venable.com
Email: ALJara@venable.com

---

Court Reporter: Janice E. Dickman, RMR, CRR, CRC
Official Court Reporter
United States Courthouse, Room 6523
333 Constitution Avenue, NW
Washington, DC 20001
202-354-3267

* * * * * * *P R O C E E D I N G S* * * * * * *

THE COURTROOM DEPUTY: We are on the record with criminal case 23-177, United States of America versus Shane Brian Lamond.

Counsel, please approach and state your appearance for the record.

MS. ROSS: Good morning, Your Honor. Rebecca Ross and Joshua Rothstein on behalf of the United States. Joining us at counsel table are Special Agent Elizabeth Hadley, Special Agent Paulina Murphy, and paralegal Lisa Abbe.

THE COURT: All right. Good morning.

MR. SCHAMEL: Good morning, Your Honor. Ana Jara, Mark Schamel. And we are joined by our paralegal William Hinger. And we have our client, Mr. Lamond, present.

THE COURT: Ms. Ross, you said you had a preliminary matter.

MS. ROSS: Yes, Your Honor. The government would like to call a witness out of order today. The witness is Nicholas Quested. He was the documentary filmmaker. It's the government's position that because Enrique Tarrio intends to testify, that the video that was the subject of pretrial litigation would be admissible.

Mr. Quested is unavailable to authenticate the video later this week and defense counsel has indicated that he will not stipulate to the authenticity. So we have Mr. Quest flying

in today and would request that Your Honor take that testimony out of order. We anticipate it taking no more than three or four minutes.

THE COURT: I don't have a problem with doing that when he gets here. There's no order that the witnesses have to come in. So once he's here after lunch, whenever he arrives, you can let me know and we can come up with a logical break to get that done.

MS. ROSS: Thank you, Your Honor. We anticipate him being here, hopefully, by 2:30, if all goes well with travel plans.

THE COURT: All right. So, Ms. Hadley can -- Agent Hadley can return to the stand.

MS. ROSS: Thank you, Your Honor.

THE COURT: I'll remind you that you're still under oath.

All right. You can proceed.

DIRECT EXAMINATION (Cont.)

BY MS. ROSS:

Q. Good morning, Agent Hadley.

A. Good morning.

Q. When we left off yesterday, we had gotten through November 2nd, 2020, is that right?

A. Yes.

Q. So I'm going to continue on chronologically now with your

investigation. And so I'm going to bring up Government Exhibit 4011.

THE COURT: Four thousand and what?

MS. ROSS: Eleven.

THE COURT: Thank you.

BY MS. ROSS:

Q. Agent Hadley, what is this exhibit?

A. This exhibit is all entries from the master summary chart from -- dated November 3rd, 2020 through November 5th, 2020.

Q. And, Agent Hadley, what is the significance of November 3rd, 2020 to your investigation?

A. That was the date of the 2020 U.S. presidential election.

Q. And, Agent Hadley, while you're working as an FBI agent in the District of Columbia during this time, if you know, what type of events were the Proud Boys organizing and participating in around that time?

A. Rallies and demonstrations, and then after the election, protests.

Q. Now, looking at page 1, can you read the stop four messages, please?

A. Sure. The first entry is from Carolyn Montagna to the defendant. It says, "Hahaha, can check with your boy? I'm sure it's nit all the PBs." And then, "Hahaha, never mind, you're all over it."

Next entry, also November 3rd, it is from -- it's a

call from the defendant to Tarrio that lasted 1 minute and 37 seconds. And then later that day, on November 3rd, a message from the defendant to Tarrio, it said, "You at Harry's now?"
Q. Stopping you there, Agent Hadley. What time did the defendant speak to Tarrio on the phone?
A. 2:49 p.m.
Q. And approximately how long after that does the defendant send Tarrio the iMessage asking if he's at Harry's?
A. About 3 hours, 45 minutes.
Q. Now, looking at the rest of these messages -- the rest of the messages on this page, how did Tarrio respond?
A. He responded, "Yep." And then -- should I keep going?
Q. Yes, please.
A. The defendant replied to that, "I will head down for a bit and grab a drink." Later that night there's a message, iMessage from the defendant to his contact David Lamond. It says, "Hey, Dave. I'm meeting with a source right now, but will call you back in a few minutes."
Q. And, Agent Hadley, looking at the last message on this page, where the defendant writes, "I'm meeting with a source right now, but will call you back in few minutes." He wrote that to David Lamond. Who is David Lamond?
A. He's an individual who worked for the United States Park Police.
Q. Any relation to the defendant?

A. No.
Q. Did you find any communications between David Lamond and Enrique Tarrio?
A. No.
Q. And what time did the defendant send that message to David Lamond?
A. 7:49 p.m.
Q. Approximately how long after the defendant messaged Tarrio and said, "I will head down for a bit and grab a drink," was that?
A. About an hour and 15 minutes.
Q. Now going to page 2. Can you please just read the top message on that page?
A. At 8:53 p.m. that night the defendant wrote an iMessage to Tarrio that said, "I need more drinks for this."
Q. Approximately how long after the defendant messaged Tarrio and said, "I will head down for a bit and grab a drink" was that?
A. A little over two hours.
Q. And can you just repeat the rest of the messages on this page, please?
A. Sure. Tarrio responded to the defendant, "LMAO."
Could you move that to the other side of the screen? Thank you.
Later that night, 10:17 p.m., defendant sends an

iMessage to Tarrio that said, "You all are starting to attract attention."

Tarrio replied, "How? They coming this way?"

The defendant said, "People walking in the middle of road."

Tarrio said, "Just brought everyone in."

Q. Now going to page 3. Can you read the messages on this page, please?

A. Defendant replied, "Just try and keep them out of road. Perfect."

Later that evening, so 12:32 a.m. the next morning, November 4th, Tarrio sent a message to the defendant that said, "How's work?"

Defendant replied, "Nor bad. Have a group marching around, but that's the only thing we are seeing. I'm hearing rumors that a couple of your people were stabbed. Have you heard anything about that?" And that was a few hours later, 3:16 a.m.

Tarrio replied, "Yes, I'm here now. Bevelyn and two of my guys."

Q. And can we go to page 4.

And can you read the messages on this page, please?

A. Defendant replied, "Ugg, I'm heading down now."

The next morning, 10:47 a.m. on November 4th, the defendant sent a message to Tarrio that said, "Hey, brother.

How you and your team doing today? Everyone okay?"

Tarrio replied, "Bev is the only one left in the hospital, I think."

And the defendant said, "I gotcha. That's good to hear. I'm not going to be as busy today, so please give me a heads-up if you all go anywhere so I can be around in case you need anything."

Tarrio replied, "We're staying put."

Defendant said, "Good deal."

A little over an hour later, 12:58 p.m., Tarrio sent a message to the defendant that said, "Any word on catching these people?"

Q. Can we go to page 5 of this exhibit.

And, Agent Hadley, can you read this page? And then I have just a few questions for you.

A. Defendant responded, "I haven't heard anything yet. I know detectives are working on a BOLO for the suspects and are pulling the security camera videos from the block. I will keep you updated on the investigation."

Tarrio replied, "You think they'll find them?"

Defendant responded, "I don't know. Depends on how good the video is and whether we can identify the suspects. Hopefully we can. It was brought up during a press conference with our police chief and mayor today, so we will be putting a lot of effort into identifying and arresting the suspects."

3:16 p.m. that afternoon, November 4th, Tarrio sent an image to the defendant which appears to be a screenshot of a social media post regarding Enrique Tarrio.

Defendant replied, "Wonderful. Is anyone staying at Phoenix?"

Tarrio responded, "LOL. Me and Jen."

Q. Stopping you there, Agent Hadley. We saw in the top message on this page that the defendant said that he was working on a BOLO. If you know, generally what does BOLO mean?

A. Stands for be on the lookout.

Q. Is that a law enforcement tool?

A. It is.

Q. And then we saw a reference here to the Phoenix. Are you familiar with the Phoenix?

A. Yes. It's a hotel in Washington, D.C.

Q. And can we go to page 6, please. And can you --

THE COURT: I'm sorry. What did you say the answer was? Phoenix?

THE WITNESS: It's a hotel in Washington, D.C.

THE COURT: Okay.

BY MS. ROSS:

Q. Now, looking at page 6, can you read the messages on this page, please?

A. Defendant responded, "I gotcha. I thought you were staying at Harrington. I'm going to give my team a heads-up for their

awareness. Let me know if you have any issues at all. I will be staying in town through at least Friday, so I'm close by."

Tarrio replied, "I'm leaving in the a.m. Not leaving the hotel until then."

Defendant responded, "Copy. Let me know if you need anything."

Later that day, 6:47 p.m. on November 4th, defendant sent an iMessage to Tarrio that said, "Hey, brother. You don't have a group walking around 14th Street near the Willard, do you?" U.S. Park Police thought they spotted your group walking a little while ago."

Tarrio replied, "Negative."

Defendant said, "Copy. Didn't think so, but just wanted to make sure. Thanks."

Q. Agent Hadley, are you familiar with the Willard?

A. Yes.

Q. What is that?

A. It's a hotel in Washington, D.C., near Freedom Plaza.

Q. Now going to page 7.

Can you read just the top three messages on this page, please?

A. Next entry is a WhatsApp message on November 5th, 2020, at 8:02 p.m., from Daren DeMarco to the defendant. It says, "Can you answer this? 'I'm starting to see posts about Proud Boys coming to Michigan for Friday. Enrique Tarrio posted a video

he's heading this way. Hate to bug you again. Can you pinning your guy?'"

Defendant -- next entry, defendant sent an iMessage to Tarrio that said, "Hey, brother, I'm hearing chatter that you are heading to Michigan. Any truth to that?"

Tarrio replied, "I was, but I'm canceling that trip."

Q. Stopping you there, Agent Hadley. This top message is from Daren DeMarco. That's the officer from New York, right?

A. Correct.

Q. And we see here that he asked -- he asked the defendant if he knew anything about the Proud Boys going to Michigan, is that right?

A. Correct.

Q. And what is -- does Lamond reach out to Tarrio after that?

A. He does.

Q. Approximately how soon after?

A. About 11 minutes.

Q. And when he reached out to Tarrio to ask for information, what type of application was he using?

A. iMessage.

Q. And can you continue reading the rest of this page, please?

A. Defendant replied to Tarrio, "I gotcha. Everybody doing okay from the incident here in D.C.?" Tarrio said, "Bev is still in the hospital. Any leads?" Defendant replied, "I checked with our detectives. They have some additional video,

but haven't identified suspects yet. They are working on it, though."

Q. And can we take that down. Okay. And can we go to page 8, please.

And can you read the messages on this page?

A. Defendant said -- sent another message to Tarrio that said, "You want me to check in on her tomorrow?" Tarrio replied, "Please. It's hard to get info."

Defendant said, "You got it. I will swing by there tomorrow. GW Hospital, right?" Tarrio said, "Yep."

Defendant replied, "Got it. I will check in with her tomorrow and let you know."

Q. Thank you. We can take that exhibit down. We're continuing through your investigation chronologically, Agent Hadley, and so that brings us to November 5th, 2020. Agent Hadley, the next day, November 6th, 2020, the defendant and Tarrio do not communicate, is that right?

A. Correct.

Q. Did they communicate on November 7, 2020?

A. They did.

Q. What is the significance of November 7, 2020?

A. November 7th, 2020 was the date the U.S. presidential election was widely reported by media to -- sorry, for President Biden to have won that election.

Q. So that brings us up to November 7th, 2020. Up until this

point, Agent Hadley, did you investigate the methods that the defendant used to communicate with Tarrio?
A. Yes.
Q. And can we please bring up Government Exhibit 4029, please. And let's just walk through this exhibit. Can we Zoom in on the square box, the key there, please.
Agent Hadley, how many text messages and Google Voice messages did the investigative team recover between the defendant and Tarrio prior to November 7th, 2020?
A. Ninety-four.
Q. And how many iMessages?
A. One hundred and eighty-five.
Q. How many Telegram private chats?
A. Four.
Q. And how many Telegram secret chats?
A. Zero.
Q. So if you add up all those messages, how many did the defendant and Tarrio exchange between October 24th, 2019 and November 6, 2020?
A. Two hundred and eighty-three.
Q. Agent Hadley, you previously testified that between October 24th, 2019 and June 22nd, 2020 the defendant and Tarrio communicated 90 times during that approximately seven-month period. How many times does that mean they communicated in the roughly three and a half months between June 22nd, 2020 and

November 7th, 2020?
A. One hundred ninety-four, if my math is correct.
Q. And Agent Hadley --
A. One-ninety-three.
Q. One-ninety-three?
A. Correct.
Q. And, Agent Hadley, you testified earlier that the frequency with which the defendant and Tarrio communicated begin to increase. Did you begin to see that increase in the frequency around this time?
A. I'm sorry. I missed the last part of your question.
Q. Did you see the increase in the frequency with which the defendant and Tarrio communicate begin to increase at this time?
THE COURT: What time?
MS. ROSS: Leading up to the election and after the election.
THE COURT: So June to November time, is that what you're talking about?
MS. ROSS: Yes, Your Honor.
A. Yes.
BY MS. ROSS:
Q. Can you just walk us through the rest of this exhibit, please?
A. Sure. This is a visual or graphic representation of the

messages exchanged between the two before November 7th. And it's color-coded and weighted by the percentage of messages of the total on the three different platforms. So you can see that of the 283 messages, 33 percent of them were exchanged over Google or text, 65 percent over iMessage, and only 2 percent over Telegram.

Q. I want to continue moving on chronically now, Agent Hadley.

Can we please bring up Government Exhibit 4012.

What is this exhibit?

A. This exhibit is all entries from the master summary chart dated November 7th, 2020.

Q. And can you read just the first five messages on this page, please?

A. Yes. The first is a WhatsApp group message from an individual named Kevin Riley to a WhatsApp group entitled Intel. It says, "Anyone have a Parler account? Hearing PB using it to mobilize." Defendant replied to the group, "I think I do. Or I can go straight to the source. LOL."

And Ben Tyler sends a message to the group, "I'd call him."

Q. First, Agent Hadley, what is Parler?

A. Parler is a social networking service similar to mainstream services, such as Facebook and Twitter, or X, but it's often used by individuals who have been banned from those other platforms dues to moderation policies.

Q. And who's Kevin Riley?
A. Kevin Riley is an individual who works for the Arlington County Police Department.
Q. Did you find any communications between Kevin Riley and Enrique Tarrio?
A. No.
Q. And on the "To" line here it says "Intel." Did you investigate the -- that Intel group chat?
A. Yes.
Q. And what did you learn?
A. It was a group of about half a dozen individuals that were law enforcement contacts of the defendant.
Q. And we see here a message from Ben Tyler. Who is Ben Tyler?
A. He was an individual who worked for the Virginia State Police at the time.
Q. And did you find any communications between Ben Tyler and Enrique Tarrio?
A. No.
Q. What time does Ben Tyler send that message to the Intel group at the bottom there?
A. 1:06 p.m.
Q. He said, "I'd call him," right?
A. Yes.
Q. Can you finish reading the rest of this page, please.

A. Next entry is at 1:07 p.m., it is an iMessage from the defendant to Tarrio. He said, "Hey, brother. Sad, sad news today. You all planning anything?"

The next entry is from Kevin Riley to the group chat Intel. It says, "LOL. That could be more efficient."

Q. So we see that message there at 1:07 p.m. from the defendant to Enrique Tarrio. He says, "Sad, sad news today." Again, Agent Hadley, what is the significance of November 7th?

A. It's the date that the --

THE COURT: She just said that.

BY MS. ROSS:

Q. We'll go on to page 2. Can you please read just the top three messages?

A. First one, the defendant sends a message to the WhatsApp group Intel. He said, "Just text him."

Next entry is an iMessage from Tarrio to the defendant. He says, "Yep." And there is a video, it appears to be monster truck off-roading, truck off-roading.

Next entry is from the defendant to Tarrio. He responds, "Nice. Wish I was there, instead of here. Let me know if you do anything here."

Q. That last message there where the defendant wrote Tarrio, "Nice. Wish I was there, instead of here. Let me know if you do anything here." What time does he send that message?

A. 1:09 p.m.

Q. And can you please continue reading the rest of this page.
A. Defendant sent another message to Tarrio that said, "Where is that? Thanks, brother."
Next entry is from the defendant to the Intel WhatsApp group. He said, "Some of them are in Michigan and Phoenix. Nothing in this area." Ben Tyler responded to the group, "Do they have any plans to come to the area?"
Q. And can we go to page 3. And can you read this page, please?
A. Defendant replied to the group, "Nope." Ben Tyler sends a thumbs-up emoji to the group. Then the defendant said, "Not as of yet anyway." And Kevin Riley responded to the group, "Excellent. Thanks."
Next -- I'm sorry, should I continue to read?
Q. Yes, please.
A. Next entry is a Telegram private chat from the defendant to Tarrio at 2:10 p.m. on the 7th. He said, "Need to switch to encrypted. Alerts are being sent out to LE that Parler accounts belonging to your people are talking about mobilizing and 'taking back the country,' getting people spun up. Just giving you a heads-up." Tarrio responded via Telegram with an audio file that we were not able to recover.
Q. I want to talk about these last two messages in a little bit more detail. When the defendant wrote to Tarrio, "Need to switch to encrypted," what messaging application does he use?

A. Telegram.
Q. And what is the significance of this particular Telegram chat to investigation?
A. This was the first time that the defendant used Telegram to proactively provide information to Enrique Tarrio.
Q. And prior to this, so before November 7, 2020, how many Telegram messages had the defendant and Tarrio exchanged?
A. Four.
Q. And we see in this message that the defendant tells Tarrio, "Alerts are being sent out to LE that Parler accounts belonging to your people are talking about mobilizing and taking back the country, getting people spun up. Just giving you a heads up." Generally, Agent Hadley, "LE," what does that mean in this context?
A. Law enforcement.
Q. Can we go now to page 4, please.
And can you read this page?
A. Next entry is another Telegram from the defendant to Tarrio. It says, "These are some of the posts. Looks like the first one is a fake account claiming to be you." With an image attached that we were not able to recover.
Tarrio responded with, first, an audio file that we were not able to recover and then an image that we were not able to recover.
The next entry is from -- response from the defendant

to Tarrio on Telegram. He said, "Got your voice messages, just giving you a heads up. Please keep this between you and me." Tarrio responded, "All ways."

Q. By looking here at this page, where defendant wrote to Tarrio, "Got your voice messages, just giving you a heads up. Please keep this between you and me," what application did he use there?

A. Telegram.

Q. So that brings us to the end of November 7th, 2020. So, again, we're going to continue on chronologically.

Can we please bring up Government Exhibit 4013.

And, Agent Hadley, what is this exhibit?

A. All entries from the master summary chart dated November 8, 2020.

Q. Can you please just read the top two messages on this page?

A. First message is from the defendant to Tarrio. It's an iMessage, 7:59 a.m. He said, "Morning, brother. I'm sure you are tracking this. You attending?" And then an image that looks -- appears to be a screenshot of a social media account promoting the Million MAGA march.

Q. Agent Hadley, if you know, what's the Million MAGA march?

A. A rally to support President Trump's claims of election fraud that occurred in Washington, D.C. November 14th, 2020. It was attended, promoted by Tarrio and the Proud Boys and it was one of the events that helped Tarrio gain power, influence

within that sphere at the time.

Q. Agent Hadley, can you please read just the next three messages?

A. Next entry was a call from Tarrio to the defendant. It lasted only 2 seconds, went to voicemail. And then Tarrio sent a message to the defendant that said, "I was invited. I don't know if I can make it. I have a family thing that day." Defendant replied, "I gotcha. Hopefully there will be a big turnout."

Q. Can you read just the last message on this page, please?

A. Tarrio responded, "I don't know why they labeled it, 'million.'"

Q. And can we go to page 2, and can you please read this page?

A. First entry appears to be Tarrio correcting a typo. He said, "They."

Next entry is from the defendant to Tarrio. He said, "Yeah, I think they are being a bit optimistic," crying-to-laughing emoji. And then, "Would you give me a heads-up if anyone else from your group decide to attend?" Tarrio replied, "I'm pretty sure my guys will be in attendance."

Defendant replied, "Copy. You are welcome to pass my information to one of them, if they need anything while they're up here." Tarrio replied, "I will, bruv." Defendant responded, "Thank you."

Q. Now, here, on page 2, Agent Hadley, what application were

the defendant and Tarrio using to communicate?
A. iMessage.
Q. And what is the time of that last message down there?
A. 10:37 a.m.
Q. Now, going to page 3 of this exhibit. Can you please read just the top message?
A. Sure. This is an iMessage from the defendant to a group chat that included his boss, Carolan Montagna, and Assistant Chief Carroll. He said, "Just got a heads-up that ET will not be here next weekend for the Million MAGA march, but some of the PBs will very likely come."
Q. How soon after receiving the information from Tarrio using iMessage does the defendant inform his supervisors about that information?
A. About two minutes.
Q. And can you please continue reading the rest of this page?
A. Next entry is from Kevin Riley to the Intel WhatsApp group chat. He said, "Any arrests in D.C. last night?" Defendant replied, "No. Everything was peaceful," parenthesis, "surprisingly." Kevin Riley responded, "Wow, that is awesome." Then Justin Scanlon sent a message to the group that said, "Everyone is in healing mode." Defendant replied, "LOL. Until next Saturday. ET is not coming, but he said it is very likely other PBs will be here."

The next entry is from Tarrio to the defendant, an

iMessage later that day, at 4:54 p.m., he said, "I might be going."

Q. And can we go to page 4. And can you please continue reading?

A. Tarrio sent another message to the defendant that said, "I'll know for sure in the a.m." Defendant replied, "Copy. Let me know. Do you feeling like the event is getting some traction?" Tarrio responded, "I feel like it's getting a lot of traction."

And the defendant said, "I'm trying to gauge it. I see a lot of social media chatter, but hard to guess how many will show up. Let me know if you need anything, as always. Haven't seen anything from antifa yet, but once they get word, I'm sure they will call for backup." Tarrio replied, "I'll gauge it myself and let you know. I'll know more about me going by tomorrow afternoon." Defendant responded, "Sounds good. Thanks, brother."

The next entry, 9:21 p.m. that evening, Tarrio sent an iMessage to a contact of his that says, "I'm planning a big event in D.C. this weekend."

Q. And can we go to the next page, page 5, please. And can you read this page?

A. Then Tarrio sent a follow-up iMessage to that contact with a screenshot, appears to be a flyer for the Million MAGA march.

Next entry is from the defendant to his contact Dave

Engel, 11:09 p.m. He said, "Saturday MAGA event gaining traction. ET may attend after all. Antifa also knows about it and is planning on crashing it."
Q. Agent Hadley, who is Dave Engel?
A. He's an individual who worked, at the time, for Maryland State Police.
Q. Did you recover any communications between Dave Engel and Enrique Tarrio?
A. No.
Q. So that brings us to November 8th. So we're going to keep going on. Can we please bring up Government Exhibit 4014.
And, Agent Hadley, what is this exhibit?
A. All entries from the master summary chart dated November 9th through November 10th, 2020.
Q. And can you read just that top message, please?
A. Sure. This is a Telegram group chat from Enrique Tarrio to a group entitled D.C.'s Finest Law Enforcement Agency. He said, "Normies will already be at Freedom Plaza." It's 2:30 a.m.
Q. Agent Hadley, did you investigate that group chat, D.C.'s Finest Law Enforcement Agency?
A. Generally, yes.
Q. What did you learn?
A. That it was a group of several hundred Proud Boys that was actually renamed after the Million MAGA march. But the name

appears to be a reference to the Proud Boys laying down the law in D.C. during the Million MAGA march.

THE COURT: I'm sorry. You have to keep your voice up and use the microphone. Say what that was again.

THE WITNESS: So D.C.'s Finest Law Enforcement Agency was a group of several hundred Proud Boys that was renamed -- was started in early November and it appeared to be renamed after the Million MAGA march and be a reference to the Proud Boys laying down the law in D.C.

BY MS. ROSS:

Q. What does the defendant write to Tarrio after that, Agent Hadley?

A. He writes, "Hey, brother. Do you know roughly how many of you will be here Saturday?"

Q. What application did he use to ask that of Tarrio?

A. iMessage.

Q. And can you continue reading, please?

A. Tarrio responded, "150 to 200." The next entry, Tarrio called the defendant and that call was connected for 7 minutes, 34 seconds.

Q. Stopping you there, Agent Hadley. What time was that telephone call?

A. 2:12 p.m.

Q. Okay. Can you continue reading the rest of the page, please?

A. Next entry is from the defendant to Ben Tyler via WhatsApp. He said, "Didn't want to put this in email, but just spoke with ET. He is coming this weekend and he expects approx 150 to 200 PBs for Saturday's event."

The next entry, later that day, 4:34 p.m., Tarrio called the defendant. That call was connected for 2 seconds; went to voicemail.

The next entry, several minutes later, the defendant called Tarrio. That call was connected for 2 minutes and 14 seconds.

Q. Agent Hadley, after the defendant and Tarrio spoke for 7 minutes and 34 seconds, how long after that did the defendant reach out to Ben Tyler?

A. It's about 10 minutes.

Q. And can we go to page 2 of Government Exhibit 4014. And can you please continue reading.

A. First entry is from the defendant to Tarrio via iMessage, 5:19 p.m. He said, "Organizers of march are consolidating. Both groups are meeting at Washington Monument and then marching to SCOTUS. Also have women's march from Freedom Plaza to SCOTUS." Tarrio responded, "LOL. Same time?" Defendant said, "Yeah, they are saying they will begin gathering at 7 a.m. March starts at noon." Tarrio responded with a grimace face emoji.

Next entry, 9:44 p.m., is the defendant joining a

Proud Goys public group chat.
Q. Stopping you there, Agent Hadley. What application was that on?
A. On Telegram.
Q. And did you investigate that Proud Goys chat?
A. Yes.
Q. What did you find out about it?
A. It was a Telegram group chat of several hundred people that appeared to be a faction of the Proud Boys.
Q. And what is the date that the defendant joins that group chat on Telegram?
A. November 9th, 2020.
Q. And can you just read that last message?
A. Sure. This is an iMessage from the defendant to Tarrio, 11:11 a.m., on the 10th. He said, "I'm sure you already have this, but just in case you don't." And then a screenshot of an image of a social media account with a picture of Alex Jones.
Q. Can we go to page 3.
And can you read these messages, please?
A. Tarrio responded, "Yeah, I got that. Retards are using him to drum up outrage." Defendant replied, "Yep." And Tarrio responded, "You think we'll have good separation?" Defendant replied, "Yes, that's why I keep hitting you up for your plans. I don't want you to think I/we are keeping tabs on you guys, but the more details we have about your plans, the better we

can plan to keep separation between the groups."

Next entry is a phone call from Tarrio to the defendant that lasted 10 minutes and 56 seconds. And then there is an iMessage from the defendant to Tarrio that said, "Forgot to ask you, you still thinking 150 to 200?" Tarrio responded, "I think so."

Q. And, Agent Hadley, what application was the defendant using to communicate with Tarrio here?

A. iMessage.

Q. Can we go to page 4.

And can you please continue reading?

A. Next entry is a Telegram private chat from the defendant to Tarrio with an image that we were not able to recover. And then a message that said, "You have any idea who this guy is? He is making it sound like he was there for the incident at 14th and NY, but I can't tell because he's talking in circles." Tarrio responded, "Standby. I know who will be able to tell you." And then a few minutes later, "Hmmmm, he doesn't know."

Defendant responded, "I got you. He's all over Parler trashing you all." Tarrio replied, "When he says, 'We got jumped,' I don't know if he's referring to all of us or him. But this wasn't a person that was there when we got stabbed. But my Mass guy says he has no idea who that is."

Q. And can we go to page 5.

And can you read the messages on this page?

A. First one is a phone call from Tarrio to the defendant that was only connected for two seconds; went to voicemail. And then there's a message from the defendant to Tarrio that says, "In a meeting, but I will call in a few." And then a phone call from the defendant to Tarrio, connected to voicemail for 11 seconds. And then another message, "Tried calling you back. Give me a call when free."

Next entry is a phone call from Tarrio to the defendant that was connected for 3 minutes, 24 seconds.

Q. Okay. Agent Hadley, that brings us to November 10th, 2020. We're going to move forward in time to November 13th, 2020.

Can we please bring up Government Exhibit 4015.

And what is this exhibit?

A. All entries from the master summary chart dated November 13th, 2020.

Q. Focusing just on these top three messages, can you please read those?

A. First is an iMessage from the defendant to Tarrio, 8:36 a.m. He said, "Hey, brother, as we suspected, the organizer for the MAGA march changed his info to reflect the other event. Now everyone meeting up at Freedom Plaza at noon." Tarrio responded, "Woof. Perfect."

Q. We see here the defendant and Tarrio are talking about MAGA march. The date here is November 13th. When, in relation to the MAGA march, was this?

A. The day before.
Q. And can you please continue reading the rest of this page?
A. Defendant responded to Tarrio, "Yep, that's going to be a shit ton of people, but it will work. Was down in Richmond last night for the car caravan. Decent turnout. You staying at Phoenix again?" Tarrio replied, "Yep. I'm about to take off." Defendant responded, "Copy. I'm staying in D.C. tonight. Let me know if you go out and I may stop by."
Q. Agent Hadley, we see here that Tarrio tells the defendant, "I'm about to take off." Where is Tarrio living at this time?
A. Around Miami, Florida.
Q. Can we go to page 2 of this exhibit.
And can you please continue reading?
A. Later that day Tarrio sends an iMessage to the defendant, "In town." Defendant replied, "Copy. I'm up near BLM Plaza, baby-sitting the Infowars truck." Tarrio responded, "LMAO. Well, at least he's entertaining."
And then later that afternoon, 3:02 p.m., Tarrio sent a message to the defendant, "At Harry's." Defendant replied, "Copy. About to check out BLM Plaza. Heard there was a skirmish up there. Will let you know when I'm heading down."
Q. And can we go to page 3 of this exhibit.
And can you read just that top message, please?
A. Sure. This is an iMessage from the defendant to Tarrio, 8:33 p.m. that night. "You still at Harry's?"

Q. How did Tarrio respond to that message?
A. He said, "Yes. Doing a show and I'll be back down."
Q. Using what application?
A. iMessage.
Q. At what time?
A. 8:34 p.m.
Q. How does the defendant respond to that message?
A. Responded several minutes later with a Telegram chat that said, "Just giving you a heads up, there's a lot of attention at Harry's right now. If it doesn't calm down, they are going to shut Harry's down."
Q. And how many minutes later was this message in response to Tarrio's?
A. About three minutes.
Q. Did the defendant switch which application he was using to send this message?
A. He did.
Q. And what application did he use?
A. Telegram.
Q. After sending this Telegram message, did the defendant follow up with Tarrio?
A. Yes.
Q. What did he say?
A. About two minutes later he sent an iMessage to Tarrio that said, "Check Telegram."

Q. Did Tarrio respond?
A. Yes. About two minutes after that Tarrio sent an audio message to the defendant -- or, an audio file that we were not able to recover.
Q. And then how did the defendant respond?
A. He responded, "Sounds good. Just wanted to let you know, I heard ABRA already on scene."
Q. Agent Hadley, what is ABRA?
A. It's the Alcoholic Beverage Regulation Administration in Washington, D.C.
Q. Thank you. We can take that exhibit down.
We're going to continue on to November 13th. Can we please bring up Government Exhibit 4016.
What is this exhibit?
A. All entries from the master summary chart dated November 14th through 16th, 2020.
Q. And can you please read just this first page?
A. First entry, 6:01 p.m., is a phone call from Tarrio to the defendant that lasted 1 minute and 54 seconds. And then there are two phone calls from the defendant to Tarrio. The first lasted 45 seconds and the second was not answered.
Next entry is from Tarrio to the D.C. Finest Law Enforcement Agency Telegram group chat. He said, "Freedom Plaza, 10 p.m. Bring your gear."
At 6:45 p.m. on the 14th the defendant sent a

Telegram message to Tarrio that said, "Antifa and your guys at 10th and E. We have both groups separated." Then a few hours later, 9:23 p.m., another message to Tarrio, "We cut your guy loose. Victim could not be located."

The next entry is from the defendant -- I'm sorry, from Assistant Chief Carroll to the defendant. He said, "Any idea when the Proud Boys are leaving the city from social media?"

Q. Agent Hadley, just to clarify, when the defendant sent Tarrio that message that said, "We cut your guy loose. Victim could not be located," what application was he using there?

A. Telegram.

Q. Can we go to page 2 of this exhibit. And can you read just the top four messages there, please?

A. Defendant responded to Assistant Chief Carroll. He said, "I will check again with my source. But on Friday he said most on Sunday, a few leaving Monday. Not sure if they are participating in Straka demo tomorrow, but I will find out." Assistant Chief Carroll responded, "Thanks."

Q. If you know, Agent Hadley, who is Brandon Straka?

A. He's a pro-Trump influencer.

Q. And can you please continue reading?

A. Next entry is from the defendant to Tarrio, 10:22 p.m., via iMessage. He said, "You guys attending the Brandon Straka event tomorrow morning?" And then five minutes later there's

an iMessage from the defendant to Assistant Chief Carroll, "Just talked to him. They're all leaving tomorrow and not attending the Straka event."

Q. So we see here that Jeffery Carroll asked the defendant to reach out for information. When the defendant reached out to Tarrio for information, what application was he using?

A. It's iMessage. However, Assistant Chief Carroll asked him if he knew anything from social media and then the defendant said he would reach out.

Q. I'm sorry. Yes. Thank you for clarifying.

So when the defendant -- after the defendant reached out to Tarrio using iMessage, did he provide information to Jeffery Carroll?

A. Five minutes.

Q. Five minutes later he did?

A. About five minutes later, yes.

Q. Can you please continue reading the rest of this page?

A. Next entry is a few days later, November 16th, 2020, 3:18 p.m., from Tarrio to the defendant. He said, "These Boogaloo guys are pretty retarded." Defendant replied to Tarrio a few hours later, he said, "So are the antifa and BLM ass hats." Tarrio responded, "You ain't wrong."

Q. And can we go to page 3. And can you read these messages?

A. Defendant replied, "I've been fielding threatening phone calls and social media posts from both sides all day." Tarrio

said, "LOL. I imagine there's a lot more now." Defendant said, "Definitely. My personal favorites are the ones that call you white supremacists and say we protected you while you attacked peaceful protesters."

Tarrio responded, "The article from Carles that said after we got stabbed you guys gave us, 'preferential' treatment, I was like, yeah, we were the victims." Defendant responded, "Exactly."

Next entry is a WhatsApp message from Ben Tyler to the defendant. He said, "Okay. Also, Mike Dunn and Enrique have a battle going on Parler." Defendant replied to Tyler, "Hahaha. Enrique texted me about Boogs being retards a little earlier. He must have been referring to him."

Q. Then can we go on to page 4. Can you just read this last message, please?

A. Next entry is from Tarrio to his contact Sheriff Clarke MAGA. It's a text message. He said, "Sometimes I wish we can be everywhere. D.C. Metro wanted to act, but weren't allowed to."

Q. Agent Hadley, what date does that bring us up to?

A. Through November 16th, 2020.

Q. We're going to fast forward in time a bit to December 7th, 2020. Just to be clear, though, Agent Hadley, were there communications and other relevant evidence to your investigation between the defendant and Tarrio between November

17th, 2020 and December 7, 2020?
A. Yes.
Q. And are all of those reflected in the master summary chart in Exhibit 4006?
A. There are.
Q. Can we please bring up Exhibit 4017.
And what is this exhibit?
A. All entries from the master summary chart dated December 7th, 2020 through December 12th, 2020 at 5:39 p.m.
Q. So we've jumped forward in time. And can you please just read this first page here, beginning on December 7th at 2 p.m.?
A. Yes. The first entry is from -- WhatsApp message from Ben Tyler to the defendant. He said, "What numbers do you all anticipate for Saturday?" Defendant replied, "We are estimating between 5 to 10K. Not as big at last time, but still big." Tyler responded, "Have you heard from ET?" Defendant said, "Not in a few days. Texted last week. He said there should be more of them this time." Tyler responded, "Oh, boy."
The next entry is -- sorry, an iMessage from the defendant to Tarrio that same day. He said, "You have any info on the event planned Saturday night after the march?"
Q. And can we go to page 2.
And can you please continue reading?
A. Tarrio replied, "March at 6 p.m. I don't know the location

yet." Defendant responded, "I gotcha. Going to be like November 14th?" Tarrio said, "Somewhat." Defendant said, "Thanks."

Tarrio replied, "Harry's is getting bombarded with harassing calls." Defendant said, "Yep, I was about to send it to you. ShutDownDC is telling people to call Harry's and demand they close for December 12th." Tarrio responded, "Then we turn into the bad guys somehow."

Q. And can we please move on to page 3.

And can you read this page, please?

A. Tarrio sent another message, "This is all not cool." Defendant replied, "Unfortunately, nothing can be done about the calls. Not breaking the law." Tarrio said, "Yeah, I know." And then defendant responded with a screenshot of something that I can't read.

The next entry is a few days later, December 9th, 2020, it's a WhatsApp message from Ben Tyler to the defendant. "Good morning. At some point when you have a minute, can you see if ET plans to attend the VA Lobby Day in January?" Defendant replied, "Hey, Ben. Yep, I will reach out to him today."

Q. Can we go to page 4.

And can you please continue reading?

A. Tyler responded, "Thanks." And then about an hour later defendant sent a Telegram private chat to Tarrio. He said,

"Hey, brother. I'm sure you've heard, antifa is calling the hotels, urging them to cancel reservations for Trump supporters this weekend. Will you have guys staying at Harrington again? That's one of them on the list."

And the next day, December 10th, at 10:12 a.m., defendant sent another Telegram to Tarrio that said, "I'm hearing Harry's is going to be closed Saturday." Tarrio replied, "Yeah, I figured. I told my guys to not go to Harry's." And then Tarrio sent an audio file to the defendant that we were not able to recover.

Q. What application was defendant Tarrio using to communicate here?

A. Telegram.

Q. Can we please bring up Government Exhibit 2001, please.

And, Agent Hadley, we previously looked at this record, which you testified was the records you obtained from American Airlines pursuant to a grand jury subpoena. Sort of walk through this in a little bit more detail. Looking here at page 1 of this exhibit, can you just explain what this indicates Tarrio's travel schedule was?

A. That he was flying from Miami to DCA December 10th, 2020 and returning to Miami December 17th, 2020.

Q. And, Agent Hadley, through the course of your investigation did you learn whether Tarrio was in fact in the District of Columbia during this time period?

A. Yes. And he was.

Q. Can we please bring back up 4017 and go to page 5, please.

A. This is also December 10th, 2020. Defendant sends a Telegram message to Tarrio that said, "Do you know where Alex Jones is speaking? We are hearing conflicting locations, SCOTUS, Freedom Plaza, and National Mall. Any way you can find out where he is going? Will you all be at Freedom Plaza or National Mall?"

Next entry is later that day, 5:36 p.m., from Tarrio to a Telegram group chat entitled East Coast Rally Command. It says, "The only way we control the safety of our guys is to lead them into situations we control." And then, "I've had little communication with D.C. Metro, which is odd. They've been really short."

Next entry is a WhatsApp message from the defendant to Tyler on the 11th, December 11th, at 9:55 a.m. "Sorry for the delayed response, but he just got back to me now. He says he hasn't decided yet. He's going to be in D.C. for inauguration, but not sure when he's coming to the area. He said he's let me know once he decides."

Q. And can we go to page 6, please.

And can you please continue reading?

A. First message is from Ben Tyler to the defendant. He replies, "Thanks for checking." Next entry, later that afternoon, the defendant -- or, I'm sorry, Tarrio sends a

Telegram message to the defendant that was an audio file which we were not able to recover.

Defendant replied, "Yep, I know. Cuban embassy called police on you. LOL." Tarrio responded with an audio file that we were not able to recover. Defendant replied to that, "Midget tossing? I think that certainly qualifies as civil disobedience." Crying-to-laughing emoji. Tarrio responded to the defendant, "We're clearing out."

Q. And, Agent Hadley, can you please read the messages on the next page, page 7?

A. Defendant replied to Tarrio, "Copy. Thanks, brother." And Tarrio responded, "I'll update you on movements from now on." Defendant said, "I appreciate it. Any other plans for this evening? I hear Harry's is shutting down at 7."

Tarrio said, "We're going to have a briefing tonight at 10:30 at the National Mall. We're marching from Harrington's." Defendant replied, "Copy. Antifa should be staying up at BLM Plaza. Do you want me to let our uniformed officers know that or keep it to myself? I will be around all night, in case anything kicks off." Tarrio responded with an audio file that we were not able to recover.

Q. Agent Hadley, when the defendant says, "Antifa should be staying at BLM plaza. Do you want me to let our uniformed officers know that or keep it to myself?" what application was he using?

A. Telegram.
Q. And can we please go to page 7 of this exhibit.
And can you just read the messages on this page?
I'm sorry, page 8.
A. First entry is from the defendant to an SMS group chat that included his boss, Carolyn Montagna, Assistant Chief Carroll. He said, "Just got word that PB will be having a meeting on National Mall at 2230 hours tonight. They are planning on marching over from Harrington around 2200. Will send to USPP as well." Assist Chief Carroll replied to the group, "Thanks. Are they planning on going anywhere after that?"
Defendant responded, "No. The meeting is to discuss their game plan for tomorrow. They will all break up and head to hotels from there." Carroll replied, "Well, at least we will get an idea of how many are actually here based on that meeting."
Next entry is later that night, 9:36 p.m., via Telegram. Defendant sends a message to Tarrio that said, "Where you all headed? Is your group at 11th and E heading to FP or the Mall?"
Q. Agent Hadley, that brings us to December 12th, 2020. What significance does the date December 12th have to your investigation?
A. That's the date that the BLM banner was burned.
Q. Going to page 9 of this exhibit.

Can you read just the top two messages on this page?
A. First entry, December 12th, 2020, in the morning, via Telegram from the defendant to Tarrio. He said, "And invite to the White House," thumbs-up emoji. Later that day, 3:43 p.m., the defendant sends an iMessage to Tarrio that said, "Hey, brother, what's the plan for the rest of the day?"
Q. That first message on this page, Agent Hadley, what application did he use?
A. Telegram.
Q. At what time?
A. 9:49 a.m.
Q. What time did he send that second message?
A. 3:43 p.m.
Q. Using what application?
A. iMessage.
Q. Once the defendant switched messaging applications, did Tarrio respond?
A. He did. Several hours later he responded, "6 to 7 p.m., Harrington's, then we're going to march. Don't know the route yet."
Q. Can you just read the rest of this page, please?
A. Defendant replied, "Copy. I'm up with your boys at McPherson Square now. Do you know where you're heading to?"
And there's a message from the defendant to the SMS group chat that included his chain of command. And he said,

"From PB source. 6 to 7 p.m., Harrington's. Then we're going to march. Don't know the route yet."
Q. And can we go to page 10, please. And can you read this page?
A. Defendant sent a separate WhatsApp message to Carolyn Montagna, his supervisor, it said, "6 to 7 p.m., Harrington's, then we're going to march. Don't know the route yet. From ET." Montagna responded, "Wow."
Q. Agent Hadley, the top message on this page, to be clear, where did the defendant get that information?
A. From Enrique Tarrio.
Q. And was that just cut and pasted from Tarrio to Carolyn Montagna?
A. Appeared to be.
Q. What application did the defendant use to communicate with Tarrio to get this information?
A. iMessage.
Q. And then he shared it with the chain of command, right?
A. He did.
Q. And what date does this take us to?
A. Through December 12th, 2020, at 5:39 p.m.
Q. Can we please bring up Government Exhibit 4018. And what is this exhibit?
A. All entries from the master summary chart between December 12th, 2020, at 7:30 p.m., through December 20th, 2020.

Q. Okay. And can you please start reading?
A. First entry, Telegram message at 7:30 p.m. on the 12th, from the defendant to Tarrio. He said, "We just locked up one of your guys at 14th and K."
Later that evening Tarrio sent an iMessage to the defendant that said, "Two of my guys stabbed." Defendant replied, "I'm hearing maybe a total of four. I'm up at 11th and F now."
Q. And then what does that next gray box say?
A. It says, "Destruction of property. BLM banner is burned by group, including Tarrio, at church near intersection of 11th Street and E Street Northwest, Washington, D.C., on the evening of December 12th, 2020, from the MPD case file."
Q. Agent Hadley, you testified earlier that December 12th, 2020 was a significant date to your investigation. So I want to pause here and just review the communications between Tarrio and the defendant up until this point.
Can we please pull up Government Exhibit 4030.
And, Agent Hadley, what is this exhibit?
A. Similar to the last one, it is a visual representation of the messages exchanged between the defendant and Tarrio between the dates November 7th, December 12th, 2020, organized, color-coded by platform.
Q. And starting here with the key, how many total text messages and Google Voice messages were there between the

defendant and Tarrio between November 7th, 2020 and December 12th, 2020?
A. Zero.
Q. And how many iMessages did the investigative team recover between the defendant and Tarrio between November 7th, 2020 and December 12th, 2020?
A. One hundred and nine.
Q. And how many Telegram private chats?
A. Forty.
Q. And Telegram secret chats?
A. Zero.
Q. So in that time period, just over a month, how many total communications were there between the defendant and Tarrio?
A. There was 149 messages, but that does not include calls.
Q. And, again, how many total messages were there between the defendant and Tarrio between October 24th, 2019 to November 6th, 2020, so just over a year?
A. Two hundred and eighty-three.
Q. And can you just walk us through the rest of this exhibit, please?
A. Sure. Like the last one, it shows the percentages. So the weighted percentages of the total of the 149 messages, 73 percent were iMessages and 27 percent were Telegram private chats.
Q. And after December 12th -- so focusing after that date --

did you find there was another shift in the method of communications between the defendant and Tarrio?
A. Yes.
Q. And can you just explain that?
A. They increased in frequency yet again and also shifted to be completely on the Telegram platform.
Q. We're going to look at that in more detail.
Can we please bring up Government Exhibit 4031.
And can you explain what this Exhibit is, please?
A. This exhibit is a visual representation of all messages between the defendant and Tarrio after December 12th, 2020. So between December 12th and January 27th, 2021, about six weeks.
Q. Starting here at the key, Agent Hadley, how many total text messages and Google Voice messages did the investigative team recover after December 12th, 2020 between the defendant and Tarrio?
A. Zero.
Q. And how about iMessages?
A. Zero.
Q. How about Telegram private chats?
A. Thirty-five.
Q. And how about Telegram secret chats?
A. Two hundred and nine.
Q. Can you just walk us through the rest of this exhibit, please?

A. Sure. It shows that of the 244 messages, 68 percent were Telegram secret chats. And of the 244, 46 percent were recovered, 40 percent of the secret chats were not recovered. I'm sorry, 40 percent of the total were secret chats not recovered and then 14 percent of the 244 were Telegram private chats.
Q. Put concisely, Agent Hadley, did the defendant and Tarrio communicate exclusively using Telegram after December 12, 2020?
A. Yes.
Q. And how many total Telegram communications between the defendant and Tarrio were there after December 12th?
A. Two hundred and forty-four.
Q. And, Agent Hadley, the last message that was recovered, that was January 7, 2021, right?
A. January 27th, 2021.
Q. Yes.
A. Yes.
Q. And, Agent Hadley, so does that mean in that roughly six-week period there were 244 messages?
A. Yes.
Q. Okay. So we're going to keep moving on chronologically now.
Can we go back to Exhibit 4018, page 1, please.
And so we're up to the Black Lives Matter banner burning. What type of record comes next there?

A. Next record is an email from Kelly O'Meara to the defendant, as well as Commander Parsons, Captain David Hong, and Kristen Metzger, all of MPD. Subject line: BLM signs. It says, "Because John Falcicchio is asking, are we all on board with saying that the tearing down of the BLM signs would be investigated as a possible hate crime?" This is the morning after, at 10:58 a.m.

Q. Just to be clear, Agent Hadley, the recipients of this email, are those all MPD employees, including officers in defendant's chain of command?

A. They were at the time.

Q. And --

A. Not including officers in the defendant's chain of command, though.

Q. Can you please continue reading.

We'll go to page 2.

And can you read just what the defendant writes in that top email there?

A. Sure. He responds to the group. He says, "That's a very tricky question and one that I was thinking about this morning. We have supported this offense in the past with the burning and destruction of gay pride flags and such. However, wouldn't that also mean that a lot of the criminal offenses," parenthesis, "assaults, the stabbing on 11th Street," end parenthesis, "reported yesterday connected to the event would

be possible hate crimes?"

Q. Can you read the next two emails, please?

A. Captain David Hong responded to the group, "I think it really just depends on each circumstance and what was said or heard and who was involved. I'll check all the reports today and tom they come in and see if we need clarification from the report-takers, if possible."

Then there's an email from Kristen Metzger to the group. She said, "We've had a few media inquiries about this," parenthesis, "See attached. Is it accurate for us to say: Yes, MPD is aware of these incidents. We take these offenses seriously and we are currently investigating them as possible hate crimes. If anyone has any information, we ask that they call (202) 727-9099 or text 50411." And there are several email messages attached.

Q. Now going to page 3.

Can you read just that top email?

A. Then Kelly O'Meara replied to the group, "I think that is correct, that some of them may be. However, while we know that race is a protected category, I think we'll have to think about whether the Proud Boys falls into one, it may not."

Q. And what time was that email sent, Agent Hadley?

A. 11:15 a.m.

Q. And how soon after that does the defendant reach out to Tarrio in that next message?

A. It's about six hours, at 5:07 p.m.

Q. Using what application?

A. Telegram.

Q. Can you please continue reading?

A. Defendant sent a Telegram to Tarrio that said, "ShutDownDC is going after Harry's again, urging people to report them to ABRA. Tarrio replied, "We didn't even go into Harry's. What's ABRA?" Defendant said, "Alcoholic Beverage Regulatory Agency." Tarrio replied, "What codes would they have broken?"

Q. And can we go to page 4, please.

Can you read just the top four messages on this page?

A. Defendant replied, "Were your guys there on Friday?" Tarrio responded with an audio file that we were not able to recover. Then the defendant said, "There may be no evidence to support it, but they have sent emails to their followers urging them to call ABRA and report violations and also to call both Harry's and Hotel Harrington and tell them not to let PB back. Just giving you a heads up. On a brighter note, guy who stabbed your guys got locked up."

Q. Agent Hadley, through the course of your investigation, did you learn what -- when the defendant says, "guy who stabbed your guys got locked up," did you learn what that was referring to?

A. Yes.

Q. What was that?

A. That was referring to an incident on December 12th, 2020, in the evening, where two Proud Boys got stabbed -- at least two Proud Boys.
Q. Can you just read the last two messages, please?
A. The next entry is an audio file from Tarrio to the defendant that we were not able to recover. And the defendant replied, "I haven't pulled the report yet, but from what I learned on the scene last night, it was only one person."
Q. And can you please go to page 5.
And can you read just the top four messages on this page?
A. Tarrio replied to the defendant, "What's the general consensus with D.C. Metro and my guys?" Defendant replied, "That's too complicated for a text answer. That's an in-person convo over a beer." And then a few minutes later, "That Nomad Patriot 86 guy I asked you about before pisses me off though. He was posting shit on Parler about behind here this weekend. It took everything I had not to call him out on his BS." Tarrio responded, "I'll be in town til Thursday."
Q. So we see here that Tarrio asked the defendant, "What's the general consensus with D.C. Metro and my guys?" In this context, Agent Hadley, if you know, what does D.C. Metro refer to?
A. Likely the D.C. Metropolitan Police Department.
Q. And what time did Tarrio send that message to the

defendant?
A. 5:32 p.m.
Q. How soon after that did the defendant respond?
A. About 10, 11 minutes.
Q. And what is the significance of the date that this was sent, December 13th?
A. This is the day after the BLM banner was burned by Tarrio and other Proud Boys.
Q. Can you please read the rest of this page?
A. And Tarrio said, "We can go to the Dubliner." Defendant replied, "Perfect. I won't be working tomorrow, but how about Tuesday afternoon?"
Q. Stopping you there, Agent Hadley. If you know, what is the Dubliner?
A. It's a bar/restaurant in Washington, D.C.
Q. And can we go to page 6.
And can you read just those top five messages?
A. Tarrio responded, "Let's do it." The next entry is the next day, December 14th, at 1:09 a.m., from a user Chris PB, to the Telegram group chat Skull and Bones 2020/2021. It says, "LMFAO. Enriqueta is in trouble." Tarrio responded to the Scull and Bones group chat, "I'm going to prison for a hate crime."
Next entry is later that morning, 10:52 a.m., it's a Telegram private chat from Tarrio to the defendant, an audio

file that we were not able to recover. Within that same minute Tarrio sends a Telegram message to the group chat Cuffs and Gashes. He said, "Just contacted my D.C. Metro guy."
Q. Agent Hadley, we see that Tarrio sent a Telegram message to a group called Skull and Bones. Did you investigate that group chat?
A. Yes.
Q. And what did you learn?
A. It was a group chat consisting of about a dozen Proud Boys that was in existence from autumn 2020 through at least January 2021.
Q. We also see that the defendant -- or, that Tarrio sent a message to a Skull and Bones group chat. Did you investigate that chat as well?
A. Sorry, I thought that's what you just asked me.
Q. I'm sorry. Cuffs and Gashes. I'm sorry.
A. Yes, that one was about eight individuals. It was created after the stabbing, appearing to be able to -- or, be created to send updates and do some fundraising for the victims of the stabbing.
Q. Now looking here, before Tarrio sent that message to Cuffs and Gashes, did he send something to the defendant?
A. Can you repeat that?
Q. So we see that Tarrio sent a message to the Cuffs and Gashes group. He said, "Just contacted my D.C. Metro guy."

What time was that?
A. 10:52 a.m.
Q. And right before that did Tarrio reach out to the defendant?
A. Yes.
Q. And what did he do?
A. He sent an audio file that we were not able to recover.
Q. And just to be clear, Agent Hadley, during the course of your investigation, including your review of Tarrio's phone, did you find any evidence of any other communication between Tarrio and any other MPD officials prior to and around this time, 10:52 a.m. on December 14th?
A. No.
Q. Can you please continue reading the rest of the messages here on page 6?
A. The next entry is from -- it's a WhatsApp message from the defendant to his supervisor, Carolyn Montagna. It says, "I know what happened." And then, "Also, I'm having drinks with ET tomorrow afternoon to discuss some things with him."
Q. Agent Hadley, we see here the defendant wrote to Carolyn Montagna, "I know what happened." Did you investigate what that was referring to?
A. Yes.
Q. And how did you investigate that?
A. By looking at the other messages that were exchanged that

day between the defendant and Carolyn Montagna.
Q. And what did you learn? What was he referring to here?
A. It appears that they were referring to something that happened in a conference call that they were both on just prior to these messages, or during these messages.
Q. And can we go to page 7, please.
And can you read this page?
A. Montagna replied, "Eek. Is that smart to do social?" Defendant responded, "It's fine. Only the two of us and at a low-key place, not Harry's." Montagna responded, "Okay."
Next entry is a Telegram private chat from the defendant to Tarrio. He said, "Just heard your message. He will be released at the ramp at 3rd and C Streets NW this afternoon. The ramp is at the underpass between MPD headquarters and Department of Labor on Third Street. Is your guy Corey Nielsen?"
Q. Agent Hadley, you testified that Tarrio sent the defendant an unrecovered audio file at 10:52 a.m. How long after that message was sent did the defendant respond, "Just heard your message"?
A. About two hours.
Q. And can we go to page 8.
And can you read this page, please?
A. First entry is from a Telegram user Jon2A to Tarrio. It is a link to a Twitter feed from the D.C. Police Department and

appears to be a BOLO of sorts related to the burning of the banners. The next entry, later that day, 6:31 p.m., a Telegram chat from the defendant to Tarrio, "How about 4:30 tomorrow at Dubliner?" Tarrio responded, "Deal."

Later that night, 9:09 p.m., Tarrio sends a Telegram private chat to a user Jon2A. He said, "Yeah, I'm following this. Meeting with my D.C. Metro contact." Next entry, 9:35 p.m., from Tarrio to the defendant, a reply to the defendant, "Yes."

Q. Agent Hadley, how soon after Tarrio tells defendant, "Deal" to meet him at the Dubliner does Tarrio write to Jon2A in Telegram private chat, "Yeah, I'm following this. Meeting with my D.C. Metro contact"?

A. It's about 2 hours, 20 minutes.

Q. And can we go to page 9 of this exhibit.

And can you please continue reading?

A. This is the next day, December 15th, 7:54 a.m., from a user Colors and Creed, to the Cuffs and Gashes Telegram group chat. He said, "Corey is still in hospital or in custody, we haven't found out where. But we do know he was arrested. They charged him with misdemeanor petty assault, so we're hoping it's all over soon. When he is out of the hospital or jail, some boys back East are going to pick him up and bring him to the airport. We should know more when the lawyer we got for Corey gets back in touch with us this morning. Keep you posted,

boys."

Next entry, 2:03 p.m. on the 15th, it's an audio file from Tarrio to the defendant that we were not able to recover.

2:07 p.m. Tarrio sends a Telegram message to the Cuffs and Gashes group chat. He said, "D.C. Metro asking about Corey."

Q. And just stopping you there, Agent Hadley. To be clear, who asked Tarrio about Corey?

A. I think you're talking about in the Colors and -- the Colors and Creed. So someone in the Cuffs and Gashes group chat? One of the Proud Boys? Or their --

Q. So we saw -- I'm sorry. We saw the message from Enrique Tarrio to the Cuffs and Gashes group, right? He says, "D.C. Metro asking about Corey." Was there somebody who reached out to Tarrio to ask about Corey before this?

A. Can you refer back to the previous page?

Q. Go back to page 8, please.

Do we see at the bottom here --

A. Sorry. The defendant sent a message to Tarrio saying, "Is your guy Corey Nielsen?"

Q. And then going back, please, to page 9.

So when we see here that Enrique Tarrio reached out to the Cuffs and Gashes group, "D.C. Metro asking about Corey," who from D.C. Metro asked Tarrio about Corey?

A. The defendant.

Q. And can you just read that next message, please?
A. Sure. The defendant replied to Tarrio via Telegram, "Yes, I'm doing this training now, but should be done by 4, so I will be there at 4:30."
2:39 p.m., Jeffery Carroll sent an iMessage to the defendant, "Shane, have you received any information that would lead you to believe the Proud Boys are going to be here for inauguration?" Defendant replied, "My source told me months ago they would probably be here for inauguration, but nothing lately. I'm meeting with him this afternoon, so I will confirm."
Q. And can we please go to page 10. And can you please continue reading?
A. First is a message from the defendant to Tarrio, 4:14 p.m. It says, "On my way now." And then, "Have a table in the room to the right when you walk in." Tarrio responded, "Going down."
Q. Agent Hadley, did the defendant and Tarrio make plans to meet that day?
A. Yes.
Q. Where was that?
A. At the Dubliner, in Washington, D.C.
THE COURT: Miss Ross, really, if something is in evidence, it's in evidence and it doesn't have to come out of your mouth repeating it for it to be in evidence. I'd just ask

you to kind of think about the fact that she's saying something, then you're reading it back to her, and then a minute later you ask her again what did you just tell us? and I don't think that's necessary.

MS. ROSS: Yes, Your Honor.

THE COURT: Trust the listener a little bit more. Thank you.

BY MS. ROSS:

Q. Can you please continue reading the rest of this page, please, Agent Hadley?

A. Sure. The defendant sent an iMessage to Assistant Chief Jeffery Carroll, 5:52 p.m., "Just confirmed that Proud Boys are not planning on coming to D.C. for inauguration at this time. Carroll replied, "Hopefully it stays that way." Defendant responded, "He is not happy with what happened on Saturday and admitted that their crowd was way too big and unmanageable, so he wants to rethink what they will do in the future."

Q. Can we go to page 11.

And can you just read this page, please?

A. Carroll responded, "How about never come to D.C. again. Can he ID those people in the fliers?" Defendant replied, "He's claiming that he doesn't recognize them and said that he had close to 1,000 members here and doesn't know all of them." Carroll responded, "I bet."

The next entry is from Telegram user Noble Big

Bollocks 4 Degree Elder Britannia VP to the Skull and Bones group chat. He said, "Are you going to jail, Enrique?" Tarrio replied, "This might not be good. I admitted to burning the sign to an MDC officer."

Q. Agent Hadley, what time did Tarrio send that message to the Skull and Bones group?

A. 7:11 and 7:12 p.m.

Q. Approximately how long after the defendant messaged Tarrio that he had a table at the Dubliner did he send that message to the Skull and Bones group?

A. It was a little under three hours.

Q. Agent Hadley, did you investigate whether Tarrio had spoken to any other MPD officers that day?

A. Yes.

Q. And how did you investigate that?

A. By searching Tarrio's phone.

Q. And what did you learn?

A. Learned that he did not, or there was no evidence that he did.

Q. In other words, Agent Hadley, based on your investigation, who was the only MPD officer Tarrio was in contact with on December 15th, 2020?

A. The defendant.

Q. Can we go to page 12 of Government Exhibit 4018.

And can you please continue reading?

A. Next entry is from Tarrio, also to the Skull and Bones group chat. He said, "I told them to take me in." Two days later, December 17th, 2020, defendant sent a Telegram private chat to Tarrio, it was an image that we were not able to recover, and then a message, "You didn't tell me we are going to be neighbors," crying-to-laughing emoji.

Tarrio responded with an audio file that we were not able to recover. Defendant responded, "If that's the case, sounds like you have a leak." Tarrio responded with another audio file that we were not able to recover. And then the defendant said, "It's an antifa IG handle."

Q. Can we please go to page 13. And I just want to pause here at the top of Government Exhibit 4018, at page 13.

And I want it ask you: What is this post here?

A. This entry represents a Parler post from Enrique Tarrio's account on Parler.

Q. Were you able to obtain a copy of this post?

A. Yes.

Q. Is a copy of that post marked as Government Exhibit 4004?

A. Yes.

Q. And whose account was this posted to?

A. It was known to be Enrique Tarrio's account.

Q. And can you please read this post?

A. Sure. It says, "The FBI is currently the investigating a supposed 'hate crime' perpetrated by the Proud Boys. They're

even offering a reward. I'm here to tell you that there was no hate crime committed. The only hate there is in my heart is for communism and an authoritarian government. BLM is a Marxist movement. It isn't about the color of someone's skin.

"Against the wishes of my attorney, I am here today to admit that I am the person responsible for the burning of this sign and I am not ashamed of what I did because I didn't do it out of hate, I did it out of love. Love for a country that has given my family so much.

"The burning of this banner wasn't about race, religion, or political ideology, it was about a racist movement that has terrorized the citizens of this country. I will not stand by and watch them burn another city. So let me make this simple: I did it. Come get me if you feel like what I did was wrong. We'll let the public decide. Forever proud, Enrique."

Q. Agent Hadley, we see in this post that Enrique Tarrio referenced the hate crime. If you know, is Enrique Tarrio communicating with somebody about the banner burning being charged as a hate crime?

A. Yes.

Q. And who is that?

A. The defendant.

Q. Did you find evidence that Tarrio was communicating with anybody else about the banner burning being charged as a hate crime?

A. No.

Q. Can we Zoom in on the next gray box on this page, please.

Agent Hadley, what is this?

A. This represents a *Washington Post* article in which the *Post* says that they interviewed, had a telephone interview with Enrique Tarrio and that he stated that he burned the BLM banner.

Q. Were you able to obtain a copy of that article?

A. Yes.

Q. And can we please bring up Government Exhibit 4001, please.

Is this a copy of that article?

A. Yes.

Q. We will not read this entire thing, but can you just please read the top -- what the title of the article is, please?

A. "Proud Boys leader says he burned Black Lives Matter banner stolen from church during demonstrations in D.C."

Q. Can we please go to page 3.

And can you please read the third and second paragraphs from the bottom, beginning with, "He said?"

A. "He said, 'If they want to get me for destruction of property, I won't even give them a fight. I'll tell them guilty.' But he called a hate crime enhancement 'an overreach' and 'an attempt to silence us.' Tarrio said that on previous demonstrations his supporters had flags and hats stolen and burned in the streets, along with American flags, 'and we

haven't seen any prosecution there.'"

Q. And can we please go to page 14 of Government Exhibit 4018, please.

And can you please continue reading?

A. I think there was one message on the previous page that we skipped.

Q. Can we go back to page 13, please.

Can you read just that last message there?

A. This is a WhatsApp message from Carolyn Montagna to the defendant. "Did you see the crime solvers tip?"

Q. And now can we go to page 14 and can you please continue reading?

A. Another message from Montagna to the defendant. "On 12-18-20, at 0145 hours, stating that a male by the name of Henry Enrique Carrio, who is a member of the Proud Boys, is claiming responsibility for the destruction of property at the church located in the 400 block of 11th Street Northwest, NW. The caller stated that Mr. Carrio is living in Miami, Florida, at 5730 N.W. 2d Street." Defendant replied, "Oh, fuck." Montagna responded, "What? The tip?" Defendant said, "Yes, remember what he told me?" Montagna replied, "I mean, it's for Mr. Carrio."

Q. And can we go to page 15. And can you read this page, please?

A. Montagna said, "Yes. But this tip is for Carrio,"

laughing-til-crying emoji. Defendant replied, "Or the CIC screwed up and got his name wrong," tongue sticking out, winky face emoji. Montagna replied, "It's not recorded, so the world may never know."

This is a Telegram secret chat, December 18th, 7:34 a.m., from the defendant to Tarrio. He said, "Hey, brother, did you call in an anonymous tip to MPD claiming responsibility for the banner burning?"

Q. Agent Hadley, this was a Telegram secret chat. Have we seen a Telegram secret chat before this message between Tarrio and the defendant?

A. No.

Q. What is the significance of a Telegram secret chat?

A. Using the secret chat function on Telegram allows for various features, including end-to-end encryption and the self-destruct feature is an option to be used on secret chat.

Q. And what is the significance of this specific Telegram secret chat to investigation?

A. That it was the first secret chat between the two.

Q. And can you please continue reading the rest of this page?

A. Next message is from the defendant to Carolyn Montagna via WhatsApp. He said, "I think he called that tip in on himself because very few people know that Henry is his legal name." Montagna replied, "Hahaha, maybe? I thought it's out there."

Q. And can we please go to page 16.

And can you please continue reading?
A. Then she said, "I've seen it online before." Defendant replied, "You have? I've always seen 'Enrique.'" And then Montagna sent two images to the defendant, appear to be internet searches. And then a message, "It's definitely out there."
Q. And can we please go to page 17.
And can you read this page?
A. Defendant replied, "Ahhh." The next entry is from Tarrio to the defendant, responding to the previous Telegram secret chat. He said, "I did more than that. It's on my social media." Defendant replied, "I gotcha. Someone called in an anonymous tip saying that you claimed responsibility for it."
Tarrio replied, "This wasn't a hate crime, and I want to see it play out." And the defendant said, "I'm curious to see what happens, too. I will check with our CID people to see if they have you on video. Also, you've got the FBI and USSS all spun up over what was said on Infowars the other night about PB dressing up as Biden supporters on inauguration day. Got an email first thing this morning," surprised-face emoji.
Q. Agent Hadley, when the defendant tells Tarrio, "I will check with our CID people to see if they have you video," if you know, what does CID refer to?
A. MPD's Criminal Investigations Division.
Q. And that's a division within MPD?

A. Yes.
Q. And to be clear, what time did the defendant send this message?
A. 10:06 a.m.
Q. In that next message where the defendant says, "You've got the FBI and USSS all spun up," do you know, what does USSS refer to in this context?
A. United States Secret Service.
Q. Is that another law enforcement investigative body?
A. Yes.
Q. And, Agent Hadley, was inauguration day on January 20th, 2021?
A. Yes.
Q. And how far in advance of that day did the defendant warn Tarrio of this?
A. About a month.
Q. And can we please go to page 18. And can you please continue reading?
A. The first five messages are a series of messages from Tarrio to the defendant. There you have an audio file and then an audio file, another audio file, then a message. "LOL. Just searched. I never said this, haha," then an image and then another audio file. None of the files that we were able -- or, we were not able to recover any of those files.
And the defendant replied, "LOL. Yep, that's exactly

what O got from FBI and USSS."
Q. And can we please go to page 19.
Can you continue reading?
A. Tarrio responded, "The video is out there." The defendant replied, "I think it was included. I'm just going to let them get all freaked out. They're idiots." Tarrio responded, "LOL." And then an audio file that we were not able to recover.
Q. Can we please go to page 20.
And looking at this top email, what does the defendant do here on December 18th, 2021?
A. He sent an email to Captain David Hong and Commander Parsons, as well as others. Subject line: BLM banner. He said, "Good afternoon, all. Is anyone aware of whether the burning of the BLM banner is being investigated by the FBI as a possible hate crime? I know we talked about it on Sunday, but I didn't hear anything about the FBI taking over the investigation.
"As you may be aware, the current chairman of the Proud Boys, Enrique Tarrio, just publicly admitted that he was responsible for its destruction," with an image of Enrique Tarrio's Parler message attached.
Q. Agent Hadley, if you know, who is David Hong?
A. He's a captain at MPD at the time within the special liaison branch.

Q. And if you know, what unit was Leslie Parsons in?
A. Parsons was in the criminal investigations division.
Q. Again, what time did the defendant send this email?
A. 2:46 p.m.
Q. And approximately how soon after the defendant told Tarrio, "I will check with our CID people to see if they have you on video" does he send this email?

Can we go back to page 17, please.
A. I believe it was about four hours.
Q. So we see here the message that defendant sent saying, "I will check with our CID people." What time was that sent?
A. 10:06 p.m. So closer to five hours.
Q. And then can we please go back to page 20.

And can you please continue reading?
A. Sure. David Hong responded via email. He said, "Humm, I talked to my contacts, Special Agent Gano, and linked him with DDU, but he advised their office would unlikely take the case federal. I can find out more."

The next entry is an email from the defendant to Carolyn Montagna, Commander Parsons, Sergeant Nicole Copeland, and others. Subject line: Phone tip. He said, "Please let me know if you need anything related to this. I know him, so I can probably fill in any blanks you may have. I have attached his picture for your awareness," with an image of Enrique Tarrio.

Q. And can we please go to page 21.

And can you please continue reading?

A. Defendant replied to the BLM banner email thread. I said, "Copy. This post may have been mistaken. I would be surprised if FBI took over this investigation." Captain Hong replied, "I just talked to Matt Gano. They are what they call 'assessing it.' They have not indicated or advised publicly that they are attaching themselves, so the post may be false. At this point they are just assessing DDU" -- sorry, "assisting DDU where they can." Defendant replied "Copy. Thank you, David."

Next entry, later that afternoon, 3:33 p.m., Tarrio sends a Telegram message to the Skull and Bones group chat. He said, "We got the jump on the narrative for the banner burning. This should make it next to impossible for them to use the 'hate crime' enhancement, as per my contact at D.C. Metro. This stays in here."

Q. Agent Hadley, if you know, was MPD considering whether to charge the BLM banner burning with a hate crime enhancement?

A. Yes. Investigating as such, and the U.S. Attorney's Office would charge.

Q. And we see in this message that Tarrio sent at 3:33 p.m., that he references "My contact at D.C. Metro." Agent Hadley, prior to December 18th at 3:33 p.m., who was the only person at MPD that you found evidence that Tarrio was communicating with?

A. The defendant.

Q. And, Agent Hadley, were there Telegram secret chat messages that the defendant sent to Tarrio on December 18th prior to 3:33 p.m. that the investigative team was unable to recover?

A. Yes.

Q. And how many was that?

A. It was at least four or five.

Q. And can we please go to page 22. And can you please read this page?

A. First entry is from Tarrio to the defendant, 4:09 p.m. He said, "So what do you think?" Defendant replied, "About which part? You clearing the air about the Biden gear or the BLM banner?" Tarrio responded, "BLM banner. You think they'll make a stink of it?" And then he replied to the defendant's previous message, "The Biden gear is a nonissue. That's just media retards."

Q. And can we please go to page 23. And can you read that top message?

A. Defendant replied to Tarrio via Telegram secret chat. No, a bit of the opposite. I've been talking to CID about it. They wanted to know what I know about your group and if I think you all are racist. I told them you are made up of a lot of Latinos and Blacks, so not a racist thing. If anything, I said, it's political, but then I drew attention to the Trump and American flags that were taken by antifa and set on fire. I said all those would have to be classified as hate crimes,

too. It's not being investigated by FBI though, just us," parenthesis, "MPD."
Q. Agent Hadley, what time was this message sent?
A. 4:55 p.m.
Q. How soon after the defendant emailed David Hong was this sent?
A. I'm sorry, could you go back?
Q. Can we go back to page 20, please.
Looking at that email at the top of the page, that the defendant sent to David Hong, what time was that sent?
A. So to answer your question, it was about two hours.
Q. And can we please go back to page 23.
So again, Agent Hadley, how long after did the defendant send this message to Tarrio?
A. It was about two hours.
Q. And can you please continue reading?
A. Tarrio responded, "Ah, okay. Awesome." And then Tarrio sends a Telegram message to the Skull and Bones group chat. He said, "For our eyes only." And then he repeated the message he had just received from the defendant.
Q. Agent Hadley, the message there at the bottom that Tarrio sent to the Skull and Bones group at 4:56, is that message cut and pasted from the defendant's?
A. Appears to be, yes.
Q. And how soon after the defendant sent Tarrio that message

does Tarrio send those bottom two messages to the Skull and Bones group?
A. Within two minutes.
Q. Is it fair to say that the information went from the defendant to Tarrio and then to other Proud Boys?
A. Yes.
Q. And can we please go to page 24.
And can you read just the top four messages on this page, please, Agent Hadley?
A. First message is from Enrique Tarrio to his contact Amy Harris Photo. It says, "Okay. So off the record, you won't be having any fun watching me get put away." Next entry is from the defendant to Tarrio. He said, "I don't think they have any pictures of you, though." And then a message from Tarrio to Telegram user Mexizzachet, "So I just got word. We're clear on the banner."
Q. Stopping you there. I just want to review the timing of these messages. How soon after the defendant tells Tarrio, "I don't think they have any pictures of you, though," does Tarrio message Mexizzachet, "So I just got word"?
A. Within one minute.
Q. And how soon after the defendant tells Tarrio, "I don't think they have any pictures of you, though," does Tarrio message the same person, "We're clear on the banner"?
A. Within two minutes.

Q. And so, again, is it fair to say that the information went from the defendant to Tarrio, then to others?
A. Yes.
Q. And can you please continue reading the bottom three messages on this page?
A. Tarrio responded to the defendant, "Strange." Then Tarrio sends a Telegram secret chat to his contact Amy Harris Photo. It said, "D.C. Metro just told me they won't be pursuing it." Amy Harris Photo responded, "What about the FBI?"
Q. And can we go to page 25. And can you read just that first message?
A. Tarrio responded, "FBI isn't investigating."
Q. Agent Hadley, who told Enrique Tarrio that FBI wasn't investigating?
A. The defendant.
Q. And how soon after the defendant wrote to Tarrio, "It's not being investigated by FBI, though" did Tarrio inform Amy Harris that FBI isn't investigating?
A. It's about 20 minutes.
Q. Agent Hadley --
THE COURT: Do you know who Amy Harris is?
BY MS. ROSS:
Q. Agent Hadley, do you know who Amy Harris is?
A. She's a contact of Enrique Tarrio's.
THE COURT: That's all we know. Okay. All right.

BY MS. ROSS:
Q. Can you please just continue reading page 25.
A. Amy Harris Photo responded to Enrique Tarrio, "Are they going to still look for your guys?" Tarrio responded, "They signal boosted D.C. Metro. They can't because they're not investigating."
The next entry is an email from Sergeant Nicole Copeland to then Detective Mufti, forwarding an email from the defendant. Subject line: Phone tip. She said, "If anyone has questions on him, Lt. Lamond states that he knows him."
Next entry is from Tarrio to the defendant. It's an image that we were not able to recover. And that Telegram secret chat was the next day, December 19th.
Q. And can we go to page 26.
And can you please continue reading?
A. Lamond -- defendant responded to Tarrio, "Got it. We will see if we can ID the person." Then later that morning the defendant sends Tarrio an image that we were not able to recover and a message, "Have you heard anything about this? Is this legit?"
That same morning, 9:22 a.m., the defendant sends an email to a few of his contacts, John Donohue, Julie Farnham, William Nasworthy, Mark Varanelli, and others. Subject line: Possible January Demo. He said, "Good morning, all. I hate to be the Christmas Grinch, but please see below post regarding a

possible big demo on January 6th. So far there have not been any permit applications for this that I'm aware of. We are hoping this is a hoax, but will keep digging to vet this information. If anyone locates anything to corroborate or refute this info, please share with the group." And a link to a Twitter account.

Q. And can we please go to 27.

And will you just continue?

THE COURT: All right. This seems like a good time to take a break. So that's what we will do, and we'll resume in approximately ten minutes.

MS. ROSS: Thanks, Your Honor.

(Recess from 11:32 a.m. to 11:47 a.m.)

THE COURTROOM DEPUTY: We're back on the record with criminal case 23-177, United States of America versus Shane Brian Lamond.

BY MS. ROSS:

Q. Agent Hadley, we now see page 27 of Government Exhibit 4018 on the screen. Can you please read the messages on this page?

A. Yes. The first is a message from Tarrio to the defendant, it's an audio file that we were not able to recover. Next entry is an email from the defendant to the same group as before, which was -- sorry -- John Donohue, Julie Farnham, William Nasworthy, Mark Varanelli, and others. Subject line: Possible January Demo. He said, "Looks like this may be a

legitimate event. I know the author of this article. I have reached out to her to see if this thing is growing legs," and then a link to an article in *The Gateway Pundit*.

Next entry is from the defendant to Tarrio, a Telegram secret chat that reads, "No, we really can't catch a break. I just found the article written by Cassandra. I just asked her if she thinks this is going to grow legs. Would you let me know if your group decides to participate?" Tarrio responded, "If we do, it will be extremely small and not in colors. No night march." Defendant replied, "Copy that. I appreciate it."

Q. And can you please continue reading page 28?

THE COURT: Can I ask, Ms. Abbe, when you were calling out blocks before, you were doing the top of the page and the bottom of the page. When you call out the whole page, it's just as small as it was before you called it out.

MS. ABBE: Okay.

THE COURT: So I was wondering if you could help us with that. Thank you.

MR. SCHAMEL: Judge, we have a printed copy. We have printed copies, that's what I'm doing.

THE COURT: I have -- thank you. This is easier because everybody is here. Go ahead.

A. First entry is from Tarrio to the defendant. There's an attachment, a PDF entitled *The 2020 Election Disruption Guide*

by Antifa. Defendant replied, "Thanks brother. We've had that for a few months now. They posted that on a website a while ago."

Tarrio responded, "I don't know if it's legit." Defendant said, "We think it was more of a poison pen document. The person who posted it wanted to stir shit up, but we didn't see any of this actually materialize."

And then the defendant sends an image to Tarrio that appears to be a screenshot from social media regarding January 6th. Tarrio responded with a grimace face emoji.

Q. Can we please go to page 29.

And will you just read the messages on this page?

A. Then Tarrio sent another message -- sorry, the defendant sent another message to Tarrio that said, "It's growing legs all right," and a link to a Fox 5 D.C. article entitled, "Trump promises 'wild' protest in D.C. on Jan 6, the day Congress to count Electoral votes."

The next entry is from Tarrio to his contact Amy Harris Photo. He said, "FBI said they'll 'look into it.'"

Next entry, later that day, the defendant sent an iMessage to a group chat that included his chain of command. He said, "From my source about Jan 6. If we do, it will be extremely small and not in colors, no night march," which was the text that he received from Tarrio.

Next entry is from Detective Franklin Then. He

called the defendant and that call was connected for 5 minutes and 19 seconds at 5:58 p.m.

Q. Agent Hadley, who is Franklin Then?

A. He's a detective from MPD that was on the riot task force at this time and part of the group investigating the BLM banner burning.

Q. And can you please continue reading page 30 of this exhibit?

A. The next entry is an email from Detective Then to the defendant, Detective Mufti and others. Subject line is: Subject in photo. And there's an image attached of the burning of the Black Lives Matter banner. The defendant replied to Detective Then with a phone call that lasted a minute and 17 seconds, and then about 25 minutes later another phone call that lasted a minute and 33 seconds.

The next three entries are all phone calls. The first is from Commander Parsons to the defendant. That call lasted 8 minutes and 5 seconds, and then two calls from Detective Then to the defendant, each of went to voicemail, lasted 2 seconds.

Q. And can you please continue reading on page 31?

A. The defendant called Detective Then back. That call lasted a minute and 43 seconds. About 5 minutes later the defendant sent a Telegram secret chat to Tarrio that said, "Police want to talk to you about the banner. You have a certain phone

number you want me to give them?"

Q. Agent Hadley, stopping you there. Did you find any evidence that anybody at MPD directed the defendant to reach out to Enrique Tarrio to tell him that the police wanted to speak to him?

A. No.

Q. And can you please continue reading?

A. Next entry is an email from the defendant to Detective Then and Detective Mufti and others. He said, "Here is what he looked like and how he was dressed in December 12th," with two images of Enrique Tarrio attached. Detective Then responded by saying, "Send me his phone number and DOB, address, if you have it."

Q. And can we go to page 32.

And can you just read this page, please, Agent Hadley?

A. Defendant replied to Detective Then with an email that included Henry Enrique Tarrio's name, date of birth, address, and phone number.

The next entry is a Telegram group chat from user Briam AG to the State Head Leadership chat. He said, "Your admitted relationship with law enforcement, combined with your support of Biggs when he threatened to have brothers arrested and your willingness to turn yourself in leads a lot of us to believe that you may have some reason to be confident the law is not a threat to you. The rest of us don't have this level

of faith and trust in the pigs."
Q. Agent Hadley, did you investigate this group, the State Head Leadership chat?
A. Yes.
Q. What did you learn?
A. It was a group of several dozen Proud Boys. It was in existence from autumn 2020 through at least January 2021.
Q. Would you continue reading the rest of this page?
A. Enrique Tarrio responded to the same chat, "Stay on topic. We're talking about contacting LEO here. I literally just contact them when we're in town."
Q. And, I'm sorry, I think you may have missed the top message. Will you read that?
A. Apologies. First message from Enrique Tarrio to the State Head Leadership chat, "I admitted to talking to them about our movements in D.C. and not on this last trip. That's not a secret. Never was. Anyone who has ever planned something with me knows I contact local LEO to keep a level of separation between the groups."
Q. Thank you.
And can we go to page 33?
And will you read just the top four messages on this page, please?
A. The first entry is a reply from Tarrio to the defendant. He said, "Miami-Dade PD reached out. I'm going to use my

Fifth. I'll be in D.C. on the 6th. If MDC wants to talk to me, they can see me there. Are they pushing the hate crime thing?" Defendant replied, "Give me a call when you can." Tarrio responded, "Through here?" And then Tarrio called the defendant and that call lasted 411 seconds, or about 7 minutes.
Q. Agent Hadley, approximately how long after Tarrio asked the defendant if MPD is pushing the hate crime thing does the defendant tell Tarrio to call him?
A. About 11 minutes.
Q. And how soon after that does Tarrio call the defendant using Telegram?
A. Within two minutes.
Q. Can you just read the last message on this page, please?
A. This is a call from Commander Leslie Parsons to the defendant at 5:40 p.m. on the 20th, call lasted 3 minutes, 4 seconds.
Q. Can we please go to page 34. And will you continue reading?
A. There's another call from Commander Parsons to the defendant at 5:47 p.m. That call listed 59 seconds. About 50 minutes later the defendant sent Commander Parsons an email that said, "Good evening, Commander. I have viewed the attached photograph and it is difficult for me to conclusively identify with 100 percent certainty that the individual depicted in this photograph is Mr. Henry Enrique Tarrio, since

I cannot see his whole face. However, I physically observed Mr. Tarrio on December 12th and have reviewed multiple videos that captured him on December 12th in Washington, D.C. Based on a comparison of those videos with the attached photograph, I believe this is Mr. Henry Enrique Tarrio kneeling down next to the banner, based on the clothing he is wearing, the placement of the patches, and the drink on his tactical vest and the limited view of his face."

Q. And can you please continue reading on page 35. Will you read just that top email there, please?

A. This is another email from the defendant, this one to Commander Parsons, Sergeant Nicole Copeland. It says, "The first picture from the article is one of the pictures I reviewed. That is 100 percent him and accurately depicts how he looked when I physically observed him on December 12th. The second and third pictures appear to be the same guy who was kneeling down next to the banner in the original photograph I was asked to identify.

"Again, I believe this is Mr. Tarrio, based on the clothing he is wearing, the placement of the patches and the drink on his tactical vest and the limited view of his face. I forgot to provide the background on my familiarity with Mr. Tarrio in my previous email. I have known him for almost 1.5 years, since meeting him while working with the Demand Free Speech First Amendment event in July 6th, 2019. I have seen

him in person and spoken with him approximately five to six times since first meeting him in July 2019." And there are three images attached.

Q. Agent Hadley, we see here that the defendant wrote, "I have seen him in person and spoken with him approximately five to six times since first meeting him in July 2019." And I want to just ask you a couple follow-up questions on that.

First, Agent Hadley, did you count the number of times the defendant and Tarrio spoke on the phone prior to December 20th, 2020?

A. I did.

Q. And how many times was that?

A. It was 24 times that were connected for over a minute and then there were more, about another 15 under a minute.

Q. And next can we please bring up Government Exhibits 4029 and 4030, side by side, please.

And, Agent Hadley, looking first here at Government Exhibit 4029. We looked at this a little bit earlier in your testimony. How many messages between the defendant and Tarrio were recovered before November 7th, 2020?

A. Two hundred and eighty-three.

Q. And how many were recovered between November 7th and December 12th, 2020?

A. A hundred and forty-nine.

Q. So if we add up those messages, at the time the defendant

wrote that he had spoken to Tarrio approximately five to six times, on December 20th, 2020, is it fair to say that you had recovered at least 432 messages between the defendant and Tarrio?
A. Yes.
Q. Okay. And can we please go back to page 35 of Government Exhibit 4018.
And can you please continue reading that page?
A. Next entry is a WhatsApp message from the defendant to Carolyn Montagna. It says, "Also, Parsons has called me multiple times this evening. They are really going after ET." And then there was an email from Commander Parsons to the defendant and Sergeant Copeland in response to his email, it says, "Thanks."
Q. And can we please go to page 36.
And, Agent Hadley, will you continue reading, please?
A. First message is a Telegram message from Tarrio to a contact of his, Oly, that says, "They don't have anything. Just confirmed. They're searching. That's why they want to talk." And then a message that we were not able to recover.
Oly responded, "Do what Martin said. If you do that, they can't talk to you." And then a photo that we were not able to recover -- or, a photo and a message that we were not able to recover. "Once you do this, they can't talk to you." Tarrio responded, "I don't think they can force me to talk to

them, regardless of legal representation. I'm going to get my lawyer to do it anyway."

Q. And can we please go to page 37.

And will you just read the four messages on this page, please?

A. Oly responded to Tarrio, "They will try, if you are not lawyered up. Will explain on a case that I have when I see you. They haven't been able to arrest him because of this. They have nothing on him, so they were hoping to talk to him, but he lawyered up."

Next entry is an email from Sergeant Nicole Copeland to Detective Mufti. It's a forward of the defendant's previous email. Another message from Oly to Tarrio on Telegram, "Your pain-in-the-ass baby sister wants to know if you contacted the attorney."

Q. Agent Hadley, to what date and time does this bring us?

A. Through December 20th, 2020.

Q. At what time?

A. 9:56 p.m.

Q. Okay. We're going to continue moving on.

So can we please bring up Government Exhibit 4019, please.

And what is this exhibit?

A. This is all entries from the master summary chart dated December 21st to December 28th, 2020.

Q. And can you read this page, please?
A. Yes. The first is a text message from Detective Mufti of MPD to Enrique Tarrio. He said, "Good morning, Mr. Henry Tarrio. This is Detective Mufti from Metropolitan Police Department, Washington, D.C. Do we have permission to reach out to your counsel?" Tarrio responded, "Detective Mufti, thanks for reaching out. Out this point I haven't retained my attorney in this situation yet, but I won't need my attorney to inform you that I will be using my Fifth. Thanks." And then a message to correct a typo. Detective Mufti replied, "Received. Thanks."
Q. Stopping you there. Agent Hadley, through the course of your investigation, did you find any evidence that the defendant ever told Detective Mufti that he had told Tarrio that MPD wanted to talk to him?
A. No.
Q. Thank you. And can you just read the rest of this page, please?
A. The next three entries are Telegram private chats from Tarrio to his contact Oly. The first is a voice or instant video that we were not able to recover. Same for the second. And the third is a phone call that was canceled and lasted zero seconds.
Q. And can we please go to page 2.
And will you read this page, please, Agent Hadley?

A. Oly responded to Tarrio, "Call again." And then a phone call -- or, I should say, a Telegram call that lasted 139 seconds. The next entry is an email from Detective Mufti to AUSA Paul Courtney, Commander Parsons, Sergeant Copeland, and others. Subject line: Review Warrant. CCN 2017-6767, destruction of property/church, hate crime. It says, "Good evening, all. Please see the attached warrant for review." And there are multiple attachments to the email.

This is on December 22nd, 2020, at 8:08 a.m. It's a Telegram secret chat from Tarrio to the defendant. It is a screenshot of the messages between Tarrio and Detective Mufti. Defendant replied -- I'm sorry, the next entry is the defendant setting the self-destruct timer to 5 seconds. And the next entry after that is Tarrio setting the self-destruct timer to 30 seconds.

Q. Agent Hadley, message ID 27, what is the significance of that to your investigation?

A. This is the first time that either the defendant or Tarrio set the self-destruct timer within the Telegram secret chat.

Q. And can you explain the significance of setting the self-destruct timer to your investigation?

A. The timer essentially creates -- or, after someone sets -- after a user sets the timer all messages within that secret chat are destroyed after received to whatever timeframe the user sets until changed.

Q. And can we please go to page 3 of this exhibit.

And can you please read these communications?

A. Next entry is an email from the defendant to Commander Parsons. Subject line: Podcast. He says, "Good afternoon, Commander. I have listened to the podcast and can confirm with 100 percent certainty that the individual speaking about white supremacy, beginning at the 15:39 mark on the podcast, is Henry Enrique Tarrio."

And there's another email later that day from the defendant to Detective Then, Detective Mufti, Commander Parsons, and Sergeant Copeland. Subject line: Updated list of right-wing members. He said, "Good afternoon, all. Please see below web link containing an updated list of members associated with right-wing extremists for your awareness," with a link to airtable.com.

The next entry is an email from Detective Mufti to AUSA Courtney, Commander Parsons, and Sergeant Copeland, among others. It is a resubmission of the same warrant that was referred to earlier. It says, "Warrant attached," with a PDF attached.

The next entry is several days later. It's on December 25th, 2020, from the defendant to Tarrio. There's a self-destruct timer for the message for 30 seconds. And it says, "Just a heads up, CID had me ID you from a photo you posted on Parler kneeling down next to the BLM banner, so they

may be submitting an arrest warrant to U.S. Attorney's Office."

Q. Can we please go to page 4.

And, Agent Hadley, will you read these messages?

A. First two are emails. The first from AUSA Courtney to Julianne Johnston, also with the U.S. Attorney's Office, and others. It's a reply to the draft warrant sent by Mufti. It says, "FYI, I will call Lamond now for additional info, but the ID procedure appears to be captured in these emails. I will give you a ring once I've spoken to Lamond." And there are multiple attachments.

Next is an email from Sergeant Copeland to AUSA Courtney, AUSA Johnston, Detective Mufti, and others. Subject line: Phone tip. She said, "Good morning again. I just went back through my emails on this. This email was initially sent on Friday, Dec 18, in which Lieutenant Lamond advised that he knew the subject. Hence, then reached out to him the following day, when an affidavit was requested." Both of those are from December 28th, 2020.

Same day, the defendant sent a WhatsApp message to Carolyn Montagna. "Yep, although I have to wait another 30 minutes to eat, but that's okay. USAO is calling me in ten minutes for ID on Tarrio." Next entry, later that day, "Tarrio's January 4th, 2021 American Airlines flight 4782 from Miami to DCA booked."

Later that evening Tarrio sent an iMessage to his

contact Linda C. He said, "I'm getting in on the 4th. I have a feeling D.C. Metro is going to pick me up at the airport." Linda C. replied, "I don't know why he would call us there to lose."

Q. Now going to page 5.

Will you just read this page, please?

A. Then Linda C. said, "I think he has something up his sleeve." Tarrio responded, "I hope so." And then Tarrio sent a screenshot of his text messages with Detective Mufti to Linda C. Linda C. replied, "You have to be fucking kidding me." Tarrio responded, "That's why I'm getting there a day early."

Q. Agent Hadley, where does that bring us to?

A. Through December 28th, at 2020, at 10:15 p.m.

Q. Going to keep moving along chronologically. Next we're going to bring up Government Exhibit 4020. What is this exhibit?

A. All entries from the master summary chart dated December 29th, 2020 through December 30th, 2020, at 2:39 p.m.

Q. And will you read this first page, please?

A. First message is a WhatsApp message on December 29th from Ben Tyler to the defendant. He said, "Have you heard from ET? Have they changed their mind and plan to come next week?" Defendant replied, "Yep, we've been in communication. They are still planning on coming next week, but he says it will be a much smaller group. There is also an arrest warrant for him

pending with USAO for the destruction of the BLM banner." Tyler responded, "Okay. Video was located?"

Defendant replied, "Yes, but he was only standing next to it. No evidence that he actually torched it. He also posted a picture on his Parler page when he took responsibility for it." Tyler responded, "Okay. So let's make a charge that won't really stick, but then we can say we did something." Defendant replied, "Yep, basically. Lots of pressure for an arrest on this one." And these are all December 29th.

Q. And can we please go to page 2.

And will you please continue reading?

A. Still December 29th, the defendant sent an iMessage to Commander Parsons. "Any update on the warrant? Did the USAO approve it?" Parsons responded, "Not yet." Defendant said, "Copy. Give me a call when approved and we can discuss how you want it served."

Next entry is an email from the defendant to William Nasworthy. Subject line: Counters. I'm sorry, William Nasworthy and others. He said, "Good morning, all. You probably already have this, but wanted to make sure you all saw this post from the counter groups for January 6th and 20th. Of note, it looks like they've changed their tactics and are not posting their plans on social media in advance this time. That may be because we implemented the exclusionary zone around BLM Plaza a day prior to when they were planning to assemble there

at the last go around. Looks like they may have secured their comms this time around." That's an email that was on -- sorry, December 30th -- I'm sorry, could you pull it back up?

Seems like these two are incorrectly out of order. The next entry is December 29th, 2020, 7:49 p.m., an email from Detective Mufti to AUSA Courtney, Commander Parsons, and Sergeant Copeland. It is a resubmission of the same arrest warrant as before. It says, "Please see the attached resubmission in reference to defendant Henry Tarrio's case," with multiple attachments.

Q. Can we go to page 3, please.

Can you please continue reading?

A. Next entry is a response to the defendant's email about counters, from William Nasworthy. It says, "I saw Enrique from the Proud Boys. He said on Parler that they were ditching their standard attire, staying at numerous different hotels, splitting up into smaller groups to cover more ground, and were possibly going to dress in all black, like antifa. My guilty pleasure of perusing social media feeds."

Defendant replied to Nasworthy, "LOL. While I believe that the splitting up part is true, I think the dressing in all black was partly him playing with the media and counter groups. I know they are trying to keep a much lower profile this time around," and then an image attached of a screenshot of social media.

The next entry is a call from Commander Parsons to the defendant. That call went to voicemail, lasted 3 seconds. The defendant returned Parsons' call, 11:22 a.m. That call lasted 4 minutes and 57 seconds. And then about three hours later the defendant called Parsons again, that call went to voicemail.

Q. And then will you just read the last page of this Exhibit, please, page 4?

A. Parsons sent an iMessage to the defendant in reply, it said, "2 minutes." Defendant said, "Copy." The next entry was a phone call from Commander Parsons to the defendant that lasted 6 minutes.

Q. Can we please bring up Government Exhibit 4021.

And, Agent Hadley, we'll keep moving along. Can you please just read this first page? Or, what is this exhibit?

A. All entries in the master summary chart from December 30th, 2020, at 5:56 p.m., through December 31st, 2020.

Q. Thank you. Now we'll continue reading.

A. First entry is an email from Detective Mufti -- I'm sorry, to Detective Mufti from the Superior Court judge. It is subject line: 2020 CRWSLD 005553, Henry Tarrio. It says, "I have attached the signed warrant," with a PDF attachment. That email was at 5:56 p.m. At 6:20 p.m. the defendant placed a Telegram call to Tarrio. That call was connected for 849 seconds, or approximately 14 minutes.

Q. So, Agent Hadley, approximately what time did the defendant and Tarrio hang up after that call?
A. It would have been about 6:34.
Q. Thank you. Can you continue reading?
A. At 6:35 p.m. Tarrio sent an audio file to user Mamafe via Telegram. And at 6:38 p.m. Tarrio sends a Telegram message to the Ministry of Self-Defense group chat. It said, "Emergency voice chat, hit join." The next entry is from Robert Glover to -- he called the defendant. That call was connected for 9 minutes, 56 seconds.
Q. Just a couple questions here, Agent Hadley. First, who is Robert Glover?
A. He was an employee of MPD.
Q. And did you find any communications between Robert Glover and Enrique Tarrio during the relevant time period of your investigation?
A. No.
Q. And so, Agent Hadley, you said that the defendant Tarrio hung up around 6:34 p.m. How soon after that did the defendant reach out to Mamafe?
A. Within 2 minutes.
Q. How soon after that did he tell the Ministry of Self-Defense group to hit join on an emergency voice chat?
A. It was 3 minutes after that.
Q. And what does Tarrio do next? Can we read the top message,

please, on the next page?
A. Next, Tarrio sent a Telegram private chat to his contact Mamafe. He said, "My contact just called me. DA hasn't signed it yet. He says they want to take me on stage. This is going to be fun. They want a show, I'll give them one."
Q. So, Agent Hadley, we see here that Tarrio told Mamafe, "My contact just called me." What time does he send that message?
A. 6:55 p.m.
Q. And approximately how long after the defendant called Tarrio does Tarrio send that message?
A. It was about 20 minutes after they hung up.
Q. And who is Mamafe, if you know?
A. It's an individual who was romantically involved with Tarrio at the time.
Q. Agent Hadley, we see that after Tarrio told Mamafe that his contact just called him, he tells her some information. Agent Hadley, did you find any evidence that Tarrio was in contact with anyone, besides the defendant, who had knowledge about the banner-burning investigation between when the defendant called Tarrio and when Tarrio messaged Mamafe this information?
A. No.
Q. And can you please continue reading the rest of page 2?
A. Next entry is an email from Detective Mufti to AUSA Courtney, Commander Parsons, Sergeant Copeland, and others. It was a forward from the judge. It says, "Please see the

attached arrest warrant, signed by Honorable Judge Pittman," with a signed PDT -- I'm sorry, PDF attached.

The next entry is from user Johnny Blackbeard to the Ministry of Self-Defense Telegram group chat, actually. He says, "What's up. Was in the shower."

Q. And then can you please read page 3 of this exhibit?

A. User Noble Beard responded to the group chat. He said, "The N is going to jail." With the "N" being a racially derogatory expletive. Tarrio responded, "Info stays here." Johnny Blackbeard responded, "Why now?" Tarrio said, "No one else knows."

Noble Beard responded to the group, "Burning honored Black fellows banners." Johnny Blackbeard said, "I thought you were assured it was nothing." Tarrio replied, "It's just the misdemeanor, not hate crime."

Q. And please continue on page 4.

A. Tarrio replied again, "And it hasn't been solid yet." Blackbeard responded, "Then why jail? I knocked a cop out and never went in." Noble Beard replied, "It's always a hate crime."

Tarrio responded, "They'll probably drop the charges or something. They want the arrest." Blackbeard responded, "Is this coming on the 6th?" Tarrio said, "The DA might or might not give it to them."

Q. And can we please go on to page 5.

Can we just read these three messages?

A. Tarrio replied again, "I'm pushing for that." Next entry is the next day, December 31st, 2020, from Assistant Chief Carroll to the defendant. He said, "Shane, call John Branch about the arrival info for Enrique." Defendant replied, "Copy."

Q. And can we please bring up Government Exhibit 4022.

Agent Hadley, where does this bring us?

A. This is all entries from the master summary chart dated January 1st, 2021, between 1:06 p.m. and 1:11 p.m. First entry is from the defendant to John Donohue, it's a text message. It said, "Tight hold on this, but I may lose him as a source soon. Our CID got a warrant for him for burning them BLM banner. They are going to pick him up next week when he is in town, so he may not speak to me anymore."

Q. Stopping you there, Agent Hadley. Who is John Donohue?

A. At the time he worked for the United States Capitol Police. He was the director of their intelligence and interagency coordination division.

Q. Did you find any communications between John Donohue and Enrique Tarrio during the relevant time period of your investigation?

A. No.

Q. And will you continue reading, please?

A. Donohue responded, "That sucks. Not a word. And it's a

nonsense summons, no? That's all we'd give in NYC for a flag fire."

Defendant replied, "No, we don't have those in D.C. It's a full-fledged arrest warrant. He will get locked up, fingerprinted, photographed, and be sent in front of a judge." Donohue replied, "Well, if it's in the U.S., antifa walks away with an admonishment."

Q. And can we please go to page 2.

And will you read this page, please, Agent Hadley?

A. Donohue said, "That's very weird, especially in such a liberal town." Defendant replied, "That's what I said. They were contemplating making this one a hate crime. I said if that's the case, they would have to make all of the U.S. taken and burned by antifa hate crimes. They backed off then. In the end, it's a misdemeanor charge, so it won't go far, but it was very political." Donohue replied, "Let's discuss in person."

Q. I want to continue on a little bit later, on January 1st.

So can we please bring up Government Exhibit 4023.

And what is this exhibit, Agent Hadley?

A. This is all entries in the master summary chart from January 1st, 2021, at 1:33 p.m., through January 2nd.

Q. And can you please just read this page?

A. First is a Telegram message from Tarrio to his contact Oly. "So they did all of this for a misdemeanor. The DA hasn't

signed the warrant. I don't know if they're going to. But there's not 'hate crime' enhancements." Oly replied, "Did what? What's going on?" Tarrio responded, "D.C. Metro submitted an arrest warrant to the attorney's office." Oly replied, "Incredible."

Tarrio responded, "Destruction of property, no hate crime enhancement." Oly responded with face-palm emoji. Tarrio replied, "But he says that he doesn't think they're going to sign off on it."

Q. Agent Hadley, we see here that at the bottom message -- if we could zoom in -- we see here that Enrique Tarrio writes to Oly, "But he says that he doesn't think they're going to sign off on it." Again, when he says "he," Agent Hadley, through the course of your investigation, did you find that Tarrio was in contact with anyone else, beside the defendant, who was providing him with information about the Black Lives Matter banner-burning investigation prior to January 1st, 2021?

A. No.

Q. Or anytime after January 1st, 2021?

A. No.

Q. Thank you. Can we go on to the next page, please.

A. Tarrio responded, "Because they're afraid I'll take it to trial and their argument is very weak." Oly replied, "They will do it to make a point." Tarrio said, "So will I." Oly replied, "Yeah, okay. D.C. is all democrats and the jury will

convict you because you are the leader of the Proud Boys. What a waste of tax dollars on that shit." Tarrio responded, "LOL. To contact another department four states away." Oly responded, "Their murder rate is high and they are focusing on this shit."

Q. Can you please go to page 3.

And will you continue reading, Agent Hadley?

A. Oly sent a message to Tarrio that said, "Or maybe they don't want you to go on the 6th, so that you don't help the president." Tarrio replied, "If I walk into the station on the 4th, they'll have no choice but to pick me up." Oly said, "Don't do it." Tarrio replied, "Can't miss my flight on Friday. I'd rather let that bandage tear." Oly replied with three crying emojis.

Q. And moving on to page 4, please.

A. Then Oly said, "You are so stubborn, Conjo." Tarrio replied, "That's if they sign the warrant." The next entry is a Telegram within Tarrio and the defendant's secret chat. Tarrio set a self-destruct timer to one hour. And Oly responded to Tarrio in Telegram. "Martin said that it's a misdemeanor and it didn't happen in the presence of an officer. Fucking a joke." The next entry Tarrio reset the self-destruct timer to 30 seconds in his Telegram secret chat with the defendant.

Q. Agent Hadley, looking at the message, after Tarrio tells

Oly, "That's if they sign the warrant," did the defendant -- I'm sorry, does Tarrio send the defendant a message?
A. Yes.
Q. How can you tell?
A. Because of the message ID counters. It skips a number. It starts at 50 with a self-destruct timer and then it skips one number and then there's another self-destruct timer at 52.
Q. Why is message ID 51 not reflected in this chart?
A. Because it was destroyed because Tarrio set the self-destruct timer.
Q. And can we please continue on to page 5. And can you please read the messages here?
A. First message is from Oly to Tarrio. It said, "But it's okay for them to destroy and vandalize Republican's property or assault them." Tarrio replied, "Yes, it is. They're immune." And then Oly sent five angry-face emojis. Then Oly said, "Is your attorney going with you? Do you need me to go?" Tarrio replied, "It will be fine."
Q. And going on to page 6, please.
A. Tarrio sent another message to Oly, "I'll wait until it happens. I'm not going to talk to anyone." Oly replied, "First of all, they don't have you pulling down the sign. Second, it was on the street, making it trash on public sidewalk. WTF."
Tarrio replied, "Exactly. I was getting rid of some

garbage." Oly responded, "Now I have a headache. Great." Tarrio replied, "They throw out misdemeanors all the time, especially when it's during protests."

Q. Can we go to page 7.

Can we continue, please?

A. Tarrio sent another message, "Including my guys." That message was to Oly. The next message is from Mamafe to Tarrio later that night, 7:11 p.m. She said, "Have you heard anything about that warrant?" Tarrio replied, "They can't sign it until Monday."

Next entry from that evening, January 1st, it's an iMessage from John Haines to the defendant. It says, "Shane, do we I have any flight info or travel info on when and where Enrique Tarrio will arrive in D.C. or which airport?" Defendant replied, "No specific flight info, but I know he is flying into DCA on 1-4. Don't have the time." Haines replied, "Okay. Thanks."

Q. Agents Hadley, who is John Haines?

A. He was an employee of MPD within the narcotics and special investigations division.

Q. And can we please go to page 8.

Can you read just the top two messages here, please?

A. First is an email from the defendant to Charlie Cox. Subject line: Passenger check. He said, "Good evening, Charlie. I hope you had a great Christmas and New Year. I am

hoping that you can help me with something. MPD has obtained an arrest warrant for someone in connection with the December 12th protest in Washington, D.C. We have" -- and it's actually inadvertently cut off.

The next entry is from the defendant to John Haines. It's an iMessage. It says, "I just reached out to my TSA contact to see if they have access to booking information. Will let you know if I can confirm his flight info."

Q. First, Agent Hadley, who is Charlie Cox?

A. He was a field intelligence officer for the Transportation Security Administration.

Q. And did you find any communications during the relevant time period of your investigation between Charlie Cox and Enrique Tarrio?

A. No.

Q. And can you please continue reading?

A. Haines responded to the defendant, "Thanks. We tried ours, but with the holiday weekend, no success on a response." Defendant replied, "Copy. I just emailed mine, so I will let you know when he responds." Haines said, "Thank you."

Next message is from Robert Pond to the defendant. It said, "Hey, Shane, sorry to bother you. It seems that we have a 'credible source' that is indicating PB are going to the Hampton Inn on King Street in Alexandria. Can you verify?"

Q. Before moving on, Agent Hadley, who is Robert Pond?

A. He is an individual who worked for the Alexandria Police Department at the time.

Q. Did you find any evidence that Robert Pond ever communicated with Enrique Tarrio?

A. No.

Q. Can we go to page 9.

And will you please continue reading?

A. Defendant responded to Pond, "Yep, I will check now, but that seems a little far out." Pond replied, "Thanks." Defendant said, "You're welcome. Message sent. Will let you know when I get a response." And then two minutes later, "Just heard back. Said he doesn't think any PB are staying in VA, and certainly not that far south.

Defendant said to Pond, "I'm sure there's a very good chance Trump supporters will be staying there, but not PB." Pond replied, "Thanks again." And defendant said, "Anytime, bother."

Q. And can we please go to page 10.

Will you just read this page, please.

A. Next entry is an email from the defendant to Charlie Cox. Subject line -- subject: Info. It said, "Please see attached document, password to follow," with a word document attached. Cox responded to the defendant, "Shane, watching Ohio State put a beating on Clemson. I'll check and get back to you soonest. I can only look 72 hours out."

Defendant replied, "LOL. Sounds good. No hurry, as he isn't supposed to be traveling until 1-4. Thanks again. I appreciate you responding so quickly, and on a holiday, no less."

Then the defendant sends an iMessage to John Haines. "Hey, John. My TSA guy is going to come through for us. He can only check 72 hours out, so he is going to hold off on checking until tomorrow. Will advise when he responds."

The next day, January 2nd, at 2:26 p.m., Oly sent a Telegram message to Tarrio that said, "Any update on the warrant?" Tarrio responded, "Won't know until I land."

Q. And can we please go to page 11.

A. Oly replied, "Oh, my God. Did you go to Rubio's?" Tarrio replied to Oly with an image, appears to be possibly a rally of some sort. Oly replied, "I love it. But not a lot of people."

Q. Could we go to the last page of this exhibit, please, page 12. And will you just read this page, please?

A. This is an email from Charlie Cox to the defendant on January 2nd, at 7:09 p.m. "Shane, also, I show LKA, via Clear. Source: Experian, as of 10-17-2020," and then an address in Miami, Florida. "Gate 40." And there's an image attached. Appears to be a screenshot of flight information.

The next entry, the defendant sent a text message to Commander Parsons, Assistant Chief Carroll, and Captain Haines that said, "Here's his flight info," with that same screenshot

of flight information attached. Parsons replied to the group, "Thanks." And then John Haines replied to the group, "Awesome. Thank you."

Q. That brings us to the end of the day on January 2nd, 2021. So I'm going to continue on.

Can we please bring up Government's Exhibit 4024.

And, Agent Hadley, what is this exhibit?

A. All entries from the master summary chart that is dated January 4th, 2021.

Q. Can we focus on the top three boxes there, please.

A. Sure. The first one is 6:44 a.m., Tarrio checks in for American Airlines flight 4782 from Miami to DCA. And then at 7:27 a.m. Tarrio checks in baggage for that same flight. At 8:33 a.m. -- this is from the American Airlines records -- it says, "PAX was late at the gate, 11 min prior departure. I was processing standby list already. I explain that since 15 min prior we supposed to start processing standby and I wait until 12 min waiting for him. But he, it's supposed to be at the dep gate 30 min prior departure. PAX was very upset and cussing, and saying bull shit to me and to the lead agent."

Q. Can we please bring up Government Exhibit 2005, please.

And, Agent Hadley, what is this record?

A. This is the American Airlines record, it was the -- shows Enrique Tarrio's flight on January 4th, 2021.

Q. What time does it say that he was scheduled to leave?

A. 12:29 p.m. This is the rescheduled flight.
Q. Okay. Can we please go back to Government Exhibit 4024. And can we please go to page 1. Thank you.
And will you just read the rest of this page, please, Agent Hadley?
A. The next entry is an iMessage from John Donohue to the defendant. He said, "FYI, Tarrio may be staying at Phoenix Park Hotel." Defendant replied, "Yes, that's confirmed. Supposed to be arriving later today. Will talk in person for additional info."
ET -- I'm sorry, this message is from the defendant to Ben Tyler, 9:38 a.m. It says, "ET changed his flight info. Was supposed to arrive this morning, now not coming until this afternoon. Our crim. apprehension unit will be picking him up as soon as he enters the city." And then at 11:55 a.m. Tarrio boards American Airlines flight 925 from Miami to DCA.
Q. Agent Hadley, we see the defendant let Ben Tyler know that ET changed flight info. Did you recover evidence that Ben Tyler communicated with Enrique Tarrio after this message?
A. No.
Q. Can we please go to page 2.
Will you just read this page, please?
A. First entry shows Tarrio's American Airlines flight 925 departing the gate in Miami at 12:32 p.m. and then taking off at 12:55 p.m. At 1:02 p.m. the defendant sent -- I'm sorry,

the defendant set a self-destruct timer for his conversation, his Telegram secret chat with Enrique Tarrio, to 10 seconds.

At 1:30 p.m. Tarrio sent a Telegram private chat to Mamafe, said, "Warrant was signed." And then a private -- Telegram private chat to user Avva that said, "Warrant for my arrest was just signed," and then a Telegram group chat message to Ministry of Self-Defense that said, "The warrant was just signed." Avva replied to Tarrio, "OMG."

Q. I want to pause here and just unpack these communications a little bit.

So, first, I want to focus on when Tarrio's flight took off. How do you know that it took off at 12:55 p.m.?

A. From the records provided by the Federal Aviation Administration.

Q. Can we please pull up Government Exhibit 2007, please.

Can you explain, what is this document?

A. This is an excerpt from the records we received from the Federal Aviation Administration that show some of the information about that flight, including exact location and altitude at certain times.

Q. Can you explain how this record tells you that Tarrio's flight took off at 12:55 p.m.?

A. Because that's when the flight went from altitude zero to altitude 25.

Q. And then did it keep climbing after that?

A. It did.
Q. And at 1:30 p.m., what is the altitude of the flight?
A. Approximately 34,000 feet.
Q. And what time does it indicate the plane landed?
A. At 2:52 p.m.
Q. And how do you know that?
A. Because that's when the altitude of the plane went from 25 to zero.
Q. And can we please bring up Government Exhibit 4024. And go back to page 2, please.
And now looking here, what time did the defendant set the self-destruct timer to 10 seconds?
A. 1:02 p.m.
Q. I'm sorry, he actually changed the setting of the self-destruct timer, is that right?
A. Yes.
Q. He changed it from 30 seconds to 10 seconds?
A. I can't recall the timer immediately before this.
Q. Was the self-destruct timer already on when he reset the time?
A. Yes.
Q. And where is Tarrio at this time?
A. He's on the plane, in the air.
Q. How soon after the defendant set the self-destruct timer to 10 seconds did Tarrio send the Telegram private chat to Mamafe

that the warrant was signed?
A. It was approximately 28 minutes.
Q. And where was Tarrio at that time?
A. Also on the plane, in the air.
Q. And, Agent Hadley, in the course of your investigation, did you find evidence that Enrique Tarrio purchased WiFi while he was on the plane?
A. I did.
Q. And what evidence is that?
A. Bank records.
Q. Can we please bring up Government's Exhibit 2008, please.
And, Agent Hadley, we looked at this yesterday. But now we're going to look at it in a little more detail.
Can we please go to page 3.
And you testified earlier that this was a bank statement for an account that Tarrio used, is that right?
A. Correct.
Q. And so looking here at the charge on January 5th, 2021, can you just walk us through that, please?
A. Sure. It's a $16 charge for Viasat in-flight, which was the service provider for the WiFi in-flight American Airlines at the time.
Q. Can we please bring back up Government Exhibit 4024. And go to page 2, please.
Agent Hadley, we see in that message on January 4th,

2021, at 1:30 p.m., that Enrique Tarrio told Avva, "The warrant for my arrest was just signed." How soon after the defendant changed the self-destruct timer to 10 seconds did Tarrio say the warrant was just signed?
A. Same, about 28 minutes.
Q. And, Agent Hadley, did you investigate when Tarrio was first able to receive messages when he was on the plane?
A. Yes.
Q. And how did you investigate that?
A. By looking at the pattern of his messages. And he had been sending messages prior to boarding the plane, and then those messages ceased between 12:58 p.m. and 1:28 p.m., when he sends a message to his mother.
Q. And the message that he sent to his mother, was that the first message you recovered after he took off on the plane?
A. Correct. And he had sent about 70 messages in the 50 minutes prior to going silent.
Q. And when you say "going silent," was that around the time when the plane took off from Miami?
A. Yes.
Q. And how long after defendant changed the self-destruct timer to 10 seconds did the defendant first start receiving messages?
A. It was about 26 minutes.
Q. Can we please go to page 3 of Government's Exhibit 4024,

please.

And will you please continue reading?

A. Avva responded to Tarrio via Telegram, "Babe." And then Tarrio responded to Avva, "It's cool. They'll have to have me in and out." Avva replied, "When you land? Are they taking you on stage? This is so fucked."

Q. And can you focus just on the top five messages, actually? Can you focus on the next one too, please?

A. Tarrio replied, "Don't know if my contact will tell me that."

Q. Agent Hadley, is this the first time that we have seen Tarrio reference a contact in the context of the banner-burning investigation?

A. No.

Q. Okay. I want to review that briefly.

Can we please pull up Government Exhibit 4018, and go to page 6, please?

And can you please read just the top four?

A. Tarrio sent a message to the defendant that said, "Let's do it." And then Chris PB sent a message to the Skull and Bones group chat saying, "LMFAO. Enriqueta is in trouble." Tarrio responded, "I'm going to prison for a hate crime." And then Tarrio sent an audio file to the defendant.

THE COURT: You used the word "contact" before. That's in evidence already.

MS. ROSS: Yes, Your Honor.

THE COURT: Okay. We can go back to where we were in the chronology.

BY MS. ROSS:

Q. Can we please go back to Exhibit 4024. And we'll go to page 2, please. And go to page 3, please.

THE COURT: Let me ask you this: About how long do you think it will take to do the entire rest of the flight and what's there and what's not there? I was hoping to finish maybe this exhibit and break for lunch at 1, but it seems like maybe we're not going to make it. So does it make more sense to break now?

MS. ROSS: I think, Your Honor, I could finish this exhibit in, like, maybe five minutes.

THE COURT: Okay.

BY MS. ROSS:

Q. Can you just read the rest of this page, please?

A. Mamafe responded to Tarrio, "Fuck. Try to keep me in the loop."

Q. And can we go on to page 4 of this exhibit, please.

And will you just read this page?

A. Mamafe replied again, "Although I'll understand if you can't." And Tarrio sent a Telegram message to contact Bianca TuVoz. He said, "The warrant has been signed." And then a message to the Skull and Bones group chat, "Warrant has been

signed."

Next entry shows Tarrio's American Airlines flight 925 landing in D.C., 2:52 p.m.

Q. Agent Hadley, if you know, where was Tarrio arrested?

A. He was arrested in a ride share on a highway driving into D.C.

MS. ROSS: And when I said five minutes, I meant like a minute, Your Honor. That's the end of that exhibit.

THE COURT: Okay. All right. I think that's it.

A. Do you want me to read the last three?

BY MS. ROSS:

Q. Sorry. Did I miss that?

A. Yes.

Q. Sorry. Yes, will you read the rest of that page? I'm sorry, I thought you had finished. My apologies.

A. Next entry, 3:16 p.m., Tarrio sent a message to Jacob Engels Z4, "Warrant for my arrest is out." Next entry, defendant sends a message to John Donohue, "ET locked up for warrant." And then at 4:18 p.m. the MPD case file shows the arrest of Enrique Tarrio.

MS. ROSS: Thank you. That's it.

THE COURT: All right. We'll return at 2.

Is your witness, your other witness ready to go at 2? Or it will be later in the afternoon?

MS. ROSS: Seems like he is on schedule, so he should

be ready to go at 2.

THE COURT: Maybe it just makes the most sense to do that and complete whatever needs to be done with them and then we'll continue with this witness.

MS. ROSS: I think that makes sense. Thank you, Your Honor.

THE COURT: All right. I'll see everybody at 2.

(Recess from 12:56 p.m. to 2:10 p.m.)

THE COURTROOM DEPUTY: We're back on the record with criminal case 23-177, United States of America versus Shane Brian Lamond.

MR. SCHAMEL: May I, Your Honor? Just one thing.

THE COURT: I guess.

MR. SCHAMEL: We were just talking, the parties have been talking about, sort of, timing, and the government thinks they're going to rest -- I think Mr. Rothstein's words were, "Early afternoon tomorrow." And Mr. Tarrio I was hoping to put on tomorrow, in the afternoon. So I think the Court has to notify the marshal service for a come-up.

I talked to Mr. Nayib again at the lunch break and he's going to get on a plane tomorrow morning. He's moved things around to come up tomorrow. And so he's going to fly up tomorrow morning and we're going to try to put Mr. Tarrio on. I was going to let the Court know, as opposed to telling you at the end of the day, so that you can let the Marshal Service

know because he's in Alexandria.

THE COURT: All right.

MS. ROSS: Good afternoon, Your Honor. Mr. Quested hasn't quite made it to the building yet. If it's okay with Your Honor, we'll continue on and maybe he can go on after the afternoon break, if that's the logical time.

THE COURT: All right.

MS. ROSS: Thank you.

BY MS. ROSS:

Q. All right. Agent Hadley, so when we left off before lunch, we were up to Tarrio's arrest on January 4th, 2021. Did the defendant and Tarrio continue speaking after that?

A. Yes.

Q. Can we please bring up Government's Exhibit 4025, please.

And what is this exhibit?

A. These are the remaining entries from the master summary chart, the ones dated January 7th to January 27th, 2021.

Q. And can you read the top message here on page 1?

A. Yes. This message is from Tarrio to the defendant. January 7th, at 3:25 a.m., via Telegram secret chat, he said, "I think I could have stopped this whole thing."

Q. And, Agent Hadley, we see that message was sent on January 7th, 2021. What is the significance of January 7th 2021?

A. It's the day after the January 6th attack on the U.S. Capitol.

Q. Can you please continue reading?
A. Defendant replied the next morning, 7:55 a.m., "I don't know, bro. You know, it's fucking bad when Alex Jones was the voice of reason and they wouldn't listen to him. He got on the bullhorn and urged everyone to stop attacking the police and march around the U.S. Capitol and they ignored him. How you holding up? I checked on your charges and the poss of high capacity mags is a felony."
Tarrio responded, "So gay." And then, "Yeah, but I have guys I can line up, he doesn't. LOL."
Q. Please go to page 2.
And can you read this page, please?
A. Defendant replied, "That is true. Yesterday was a total shit show." Tarrio responded, "I have someone you guys might be looking for. Nicole Daniel Roberson. She had Maryland police go to her house yesterday. She thinks they came because of the Capitol stuff."
Tarrio responded -- I'm sorry, the defendant responded, "Copy. Not that I'm aware of offhand, but I will check. I know we are working on identifying a number of people."
Q. And can we please go to page 3.
And will you please continue reading, Agent Hadley?
A. Next entry is an iMessage from an individual named Brian Carney to the defendant. It is a video file, appears to be at

the Capitol. Next message is from Tarrio to the defendant, Telegram secret chat. He said, "Let me know if she's on your list. I'll have her turn herself in." Defendant replied to Carney, "Thanks, Brian. The one we were looking at is Nicole Daniel Roberson." Carney replied, "Okay. I'll look into it."

Next entry is from the defendant to someone named Julie Farnham, text message, 3:17 p.m., "Hey Julie, can you send me the FBI list?" Farnham replied via email with a subject line: FBI's list, and approximately 25 names in the body of the email.

Q. Agent Hadley, who is Brian Carney?
A. He was an individual who worked for the Anne Arundel Police Department.
Q. During the course of your investigation, did you find any evidence that he ever communicated with Tarrio?
A. No.
Q. And, Agent Hadley, who is Julie Farnham?
A. She was an individual who worked at United States Capitol Police at the time. She was -- worked for John Donohue.
Q. And did you find any evidence that Julie Farnham ever communicated with Enrique Tarrio during the relevant time period of your investigation?
A. No.
Q. If you know, Agent Hadley, we see the defendant refer to an FBI list. What is that list?

A. Appears to be the names of individuals that the FBI was investigating at that time for events related to January 6th.
Q. Could we please go to page 4.
And could you just read the top two messages on this page, please?
A. Farnham replied to the defendant, "Sent." About 4 minutes later defendant sent a Telegram secret chat to Tarrio, he said, "Nope, not on our list."
Q. And can you please continue reading the rest of this page?
A. He sent another message to Tarrio that said, "Looks like the feds are locking people up for rioting at the Capitol. I hope none of your guys were among them." Tarrio replied, "So far, from what I'm seeing and hearing, we're good." Defendant responded, "Great to hear." Of course I can't say it officially, but personally I support you all and don't want to see your group's name or reputation dragged through the mud." Tarrio responded, "One of my guys did get arrested in Hawaii, but he was just in there behind people, recorded the whole thing for his YouTube. No damage."
Q. And can we go to page 5.
And would you continue reading, please, Agent Hadley?
A. I apologize. All those were on January 8th.
This message, also on January 8th, from Tarrio to the defendant. "Thanks, but I think we're past that. The brunt of this will come down on us." And then he sent a correction to a

typo. Defendant replied, "It's not going to matter. Simply entering the building will be enough to get charged. Being up on the upper terrace past the police lines may even be enough."

Tarrio replied, "Yeah, I know. Will those be felonies?" Defendant said, "Yes, 100 percent." Tarrio replied, "What felony is it?"

Q. And moving on here to page 6.

Will you please continue reading, Agent Hadley?

A. Defendant responded, "18 U.S.C. 1752, restricted building or ground." And then the next day, January 9th, 12:45 p.m., defendant sent a Telegram to Tarrio saying, "Lots of bad and misinformation circulating around regarding your group. I need you to be totally honest with me. Are there any plans for PB to be in D.C. anytime between January 16 to 20? You can call if you prefer. Thanks." Tarrio responded, "At ALL."

Defendant said, "Copy. A private organization put an alert that specifically mentions Proud Boys will be conducting armed protests at every state capitol and U.S. Capitol on January 17th. I take it you mean not at all?" Tarrio responded with an audio message that we were able to recover, it said, "Uh, yeah, not at all. We're, uh, definitely not going anywhere."

Q. And can we please go on to page 7.

And will you please continue reading, Agent Hadley?

A. Then Tarrio said, "Give me a few and I'll give you a call."

Defendant responded, "Sounds good." Next entry is a Telegram call from Tarrio to the defendant that lasted 1522 seconds, or around 25 minutes.

Next entry is from the defendant to Tarrio. It's a screenshot of what looks like a headline. "FBI announces arrest of protest leader Nicholas Ochs for unlawful entry into U.S. Capitol, government via US DOJ." Tarrio responded, "That's a felony?

Q. And then moving on to page 8, please.

A. Defendant said, "Yes. Same ones first 13 were charged with. What are we standing by for? Tarrio responded, "Ha"?

Defendant said, "Joe Biggs just posted 'standby' on Parler." Tarrio responded, "Dunno, but we just banned rallies for a while, a while."

Q. And can we go to page 9, please.

I'm sorry. Agent Hadley, on page 8 we saw a reference to Joe Biggs. Who is Joe Biggs?

A. He was another Proud Boys that was associated with Enrique Tarrio.

Q. And then will you continue reading here on page 9? Thank you.

A. Defendant replied, "That's a good idea." Then Tarrio said, "It looks like his account is hacked or something. Look at the posts under that." And then Tarrio sent an image, a screenshot of a social media feed. Defendant replied, "I gotcha. Lots of

eyes are on you all right now. I got a first alert on his post." Laughing-to-crying emoji. Tarrio replied, "But I'm sure that doesn't mean what people think it means. LOL."

Q. And going on to page 10, please.

A. Says, three days later, January 12th, 2021, defendant sent a Telegram secret chat to Tarrio. It is an image of an American flag that says something Proud Boys, and then a message that said -- it says, "Virginia Proud Boys," and then a message that said, "Is this legit?" Tarrio responded, "What is this?" Defendant said, "Claiming to be a Proud Boys sticker." Tarrio responded with an audio message that we recovered where he said, "I don't know. Let me check, but."

Q. And can we continue reading on page 11, please?

A. Defendant sent another message, "Do you know if any of your guys will be at VA Lobby Day on the 18th?" Tarrio replied, "Doubt. Big doubt. Uh, I might go, uh, but I don't think I'll make it. There's like a, probably, uh, 20 percent chance of me going." And that was an audio message.

And then another audio message that we recovered where he said, "My guys don't even know that. Uh, if I do go, my guys won't even know that I'm going."

Next entry shows Tarrio setting the self-destruct timer to 30 seconds for his Telegram secret chat with the defendant.

Next entry, three days later, January 16th, the

defendant sent a message to Tarrio that said, "Hey, brother, are you guys planning to come to D.C. on March 4th?" With a self-destruct timer attached to it of 30 seconds.

And then one more.

Q. And then can you read just that last message there?

A. And then three days later another Telegram secret chat with a self-destruct timer of 30 seconds where the defendant said, "Bump."

Q. And can we go to the last page of this exhibit. Page 12 of Exhibit 4025, please.

MS. ROSS: It knew we were at the end. Let me grab a paper copy real quick.

THE COURT: Mr. Schamel, are you going somewhere?

MR. SCHAMEL: Just trying to plug in my computer, Your Honor.

THE COURT: Okay.

BY MS. ROSS:

Q. Going to page 12, please.

Okay. This last message, Agent Hadley, will you read that, please?

A. The last message is from the defendant to Tarrio on January 27th, 2021, it is a link to a Reuters article entitled "Exclusive. Proud Boys' leader was 'prolific' informer for law enforcement." And it had a self-destruct timer of 30 seconds associated with it.

Q. Agent Hadley, that brings us to January 27, 2021. That last message you just read, is that the last message that was recovered between the defendant and Enrique Tarrio?
A. Yes.
Q. All right. Just a couple more questions, Agent Hadley.
Can we please bring up Government's Exhibit 4028.
Agent Hadley, what is this exhibit?
A. It's another visual representation of the messages between the defendant and Tarrio for the time period November 7th, 2020 to January 27th, broken down by platform and month. So it shows, by month, the different platforms and volume of messages on the left-hand side.
Q. And, Agent Hadley, what is the significance of those two dates, November 7th through January 27th?
A. November 7th was the day after the presidential election was called. And January 27th is the last date that they -- the two communicated.
Q. And starting at the bottom, the box at the bottom, what type of messages are in this exhibit?
A. We have iMessage as blue, Telegram as red, both private chats as the lighter red and secret chats as the darker red. And it also notes that this does not include unrecoverable Telegram secret chats because those do not have date and timestamps.
Q. Can you please just walk us through this exhibit, Agent

Hadley?

A. Yes. So it shows in November that the communications between the two were largely iMessage, with a few Telegrams. In December 2020 it switched to be more evenly disbursed, but heavily on the Telegram side. And then in January 2021 the two were communicating exclusively with Telegram secret chat.

Q. Can we next bring up Government Exhibit 4027, please.

And, Agent Hadley, what is this exhibit?

A. This shows the same information, but a larger time period. In fact, the entire time period of this master summary chart, October 19 to January 2021.

Q. And can you just walk us through this exhibit, please?

A. Yes. Again, same information with just the added green messages representing text and Google Voice messages. Also does not include unrecoverable Telegram secret chats.

Q. What does this indicate, Agent Hadley?

A. Indicates -- or, shows visually that up until June 2020 the two were communicating exclusively with text and Google Voice and then there's a shift to iMessage, with a few Telegrams sprinkled in. And the last two months, the majority of the messages are exchanged via Telegram.

Q. And, next, can we please bring up Government Exhibit 4032.

And, Agent Hadley, what is this exhibit?

A. Another graphic representation of the breakdown between the different platforms during the entire time period.

Q. Can we just look at that box? Can we Zoom in on the key there, please.
Agent Hadley, through the course of your investigation, how many SMS and MMS and Google Voice messages did you recover between the defendant and Enrique Tarrio?
A. Ninety-four.
Q. And how about iMessages, Agent Hadley?
A. Two-ninety-four.
Q. And Telegram private chats?
A. Seventy-nine.
Q. And how about Telegram secret chats, how many did you recover between the defendant and Enrique Tarrio during the relevant time period?
A. Two hundred and nine.
Q. And then can we just look at the graph there.
Can you just walk us through that, Agent Hadley?
A. Yes. It shows the percentages of those -- I believe it adds up to 676 messages. So it shows the breakdown as 14 percent Google voice and text, 43 percent iMessage, Telegram secret chats 31 percent, about half and half recovered and unrecoverable, and then 12 percent Telegram private chats.
Q. And, I'm sorry, Agent Hadley, did you say how many total messages you were able to recover?
A. I want to double check my math. I think it's 676.
Q. So if you add up the Google Voice messages, the iMessages,

the private chats and the secret chats, is it fair to say there were 676 recovered messages?
A. Yes.
Q. Agent Hadley, I want to talk about Tarrio's communications for a moment.
And we can bring that exhibit down. Thank you.
Agent Hadley, I just want to be clear. In the entirety of your investigation did you recover any communications between Tarrio and MPD officers?
A. Yes.
Q. Who?
A. Between the defendant and Lieutenant Mufti.
Q. With Lieutenant Mufti, what type of communications did you find?
A. There were several communications where Detective Mufti asked Tarrio if he had counsel that Detective Mufti could reach out to.
Q. Was that the extent of their communications?
A. Yes.
Q. Now, focusing more broadly in the entirety of your investigation, did you recover communications between Tarrio and someone who was giving him case information about the Black Lives Matter banner-burning investigation?
A. Yes.
Q. Who?

A. The defendant.
Q. Just to be clear, Agent Hadley, did you identify anybody else in the course of your investigation that was providing Tarrio with information about the Black Lives Matter banner-burning investigation?
A. No.
Q. Now, focusing just on the defendant, Agent Hadley, in the course of your investigation did you recover any communications between the defendant and anybody at MPD in which the defendant indicated that he was using Telegram to communicate with Tarrio?
A. No.
Q. Did you recover any communications between the defendant and anybody at MPD in which the defendant indicated that he was using Telegram to automatically destroy messages he sent to and received from Tarrio?
A. No.
Q. And did you ever have any communications between the defendant and anybody at MPD in which the defendant said that he was going to inform Tarrio that the arrest warrant had been signed?
A. No.
Q. And in the course of your investigation did you recover any communications between the defendant and anybody at MPD in which the defendant indicated that he was updating Tarrio about

the banner-burning investigation?

A. No.

Q. And just to be clear, Tarrio was the subject of that investigation, right?

A. He was.

MS. ROSS: Thank you, Your Honor. No further questions.

THE COURT: All right. Any cross-examination?

MR. SCHAMEL: Yes, Your Honor. Should we check and see if the other witness is here, or should I just start?

THE COURT: They'll let me know if the other witness is here. All right. Go ahead.

MR. SCHAMEL: May I have a moment, Your Honor.

(Pause.)

MR. SCHAMEL: Apologize. I was at the computer. I couldn't print.

CROSS-EXAMINATION

BY MR. SCHAMEL:

Q. Good afternoon.

A. Good afternoon.

Q. We've never met before. I'm Mark Schamel, as I think you know, Mr. Lamond's lawyer.

A. Good afternoon.

Q. I have some general questions and I want to go through some of the things you talked about in your direct. Okay?

A. Okay.
Q. First of all, there was a lot of references during the course of the direct examination about how Mr. Lamond referred, and many times, to Mr. Tarrio as, "Hey, brother," right?
A. Yes.
Q. "Hey, brother." And you are the person, as the case agent, that reviewed all of the messages, correct?
A. All the messages between the two?
Q. All the messages from Mr. Tarrio's phone, correct?
A. With the defendant, yes.
Q. And all the messages that you recovered from Mr. Lamond's devices, including the MPD devices, correct?
A. With Mr. Tarrio, yes.
Q. So you're sort of the authority for the government's side on all the communications? You've seen them, there wasn't anybody else that was reviewing them? That was your job?
A. No, there were others that were reviewing them.
Q. You're the case agent, so you're responsible for knowing what everybody else is reviewing?
A. Correct.
Q. There wouldn't be things out there that you're aware of that you didn't review, right?
A. That's correct.
Q. Okay. And so in the various communications that Mr. Lamond and Mr. Tarrio had, Mr. Lamond refers to Mr. Tarrio as

"brother," correct?
A. Yes.
Q. He also refers to other people as brother? It's a sort of common, hey, dude, kind of greeting he uses with a lot of other people?
A. Yes.
Q. You didn't see that as anything significant for just Mr. Tarrio, correct?
A. Correct.
Q. Okay. I heard a little bit -- I apologize, I've forgotten some of it from yesterday. Could you tell us a little bit about your background?
A. I'm a special agent with the FBI, for 15 years. Started off investigating white-collar crime, then crimes against children, then worked at headquarters in our national security department, and have been working on my current squad, investigating public corruption, fraud against government, and violation of civil rights, for about three and a half years.
Q. And in that role, you were assigned to this investigation when of Mr. Lamond?
A. I believe it was February 2022.
Q. Okay. You've been working on this, if my math is correct, about two and a half, almost three years?
A. Yes. It's not continuously, but, yes.
Q. And I'm not suggesting it's your only case. I know you

have many more. But for almost three years you've been investigating Mr. Lamond as the lead case agent. And essentially you know everything that was done as part of the investigation, correct?
A. Correct.
Q. Okay. As part of your investigation, you're supposed to look into favorable and unfavorable issues as it relates to what Mr. Lamond did or didn't do right, correct?
A. Yes.
Q. Okay. So one of the things you would do is you issued, probably, subpoenas to Telegram. Did you do that?
A. No.
Q. Did you issue subpoenas to any of the iCloud storage or anything that was out there relating to the messages you said you couldn't recover?
A. No.
Q. Okay. We talk -- I think the math is right, Ms. Ross says there were about 667 -- or, 676, was that the number?
A. Yes.
Q. Total messages.
A. Um-hum.
Q. About how many messages were not recovered, based on your report?
A. I'm sorry, can you be more specific?
Q. We have the master list and a lot of it shows

communications that you say were not recoverable?
A. Correct.
Q. You know from your investigation that there was either a message from Mr. Tarrio to Mr. Lamond or Mr. Lamond to Mr. Tarrio, but you don't know the content of that communication, correct?
A. Yes.
Q. What's -- how many of those exist?
A. There was about 100 that we had northing, and then there were others that we didn't have the content, but we had the fact that there was a message and there was an audio file sent.
Q. Okay. So what's the total number?
A. I don't know the number.
Q. Approximate?
A. I know that there's 100 that were unrecoverable. I don't know the total of the other.
Q. Fifty?
A. I don't know.
Q. More than 50?
A. I would have to count.
Q. So there's at least 100 messages that you don't have?
A. Correct.
Q. Those are the Telegram messages?
A. At least, yes.

Q. Okay. What other message apps were that you didn't have communications?
A. We don't know what we don't have, except for Telegram, where we had the message ID counters.
Q. I'm assuming you had full access -- because I've seen the communications -- for accessing Mr. Lamond's phone, correct?
A. His work phone, yes.
Q. And you had his computer?
A. Yes.
Q. And so you were able to ascertain all of the apps that he had in his name, correct?
A. Yes.
Q. So you knew if he had Telegram, if he had Signal. You knew what he had?
A. Yes.
Q. And I'm asking you: Did you subpoena any of those companies to get any of the messages that you claim you couldn't recover?
A. No.
Q. What steps did you take to try to recover those hundred plus -- I'll just say it's one-hundred-plus messages that you say you know happened but that you couldn't recover?
A. We reviewed Mr. Tarrio's phone and we used our CART team to perform additional extractions to try to get to deleted information.

Q. But you took no steps to investigate this through any of the third parties, like Signal, Telegram, and Apple iCloud, nothing like that?
A. Telegram does not maintain the content of their messages, which is why we did not subpoena them.
Q. So the answer is you didn't take any steps to try to contact any of those apps to try to collect those messages?
A. We believed it would be futile, so we did not.
Q. There was discussion about this being a hate crime. Do you remember that series of questions? You were asked about that during your direct examination.
A. Yes, sir.
Q. Okay. And it was being investigated as a hate crime at MPD and at the FBI, correct?
A. Yes, we did have an assessment open.
Q. Okay. What does that mean, "We had an assessment open"? I assume by the "we," you mean the FBI, Federal Bureau of Investigation?
THE COURT: Can you talk a little slower?
MR. SCHAMEL: Am I still going too fast? Okay. I'll slow down. All right.
THE COURT: And maybe one question at a time, then when you finish your question, let her answer before you ask you next one. Okay. Go ahead.
MR. SCHAMEL: I'll try to do a better job.

Mr. Hinger got the printer working.

BY MR. SCHAMEL:

Q. Okay. You say we did what? I didn't catch the term. We did what? "We," being the FBI, did what?

A. The FBI opened an assessment.

Q. Okay. What's that mean?

A. It is a -- short of a full investigation. If you have some facts, you can open an assessment. And there are various limitations about how long you can have it open before you have to make a determination on it.

Q. How long was this open?

A. This one was open for several months and then it was reopened because the FBI offered a reward for the outstanding subjects in, like, July of 2021.

Q. So the banner burning is December 12th, 2020, correct?

A. Correct.

Q. And it was open and Mr. Tarrio was arrested on January 4th, 2021?

A. Correct.

Q. So slightly less than a month later?

A. Yes.

Q. And your investigation -- I'm talking "your," meaning the FBI.

A. Correct.

Q. -- was several months?

A. Yes. It was closed in -- closed out officially in February.
Q. I assume Mr. Lamond had nothing to do with the FBI investigation, correct?
A. Correct.
Q. He wasn't consulted, right?
A. I don't know if he spoke with the case agent, I wasn't -- I know the case agent spoke with MPD, I believe it was Captain Hong. I don't think the case agent spoke with the defendant, but I haven't asked that specific question.
Q. Okay. And the FBI made its own determination that this was not a hate crime, correct?
A. Correct. They determined that it was not a -- did not violate the federal hate crime statute.
Q. So what I'm trying to get at here is: The determination by the FBI, after several months, that determined that the burning of the BLM banner was not a hate crime was not in any way influenced by Mr. Lamond, correct?
A. Correct.
Q. And the FBI reached the same conclusion that the District of Columbia Metropolitan Police Department reached, that this was not a hate crime, correct?
A. Correct.
Q. And as part of your investigation did you come to learn about the process by which the D.C. MPD made a determination

that this was not a hate crime?
A. I'm sorry, what was the question?
Q. Did you learn about the process by which D.C. MPD made a determination that this was not a hate crime?
A. Yes, generally.
Q. What did you learn?
A. I learned that there was a group of individuals that came together, including the special liaison branch, which was responsible for responding to these types of crimes, and made a determination with a panel.
Q. Mr. Lamond was part of that panel?
A. Correct.
Q. Five individuals?
A. Around that, yeah.
Q. And they had to unanimously -- and the five individuals had to unanimously agree that this was not a hate crime to make that determination?
A. I did not realize it was unanimous.
Q. What did you think it was?
A. I didn't know the exact number that had to vote on it.
Q. All right. Fair.
As part of your review -- if I use 676, we agree that's the number of all the messages?
A. Yes.
Q. Okay. And if I misstate it, it's not trying to be

trickery. I think that's what you said.

All right. So as part of your review of the 676 messages that you could examine -- right?

A. Yes.

Q. -- you found there were a number of messages that involved Mr. Lamond talking to various folks within that intel group chat, is that right?

A. Yes.

Q. Okay. I just want to run through a couple names. I think you talked about them a little on direct and I want to make sure I have them all. Daren DeMarco?

A. Yes.

Q. Did you come to learn who he was?

A. That he worked for NYPD at the time.

Q. He was an officer with the New York Police Department assigned to Washington, D.C. as an intel officer, is that right?

A. I do not know if he was assigned to Washington, D.C., but that makes sense.

Q. Okay. Well, he was an intelligence officer with the NYPD, correct?

A. Yes.

Q. Carolyn Montagna?

A. Yes.

Q. She was Mr. Lamond's supervisor at MPD, a civilian in intel

section?
A. She was, yes, sir.
Q. You said David Lamond. No relation to Shane Lamond?
A. Correct.
Q. And David Lamond was intel with U.S. Park Police, correct?
A. I know he was with United States Park Police.
Q. Okay. Sworn officer?
A. I'm not sure.
Q. How about Ben Tyler?
A. I know that he was a sworn officer with Virginia State Police.
Q. In his capacity with state police he was an intel officer, correct?
A. I'm not sure.
Q. Kevin Riley?
A. Yes.
Q. Who is that?
A. Arlington County Police Department.
Q. Okay. Do you know what his role was?
A. I do not.
Q. You're the case agent, you interviewed all these people, right?
A. I did not interview those people, no.
Q. These are the people you see in these chats who are communicating with Mr. Lamond, including, like, Ben Tyler,

right?
A. Yes.
Q. Mr. Tyler has a message in here, says, "Check with your PB," Proud Boys, "source" --
A. Yes.
Q. -- "about a specific thing," correct?
A. Correct.
Q. I mean, there's no reason to believe that wasn't Mr. Tyler asking Mr. Lamond to help him get information from Mr. Lamond's source, Mr. Tarrio, is it?
A. Sorry?
Q. That's what he was doing, Mr. Tyler is asking his compatriot at NY -- at Metropolitan Police Department to go to his source, Mr. Tarrio, and get information, correct?
A. He was.
Q. And in a number of those messages, particularly Mr. Tyler and some of the others, Mr. Lamond very clearly says, "I have a source at PB," Proud Boys, right?
A. Yes.
Q. You see him referring to ET, Enrique Tarrio, correct?
A. Yes.
Q. You see him referring to Mr. Tarrio, correct?
A. Yes.
Q. Enrique, right?
A. Yes.

Q. So it's very clear that with Mr. Tyler, Mr. Lamond -- we'll go through some more names, David Lamond -- he, Mr. Shane Lamond, is being very clear that he has a source at the Proud Boys from which he's gaining information, correct?
A. Correct.
Q. And he's sharing it with his compatriots, his other intelligence officers at other law enforcement agencies, correct?
A. Correct.
Q. He is not doing anything to hide, going back to early 2020 and even late 2019, that he has this contact within the Proud Boys, correct?
A. Correct.
Q. Who's Officer Copeland?
A. She is a sergeant within the riot task force at MPD -- or was at the time.
Q. Also, Mr. Lamond also communicated with Sergeant Copeland about Mr. Tarrio, his source at the Proud Boys?
A. I'm just trying to remember if it was directly with Sergeant Copeland or if it was with persons -- yes, the defendant did send an email to Sergeant Copeland.
Q. Again, if I ask you a question, you're not sure, we have to go through some of the documents -- I'm not trying to trick you.
A. Yep.

Q. Lamond, our Lamond, he is communicating with Copeland both individually and as part of this intel group that he's sharing information with Enrique Tarrio, correct?
A. Correct.
Q. Leslie Parsons is who?
A. Commander at MPD over -- within criminal investigations division.
Q. Where does she stand in the hierarchy compared to then Lieutenant Lamond?
A. She -- I'm sorry. Parsons is a man. He was --
Q. Oh, I said "she." I'm sorry.
A. That's okay.
Q. It wasn't --
A. He was a commander, which I believe is higher than lieutenant. I believe.
Q. Lieutenant, captain, commander, correct?
A. I'm not sure what captain is. I was never quite clear.
Q. What about Captain David Hong?
A. Also MPD, special liaison branch.
Q. Also an officer?
A. Yes.
Q. Also superior to Lieutenant Lamond?
A. Again, I apologize, I do not know their ranking. If captain is over --
Q. You don't know if captain is above a lieutenant? But

presuming a captain is above a lieutenant, then Captain Hong would be above Lieutenant Lamond?
A. Presuming that, yes.
Q. So somebody who Lieutenant Lamond was contacting directly, correct?
A. Yes.
Q. And also part of this intel group chat?
A. Captain Hong was not part of the intel group chat.
Q. Did you interview Captain Hong?
A. I did not, but someone on my team did, yes.
Q. Did they come to learn that Captain Hong knew that Lieutenant Lamond had a source at the Proud Boys?
A. Yes.
Q. He knew that long before January 4th, correct?
A. Correct.
Q. How about Jeff Carroll? Who's Jeff Carroll?
A. That was the defendant's boss's boss, the assistant chief in the Homeland Security Bureau.
Q. The assistant chief of police for the Metropolitan Police Department, Homeland Security Bureau, correct?
A. Correct.
Q. So no question superior to Lieutenant Lamond?
A. Correct.
Q. Jeff Carroll knew about Enrique Tarrio as a source?
A. At some point he became aware of it, yes.

Q. Did you interview Jeff Carroll?
A. Yes.
Q. And he told you that?
A. Yes.
Q. Okay. And did you -- when you were doing your investigation, finding both the good things and the bad things, you're talking to these individuals, did you ask any of them, Did Lieutenant Lamond ever memorialize any of this or did he just tell you and send you text messages?
THE COURT: What was the question?
BY MR. SCHAMEL:
Q. When you're interview people like Jeff Carroll, did you inquire about whether or not there was a discussion about Lieutenant Lamond memorializing the relationship that they knew about that he had with Enrique Tarrio?
A. I conducted a lot of interviews. If you could show me a document to refresh my recollection about specific questions in a specific interview.
Q. I will find that one on the break and show that to you and come back to you. I'll make myself a note.
A. Okay.
Q. Do you recall -- let me continue through my list here.
William -- is it Nasworthy or Nasworthy? Am I saying it correctly?
A. I'm not sure.

Q. Are you familiar with the name?
A. Yes.
Q. Who is William Nasworthy?
A. You're testing my memory. If I could look at the timeline.
Q. If I told you United States Secret Service, does that sound right?
A. Yes, it would.
Q. Okay. Do you remember what Mr. Nasworthy's role was at the United States Secret Service?
A. I do not, no.
Q. Do you know that Mr. Nasworthy was an intelligence officer with the United States Secret Service?
A. I do not, no.
Q. Did you interview Mr. Nasworthy?
A. I have not.
Q. Do you know Mr. Nasworthy was on some of the group chats that Mr. Lamond sent out with information about Mr. Tarrio?
A. I'm sorry, their email or chat, I'm not sure which one.
Q. And did you know that Mr. Nasworthy was also aware that Mr. Lamond had a source at the Proud Boys named Enrique Tarrio?
A. I'd have to look at the specific chat to refresh my memory.
Q. I'm going to pull that one up for you, too, and we'll look at that one after the break.
A. Sure.
Q. How about Julie Farnham? Farnham? F-A-R-N-H-A-M.

A. Yes.
Q. Did you speak to Julie Farnham?
A. Yes.
Q. Who's Julie Farnham?
A. She was the assistant director of the United States Capitol Police's interagency -- intelligence and interagency coordination division.
Q. That one you knew. That was good. I wouldn't have come up with it.
THE COURT: Can you just ask questions, instead of just making little speeches about what you're going to do or what you think. Your thoughts and your emotions are not part of this trial.
MR. SCHAMEL: Okay. Okay. Thank you, Your Honor.
BY MR. SCHAMEL:
Q. Ms. Farnham, in her role, was an intelligence role, correct?
A. Yes.
Q. She's also part of these emails and chats?
A. She was part of one exchange with Mr. Lamond and then one email.
Q. Okay. And in your interviewing, as part of your investigation as the lead agent, did you come to know that Ms. Farnham was aware that Mr. Lamond had a source at the Proud Boys named Enrique Tarrio?

A. I actually don't remember that. I need to look --
Q. Look at that one, too. I'll put it on my list.
A. Okay.
Q. Mark Varanelli?
A. Yes.
Q. And he's at the NPS. What's that stand for?
A. That would be the National Park Service.
Q. Okay. What was Mr. -- I'm probably getting it wrong -- Varanelli, what is his role?
A. I'm not sure.
Q. Did you interview him?
A. No.
Q. You didn't know that he was in intelligence with the Park Service?
A. I did not.
Q. Do you know that he was part of some of these chats?
A. If you could pull that one up, too, just to refresh. I know I've even his name and read some communications, I just can't remember specifics.
Q. So you don't know that Mr. Varanelli also knew that Mr. Lamond had a source at the Proud Boys named Enrique Tarrio?
A. Once we pull that up, we can look it up. But it was not disputed that many of his contacts knew that he had a source in the Proud Boys.
Q. How about Robert Glover?

A. Yes. He is with MPD. Captain, I believe.
Q. What was his role? Do you remember?
A. I believe he was in the special operations division, but I would need to confirm.
Q. Do you remember his rank?
A. If I could look at Exhibit 4026, I could tell for sure.
Q. Did you say 4026? 302 or 4026?
A. I think it's 4026, which is the list of the defendant's contacts.
Q. Okay. I will pull that for you.
Robert Pond. Who is Robert Pond?
A. He was with Alexandria Police Department.
Q. Was he also an intelligence officer?
A. I assume so, but I do not know for sure.
Q. Did you ever interview Mr. Pond?
A. No.
Q. You don't know whether or not Mr. Pond was also aware that Mr. Lamond was working with a First Amendment intelligence source at the Proud Boys named Enrique Tarrio? You don't know?
A. I just would have to refer back to the written texts.
Q. Is there anybody else that was in intelligence in the D.C. metro area that Mr. Lamond was communicating with about the Proud Boys and Mr. Tarrio that you interviewed?
A. Could you say it one more time?
Q. Did I miss anybody on the list I just went through of all

the intel officers that Mr. Lamond was sharing information with?
A. I believe I would have to look at the list and do a one-to-one comparison.
Q. Nobody jumps to?
A. Justin Scanlon, I don't think you referenced.
Q. And you didn't come to find that there was anybody in the intelligence community that Mr. Lamond was working with that was unaware that he had a source at the Proud Boys, correct?
A. Well, people became aware of it at different points.
Q. Okay.
A. I'm not sure when each person knew.
Q. Did you find anybody that said Mr. Lamond kept it a secret or denied having Mr. Tarrio as a source?
A. No.
Q. You didn't find any evidence anywhere that Mr. Lamond withheld that information from any of his colleagues in any of the other agencies, did you?
A. He, with -- no, however --
Q. Okay. Let me change gears here for a second. Did you interview AUSA Paul Courtney about this case?
A. Yes.
Q. And what was Mr. Courtney's role? Why did you interview him?
A. He was the assistant United States attorney assigned to the

case in Superior Court.

Q. We're talking about the flag-burning case, correct?

A. Yes, sir.

Q. Okay. In the flag-burning case, Mr. Courtney, he told you, didn't he, that they had probable cause without Mr. Lamond's assistance, without his identification, correct?

A. I would have to review that report.

Q. Okay. I'll pull that one up for you, too. I didn't think we were going to be doing that. All right.

A. Sorry, it was --

Q. That's okay. How about Diana Haviland? Did you interview Diana Haviland as part of your investigation?

A. I did not. Someone on my team did.

Q. Okay. But as a case agent, you would have reviewed that 302 and the notes and known about the contents of that interview, correct?

A. I would have.

Q. Okay. And you're aware that she was on the hate crime committee at MPD, who made the determination about whether the flag burning was a hate crime?

A. I know she was on the special liaison branch, I'm not sure that she was on the hate crime committee.

Q. Do you recall her communicating to a member of your colleagues to that interview that she knew at the time that they are assessing whether or not this was a hate crime that

Mr. Lamond and Mr. Tarrio were still in contact?
A. I would have to review that 302.
Q. Okay. Pull that one, too.
A. Apologize. I'm not trying to be difficult.
Q. I thought we would just jump through them. Sorry.
Let me change gears a different way. Okay?
A. Okay.
Q. In the FBI you have specialized designations for things in your investigations? By that I mean "confidential," right? Like you label things confidential at the FBI?
A. Confidential is one of the classifications, yes.
MS. ROSS: Objection, Your Honor. That's beyond the scope of direct and it's irrelevant. FBI classifications have nothing to do with this investigation, Your Honor.
THE COURT: That's true. And I don't think she testified about anything relating to FBI or classified material.
MR. SCHAMEL: She's the case agent, Your Honor.
THE COURT: I know.
MR. SCHAMEL: And as the case agent she's responsible for all aspects of the investigation. And I've never, ever seen that limited when I question about that. I'm trying to get the foundation of her knowledge. The government has made a number of assessments and allegations about classifications and I want to see what she understands about some of those

classifications.

THE COURT: They haven't said anything about any FBI classified information.

MR. SCHAMEL: Okay. I'll phrase it a different way.

THE COURT: All right.

BY MR. SCHAMEL:

Q. Are you familiar with, as part of your investigation, MPD general orders that talk about sharing of information and the regulations that apply to MPD sworn officers, what they can and cannot share?

A. I've read them, yes.

Q. Okay. Are you familiar that there's anything in those regulations that talks about SSI classifications? Do you know what SSI classifications are?

A. I do not.

Q. Sensitive security information. Did you see any SSI evidence anywhere in the flag-burning case during your investigation of Mr. Lamond?

A. I did not.

MS. ROSS: Objection, Your Honor. There's no evidence about what SSI is or even if it's relevant to this investigation. That term never came up on Hadley's direct or, quite frankly, in this entire trial.

THE COURT: She just said she doesn't know what it is, so then you just asked her if there's any of it involved in

this case.

MR. SCHAMEL: I'm asking her if she saw any -- anything that you saw in this case that was labeled SSI as related to the Enrique Tarrio Black Lives Matter flag-burning investigation.

THE COURT: Paper? Did she see any paper that had that on it? Because we haven't seen any paper at all.

BY MR. SCHAMEL:

Q. Did you see it on any reports? Did you see it on any banners, on any emails? For anybody who was sharing information, did you see anyplace that any part of this investigation was labeled as SSI?

MS. ROSS: Your Honor, the government still objects to this question. There is no indication what SSI is. She testified she doesn't know. Or that SSI is even relevant to this investigation.

THE COURT: There's no charge in the case related to that.

MR. SCHAMEL: It's one of a number of classifications. I would just like to go through and see if she saw any of these classifications on any of the materials. I'm going to get to what they've said, starting with their opening, about law enforcement sensitive, LES.

BY MR. SCHAMEL:

Q. Did you see anything in your investigation of Mr. Lamond

that any part of the Black Lives Matter flag-burning investigation was labeled LES, law enforcement sensitive? Did you see that anyplace?

A. I do not recall seeing that anywhere.

Q. How about confidential? Did you see any emails, did you see any document, did you see any reports, did you see anything that was marked confidential?

A. Not that I recall.

Q. Okay. Did you see any banners or anything on any of the emails that talk about anything being labeled confidential?

A. Not that I recall.

Q. Okay. How about FOUO. Do you know what FOUO is?

MS. ROSS: Objection, Your Honor. Again, there's been no mention of UFUO [sic]. This case is not about leaking classified information. This question is irrelevant.

THE COURT: First of all, I understand the government put in the general orders, I'm not entirely sure why. I mean, I think I understand it. But he's not charged with violating the general orders in this case. The government pointed to that to give some context to their suggestion that what he was doing was wrongful. What they have to prove is that he obstructed the investigation or he tried to obstruct the investigation or that he said something later and he lied about what he did or didn't do.

So I think they are somewhat tangential, but they

were brought in for whatever purpose the government brought them in for and you've had the opportunity to cross-examine the witness who was put on to testify about them. And you asked -- there were a lot of questions about what the use of the word "confidential" in a longer sentence meant. And they did not object just now when you asked this witness: Have you seen any paper labeled confidential in your investigation? She answered that. But now you've just raised another label that we've never discussed in this case before. So I'm not sure why that's relevant.

BY MR. SCHAMEL:

Q. How about "Need to Know"? Do you know what this term means as a designation within the Metropolitan Police Department?

A. Not within the Metropolitan Police Department.

Q. Did you see anything in this investigation of the flag burning that was labeled -- whether it was on email or text message or written forms, documents, anything that was labeled "Need to Know"?

A. Not that I recall with those words, no.

Q. How about as it relates to the warrant application and the warrant that was issued for the arrest of Enrique Tarrio that was in any way labeled "Under Seal"?

A. Not that I recall.

Q. Do you remember seeing anything, as any part of your investigation into the issues of the flag burning, that

indicated that it was an application to obtain an under-seal ruling on that warrant?

A. I do not remember that, no.

Q. So let me ask you this: Did you find anything in your investigation to indicate that any of the information that was contained in the 676 messages that were shared with Mr. Tarrio was confidential?

MS. ROSS: Asked and answered, Your Honor.

MR. SCHAMEL: I didn't ask about a label.

THE COURT: I don't think so. I don't think so. You can answer the question.

A. I'm sorry, can you repeat it?

BY MR. SCHAMEL:

Q. I'm not asking you what was labeled, I'm asking you: In the entirety of your investigation, did you find any evidence that any of the 676 messages that we've talked about between Mr. Lamond and Mr. Tarrio contained information that was designated confidential?

THE COURT: That's a different question.

MR. SCHAMEL: I thought it was a little bit better. I tried.

THE COURT: Okay. So that's the question, whether it had the word "confidential" on it?

MR. SCHAMEL: No, I'm asking if there was anything content-wise that was confidential.

THE COURT: Okay, that's a third question. Okay, so that's the one you want, whether any information, confidential -- what? within the meaning of the general orders was shared, is that your question?

MR. SCHAMEL: Yes, that would be --

THE COURT: Is that an factual question? Is that a legal question?

MR. SCHAMEL: No, it's a factual question.

THE COURT: All right. Did you find anything to indicate that any information that was confidential was shared?

THE WITNESS: Yes.

BY MR. SCHAMEL:

Q. What was that?

A. If we can pull it up, we can go over the messages. But there was information about the police lineup, about the fact that they were considering a hate crime, all of that was information that was sensitive to an ongoing law enforcement investigation, which MPD officers told me would have been confidential under the general orders.

Q. Okay. So your position is that somebody told you it was confidential, but you didn't independently determine anything was confidential, is that right?

A. Are you talking about if it were my case?

Q. I'm talking about -- we're not talking about FBI, we're talking about MPD. I'm asking you what, of the 676 messages,

contained confidential information that Mr. Tarrio received from Mr. Lamond?
A. Can we pull them back up?
Q. Okay. You don't recall anything off the top your head?
A. I just mentioned them.
Q. What were they?
A. A few instances about police asked me to ID you, the fact that the -- he talked about how MPD was considering it to be a hate crime, how the warrant had gone to the U.S. Attorney's Office.
Q. Hang on. I'm tracking them here. So the hate crime, the warrant had been sent to the prosecutor, and I was asked to ID you?
A. Yes. If we can pull them up, I can show you more.
Q. Okay. We will do that.
Let me ask you about the hate crime. Let me see.
I'm going to ask Bill to pull up, if he could, Government Exhibit 4018, page 2 of 37.
While he's pulling that up, do you recall the message from Kristen Metzger? Do you remember who Kristen Metzger is?
A. She was one of the individuals on the emails about the hate crime enhancement.
Q. She worked for whom?
A. MPD.
Q. Okay. And she -- do you remember her sending out a note

saying: We've had a few media inquires about this, is it accurate for us to say MPD is aware of these indents, we take these offenses seriously, and we are currently investigating them as possible hate crimes? Do you remember that message that she sent?

A. Yes.

Q. That was a message that was sent on the 13th of December, correct?

A. Correct.

Q. To Leslie Parsons, David Hong, Kelly O'Meara, Shane Lamond, et al.

A. Correct.

Q. Do you remember that?

A. Yes.

Q. And this was going to be -- can you make that bigger, so we can show Agent Hadley, please. The bottom one, please.

Do you see that?

A. Yes.

Q. That's the one we're talking about?

A. Yes.

Q. Okay. And that was actually going to be the press release from the MPD on December the 13th?

A. I'm not sure how that information was released.

Q. We've had media inquires, and is it accurate for us to say. Ms. Metzger is asking the group if this is an accurate

portrayal of what they're doing in this investigation on December 13th, the day after the burning, is it not?
A. It is, but you said "press release." I just don't know how it went out.
Q. You don't know how it went out, but this was the press release they were putting together?
A. That was information they were putting together, presumably to be released.
THE COURT: Do you know what ultimately was released? Was it consistent with this?
THE WITNESS: I do not know.
BY MR. SCHAMEL:
Q. Do you remember, as part of your investigation --
MR. SCHAMEL: I'm sorry?
THE COURT: Go ahead.
MR. SCHAMEL: I thought you said something. I'm sorry.
BY MR. SCHAMEL:
Q. Do you remember, as part of your investigation, seeing a press release on December 14th of 2020 by the D.C. Metropolitan Police Department that showed pictures of people that were destroying and burning a banner and ended with a paragraph, after a $3,000 reward was posted, where it talks about persons involved in the crime as being investigated as a hate crime? Do you remember that?

A. If you could show me the press release. I do remember the Twitter feed, there being some BOLOs and some information about the crimes. I would have to look at the press release.
Q. Okay. I'm going to show that to you.
MS. ROSS: Your Honor, I believe he's referencing something that is not in evidence.
MR. SCHAMEL: I'm not offering it.
MS. ROSS: You're reading off of it, so you're essentially reading it into the record. But that is not in evidence yet.
THE COURT: Well, were you referring to something that's been marked as an exhibit?
MR. SCHAMEL: It is not, Your Honor. I'm referring to a document that I think this agent should be aware of, a press release by the Metropolitan Police Department. I'm asking her if she knows of its existence.
THE COURT: Are you familiar with a press release that came out from MPD?
THE WITNESS: I can't recall.
THE COURT: All right.
BY MR. SCHAMEL:
Q. Are you aware that the FBI also issued a Twitter statement on December 14th about the BLM flag burning and identified it as a potential hate crime? Were you aware of that?
A. Yes.

Q. So we are -- you don't remember the MPD one, but you do remember that the FBI issued a release through public Twitter that this was being investigated as a hate crime, correct?
A. Correct.
Q. And that was before Mr. Lamond ever communicated that to Mr. Tarrio, was it not?
A. Correct. However, there were additional information in Mr. -- the defendant's message to Enrique Tarrio about the hate crime.
Q. About what -- about his opinion about whether or not they could make it a hate crime, correct?
A. Yes, what he told his coworkers and that the FBI was not investigating it.
Q. Okay. I'm not focusing on whether the FBI was or wasn't investigating those messages. I'm asking you: Is it not a fact that the FBI, on its verified Twitter account, released a statement to the world that they were investigating the flag burning as a hate crime before that ever came up between Mr. Tarrio and Mr. Lamond in their messages?
A. Yes.
Q. Thank you. The fact that the FBI was investigating was publicly known prior to Mr. Lamond's communication with Mr. Tarrio about that fact, correct?
A. Correct.
Q. The fact that the Metropolitan Police Department was

investigating the flag burning was publicly out there before Mr. Lamond and Mr. Tarrio started talking about it, correct?
A. It was.
Q. There was -- MPD and FBI had both issued rewards prior to the communications between Mr. Tarrio and Mr. Lamond, correct?
A. I thought the FBI issued their reward starting in July.
Q. Six months later?
A. Correct.
Q. You were asked on direct examination about some messages that Mr. Lamond had with Mr. Tarrio about the release of one of Mr. Tarrio's colleagues from the police department after his arrest. Do you remember those messages?
A. Yes.
Q. And Mr. Lamond told Mr. Tarrio where his colleague would be released outside the central cellblock?
A. Yes.
Q. Next to the MPD headquarters, correct?
A. Correct.
Q. That is information that is public, is it not?
A. I'm not sure what was public at the time about where he was being released.
Q. Do you perceive the release location of all inmates coming out of central cellblock as a confidential piece of information?
A. No.

Q. The ABRA investigation, do you remember, you talked about ABRA during your direct examination?
A. Yes.
Q. You told us it was the Alcoholic Beverage -- what does the "R" stand for? Regulatory Authority?
A. Regulation Administration.
Q. Regulation Administration. The ABRA investigation was out on both the MPD website and the D.C. government website prior to Mr. Lamond's communication to Mr. Tarrio, was it not?
A. I don't know.
Q. You didn't learn that in your investigation?
A. I did not.
Q. Is it your understanding that Mr. Tarrio learned of it from Mr. Lamond before it was publicly released?
A. I don't know.
Q. Well, I'm asking you, is it the conclusion of your investigation -- as the case agent, sitting here today -- do you believe that Mr. Tarrio learned of that from Mr. Lamond before it was publicly available?
MS. ROSS: Your Honor, she just said she didn't know.
THE COURT: Right. She did.
BY MR. SCHAMEL:
Q. So is it your position that Mr. Lamond sharing that ABRA information to Mr. Tarrio was confidential?
A. I would have to look more into the details of it.

Q. Not part of the analysis that you've gone through?

A. No.

Q. The fact that this was being investigated as a misdemeanor destruction of property, that was publicly known, correct?

A. I'm not sure if it was public out there, that it was a misdemeanor.

Q. Okay. But it was publicly released that it was a destruction of property investigation, correct?

A. Correct.

Q. And it was just a -- are you familiar with the difference between a felony and misdemeanor destruction of property in the District of Columbia?

A. I don't know the D.C. statutes.

Q. So you don't know what the cut is for value to make the decision?

A. I don't.

Q. But is it fair to say that it was publicly out there from law enforcement -- not Mr. Lamond -- that this was an investigation into destruction of property before Mr. Lamond and Mr. Tarrio started discussing this investigation of the banner burning?

A. Yes.

Q. You said the existence of the warrant was one of the things that you thought might be confidential that Mr. Lamond shared with Mr. Tarrio, correct?

A. I believe I said it was that the warrant was going to the U.S. Attorney's Office.
Q. So is it your position in your investigation that it was the fact that the warrant had been completed and applied for, or the step it was in the process? What exactly do you think was the confidential nature of what Mr. Lamond shared with Mr. Tarrio?
A. I think it was all information about the arrest warrant for Mr. Tarrio.
Q. And your position is that's all confidential?
A. Yes.
Q. On what do you base that?
A. The fact that it's an ongoing criminal investigation, so release of information about a warrant to the subject of that warrant creates problems with officer safety, problems with destruction of evidence, attempt to evade --
Q. But that's a different question. I'm not asking you what problems it caused. I'm asking you, was it confidential?
A. Yes.
Q. And how do you make that determination?
A. Because it causes those problems.
Q. So your analysis is, it wasn't designated as confidential, but because of problems it caused, that you've concluded it was?
A. All information about an ongoing criminal investigation

could be classified as confidential if it compromises that investigation if released.

Q. Could be. Was it?

A. This particular, yes. It was confidential.

Q. It was classified as confidential by whom?

A. Classification --

MS. ROSS: Your Honor, we've been over --

THE COURT: We have no piece of paper that was designated confidential. I have not seen any general order anywhere that talks about information being designated confidential. It says, "Confidential, or it was confided in you in your role as a law enforcement officer," that's that one. And then there's other ones about ongoing investigations and sources and all that.

We've all read them, we all know exactly what they say and you'll be able to cite them to me and tell me whether you think they apply or not. But you keep using the term with her, designated as confidential or labeled as confidential and sort of arguing with her about it.

I think we've already established that there was no piece of paper that had a red stamp "confidential" on it. But that doesn't mean that every time you use the word "confidential," that that's what that encompasses.

MR. SCHAMEL: I'll move on to something else.

THE COURT: I'm sorry, what did you just say?

MR. SCHAMEL: I'll move on to something else, Your Honor.

THE COURT: Okay.

BY MR. SCHAMEL:

Q. Did you find any communications between Mr. Lamond and Mr. Tarrio on Mr. Lamond's personal phone?

A. No.

Q. Do you find any communication between Mr. Lamond and Mr. Tarrio on Mr. Lamond's personal computer?

A. I did not search Mr. Lamond's personal computer.

Q. Why didn't you do that?

A. We had no probable cause to get a warrant for that computer.

Q. Did you interview Mr. Tarrio prior to this investigation?

A. No.

Q. Did you have any understanding of why Mr. Tarrio booked a travel from January -- on January 4th, as opposed to January 5th, in the District of Columbia?

A. He wrote a text message about it.

Q. What did he say?

A. He said that's why I'm getting there a day early, because he believed he was going to be arrested.

Q. Do you remember when he booked that travel?

A. It was in January, but I would have to look. Either late December or early January.

Q. Do you want to take a look? What would help refresh your recollection? What do you want to look at?
A. Sure. The master summary chart or the sub-exhibit associated with it.
Q. Okay. Bill, can you just pull that up?
While Bill is pulling it up, I want you to look at it, get the date right. It was definitely before January 4th he booked it, correct?
A. Correct.
Q. So he booked it, and he said in his messages, I'm booking this and coming in early because I'm going to get arrested?
A. The implication was that it was because he was going to get arrested.
Q. So he was going to make a big show of it?
A. He did.
Q. Take a look. Is there a particular part of this you want me to show you? And I'm happy to --
Bill, could you bring it to the --
A. Keep going.
THE COURTROOM DEPUTY: Which number is that?
MR. SCHAMEL: 4006.
A. Keep going. Keep going. Keep going. Okay.
It would have been -- I'm sorry, December -- go back to December 30th. Go forward. Go forward.
I apologize. I can't see it.

BY MR. SCHAMEL:
Q. Let me see if I can find it in the sub one.
Billy, would you pull up -- this is 4019, page 405, please.
PARALEGAL HINGER: Which page, Mark?
MR. SCHAMEL: 405, please. You passed it.
A. There it is. Thank you.
BY MR. SCHAMEL:
Q. Do you see that, Agent?
A. I do. It was December 8, 2020.
Q. So Mr. Tarrio booked his flight to D.C. to come in on January 4th on December 28th?
A. Somebody booked it, yes.
Q. Okay. Fair. For him to travel?
A. Correct.
Q. Understanding he missed the flight and got the later flight, but this was the ticket on which he traveled?
A. Yes, it was.
Q. So he fully intended, it appears, on the 28th of December, to come in on the 4th for the purposes of being arrested?
A. Yes, sir.
Q. And when was the warrant signed?
A. I'm sorry. It goes back and forth a couple times.
Q. If I told you December 30th, two days later, does that sound right?

A. That sounds right.
Q. So this was booked two days before the warrant was signed?
A. Yes.
Q. He was going to come to town, and there was no other criminal investigation of Mr. Tarrio that you're aware of, correct?
A. Correct.
Q. So he was coming into town for the misdemeanor non-hate crime, destruction of property, in D.C. Superior Court?
A. Correct.
Q. So when he said I learned about it on the plane in his later text messages, he sort of knew it already before then, didn't he?
A. He knew there was a possibility.
Q. And knowing there was a possibility, he came here, as your understanding from the investigation, fully intending to be arrested?
A. He did.
Q. And there was an arrest team at the airport for him?
A. They were not at the airport, no.
Q. There weren't people following him at the airport?
A. There were. That was not necessarily the arrest team --
Q. What would you call that?
A. -- that was in Virginia.
It was a surveillance team.

Q. There was law enforcement waiting for Mr. Tarrio at the airport?
A. Yes.
Q. And they watched him get into a Uber, go directly to the District of Columbia?
A. They did.
Q. As soon as he crossed the bridge, he got stopped in the tunnel and got arrested without incident?
A. He did.
THE COURT: Can I just go back? There was a question you asked that said: Why did he change his flight to January 4th? Was there an earlier booking for a later date or was that always the booking? It's just he knew at the time that there was a possibility he was going to get arrested when he booked it?
THE WITNESS: It was always booked for January 4th. I believe the question was it got changed that day because he missed his original flight.
THE COURT: Okay. All right.
THE WITNESS: I believe.
MR. SCHAMEL: To answer Your Honor's question --
THE COURT: You had asked that in your question.
MR. SCHAMEL: I did. It may have been sort of an imperfect question I asked.
THE COURT: I think the point that you're making is

made. I wanted to make sure I didn't miss something.

Go ahead.

MR. SCHAMEL: No, you didn't, Your Honor.

BY MR. SCHAMEL:

Q. Other than the discussions that you've been focusing on with Ms. Ross about the hate crime/not hate crime warrant/not warrant for Mr. Tarrio, are -- the substance of all the other communications between Mr. Lamond and Mr. Tarrio, they're about protests and demonstrations, correct?

A. Could you be more specific? You said "all."

Q. Okay. When Mr. Lamond is contacting Mr. Tarrio, he's asking him: Where are you protesting? When are you coming?

A. Those are, in part, yes, what he is asking.

Q. He is constantly, all the way through to the very end, to the 27th of January of 2021, still asking questions, things like: Are you coming up for the inauguration?

A. Yes.

Q. Where are your people going to be?

A. Yes.

Q. How many people are you going to have?

A. Yes.

Q. Okay. So there's no break from 2019 until the end of communication in 2021 where Mr. Tarrio is still not providing information to Mr. Lamond about protests and demonstrations and things that are going to happen in the District of Columbia,

correct?
A. Well, there is a break when we -- when the messages start being destroyed.
Q. In the messages that exist, there's no break in those communications and they're still discussing that right up through the end, right?
A. Other than destroyed messages, yes.
Q. And so we'll leave that as a caveat. Other than destroyed messages -- I'm just focusing on messages you have -- Mr. Lamond is still getting information from Mr. Tarrio about his and the Proud Boys' plans as they relate to protests and demonstrations?
A. That was part of what he was doing, yes.
Q. He was fielding -- "he," Mr. Lamond -- was fielding questions from other law enforcement personnel specifically to go to Mr. Tarrio and get that information, right?
A. Correct.
Q. Like, are you going to this rally in Richmond, right?
A. Correct.
Q. Are you going to this other rally in Michigan, correct?
A. Yes.
Q. And then he, Mr. Lamond, is then sharing that with the other law enforcement folks that we've talked about here in those other agencies, correct?
A. He did.

Q. That never stopped, right?
A. With the exception of the deleted messages, yes.
Q. With that caveat.
And we don't know that it stopped, you just don't know what was in those messages?
A. Exactly.
Q. The timing -- Ms. Ross asked you some questions about the timing, when, sort of, the messages started to increase, there became more and more messages. Do you remember her asking that line of questions?
A. Yes.
Q. The messages, the frequency of the messages increased as it got closer to the election, correct?
A. Correct.
Q. And then after the election as it got closer to January 6, correct?
A. Correct.
Q. And then there's a number of them about potential protests and things at the inauguration, correct?
A. Correct.
Q. No disputing that was then Lieutenant Lamond's duty to have those communications with Mr. Tarrio and gather that information, correct?
A. Correct.
Q. And there's no information that Mr. Lamond took that

information and disseminated it to other law enforcement officers as part of his job, correct?
A. Correct. However, a large percent of the communications were not about First Amendment demonstrations.
Q. Understand. And we're going to talk about those, too. But I'm asking you, you have no qualm with me saying he's still doing his job in collecting intel from Mr. Tarrio and sharing it with law enforcement?
A. That part of his job, no dispute.
Q. Okay. And he's not hiding with all these other law enforcement folks we've talked about that he's getting it from Mr. Tarrio?
A. Correct.
Q. Did you see anything in the 676 messages -- I'm not talking about what we couldn't find, just the ones you have -- did you see anything in there that Mr. Lamond was doing any criminal investigations as it related to Mr. Tarrio? He was doing anything as part of a criminal investigation?
A. Mr. Lamond?
Q. Um-hum.
A. Yes. He was involved in the criminal investigation of Mr. Tarrio.
Q. In what capacity was he involved in the criminal investigation of Mr. Tarrio?
A. He was called upon to help identify Mr. Tarrio.

Q. Well, to be fair, he volunteered to identify Mr. Tarrio, correct?
A. Correct.
Q. Once that came out, that Mr. Tarrio and the Proud Boys were somehow associated with this flag burning, Mr. Lamond came forward through his chain of command and said, I know him?
A. He did.
Q. And ultimately identified him?
A. Yes, he did.
Q. He had some trouble with the one photo, right?
A. He did.
Q. So the face was a little obscured?
A. Yes.
Q. But he then -- "he," Mr. Lamond -- then provided other pictures of Mr. Tarrio from that day showing how he was dressed?
A. Publicly available, yes, he did.
Q. He went out and did that work and provided that to the folks inside?
A. Yes, while at the same time directly undermining the investigation by not providing a big chunk of information.
Q. We're going to get to what you think that is in a second. But I'm just focusing on what he did here for a minute here, okay?
A. Okay.

Q. And so when he's doing that, he was also telling Mr. Tarrio at the same time they, MPD, doesn't have a photo of you, right?
A. Correct.
Q. He wasn't being truthful with Mr. Tarrio?
A. Did you say they don't have a photo or don't have video? I think he said they don't have video.
Q. They don't very video. Okay.
A. I can't remember exactly.
Q. Okay. And he's telling them that maybe they're not going to make the case?
A. That -- I believe those messages are destroyed, but that is what Tarrio is telling his own contacts that he's receiving from his contact at D.C. Metro.
Q. So Shane is communicating with Tarrio and asking him questions about protests and demonstrations, right?
A. Yes.
Q. And also, apparently, giving Mr. Tarrio bad information from the criminal investigation?
A. I'm not sure what bad information you're talking about.
Q. He's not being truthful that they're not going to be able to make the case?
A. I don't -- I don't know what you're talking about.
Q. We have the internal emails that show that they have -- you talked to the AUSA, they had probable cause just based on the social media posts, right?

A. I don't think I testified to that, no. You were going to show me the interview.

Q. Oh, you didn't remember that. That's fair. Okay. Then we'll wait until we get that, then I'll show it to you.

MR. SCHAMEL: Trying to cut a lot of things out of here, Your Honor.

BY MR. SCHAMEL:

Q. Have you ever done any intelligence work? Have you ever worked in the intelligence section?

A. No.

Q. Have you ever done work with -- strike that. I won't ask.

Could you tell me, when you talk about the list of people that you had interviewed, Assistant Chief Carroll?

A. It was -- yes. I was there for one and then somebody else on my team -- I think there was another, second interview.

Q. When you interviewed Assistant Chief Carroll, was there any discussion during that about whether or not Lieutenant Lamond had properly documented his use of Mr. Tarrio as a source?

A. I think that's what you were going to show me.

Q. Okay. That's what I was going to show you. I just want to make sure -- I'll go back to that in a second. When we take the break, I'll pull those things together.

THE COURT: I guess you're telling me you want a break before you finish your cross?

MR. SCHAMEL: Yeah. What I'm doing, Your Honor, just

trying to cut a bunch of things out here.

THE COURT: I have no problem with people taking time to get their thoughts together and make their questions shorter. I just -- when you keep saying, "I'll do that during a break," I think what you're communicating is that you want to have a break before you finish your cross.

MR. SCHAMEL: I'm happy to take a break, and maybe you don't have to sit here and watch me go through my notes. That would be fine, Your Honor, if Your Honor wants to take a break.

THE COURT: You're missing my question.

MR. SCHAMEL: I would love a break, Your Honor. And I'll wrap it up after the break.

THE COURT: All right. It seemed like you needed one to get whatever you wanted to confront her with.

MR. SCHAMEL: Yep, I want to pull those things together.

THE COURT: Okay. Then we'll take our afternoon break.

Before we do that, I just want to ask another question about the timing and the conversation we had about Mr. Tarrio when we came back from lunch. You said he's here, you asked us to put in a come-up. We put a come-up for tomorrow, on the assumption the government may finish its case-in-chief in the morning, and then he would be testifying in the

afternoon. And you said his lawyer was going to make his way here for that to happen. But he's -- it just occurred to me that I think you said something about his talking to Mr. Tarrio at D.C. jail in the morning, but Mr. Tarrio is going to be here.

MR. SCHAMEL: I didn't mean to say -- I think I said lockup.

THE COURTROOM DEPUTY: I assume -- I took a note, but I assume that attorney will speak to him here, so I asked for him to be here in the morning.

THE COURT: Yes, I just wanted to make sure we didn't have this conversation that we need to have before Mr. Tarrio can ever take the stand not happen because they haven't connected. So he knows that Mr. Tarrio is going to be here.

MR. SCHAMEL: Yes.

THE COURT: He'll be looking for him in the right place.

MR. SCHAMEL: Correct.

THE COURT: All right.

MR. ROTHSTEIN: To be clear, we believe we'll rest around this time tomorrow. That's our goal.

THE COURT: We'll have him here just in case. And we'll have him here at least to facilitate this conversation, because we still -- I don't know if we've heard definitively what Mr. Tarrio's position is on whether he's going to testify

or not. Maybe you have heard, but I haven't.

All right. So we'll take a ten-minute break, we'll come back and you'll continue cross-examination of this witness.

(Recess from 3:35 to 4:01 p.m.)

THE COURT: All right. You can resume.

BY MR. SCHAMEL:

Q. Hi. Nice to see you again.

Bill, could you pull up 4018, 33. Don't show it. Well, I think you can show it.

You remember being asked questions on direct examination about whether or not Mr. Tarrio was told by Mr. Lamond that MPD wanted to speak to him? Do you remember being asked that question?

A. Correct.

Q. And did you say "No"?

A. Could you repeat the question, make sure.

Q. Ms. Ross asked you if MPD wanted to speak to Mr. Tarrio and Mr. Lamond had communicated that to Mr. Tarrio?

A. Correct.

Q. Okay. And did you say yes, he had, or no, he hadn't?

A. The defendant did tell Tarrio that MPD wanted to speak with him.

Q. Defendant did. Okay. I wrote it down wrong. Okay.

We'll move on to the next one, Bill.

You indicated that you interviewed Mr. Paul Courtney, correct?
A. Yes.
Q. AUSA?
A. Yes.
Q. Okay. And do you recall Mr. Courtney telling you that -- the question I asked you was, "The identification was not needed because the U.S. Attorney's Office had sufficient other evidence, including Tarrio's admissions, social media posts, and a video of the event?" I asked you that question and you said, "I don't recall."
MS. ROSS: Objection, Your Honor.
THE COURT: On what basis?
MS. ROSS: Your Honor, he's offering the statement for the truth of the matter. This is hearsay.
THE COURT: What's your response to that?
MR. SCHAMEL: I'm not offering it at all. I'm asking her if that's what was told as part of her invest -- if she learned that during her investigation, not whether or not it's true.
THE COURT: Just the fact that it was said is relevant? Why is the fact that it was said relevant?
MR. SCHAMEL: The fact that it was said and she learned through her investigation and previously testified --
THE COURT: That she learned it. So you're saying

that it was true?

MR. SCHAMEL: I'm saying that the government has alleged that they needed Mr. Lamond for probable cause and she learned otherwise in her investigation.

THE COURT: I don't think that's what the government's alleged. But putting that aside, you were doing this with the other witness the other day about the internal affairs investigation. Which, I just want to tell everybody, I have no idea what was investigated or what the outcome was and I don't think I should know. So, it's not part of this case, but you started inching into it. And one of the things you were asking him was: Did so-and-so tell you this? And did so-and-so tell you that? And now you're asking her: Did so-and-so tell you this? And did so-and-so tell you that? And I don't understand why that's not hearsay.

MR. SCHAMEL: She's a case agent, it's part of her analysis when she gets asked all those summary questions at the end of her direct examination about what she learned, what she came to know. And I'm asking her: Did she come to know this? And she's saying she doesn't recall, so I show it to refresh her recollection, ask: Did you come to learn that the U.S. Attorney's Office did not need Mr. Lamond's identification for the purposes --

THE COURT: So you're seeking to elicit testimony about an out-of-court statement made to this witness which

you're offering for the truth of the matter asserted. And it will be -- the objection is sustained.

MR. SCHAMEL: I'm not asking for the statement. I'm asking: Did she come to learn in her investigation --

THE COURT: Come to learn. You're assuming that it's a fact, it's a fact because someone said it out of court to her. It's hearsay. It is a textbook definition of hearsay. It doesn't matter if it's hearsay -- let's put it this way: If she's sitting here and she's the case agent and they asked her about something somebody said to her, you would object, it's hearsay, and their saying she's the case agent would not be enough to overcome that objection.

So ask your next question. You can call Mr. Courtney as a witness.

MR. SCHAMEL: I may. Thank you.

THE COURT: All right.

BY MR. SCHAMEL:

Q. Did you interview Detective Franklin Then?

A. Yes.

Q. Okay. Did you come to learn that Mr. Then was aware that Mr. Lamond and Mr. Tarrio were in regular communication during the time of the flag-burning investigation?

MS. ROSS: Same objection.

THE COURT: All right.

MS. ROSS: Same objection, Your Honor.

THE COURT: Yes. I think she's -- you did a lot of this without objection earlier, where you asked her repeatedly was someone in communication, did they know that he was a source, and she answered all those questions, yes, yes, yes. And it wasn't a secret? Yes, yes, yes. And we went through at least 20 people and she said there's no dispute about any of that. But I don't see how you can ask her: Did so-and-so tell you X? If you want to explain to me how --

MR. SCHAMEL: If someone -- case agents are different, Your Honor.

THE COURT: They aren't.

MR. SCHAMEL: They are.

THE COURT: They're not an exception to the hearsay rule.

MR. SCHAMEL: I'm not asking her: Did he tell you this? What did he say? and offering it for the truth. I'm asking --

THE COURT: You said, "Did you come to learn."

MR. SCHAMEL: In the course of your investigation.

THE COURT: That assumes that somebody told her something and that it was true, right?

MR. SCHAMEL: But unless I'm asking her for the statement. I'm not asking for the statement.

THE COURT: You said, "Did you come to learn," and then in the brackets was the statement. It's just clever

phrasing, but you're asking her what that gentleman told her.

MR. SCHAMEL: It is --

THE COURT: And you're holding in your hand the 302 of her interview of that person.

MR. SCHAMEL: If she has to refresh her recollection about what she learned in the course of her investigation was that Mr. Lamond was communicating with Mr. Tarrio during the flag burning and that everybody was aware of that. That's part of her investigation. That's why she's different.

THE COURT: Okay. No, it's not. You're going to have to call these people, if this is important to you. It's also -- you know, all she testified to was the content of the emails. So I'm giving you a lot of leeway about going outside that. There are emails, I believe, that you wanted to confront her with and call up because she couldn't remember them off the top of her head. And you're welcome to do that and you're welcome to ask her any other questions, but you are not welcome to ask her what somebody else told her in her investigation.

MR. SCHAMEL: Even for the purposes -- never mind. I'll withdraw it.

BY MR. SCHAMEL:

Q. Let me ask you this: Did you come to learn, in the course of your investigation, that MPD often has sources that are not registered?

A. Yes.

Q. Did you come to learn, in the course of your investigation, that MPD has sources that are not registered for long periods of time?
A. Yes.
Q. Okay. Did you come to learn, in the course of your investigation, that MPD has sources that remain anonymous to other people at MPD?
A. Yes.
Q. Did you come to learn that -- in the course of your investigation, that the intelligence section use of sources is different than for criminal investigations?
A. No.
Q. Did you come to learn, in the course of your investigation, that it is not uncommon to identify someone with a warrant and to tell them they have a warrant to allow them to turn themselves in?
A. I do not know. I can't talk about how common it is at MPD.
Q. Did you come to learn that that happens?
A. That it has happened before, yes.
Q. Did you come to learn that there's no general order that prohibits that?
A. Correct.
Q. Did you arrest Mr. Lamond? Did you or were you part of the arrest team of Mr. Lamond when he self-surrendered?
A. Yes.

Q. Do you know how he came to be at the FBI --

MS. ROSS: Objection, Your Honor. Relevance.

THE COURT: I'm sorry. Let him finish the question, then you can object. Go ahead.

BY MR. SCHAMEL:

Q. Did you come to learn how Mr. Lamond came to be at FBI to self-surrender on his arrest warrant?

MS. ROSS: Objection, Your Honor. Relevance.

THE COURT: Sustained.

BY MR. SCHAMEL:

Q. Did you come to learn, in the course of your investigation, that there's a difference between a paid confidential informant and a source?

MS. ROSS: Your Honor, this is beyond the scope of Agent Hadley's testimony.

THE COURT: I think so. I presume -- I don't know if you're going to call somebody from the intelligence division or not. The government might. Seems like some of the things that they're trying to teach me could be taught by that person, and then you can cross-examine that person. But, again, you're -- and you did this, to some extent, with the internal affairs guy who didn't have personal -- she doesn't have personal knowledge about how the intelligence division operates.

MR. SCHAMEL: But she ran the investigation into Lieutenant Lamond and she said she has personal knowledge of

the MPD general orders and she came to know how MPD handles these types of investigations, and I think that goes to the heart of the credibility of her investigation and her ultimate conclusion.

THE COURT: I don't think she testified that she came to learn how MPD handles these type of investigations. I don't even know which type you're now referring to.

MR. SCHAMEL: The investigation of Mr. Tarrio and the flag burning.

THE COURT: Okay. Well, you've been asking her questions about the intelligence division.

MR. SCHAMEL: I have. And when I asked her questions about confidential, I was told I was -- I learned these other things in the course of my investigation, that these -- these things that Mr. Lamond was sharing were confidential. That's what she said. She said these things were confidential.

THE COURT: Right. She responded to your question on cross. What's your next question?

BY MR. SCHAMEL:

Q. Did you come to learn that there -- anything about the MPD form 854 as it related to sources or confidential informants?

MS. ROSS: Objection, Your Honor. Again, that's outside the scope of Agent Hadley's direct examination.

THE COURT: She wasn't the one who testified about looking for records about the source, and I don't --

MR. SCHAMEL: She's the case agent. Everything is --

THE COURT: You can say that to me until the cows come home. I don't know how that answers the question.

MR. SCHAMEL: I'm not sure I understand -- okay.

THE COURT: She testified about all the emails.

MR. SCHAMEL: She did.

THE COURT: Somebody already testified about the general orders. She was not the one who said I went and looked to see if he was registered as a source. And even that gentleman said we don't register -- not everybody's in there. So if you want to know how the intelligence division uses the registry, or doesn't, for sources and the difference between paid and unpaid, and anonymous -- which he's obviously not because you've elicited already that he told everybody who it was. Somebody with person knowledge of that information has to testify about that information.

MR. SCHAMEL: My understanding --

THE COURT: If case agents just got to come in and sit on the bench and summarize their investigation, we wouldn't have trials.

MR. SCHAMEL: But that's exactly what case agents do on direct examination, they summarize their investigation.

THE COURT: They don't. She didn't.

MR. SCHAMEL: They didn't elicit that, but that -- once she's an the stand, they are. She's responsible --

THE COURT: She summarized the text messages, that's all.

MR. SCHAMEL: But she's on the stand as the case agent, so she's responsible --

THE COURT: They did not say, Ma'am, tell us everything about the investigation. They said -- they put up the chart and we went through the exhibits.

MR. SCHAMEL: I will --

THE COURT: Go on. Ask your next questions.

MR. SCHAMEL: I'm going to stop there then, Your Honor, and I'm going to have Agent Hadley subject to recall for the defense.

THE COURT: Okay. When she comes back, she still can't testify to hearsay.

MR. SCHAMEL: I understand your position, Your Honor. I understand your ruling.

THE COURT: Okay. Every one of these people that you think is important, who has information, they can call and you can call. And I can tell you, the whole issue about the warrant, the record is a mess right now. We've got one general order that says you're not allowed to contact somebody else's suspect without their permission. And then we've got people saying there's no general order that says you can call people and tell them there's a warrant.

So I don't know what to make of all that. You all

will have to tell me what to make of all that. Maybe someone who has knowledge of the answer will tell me. You're going to argue what you're going to argue, they're going to argue what they're going to argue. But if someone told her something that you want me to hear because they think it's true and you want me to believe that what they said is true, then you need to call that witness. And it's the same thing for the government.

You're looking at me like I made this up.

MR. SCHAMEL: No, Your Honor. I'm not trying to --

THE COURT: Well, you're looking disgusted, which I understand you're frustrated right now. But I just don't understand how the hearsay rule could be a mystery to you. Truly.

MR. SCHAMEL: It's not a mystery to me, Your Honor. I understand. I think I understand the hearsay rule. What I'm -- if I'm expressing frustration, I apologize. I'm not trying to do so.

I am a little frustrated only because in all the years I've tried cases and all the places I've tried them, every time the case agent gets on the stand the entirety of the case is something you can cross about. And I'm happy to go back and look and see if these other judges --

THE COURT: I've never seen such a ruling in my life.

MR. SCHAMEL: I'm happy to even cite to some cases for that, Your Honor, where I've done it in different federal

courts. And what I'm going to do is I'm going to sit down, I'm going to go back and look at it. If I need to file something with the Court --

THE COURT: If you want to ask her for facts, facts within her personal knowledge, I think -- she's been on for several hours. It's not like I held you strictly to the texts and the texts only. You asked many questions about her investigation. But you are now asking questions that don't arise out of her personal knowledge, that arise out of what she gleaned in interviews of people with personal knowledge of the things you're trying to ask her. That's my problem, it's not so much that you expanded the scope.

MR. SCHAMEL: No, I understand, Your Honor. I think we just have a --

THE COURT: All right. So are you finished with this witness?

MR. SCHAMEL: Subject to recall, Your Honor.

THE COURT: All right.

MR. SCHAMEL: Thank you.

THE COURT: Any redirect?

MS. ROSS: Briefly, Your Honor.

THE COURT: You always say that.

MS. ROSS: Hopefully I will be -- hopefully that will be the case this time.

THE COURT: Okay.

REDIRECT EXAMINATION

BY MS. ROSS:

Q. Agent Hadley, defense counsel asked you some questions about a press release, right?

A. Yes.

Q. And the FBI did issue a press release?

A. Yes.

Q. Is there any dispute that the fact that there was an investigation into the banner burning was public?

A. No.

Q. But were all aspects of that banner-burning investigation public?

A. No.

Q. So just as one example, were the internal discussions the FBI was having about whether to charge the banner burning as a hate crime announced publicly?

A. No.

Q. And were the internal discussions MPD was having about whether to charge the banner burning as a hate crime announced publicly?

A. No.

Q. But was there evidence that Tarrio was made aware of internal discussions MPD was having about the banner burning and whether it should be charged as a hate crime?

A. Yes.

Q. And who made Tarrio aware of those internal discussions?
A. The defendant.
Q. Agent Hadley, did you see any evidence, in the course of your investigation, that MPD intended for investigative steps MPD was taking in the banner burning to be made publicly available prior to the arrest?
THE COURT: Okay. Wait a minute. I missed that. It went by real quickly.
MS. ROSS: Sorry, Your Honor. I'll slow down.
BY MS. ROSS:
Q. Agent Hadley, in the course of your investigation, did you see any evidence that MPD intended for investigative steps that it was taking in the banner-burning investigation to be made publicly available prior to Tarrio's arrest?
A. No.
Q. Or that anybody at MPD intended for those investigative steps to be provided to Tarrio?
A. No.
Q. And can we please bring up Exhibit 4018 and go to page 21, please.
Agent Hadley, you read this message that's second from the bottom there a little bit earlier in your testimony. And it said, "We got the jump on the narrative for the banner burning. It should be next to impossible for them to use the hate crime enhancement as per my contact at D.C. Metro."

This information here, Agent Hadley, that Tarrio passed on to the Proud Boys, that was not from a press release, correct?

A. Correct.

Q. That was from the defendant, right?

A. Correct.

Q. Agent Hadley, defense counsel asked you some questions about whether the defendant was providing Tarrio with false information about the investigation. Do you remember that?

A. Yes.

Q. And did you find any evidence that there was any sort of plan for the defendant to purposely mislead Tarrio about the banner-burning investigation?

A. No.

Q. Any discussion of that whatsoever?

A. No.

Q. And is there any evidence that defendant did in fact intentionally mislead Tarrio about the investigation?

MR. SCHAMEL: Objection.

Objection.

THE COURT: I know. I'm thinking.

MR. SCHAMEL: I didn't know --

THE COURT: What's the basis?

MR. SCHAMEL: Calls for a conclusion.

THE COURT: I think you can ask her about any

particular instances where he's said something incorrect, but I'm not sure about that question.

BY MS. ROSS:

Q. Agent Hadley, based on your review of emails and text messages and based on the information that the defendant was learning about the banner-burning investigation, did he pass on any information to Tarrio that was inconsistent with what he was learning, based on the emails and text messages he was receiving?

A. No.

Q. Agent Hadley, there's evidence that Enrique Tarrio was not the only Proud Boy involved in the banner burning, correct?

A. Yes.

Q. And you can't know for sure whether other Proud Boys who were involved in the theft and destruction of the banner burning deleted evidence as a result of Tarrio passing on information that he received from the defendant, correct?

A. Correct.

Q. But, Agent Hadley, there is evidence that the defendant intended to delete evidence, isn't that right?

MR. SCHAMEL: Objection.

THE COURT: All right. Are you talking about the Telegram again?

MS. ROSS: Yes, Your Honor.

THE COURT: I guess I don't need her to make your closing argument. Just ask her the facts that you need to ask her now based on the cross. I mean, you're basically asking her lines from your closing argument and I don't think that's what she's here for.

MS. ROSS: Thank you, Your Honor. No further questions.

THE COURT: All right.

MS. ROSS: And with Your Honor's permission, we would like to call Nicholas Quested out of turn.

THE COURT: He's here?

MS. ROSS: He's here, Your Honor.

THE COURT: All right. You can step down. Thank you.

MR. ROTHSTEIN: Just so Your Honor is aware, Franklin Then and Jeffery Carroll, that's the 302s that Mr. Schamel is reading from, they're going to be called by the government tomorrow as witnesses.

THE COURT: All right. They can cross-examine them.

MR. SCHAMEL: I'm sorry, did you say something to me?

THE COURT: He said that the people whose 302s you were intending to ask about were going to be here tomorrow, which I suppose you knew. At any rate, you can ask them what you want to ask them.

All right. Call your next witness.

NICHOLAS QUESTED,

was called as a witness and, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSS:

Q. Good afternoon, Mr. Quested. Will you please just state and spell your name for the record?

A. Yeah, that's Q-U-E-S-T-E-D.

Q. What line of work are you in, Mr. Quested?

A. I'm a filmmaker, documentary filmmaker.

Q. Focusing just on December 2020, did your work bring you into contact with Enrique Tarrio?

A. Yes.

Q. Did Mr. Tarrio agree to allow you and your film crew to film him and some of the Proud Boys?

A. Yes.

Q. And were you and members of your film crew in Washington, D.C. on January 5th, 2021?

A. Yes.

Q. And were you filming Tarrio that day?

A. Yes.

Q. Did you and your film crew have the opportunity to film a meeting Tarrio had with Bianca Gracia and Joshua Macias and others in a parking garage?

A. Yes.

Q. Was that after Tarrio had been released from MPD custody?
A. Yes.
Q. And did you personally observe that meeting in the garage?
A. Yes.
Q. And did you turn over the video that you and your film crew recorded of that meeting that took place on January 5th, 2021 in the garage?
A. Yes.
Q. And when you turned over that video, did you alter it in any way?
A. No.
Q. In other words, was it just the raw footage?
A. Indeed.
Q. And earlier today, Mr. Quested, did you have the opportunity to review what has been marked as Government Exhibit 4034?
A. Yes.
Q. Was that a clip of the video you and your film crew took of that meeting in the parking garage on January 5th, 2021?
A. Yes.
Q. And did that clip -- did Government's Exhibit 4034 accurately depict the meeting between Mr. Tarrio and Ms. Gracia and Mr. Macias in the garage on January 5th, 2021?
A. Yes.
Q. Was what was on that clip what you witnessed that day?

A. Yes.
Q. And did you have an opportunity to review Exhibits 4034-A through E?
A. Yes.
Q. Were those just smaller clips of the video you and your film crew took of the meeting in the parking garage between Mr. Tarrio and Ms. Gracia and Mr. Macias on January 5th, 2021?
A. Yes.
Q. Do those clips also accurately depict that meeting?
A. Yes.
THE COURT: Okay. Just -- 4034 is a clip of the meeting and A through E are clips of the clip.
MS. ROSS: Exactly, Your Honor.
THE COURT: So how long is 4034?
MS. ROSS: Excuse me?
THE COURT: How long is 4034?
MS. ROSS: I think it's approximately 30 seconds, Your Honor. Perhaps not even.
THE COURT: Okay. Go ahead.
BY MS. ROSS:
Q. And, Mr. Quested, you had the opportunity to review the entire clip?
A. Yeah. As you presented it to me, yes.
MS. ROSS: No further questions. Thank you, Your Honor.

THE COURT: You're not seeking to introduce it at this time, you're waiting to use it?

MS. ROSS: Yes, Your Honor. We can't know for sure yet whether Mr. Tarrio is going to testify and whether it would be admissible, but that is our intention.

THE COURT: All right. Any cross-examination with respect to the --

MS. JARA: Your Honor, we don't have -- I'm sorry. Your Honor, we don't have any questions for this witness with respect to the authenticity. So, no, Your Honor.

THE COURT: Okay. Can this witness be excused?

MS. ROSS: Thank you, Mr. Quested.

THE WITNESS: Thank you.

THE COURT: All right. Is there another witness who's brief enough, or do you want to do them in the morning?

MR. ROTHSTEIN: Yes, Your Honor. We can start on him right now.

THE COURT: Okay.

MR. ROTHSTEIN: He's relatively short.

THE COURT: So we made him fly all the way here for something we don't have any dispute about authenticity?

MR. ROTHSTEIN: Your Honor, we asked defense to stipulate to it and they refused.

THE COURT: Okay. All right.

THE COURTROOM DEPUTY: Who is the next witness?

MR. ROTHSTEIN: John Haines.

JOHN HAINES,

was called as a witness and, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ROTHSTEIN:

Q. Good afternoon.

A. Good afternoon.

Q. Would you please state your name and spell if for the court reporter?

A. John Haines. H-A-I-N-E-S.

Q. Where do you work?

A. I work for the Metropolitan Police Department in District of Columbia.

Q. And what's your current title?

A. I'm a commander.

Q. Okay. And when did you start with MPD?

A. I started March 13th of year 2000.

Q. And can you walk us through the jobs that you've had at MPD?

A. First I was a recruit officer at the academy, I was assigned as a patrol officer in the First District. From there I went on to be a crime scene officer at the crime scene search division. From there I was promoted to sergeant. I went to the Fifth District. There I served as task force officer for

both the FBI and DEA.

From there I was promoted to lieutenant of the Fourth District. I was assigned as the Fourth District vice lieutenant. From there I was moved, after several years, to the criminal investigations division.

I went to the Fifth District's detectives unit. I was promoted to acting captain of the criminal investigations division. I was then moved to lieutenant of the sexual assault unit. From there I was actually promoted to the rank of captain and sent to the Seventh Patrol District. After one year I was promoted to commander in the narcotics special investigations division.

I then was moved, after three years, to the commander of the criminal investigations division. After three years of that I was moved to the youth and family services division as the commander, where I served four months. And I currently serve as the commander of the district investigations division.

Q. Okay. And what are your current duties and responsibilities in that role?

A. Currently I'm in charge of the district investigations division. I oversee all the district detective units throughout the city.

Q. And do you know the defendant, Shane Lamond?

A. I do.

Q. Okay. And how long have you known him for?

A. About 24 years, give or take.
Q. And where did you first meet?
A. We met as we were both assigned as patrol officers in the First Direct.
Q. And were you partners?
A. We were.
Q. For how long?
A. Roughly about a year, I guess.
Q. Were you also friends?
A. Yes.
Q. At the time were you close friends?
A. Yes.
Q. Did you get together outside of work?
A. Yes.
MR. ROTHSTEIN: Your Honor, I'm going to ask a question, it's just for purposes of bias. And I just wanted to alert Your Honor to the reasoning behind it before I ask it.
BY MR. ROTHSTEIN:
Q. Did there come a point in time where your relationship with the defendant changed?
A. It did.
Q. Okay. What happened?
MR. SCHAMEL: Objection.
THE COURT: Are you -- do you want to elicit this to anticipate the cross-examination about this?

MR. ROTHSTEIN: Yes, Your Honor.

THE COURT: All right. I think he can do it. I mean, we don't have a jury here, I know what to do with this information.

MR. ROTHSTEIN: Your Honor, that's why I just prefaced it, just so you knew that it wasn't 404(b).

THE COURT: All right. Briefly, what happened?

THE WITNESS: Briefly, I found him to be untrustworthy and not truthful and, therefore, I felt that I no longer wanted a relationship with him.

BY MR. ROTHSTEIN:

Q. What was the basis for that?

MR. SCHAMEL: Objection. I move to strike.

THE COURT: I mean, I think -- they were friends, they aren't friends anymore. I think giving his opinion about his character goes a little beyond what we're supposed to be hearing right now.

MR. ROTHSTEIN: Okay.

THE COURT: So I think I will strike that right now. If you start to get into the fact that he has bias on cross-examination, then I'll let you come back and ask more questions on redirect as to why.

MR. ROTHSTEIN: Sure. Thank you, Your Honor.

BY MR. ROTHSTEIN:

Q. Okay. After that point in time that your friendship ended,

did you make any specific efforts with respect to the defendant?
A. Could you repeat that last part?
Q. After the point in time where your friendship ended in 2004, did you make any specific efforts with respect to the defendant?
A. I just chose not to associate with him as much as possible.
Q. Okay. Now, what was your position in June 2020?
A. I was the commander of the narcotics and special investigations division.
Q. And what was going on in the District at that time, in June 2020?
A. In June 2020, that was a time of a lot of protests in the city after the -- George Floyd was killed. We were dealing with that pretty much on a nightly basis.
Q. And did you work with the Homeland Security Bureau?
A. I did.
Q. What is the Homeland Security Bureau?
A. It is the bureau of the department that oversees basically our special operations division and they deal highly with First Amendment protests and riots.
Q. Did you coordinate with HSP?
A. I did.
Q. Was CID working with them at that point?
A. They were.

Q. And what were they working to do?
A. So, it was CID, their part was investigating any criminal activity that stemmed as a part of, essentially, what, at that point, would have been riots or illegal acts that occurred during First Amendment protests.
Q. So is it fair to say the CID division is the one that investigates the crime and HSB is the one that works on First Amendment activity and intelligence, is that correct?
A. Correct.
Q. Okay. And was HSB doing any intelligence surrounding First Amendment activities or protected activities where these protests were occurring?
A. It's my understanding they were, yes.
Q. Okay. Are you aware of what the defendant's responsibilities were during that time?
A. Specifically, no. I know that Lieutenant Lamond was in charge of the intelligence unit, but what he did day to day I'm unsure of.
Q. What were your responsibilities with respect to the riots?
A. So, I've had several responsibilities as part of the commander in my division. One of them was for high-volume prisoner processing, if we were to make large-volume arrests. I was in charge of the high-volume prisoner processing process, along with the transportation piece of moving those that might be arrested in a high-volume setting or mass arrests, moving

them from the location of the arrest to the high-volume prisoner processing center and getting all those arrestees processed.

On top of that, I also oversaw the electronic surveillance unit, that was one of my units. They had a twofold purpose. One of the purposes, specifically, was to document First Amendment activities. And they were attached directly to SOD. And then we had a second portion that was evidence collection. They were plainclothes officers that were -- would be mingled amongst the First Amendment protestors. When things got out of line and criminal acts started to occur, they would do everything they could to document those criminal acts and the people responsible for them so that we could then turn that evidence over to the criminal investigation division so they could conduct their investigation and try to bring those people to justice.

Q. Okay. Now I want to direct your attention to December 2020. In December 2020, where were you assigned?

A. I was assigned to the commander of narcotics and special investigations division, same place.

Q. Were you aware of the Proud Boys during that time period?

A. Yes.

Q. Were they coming to the District?

A. Yes.

Q. And based on your experience, what were they coming here to

do?
A. To exercise their First Amendment rights to protest.
Q. Okay. Did they get -- were there ever fights with antifa when they were here?
A. We had -- and I don't remember the dates, but there were -- having -- I was out in the field, along with Commander Glover, to monitor activities in case we had to do -- we were anticipating having to make high-volume arrests. During those times while in the field there were skirmishes between Proud Boys and suspected members of antifa and other protestors in the city, yes.
Q. Okay. Did the Proud Boys come and march?
A. Yes.
Q. Did they ever commit acts of vandalism?
A. Yes.
Q. Were you on duty on December 12th, 2020?
A. I was.
Q. What were you doing that day?
A. I was helping to monitor the Proud Boys march. I actually was shadowing with Lieutenant Glover, the Proud Boys, as they marched through the city.
Q. Were you effectively tailing them?
A. Yes. He was in his cruiser, I was in mine directly behind the march.
Q. Why were you doing that?

A. Again, for the purposes -- twofold. One, for the high-volume prisoner processing, in case we did the mass arrest. And I had my plainclothes officers in the crowd, monitoring them in case there was any law breaking, so that they could capture that evidence, and I wanted to make sure they were safe.
Q. Did anything significant happen on that day?
A. That was the day that they tore down a banner from a church up in Northwest. I forget the exact address.
Q. Okay. And where were you when that occurred?
A. Again, I was tailing the march, behind them.
Q. Okay. And did you have any undercover assets involved at that time while you were tailing them?
A. Yes. Plainclothes officers that were in the crowd. As a matter of fact, they came over the radio and said, hey, we're observing them tear down this banner. And they had acknowledged that they were in a position to capture that on video surveillance.
Q. Okay. And what did you do?
A. I simply monitored to make sure that our people were safe. Because of the nature of it was simply a banner and in order to go into the crowd or have SOD assets or MPD assets go into the crowd to try to make arrests then would probably incite violence, so the decision was to collect the evidence that we could, which was our members who were recording it, what was

occurring, and then turn that evidence over to CID so they could investigate it for criminal charges.
Q. You just brought up a topic I wanted to discuss with you, which is arrests. In the course of your career, how many arrests do you think you've made?
A. A lot.
Q. Over 100?
A. Yes.
Q. Over 500?
A. Perhaps, yes.
Q. Okay. How many arrests have you supervised?
A. Again, probably hundreds, if not thousands, probably.
Q. Okay. And did you supervise the arrest of Enrique Tarrio?
A. I did.
Q. Okay. And when there is an arrest warrant at MPD, did you ever -- in effecting an arrest, did you ever contact a suspect in somebody else's case without their knowledge?
A. No.
Q. Why?
A. Because the case agent or the detective or whoever was -- case it was, that would be their decision, or through their chain-of-command's decision on how that arrest would occur.
Q. Is it common at MPD that a particular officer just goes into the arrest database or warrant database and contacts random people without --

MR. SCHAMEL: Objection.

THE COURT: Let's try to just rephrase that.

MR. ROTHSTEIN: Okay.

THE COURT: Can anyone who is aware of the existence of a warrant contact the suspect?

THE WITNESS: They shouldn't, as a matter of procedure.

BY MR. ROTHSTEIN:

Q. Why is that?

A. A lot of reasons. Again, depending on the type of arrest, the warrant that it's for. Like in this case, it was a high-profile arrestee or suspect. We would never -- you know, those decisions would have to go up through the chain of command and be made at the highest levels because that arrest specifically would have greater impacts beyond the Metropolitan Police Department in Washington, D.C. It could have national impact.

Q. Okay. So let's move forward. What's the criminal apprehension team?

A. That is my, essentially -- not mine. It was -- as the commander, they were a unit within my division that specifically went and seek out people who have arrest warrants within the District of Columbia.

Q. And is the criminal apprehension team -- were they involved -- are they involved in the investigation?

A. They are not.

Q. Okay. So what is -- are they solely involved in the execution of an arrest warrant?
A. Correct.
Q. Okay. And are they involved in drafting the arrest warrant?
A. They are not.
Q. Once the arrest warrant -- to be clear, you were not involved in the drafting of the arrest warrant for Mr. Tarrio, correct?
A. I was not.
Q. Okay. Once the arrest warrant was issued for Mr. Tarrio, was a criminal apprehension team responsible for the arrest?
A. Yes, the criminal apprehension team and members of the violence reduction unit.
Q. What was needed to plan the arrest?
A. So, ideally, the issue with the arrest warrant that was issued, it was a non-extraditable warrant, so the arrest could only be made within the District of Columbia. So what we did was devise a plan, that we knew that Tarrio was coming into the city for the January 6th protest. So what -- we figured he was staying -- guessed at the time, that he was probably staying at a hotel within the city and that he would arrive sometime before January 6th.
So what we wanted to do was to be able to get him into custody the moment he stepped foot, quote/unquote, into

the District of Columbia. So we knew that he was based out of Florida, so most likelihood, we believed, he would be flying into probably Reagan National or one of the local airports.

Q. Let me just stop you there and just go back a second. You said that the plan was to arrest him the second he got into the District of Columbia, correct?

A. Yes.

Q. Was it ever part of the plan to have him self-surrender?

A. No.

Q. Okay. So keep going. The plan to arrest him when he gets to the District.

A. So what we wanted to do was determine what flight he was coming into the area on and be able to have undercover officers pick him up the moment he stepped off the plane and essentially tail him until he entered the District of Columbia, at which time we would execute an arrest on him.

Q. Okay. So could you arrest him in Virginia?

A. No, because the warrant was non-extraditable.

Q. Why did you have officers at the -- at Reagan?

A. So I had learned, we had learned, MPD specifically, what flight he was arriving in and what day.

Q. Okay. And who did you reach out to to obtain that flight information?

A. I had reached out to several sources, to include the U.S. Marshal Service, the FBI, and members of my department, and

that included Lieutenant Lamond.
Q. Okay. And did you know that Tarrio was a source for Lamond?
A. I did not.
Q. Okay. Showing you Government Exhibit 4023, at page 7.
A. I'll put on my glasses.
Q. Can you see that?
A. Yes.
Q. Can you read the top -- or, who is that from and to?
A. It's from me to Shane.
Q. And what's the date there and time?
A. It is January 1st, 2021, at 8:25 p.m.
Q. What did you use? What was the method of communicating?
A. My department cell phone.
Q. Okay. Was that iMessage?
A. It was a text, yes.
Q. And what did you say there?
A. First, I texted Shane, I said, "Shane, do you have any flight info or travel info on when and where Enrique Tarrio will arrive in D.C. or which airport?"
Q. How did he respond?
A. He responded, "No specific flight info, but I know he was flying into DCA on 1-4. Don't have the time." And I replied, "Okay. Thanks."
Q. That was an important piece of information for you, right,

when he was flying in?
A. Yes.
Q. Now going to -- continue to page 8. Let's go to page 8 of 432.
Did the defendant get back to you?
A. Yes, that same day, at 8:37 p.m.
Q. What did he say?
A. He texted back, "I just reached out to my TSA contact to see if they have access to booking information. Will let you know if I can confirm his flight info." I replied back, "Thanks. We tried ours, but with the holiday weekend, no success on a response." He then wrote back, "Copy. I just emailed mine, so I will let you know when he responds." And I responded, "Thank you."
Q. Okay. And going to page 12, Government's Exhibit 4023.
On January 2, 2021, did Lamond provide you with flight information?
A. He did.
Q. And was that information helpful?
A. It was.
Q. And what did you do with that information?
A. Based on that, we came up with an operational plan on how we were going to get surveillance on him as soon as he landed and apprehend him once he entered the city.
Q. Was the plan for Mr. Tarrio to know of the arrest warrant

in advance?

A. No.

Q. At any point in time did you direct the defendant to notify Tarrio about the arrest warrant in advance?

A. No.

Q. At any point in time did you hear or learn of anyone else directing the defendant to notify Mr. Tarrio about the arrest warrant?

A. No.

Q. Did you want Mr. Tarrio to know about the arrest warrant?

A. I did not.

Q. Why?

A. Safety reasons.

Q. And based on your training and experience, what could be some of the effects of a defendant learning about an arrest warrant prior to the actual arrest?

MR. SCHAMEL: Objection.

THE COURT: Well, he can ask why he didn't want him to know in advance, which I think is what he just asked him.

So why?

THE WITNESS: The biggest reason, being a non-extraditable warrant, he could come into -- still come into Virginia and just not enter the District of Columbia and, therefore, avoid arrest and still play a part with what was going to happen with his organization on January 6.

BY MR. ROTHSTEIN:
Q. Did you have any concern about destruction of evidence if an individual is made aware of an arrest warrant?
MR. SCHAMEL: Objection.
THE COURT: I'm sorry, that was a little leading.
BY MR. ROTHSTEIN:
Q. Is the destruction of evidence a concern that you have when you are coming up with an arrest plan?
A. Yes.
MR. SCHAMEL: Objection.
THE COURT: What concerns, if any, do you have about letting somebody know whether they are a suspect, if there is a warrant before --
THE WITNESS: They obviously could destroy any evidence that could exist in the case, they could -- in his case, because of his association with possible firearms, there was a huge officer safety risk that if he knew we were coming for him, he could -- you know, if he wanted to make a violent statement of some kind, he certainly could have had planning to be able to do that to our officers or officers in Virginia or anywhere else.
BY MR. ROTHSTEIN:
Q. At any point in time did the defendant tell you that he had ongoing conversations with Mr. Tarrio about the status of the investigation or the issuance of an arrest warrant?

A. No, sir.

MR. ROTHSTEIN: One moment, Your Honor.

(Pause.)

MR. ROTHSTEIN: Just a few more questions.

BY MR. ROTHSTEIN:

Q. When an arrest warrant is issued and it comes to MPD, what is your understanding about whether or not that is -- that information is distributed outside of those individuals who are involved in the arrest plan?

MR. SCHAMEL: Objection.

THE COURT: I think he can answer that question within his experience.

A. Overall, again, it depends on the nature of the crime and the person that we're seeking. In many cases it may be that there are no restrictions or anything within anybody within MPD. In this particular case, this was discussed -- this arrest and this operational plan was discussed all the way up to the chief of police and they were in the knowing and this is how they wanted the operation to go down.

MR. ROTHSTEIN: Nothing further. Thank you, Your Honor.

THE COURT: All right. Any cross-examination?

MR. SCHAMEL: A couple.

CROSS-EXAMINATION

BY MR. SCHAMEL:

Q. Is it captain or lieutenant?

A. Commander.
Q. Commander. I apologize.
A. That's okay.
Q. You reached out to Shane Lamond directly to find out information about Mr. Tarrio's flight plans, is that right?
A. Correct, sir.
Q. And you did that because you were aware that Mr. Lamond had contact with Mr. Tarrio, is that right?
A. No, sir. That is not right.
Q. You just randomly picked him out, the guy you don't like, and thought he might know?
A. So, he was the lieutenant in charge of the intelligence division. I know he had contacts with Homeland Security and TSA possibly that could get us that information.
Q. Okay. So your testimony here is you reached out to him because you thought he could reach out to other people and he would be able to find out when Tarrio was traveling?
A. Yes, sir.
Q. You had no advance knowledge that he was working with Mr. Tarrio as a source?
A. No, sir.
Q. The arrest was on January 4th, correct?
A. I believe it was the 5th.
Q. Did you say yes?
A. I believe it was the 5th, or he was in court the 5th. It

might have been the 4th, I don't remember.
Q. Were you aware that Mr. Tarrio came to town two days early before the January 6 events to be arrested?
A. No, sir.
Q. You do know that Mr. Tarrio had just come off an airplane, correct?
A. Yes, sir.
Q. So did you have any reason to believe he was going to be armed?
A. He had checked luggage, so it could be in his checked luggage.
Q. Okay. But you have to declare weapons in checked luggage, correct?
A. You're supposed to, but they're not searched.
Q. You don't believe TSA searches checked luggage for guns?
A. No.
Q. Interesting.
You indicated there was no discussion of the self-surrender. At what point did you become involved in the arrest plan here?
A. Right after -- as soon as the arrest warrant was issued, I was in discussions with my boss and the chief of police on how we were going to execute this.
Q. You don't know if there was any discussion of self-surrenderer before your involvement, do you?

A. No, sir, because there wasn't a warrant issued before that.
Q. But when was the warrant issued?
A. I don't remember the exact date. As soon as it was issued, I knew about it and we started our planning.
Q. So you started your planning around the time of the warrant being issued. It wasn't issued on the day of the burning, was it?
A. No.
Q. Couple weeks later, right?
A. It was sometime later because it happened in December and the warrant wasn't issued until sometime late December or early January. I don't know the exact date.
Q. So if I told you December 12th was the flag burning, does that sound right?
A. I believe that's the date, yes, sir.
Q. December 30th the warrant was issued?
A. That sounds probably right.
Q. You had no involvement in the 18 days between the 12th and the 30th, correct?
A. Not specifically with this, no.
Q. What does that mean?
A. I mean, I had no involvement in obtaining or getting the warrant, no.
Q. Okay. So you were not involved in the discussions about what the charges were going to be, if he was going to be self-

surrendering, any of this?
A. No, sir.
Q. You only became involved after the warrant was issued, and your testimony is you don't know that there was any discussion about the self-surrender, correct?
A. In my discussions with my superiors, all the way up to the chief of police, it was never discussed.
Q. Who was the chief of police?
A. At that time, it was a transition period between Peter Newsham and Robert Contee. So in December, Peter Newsham had -- I believe it was December, had announced he was going to retire. Robert Contee was not named the chief -- he was acting chief of police, but wasn't named the chief of police until, I believe, January 1st. But right around this time period is when that transaction occurred.
Q. So when you said it went all the way up the chain, did you talk to Pete Newsham?
A. I talked to Robert Contee, because he was my direct supervisor at the time this occurred.
Q. So he was not the chief of police at that time. And you were talking --
A. Again, I don't remember the dates because there was a transition period and a period where Chief Contee was acting chief before he was officially named.
Q. When you became aware of the existence of the arrest

warrant, were you also aware that Mr. Tarrio had publicly stated, in multiple forums, that he would voluntarily travel to D.C. to turn himself in?
A. No, sir.
Q. You've been interviewed as part of this investigation, correct?
A. I'm sorry. Repeat.
Q. You were interviewed as part of this investigation?
A. Can you be more specific as to --
Q. You were interviewed by the Federal Bureau of Investigation in the investigation of Shane Lamond?
A. I was.
Q. And do you remember being questioned about whether or not you knew that Mr. Lamond had contacts within the Proud Boys?
A. Yes, we had a discussion about that.
Q. Who did?
A. I had that with the FBI.
Q. Because at that time you knew that Mr. Lamond was in contact with the Proud Boys, not just that he had Homeland Security contacts, correct?
A. I had learned of those contacts after the event.
Q. You learned after the arrest?
A. It was sometime after these events, yes.
Q. Who did you learn that from?
A. I don't recall.

Q. Okay. Was it common knowledge that Mr. Lamond was working with Mr. Tarrio of the Proud Boys?
A. No. Well, it wasn't my knowledge, I should say that.
Q. Okay. The warrant, the existence of the warrant, was that under seal?
A. Not that I know of.
Q. Were there any steps taken to label it as confidential or take any steps to make it so it wouldn't be distributed outside your arrest team?
A. Not that I'm aware of.
Q. Was it pretty well known within the department that an arrest warrant had been issued for Mr. Tarrio?
A. I couldn't honestly answer that.
Q. Mr. Rothstein asked you about whether or not Mr. Tarrio had been told about the warrant. Were you aware that he'd been told about the warrant?
A. I was not.
Q. Okay. Did you believe he was, as you sit here today?
A. Actually, up to the time -- until this incident came out, I was unaware that he knew about it.
Q. And you -- you didn't hear that he was -- strike that.
MR. SCHAMEL: That's it. I have nothing else. Thank you.
THE COURT: All right. Any redirect?
MR. ROTHSTEIN: Just four questions.

REDIRECT EXAMINATION

BY MR. ROTHSTEIN:

Q. You were asked a question about whether or not you were concerned that the defendant could be armed. Do you recall that?

A. Yes.

Q. And are you aware whether or not the defendant had high-capacity magazines in his luggage?

A. I am aware of that.

Q. Did anyone ever discuss with you, when you were planning the arrest -- after the arrest warrant came, did anyone discuss with you that there had been previous discussions about self-surrendering?

A. No.

Q. Okay. Do you recall whether or not Chief Newsham left around December 20th of that year?

A. That sounds right.

Q. Okay. Is that before the arrest warrant was issued on December 30th?

A. Yes, it was.

Q. Was that before you planned the arrest?

A. Yes.

Q. Okay. And if a warrant isn't labeled as confidential or sealed, does that mean that any officer can disclose it to a suspect?

A. No.

MR. ROTHSTEIN: Nothing further, Your Honor.

MR. SCHAMEL: One question on cross -- recross.

THE COURT: All right. Go ahead.

RECROSS-EXAMINATION

BY MR. SCHAMEL:

Q. You said that it cannot -- Mr. Rothstein's last question, it cannot be disclosed. Based on what? What's the MPD general order that says that?

A. It should not. I mean, any part of a criminal investigation should be kept confidential with those that are part of the investigation. Now --

Q. I understand --

THE COURT: You asked him a question. Let him answer it. Go ahead.

THE WITNESS: So as a matter of course, there have been officers in our department who have been disciplined for looking at records that they're not privy to, being arrests of other police officers. If they pull those records up in RMS and look at those things, our report management system, and it's not something they should be looking at, that is not authorized, those criminal investigations, it is part of our general order to keep that stuff confidential.

BY MR. SCHAMEL:

Q. Where in the general orders does it say that an arrest

warrant cannot be disclosed?
A. Because it says our records are to be kept confidential. That includes arrest warrants.
Q. Your position is the general orders say you cannot disclose an arrest warrant?
A. You can't disclose police investigations to people outside of the police department. Even to people within the department who aren't privy to that information, you shouldn't be discussing it or looking it up.
Q. I didn't ask you about shouldn't. I asked you: It says you cannot disclose?
A. I don't know the specific place within the general orders. I know it's covered.
Q. You believe it's covered, but you don't know where?
A. Absolutely, 100 percent.
MR. SCHAMEL: Okay.
THE COURT: Okay. Thank you very much. You can be excused, Commander.
THE WITNESS: Thank you.
THE COURT: And I think that's a wrap for today. We will reconvene tomorrow morning at 9:30.
I think you were able to be here, it looks like.
MR. SCHAMEL: Yeah.
MR. ROTHSTEIN: Sorry, Your Honor. The government would just ask that if we rest at 3:30, if the defense doesn't

intend to call Mr. Tarrio and there's other witnesses they intend to call, that they just provide us notice so we can be prepared.

THE COURT: All right. And given the fact that he's probably going to be a lengthy witness, depending on when we break, it may make more sense to have his testimony be on Thursday. I think we'll have to play it by ear. I don't know if you have to commit yet to whether you're planning to call any other witnesses. But if you are, you might want to have one of them here.

MR. SCHAMEL: We're going to call Mr. Tarrio when the government rests.

THE COURT: All right. So he will be your first witness?

MR. SCHAMEL: He will.

THE COURT: All right. Then we'll figure out the timing of that tomorrow.

MR. SCHAMEL: Thank you, Your Honor.

* * *

CERTIFICATE OF OFFICIAL COURT REPORTER

I, JANICE DICKMAN, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 17th day of January, 2026

/s/_________________________________

Janice E. Dickman, CRR, CMR, CCR
Official Court Reporter
Room 6523
333 Constitution Avenue, N.W.
Washington, D.C. 20001

INDEX

WITNESSES:

ELIZABETH HADLEY
Direct Examination (Cont.) By Ms. Ross........... 3
Cross-Examination By Mr. Schamel.................130
Redirect Examination By Ms. Ross.................197

NICHOLAS QUESTED
Direct Examination By Ms. Ross...................202

JOHN HAINES
Direct Examination By Mr. Rothstein..............206
Cross-Examination By Mr. Schamel.................223
Redirect Examination By Mr. Rothstein............230
Recross-Examination By Mr. Schamel...............231

* * *