**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

No. 25-3066

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

SHANE BRIAN LAMOND,

*Defendant-Appellant*.

Appeal from the United States District Court for the District of Columbia, No. 1:23-cr-00177-ABJ-1 (Hon. Amy Berman Jackson)

# APPENDIX FOR DEFENDANT-APPELLANT SHANE BRIAN LAMOND
**Volume III of V, pp. A632-A1056**

ANDREW E. GOLDSMITH
RENO G. VARGHESE
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
agoldsmith@kellogghansen.com
rvarghese@kellogghansen.com

*Appointed Counsel for Defendant-Appellant Shane Brian Lamond*

May 8, 2026

## TABLE OF CONTENTS

Page

### Volume I

Docket Sheet, *United States v. Lamond*, No. 1:23-cr-00177-ABJ-1 (D.D.C.) .......... A1

Indictment (May 18, 2023), Dkt. No. 1 .......... A23

Joint Pretrial Statement (Jan. 22, 2024), Dkt. No. 41 .......... A40

Exhibit 1: Government's Exhibit List, Dkt. No. 41-1 .......... A63

Exhibit 2: Government's Proposed Verdict Form, Dkt. No. 41-2 .......... A70

Exhibit 3: Defendant's Proposed Verdict Form, Dkt. No. 41-3 .......... A72

Notice of Filing (Nov. 5, 2024), Dkt. No. 80 .......... A74

Defendant's Waiver of Trial by Jury, Dkt. No. 80-1 .......... A75

Elements of the Offenses (Dec. 9, 2024), Dkt. No. 86 .......... A76

Judgment (June 10, 2025), Dkt. No. 110 .......... A79

Notice of Appeal (June 24, 2025), Dkt. No. 112 .......... A86

### Volume II

(Transcript Volumes II-IV)

Transcript of Status Conference Held On September 24, 2024 [Redacted] .......... A87

Transcript of Jury Trial Day 1 Held On December 2, 2024 .......... A133

Transcript of Jury Trial Day 2 Held On December 3, 2024 .......... A397

### Volume III

Transcript of Jury Trial Day 3 Held On December 4, 2024 .......... A632

Transcript of Jury Trial Day 4 Held On December 5, 2024 .......... A892

**Volume IV**


Transcript of Jury Trial Day 5 Held On December 6, 2024 ............................A1057

Transcript of Jury Trial Day 6 Held On December 9, 2024 ............................A1225

Transcript of Jury Trial Day 7 Held On December 10, 2024 ..........................A1242

Transcript of Verdict Held On December 23, 2024. Dkt. No. 99 ....................A1314

Transcript of Sentencing Held On June 6, 2025, Dkt. No. 122.......................A1389


**Volume V**

(Admitted Trial Exhibits)


Exhibit 1004: Lamond Phone Forensic Report_Timeline ...............................A1447

Exhibit 1006: Forensic Examination Report (Manicini) 1B2 Part One Final, dated Feb. 2, 2023 ..........................................................................A1484

Exhibit 1006A: Email from Shane Lamond to Commander Parsons FW: Subject in Photo, dated Dec. 20, 2020 .........................................A1494

Exhibit 1006B: Email from Shane Lamond to Kelly O'Meara re: BLM signs, dated Dec. 13, 2020 ..........................................................A1496

Exhibit 1006C: Email from Shane Lamond to Commander Parsons re: Podcast, dated Dec. 20, 2020 .........................................................A1498

Exhibit 1006D: Email from Shane Lamond to Franklyn Then re: Subject in Photo, dated Dec. 20, 2020..................................................A1500

Exhibit 1014: Email from Ahsan Mufti, re: Resubmission, dated Dec. 29, 2020 ...................................................................A1503

Exhibit 3002: Metropolitan Police, District of Columbia, General Order 201.26 – Duties, Responsibilities and Conduct of Members in the Department ............................................................A1542

Exhibit 3003: Metropolitan Police, District of Columbia, General Order 201.36 – Sworn Law Enforcement Officer Code of Ethics ...................................................................................A1554

Exhibit 3005: Metropolitan Police, District of Columbia, General Order 601.02 – Preservation of Potentially Discoverable Material ....................A1557

Exhibit 4001: Article: *Proud Boys Leader Says He Burned Black Lives Matter Banner Stolen from Church During Demonstrations in D.C.*, Wash. Post (Dec. 18, 2020)....................A1560

Exhibit 4004: Parler Post by @NobleLead, dated Dec. 18, 2020 ....................A1563

Exhibit 4006: Timeline Final – Summary Chart of Communications 10.24.2019 - 1.27.2021 ....................A1564

Exhibit 4018: Summary Chart 11.14.2020, 730PM – 12.20.2020 ....................A1619

Exhibit 4026: Timeline – Summary Chart Shane Lamond's Contacts ....................A1656

Exhibit 5006: Shane Lamond Interview Transcript Held On June 2, 2021 ....................A1658

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| United States of America, | ) | Criminal Action |
| | ) | No. 23-cr-177 |
| Plaintiff, | ) | |
| | ) | JURY TRIAL |
| vs. | ) | Day 3 |
| | ) | |
| Shane Brian Lamond, | ) | Washington, DC |
| | ) | December 4, 2024 |
| Defendant. | ) | Time: 9:38 a.m. |

---

TRANSCRIPT OF JURY TRIAL
HELD BEFORE
THE HONORABLE JUDGE AMY BERMAN JACKSON
UNITED STATES DISTRICT JUDGE

---

A P P E A R A N C E S

For Plaintiff: Rebecca G. Ross
Joshua Rothstein
UNITED STATES ATTORNEY'S OFFICE
610 D Street NW
Washington, DC 20530
(202) 252-6937
Email: Rebecca.Ross2@usdoj.gov
Email: Joshua.Rothstein@usdoj.gov

For Defendant: Mark E. Schamel
Ana L. Jara
VENABLE LLP
600 Massachusetts Avenue NW
Washington, DC 20001
(202) 344-4631
Email: MESchamel@venable.com
Email: ALJara@venable.com

---

Court Reporter: Janice E. Dickman, RMR, CRR, CRC
Official Court Reporter
United States Courthouse, Room 6523
333 Constitution Avenue, NW
Washington, DC 20001
202-354-3267

* * * * * * *P R O C E E D I N G S* * * * * * *

THE COURT: All right. Do we have any preliminary matters to take up before we call the next witness?

MR. ROTHSTEIN: None from the government.

THE COURT: Mr. Schamel, you're standing up.

MR. SCHAMEL: I'm just going to make an inquiry. Is Mr. Tarrio here? Has he made it here?

THE COURT: I don't know.

THE COURTROOM DEPUTY: I did call the cellblock this morning and I advised him that an attorney will be speaking with him today and we'll call him this afternoon.

THE COURT: And they didn't say, "Who are you talking about?"

THE COURTROOM DEPUTY: No.

THE COURT: All right. You can call your next witness.

MR. ROTHSTEIN: Your Honor the government calls Jeffery Carroll.

JEFFERY CARROLL,

was called as a witness and, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ROTHSTEIN:

Q. Good morning.

A. Good morning.

Q. Can you please state your name and spell it for the court reporter?
A. Sure. My name is Jeffery Carroll. It's J-E-F-F-E-R-Y. Last name is C-A-R-R-O-L-L.
Q. And where are you currently employed?
A. Metropolitan Police Department.
Q. What's your badge number?
A. Two.
Q. Why is it No. 2?
A. I'm the executive assistant chief.
Q. How long have you been employed by MPD?
A. A little over 22 years.
Q. And can you walk us through your professional history at MPD?
A. Sure. I joined the police department in 2002 as an officer. I was promoted to sergeant and I was transferred to the First District in about 2007. I was promoted, I believe it was in 2009, to lieutenant, where I returned to the Third District. I was promoted again to captain, where I went to the Sixth District, and then the special operations division. I was promoted to commander of the Third District, then I returned to the special operations division as a commander.
Then in 2017 I was promoted to the assistant chief of our Homeland Security Bureau. In 2023 I was transferred to be the assist chief of our internal affairs bureau, and in

November of last year I was promoted to the executive assistant chief.

Q. And as the executive assist chief, what are your duties and responsibilities?

A. Sure. So I oversee all the bureaus of the police department operationally, except for the patrol bureaus. There's another executive assistant chief that oversees patrol operations.

Q. Okay. And who do you report to?

A. I report to the chief.

Q. Now, do you know the defendant, Shane Lamond?

A. I do.

Q. And how long have you known him for?

A. I've probably known him for at least 20 years or so.

Q. And when did you first meet?

A. I first met probably when he was a sergeant and I was an officer in the Third District. Probably sometime, like, 2004ish, maybe.

Q. And in December 2020, what was your position?

A. I was the assistant chief of our homeland security bureau.

Q. And what were your duties and responsibilities there?

A. Sure. So I oversaw all homeland security operations. So that's the special operations division. It's the joint strategic and tactical analysis command center at the time, as it was called, which included our intelligence -- office of

intelligence division. And we also had our air command information center in there and the folks that were on the FBI joint terrorism task force. Those are kind of the main duties.
Q. And in that position did you work with the defendant?
A. I did.
Q. Did he ultimately report to you?
A. He did.
Q. Are you familiar with MPD general orders?
A. I am.
Q. If the defendant wanted to do something that violated those orders, would that have required your approval?
A. It would require the chief's approval.
Q. So it would have to go through you, correct?
A. Yes.
Q. And what was the defendant's position in December 2020?
A. Sure. He was the lieutenant over our intelligence unit.
Q. What was he responsible for?
A. It was all of our intelligence operations. So we had what we now call homeland security intelligence. So that's working with our interagency law enforcement partners. And we also had, at that time, gang intelligence or criminal intelligence underneath that umbrellas as well.
Q. Okay. And what does it mean when you're working on First Amendment intelligence?
A. So First Amendment intelligence, or what we now kind of

refer to as homeland security intelligence, but that's intelligence or information related to First Amendment activities that may go on in the District. So protests, rallies, demonstrations, things like that.
Q. Okay. In December 2020, what was MPD focused on related to the First Amendment protected activities and demonstrations?
A. Sure. So kind of during that timeframe, the summer of 2020, there was widespread civil unrest. Not only here in the District of Columbia, but, of course, across the nation. So, really, in November and December we had groups of individuals that were coming here in relation to the election, kind of various groups, and there was clashes between those groups.
So, really, trying to facilitate peaceful First Amendment activity was really one of the goals as we led to the certification of the elections and inauguration of the president.
Q. And how is that accomplished?
A. Through a variety of methods. I mean, there's First Amendment demonstrations. Depending on the demonstrations, some groups file permits. Permits are not required in the District of Columbia on city jurisdiction, but they are on National Park Service. That being said, so we work with those organizers and those groups to help facilitate that. Maybe they want to march or maybe they want to rally somewhere. Also coordinate with the another law enforcement agencies here in

the city that also have jurisdictional boundaries --

THE COURT REPORTER: Sir --

THE COURT: I was just going to ask you --

THE WITNESS: Slow it down. I tend to talk fast.

THE COURT: She has the unenviable position of typing up what all of us fast-talkers --

THE WITNESS: Yes, mam.

THE COURT: -- have to say. So if you could slow down a little.

THE WITNESS: Yes, ma'am.

BY MR. ROTHSTEIN:

Q. And is it fair to say that MPD was willing to talk to anybody who was willing to share information?

A. Yes, that's correct.

Q. And when we discuss "share information," which way is information supposed to flow?

A. We're supposed to obtain information from the groups about what they want to do and help facilitate that.

Q. Now, did you ever direct the defendant to share police information with anyone in those First Amendment groups?

A. No.

Q. Did he ever come to you and say, "Can I share this piece of information with a First Amendment group?"

A. Not that I recall.

Q. In November and December of 2020, were you familiar with a

group called the Proud Boys?
A. Yes. We had learned about them kind of earlier that summer, into that timeframe.
Q. Why were you familiar with them?
A. They had come to -- we didn't have any intrinsic groups in the District of those individuals, but they would come here in relation -- really, there's two big demonstrations they came for, one in November and then one -- I believe it was in December, related to the election information. And large groups of those individuals came. They kind of started to gain, like, national notoriety at that timeframe.
Q. Based on your experience, were they looking to come here to peacefully protest?
A. No. The information we had is -- what would typically happen was these individuals would come here during the daytime, they would participate in the regular First Amendment peaceful activity, and then at nighttime they would go out, incite groups of individuals. A lot of times they would go to specific establishments to drink and they kind of would go out and go around town looking for folks that are opposite of them, whoever they perceived as maybe to be BLM or antifa or someone kind of counter to their message.
And we had many altercations, conflicts between them where we would have to put officers in there to try to keep them separated or to try to keep the groups from encountering

one another.
Q. What were they looking to do when they encountered these groups like antifa or BLM?
A. They would fight and assault them.
Q. So based on your experience, were they looking to be separated from antifa to peacefully protest, or were they looking for antifa?
A. I mean, they were going around the city, kind of looking for groups of individuals to engage in fights with.
Q. Now, would information about antifa's location have facilitated their objectives, the Proud Boys, knowing where antifa was in the city?
A. I mean, yes.
Q. Now, earlier you said that MPD was willing to talk to anyone. Did you know anything about the defendant's contacts with members of the Proud Boys in or around December 2020?
A. Yes.
Q. What did you know?
A. I knew he was in communication with Mr. Tarrio, who was kind of the leader, or what we knew of the leader, I believe, of the Miami group.
Q. When you say that you knew that they were in communication, what does that mean? What did you understand the defendant was communicating with respect to Mr. Tarrio?
A. Sure. So I know that he had reached out to him to try to

get information. We knew that these groups were coming to the district, so we were trying to get information about where they were going, what they were trying to do, so that way we could help facilitate, you know, legal, peaceful activity, but also make sure there was no conflicts between various groups.

Q. And on occasion did you reach out to the defendant to get intelligence about the Proud Boys' plans?

A. I would, yes. And we'd have -- I mean, we had fairly regular weekly meetings with myself, intelligence, air special operations division, chains of -- Supervisor Director Montagna, we would all come together. And as we had the various protests, we would normally meet and, you know, whatever information was available to discuss.

Q. Were you in fairly regular communications with the defendant at that time?

A. I'm sorry. Can you say that again?

Q. I'm sorry, I'm a little sick.

Were you in fairly regular communications with the defendant at that time?

A. Yes.

Q. Daily?

A. Yeah, probably multiple times a day.

Q. Now I want to show you what's been admitted into evidence as Government Exhibit 4016.

Going to the bottom of page 1 and the top of page 2.

MR. ROTHSTEIN: Sorry. This screen is not working.
THE COURT: It's not up?
MR. ROTHSTEIN: There you go. Okay. Great. Terrific.
BY MR. ROTHSTEIN:
Q. Do you recognize this email at the top of the left-hand side of the page?
A. Yes.
Q. Is that your email?
A. It is.
Q. Okay. And at 11:14 -- sorry, on 11-14, November 14, 2020, at 9:51 p.m., what did you write to Shane Lamond?
A. I wrote, "Any idea when the Proud Boys are leaving the city from social media?"
Q. Okay. And how do you send that? What was the method of communication?
A. Text message.
Q. Okay.
A. Or iMessage, it says.
Q. And did he respond to that?
A. He did.
Q. And what did he write?
A. "I will check again with my source, but on Friday he said most on Sunday, a few leaving Monday. Not sure if they are participating in Straka demo tomorrow, but I will find out."

Q. Okay. And then going to the next. If we can go down. What did you write back?
A. "Thanks."
Q. And do you see here, at 10:22 p.m., the defendant reached out to Enrique Tarrio via iMessage, saying, "You guys attending the Brandon Straka event tomorrow morning?" Do you see that?
A. I do.
Q. And then he responds to you at 10:27 p.m., "Just talked to him. They are all leaving tomorrow and not attending the Straka event." Do you see that?
A. Yes.
Q. Now, is this consistent with the way you expected the defendant to interact with members of the Proud Boys?
A. Yeah. I mean, he obtained information. He asked him if they provided him with the information and then he shared it with us.
Q. And at any point during that time period did you authorize the defendant to provide Tarrio with police information?
A. No.
Q. At any point in time ever did you authorize the defendant to provide police information to Tarrio?
A. No.
Q. Would providing police information to Tarrio be consistent with the objectives of MPD during that time period?
A. No. We were trying to obtain information about -- from

that group about where they were going, what they were doing.
Q. So why would providing them with information -- providing Tarrio with police information not be consistent with those objectives?
A. I mean, we don't provide First Amendment demonstrative groups, like, what our plans are, how we're going to handle them or prevent them from interacting with each other. Those are operational plans that we develop for ourselves, not to share with First Amendment groups or the public.
Q. Is it fair to say the information should flow one way?
A. I mean, yeah, that's fair.
Q. Showing you Government Exhibit 4018, at page 1.
A. Yes.
Q. Can you go to the top of the page.
All right. Do you see this communication from Shane Lamond to Enrique Tarrio via Telegram private chat at 7:30 p.m., "We just locked up one of your guys at 14th and K." Do you see that?
A. I do.
Q. Did you authorize that disclosure?
A. No.
Q. Is that police information?
A. It is.
Q. Is that consistent with the defendant's duties as an MPD officer?

A. No. We wouldn't tell groups when we make arrests of their individuals, of their people that were there.
Q. Okay. Now going to page 4 of Exhibit 4018. And we're talking -- or, I just mentioned that this was Telegram private chat. Do you see that?
A. Yes, I do.
Q. Is that a method of communication that MPD uses or is authorized to use?
A. No, we don't use that.
Q. How do you typically, when you're going to text --
MR. SCHAMEL: Ask for a timeframe.
BY MR. ROTHSTEIN:
Q. On December 12th -- sorry, December 13th, 2020, at 5:18 p.m., was Telegram an authorized method by which MPD officers were communicating?
A. No, it's not something that we were using.
Q. Why not?
A. I don't know a lot about Telegram, but my understanding is, like, the messages don't get saved.
Q. Is it important to save messages?
A. Yeah. Obviously, especially if it turns into criminal activity, we may have to turn it over as *Jencks* materials, other materials as notes.
Q. So when you communicate with Shane Lamond or John Haines via text, how did you communicate?

A. We text via regular text message, iMessage.
Q. Do you retain those communications?
A. Yes, they're retained.
Q. Okay. Now I want to show you, at the top, at 5:18 p.m. on the 13th, Shane Lamond writes to Enrique Tarrio, "On a brighter note, guy who got stabbed" -- "guy who stabbed your guys got locked up." Do you see that?
A. Yes, I do.
Q. Okay. And then there's an audio file with -- from Tarrio to Shane Lamond. Do you see that?
A. I do.
Q. At the bottom Shane Lamond writes, "I haven't pulled the report yet, but from what I learned on the scene last night it was only one person." Do you see that?
A. I do.
Q. Did you authorize that disclosure?
A. No, I didn't.
Q. Is that police information?
A. It is.
Q. Is disclosure of that information consistent with the defendant's duties as an MPD officer?
A. No. We wouldn't tell people about details of criminal cases.
Q. Or what about what's in a report?
A. No. I mean, we don't generally share law enforcement

information with people outside of law enforcement.
Q. Let me ask you this: Does MPD go around stamping documents from investigations or internal records "confidential"?
A. No, not generally, we don't.
Q. Okay. And what is your understanding about whether or not law enforcement information can be disseminated if it is not stamped?
A. I mean, if it's law enforcement information, we shouldn't be disseminating outside of law enforcement.
Q. Okay. Let's go to page 5 of 4018. And if you can bring up the communication at 5:32 p.m.
Do you see there's a text Telegram private chat, 5:32 p.m., from Tarrio to Lamond?
A. Yes, I see.
Q. It says, "What's the general consensus with D.C. Metro and my guys?" And Shane Lamond responds, at 5:43 p.m., "That's too complicated for a text answer. That's an in-person convo over a beer." Do you see that?
A. I do.
Q. As the defendant's supervising officer at this time, is that information that's appropriate to disclose to a source?
A. No, it's not.
Q. Why not?
A. I'm sorry. Say that again.
Q. Why not?

A. I mean, our goal is to remain neutral when it comes to First Amendment activity. Like, we don't get involved. But we wouldn't share, like, the consensus or how officers feel about a certain group. Like, that has nothing to do with how we respond in interviews as police officers.

Q. So communications between officers about a group, is that law enforcement information?

A. Yeah. I mean, about where the group is moving, what they're doing, you know, the criminal investigation, stabbings, all that is police information that we wouldn't share.

Q. Going to page 7. Bringing up the communication at 12:46. Do you see here, Shane Lamond, via Telegram private chat, on December 14, 2020, wrote to Tarrio, "Just heard your message. He will be released at the ramp at 3rd and C Streets Northwest this afternoon. The ramp is at the underpass between MPD headquarters and Department of Labor on 3rd Street." Do you see that?

A. I do.

Q. Did you authorize that disclosure?

A. No.

Q. Is that consistent with the defendant's duties as a MPD officer?

A. No. I mean, we don't tell people where we release them at.

Q. Is that law enforcement information?

A. I mean, it is, yeah. There are groups that would come

there, but that's not information that we publicly disclose. There are folks that figure it out, that's where people come from, but we don't tell them, hey, this is where the person is going to come out at.
Q. Why not?
A. The concern would be is they may go there and try to go inside the location. That's where our central cellblock is. So we've had cases where other groups of demonstrators have come out there and we have to deploy police officers because they try to interfere or go down into the cellblock. So it's a security concern.
Q. Now, directing you to December 11, 2020, were the Proud Boys in D.C. around that time?
A. I believe so.
Q. Or how about December 12th, 2020?
A. Yeah, it was a weekend in December. I don't remember the exact date.
Q. Okay. So do you recall at the beginning of December that the Proud Boys were -- beginning to mid-December Proud Boys were in D.C.?
A. Yes, sir.
Q. Were you working at that time?
A. Yes, I was.
Q. Showing Government Exhibit 4017, at pages 8 and 9. Let's start with page 8. Then if you could just pull up the top

part.

Can you see Shane Lamond, at 4:33 p.m., on December 11, 2020, sending you a text message, "Just got word that PB will be having a meeting on National Mall at 2230 hours tonight. They are planning on marching over from Harrington at around 2200. Will send to USPP as well." And how did you respond to that?

A. I responded, "Thanks. Are they planning on going anywhere after that?"

Q. Okay. And then Shane Lamond, at 4:36 p.m., says, "No. The meeting is to discuss their game plan for tomorrow. They will break up and head to hotels from there." And how did you respond?

A. I responded, "Well, at least we'll get an idea of how many are actually here based on that meeting."

Q. Now going to the bottom of the page.

And Shane Lamond writes to Tarrio, "Where are you all headed? Is that your group at 11th and E, heading to FP or the Mall?" Do you see that?

A. I do.

Q. Okay. And is that information that was consistent with his duties and responsibilities at the time, what you expected him to do?

A. Yeah. I mean, he was trying to elicit information from them about where they were going.

Q. Okay. And going to the next page.
Do you see, at 3:43 p.m., Shane Lamond writes, "Hey, brother, what's your plan for the rest of the day?"
And Tarrio responds, at 5:31 p.m., "6 to 7 p.m. at Harrington's, then we're going to march. Don't know the route yet." Do you see that?
A. Yes.
Q. Is that consistent with how you expected the defendant to interact with Mr. Tarrio?
A. It is.
Q. Okay. And that's over iMessage, right?
A. Yes. Yes, it is.
Q. Okay. And in the course of your duties and responsibilities, did you become aware of the BLM banner-burning incident on December 12th, 2020?
A. Yes.
Q. Was the defendant asked to assist the detectives in the investigation at a certain point?
A. I know he was working with the detectives on that case.
Q. Okay. So let's go -- based on your training and experience, is there a difference in how an officer should communicate with a source versus a suspect?
A. I mean, yes. When you interact with a suspect, it changes from, you know, eliciting information to now there's an underlying criminal case. So what we're doing is to document

what we're doing.
Q. So is it fair to say, if you're talking to a First Amendment source, it may not be necessary to document all those communications, is that right?
A. Yeah. And, honestly, I wouldn't even call interacting with an organizer as someone's trying to facilitate First Amendment -- we may use the term "source" in here, but I wouldn't generally consider them a source. I would consider them as, like, the same thing as a citizen who may have information, providing it to us. So we generally don't document that unless there's some -- some need to, some investigative need to.
Q. Once somebody is a suspect or subject of an investigation, does that change?
A. Well, it does, because now there's a criminal investigation that they're a suspect in, so then whatever information that they provide to you, we need to include that in the case file as it may go towards the probable cause in the case.
Q. So based on your training and experience, is an officer required to preserve communications with the suspect?
A. They should, yes.
Q. Did there come a point in time where you learned that Tarrio with a suspect in the BLM banner burning?
A. Yes, there was.
Q. And following his identification as a subject, did you

direct defendant to reach out to Tarrio to discuss MPD's investigation?

A. No, I didn't.

Q. Did he ever come to you and ask permission, Can I share what's going on in this investigation with Mr. Tarrio?

A. No.

Q. Showing you Government Exhibit 4018, at page 15.

Okay. Do you see at 7:34 a.m., on December 18, 2020, a Telegram secret chat between Shane Lamond and Tarrio where he says, "Hey, brother, did you call in an anonymous tip to MPD claiming responsibility for the banner burning?" Do you see that?

A. Yes.

Q. And going to the bottom of page 17.

Right up here, Lisa. Yep.

Tarrio responds at 9:30 a.m., via Telegram secret chat, "I did more than that, it's on my social media."

9:50 a.m., Shane Lamond, responds, "I got you. Someone called in an anonymous type that you claimed responsibility for it."

And at 10:05 a.m., Enrique Tarrio, via Telegram secret chat, Tarrio writes to Shane Lamond, "This wasn't a hate crime. And I want to see it play out." Do you see that?

A. I do.

Q. Is there any law enforcement reason for this communication

to occur over a Telegram secret chat?
A. No.
MR. SCHAMEL: Objection. Calling for an opinion. He's not an expert.
THE COURT: I think he can answer the question.
THE WITNESS: No.
BY MR. ROTHSTEIN:
Q. Would that further the investigation?
A. No, it wouldn't further it.
Q. Should these communications have been preserved?
A. They should have been preserved.
Q. Should they have been provided to the detectives investigating the case?
A. They should have been.
Q. Did the defendant ever notify you that Tarrio had admitted to burning the banner to him?
A. No, not that I recall.
Q. Would that have been a valuable piece of information?
A. It would have been a confession.
Q. And would that have advanced the investigation?
A. Yes, it would have. It would establish probable cause, it would be a piece of it.
Q. Would that have affected the speed at which MPD could have obtained an arrest warrant?
A. I mean, it may have. I don't know exactly the timing of

when this was said versus when the warrant was issued.
Q. So if this was said on December 18, 2020 and they got the warrant on December 30th, 2020, would that have affected the speed?
A. Yes, it seems it would have.
Q. Did you ever authorize the defendant to notify Tarrio about the anonymous tip?
A. No.
Q. Did you ever hear or learn of anyone else at MPD authorizing the defendant to notify Tarrio about the anonymous tip?
A. No, not that I'm aware of.
Q. Based on your training and experience, is that a piece of information that should have been disclosed to a suspect?
A. No.
Q. Does that help or hurt a law enforcement investigation?
MR. SCHAMEL: Objection. Speculation.
THE COURT: I think he can answer.
THE WITNESS: I mean, I think it hurts them because it lets them know there are other people out there who are recording him.
BY MR. ROTHSTEIN:
Q. Now, going to the middle of page 17 of Exhibit 4018.
Do you see, at 10:06 a.m. on December 18, 2020, Lamond wrote to Tarrio, "I'm curious to see what happens, too. I will

check with our CID people to see if they have you on video." And then Lamond writes, "Also, you've got the FBI and USSS all spun up over what was said on Infowars the other night about PB dressing up as Biden supporters on inauguration day. Got an email first thing this morning." Do you see that?
A. I do.
Q. Now, what is CID?
A. It's our criminal investigations division, it's our detectives.
Q. Based on your training and experience, should the defendant be offering to reach out to CID to see if there is video of a suspect committing a crime?
A. No.
Q. Based on your training and experience, should the defendant be providing information about the United States Secret Service and FBI concerns to a leader of a group such as the Proud Boys?
A. No.
Q. Did you ever authorize those disclosures?
A. No.
Q. Page 18, Exhibit 4018.
Now, do you see that there is one, two, three audio messages there that say file unrecovered from December 18, 2020?
A. Yes.
Q. And at the bottom it says, "LOL," from Tarrio to Lamond.

"LOL. Just searched. Never said this, haha." Do you see that?
A. I do.
Q. Okay. Keep going down the page.
Do you see there's an audio file at 10:30 a.m.?
A. I do.
Q. Lamond writes, "LOL. Yep, that's exactly what O got from FBI and United States Secret Service. Do you see that?
A. Yes.
Q. To your knowledge, did the defendant provide any of these audio files from Tarrio to MPD?
A. Not that I'm aware of.
Q. If the defendant had confessed to a crime and then made audio statements to the defendant, should they have been preserved?
A. Yes.
Q. To your knowledge have you seen any reports written by the defendant about these conversations?
A. No, I have not.
Q. Were you on any communications between the defendant and CID about his communications with Tarrio?
A. No, not that I'm aware of, any of these.
Q. Based on your training and experience, is that something that should have been turned over to the detectives running that investigation?

A. Yes, it should have.
Q. Could that have affected the investigation and prosecution?
A. Yes.
Q. Going to page 19 of Exhibit 4018.
And do you see, at 10:42 a.m. on December 18, 2020, via Telegram secret chat, Enrique Tarrio wrote to Lamond, "The video is out there."
And then Lamond responds, "I think it was included. I'm just going to let them all get freaked out. They're idiots." Do you see that?
A. I do.
Q. And then Lamond replies, "LOL," and then there's an audio file there that's unrecovered?
A. Yes.
Q. Did the defendant ever notify you about these communications?
A. No.
Q. To the best of your knowledge, did he ever notify the FBI or the United States Secret Service about these communications?
A. No.
Q. Are these communications consistent with the defendant's duties and responsibilities as an MPD officer under your command?
A. No.
Q. Page 22 of Exhibit 4018, please.

Now, do you see, at 4:09 p.m. on December 18, 2020, via Telegram secret chat, Tarrio writes to Lamond, "So what do you think?"

And Lamond responds, at 4:30 p.m., "About which part? You clearing the air about the Biden gear or the BLM banner?" Do you see that?

A. I do.

Q. And Tarrio responds, at 4:52, "BLM banner." And then says, "You think they'll make a stink of it?" Do you see that?

A. I do.

Q. Now going to page 23, which is the next page. And if we could highlight the three communications at the top.

Now, do you see Lamond, at 4:55 p.m., via Telegram secret chat, writes, "No, a bit of the opposite. I've been talking to CID about it. They wanted to know what I know about your group and if I think you all are racist. I told them you are made up of a lot of Latinos and Blacks, so not a racist thing. If anything, I said, it's political, but then I drew attention to the Trump and American flags that were taken by antifa and set on fire. I said all those would have to be classified as hate crimes, too. It's not being investigated by FBI though, just us at MPD." Do you see that?

A. I do.

Q. And then Tarrio responds, "Ah, okay. Awesome." Do you see that?

A. Yes.
Q. Now, focusing your attention at the 4:55 p.m. chat. Did you ever authorize the defendant to disclose his communications with CID about the investigation?
A. No.
Q. Is that law enforcement information?
A. Yes.
Q. Did you ever authorize the defendant to disclose that it's not being investigated by the FBI?
A. No.
Q. Is that law enforcement information?
A. It is.
Q. Is there anything else in that text that's of concern to you?
A. I mean, the entire communication is. I mean, he's basically telling him internal communications that we're having about the investigation. I mean, this text message reads like he's talking to a friend.
Q. Page 24, please.
Do you see that that's the same as the communication at 4:55 p.m.?
A. I do.
Q. And do you see that Tarrio shares it with a group called Skull and Bones?
A. Yes.

Q. As the defendant's commanding officer at that time, did you intend for the Proud Boys to receive this information?
A. No.
Q. Is that consistent with the defendant's duties and responsibilities as a law enforcement officer?
A. No.
Q. Okay. Going to the top of page 24.
Okay. Do you see here there's a Telegram secret chat at 12:18 -- I'm sorry, on 12-18-2020, at 4:58 p.m., from Lamond to Tarrio, where it says, "I don't think they have any pictures of you." Do you see that?
A. I do.
Q. Did you ever authorize the defendant to disclose to Tarrio that MPD did not have any pictures of him?
A. No, I did not.
Q. Is this consistent with his duties and responsibilities as an MPD officer?
A. No.
Q. Is that helpful to the investigation?
A. No, it's not.
Q. Why?
A. Because he knows it may be difficult for us to identify him positively.
Q. Page 31 of Exhibit 4018.
Do you see, at 7:48 p.m. on December 19th, 2020, "Police

want to" -- Lamond writes to Tarrio, "Police want to talk to you about the banner burning. You have a certain phone number you want me to give them?" Do you see that?
A. I do.
Q. The defendant was in your chain of command, correct?
A. Yes, he was.
Q. Did you ever authorize the defendant to tell Tarrio that the police wanted to talk to him about the banner?
A. No.
Q. Based on your training and experience, is it common to give a heads-up -- to give a suspect a heads-up that the police want to talk to him?
A. No, not generally.
Q. Based on your experience, does that help further an investigation?
A. No.
Q. Why?
A. Because they may try to avoid being contacted, they may move, flee the area from where they're at. I mean, they'll know that law enforcement is on the lookout for them now.
Q. Now, going to page 33 of Exhibit 4018. If we can bring up the top four communications.
At 4:40 p.m. on December 20th, 2020, Tarrio writes to Lamond via Telegram secret chat in response to, "The police want to talk to you."

"Miami-Dade PD reached out. I'm going to use my Fifth. I'll be in D.C. on the 6th. If MDC wants to talk to me, they can see me there. Are they pushing the hate crime thing?"

And then Lamond responds, "Give me a call when you can," at 4:51 p.m. Do you see that?

A. I do.

Q. And do you see that Tarrio then says, "Through here?" And then there's a call to Shane FBI Police that's 411 seconds?

A. Yes, I do.

Q. Okay. Now, at any time did the defendant notify you that he had a call with Tarrio about -- following his notification of Tarrio that the police wanted to speak with him about the BLM banner burning?

A. No.

Q. Did you ever see any reports written by the defendant about those conversations?

A. No, I have not.

Q. As his supervisor, should the defendant have disclosed these conversations to anyone at MPD?

A. Yeah. I mean, they should have been disclosed to his direct supervisor, as well as to CID, because he knows they're investigating the crimes.

Q. And why? Why is it important to do that?

A. I mean, it all goes back to building the probable cause for the underlying cases and charges that are out there. I mean,

based on these communications, he's admitting what's going on to the entire -- with the entire thing. And then I don't know what was said in the phone call, obviously.
Q. And in that text message it said, "Are they pushing this as a hate crime?" As his supervisor, did you ever authorize him to have conversations with Tarrio about whether the investigation was being pursued as a hate crime?
A. No.
Q. And is Tarrio being made aware of internal deliberations of MPD helpful to the investigation?
A. No, it's not.
Q. Why not?
A. I mean, he knows the inner workings of the entire investigation, allows him to help get rid of evidence, it allows him to do everything. I mean, these messages that are going between Lieutenant Lamond and him, they talk about the police as a third-party. Lieutenant Lamond is the police.
Q. Showing you Government Exhibit 4019, at page 2.
Okay. Do you see here there's a snapshot at 8:08 a.m. from Tarrio to Lamond? It's a photo, do you see that, of a text message communication?
A. I do.
Q. And then do you see that at 8:10 a.m. the defendant set the self-destruct timer to 5 seconds? Do you see that?
A. I do.

Q. And that's message ID 27. And do you see message ID 30 at 8:11 a.m., NobleLead said, "Tarrio set the self-destruct timer to 30 seconds." Do you see that?
A. I do.
Q. Based on your training and experience, should an MPD officer be setting self-destruct timers for communications with a suspect?
A. No.
Q. How many self-destruct timers have you set on your communications?
A. None.
Q. Why?
A. I don't even know what that is, honestly. I'm not familiar with Telegram. I know it makes it go away, but I don't even know what that means.
Q. So should -- why shouldn't officers be setting self-destruct timers on their communications with a suspect?
A. I mean, we have to document the communications that we have with everybody.
Q. And how would that affect an investigation?
A. At this point we don't know what was said in those communications. It could be bad or it could be something that's benign. We have no clue what was said.
MR. SCHAMEL: What was --
MR. ROTHSTEIN: Benign.

THE WITNESS: I mean, we don't know what's in there.
MR. SCHAMEL: Thank you.
BY MR. ROTHSTEIN:
Q. Whether it's good, bad, benign, should it be retained?
A. It should.
Q. Bottom of page 3, Exhibit 4019.
Do you see, at 2:14 p.m. on December 25th, 2020, that Shane Lamond wrote to Enrique Tarrio with a self-destruct timer of 30 seconds, "Just a heads up, CID had me ID you from a photo you posted on Parler kneeling down next to the BLM banner, so they may be submitting an arrest warrant to the U.S. Attorney's Office." Do you see that?
A. I do.
Q. Did you ever authorize the defendant to tell Tarrio that CID had Lamond -- had him identify Tarrio kneeling down next to the BLM banner?
A. No.
Q. Did you ever hear or learn of anyone else at MPD authorizing the defendant to tell Tarrio that CID had him identify Tarrio kneeling down next to the BLM banner?
A. No, not that I'm aware of.
Q. Did you ever authorize the defendant to tell Tarrio that the United States Attorney's Office would be submitting an arrest warrant for him?
A. No.

Q. Did you ever hear or learn of anyone at MPD authorizing the defendant to tell Tarrio that the United States Attorney's Office would be submitting an arrest warrant for him?
A. No, not that I'm aware.
Q. Is that all law enforcement information?
A. It is.
Q. Based on your training and experience, how does the provision of information such as that affect an investigation?
A. I mean, it can harm it. He knows there's going to be an arrest warrant, so he may leave the area that he's in, he may destroy evidence that he may have, may delete things off of these pages where he's posted pictures and such.
Q. Do you recall that when the banner was burned, there were other individuals burning it as well?
A. Yeah, I do recall.
Q. So is it fair to say there were other suspects?
A. Yes, there were other people that were -- you know, that were there that either witnessed or participated.
Q. Showing you Government Exhibit 4021, at page 1.
THE COURT: Can you give me the Exhibit number again?
MR. ROTHSTEIN: I apologize, Your Honor. 4021, at page 1.
THE COURT: Thank you.
BY MR. ROTHSTEIN:
Q. Okay. Do you see that on December 30th, 2020, at 5:56

p.m., Lieutenant Mufti wrote, "I have attached the signed warrant." Do you see that?

A. I do.

Q. Okay. And do you see underneath there there's a Telegram call from Lamond to Tarrio, incoming call from Shane FBI Police, that's 849 seconds?

A. I do.

Q. Now, following the submission of the arrest warrant, did you authorize the defendant to reach out to Tarrio and have a roughly 14-minute conversation over an encrypted application with him?

A. No.

Q. Should that conversation have been recorded?

A. I mean, it should have been recorded or documented or not happen.

Q. Should the detectives on that investigation been notified?

A. Yes.

Q. Did you hear anyone else authorize him to have that conversation?

A. Not that I'm aware of, no.

Q. Did he ever tell you about the contents of that conversation?

A. No.

Q. Okay. Did you ever see any reports that the defendant wrote about that conversation?

A. No, I didn't.
Q. At the time, would the defendant, knowing that Tarrio was not just a suspect, but a person for whom an arrest warrant had been submitted, based on your training and experience, should any communication between Lamond and Tarrio have been preserved?
A. Yes, it should have been.
Q. Why?
A. Again, it all goes back into the case and the strength of the case that's going to be presented.
Q. At some point in time -- I want to take you forward, to the arrest of Mr. Tarrio. At some point in January 2021 did you learn that an arrest warrant had been submitted for Tarrio in connection with the banner burning investigation?
A. Yes, I did.
Q. And were you ever a part of any conversation in which an option was to have Mr. Tarrio self-surrender?
A. No, not that I'm aware of.
Q. Are you aware of any conversations in which the defendant was directed to arrange for Mr. Tarrio to self-surrender?
A. No, not that I'm aware of. The only thing I have knowledge of is the defendant -- we'd asked him to see if he could get information about when Mr. Tarrio was coming in so we could facilitate the arrest, and conversations about when we would facilitate the actual arrest.

Q. But to be clear, self-surrender was never a part of that plan?
A. No, not in a conversation that I had with him at all.
Q. Who was handling the arrest?
A. Officers in our violent crimes suppression division actually are the ones who made the arrest.
Q. And did you ever reach out to the defendant to ask him to provide information to the criminal apprehension unit to assist in the arrest?
A. I did. I mean, we asked him to get information, if we could find out when he was coming into the D.C. area, when he was coming to the airport and landing.
Q. Is the fact that -- is an arrest warrant, is that police information, law enforcement information?
A. Yeah, it is.
Q. Okay. And does it have to be stamped "confidential" in order for it to be police information?
A. No.
Q. Does it have to be stamped "law enforcement sensitive" for it to be police information?
A. No.
Q. How many arrests have you been involved in in the course of your career?
A. Over 100.
Q. Okay. And how many do you think you've supervised?

A. Many more than that.
Q. In the course of your career -- or, have you ever reached out to a suspect in somebody else's case to notify that individual about an arrest warrant without notifying the detectives that were on that matter?
A. No.
Q. Showing you Government Exhibit 4021, at 5.
Do you see, at 7:10 p.m., a iMessage between you and Lamond that says, "Shane, call John Branch about the arrival info for Enrique"?
A. Yes.
Q. He writes back, "Copy," right?
A. Yes.
Q. Who's John Branch?
A. At the time, I think John was a captain over at our violent crime suppression division.
Q. Did you ever -- why did you make this request to the defendant?
A. Because I knew Shane had the arrival information about when he was coming in and John Branch, his team, those were the folks that were going to go out and facilitate the arrest.
Q. Is it fair to say at this time you knew the defendant was still -- could have been in touch with Tarrio? Is that fair to say?
A. Yes, it is.

Q. But did you have any knowledge that he was discussing the banner-burning investigation with him?
A. No.
Q. Okay. Did you ever hear anyone else direct Lamond to inform Tarrio about the warrant?
A. No, I didn't.
Q. Showing you Government Exhibit 4023, at 12.
Okay. Do you see here that Charlie Cox sends an email to Shane, "Shane, also, I know LKA via Clear Source Experian as of 10-17-2020," providing an address there. Do you see that?
A. I do.
Q. It says gate 40. And then it says a flight info. Do you see that?
A. Yes.
Q. And then did you see that Shane Lamond writes to you, Leslie Parsons, Jeffery Carroll, and John Haines, "Here's the flight info"?
A. Yes.
Q. Is it correct that Leslie Parsons was overseeing CID at that time?
A. Yes, that's correct.
Q. And what was John Haines's position at that time?
A. I'm pretty sure at that time he was the commander over our violent crimes suppression division, the folks that were making the arrest.

Q. Okay. And do you see Leslie Parsons then writes, "Thanks" at 8:33 p.m.?
A. Yes.
Q. So the defendant provided you with Tarrio's flight information that day, right?
A. That's correct.
Q. And was that helpful?
A. It was.
Q. Okay. Now, showing you Government's Exhibit 4024, at 2.
Do you see that?
A. Yes.
Q. Okay. Do you see that there's American Airlines flight 925 from MIA to DCA for Mr. Tarrio?
A. Yes.
MR. ROTHSTEIN: Okay. Now can you please -- Lisa, can you --
(Off-the-record discussion between counsel and paralegal.)
BY MR. ROTHSTEIN:
Q. Okay. Now, do you see, at 1:02 p.m., Shane Lamond set the self-destruct timer on a communication with Mr. Tarrio to 10 seconds. Do you see that?
A. I do.
Q. Okay. And then do you see Mr. Tarrio writes, via Telegram private chat to other individuals, "Warrant was signed.

Warrant for my arrest was just signed. The warrant was just signed." Do you see that?

A. I do.

Q. Based on your knowledge of the investigation and arrest plan, was there any law enforcement purpose in the defendant -- based on your knowledge of the investigation and the arrest plan, was there any law enforcement purpose in the defendant contacting Tarrio once he was on his flight?

A. No.

Q. Do you ever authorize the defendant to notify Tarrio about the arrest warrant once he got on the plane?

A. No.

Q. Did you ever learn or hear from anyone else at MPD authorizing the defendant to notify Tarrio about the arrest warrant once he was on the plane?

A. No.

Q. Did the defendant ever notify you that he had tried to communicate with Tarrio while he was on the plane?

A. No.

Q. At the time, did you ever hear or learn from anyone else at MPD that the defendant had alerted them that he had tried to text Tarrio while he was on the plane?

A. No.

Q. Showing you Government Exhibit 4025, at 1.

And just to be clear about something: You weren't

actually involved in the drafting of the arrest warrant, right?

A. No, I was not.

Q. You weren't involved in the investigation, correct?

A. No. Investigative services bureau, criminal investigations division, they're the ones that handle the criminal investigation side of it.

Q. Now, do you see, at 7:55 a.m. on 1-7-2021 -- do you see that?

A. I do.

Q. And Lamond writes to Tarrio, "How are you holding up? I checked on your charges and the possession of high-capacity mags is a felony." Do you see that?

A. I do.

Q. Okay. And is it your understanding that the defendant -- that -- sorry, that Tarrio was arrested on January 4th?

A. Yes.

Q. On an arrest warrant, correct?

A. Yes, sir.

Q. And do you see that then Tarrio responds, at 8:38 a.m., "So gay"?

A. I do.

Q. Did you ever authorize the defendant to reach out to Tarrio following his arrest?

A. No.

Q. Did you ever authorize the defendant to check on his

charges and report back to Tarrio?
A. No.
Q. Based on your training and experience, is that consistent with proper police procedure?
A. No.
Q. Is that law enforcement information?
A. It is.
Q. As the defendant's supervisor, did he ever notify you about these conversations?
A. No.
Q. Should he have?
A. Yes. I mean, if he had -- he shouldn't have had them.
Q. But if he had them, should he have told you?
A. Yes.
Q. Why?
A. I mean, obviously, now the person has been -- not only was there a warrant issued, the person has been arrested, and now you're having communications afterwards. They have the right to counsel. There's all these other things that have happened in that time period and we're still communicating.
Q. Who else should he have reported that to?
A. I mean, he should report it to his direct supervisor, Director Montagna. He should report it to CID and to the U.S. Attorney's Office, they've already brought charges against the individual.

Q. Based on your training and experience, should any communications with the charged subject -- sorry, based on your training and experience, should any communications with a charged defendant occur over a Telegram secret chat?
A. No.
Q. Did the defendant ever tell you that he had conversations with Mr. Tarrio following the January 6th -- following January 6 about the riot at the Capitol?
A. No.
Q. Was the defendant under your command at that time, after January 6th?
A. He was.
Q. Page 4 of Government's Exhibit 4025.
Do you see that?
A. (No response.)
Q. Do you see, at 7:51 p.m. on January 8th, that Lamond wrote to Tarrio, "Looks like the feds are locking people up for rioting at the Capitol. I hope none of your guys were among them."
And then Tarrio says, "So far, from what I'm seeing and hearing, we're good."
And Lamond then responds, at 7:59 p.m., via Telegram secret chat, "Great to hear. Of course I can't say it officially, but personally I support you all and don't want to see your group's name or reputation dragged through the mud."

Do you see that?

A. I do.

Q. And then going to page 4025 -- sorry, going to page 5 of Government Exhibit 4025.

Do you see that Tarrio responds to Lamond's message at 8 p.m., "Thanks, but I think we're passed that. The brunt of this will come down on us." He corrects it to say "past."

And then do you see Lamond responds, at 8 p.m., "It's not going to matter. Simply entering the building will be enough to get charged. Being up on the upper terrace past the police lines may even be enough to be charged." Do you see that?

A. I do.

Q. Are these communications consistent with the defendant's duties and obligations as an MPD officer?

A. No, they're not.

Q. Is that law enforcement information about who is going to be charged for what?

A. It is.

Q. And are these communications consistent with how a charged defendant should be communicated with by an MPD officer?

A. No.

Q. Should these communications have been documented and preserved?

A. Yes.

Q. Should these communications have been provided to investigators?
A. Yes, they should have.
MR. ROTHSTEIN: One moment, Your Honor.
(Pause.)
MR. ROTHSTEIN: Nothing further.
THE COURT: All right. Cross-examination.
MR. SCHAMEL: One moment, Your Honor.
(Pause.)

CROSS-EXAMINATION

BY MR. SCHAMEL:
Q. Hi, Chief.
A. Good morning.
Q. I'm Mark. We just met out in the hallway.
I talk super fast, so we're both going to try to go slower, okay?
A. Yes, sir.
Q. Okay. I want to -- I'm going to jump around a little bit because I'm going to try to get through these.
When Mr. Tarrio was arrested on January the 5th [sic] -- okay? Following? Tracking with me?
A. Yep.
Q. He was charged ultimately with --
THE COURT: Can you talk to the microphone?
MR. SCHAMEL: Too far away?

THE COURT: Yes.
MR. SCHAMEL: Is that better.
THE COURT: Yes.
BY MR. SCHAMEL:
Q. He was charged -- Mr. Tarrio was charged with a misdemeanor destruction for the banner, correct?
A. Yes.
Q. And also the felony for the possession of the two high-capacity magazines, correct?
A. Yes, that's my understanding.
Q. So Mr. Rothstein spent a lot of time talking to you about is the fact that those are felony charges law enforcement information, I think is what he called it, right?
A. Yes.
MR. ROTHSTEIN: Objection, Your Honor. I think misstating the question and, "Are those felony charges?"
THE COURT: I don't think you're accurately characterizing the question, but go ahead, ask your question to this witness.
BY MR. SCHAMEL:
Q. Mr. Rothstein showed you the communication from Mr. Lamond to Tarrio telling him what the charges were, correct?
A. Yes.
Q. All right. And he said those are felony charges. And he asked you: Is communicating that to Mr. Tarrio, is that

communicating law enforcement information?
A. Yes.
Q. Okay. And you said it was?
A. Yes.
Q. But if he was charged in the D.C. Superior Court with two felonies, that's on the public docket, right?
A. Yes, they would be.
Q. And so he would have presented in C-10, presumably?
A. Yes.
Q. And the judge would have read -- or, the clerk for the court would have read the felony charges into the public record?
A. Yes.
Q. Everybody in the world could go -- with understanding it was COVID, but in a normal circumstance anybody in the world could go into C-10 and have watched Mr. Tarrio stand before the Court charged with a felony for possession of those magazines, correct?
A. That's correct.
Q. All right. So when Mr. Rothstein is asking you about law enforcement information, there's a lot of things that are law enforcement information that are also public, right?
A. There are some, yes.
Q. Okay. So like, for example, when somebody is released from the central cellblock below the police station, right?

A. Yes.
Q. And they come out that exit that's in the other message Mr. Rothstein showed you?
A. Yes.
Q. If a person in the public calls the police department and asks, My loved one is getting released, where are they getting released from? Don't they just tell them they come out the sally port onto 3rd Street?
A. At that time they were, but they weren't generally coming out -- that's not where they generally get released from.
Q. Okay. But you could call in and they would tell you?
A. I don't know if they would tell you they're coming up the ramp from the cellblock, because that's where central cellblock is at. Generally people get released from like -- if they're released on citation, they may say, Yeah, John's being released from the Third District. But, like, specific, coming out of the ramp, it's not like they're walking out the front door of the courthouse.
Q. Okay.
A. Because it was different at that time. Due to COVID, people weren't being -- coming to court and then getting released in C-10 and that kind of stuff.
Q. They sat in a car out there for hours, I remember.
THE COURT: Wait, wait. Are you just making a comment? Was that a question?

MR. SCHAMEL: I'm sorry. I'll withdraw my comment.
THE COURT: Okay.
BY MR. SCHAMEL:
Q. People would sit outside of the sally port waiting for their loved ones or people they were picking up to come out there because that was the known exit point after people were released?
A. Yes. Certain times, yes, they would.
Q. So, yes, law enforcement, but not something secret?
A. It was known by people, there were groups of demonstrators, as I mentioned earlier, that would come out there when their colleague, friends, whatever you want to call them, were being released. There were folks that would come out after certain demonstrations and wait there.
Q. In your position -- and is the proper way to address you Chief or Assistant Chief? Is Chief okay?
A. It doesn't matter. However you would like is fine.
Q. I want to get it right.
Chief, in your position when you were Mr. Lamond's supervisor, one of the things you said you were doing was First Amendment intelligence investigations?
A. Well, First Amendment activity. I mean, the intelligence division at that time did a lot of different things. It's current construct is a little different now.
Q. Not so much focused on now. Focused, really, on then.

A. Yep.
Q. But when that was happening, it was a different, sort of, process for dealing with the First Amendment folks than it was for a criminal investigation?
A. That's correct.
Q. And you said, I think, in your direct, it was sort of like talking to a citizen on the street, just getting that information, right?
A. Yeah, it's helping to facilitate -- so on the First Amendment side, if there is a group that's trying to do things, whatever it may be, a march, a protest, or whatever, we would reach out -- we do reach out to those groups to try to get information to help find out where they're going to be because we know there are groups that have various viewpoints that if they come together, there will be potential fights, assaults, things like that. So how we can deploy resources to allow both groups or these individuals to exercise their First Amendment rights without having conflict and fights and things like that.
Q. Okay. And that's different in the way you deal with that person, even though we're calling them a source, than a source that you sign up and number and put into the computer system, right?
A. Yes.
Q. And you're not paying these people?
A. No.

Q. You're not doing PDA-54s for these folks?
A. No.
Q. You're not expecting the same sort of process and procedures, it's a little more casual?
A. It is.
Q. You wouldn't expect anybody, Lamond or anybody else, at that time that was working with that type -- again, I'm going to use it in quotes, source, to be keeping their notes and keeping their book in the same way they would with somebody if they're investigating a crime?
A. Yes, because there's no -- at this point there's no criminal nexus.
Q. We'll talk about that in a second. I want to make sure we're clear. When you became aware that Mr. Lamond and Mr. Tarrio were in regular communication, he was one of these -- I'll call them First Amendment source, is that fair?
A. Yeah. I mean, I think that's fine, to call him that.
Q. Was that about November of 2020?
A. That's when I -- the first time I really remember the group coming to D.C., so I think that's probably a fair timeframe.
Q. So starting in November 2020, you were aware that a gentleman who was two levels -- two levels below you?
A. Yeah, he reported to Director Montagna and Director Montagna reported to me.
Q. So two levels below you. You were aware that he had a

First Amendment source with the Proud Boys?
A. He was in communication. I mean, at the time we would kind of refer to him as like the organizer, the person who's coordinating their activities.
Q. Okay. I want to go back a little bit and talk about law enforcement information. Okay?
A. Sure.
Q. Okay.
A. Yes.
Q. So when we talk about things like what's available, sort of publicly that's out there, like the exit point from the central cellblock, is it similar to the things that are like -- the Metropolitan Police Department issues press releases, right?
A. Yes, we do.
Q. Were you aware of the press releases around the Black Lives Matter flag burning?
A. I know that we released press releases. I don't know what specifically are in them.
Q. Okay. So you don't know whether the press release from the very outset indicated that it was being investigated as a hate crime?
A. I don't. I would need to see it to be able to tell you.
Q. How about the FBI press release? Do you know that that one identified it as a hate crime?
A. The same thing, I don't know. I would have to see it to be

able to tell you.

Q. And if it did, wouldn't that be similar to what's in the public record at the courthouse? Yes, law enforcement information, but not really the same as something that shouldn't be shared?

A. Yeah. I mean, if it's -- it's available publicly, is what you're describing.

Q. So if things are available publicly, they're still -- I'm not saying they're not law enforcement information, but they're different?

A. I mean, yes, it's publicly available information.

Q. Okay. How about things that are going to be available in very short order? Like, for example, an arrest warrant. If there's an arrest warrant and it's going to be released the next day to the public and you tell somebody in the press or something, is that a problem?

A. Yeah. I mean, we don't disclose things like that. Like, we don't disclose that we have an arrest warrant for somebody until they're arrested. Once they're arrested, it becomes public. It becomes public, especially the person that you're arresting. I mean, there are times when people will arrange to surrender. Like, if I have a warrant for a person, I may call them and do that. But in this case, you know, that didn't sound like what happened. He wasn't the one directly dealing with that, CID was handling the warrants.

Q. Okay. So in your understanding, your experience and training, you would only let somebody know they had an arrest warrant if you were trying to arrange for a self-surrender?
A. Yes. I mean, I wouldn't tell anybody they have a warrant unless I'm arresting them right now or if I'm trying to facilitate that, you know, come tomorrow morning and turn yourself in. And again, those would be -- you know, generally those are minor warrants.
Q. Okay. Well, this particular warrant was a misdemeanor destruction of property, correct?
A. That's correct.
Q. How would you characterize this?
A. A minor warrant.
Q. And so letting somebody know that they had a minor warrant to surrender themselves, is that -- it is law enforcement information, but is that improper per se?
A. I think that in certain circumstances it can be proper if it's your warrant.
Q. Okay.
A. If another officer has a warrant, to go to that person and tell them, that would be inappropriate, it would interfere in another officer's case.
Q. So it's an inappropriate breach of protocol to be interfering with someone else's case?
A. Yeah. We have a general order that prohibits it.

Q. So you shouldn't be letting somebody else know -- somebody know about somebody else minor warrant?
A. That's correct.
Q. Okay. On the hate crime issue, there's a process by which the determination is made if a case is a hate crime, right?
A. That's correct.
Q. And the ultimate decision is up to whom?
A. There's like a -- so, there's an initial -- when a case comes in, it's potentially a hate crime, it will be indicated by the officer that it's potentially a hate crime. And there's actually a group of individuals, I think there's four or five people -- I'm pretty sure Lieutenant Lamond used to actually sit on that group -- that would then review those cases and determine if it met the criteria for a hate crime.
Q. And they make a recommendation?
A. Yes.
Q. But the officer could still submit it as a hate crime, even if they say no?
A. Well, the officer -- it gets submitted first and then it goes to the panel, or the review afterwards.
Q. And then it goes to the U.S. Attorney's Office?
A. I mean, eventually. That doesn't mean it's going to be charged has a hate crime. That's a determination by the prosecutors.
Q. So ultimately, if MPD says it's going to be a hate crime,

the prosecutors can say no, it's not?
A. Yeah. I mean, like any case, we can make an arrest for any charge and the prosecutor is going to determine what they believe the appropriate charges are.
Q. Okay. And so whether or not something was going to be a hate crime or not going to be a hate crime, it's ultimately a decision that's not made until it gets to the prosecutor?
A. That's correct. The final decision is made by the prosecutors.
Q. If something is determined not to be a hate crime and that decision is made that we're not going forward, is that law enforcement information?
A. That's -- I'm sorry. Say that again for me.
Q. If the determination is made, we're not going to pursue a particular charge or pursue a hate crime, is that law enforcement information?
A. Well, I mean, that's really a -- the ultimate decision if we're going to pursue or not is really up to the United States Attorney's Office. So if they want to provide that information, that would be up to them, the ultimate determination.
Q. So if an officer said, for example, before the case had gone to the U.S. Attorney's Office, it's not going to be a hate crime, that's the officer's opinion, right?
A. It would be their opinion, yes.

Q. It doesn't mean that it's going to be or not going to be, right?
A. Yeah. I mean, ultimately they don't make that final decision.
Q. So is articulating your opinion about whether or not something is a hate crime outside of police, is that a breach of protocol?
A. I mean, I think it's concerning because now -- I mean, you are a police officer, so when you start providing your opinions into what legally is going to be charged, it can present problems for the case later on. So the proper way, or how I would respond is to say nothing. Like, don't invoke your opinion into it.
Q. I hear you, that you're saying that the ideal is to say nothing. But what I'm asking you is: Is articulating your opinion about whether something is or is not going to a hate crime, is that really disclosing law enforcement information or just your opinion?
A. I mean, I think it is disclosing your opinion, but it can have an overall effect on the case.
Q. Mr. Rothstein asked you a number of questions about police information. And you said, at one point, I think you used the word "operational plans," right? What did you mean by "operational plans"?
A. Kind of how we're going to respond to whatever the

situation may be. So, you know, obtaining information so we can develop how we're going to deploy resources, when we're going to bring in resources, where we're going to stage those resources or have them prepared to respond, depending on whatever the situation may be. If the group is going to gather at a certain location to have a demonstration and we know, for example, during this timeframe that up near BLM Plaza there are groups of differing opinions, deploying resources so we can allow folks to exercise their First Amendment rights, but keep separation and keep the peace.

Q. And as it relates to an arrest plan, would the operational plans be where people are going to be, who's going to be there, where they're going to arrest somebody?

A. Yes. I mean, that's kind of a different operational plan. But, yeah, that's an operational plan for an arrest, like a take-down plan.

Q. Okay. So your position is it would be improper to share a takedown plan with somebody that MPD was intending to arrest?

A. Well, I mean, I think -- when I use the term "operational plan" -- let me kind of answer this this way: I think both of them would be inappropriate. But when I was referring to operational plans, I was referring to how we were deploying resources in certain areas based on -- I was referring to what I described to you as an operational plan.

There are also operational plans for arrests, an

arrest plan. There are operational plans for execution of a search warrant, that, again, deal with similar things, the deployment of resources, ensuring we have proper safety protocols, who's, kind of, going to do what in each of those three circumstances. They're all types of operational plans, but different.

Q. Let me ask you this: In communicating through all the various communications with Mr. Tarrio, there's a difference between saying we had undercover assets within the Proud Boys, right? That's certainly much more significant than we're not going to pursue this as a hate crime, right? There's a difference?

A. There's a difference.

Q. And those are sort of judgment calls, right?

A. If we're going to tell them that?

Q. Yeah. I mean, if you're talking to a source for a period of many, many months, right? and somebody that's as important as the leader of the Proud Boys, and you're having conversations about your opinion, that's one thing. But it's totally separate to say, oh, yeah, we've got undercovers that are marching with you when you're marching?

A. Yeah. I mean, I wouldn't say that.

Q. You would never say that?

A. Yeah.

Q. And you didn't see any evidence that Mr. Lamond said

anything like that?
A. No, he didn't. I'm not seeing.
Q. Nothing you've been shown in all your preparation sessions with the government?
A. No.
Q. And you're aware, are you not, that there were actually undercovers marching with the Proud Boys on December 12th?
MR. ROTHSTEIN: Objection, Your Honor. I don't think there's been any testimony that there were undercovers. I think the testimony was plainclothes officers, which is different.
MR. SCHAMEL: I'm not sure I understand the distinction.
BY MR. SCHAMEL:
Q. But, you're aware there were plainclothes -- but I'll re-ask my question. You're aware that there were plainclothes officers marching among the Proud Boys?
A. Yes. And that's actually what I was going to say, they were plainclothes. They were not undercover.
Q. Okay. And the distinction being they weren't under a false name or something, but they were certainly not holding themselves out as law enforcement?
A. They were dressed like regular people. However, they weren't undercover with false identities or trying to infiltrate groups. They were walking in places that any person

of the public could be.
Q. All right. But among the Proud Boys?
A. They were in those groups, yes. They were in those areas.
Q. Are police reports law enforcement information?
A. Yes. I mean, they are law enforcement information.
Q. Okay. But once they become part of a -- like a court record, do they have the same sort of -- in your mind, your experience and training -- the same sort of protections as if they are before the person is charged?
THE COURT: What kind of police report are you talking about?
MR. SCHAMEL: I can specify.
BY MR. SCHAMEL:
Q. Like a 163, the old arrest report?
A. So, yes, I would say that's law enforcement sensitive information. Now, I know that eventually when a person is arrested, it goes to their defense attorney and things like that. But if a person was to call the station and ask for information that's inside the 163, the arrest, we wouldn't provide that.
I know there are ways, they could FOIA and there are other protocols to go through and get those types of information with redactions and things like that, but that's not something that generally -- that's not things that we provide like that. Even a general police report, there is a

public portion that's public, but there's also an internal narrative that we do not share publicly.

Q. With the internal narratives, for example the 163, you're not aware of any instance where Mr. Lamond shared anything of that nature with Mr. Tarrio, are you?

A. No, I'm not aware of anything like that.

Q. Are you aware of him sharing anything other than what was publicly available or what he received as part of his discovery package for his case?

THE COURT: I'm sorry. I don't know who the "he" is. Can you rephrase that?

MR. SCHAMEL: Happy to, Your Honor.

BY MR. SCHAMEL:

Q. Are you aware of Mr. Lamond providing for Mr. Tarrio anything other than what was publicly available or that he, Mr. Tarrio, received as part of the paperwork he received from his arrest?

MR. ROTHSTEIN: Objection, Your Honor. Vague as to the timeframe.

THE COURT: Are you talking about documents? Are you talking about the whole case? I mean, we just went through a bunch of communications, so I can't figure out if you're including all that or are you asking him specifically if you're aware of his -- of the defendant giving Mr. Tarrio police records? Is that your question?

MR. SCHAMEL: Clearly it wasn't a great question, so let me try again.

BY MR. SCHAMEL:

Q. You reviewed communications between Mr. Tarrio and Mr. Lamond as part of your preparation for this testimony?

A. Yes, those messages.

Q. And you've seen them on a couple of occasions?

A. Yes.

Q. And you've seen them here today with Mr. Rothstein?

A. Yes, sir.

Q. You're aware of the investigation into Mr. Lamond for sharing information to Mr. Tarrio?

A. Yes.

Q. What I'm asking you, are you aware of Mr. Lamond giving Mr. Tarrio anything other than what became -- that became publicly available or that Mr. Tarrio was given as part of the discovery in his flag burning case?

MR. ROTHSTEIN: Objection, Your Honor, as to relevance. Everything becomes public at some point, so the question is very vague as to if he got -- everybody gets their police report eventually. Did he get it before it was public or after?

THE COURT: All right. Let's try this: Are you aware of the defendant sharing anything with Mr. Tarrio that wasn't shown to you during your direct?

THE WITNESS: No, I'm not.

THE COURT: Are you aware of his providing him with reports, internal police reports?

THE WITNESS: No, I have no knowledge of him giving him any sort of paperwork.

THE COURT: Because your summary question, he said some things were and some things weren't. And, so, I'm not sure what you're getting at.

MR. SCHAMEL: I'll go through in smaller steps.

BY MR. SCHAMEL:

Q. You were asked a question by Mr. Rothstein about Telegram?

A. Yes.

Q. In the time period that we've been looking at here, 2020 to early 2021, was there an MPD policy on Telegram?

A. No, not specifically on Telegram. I think it's Telegram, is that what it is?

Q. I'm sorry?

A. It Telegram or telegraph.

Q. I thought it was Telegram?

A. I don't -- I don't know. Maybe it as Telegram.

Q. Were you aware of any MPD policy on using messaging apps?

A. No. The only thing that we generally use was, you know, the text message option, which is iMessage on iPhones and whatever that's called on the Android version.

Q. You were asked a question by Mr. Rothstein relating to the

general consensus. Mr. Tarrio asked Mr. Lamond what was the general consensus of MPD. Do you remember that question?
A. I do.
Q. Mr. Lamond's response to the text message -- or, the message was the general consensus was about his opinion of the general consensus, right?
A. Yes.
Q. You thought that was law enforcement information?
A. Can you say that again? I'm sorry.
Q. Do you think Mr. Lamond's view of the general consensus of the Metropolitan Police Department towards the Proud Boys is law enforcement information?
A. I'm pretty sure his response was, "That's too much to put into a text message."
Q. I'm sorry?
A. I pretty sure Mr. Lamond's response back to that question was, "It's too much for a text message."
Q. But I'm asking you: Do you think his response to that, what the general consensus is, his opinion, is police --
A. Oh, if he'd actually given his opinion to him in the text message?
Q. Right.
A. I don't -- I don't know what he would have said to him specifically. I mean, do I think in general giving your opinion is police information? No. It may not be law

enforcement information, but it would depend on specifically what you say in your opinion.

Q. Are you surprised, as Mr. Lamond's supervisor, that when you would go to him and ask him -- go to him either verbally or on the phone or in these messages and ask him to check with Mr. Tarrio about something, are you surprised that he didn't write a report about that?

A. No, I'm not.

Q. I'm going to draw your attention -- I want to go through some of these that Mr. Rothstein went through with you.

Exhibit 4018, Mr. Hinger, if you wouldn't mind. We'll start on page 15.

Then I want you to go to -- I want to show you first, just to make sure we have some context here, what Mr. Rothstein showed you. This was the series of messages about the anonymous tip and about the conversations back and forth. Do you remember these, this part of the conversation?

And then go to 18. All the way to 18. I just want to make sure the chief sees these.

Okay. Just setting the context now. Go to page 20.

This is one we're not showing. Take a mental look at that, on page 20.

A. Can you make it a little bigger?

Q. Why do I have it as -- hang on.

MR. SCHAMEL: You know what, Bill? I'm sorry. This

is the one that doesn't have a tab. This is --

MR. HINGER: 431?

MR. SCHAMEL: It says 20 on the bottom.

(Pause.)

BY MR. SCHAMEL:

Q. Sorry about that. Take a look at that now, if you would. The top one.

THE COURT: What exhibit are we in?

MR. SCHAMEL: I'm just going to tell you, we're on Exhibit 4018 Your Honor, page 20, at the top.

THE COURT: Thank you. Okay.

BY MR. SCHAMEL:

Q. This is immediately following the various exchanges that Mr. Rothstein asked you about, remember? And he asked you about --

A. Which exchanges? I'm sorry.

Q. About the calling in of the tip --

A. The anonymous tip?

Q. -- and a question about was there a confession. Do you remember, Mr. Rothstein asked you?

A. Okay.

Q. And here you see the next one, right there, 12-18-2020, at 2:46 p.m. So, couple hours after the exchanges that Mr. Rothstein showed you about, take a look at that. That is to David Hong. He's a captain, right, MPD at the time?

A. Yes.

Q. Leslie Parsons was a commander?

A. I believe he was the commander at the time.

Q. Okay. And this is regarding the BLM banner and it's from Shane Lamond.

A. Yes.

Q. Do you remember getting this? It says the "et al." I didn't know if you were part of that particular distribution?

A. I don't recall seeing this before.

Q. Take a look at that and go ahead and tell us what that is.

A. So it's an email from Lieutenant Lamond to, as you mentioned, Captain Hong at the time and Commander Parsons, et al., and it says, "Is anyone aware of whether the burning of the BLM banner is being investigated by the FBI as a possible hate crime? I know we talked about it on Sunday, but I didn't hear anything about the FBI taking over the investigation. As you may be aware, the current chairman of the Proud Boys, Enrique Tarrio, just publicly admitted he was responsible for the destruction." And I can't read what the little snapshot says.

Q. Okay. But do you remember when Mr. Lamond sent around Mr. Tarrio's social media post on his verified account where he admitted to the banner burning?

A. I don't specifically remember it, but, I mean, it definitely is here.

Q. Okay. And so that was Mr. Tarrio's confession, publicly on his certified account, within a couple hours of these communications between Mr. Tarrio and Mr. Lamond, correct?

A. Yes. Is that what this snapshot is?

Q. (Nods head.)

A. Okay.

Q. I tried to pull this out separately. I can try to do that, if you want to see?

A. No, it's fine. I wasn't sure what that thing is at the bottom.

Q. Okay. And then if you go down the page, Mr. Hinger.

You see the response from David Hong, right?

Keep going. Show those two, if you could. And particularly the last one.

Do you see that from Shane Lamond? Carolyn Montagna, Leslie Parsons, Nicole Copeland -- and she's who, Nicole Copeland?

A. She was, at the time, I believe, a sergeant in CID, criminal investigations division.

Q. That's from Shane Lamond, with a picture of Enrique Tarrio at the 12th -- December 12th protest, correct?

A. Yes, it is.

Q. And he's saying what?

A. "Please let me know if you need anything related to this."

MR. ROTHSTEIN: Objection, Your Honor. The defendant

is not on this email. He's showing him an email -- sorry, the witness, the witness is not on this email.

THE COURT: It's in evidence, so he's reading something that's in evidence.

BY MR. SCHAMEL:

Q. And I believe the "et al.," you were part of that distribution group?

THE COURT: You believe that?

MR. SCHAMEL: I'm sorry?

THE COURT: You believe that?

MR. SCHAMEL: Well, that's what's been represented each time we've gone through it. So is he not -- I thought he just told he --

THE COURT: He said he didn't know.

THE WITNESS: I don't know.

THE COURT: So it doesn't really matter what you believe. Okay.

BY MR. SCHAMEL:

Q. I'm sorry. Go ahead.

A. Go ahead and read?

Q. Please.

A. "Please let me know if you need anything related to this. I know him, so I can probably fill in a blanks you may have. I have attached this picture for your awareness."

Q. Okay. So you were asked a number of questions about a

confession: Would it have helped? Would it have been good to know? Do you remember those questions?
A. Yes, sir.
Q. Are you aware of any confession Mr. Tarrio made to Mr. Lamond?
A. Specifically, no. All I'm aware of is the messages that we went through earlier that allude to he burned the banner.
Q. Okay. And then these things that Mr. Lamond actually said to you showing evidence --
A. I don't know that I'm on this email.
Q. Okay. But he sent it to -- Ms. Parsons was a supervisor -- Mr. Parsons?
A. Well, Carolyn was his supervisor.
Q. Leslie Parsons?
A. He was a commander of CID.
Q. Nicole Copeland?
A. Was a sergeant, so she's a lower rank than Lieutenant Lamond.
Q. But in the same --
A. No, she's in a different bureau. She's in CID.
Q. She was also in CID?
A. Yes.
Q. So CID, who was investigating the banner burning?
A. Yes.
Q. So within a couple hours of the communications with

Mr. Tarrio, this is what Mr. Lamond provided to MPD?
A. I don't know the timeframe. I'm guessing probably at the very bottom, there's a time down there.
Q. Yep. Can you scroll up a little bit.
2:50 p.m., December 18th. Do you see that?
A. Yes, I do. I remember the date, I don't remember the exact times. But, yes, it appears to be close in time.
Q. Do you remember when the warrant was submitted?
A. I don't know.
Q. I could find it for you, but if I told you December 21st, does that sound right to you?
A. Yes. I don't -- yes, that sounds about right.
Q. Okay. So about three --
THE COURT: Which one? You mean the first draft? There were at least three versions that went by.
MR. SCHAMEL: There were two.
THE COURT: Two? I thought we saw three yesterday. But anyway, which one are you talking about?
MR. SCHAMEL: Either.
A. The drafts wouldn't have come through me. I would know, kind of tangentially, that they had submitted a warrant. But, like, the inner workings, that's all investigative services. So I wouldn't know, like, when they submitted it, when it came back. I knew that they submitted a warrant, I knew when it was approved. But like the exact timeframes, I don't know.

Q. Okay. Did you know that there was any -- did you know that there was no warrant submission before what Mr. Lamond provided?

A. Honestly, I don't know. Like, on December 18th my wife had a baby, so I wasn't even -- even if I got this message, I wouldn't have read it.

Q. You wouldn't have read it, is what you said?

A. No. So I can't really tell you.

THE COURT: I mean, we have the chronology in evidence. So whether this was before they drafted a warrant or it wasn't, we'll be able to figure that out from the evidence, even if he can't tell you.

MR. SCHAMEL: Okay. I was just going to ask.

BY MR. SCHAMEL:

Q. Okay. Can I have you go to the same exhibit, Mr. Hinger, to page 24.

Okay. Take a look at this. Mr. Rothstein showed you this. In particular, I'm showing you what shows up as pink on my screen. Do you see that?

A. Yes, sir.

Q. It's Shane Lamond --

THE COURT: I can't understand you. You're mumbling. Could you just go slower, please?

MR. SCHAMEL: I was trying to go slower. I guess it made me mumble.

BY MR. SCHAMEL:
Q. Do you see the pink box from Shane Lamond to Enrique Tarrio?
A. Yes, sir.
Q. Mr. Rothstein showed you that?
A. Yes.
Q. And it says, "I don't think they have any pictures of you though." Do you see that?
A. Yes.
Q. Okay. And that was after Mr. Lamond had just sent a picture to MPD?
A. Yes, I believe it was a couple hours afterwards, looking at the timestamp.
Q. So he wasn't even telling Mr. Tarrio the truth?
A. Doesn't appear he was, no.
Q. You were asked by Mr. Rothstein about whether or not you authorized Mr. Lamond to talk to Mr. Tarrio when he asked for the phone number. Do you remember that set of questions?
A. Yes, in general.
Q. Okay. And were you aware that prior to MPD reaching out to Mr. Tarrio, that MPD had had Miami-Dade reach out to Mr. Tarrio about this case?
A. It was referenced in the message.
Q. And that had already happened, right?
A. Yes, according to that message, that what's Mr. Tarrio

said.

Q. So at the time Mr. Lamond was asked for a phone number from Mr. Tarrio and then asked Mr. Tarrio for a phone number, law enforcement had already reached out to Mr. Tarrio, correct?

A. Well, I mean, yes, Lieutenant Lamond is reaching out to him.

Q. No, no, but Miami-Dade had already reached out to him about the banner burning?

A. Mr. Tarrio said Miami-Dade had reached out.

Q. At that point there had already been multiple reports about the banner burning as an investigation, correct?

A. You mean like public --

Q. Public reports, yes.

A. -- news things?

Yes.

Q. There had been the MPD and FBI press releases, although you don't know exactly what they said.

A. I don't know the exact time. I can't say.

Q. You just know that they were out there?

A. Yes. I know there were ones that were released at some point.

Q. So when you were asked about how that would impact the law enforcement investigation, Mr. Tarrio, at the time Mr. Lamond asked him for the phone number, was well aware that this was an investigation, correct?

A. He was. I don't even understand why he asked him. He had Mr. Tarrio's phone number, he was talking to him on it.
Q. No, but he asked him for which number, right?
A. Yeah. But, I mean, he had the number, clearly. He's texting him on his phone number.
Q. I'm focused more on the question of: You were asked, would that have impacted it? And you said, well, he could have destroyed evidence, he could have fled. All those questions. Do you remember those questions?
A. I do.
Q. Does it change your analysis, the fact that Mr. Tarrio's already well aware that this was happening for many days before Mr. Lamond reached out and said MPD is going to call you?
A. I don't know if it changed the analysis, I just don't think it's proper in general. I mean, you have a police officer that's reaching out and providing information that's not necessary to share backwards. Like, that's my bigger issue with this communication.
Q. I hear you. You have a problem with the propriety of it?
A. Yes. We don't do that.
Q. Okay. Would you turn, Mr. Hanger, to 4019, page 2. I'm sorry page 3. Page 3 of 5.
Top box, please. Take a look at that, which has already been admitted into evidence.
MR. SCHAMEL: And we're looking at Exhibit 4019, Your

Honor, page 3 of 5.

BY MR. SCHAMEL:

Q. Were you aware that Mr. Lamond had also positively identified Mr. Tarrio's voice from a podcast?

A. I was not.

Q. Okay. You were asked a number of questions about whether there was a discussion of self-surrender. Do you remember being asked those questions?

A. Yes.

Q. Okay. And your position was you don't recall there being any discussion of that?

A. No.

Q. Were you aware that when he originally took credit for the flag burning -- I guess blame for the flag burning -- that Mr. Tarrio had publicly stated he would fly to D.C. on his own expense to face charges?

THE COURT: That's a different question, as to whether there was conversation within MPD about self-surrender, which I think is what he was asked about.

MR. SCHAMEL: He was asked a question about self-surrender and I was trying to get more into that, about the discussions about what he was aware of as it related to that.

THE COURT: Right. But your predicate for the question was: You were asked questions about conversations

within MPD about self-surrender. Are you aware that Tarrio said he would self-surrender? Which -- the problem is your compound questions when you're linking things.

MR. SCHAMEL: He answered in between, I thought. He said yes.

THE COURT: I'm sorry?

MR. SCHAMEL: I asked him if he was aware of the self-surrender discussion, he said yes. Then I asked a second question.

THE COURT: All right. Let's just -- okay. Just ask: Were you aware of what Tarrio said on social media about "I'll turn myself in"?

THE WITNESS: No, I don't recall that.

BY MR. SCHAMEL:

Q. Were you aware that Mr. Tarrio had booked a flight to D.C. specifically a day early to self-surrender on these charges before January 6?

A. No.

Q. Were you aware that this particular charge, this misdemeanor destruction of property, was non-extraditable?

A. I don't know if I was specifically aware, but most misdemeanor charges aren't extraditable.

Q. Because you said at one point, you talked about destroying evidence and may flee. Where did you believe Mr. Tarrio was during this investigation?

A. For the most part, in Florida, is my understanding where he lived at -- or, I guess he lived at the time.
Q. You knew that Mr. Tarrio and Mr. Lamond were still talking during the course of the flag burning investigation, correct?
A. I know they were communicating when we were having the demonstrations that were going on. What those specific communications were, these after ones, I didn't know about all that.
Q. So knew that they were in communication, but what you weren't aware of is that during their communications they also talked about the BLM banner burning case?
A. Yes. I didn't know they were communicating that -- yeah, I did. It basically alluded to the fact that he did it and those kinds of things. I knew to the point of, like, hey, where are they going to be at? Where are they matching at? Where are they trying to go? Those kind of conversations, yes, I was aware.
Q. Because you were talking to Mr. Lamond about those and he was sharing that information?
A. Yes.
Q. And he was doing his job, essentially?
A. Yes.
Q. Okay. When he was made part of the -- I'm sorry, when -- was it you that asked him to find out about Mr. Tarrio's travel plans?

A. I'm pretty sure it was me, or me through Director Montagna, one of the two. Because I know there was conversations about him getting these messages that we saw, he got it and he sent it back to us.

Q. Were you aware that Mr. Tarrio missed his first flight on January 4th?

A. I don't recall specifically.

Q. Do you recall if you were aware that Mr. Tarrio ended up getting on a standby, second flight later in the day?

A. Again, I don't specifically remember that.

Q. Do you know that -- were you aware that Mr. Lamond was still contacting Mr. Tarrio to see if he made the second flight because he wasn't ticketed for that flight?

A. Same thing. I don't really recall that whole nuance part. I know that Shane was working to get the information to share with the violent crimes suppression division that was facilitating his arrest. They were working on that.

Q. Okay. But I think you were asked by Mr. Rothstein whether or not it was proper, or that you had asked Mr. Lamond to speak to Mr. Tarrio or communicate with him while he was flying. Do you remember being asked that?

A. Yeah, the specific messages about flying.

Q. Okay. And would it have been proper for Mr. Lamond to communicate with Mr. Tarrio to see if he was on the flight?

A. I mean, I don't particularly see a concern, if he's asking

him on the flight. I don't remember specifically what were in those messages that the attorney showed me.
Q. Well, I think what he showed you -- and I'm happy to bring it back up -- was --
Page 2 of 4 on Exhibit 4024, Mr. Hinger.
Okay. Yep, that's it. Thank you.
All right. Do you see that? Do you remember Mr. Rothstein showed you this one? The pink box is the from Shane to Enrique.
A. Okay. Yes.
Q. Shane FBI Police set the self-destruct timer to 10 seconds, right?
A. Yes.
Q. And that's at 1:02 p.m.?
A. Yes, sir.
Q. And then at 1:30, Mr. Enrique Tarrio, to Mamafe, that says, "Warrant was signed"?
A. Yes, I saw that.
Q. And you were asked about whether or not it would -- you asked Mr. Lamond to be in contact with Mr. Tarrio while he was on the plane?
A. I think -- I'm getting a little confused. Is your question is it okay for him to have contact with him or is it for him to tell him he has a warrant?
Q. I'm asking you specifically whether -- do you see any

evidence here that Mr. -- let me ask you this: Are you aware that Mr. Lamond told Mr. Tarrio that there was a warrant?
A. No. I mean, based on what you're showing me, I can only assume that there's a self-destruct message and then the following ones are the warrant was signed, the warrant was signed, the warrant was signed.
Q. Okay. Totally get it. That's your assumption?
A. Yep.
Q. So I'm asking you: Do you have any knowledge that that happened?
A. No. I don't know what was said in that message.
Q. You don't know what was said in that message?
A. No.
Q. So I'm asking you: Would it have been appropriate for Mr. Lamond to have contacted Mr. Tarrio during his flight to find out if he made the plane?
A. I mean, I don't see that that would be necessarily inappropriate, but we also have law enforcement contacts that can tell us if he got on the plane, that would be able to confirm he did enter this plane, which is kind of what we see above from the FAA.
Q. Okay. You have the FAA, but whether or not -- it just says Tarrio's American Airlines flight 925 takes off from Miami to DCA, right?
A. Yes.

Q. And you didn't know that he was on a standby? That wasn't even his booked flight?

A. No.

Q. So I'm just asking the simple question: Was it inappropriate for Mr. Lamond to reach out to Mr. Tarrio to find out if he was on the plane?

THE COURT: Was it or would it have been?

MR. SCHAMEL: Would it have been.

A. It wouldn't have been, if that's what the conversation was. I don't know what they communicated.

BY MR. SCHAMEL:

Q. After Mr. Tarrio's arrest on January the 4th, were you aware that Mr. Lamond was still in communication with Mr. Tarrio?

A. I don't specifically know if I was -- if I knew he was in communication. I don't recall knowing that.

Q. Do you know that -- because after January 6 and all the horror of that, there was something else coming up, right? January 20th.

A. Yes.

Q. And there was concern at MPD about something like January 6th happening again?

A. Yeah. I mean, yes, there was concerns. Yes.

Q. Particularly the Proud Boys were part of the January 6 problem?

A. That's correct.
Q. And, so, Mr. Lamond was still full duties, right, as lieutenant?
A. He was at that time.
Q. There was no reason for him not to be working and doing his intel job between January 5th, when Mr. Tarrio was released from jail, and January 20th for the inauguration, correct?
A. That's correct.
Q. In fact, you would expect him to continue working all avenues to get information about what was going to happen in our city on the 20th of January?
A. No, I mean, that's fair to say. The concern is at this point he's a person, he's now a defendant, he's been charged with criminal charges, that he's going back and communicating with. So there's -- isn't necessarily him having communications, it's if he's going to have his communications, it needs to be cleared through the prosecutor.
There's a protocol to do that because people need to know. He's already been charged with the felony magazines and the flag burning, but now he's in communications with him after he's a charged defendant and continuing those communications. And, I mean, and then some of the messages that we saw, they don't appear to be police related, they appear to be, like, friendly, I guess.
MR. SCHAMEL: Court's indulgence just one moment.

(Pause.)

BY MR. SCHAMEL:

Q. Are you citing to a specific general order that says once somebody is charged, you can no longer talk to them?

A. No, that's not what I just said. I said you could be in communication potentially, but you need to discuss that with the prosecutor because at this point he's been charged criminally, right? So we know that there's a criminal case against him, so now we're communicating with a defendant in a criminal case.

So if we're going to have those communications, A., we need to document it because this is no longer helping to facilitate First Amendment activity, right? We know this is a criminal defendant in a criminal case. And not only should we have been documenting it before, once he was identified as the defendant, but now he's been actually arrested and charged on that, any communications should be documented and coordinated with the United States Attorney's Office, much like how we would debrief a defendant after they're arrested. We wouldn't just, as law enforcement, do that.

MR. SCHAMEL: Can you take it off the screen.

THE COURTROOM DEPUTY: I took it off the screen. It's only on yours. It's not on --

MR. SCHAMEL: No, they're looking at --

THE COURTROOM DEPUTY: It shows, but it's not public.

MR. SCHAMEL: Okay. Sorry. Little technical difficulty.

Can you shut it off? Do you have the ability to shut it off? Thanks. I appreciate it.

THE COURTROOM DEPUTY: Thank you.

BY MR. SCHAMEL:

Q. I think you were saying once somebody is charged, whoever from MPD is dealing with that person should be coordinating with the prosecutor because of the ongoing criminal case, correct?

A. Yes.

Q. And that is a failure of protocol, that is a violation of MPD general orders?

A. I can't say there's a specific order that says that, but we do know if there's a charged defendant, we should be -- there's a whole host of issues that can come from the criminal case because they have the right to defense counsel, the involvement of counsel, what those communications are. There's a whole host of legal issues that would need to be resolved if we're going to do that.

Q. Is there an MPD general order that specifically says once somebody is charged, you must cease all communications with them?

A. Not that I'm aware.

Q. But it's just not a good idea?

A. No. I mean, it's not good for the underlying case that's involved with that.

Q. So there was communications between Mr. Tarrio and Mr. Lamond going up until the 17th of January, is that right?

A. I don't know.

Q. You don't know when they ended?

A. I don't know.

Q. Okay. Are you aware that Mr. Tarrio and Mr. Lamond were communicating, Mr. Lamond was asking questions about the Lobby Day in Virginia? Do you know what Lobby Day in Virginia was?

A. If memory serves, a lot of times they'll have armed demonstrators that will come to that, I believe.

Q. That was on or around the 18th of January in Richmond. Do you remember about that?

A. I've heard of it, but I'm not that familiar with it.

Q. Do you know who Ben Tyler is, with Virginia State Police?

A. I do.

Q. Do you remember him being one of the intel sources working with Mr. Lamond when Mr. Lamond was employed under your division?

A. Yeah, I believe Ben is one of -- I don't know what they call them, but he works for Virginia State Police, in their intelligence division.

Q. And so when Mr. Lamond was continuing to be in contact with Mr. Tarrio and asking questions about whether or not the Proud Boys were coming for the inauguration, was that appropriate

police work for him to continue doing?
A. I think we're back to the same conversation we just had about Mr. Tarrio's now a charged defendant, any communications should be coordinated with the United States Attorney's Office through his attorney, his legal counsel. So we're kind of back to the same answers I just gave you.
Q. You didn't know that Mr. Lamond was continuing to talk to Mr. Tarrio after the arrest and gather more information that he was disseminating to law enforcement?
A. I don't specifically recall that.
Q. Okay. Does it surprise you that he was?
A. I mean, at this point, no, from what I read.
MR. SCHAMEL: Court's indulgence for just one moment.
THE COURT: All right.
(Pause.)
MR. SCHAMEL: Thank you.
THE COURT: No further questions?
MR. SCHAMEL: I'm sorry?
THE COURT: You have no further questions for him?
MR. SCHAMEL: Oh, no. I have no further questions for him.
THE COURT: All righty. Redirect? Any?

REDIRECT EXAMINATION

BY MR. ROTHSTEIN:
Q. Chief, you were asked some questions about law enforcement

information by Mr. Schamel. Do you remember that?
A. Yes.
Q. Anything that the defendant learned as a result of his job was law enforcement information, correct?
A. Yes.
Q. Okay. And you were asked some questions about whether or not if things eventually become public, does that mean that before they become public they are not law enforcement information and can be distributed?
A. No, it does not.
Q. Okay. So you were asked some questions about things which are public and things which are not. Do you recall that?
A. Yes.
Q. Whether or not CID has particular evidence, is that public or private -- or, law enforcement information?
A. It's law enforcement information.
Q. Internal deliberations amongst the hate crimes committee, is that public or law enforcement information?
A. It's law enforcement information.
Q. Whether something was going to be pursued as a hate crime, is that law enforcement information or public information?
A. It's law enforcement information.
Q. What investigative steps were being taken, is that public or law enforcement information?
A. It's law enforcement information.

Q. MPD's opinion about particular groups based on communications between MPD officials, is that public information or law enforcement information?
A. It's law enforcement information.
Q. Whether an arrest warrant has been submitted, is that public information or law enforcement information?
A. It's law enforcement information.
Q. The status of that arrest warrant, is that public information or law enforcement information?
A. It's law enforcement information.
Q. Okay. All those categories that we just discussed, did you authorize the defendant to disclose any of that information to Mr. Tarrio?
A. No.
Q. Okay. And you were asked some questions about prior to the defendant being a subject in the banner burning, if you were aware of his communication -- of the defendant's communications with Mr. Tarrio. Do you recall that?
A. Yes.
Q. And you had said during that period of time, when he was providing First Amendment information, you didn't expect that that information needed to be documented, correct?
A. Yes.
Q. Does that change once the defendant was the subject in a crime?

A. Yes.
Q. Okay. And you were asked some questions about minor warrants. Do you recall that?
A. I do.
Q. Okay. Given that the defendant was the leader of a far right-wing hate group, was this warrant being treated as a minor warrant?
A. No, it wasn't. And the other thing that kind of -- there's a lot going on there with the attorney. But, I mean, at the time we had a misdemeanor warrant, but we don't know what other potential federal charges that could have been brought. So although it might have been a non-extraditable warrant in Florida, he may still flee the area. So --
Q. Is it fair to say this warrant wasn't being treated like all other warrants?
A. I mean, no, it wasn't being treated -- I mean, we don't generally make operational plans to serve, you know, people as soon as they get off the plane and enter the District of Columbia.
Q. Okay. And you were asked some questions about general orders regarding applications. Do you recall that? Like, whether or not there was a general order regarding Telegram?
A. Yes.
Q. And although there wasn't a general order saying which apps could be used, at that time, in December of 2020, were there

general orders as to the preservation of evidence?
A. Yes.
Q. Were there general orders as to the destruction of evidence?
A. Yes.
Q. Would those have covered using an app that destroyed evidence or didn't preserve it?
MR. SCHAMEL: Objection.
THE COURT: Well, I think you've asked him a lot about what was and wasn't covered by general orders also.
So was there a general order that covered the destruction of electronic communications at the time?
THE WITNESS: There's a general order that talks about the destruction of evidence, preserving evidence.
BY MR. ROTHSTEIN:
Q. And once Mr. Lamond became the subject, you were asked some questions, where Mr. Schamel phrased it were you surprised to learn or would you be surprised to know once Mr. Lamond became -- sorry, once Mr. Tarrio became a subject of the investigation, were you surprised that Mr. Lamond didn't retain those communications?
A. Yes. I would expect him to retain, to share all those communications with CID, the folks that were actually seeking the warrants in the case.
Q. Are you surprised that he didn't document those

communications?
A. I am.
Q. Are you surprised that he set self-destruct timers on those communications?
A. Yes.
Q. Okay. I just have a few more questions for you.
Can we bring up Government Exhibit 4018, at 17. And if we can just highlight everything after Mr. Tarrio's conversation at 10:05 a.m. to the bottom and blow that up.
Okay. Do you see here at 10:05 Lamond -- Tarrio writes to Lamond, "This wasn't a hate crime." And then Lamond responds, "I'm curious to see what happens, too. I'll check with our CID people to see if they have video on you." Do you see that?
A. Yes.
Q. And then do you recall that Mr. Schamel showed you an email on page 20?
Can we bring that up. Going to the top.
And this is an email from Mr. Lamond to David Hong and Leslie Parsons, asking about whether it's being investigated by the FBI as a possible hate crime. Do you see that?
A. I do.
Q. Do you see anywhere in there where the defendant informs those individuals that he had just had a conversation with Enrique Tarrio in which he was -- said he was curious to see

what would happen and would check to see -- what happens, too, regarding whether or not it's a hate crime?
A. No.
Q. And going to the bottom of that page, there's another email. And can we just blow that up.
Okay. Can we make that even bigger. Focusing on the photo there.
Can you just focus on -- right where -- just the photo. Yep. Okay.
Do you see what that photo is attributed to at the bottom, on the right-hand side?
A. Yes, AP photo/Noah.
Q. Okay. And that wasn't a photo from the banner burning, correct?
A. No. Looks likes it's some sort of rally, they're standing around.
Q. Okay. And that was a publicly available photo? That wasn't a police department photo, right?
A. No.
Q. So, when later --
Can we go to the communication on page 24 of this exhibit? And just from here to down to there (indicating).
This doesn't -- where Lamond says, "I don't think they have any pictures of you, though," do you recall earlier he was -- he had promised to check whether or not CID had any

evidence? Do you recall that? Any video?
A. Yes. The video, yes.
Q. There's no discussion of whether or not anybody at CID had publicly available photos, correct?
A. No.
Q. Okay. And can we just go -- finishing up, can we go to Government Exhibit 4024, at 2.
Do you recall, on the day of the arrest, anyone asking Shane Lamond to find out whether or not Tarrio had made his flight that day?
A. I don't recall.
Q. Did you see any communications in which Mr. Lamond said, "I'm going to reach out and see if he made the flight"?
A. No, I haven't seen any. No one has shown me that.
Q. Okay. After Mr. Lamond, the defendant, made contact with him at 1:02 p.m., or at least set the self-destruct timer, did you receive any communications from the defendant or from anyone else at MPD that said Shane Lamond checked, he's on the flight?
A. No, not that I'm aware of. Not that I recall.
Q. And can you just bring up Government Exhibit 4006, at page 51. And can you -- everything between the area here (indicating).
Okay. Do you see this is the communications on the morning of January 4th, 2021? Do you see that?

A. Yes, sir.
Q. All the way up to 1:30 p.m. Do you see that?
A. Yes.
Q. Okay. And do you see that at -- you were asked about Ben Tyler, right?
A. Yes.
Q. Do you see that at 9:38 a.m., roughly, I guess, two and a half hours before Mr. Tarrio's flight, the defendant wrote to Ben Tyler, "ET changed his flight info. Was supposed to arrive this morning, now coming til early this afternoon." Do you see that?
A. I do.
Q. Okay. Do you recall, that morning, any discussion amongst MPD or with the defendant about the -- Mr. Tarrio missing his flight and the defendant following up with him?
A. No, I don't specifically recall that.
MR. ROTHSTEIN: One moment, Your Honor.
That's all Your Honor. Thank you.
THE COURT: All right. This witness can be excused. Thank you.
THE WITNESS: Thank you.
THE COURT: I think this is a good time to take a break, so we'll do that for ten minutes.
Do you have another witness ready to go?
MR. ROTHSTEIN: Yes, Your Honor. We think that that

witness, we should be able to get done before the lunch break. We'll try.

THE COURT: Okay. And then will there be another one?

MR. ROTHSTEIN: We have two more witnesses after the lunch break, which I think are shorter witnesses.

THE COURT: Okay. Let's take a break now. We'll resume in ten minutes.

(Recess from 11:30 a.m. to 12:03 p.m.)

THE COURT: All right. Call your next witness.

MR. ROTHSTEIN: The government calls Sean Ricardi.

And, Your Honor, the government is going to be playing some audio clips. But we've also provided you with a transcript and so when we play the audio clips -- it's Exhibit 5006. So I didn't know if you want to --

THE COURT: I didn't bring my binder of exhibits with me, so if you have it, yes, I would love to have it.

MR. SCHAMEL: We have an unmarked copy.

THE COURT: That would be fine.

SEAN RICARDI,

was called as a witness and, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ROTHSTEIN:

Q. Good morning. Would you please state your name and spell

it for the reporter?

A. Yes. Good morning. My name is Sean Ricardi. My first name is spelled S-E-A-N. My last name is spelled R-I-C-A-R-D, as in delta, -I.

Q. Okay. And what's your educational background?

A. I have an undergraduate degree from the University of Connecticut and I have a master's degree in homeland security studies from Penn State University.

Q. Can you describe your employment history following college?

A. Yes. After college I started with the United States Border Patrol. I was a uniformed border patrol agent on the southwest border in California. I moved up to Montana, where I was a plainclothes border patrol agent, like an investigative agent. In -- that was in 2009.

In 2014 I joined the United States Secret Service as a special agent or a criminal investigator there. I was assigned to the Secret Service, Seattle field office, where I investigated organized fraud and missing, exploited children cases, then I moved to Washington, D.C.

I left U.S. Secret Service and became a senior special agent at U.S. Customs Office of Professional Responsibility. I was only there for a little over a year and then I came to the U.S. Attorney's Office for the District of Columbia as a special agent. That was in 2020, I came here as a special agent.

Q. And so what's your current job?
A. So my current job is as a special agent at the U.S. Attorney's Office for the District of Columbia. In that capacity I investigate both D.C. Superior Court related crimes and federal crimes in Washington, D.C. and the surrounding area.
Q. Is the U.S. Attorney's Office part of the Department of Justice?
A. Yes, it is.
Q. Is that part of the executive branch?
A. Yes, it is.
Q. Were you involved in an investigation relating to the defendant?
A. Yes, I was.
Q. What were you investigating?
A. So we were investigating some information that we had received that Enrique Tarrio and the Proud Boys had possibly been receiving information from members of law enforcement.
Q. And how did that investigation begin?
A. So that began, the FBI was investigating a Proud Boy and they found messages that appeared to be from Enrique Tarrio where Tarrio had referenced a source within law enforcement, I believe had a contact that was called Shane FBI Police.
Q. And approximately when did that investigation begin?
A. So that investigation, I believe, for the agents of the

U.S. Attorney's Office, began in May of 2021. But I remember we interviewed the defendant on June 2nd of 2021.

Q. And was there another agent on the case with you?

A. Yes, there were other agents that worked this case. At the beginning of this case it was Special Agent In Charge Brian Molnar that took the lead from the FBI and started the investigation.

Q. When did you get involved?

A. I got involved on the day of that interview.

Q. Okay. So at that time, on the day of the interview -- that's an interview with the defendant, correct?

A. Yes, that's the interview with the defendant.

Q. Did law enforcement have access to Mr. Tarrio's phone that day?

A. No, we did not.

Q. At that time did law enforcement have access to Mr. Tarrio's Telegram account?

A. No, we did not.

Q. Did there come a point in your investigation when you interviewed the defendant?

A. Yes.

Q. Now, why did you interview him in particular?

A. Because there was the reference to who we believed -- it was Shane FBI Police, we believed it was possibly Mr. Lamond, his first name is Shane. Also, Mr. Tarrio was on the phone

with some reporters on the day he was arrested and it seemed like -- so he was arrested on January 4th of 2020. It seemed like he had information or had been tipped off to the warrant.

So just with that being the set of circumstances, we wanted to talk to Mr. Lamond and kind of get to the bottom of what was going on with Mr. Tarrio and any of his involvement that he would have had with law enforcement.

Q. When you're talking about him on the phone with reporters, was at the exact time of his arrest? Is that what you're referring --

A. Yes. I believe he was on the phone with reporters at the time he was arrested by MPD.

Q. Did there come a point in your investigation where you -- sorry, the interview that occurred with the defendant, when was that interview?

A. June 2nd, 2021.

Q. Where was it?

A. That occurred at the U.S. Attorney's Office in Washington, D.C.

Q. And who was there?

A. So I was there, Special Agent In Charge Brian Molnar was there and the defendant, Mr. Lamond, was there.

Q. And was it surreptitiously recorded?

A. Yes, it was surreptitiously recorded.

Q. So the defendant didn't know you were recording it, yes?

A. No.
Q. Was that an audio recording?
A. Yes.
Q. What was the purpose of that interview?
A. The purpose of the interview was, as I said, to talk to Mr. Lamond and get to the bottom of what exactly was the nature and scope of his relationship with Mr. Tarrio. Was Mr. Lamond the source within law enforcement that Tarrio had been referring to? Was there a source within law enforcement that Mr. Tarrio was referring to? And we were trying to figure out what kinds of information was Mr. Tarrio attempting to elicit from law enforcement.
Q. And when the defendant came for that interview, was he informed that it was going to be a confrontational interview? Or what was the context of the -- that?
A. So he was told that it was going to be an interview. We were asking some questions about Enrique Tarrio. He was referred to us as, like, an MPD expert on Enrique Tarrio. We know that he had contact with Enrique Tarrio in the past. So he was told we wanted to talk to him about his contact with Enrique Tarrio and his knowledge of Mr. Tarrio. Then as the interview started, we let him know that we were trying to gather information regarding information that Mr. Tarrio would have received from law enforcement.
Q. Prior to the interview, did you or Agent Molnar ever

express to the defendant that he was a subject or a target in an investigation prior to the interview?
A. No.
Q. Okay. What was your expectation when you were interviewing a fellow member of law enforcement?
A. My expectation is that a member of law enforcement would be truthful and forthcoming with me.
Q. And prior to that interview, had you obtained the contents of the defendant's phone?
A. No.
Q. Did you have access to all of his text messages with Tarrio?
A. No, we did not.
Q. Did you have access to all of his Telegram messages with Tarrio?
A. No.
Q. During the recorded interview did you ask the defendant how he spoke with Tarrio?
A. Yes, we did.
Q. And can you explain why that question was relevant to your investigation?
A. Yes. So we were going to be taking his phone in that interview and we wanted to know what acts, and what places within that phone or, you know, anywhere else our investigation would lead us, what places we would need to look for

communications between the defendant and Mr. Tarrio. Also, to be looking for the types of information that we should be looking for. For example, if he gave us a certain, like, word or phrase, we would know to look for that certain phrase as we reviewed any stored electronic communications.

Q. How would providing false information or him lying to you regarding that affect your investigation?

A. Surely it would slow us down, it would send us down -- we could potentially be looking into areas that we didn't need to spend time looking at. We would have to start looking at, potentially, if there's other members of law enforcement we need to look at again.

At this point we weren't sure that the defendant was the person that Enrique Tarrio was looking at. We didn't know if there were multiple members of law enforcement that were involved in this. That surely would have slowed us down, we would have had to look at many other members within the law enforcement community.

Q. When you started the interview, did you express to the defendant anything about if he didn't understand a question or how the interview should proceed?

A. Yes, that was stated to him in the interview.

Q. And at any point in the interview did he tell you he didn't understand what you were asking?

A. No, not at that point. I think he clarified some

questions, but at no point he said he didn't understand, and it was left at that.

MR. ROTHSTEIN: The government asked that Exhibit 1016-C be played for the Court and for Your Honor. It's in the transcript at Exhibit 5006, it's page 25, lines 12 to 18.

THE COURT: Okay. I'm sorry, what exhibit number was this again?

MR. ROTHSTEIN: So the audio clip is Exhibit 1016-C. The transcript is Exhibit 5006, at page 25, lines 12 to 18.

THE COURT: Okay.

(Video played.)

MR. ROTHSTEIN: I think the audio doesn't sound so great. So let's go to page -- Lisa, can you bring up on the screen 5006, page 25, 12 to 18.

THE COURT: This is 106 --

MR. ROTHSTEIN: 5006.

THE COURT: No, I'm saying which clip.

MR. ROTHSTEIN: Oh, that was 1016-C.

THE COURT: Okay. I thought you were playing another one. You're just pulling up the transcript. Got it.

MR. ROTHSTEIN: I think the audio was kind of hard to hear.

PARALEGAL ABBE: Which page was it?

MR. ROTHSTEIN: It's page 25, lines 12 to 18.

Can you blow up 12 to 18?

BY MR. ROTHSTEIN:
Q. Okay. And can you read this to the Court?
A. Yes. So Special Agent In Charge Molnar asked, "So how would you talk to him?"
Mr. Lamond replied, "Either by phone or -- I'm trying to think. Never by email. I can't remember. I think sometimes it was by text, too. I don't remember."
Special Agent Molnar asked, "Did you ever use any, like, apps, like Telegram or Signal or anything like that?"
To which Mr. Lamond replied, "Yes. I think Telegram maybe. Yeah."
Q. At any point in the interview did he tell you that he had communicated by text hundreds of times with Mr. Tarrio?
A. No.
Q. At any point in the interview did he tell you he had communicated over 200 times via Telegram --
A. No.
Q. -- with Mr. Tarrio?
A. No, he did not.
Q. Okay. And was he definitive about whether he had used Telegram?
A. No. He said, "I think Telegram maybe. Yeah."
Q. Did he ever mention during that interview that he had used self-destructing messages?
A. No, he never mentioned that he had used self-destructing

messages.
Q. Was it important to your investigation that he accurately provide you with all of the methods by which he communicated with Tarrio?
A. Yes.
Q. Why?
A. We were going to be doing a forensic review of the phone, we needed to know what places to look for those text messages. Again, we were trying to figure out the extent of the communications with Tarrio, the types of information provided to Tarrio, and the types of information Mr. Tarrio would potentially be asking for. So that way if we were looking at other law enforcement officers, we would know the types of information he was asking for.
So now if we have a situation where we don't know which app that was in, it's going to be harder for us to find that. And also, you know, whether or not self-destruct was used certainly would have been relevant.
Q. At this point in the interview regarding these questions, at any point did the defendant tell you he didn't understand what was being asked?
A. No.
Q. During the interview, was the defendant asked whether it would be common for Tarrio to fish for information?
A. Yes.

Q. Why was that question relevant to your investigation?
A. Because we are trying to determine not just whether or not Mr. Tarrio had asked for information, we want to know the type of information he's asking for and what information he was provided because we need to know how much law enforcement sensitive information has been put out there to the world or, specifically, to the Proud Boys. And we were, obviously, interested in knowing what types of information that Mr. Tarrio was interested in receiving from law enforcement.

MR. ROTHSTEIN: The government asks that Exhibit 1016-A, which is the audio recording, be played. And, Your Honor, we'll bring up the transcript after, but it's Exhibit 5006 from pages -- page 20, line 25, to page 21, line 21.

(Video played.)

MR. ROTHSTEIN: And, Lisa, can you just bring up Government Exhibit 5006, at page 21.

Okay. Can you just highlight down to there (indicating). The top down. The top part down to there. Thank you.

BY MR. ROTHSTEIN:
Q. Now, was it relevant to your investigation that the defendant said Tarrio never really asked him questions?
A. Yes.
Q. Why?
A. We were trying to determine what information Mr. Tarrio was

soliciting from law enforcement and what information he received. So the fact that here we have a statement saying Mr. Tarrio is not really fishing for information, that informs our investigation and it's contrary to statements that Mr. Tarrio had said to fellow Proud Boys.

Q. And was it relevant to your investigation that the defendant said that the conversation was, quote, more one-sided, with just him telling me what their plans were, unquote?

A. Yes, it's relevant.

Q. Why?

A. Because that informs us regarding the nature of their interactions and conversations. It would also -- if we were looking at cellular devices, things like call detail records, things like that, we would know what to look for, at least have an expectation of what we should be looking for regarding their communications.

Q. At any point in this part of the conversation did the defendant say he didn't understand what you were asking?

A. No.

Q. Did he seek any clarification?

A. No.

Q. At any point during your interview did the defendant tell you that he had provided police information to Tarrio?

A. No.

Q. At any point in your interview did the defendant tell you that he had discussed the banner-burning investigation with Tarrio?
A. No. We discussed the banner-burning investigation in this interview, but he did not say that he had discussed the banner-burning investigation with Mr. Tarrio.
Q. At any point in the interview did he tell you that he had discussed the arrest -- the status of an arrest warrant for the banner burning with Mr. Tarrio?
A. No. In fact, he had stated that he did not discuss the warrant with Tarrio.
Q. Did you ask the defendant whether Tarrio ever asked him for any police information?
A. Yes, we did.
MR. ROTHSTEIN: The government asks that Exhibit 1016-B be played for the Court. And, Your Honor, that's in the transcript, Exhibit 5006, page 24, line 23, to page 25, line 6.
(Video played.)
Okay. Lisa, can you bring up 5006, the bottom of page 24 and the top of line 25, down to line 6. 5006, at 24.
Line 23 and then -- all right. Can we bring up 5006, 25, line 1 to 6.
BY MR. ROTHSTEIN:
Q. When the defendant was being asked these questions, did he ever ask you to clarify what you meant by "inappropriate"?

A. No, he did not.
Q. Did he ever ask for any clarification about what it meant to have gone over the line?
A. No, he did not.
Q. Did he ever ask for any clarification about what you meant by information?
A. No.
Q. When you -- you're observing him during the interview, is that correct?
A. Yes. I was right next to him.
Q. Does he look confused by those questions?
A. No.
Q. Now I want to focus on him saying that -- him saying he didn't know anyone else that would give Tarrio information. Do you see that?
A. Yes.
Q. Now, was it relevant to your investigation that the defendant denied that Tarrio had ever gone over the line or asked for any sort of information?
A. Yes.
Q. Why?
A. Because, again, we are trying to determine what types of information he's asking for, what types of information he's getting from law enforcement, and who he is contacting within law enforcement. So, like, here we have a situation where it

looks like if this is true, and he is not asking Mr. Lamond these questions, we would have to look at other members of law enforcement to see who he was trying to gather information from.

Q. Okay. At any point in your interview did he discuss -- did he tell you that he had discussed whether or not there would be a hate crimes enhancement with the defendant?

A. No.

Q. At any point in time during the interview did he disclose to you that he had discussed with Mr. Tarrio about what type of evidence had been collected?

A. No.

Q. Was it relevant to your investigation that the defendant denied that he was aware of anyone else giving Tarrio any information?

A. Yes.

Q. Why?

A. Because had he had information regarding someone else, that would have been a lead for us. The fact that he said he didn't have knowledge, that's a dead end for us. It didn't provide us any more leads, if there is anyone else providing Tarrio information.

Q. And did you ask him whether he communicated with Tarrio between the banner burning and January 4th?

A. Yes, that was asked.

Q. Why was that relevant?

A. Because that is the -- I mean, that's the time period of that investigation, that's when the investigation regarding that banner burning is occurring. That is -- from the information we had, it appeared that Mr. Tarrio was aware of that arrest warrant, so that was information we knew that Mr. Tarrio -- or, we believed that Mr. Tarrio had, so we wanted to follow up on that.

MR. ROTHSTEIN: The government asks Government Exhibit 1016-D be played for the Court.

Your Honor, this is the transcript, Exhibit 5006, at page 9, line 19, through page 10, line 19.

(Video played.)

MR. ROTHSTEIN: Lisa, I would ask that 5006, at page 9 to 10, be brought up.

To line 19 on the other page, if we can.

BY MR. ROTHSTEIN:

Q. Okay. Was it relevant to your investigation that the defendant said he spoke to Mr. Tarrio, quote, without tipping him off to the MPD investigation?

A. Yes.

Q. Why?

A. Well, again, that is one of the specific concerns that we had, was that Mr. Tarrio had been tipped off to that MPD investigation. So we were trying to determine how he had

potentially received that information. In this case, it would also inform, like, as we look at call detail records, cellular devices, the certain timeframe that we would be looking at. Right? We're looking at the time between the banner burning and the arrest on January 4th. If we had had information regarding when those conversations would have taken place, if they took place, then we would be able to hone in on those certain time periods.

Q. Okay. And at any point when he was being asked this question did he ask for clarification?

A. No.

Q. Did he look confused?

A. No.

Q. Did he ever inform you that he had discussed the banner burning with Mr. Tarrio?

A. No.

Q. During the interview the defendant said, quote, We didn't have any conversation that he was the one who burned the banner. Do you see that?

A. Yes.

Q. Did he ever mentioned that Tarrio had confessed to him on December 15th, 2020 that he had burned the banner?

A. No, he did not mention that.

Q. Did he ever disclose any communications he had with Mr. Tarrio during that time period about Mr. Tarrio's actions

that day?
A. No.
Q. Did you ask the defendant about the arrest warrant for Tarrio and the execution of the arrest warrant?
A. Yes.
MR. ROTHSTEIN: The government asks that Exhibit 1016-E be played for the Court.
Your Honor, this is in the transcript, Exhibit 5006, page 12:16 to page 14:5.
(Video played.)
MR. ROTHSTEIN: Okay. Can we bring up Government Exhibit 5006, at page 13.
BY MR. ROTHSTEIN:
Q. Was it relevant to your investigation that the defendant said that, quote, I know that I didn't inform him that he had a warrant?
A. Yes.
Q. Why?
A. That's one of the specific points of interest for us, was that we're looking for who, within law enforcement, potentially tipped off Mr. Tarrio. This is the matter we're discussing with Mr. Lamond and he is bringing up affirmatively that he did not tip off Mr. Tarrio to this warrant.
Q. Okay. And you said, "Bringing up affirmatively," which is my next question. Did you ever ask the defendant if he

informed Tarrio about the warrant?

A. No. We told him we were looking into it. We didn't ask him specifically if he was the one that had brought up the warrant.

Q. Did he just offer up that denial?

A. Yes, he offered.

Q. So, another question in the paragraph at the top of page 13, do you see there where he said he actually reached out to TSA?

A. Yes.

Q. Okay. Now, when you were asking him these questions, did he ask you for any clarification about your questions regarding the warrant?

A. No.

Q. Did he look confused?

A. No.

Q. Okay. At any point did he tell you that he had contacted Tarrio that day to see if he made his flight?

A. No.

Q. Did he ever disclose to you during the interview that he had contacted Tarrio at all that day?

A. No.

Q. Okay. Did you ask him about any conversations he had after Tarrio's arrest?

A. Yes.

Q. Why?
A. Well, two days after Tarrio's arrest was January 6th, so we were very interested in any information that Mr. Tarrio would be providing, and he would be talking about in the wake of January 6 because he was a January 6 defendant. Also, because we are trying to determine the extent of the relationship that Mr. Tarrio had with Mr. Lamond or any other member of law enforcement, so any conversations after that arrest would certainly be relevant to us.
MR. ROTHSTEIN: The government asks that Exhibit 1016-F be played for the Court. And, Your Honor, in the transcript at Exhibit 5006 it's page 4, line 19, to page 5, line 1.
(Video played.)
BY MR. ROTHSTEIN:
Q. Now, approximately how many conversations did he say he had with Mr. Tarrio?
A. I'm sorry. Could you play that one more time? It was --
Q. Yep. Sure.
(Video played.)
A. So it was one or two conversations after the arrest.
Q. Was that relevant to your investigation?
A. Yes.
Q. Why?
A. Again, we planned to look at all sorts of stored electronic

communications, call detail records, text records, things like that. We would want to know where to focus our investigative efforts. If we had information that he had had, say, hundreds of texts and conversations after January 4th, then we would start there, potentially.
Q. At any point when you were asking that question, did he ask for clarification, what you meant by "conversations"?
A. No.
Q. Did he look confused about that?
A. No.
Q. Can we bring up Government Exhibit 4006, at page 53.
Okay. Can you see that?
A. Yes.
Q. Okay. And you say he said one or two conversations, correct?
A. Yes.
Q. Did he ever disclose to you that he had conversations with Mr. Tarrio on the 7th of January?
A. No.
Q. On the 8th of January?
A. No.
Q. Going to the bottom of the page.
Did he disclose communications on the 9th of January?
A. No.
Q. Let's go to the next page. Actually, let's go to page 55.

Did he disclose communications on January 12th?
A. No.
Q. Did he disclose communications on January 13th?
A. No.
Q. On the 16th?
A. No.
Q. On the 19th?
A. No.
Q. The 27th?
A. No.
Q. Okay. Now, can you describe the defendant's demeanor during the interview?
A. Yes. I would say towards the beginning of the interview he was amicable, jovial. I mean, he's a nice guy. He was very normal. Towards the end of the interview he became visibly much more apprehensive.
THE COURT: I'm sorry. He became --
THE WITNESS: Visibly much more apprehensive.
BY MR. ROTHSTEIN:
Q. When did that occur during the interview?
A. That occurred -- like towards the end of the interview, I think. I don't remember the exact words, but he was nervous, he was shaking a little bit. And I think he said something to the effect of, well, before we do that, before we go any further, I feel like this interview has taken a turn. He said

something to that effect.

Q. Okay. And what happened at the end of the interview?

A. So at the end of the interview Special Agent In Charge Molnar informed Mr. Lamond that we had a subpoena authorizing us to seize his MPD work phone.

Q. And how did he react to that?

A. So at first he was unwilling to give up the phone, stating that he wasn't sure whether or not he could give up his MPD work phone, which Special Agent In Charge Molnar immediately contacted MPD internal affairs agent Gary Ciapa and Gary Ciapa advised Mr. Lamond that MPD command had been briefed of the situation and that he was to give up the phone to us.

Q. And did the defendant start arguing with Mr. Ciapa about whether or not he had to give up the phone?

MS. JARA: Objection, Your Honor.

THE COURT: On what basis?

MS. JARA: I would say that that's argumentative. The transcript reads as it is. You can determine whether or not he was arguing. But the use of the word "arguing" is argumentative.

THE COURT: Well, he was there. You can answer the question.

A. I would describe it as pushback or a challenge to Agent Ciapa as to whether or not he was authorized to give up the phone. After Agent Ciapa had advised him that MPD command had

been briefed, he pushed back, asking if it had been cleared by MPD general counsel.
Q. And how did Agent Ciapa respond?
A. I forget exactly what Ciapa said. I think he just reaffirmed that MPD command had been briefed on the situation and he was to surrender the phone to us.
THE COURT: So all of this that went on, what you said was at the end of the interview or after the interview, when he was asked for the phone, is all transcribed?
THE WITNESS: Yes, Your Honor.
MR. ROTHSTEIN: One moment.
Nothing further, Your Honor.
THE COURT: All righty. Any cross-examination.

CROSS-EXAMINATION

BY MS. JARA:
Q. Good afternoon, Agent Ricardi. My name is Ana Jara. I represent Shane Lamond. It's nice to meet you.
A. Good afternoon, Ms. Jara.
Q. You testified about your background and experience, right?
A. Yes.
Q. Okay. And you talked about how you joined the AUSA's office in 2020, correct?
A. Yes.
Q. When in 2020 did you join?
A. September of 2020.

Q. Okay. And from September 2020 to the time that you interviewed Mr. Lamond, about how many interviews did you do with the AUSA's office?

A. Dozens and dozens.

Q. And just to get a general idea of the information that you had when you interviewed Mr. Lamond, you testified that you didn't have access to Mr. Tarrio's phone when you interviewed Mr. Lamond, is that right?

A. Yes.

Q. Okay. And you also testified that you didn't have access to Mr. Lamond's phone when you interviewed Mr. Lamond, is that correct?

A. That is correct.

Q. So how did you know about there being a bunch of communications between Mr. Lamond and Mr. Tarrio, if you didn't have their phones?

A. So the FBI had information that was provided to us that was received from the phone -- I believe it was the phone or the Telegram account of another Proud Boy.

Q. Okay. Understood. And just so that I'm clear, Mr. Ricardi, you were in the interview, right, with Mr. Lamond?

A. Yes. As I said, I was sitting right next to him.

Q. Okay. And Agent Molnar began the interview talking about how -- what -- the purpose of the interview, right? Like, why

you guys were there, correct?
A. Yes.
Q. Okay. And Agent Molnar told Mr. Lamond that with Mr. Lamond running intel, you know, some other agency said you should probably talk to Shane in regards to the communications, is that right?
A. Yes, that was said in the interview.
Q. Okay. And when he said some of the other agencies, is he referring to the FBI?
A. I don't know who he was referring to specifically. I know that Mr. Lamond was a prominent member of the local D.C. intelligence community, so --
Q. Did you talk to any other agencies about Mr. Lamond's role at the MPD intelligence office?
A. I did not.
Q. Okay. What about Mr. Molnar? Do you know?
A. I can't say.
Q. Okay. You testified that at the time that Mr. Lamond was interviewed, that he was not a subject, is that right?
MR. ROTHSTEIN: Objection, Your Honor. I think she's misstating the testimony. He said he wasn't told that he was a subject, not that he wasn't a subject.
THE COURT: Okay. So ask your -- you can ask --
MS. JARA: I'll withdraw the question, Your Honor.
THE COURT: All right.

BY MS. JARA:
Q. Okay. I am actually going to ask my colleague, Bill, to pull up Exhibit 5006, please, and go to page 25:12 to 18.
Okay. Agent Ricardi, do you remember you were asked about this excerpt here? Do you remember that?
A. Yes.
Q. Okay. And Mr. Rothstein asked you about how -- if Mr. Lamond disclosed hundreds of times that him and Tarrio had texted. Do you remember that testimony?
A. Yes.
Q. Okay. Did Molnar ever ask Mr. Lamond how many times he texted with Tarrio?
A. I think he asked how often you had communicated with him. I don't think he specifically used the language how many times, asking for a exact number, did you text with Mr. Tarrio.
Q. Right. So it's fair to say that he did not ask how many times they texted, right? Specifically texted.
A. Yes, it's fair to say he did not specifically ask that question.
Q. What about you, did you ask Mr. Lamond how many times he had texted?
A. No, I did not.
Q. Okay. Mr. Rothstein asked you -- I'm sorry, Mr. Rothstein and you talked about how there were about 200 times that Mr. Lamond and Mr. Tarrio had communicated via Telegram. Do

you remember that line of questioning?
A. Yes.
Q. Okay. Did Molnar ever ask Mr. Lamond how many times him and Tarrio communicated via Telegram?
A. No.
Q. Okay. What about --
A. Not with regard to the specific number. The questioning was aimed at the general overview of how often they communicated.
Q. Right. It was basically like how frequently did you all talk or that sort of thing, right?
A. Yes.
Q. It wasn't like, you know, exactly how many phone calls did you have, right?
A. Exactly.
Q. Or how many text messages did you exchange, like we just talked about?
A. Yes.
Q. Or how many Telegram messages you just --
A. It would be rare for someone to know an exact number.
Q. Let me ask you about the banner burning.
Can you pull up, Bill, in the same exhibit, page 24:23 to 25:6.
Mr. Rothstein asked you about whether or not Lamond ever told you that he had disclosed police information to

Mr. Tarrio. Do you remember that?
A. Yes.
Q. Okay. Did he -- that's not the one that I wanted. You can take that down, Bill. Sorry.
Did Mr. Molnar ever ask that question?
A. Which question?
Q. I'm sorry, what -- whether or not there was any police information -- whether or not Lamond disclosed any police information to Tarrio.
A. So just so I understand, the question that you are asking me is whether or not Special Agent In Charge Molnar asked Mr. Lamond which question?
Q. Whether Lamond ever told Tarrio about any police information.
A. I don't remember the specific question, but he did ask -- he asked whether or not Mr. Tarrio had fished for information or -- he asked for the nature of those communications.
Q. Right. So he asked about Tarrio, right? So, like, the Tarrio communications to Lamond, right?
A. Yes.
Q. What about the Lamond communications to Tarrio?
A. I would have to read through the entire -- I don't have the entire interview memorized. I would have to read through the entire interview transcript to say that.
Q. Okay. Did Mr. Molnar or you ever ask Mr. Lamond if --

anything about the MPD press release about the banner-burning case?
A. No, we did not ask questions about the press release.
Q. Okay. What about any social media posts or anything like that?
A. I don't remember that we did.
Q. Okay. In --
MS. JARA: Court's indulgence, Your Honor.
BY MS. JARA:
Q. Do you remember when you and Mr. Rothstein talked about Agent Molnar's questions about the warrant? Do you remember that testimony?
A. Yes.
Q. Do you remember Agent Molnar asked, in the beginning of one of his questions, "So when they got the warrant, the warrant was under seal." But the weren't wasn't under seal, is that correct?
A. Yes.
Q. It was not, right?
A. I don't know the exact status of whether or not the warrant was under seal.
Q. Okay. There was a line of questioning that you and Mr. Rothstein had about whether or not Mr. Tarrio -- let me try that again.
You and Mr. Rothstein talked about how Mr. Molnar asked

Mr. Lamond about how -- if Tarrio had ever asked for, like, information that was inappropriate or had been kind of, sort of, over the line. Do you remember that line of questioning?
A. Yes, I do.
Q. Okay. Again, the same question. Was there ever the reverse question asked, like whether or not Lamond ever did anything inappropriate or whether or not Lamond had ever crossed some sort of line?
A. No. I believe the reverse of that question was asked.
Q. Okay. Not by Mr. Molnar, not by you, right?
A. Not by Special Agent In Charge Molnar and not by me.
Q. Mr. Rothstein talked to you about how Mr. Lamond, I believe he said, argued a little bit before his turned over his phone. Do you remember that?
A. Yes.
Q. But he didn't refuse to answer any questions, right?
A. No.
Q. He was cooperative, right?
A. Yes.
Q. Okay. Can we please pull up Exhibit 4006.
Okay. Mr. Rothstein asked you some questions about conversations after January 6 with Mr. Tarrio and Mr. Lamond. Do you remember that?
A. Yes.
Q. Conversations are often two people talking to each other,

right?
A. Yes.
Q. So one person says something, the other person responds, right?
A. Yes.
Q. Okay. Can we please go to page --
A. I mean, to be clear, I don't believe that's always what constitutes a conversation.
Q. I understand, I understand. But that's your general understanding, right?
A. Yes.
Q. Okay. So can we go to page 50 -- nope, not 51. Can we please go to page -- I think it's 53. Page 53.
So, and Mr. Rothstein talked about how Mr. Lamond and Mr. Tarrio had conversations on January 7th, 8th, 9th, 12th. Do you remember that?
A. Yes.
Q. Do you remember all those dates?
A. Yes.
Q. Also the 13th, 16th, 19th and 27th. Do you remember that?
A. Yes.
Q. So let's look at the 7th in this. You see that line, it says, "Shane Lamond, Enrique Tarrio." It's Shane to Enrique. Do you see that line right there?
A. I'm sorry. Which line is it?

Q. It's the one --
A. Is it the one you have the cursor over?
Q. It's the eighth entry down. It says -- yeah, do you see --
A. Oh, I'm sorry. I think someone else is using the cursor that is not you.
Q. Oh, sorry about that.
A. I had a cursor on my screen.
Q. But this, like, pen. I think that's me. I'm so sorry.

THE COURTROOM DEPUTY: You can do that. You can mark it.

BY MS. JARA:

Q. Okay. Let's try again. This area right here, you see it says -- oh, no.

This area right here, it says 1-7-21, at 3:37 p.m. Do you see that?
A. Yes.
Q. And that's Shane reaching out to Enrique, right?
A. Yes.
Q. Before that there is Enrique reaching out to Shane. Do you see that?
A. Yes.
Q. Okay. So that's them communicating. That's a conversation. Is that fair to say?
A. Yes.
Q. What about on the 13th?

If you can go to the next page, Bill. I'm really sorry. I've never used this system before, so --

On the 13th, you see that line right here (indicating)? 1-13-21, 8:52 p.m., Enrique Tarrio to Shane Lamond?

A. Yes.

Q. Do you see any other entry for the 13th?

A. No, there's no other entry.

Q. So fair to say, based on this document, no one responded?

A. (No response.)

Q. Let me rephrase that question.

MR. ROTHSTEIN: Your Honor, objection. I don't want to accuse defense counsel of misleading the court, but there's literally ID numbers on these messages. You can see that they jump. Do you see the self-destruct timer? So the idea that --

THE COURT: Wait. You can do your redirect. I understand the point she's trying to make. Whether it's an effective point or whether there's response to the point, it's not a basis to object. She's showing that some individual ones reflect communication going in one direction. And so she can show as many of those as she wants to show and then you can do whatever you want to do in response.

A. So like for this, it says Enrique set the self-destruct timer to 30 seconds. Based on the record, I can't see that message. I'm not comfortable either way, saying whether or not I would classify this as a conversation.

BY MS. JARA:

Q. Okay. Do you know if in that moment, on the self-destruct timer, do you know if that even means that he sent a message? Do you know that?

A. I know what he can see here. It's a -- there is a message with a self-destruct timer. I have no idea what it is.

Q. Okay.

MS. JARA: Court's indulgence, Your Honor.

(Pause.)

BY MS. JARA:

Q. Okay. So a couple more questions. You can take that exhibit down, Bill. Thank you.

So we talked about the definition of a conversation. Do you remember that?

A. Yes.

Q. Okay. So -- and we talked about how, you know, sometimes it's one or two people, right? Like, people have to respond to each other, that sort of thing. Do you remember that?

A. I don't know that I would necessarily say that a conversation has to -- it has to have two people, for sure. If I'm talking to the wall, that's not a conversation, right? But I don't know that I would necessarily commit to saying that a conversation has to have two people responding back and forth to one another.

Q. Okay. Do you think that people have different definitions

of what a conversation is? Like my definition might be different than your definition?
A. Yes. I think we see that here.
Q. Okay. So when Molnar, for example, was asking Lamond about fishing, is it fair to say that your definition of fishing and my definition of fishing might be different?
A. I wouldn't say different, but similar.
Q. It's fair to say that it would be different? Like, what you believe would be fishing would be different than what I would think, right?
A. It's possible.
Q. What about "tipped off"? The phrase "tipped off," would you have a different -- it's possible that you and I have a different definition of what that means?
A. I would say, within the law enforcement community, we all have a good grasp and a communal understanding of what "tipped off" means.
Q. That communal understanding, meaning like there's a general understanding. But within that general understanding there can be some different nuances, right?
A. I would have to see examples.
Q. Okay. Well, so like if -- so you're a special agent in the AUSA's office, right?
A. Yes.
Q. So is it possible that somebody in the intelligence

division might have a different definition of what "tipping off" means than somebody who is a special agent in the AUSA's office?
A. I don't know. I believe that within the law enforcement community we have a communal understanding of what "tipped off" means, and that's did that person have some information that this was going to go down. I think you could split hairs onto the size of that tip, if you wanted to do that. But "tipped off," I don't know of any, like -- I can't imagine anyone within the law enforcement community would not describe tipped off as receiving information regarding X.
Q. Okay. Some information that it was going to go down, what does that mean? Just so I know.
A. Exactly that. It's information. Information is a fact, a tip, a hint.
Q. Right. So information could mean something different to you than it does to me, right?
A. I would to have to see examples of that point. I would think that we would define information in the same way.
Q. You would think, but you don't know?
A. What is your definition --
THE COURT: Wait, wait. No, no. Ask questions.
MS. JARA: That's okay, that's okay.
THE COURT: All right.
MS. JARA: Okay.

BY MS. JARA:
Q. What about "one-sided," does that have -- do we have different definitions of that?
THE COURT: Just "one-sided"?
MS. JARA: Yeah, the phrase "one-sided."
A. I mean, I think "one-sided" is a figure of speech. We all speak English.
MS. JARA: Okay. Court's indulgence.
BY MS. JARA:
Q. So we just went through this lovely definition part. Did Molnar ever clarify with Lamond what any of those terms meant or what he meant by them?
A. No, we did not clarify in that interview what those specific terms --
Q. What about did he confirm with Lamond what Lamond thought those words meant?
A. No, we didn't clarify his definitions of those words.
MS. JARA: Okay. I have no further questions, Your Honor. Thank you.
MR. ROTHSTEIN: I just have --
THE COURT: Okay. We don't need to have the direct again. Okay. Go ahead.
REDIRECT EXAMINATION
BY MR. ROTHSTEIN:
Q. You were just asked about -- I think you testified that law

enforcement had some common understanding of phrases?
A. Yes.
Q. Is "fishing" one of those phrases?
A. Yes.
Q. During his interview, did the defendant ever say to you or Agent Molnar, I don't understand what you mean by "fishing"?
A. No.
Q. Did he look confused when you used the phrase "fishing"?
A. No, he did not look confused when he used the phrase "fishing."
Q. When Agent Molnar used the phrase "tipped off," is that a phrase that -- you said law enforcement, there's a common understanding?
A. Yes.
Q. Did the defendant look confused when he used the phrase "tipped off"?
A. No.
Q. Did he ask for any clarification?
A. No.
Q. When Agent Molnar used the phrase "one-sided," did the defendant ask for clarification?
A. No.
Q. Did he look confused?
A. No, he did not.
Q. Okay. You were asked -- can we bring up -- well, couple

questions. How many interviews have you conducted in your career?

A. Oh, boy. Hundreds and hundreds, if not -- I may be over the thousand mark.

Q. So it didn't just start when you joined the U.S. Attorney's Office?

A. No. I was an accomplished criminal investigator before I came here.

Q. You were asked by defense counsel about a Telegram message that the FBI had with the phrase "Shane FBI Police" in it. Do you recall that?

A. Yes.

Q. Did you or the FBI at that time have all of or any of the communications between the defendant and Mr. Tarrio?

A. No.

Q. Okay. Can we bring up Exhibit 5006, at page 4, line 19 to line 1.

And do you recall being asked some questions by defense counsel that Agent Molnar hadn't asked the exact number of conversations that they had had?

A. Yes.

Q. All right. But here, regarding the time period after the arrest, did he ask about the number of communications?

MS. JARA: Objection, Your Honor.

THE COURT: What's your objection?

MS. JARA: My questions about how many times something happened or the number of times they communicated, it was about the text messages and Telegram communications. It wasn't necessarily about the January 4th or 5th. So I would say it's outside of the scope of the cross for the redirect.

THE COURT: All right. Well, a lot of the direct was he got asked this, he said that, or he volunteered that. And your questions were -- sometimes they were vague, but sometimes they were quite specific. You weren't asked this, you weren't asked this, you weren't asked that. This is redirect. If there's some particular question that you want to direct his attention to, there's not actually a question on the page you just pulled up. And the transcript will be in evidence and I will have the opportunity to read it, to read all these excerpts in context, as I've been told I need to do and I will.

MR. ROTHSTEIN: Yes, Your Honor. I'll wrap up.

BY MR. ROTHSTEIN:

Q. Regarding Telegram, was he just asked what types of applications he used? The defendant, how he would communicate?

A. He was asked how he commuted with him.

Q. Okay. And when he said -- what did he say about Telegram?

A. He said -- well, we asked how he communicated. He said -- originally it was text, maybe. And then Special Agent In Charge Molnar asked about specific apps. He said specific apps, like Signal, Telegram? And he said Telegram, maybe.

Q. Okay. Finally, you were -- you were asked whether or not he refused to answer any questions. Do you recall that?
A. Yes.
Q. The point at which the interview started to become a little more contentious, was that at the end of the interview?
A. That was at the end of the -- towards the end of the interview.
Q. At that point did you ask him any more questions, other than asking for his phone?
A. No.
Q. Okay. So there wasn't an opportunity to refuse to answer questions, right?
THE COURT: Well, he could have refused at the beginning.
BY MR. ROTHSTEIN:
Q. I'm sorry. After he started to display a change in demeanor, was there an additional -- did you ask any other questions, other than asking him for his phone?
A. No, there were no other questions after that.
MR. ROTHSTEIN: Nothing further, Your Honor.
THE COURT: All right. This witness is excused.
THE WITNESS: Thank you, Your Honor.
THE COURT: Okay. And we will take our lunch break now and we'll resume at 2 p.m.
And you still have two more witnesses, you said?

MR. ROTHSTEIN: Yes. We are calling Detective Franklyn Then and Sergeant Nicole Copeland and then we'll rest.

THE COURT: Okay. Is there something you want to say?

MR. SCHAMEL: Can I have one second with Mr. Rothstein?

THE COURT: Okay.

(Off-the-record discussion between counsel.)

MR. SCHAMEL: I was just going to see if there was going to be a stipulation at this point, but I guess not. I'm just concerned about Mr. Tarrio and the timing because he's here and his lawyer is here, that's all.

THE COURT: Okay. Well, the government has to finish its case. When the government finishes its case, I anticipate you're going to make a motion. I may or may not have questions about it. Then we'll get around to putting on the defense case, if the defense chooses to put on a case.

Have you ascertained that if you choose to call him, that Mr. Tarrio is going to testify?

MR. SCHAMEL: Mr. Tarrio's counsel and I have spoken. He is here in the courthouse. He has indicated that Mr. Tarrio will be testifying.

THE COURT: All right. Then he'll be your first witness when we get there.

MR. SCHAMEL: Thank you, Your Honor.

(Recess from 1:07 p.m. to 2:11 p.m.)

THE COURT: All right. You can call your next witness.

MR. ROTHSTEIN: Your Honor, the government calls Franklyn Then.

THE COURT: There he is.

MR. ROTHSTEIN: Trying to be efficient.

FRANKLYN THEN,

was called as a witness and, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ROTHSTEIN:

Q. Good afternoon. Could you please state your name and spell it for the court reporter?

A. Yes. Good afternoon, my name is Detective Franklyn Then. First name is spelled F-R-A-N-K-L-Y-N. Last name is spelled T-H-E-N.

Q. And where do you work?

A. I'm employed with the Metropolitan Police Department.

Q. And how long have you been with MPD?

A. Since June 29 of 1998.

Q. '98 you said?

A. '98, yes.

Q. Did you go to the police academy?

A. Yes, I did.

Q. What type of training have you received?
A. Basic police officer training. Also attended investigator and detective school with MPD training. On-the-job training as well.
Q. Can you walk us through your assignments since you've joined MPD?
A. Yes. Originally I was assigned to the Third District, worked patrol. I also worked in a narcotics unit, a vice unit. I also did about a year in Boys and Girls Club. I also worked at major cases under -- in an undercover capacity. For a while I worked in the Third District detective's office. I also worked in riot task force, carjacking task force, Fourth District detective's unit, missing persons unit, which is my current assignment.
Q. Okay. And in December of 2020, where were you assigned?
A. I was assigned to the riot task force.
Q. And what was the purpose of the riot task force?
A. We were investigating mostly protests that were going on through the city, where we would investigate individuals that were committing crimes, assaults, robberies, that sort of nature, to present for evidence for prosecution to the U.S. Attorney's Office.
Q. Okay. And who else did you work with on the task force?
A. Detective Mufti at the time, Detective Batko, Detective Babich, Detective Langenbach, and then we had additional

detectives join the unit.
Q. Who is your supervisor?
A. At that time, Sergeant Copeland was my supervisor.
Q. In the course of your work on that task force, did you become involved in the investigation of the burning of the Black Lives Matter banner?
A. Yes.
Q. And who was the detective in charge of that investigation or who was it assigned to?
A. So that investigation was assigned to Detective Mufti, and I did assist him in some capacity.
Q. Okay. And so who else was involved, besides you and Mufti?
A. Also, Sergeant Copeland was involved and some of the other detectives were involved. I don't know the assigned roles, but we all had kind of like limited roles, as compared to Detective Mufti, who was the lead.
Q. Fair to say Detective Mufti was the lead investigator and you provided assistance?
A. That's correct.
Q. Can you explain to the judge, from the time -- sorry. Can you explain, from the time of an incident to the drafting of the affidavit for an arrest warrant, what are you trying to establish?
A. We're basically trying to establish probable cause to bring for prosecution.

Q. And so, in this case, did you have probable cause in the banner burning?
A. Yes, we did.
Q. Okay. So besides probable cause, what else do you need?
A. We're trying to identify suspects.
Q. Okay. And did you have an identification initially in this case?
A. No, not initially.
Q. If you were aware of a confession to a law enforcement officer, how would that have affected your investigation?
A. If we did have a confession that we became aware, then we would immediately be able to prepare, with that confession, an affidavit for prosecution for an arrest warrant or do a probable cause arrest.
Q. So if you have probable cause and a confession to law enforcement, you can get an arrest warrant right then?
A. Immediately, yes.
Q. In this case, were you ever aware of a confession to the defendant by Enrique Tarrio?
A. I was not aware.
Q. Because you had probable cause but you lacked a confession or a positive identification, did that affect the timing of your ability to get an arrest warrant?
A. Yes. It delayed the ability for us to obtain an arrest warrant just because we didn't know who the offenders were.

Q. Does the timing of an investigation -- sorry. How does the timing affect an investigation?
A. The timing of the investigation, the faster we get information, the faster we can act on it because evidence can be lost, folks can change their mind as far as cooperating, and we can lose witnesses.
Q. Okay. So what happens as time passes in an investigation if you do not have a positive identification or a confession?
A. The information can become no longer available, the suspect can basically remain free.
Q. Okay. So let's go back to this investigation and the identification. Did you obtain video and photos that captured the burning of the Black Lives Matter banner?
A. Yes, we did come into possession of video that showed individuals burning and working on burning the banner from the Black Lives Matter protest.
Q. And as part of your investigation, did you review those videos and photos?
A. Yes.
Q. Why?
A. We were trying to identify the individuals that were involved.
Q. And were you initially able to determine any possible subjects?
A. No. We had one subject that we believed might have been an

individual who later on we were able to identify as Enrique Tarrio. But we were trying to obtain that person's identity.

Q. And in the course of your work at MPD, did you interact with the defendant, Shane Lamond?

A. Yes, I did.

Q. Did you interact with the defendant as part of the BLM banner-burning investigation?

A. Yes, I did.

Q. Do you recall, on December 19, 2020, that Detective Mufti was out of the office that day?

A. Yes.

Q. And that day were you the senior person on the case?

A. Yes. On that day, with my supervisor asking me to basically step in and help, I did perform part of the investigation on that date, doing the -- being Detective Mufti was out.

Q. Did you call the defendant on that day?

A. Yes, I did.

Q. And who directed you to call him?

A. So, I was advised by my commander at the time, Leslie Parsons, informed me that the defendant had information and he was familiar with the suspect that we were trying to identify. And he advised me to reach out to the defendant for purpose of identifying the suspect that was involved in the banner burning.

Q. Did the person tell you he was familiar with Tarrio and knew him well?
A. Yes. He informed me he knew the defendant -- I'm sorry, the suspect very well.
Q. Going to Government's Exhibit 4006, at page 40.
I want to direct your attention to December 19th, 2020, at 5:58 p.m.
Do you recognize the telephone number (240) 418-7386?
A. Yes.
Q. Whose number is that?
A. That is my phone number.
Q. Who were you calling?
A. I was calling the defendant.
Q. And how long was that call for? Do you see the duration?
A. Yes, it was 5 minutes and 19 seconds.
Q. What was the purpose of that call?
A. So the purpose of the call was basically to establish how well he knew the suspect, and also to obtain any information that could help us in identifying the suspect.
Q. So when someone is doing an identification, why is it important to ascertain how well or how familiar they are with the individual they're identifying?
A. So some of the steps that we take, if the person knows them very well, then we can just do, like, a single photo. If they don't know them that well, then a lot of times we do a photo

array. But if they know them well and they express that they do know them well, then we can just go with, basically, the confirmation photo at that time.

Q. So does that go to the strength of the identification?

A. Yes.

Q. Now, what did the defendant tell you about how he knew Tarrio during that call?

A. He said he had come in contact with him at other protests.

Q. And during that call did you send the defendant an email?

A. Yes.

Q. Showing you Government Exhibit 1006-D, at page 2. Scrolling to the bottom.

Do you see December 19, 2020, at 6:02 p.m.?

A. Yes.

Q. And do you recall, we just looked at a call at 5:58 p.m. that lasted a little over 5 minutes?

A. Yes.

Q. And, now, this is a copy of that email you sent, right? This is you at the bottom?

A. Yes, that is my -- yes.

Q. And did you attach a photo to this email?

A. I did.

Q. Was that photo from the crime scene?

A. Yes, it was.

Q. Why did you send this email and photo?

A. I wanted to know if he can identify the subject that was in the photo that we had captured from the video, that was involved in the banner burning.
Q. During that call, did the defendant identify Mr. Tarrio?
A. No, he did not.
Q. Was -- what did he tell you regarding the identification?
A. He couldn't identify him. He wasn't able to identify him because he couldn't see him well or he just wasn't able to.
Q. Now, based on what the defendant told you, what was your impression of the defendant's relationship to Tarrio?
A. Well, my impression was that once I basically got off the phone with him, I believe that he probably didn't know him that well, or that he was maybe just saying that to the commander. But, my impression was that maybe he just didn't know him that well, or at the time I had the feeling maybe he just didn't want to ID. So I wasn't really sure what was going on.
Q. You say you got the feeling you weren't sure that he wanted to ID?
A. Yeah.
Q. Okay. Now, at any point during that call did he inform you that he had spoken with Tarrio about your investigation?
A. No.
Q. At any point during that call did he inform you that Tarrio had confessed to him that he had burned the banner?
A. No.

Q. At any point during that call did he tell you that he was currently in contact with him about the banner burning?
A. No.
Q. Would that have been information that was relevant to your investigation?
A. Yeah, it would have helped.
Q. Going back to page 40 of Exhibit 4006.
I'm sorry. Can we stop right there.
The photo right there -- Lisa could you pull that up -- is that the photo that you sent to Lamond on that email?
A. Yes. Yes, that's the photo. That is the photo.
Q. Okay. Now let's go back.
And -- thank you.
Did you have additional phone calls with the defendant that evening?
A. Yes, there was another phone call.
Q. Do you see a call at 6:06 p.m. from Lamond to you?
A. Yes, I do.
Q. And that call was 4 minutes, 17 seconds, is that correct?
A. Yeah, that is correct.
Q. Do you see a call from Lamond to you at 6:30 p.m.?
A. Yes.
Q. And how long was that call?
A. That was 1 minute and about 33 seconds.
Q. During either of those calls did the defendant identify

Tarrio in the photo?
A. No, he did not.
Q. During either of those calls did the defendant tell you that Tarrio confessed to him that he had burned the banner?
A. No.
Q. What was your reaction to what the defendant had told you during those calls when he couldn't -- he didn't ID him and you thought he didn't know him that well? What did you do next?
A. I expressed to my supervisor, and I also believe to the commander, that maybe he just didn't know him that well, as well as the commander had led me to believe.
Q. And how did they react?
A. I mean, they didn't indicate either way, but that was, you know, kind of what we were discussing, that maybe he just didn't know him that well.
Q. And as a result of what you had told Sergeant Copeland, what did she do next with you present?
A. She did a phone call on her cell phone to the commander, Commander Parsons. And she basically had it on speaker, so we were all able to hear each other and communicate.
Q. And you participated in that call?
A. Yes, sir.
Q. Who else was on that call?
A. It was Commander Parsons at the time and Sergeant Copeland at the time.

Q. And do you see -- following the call with Copeland and Parsons, did you speak with the defendant again at 7:43 p.m.?
A. I did.
Q. Okay. And do you see that 6:56 is a call between Parsons and Lamond? Do you see that, right there (indicating)?
A. Okay. Yes, I see it.
Q. And then you spoke to -- Lamond called you at 7:43, right?
A. Yes.
Q. During that call did the defendant identify Tarrio?
A. No, he did not.
Q. During that call did the defendant inform you that Tarrio had confessed to the banner burning?
A. No.
Q. As a result of the defendant's failure to identify Tarrio, did you consider calling Mr. Tarrio on the phone?
A. Yes.
Q. At that time did you know that the Miami Police Department had reached out to Mr. Tarrio?
A. No, I did not.
Q. Did you think you were going to be the first person to contact him from MPD?
A. Yes, either myself or Detective Mufti.
Q. And why did you want to reach out to him?
A. We wanted to, you know, catch him basically off guard and try to interview him in regards to the incident.

Q. Did you ever ask the defendant to notify Mr. Tarrio that you wanted to speak with him about the BLM banner burning?
A. No, I did not.
Q. Did you ever ask the defendant to ask Tarrio what number he preferred that police officers contact him on?
A. No.
Q. Okay. Showing you Government Exhibit 1006-D, at page 1.
Did the defendant send you a photo of how Tarrio was dressed on December 12th?
A. Yes, he did.
Q. Do you want to go back? Lisa, can you pull that up?
Okay. And that wasn't a photo from the crime scene, correct?
A. You said was it --
Q. What he sent you.
A. No, it was -- I think that's when he was kind of, like, out and about during the protest.
Q. Publicly available photo, correct?
A. Yes, correct.
Q. Was that information particularly helpful to you?
A. No. It was photos that you basically -- this individual was basically all over the internet, so he had a lot of photos that we can put up.
Q. And following that email from the defendant, what did you do?

Going to the top of the page, please. Scrolling all the way down to -- yep, right there.

December 19th, 2020, at 7:53, what did you ask for?

A. Yes, I asked him if he could send me, basically, his biological information; name, date of birth, phone number, address, anything that he had, basically.

Q. Did you ever ask the defendant to discuss the investigation with Tarrio before you called him?

A. No, no.

Q. Now, were you involved in drafting of the arrest warrant?

A. No, I was not.

Q. Were you involved in the execution of the arrest warrant?

A. I was not.

Q. At any point in time did you direct the defendant to notify Tarrio about the arrest warrant?

A. No.

Q. At any point in time did you hear or learn of anyone else at CID or at MPD directing the defendant to notify Tarrio about the arrest warrant?

A. No.

Q. Following his arrest, did you interview Mr. Tarrio?

A. Yes, I did.

Q. Did he ask you questions about the charges against him?

A. Yes. His biggest concern was that the charge carried a hate crime, I guess, addition to the charge.

Q. Was he trying to confirm whether or not there was a hate crime enhancement?
A. Yes, yes.
Q. Prior to Tarrio mentioning the hate crime enhancement, did you mention that to him?
A. No.
Q. So he was the one that brought it up and asked if it had been applied?
A. Yeah, I believe that was the case, that he was concerned that it was an enhancement of a hate crime to his charges.
Q. So -- let me finish with a couple questions.
At any point in time did the defendant tell you he was exchanging Telegram messages with Mr. Tarrio?
A. No.
Q. At any point in time did the defendant provide you with text messages he was exchanging with Mr. Tarrio?
A. No.
Q. At any point did the defendant provide you with the Telegram messages he was exchanging with Tarrio related to the banner burning?
A. No.
Q. At any point did the defendant tell you that he was destroying messages he was exchanging with Tarrio on Telegram?
A. No.
Q. Would it have assisted your investigation if the defendant

had retained his communications with Tarrio?
A. Yes, yes.
Q. How?
A. That's all evidence that we can basically use, whoever was presenting the affidavit, any evidence that showed, you know, the planning of and how -- what was talked about, also, after the banner burning.
Q. At any point did the defendant tell you he had met up with Tarrio for drinks at The Dubliner on December 15th?
A. No.
Q. December 15th was after the banner burning, correct?
A. Yes.
Q. At any point did the defendant tell you that he had spoken to Tarrio about the banner burning?
A. No.
Q. At any point did the defendant tell you that he was updating Tarrio on the status of your investigation?
A. No.
Q. At any point did the defendant tell you that Tarrio had confessed to being involved in the banner burning?
A. No.
Q. Would it have assisted your investigation if the defendant told you that Tarrio had confessed to being involved in the banner burning investigation when he met with him on December 15th?

MR. SCHAMEL: Objection. Asked and answered.

THE COURT: All right. True.

MR. ROTHSTEIN: That was my last --

MR. SCHAMEL: Objection.

THE COURT: Okay. I already granted your -- I sustained your objection. We have asked and answered, "Did he ever tell you about the confession" a good bit.

THE WITNESS: Sure.

BY MR. ROTHSTEIN:

Q. Do you recall when an arrest warrant was obtained?

A. I don't know the exact date, that was Detective Mufti.

MR. ROTHSTEIN: Thank you. Nothing further, Your Honor.

THE COURT: All right, cross examination.

CROSS-EXAMINATION

BY MR. SCHAMEL:

Q. Detective?

A. Yes. How you doing?

Q. Nice to meet you.

A. Nice to meet you.

Q. Couple questions for you.

A. Sure.

Q. You were asked a number of questions about probable cause. What's probable cause?

A. Basically is when officer has reasonable suspicion that a

person did commit a crime and there's a reason to, basically, present an arrest warrant or to arrest that person on scene.
Q. Is a confession by the person, a written confirmed confession by that person that they in fact did the crime that they're being investigated for, is that probable cause?
A. Yes.
Q. Were you aware that Mr. Tarrio gave a written confession on his verified Parler account before you ever talked to Mr. Lamond?
A. No, I was not aware.
Q. Did you become aware of it at some time later?
A. I wasn't aware that he -- I believe Detective Mufti said that -- not on Parler, but I believe it was Twitter at the time, he had confessed somehow, but I didn't see it.
Q. You didn't see it as part of your investigation?
A. No. No, I had limited interaction in the investigation, so --
Q. But presuming it's Twitter, on his verified account, if he said I'm the person that burned the banner, would that be probable cause?
A. Yeah.
Q. Okay. How about the fact that Mr. Tarrio has a podcast -- did you know Mr. Tarrio had a podcast?
A. I did not know that.
Q. Were you aware that Mr. Tarrio had gone --

MR. ROTHSTEIN: Objection, Your Honor. The witness just said that he wasn't aware he had a podcast, then Mr. Schamel is asking him about something that happened on the podcast.

THE COURT: All right.

MR. SCHAMEL: Actually, that's not what Mr. Schamel was going to ask. So I'd like to finish my question.

THE COURT: Finish your question and then I'll rule on it.

MR. SCHAMEL: Thank you, Your Honor.

BY MR. SCHAMEL:

Q. Were you aware that Mr. Tarrio had been interviewed online and that he had then stated that he had been the one that burned the banner?

A. I was not aware of that.

Q. If Mr. Tarrio went online and was interviewed by anyone and stated, I burned the Black Lives Matter banner on December 12th, in Washington, D.C., would that be probable cause?

A. Yes.

Q. Okay. Mr. Rothstein asked you, on a number of occasions, would a confession from Mr. Tarrio to Mr. Lamond have assisted in your investigation?

A. Yes, he did ask me that.

Q. Are you aware that Mr. Tarrio gave Mr. Lamond a confession?

A. No, I'm not aware of that.

Q. You talked a little bit about the video. You said there was a video about the banner burning. Do you remember that?
A. So it was a video that was captured from someone that was streaming as the guys were lighting the banner up.
Q. Okay.
A. Or attempting to, because that's what we were able to see on that streamer's portion of the video.
Q. Hold on a second.
A. Sure.
(Pause.)
Q. Were you aware that Captain Haines had plainclothes officers in the Proud Boys group that was involved in the banner burning?
A. I was not.
Q. Were you aware that Captain Haines had officers in plainclothes in the group that were taking videos of the banner burning?
MR. ROTHSTEIN: Objection, Your Honor. He just said that he wasn't aware that they were there. He's not aware that they were there, how can he be aware of what they were doing?
THE COURT: All right. Do you know who captured the video?
THE WITNESS: No.
THE COURT: Okay. Next question.
BY MR. SCHAMEL:
Q. So you didn't interview anybody else from MPD who was there

that day on the banner burning?
A. No.
Q. Because you weren't aware that anybody from MPD was there?
A. I was not aware.
Q. But had somebody from MPD been there and seen the banner burning, would that have helped you establish probable cause?
THE COURT: Only if they knew who the person was. I don't understand why you keep asking that question.
MR. SCHAMEL: Okay. I'll move on.
BY MR. SCHAMEL:
Q. You indicated you had one subject for the banner burning?
A. No, there was several subjects involved. But that individual, Enrique Tarrio, being that he was kind of like in a lot of places on the internet and we kind of like knew -- we didn't know, you know, if that was him, but it appeared to be him, so we were trying to ID him and whoever was involved.
Q. Let me ask you: Do you know how it came to be that you were calling Mr. Lamond? How you became aware that Mr. Lamond knew Mr. Tarrio?
A. Sure. So that was brought to me by our Commander Parsons. He indicated that Lieutenant Lamond at the time was familiar with this individual and he's, like, this is the person you need to call and he'll be able to help you out.
Q. And at that point did Commander Parsons let you know that Mr. Lamond had already forwarded the online confession by

Mr. Tarrio to MPD?
A. No.
Q. You did not know that?
A. I did not know that.
Q. Did you ever become aware that Lieutenant Lamond had forwarded that to MPD?
A. No.
Q. You said the photograph -- I think it was on December 19th, is that right?
A. I believe so.
Q. You sent -- by "sent" I mean to Mr. Lamond.
A. Yes.
Q. Okay. And let me ask you to pull up, if you could quickly, 4019, page 30, Bill.
Just the same photo, I want you to take a look.
A. No problem.
Q. 4018. Did I say '19? I'm sorry. I misspoke. 4018, page 3. Apologize.
While Mr. Hanger is pulling that up, that photograph, is it fair to say it's not a direct, full-on of the person lighting the banner, right?
A. That photo there?
Q. Yes.
A. No, it's fair to say that. Sorry.
Q. What you can see is some details, but you can't see the

face?
A. Right.
Q. And that's essentially what Mr. Lamond told you, right?
A. He told me he couldn't ID, you know, so -- you know, I took it at face value.
Q. He couldn't identify it with 100 percent certainty?
A. Correct.
Q. Because you were asking him to swear to it, right?
A. I was -- well, that would -- eventually that would be the case, yes.
Q. But, it's one thing to say, hey, do you think that's Tarrio? But you were saying: Is that Enrique Tarrio? to identify him for us to get an arrest warrant?
A. Correct.
Q. And so he has to be able to say I swear or affirm with 100 percent certainty that's Enrique Tarrio?
MR. ROTHSTEIN: Objection, Your Honor.
THE COURT: You can ask the question.
Did you ask him to swear?
THE WITNESS: No, I didn't ask him to swear.
BY MR. SCHAMEL:
Q. That was the next step?
A. That's, you know, the normal course of action. If he can identify him, then, obviously, I'm going to be presenting that to the prosecutor. So, you know, he would have to basically

affirm that is the person, or not. But, you know, at that point if he tells me that's the person, then for us it's a lead. If he is not 100 percent sure -- I mean, I've had that happen before with folks, like that's such and such, but I'm not 100 percent sure. So at least it gives us a lead.

Q. Okay. And that's essentially what he told you?

A. What he told me was he couldn't ID, so --

Q. But you said on direct examination that you were then going to get an affidavit?

A. Yeah, if he was able to ID, correct. That's correct.

Q. By -- you're going to get an affidavit, meaning you're going to ask him to be the affiant, to swear out an affidavit of the identity, right?

A. Well, he doesn't --

MR. ROTHSTEIN: Objection.

THE COURT: Who signs the warrant affidavit? The person that gave the information or the officer that received the information?

THE WITNESS: The latter, Your Honor. So it would be Detective Mufti, eventually would have been the affiant. We would just take his statement.

BY MR. SCHAMEL:

Q. Based on his 100 percent certainty?

A. Right.

Q. If he had it?

A. If he had it, yes.
Q. And that photograph was at 6:02 p.m., is that right?
A. Yes.
Q. Let me tell you, Mr. Hinger, to go to page 31. The next.
We're looking at different things here.
Take a look at that. Take a look at that. Do you see that --
A. Yes.
Q. -- Detective?
Okay. That's from Shane to you, Franklyn Then?
A. Yep.
Q. At 7:52 p.m., right?
A. Yes.
Q. So less than two hours later?
A. Right.
Q. What does he tell you?
A. Do you want me to read it?
Q. Yeah.
A. Okay. "Here is what he looked like and how he was dressed in December 12th."
Q. Right. So Mr. Lamond went out and got photographs to show you and -- the one on the right and the one on the left, he both has, sort of, his hat backwards and wearing essentially the same clothing, right?
A. Yes, sir.

Q. Okay. Take us to page 34, if you would.
This is in evidence from December 20th, 2020, at 6:02 p.m. So the next evening. Do you see that?
A. Yeah. The photo?
Q. Yep.
A. Yes.
Q. All right. Did you see this before? Has anybody shown you this?
A. The photo or the --
Q. The photo and the email?
A. I would have to read the email.
Q. Take a minute.
A. Okay.
(Pause.)
Okay.
Q. That's what you're looking for, right?
A. You said, "That's what I'm looking for?"
Q. That's what you're looking for when you called Mr. Lamond. He says, "I'm having some difficulty making 100 percent certainty, but based on all of these other things, the videos I observed, having been there on the 12th, how he was dressed, the drink on his thing, what he was wearing, the place where the patch is, I believe this is Mr. Henry Enrique Tarrio."
A. So that is partially what we're looking for. What we're looking for is what he originally said, 100 percent ID. And I

understand he couldn't give that ID, but that's what he sees and he was able to describe, but what we wanted was 100 percent ID, which I understand, if he's not able to ID. That was my perspective, you know. And I understand he's describing exactly what's in the photo. So, I didn't think that -- anything of it at the time.

Q. He's not just describing what's in the photo, he's saying: I saw him on December 12th?

A. Right, right.

Q. He's dressed the same as the person in the photo, right?

A. Right.

Q. He's got the same drink as the person in the photo?

A. Right.

Q. And I've watched the other videos from December 12th, I think that's the guy in the photo?

A. Correct.

Q. That would have been enough for your affidavit, right?

A. No.

Q. You don't think that was enough? He had to have 100 percent certainty?

A. Yes.

Q. Okay. Let's go to the next page, page 35.

He then began -- same day, another hour and 15 minutes later, sent another email with more photographs, correct?

A. Let me read it, because this was not -- this was not to me,

so --
Q. Okay. Please.
(Pause.)
MR. ROTHSTEIN: Your Honor, the government is going to object. The witness is not on this email, so any testimony provided about it would be irrelevant to the --
THE COURT: All right. Well, I don't know what question he's going to ask him, but he can ask him. I think at this point we understand it's not sent to this witness. Sent to his supervisor after, I guess, he told the supervisor that he told me he can't identify the person.
BY MR. SCHAMEL:
Q. So you're aware -- I'm sorry, if you're still reading?
A. Sorry.
Q. Please take your time.
A. Okay.
Q. You're aware, are you not, that after your call to Mr. Lamond, he continued to try to make the ID better and cooperate with your investigation, is that right?
A. Like I said, this was not to me, this was Commander Parsons. So I'm not aware of the whole exchange they were having, but it appears that that's what he was doing.
Q. So Commander Parsons didn't share this with you?
A. He did not.
Q. Or Mr. Mufti?

A. I don't know about Detective Mufti. He did not share this information with me.

Q. How about the voice identification? Were you aware that Mr. Lamond made a 100 percent voice identification of Mr. Tarrio's voice when he confessed on the internet to having burned the banner?

A. I was not part of that and I wasn't aware of that. That was between him and Detective Mufti, I believe. I was not aware of that.

Q. You weren't aware of that on the 20th of December, that that had already happened?

A. What you just mentioned?

Q. Yeah.

A. No, I was not aware of that.

Q. And it's fair to say that with an investigation like this, we've already said if there was a voice identification and the online -- you said Twitter verified, that both of those things were enough for probable cause, correct?

A. I think that if he made a confession to law enforcement, then that would have been, you know, definite. The Twitter thing is a little bit different because -- I don't know if you know, someone can claim, oh, my account was hacked or that sort of stuff. So I'm not trying to, like, say that it would have been legit, but it's kind of hard to present that and say this is 100 percent confession, when people can start claiming my

account was hacked, someone else has access to my account. But a confession to law enforcement, and then that's good. That's 100 percent that we can present to the prosecutor and on to the judge.

Q. But as you said, you're not aware that that ever happened?

A. I was not aware of that.

Q. Were you aware that Mr. Tarrio had also confessed to *The Washington Post*?

A. I was not aware.

Q. Were you aware that Mr. Tarrio had confessed to other news outlets?

A. No, I was not aware.

Q. You didn't undertake any investigation to contact anybody else he had confessed to?

A. No, that was not part of my -- it wasn't my investigation, so it wasn't something that I was going to do. And, you know, a lot of times detectives, whoever is working investigations, they want to do their own thing now. If he would have asked me to, I would have done that, Detective Mufti that is, but I just didn't want to take his investigation and start doing stuff without him asking, so --

Q. That is totally fair. I'm not suggesting it.

A. Right.

Q. I'm just asking: You basically had a singular purpose?

A. Yes.

Q. Which was to reach out to Mr. Lamond and see if he could make a 100 percent identification from that somewhat obscured photo?
A. That is correct.
Q. Right. And you -- he said he couldn't?
A. Correct.
Q. But he did all these other things to try to get you there, right?
A. That was not with me again.
Q. Okay. But to MPD, to the investigation?
A. Yes. Looks like Commander Parsons and him were having a exchange in regards to that.
MR. SCHAMEL: One moment, Your Honor.
Thank you so much, Detective. Nice to meet you.
THE COURT: All right. Mr. Rothstein.

REDIRECT EXAMINATION

BY MR. ROTHSTEIN:
Q. You were asked some questions about probable cause. Do you recall that?
A. Yes.
Q. And probable cause is something different than a confession, right?
A. I'm sorry. Say that again.
Q. Probable cause is that a crime has been committed, right?
A. Correct.

Q. And that's different than a confession, right?
A. Correct.
Q. Okay. And so a written statement on social media is different than a confession to law enforcement, right?
A. Yes, very different.
Q. Okay. And when he -- you had said earlier, sometimes when you're trying to do an ID, someone will say to you that looks like such and such, but I can't be sure, right?
A. Correct.
Q. Is that what the defendant said to you?
A. Yes, basically.
Q. He said to you that looks like --
A. No, no. He told me he couldn't ID.
Q. Right.
A. That was the exchange with me.
Q. Right. That's what I'm --
A. He told --
Q. -- asking.
A. -- me he could not ID. I'm sorry.
Q. In the exchange with you, did say that looks like such and such?
A. No.
Q. Or did he not give you an ID?
A. He did not give me a ID or a lead at the time.
Q. I want to show you Government Exhibit 4006. Can we go to

page 40. And can you just highlight everything in blue.

Okay. So do you see that you had the call with him right at 6:06 p.m., right -- sorry, you had the call with him at 5:58?

A. Yes.

Q. With Lamond?

A. Yes.

Q. And then you sent the photo from the banner burning at 6:02, right?

A. Yes. Yes.

Q. And then you had another call with him at 6:06, right?

A. Yes.

Q. And a call at 6:30, right?

A. Yes.

Q. And after those calls with the defendant, did you have a meeting with Copeland?

A. Yes.

Q. Did she -- what did she do, you said?

A. We had on-speaker conversation with the commander, Sergeant Copeland, and myself at the time.

Q. Okay. And do you see that at 6:56 p.m. Leslie Parsons calls Shane Lamond?

A. Yes.

Q. And then going to page 41. And going to the top box. So is it correct that only after Parsons reaches out to the

defendant that he sends you these photos, publicly available photos of the defendant -- of Tarrio that day?
A. Yeah. Based on the timeline, yes.
Q. Okay. But that still wasn't enough, that's not on ID?
A. No, that's not an ID.
Q. Okay. And then going to page 41, at the bottom, can you just highlight everything in blue?
And do you see that at 5:40 p.m. and 5:47 p.m. the defendant had calls with Parsons?
A. Yes.
Q. And after that, is that when the defendant sends you back that photo from the banner burning?
A. I'm sorry. I'm trying to look at the time.
Q. Lisa, can you move it over?
Do you see it right here?
A. I see the photo, it says, "Good evening, Commander." That's not to me.
Q. So that --
MR. SCHAMEL: I didn't hear the answer.
THE WITNESS: It says, "Good evening, Commander." So I just want to make sure that that's not to me.
BY MR. ROTHSTEIN:
Q. That was to Parsons, right?
A. Right.
Q. He never gave you a positive ID, right?

A. No, I never obtained a positive ID.

MR. ROTHSTEIN: Nothing further.

THE COURT: Thank you. You can step down. Thank you, sir.

All right. Call your next witness.

MR. ROTHSTEIN: Your Honor, the government calls Nicole Copeland.

THE COURTROOM DEPUTY: Place raise your right hand.

NICOLE COPELAND,

was called as a witness and, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ROTHSTEIN:

Q. Good afternoon.

A. Good afternoon.

Q. Can you please state your name and spell it for the court reporter?

A. Sure. Nicole Copeland. N-I-C-O-L-E, C-O-P-E-L-A-N-D.

Q. Okay. Where are you currently employed?

A. Currently employed with the Metropolitan Police Department.

Q. And when did you start with MPD?

A. March of 2012.

Q. Can you walk us through the jobs you've had at MPD?

A. Sure. After graduating the academy, I was assigned to the Seventh District. Shortly after finishing up my probationary

period I was reassigned to 70 auto theft, where I stayed for about two years. Following that, I was transferred to our narcotics and special operations division, where I bounced around for -- within a few units in narcotics. I was promoted in 2018 to sergeant and assigned to the Fifth District. I spent about a year there, and was promoted to detective sergeant, where I was reassigned to the First District detectives unit.

From that point, I spent about a year there. And I was detailed to our riot task force, followed by the carjacking task force, promoted to detective lieutenant and reassigned to the Fourth District DDU, followed by the Sixth District DDU, and then my current assignment, which is the Office of Homeland Security intelligence.

Q. And are you an acting captain there?

A. I am.

Q. And who held that job before you?

A. Formerly Lieutenant Shane Lamond was in the position that I'm in now.

Q. And in that position, what do you do?

A. We oversee threats to the District, as well as District government employees and entities, as well as overseeing First Amendment demonstrations.

Q. And do you work with other divisions within MPD?

A. Yes.

Q. And if you have information about criminal activity or about an ongoing case, do you share with it with other divisions you work with?
A. Yeah, we frequently speak in regards to investigations.
Q. If you have information about a case and CID is handling it, would you turn that information over to them?
A. Yes.
Q. There's no prohibition against that, right?
A. No, no.
Q. Are you familiar with the riot task force?
A. Yes.
Q. In December of 2020 were you assigned to the riot task force?
A. Yes.
Q. What was the purpose?
A. That unit was formed shortly after the George Floyd riots that occurred in the summer of 2020.
Q. And who else was on the riot task force?
A. Myself and about seven or eight detectives were assigned to that unit.
Q. And were you involved in the investigation of the burning of the Black Lives Matter banner?
A. Yes, that investigation was assigned to that unit.
Q. As a point of reference, do you recall approximately when that banner was burned?

A. December 12th, 2020.
Q. Did MPD immediately open an investigation subsequent to the burning?
A. Yes.
Q. And so by December 13, 2020 had you opened your investigation?
A. Yes. That investigation was within the unit and assigned to a detective within that unit.
Q. Was the banner burning a pretty high-profile event?
A. Yes.
Q. Was it a priority of MPD to solve the crime?
A. Yes.
Q. Who was assigned to the investigation?
A. Detective Ashan Mufti.
Q. And did he report to you?
A. He did.
Q. Once the crime was committed, what were you and the detectives assigned to the investigation trying to establish to get to the point that you could draft an arrest warrant?
A. The individuals involved with the removal and eventual destruction of the flag.
Q. When the banner was burned, did you have probable cause that a crime was committed?
A. Yes. Yes.
Q. And after that, after you established that there was

probable cause, what was there left to do?
A. Once we had the -- we had the probable cause for it, we just needed to identify the individuals involved.
Q. Okay. And once you identified them, could you obtain an arrest warrant?
A. Yes.
Q. If you were made aware of a confession to law enforcement, how would that have affected your investigation?
A. If we were made aware of a confession in regards to that crime, it would have helped close it a lot faster.
Q. Is there a difference between a confession on social media and a confession to a sworn member of law enforcement?
A. Well, a confession would be a confession, however, if it was given to a member of law enforcement, we could definitely use that because we could use the status of the entity that it was told to, you know, as a witness to a confession being made.
Q. So a confession to law enforcement has more weight, is that fair to say, than --
MR. SCHAMEL: Objection. Leading.
THE COURT: It is.
BY MR. ROTHSTEIN:
Q. Is there a difference in the weight that you would give a confession if it was on social media versus to a law enforcement officer?
A. I would say yes, because it's coming from a fellow law

enforcement officer in which I would believe that that information would definitely have more weight to it.
Q. Okay. And were you made aware -- sorry, does law enforcement ever receive tips?
A. Yes.
Q. Do those tips include phone tips?
A. Yes.
Q. What's the process when a phone tip comes to MPD?
A. Typically a phone tip will come in to our command information center. It is received by a member that's working in that facility or that unit there. It's reviewed and then it's disseminated to the appropriate unit for follow up.
Q. Did law enforcement receive a phone tip about who was involved in the banner burning?
A. There were several tips that came in in regards to the ongoing riots, but there was one that came in in reference to the flag burning.
Q. Okay. Showing you Government Exhibit 4018, at 20.
Are you on this email?
A. Yes.
Q. Who else is on this email?
A. The email is from former Lieutenant Shane Lamond. It's to Carolan Montagna, Leslie Parsons, and myself.
Q. Okay. And what was Lamond's position at that time?
A. He was an intel lieutenant.

Q. What's the subject of the email?
A. It says, "Re: Phone tip."
Q. Did the defendant attach a photo from the press from December 12th?
A. There is a picture attached to this, correct.
Q. Do you recall receiving that email?
A. Yes.
Q. And do you recall what your reaction was to receiving it?
A. Once we received this, I kind of thought it was additional information to be obtained from it, based off of the body of the email. The purpose of filling in any blanks that we had in reference to it, along with the picture, was pretty helpful.
Q. And you had the ability to search Google for photos of Mr. Tarrio, right?
A. Yeah, we have the ability to search Google.
Q. Showing you Government Exhibit 4018, at 25.
What is this?
A. This is an email that I forwarded from the previous one to Detective Mufti.
Q. What did you say?
A. The title is, "Forward: Phone tip." And I state, "If anyone has any questions on him, Lieutenant Lamond states that he knows him."
Q. Did you recall sending this email?
A. Yes.

Q. Why?

A. Well, Mufti was assigned this investigation and based off of the previous email that I received, it appeared that additional information was available.

Q. When you sent this email, did you make any assumptions about the information Lamond would provide or his cooperation?

MR. SCHAMEL: Objection. Relevance.

THE COURT: She can answer.

A. Can you repeat that one more time? I'm sorry.

BY MR. ROTHSTEIN:

Q. When you sent this email, did you make any assumptions about the information the defendant would provide or his cooperation?

A. No. I just figured that he would be able to provide us with whatever information that he had in regards to his statement and the photo.

Q. Did you have any reason to believe he wouldn't disclose all the information that was relevant?

A. No, no reason to believe that.

Q. In the course of that investigation, did law enforcement obtain a photo of a group of individuals around the BLM banner, trying to light it on fire?

A. Yes.

Q. Did law enforcement attempt -- sorry, did law enforcement attempt to identify the individuals in that photo?

A. Yes.

Q. During the course of that investigation, did anyone suggest that you reach out to the defendant to aid in that identification?

A. Yes.

Q. Who?

A. At that time, it was Commander Leslie Parsons.

Q. Why?

A. He was my direct supervisor while on the task force and he was included in the original email chain. The attempt was to determine what individuals were involved in the banner burning. And if we had that information, we could proceed forward with going -- obtaining an arrest affidavit.

Q. Prior to this investigation did you know who Enrique Tarrio was?

A. No.

Q. Did you direct anyone to call the defendant to obtain additional information regarding Tarrio?

A. Yes, that would have been Detective Franklyn Then.

Q. Why did you ask Detective Then to reach out?

A. Once the information was obtained -- Detective Mufti was, if I can recall correctly, he was on leave that particular evening. So we work together as a unit and Then happened to be working that night, so I requested that he follow up with Lieutenant Lamond and see what additional information he had so

we can go ahead and prepare an arrest warrant, if we had an identified subject.

Q. Did you ask Then to try to get an identification?

A. Yes.

Q. Did you also ask Detective Then to try to determine how well the defendant knew Mr. Tarrio?

A. Yes. It would assist in just establishing the relationship that they had between each other and how he was able to identify him.

Q. Okay. Would that go to the weight of the identification?

A. Yes.

Q. Now, was the defendant asked -- do you know if the defendant was asked to identify Tarrio in any pictures related to the BLM banner burning?

A. Yes. There was some pictures provided to Lieutenant Lamond after Detective Then spoke with him. There was a little confusion --

Q. Let me stop you at Detective Then. After Detective Then called Lamond, what happened?

A. Following that conversation, Detective Then came into my office and stated that he was unsure how to -- he was unsure how to explain how Lieutenant Lamond knew the individual in the photo and there was some confusion as to what their relationship was at the time. So he did not feel comfortable going forward with the identification because of that.

Q. And did he make an identification during the call with Then?
A. Not to my recollection.
Q. Okay. And what was your reaction when Then came in and told you this?
A. Well, I was unclear at that time as to what was going on. It really was not very clear how we had received the forwarded text tip, and then there seemed to be some confusion on how to identify him. And so that was kind of a subject in the office that we were talking about. We were trying to figure out how could we go forward with it? How did he know him? What was the relationship between the two? Because we had the email that had came in.
Q. And what did you do next? Then is in your office, you have this discussion. What did you do next?
A. I reach back out to Commander Parsons and just let him know that we had an issue with the identification.
Q. And what did Parsons say?
A. He wanted to know how we had confusion with the identification and I explained the conversation that was told to me. And his inquiry was something to the effect of, How do they know each other? Are they drinking buddies? You know, what is the relationship? And I, unfortunately, just couldn't answer that.
Q. At that point in time did the defendant notify you or

Detective Mufti or Detective Then that Tarrio confessed to him about burning the banner?

A. No.

Q. At that point in time, to your knowledge, did the defendant -- I'm sorry. Would that information have been helpful to your investigation?

A. Yes.

Q. Why?

A. Well, if it was a confession and that was information that was known, we would have been able to proceed with the arrest affidavit and bring this case to closure. It just would have helped with the investigation.

Q. So that was December 19th. Would you have been able to obtain an arrest warrant that day, if you had those two pieces of information?

A. We would have been able to at least -- I recall it being in the evening, but we would have at least been able to get the arrest warrant drafted and submitted.

Q. Okay. And did you ever ask the defendant to speak to Mr. Tarrio about the status of your investigation?

A. No.

Q. At any point in time did the defendant notify you that he had spoken to Tarrio about the banner burning investigation?

A. No.

Q. At that point in time, to your knowledge, did the defendant

notify Then or Mufti that he had spoken to Tarrio about the banner-burning investigation?
A. Not to my knowledge, no.
Q. Would that information have been helpful to your investigation, if you knew that?
A. Yes.
Q. Why?
A. Well, it would have been extremely helpful if we knew that there were conversations ongoing with a potential suspect for criminal investigation, that would be information that we would need to know.
Q. Okay. Did you later send additional photos of the banner burning and a news article to Parsons for Lamond to review in an effort to identify Tarrio?
A. Yes.
Q. And did the defendant respond?
A. There was -- from what I recall, there was an email that came back from Lieutenant Lamond.
Q. Okay. Showing you Government's Exhibit 4018, at 35.
Okay. Now, do you see, at the bottom, there's some photos and a news article?
A. Yes.
Q. Are those the photos and news article that you provided to Parsons?
A. Yes.

Q. Do you recall receiving this email?
A. Yes.
Q. What was your reaction? And if you need a moment to read through it.
(Pause.)
A. So the first part of the paragraph, it appears clear that Lieutenant Lamond was able to identify Mr. Tarrio. In the photograph he says it with 100 percent accuracy. He breaks down the descriptions in which Mr. Tarrio's dressed, the vest he's wearing, the drink, the patches, et cetera. And so it's pretty clear that he knows him of some sort from here.
Q. But this wasn't the photo that Then sent for him to ID Tarrio, right? These are additional photos?
A. These were additional photos.
Q. These aren't of Mr. Tarrio burning the banner, right?
A. I'm sorry?
Q. These aren't photos of Mr. Tarrio burning the banner, right?
A. No, these are photos just of -- just basically photos of him present, here in the District. But, no, at this point he's not lighting the banner on fire.
THE COURT: Did I hear you correctly when you said these photos that are now in an email that Mr. Lamond is sending to you and Parsons were photos that you had given -- you had given Parsons?

THE WITNESS: That is correct.

THE COURT: Okay. And that was in a separate communication? Or you don't know?

THE WITNESS: So the initial -- this is not the initial photograph that Detective Then had shared with him.

THE COURT: He had the burning photograph?

THE WITNESS: Right. He had a completely different photograph. These photographs were put together by another detective in our office. We were trying to establish if he recognized Mr. Tarrio in these photos right here.

The initial photo that was sent to us in a text tip displays Mr. Tarrio from, I believe, almost like the waist up and he's dressed very similarly. So additional photos were sent to Commander Parsons for him to review and share with the lieutenant to see if he recognized this person who's dressed almost identical.

THE COURT: So the commander sent these photographs to Lieutenant Lamond and asked him if he knew that person? These photos didn't come to you from Lieutenant Lamond in this email?

THE WITNESS: No, ma'am.

THE COURT: Okay. All right. Go ahead.

BY MR. ROTHSTEIN:

Q. To be clear, the photo that Detective Then showed to --

THE COURT: That was a different one.

MR. ROTHSTEIN: Right.

THE COURT: That was the one of him burning the flag.

BY MR. ROTHSTEIN:

Q. That was him lighting it on fire, right? That was somebody lighting the banner on fire?

A. From what I recall.

Q. Is it correct that the defendant did not identify Mr. Tarrio in the photo of him committing the crime?

A. Correct. There was not an identification that was made.

Q. So this photo where he's IDing him, that's just photos of him that day, is that right?

A. Yes. If it could be pulled back up, I can describe it.

Q. Could we have 4018, at 35.

A. So the photo to the bottom, as well as the photo to the right, the vertical photo, those were photos from the actual burning itself.

Q. In those photos, unlike the photo that Mr. Then had sent, is Mr. Tarrio actually committing the crime?

A. No.

MR. SCHAMEL: Objection. Misstates what the actual other photo states.

THE COURT: What does it matter?

The two photos you're saying are him at the scene of the flag burning, but it's not showing anyone burning the flag or him actually burning the flag?

THE WITNESS: Yes, ma'am.
THE COURT: Okay.
BY MR. ROTHSTEIN:
Q. The information in that second paragraph there, do you see that? "I forgot to provide some background." Do you see that?
A. Yes.
Q. Was that information that you had asked Then to obtain the day before?
A. Yeah. Then did not mention that the relationship had been established.
Q. So when you spoke to Detective Then, he didn't tell you that the defendant had provided any of that information, is that right?
A. Not to my recollection, no.
Q. Okay. Now at this point in time, this is the next day, the 20th, did the defendant notify you that Tarrio had confessed to being involved in the banner burning?
A. Not to my knowledge, no.
Q. Okay. And at that point, on December 20th, did you know -- did the defendant notify you that he had spoken to Tarrio about your investigation?
A. No.
Q. Okay. And those communications, could that information have been included in a warrant? Communications between the defendant and the subject.

A. Yes.
Q. And would that have affected the speed at which you were able to obtain a warrant?
A. I believe so, yes.
Q. Why?
A. The simple fact that we would have someone -- we would have the individual identify -- we had probable cause that the crime had been committed and if there was communication, we could have included that in there to support the affidavit.
Q. Okay. Now I want to talk to you a little bit about hate crimes. Generally speaking, what is a hate crime?
A. A hate crime is, in layman's term, a crime that is committed that has bias towards someone from a protected class.
Q. Is there a process by which MPD determines whether or not to investigate a hate crime?
A. So typically if a suspected hate crime occurs, a report is taken, like any other offense or incident, and there is a designation that the officers or the reporting person is able to notate in the report, that it is being suspected or looked at as a possible hate crime.
Q. Who is on that panel of people that decides that?
MR. SCHAMEL: Timeframe.
BY MR. ROTHSTEIN:
Q. In December of 2020, who was on the panel?
A. So in December of 2020, I don't know specifically who was

on the panel. However, when I took over in February of 2022, one of the first duties that was given to me was to be a part of the hate crimes panel.

Q. And in December of 2020, do you know whether or not the defendant was on the panel?

MR. SCHAMEL: Objection. She said she didn't know who was on the panel.

THE COURT: She just said she was on it.

MR. SCHAMEL: She was asked who was on it in December. "I don't know," she said, "but I know in February 2022 I wasn't on it."

BY MR. ROTHSTEIN:

Q. Is there anybody sitting at defense table that was on the panel in December 2020?

A. So what I will --

MR. SCHAMEL: Objection.

THE COURT: I heard your objection. She can answer the question. I'm not sure I got the chronology the same way you did, so I'd like some clarification.

When did you join the panel?

THE WITNESS: So I joined the panel in February of 2022.

THE COURT: 2022?

THE WITNESS: Yes.

THE COURT: So you were not on it at the time that

any decision was being made with respect to whether the flag burning was a hate crime?

THE WITNESS: No, ma'am. That position on the panel is broken up between the criminal investigations division, our special liaison branch, and the intelligence lieutenant or captain or commander.

THE COURT: Okay. So you know how a panel works in general from your experience since you've been on it, but do you know anything about the workings of the panel in connection with the flag burning?

THE WITNESS: So initially the --

THE COURT: From your personal knowledge.

THE WITNESS: From my personal knowledge, this was being reviewed as a potential hate crime. From the perspective in criminal investigations that we had, we were working with the FBI in reference to this being a hate crime, given the fact that this was -- the flag was taken from a historically Black church.

My experience on the panel, going forward from 2022, anytime there is a suspected hate crime, it typically goes before the panel and it's decided upon with that group.

THE COURT: At the time that you were involved somewhat in the investigation of the flag burning, did you know the individuals who were on the panel at that time?

THE WITNESS: No, ma'am.

THE COURT: Okay. Ask your next question.

BY MR. ROTHSTEIN:

Q. Was the lieutenant in charge of the homeland security bureau on the panel in December 2020?

A. I would say per MPD there is a special order that is pretty old within MPD, where the intelligence lieutenant or their designee -- it has to be a lieutenant or above -- whoever is assigned to the intelligence has to be a part of the hate crimes panel. I believe the order is very old, but from what I understand, they're viewed as the hate crimes coordinator. I don't specifically know, you know, exactly who else was there, but --

Q. And was this -- in connection with the banner-burning investigation, do you recall what discussion there was of investigating it as a hate crime, from what you knew at CID?

A. What we knew at the CID side, we work specifically with the civil rights division of the FBI. We were not a part of the hate crimes panel within MPD.

Q. And was it ultimately investigated as a hate crime?

A. No.

Q. As part of your investigation, did you ask the defendant to discuss with Mr. Tarrio whether MPD was considering investigating it as a hate crime?

A. No.

Q. Did you ever intend for Mr. Tarrio to be aware that MPD was

considering investigating it as a hate crime?

A. No.

Q. Would knowledge of that fact been helpful or detrimental to your investigation?

MR. SCHAMEL: Objection. Calls for speculation.

THE COURT: I think she can answer that.

A. Can you repeat that one?

BY MR. ROTHSTEIN:

Q. Would Mr. Tarrio's knowledge of the discussions internally at MPD about whether or not to charge it -- investigate it as a hate crime, would that fact have been helpful or detrimental to your investigation, if he knew what your internal discussions were?

A. Well, I think him -- he's the suspected suspect in this investigation, any information provided to him would have been helpful.

Q. Okay. And I'm just going to finish up with a series of questions. At any point in your investigation did you tell the defendant -- sorry, did the defendant tell you that he was still in communication with Mr. Tarrio?

A. No.

Q. Would that information have been helpful or detrimental to your investigation?

A. It would have been helpful, if we knew that there were communications going on.

Q. At any point in your investigation did the defendant tell you that he was communicating with Tarrio via Telegram and deleting those messages?
A. No.
Q. Would that information have been important to your investigation?
A. Yes.
Q. Why?
A. Well, again, it would show that there were communications being going on in regards to an investigation that we had ongoing.
Q. At any point in your investigation did the defendant provide you with any communications he was having with Tarrio?
A. No.
Q. Would that have been relevant to your investigation?
A. Yes.
Q. Was it part of the investigative plan for Tarrio to be made aware of what evidence MPD had against him?
A. No.
Q. Was it part of the investigation plan for Tarrio to be made aware of MPD's investigatory steps?
A. No.
Q. Was it part of the investigation plan for Tarrio to be made aware that MPD was working to identify him in a photo?
A. Can you repeat that question?

Q. Yep. Was it part of the investigation plan for Tarrio to be made aware that MPD was working to identify him in a photo?
A. No.
Q. If the defendant received that information, would it be helpful or detrimental to your investigation?
A. Repeat that question, please.
Q. If the defendant received information that you were trying to identify him in a photo from the crime scene, would that have been helpful or detrimental to your investigation?
A. Detrimental.
Q. I just have a few more. Prior to the arrest of Tarrio, did you have any direct communications with Mr. Tarrio?
A. No.
Q. Following the submission of the arrest warrant, did you ever alert Tarrio that an arrest warrant had been submitted for him?
A. No.
Q. Following the submission of the arrest warrant, did you ever ask the defendant to alert Tarrio that the arrest warrant had been submitted?
A. No.
Q. Did you want Mr. Tarrio to know about the arrest warrant?
A. No.
Q. Why not?
A. We typically do not tell defendants that we have an arrest

warrant for them.
Q. And did you hear -- as the individual who was supervising this investigation, were you made aware of anybody at MPD that told the defendant to have discussions with Mr. Tarrio about the status of his arrest warrant?
A. No.
MR. ROTHSTEIN: Nothing further.
THE COURT: All right. Any cross-examination?
MR. SCHAMEL: One moment, Your Honor.

CROSS-EXAMINATION

BY MR. SCHAMEL:
Q. Commander?
A. Captain.
Q. Captain. I keep getting it wrong.
A. It's okay.
Q. I thought -- were you a different rank when this began?
A. Yes.
Q. That's where I got confused. I'm sorry.
A. Not a problem.
Q. Mr. Rothstein -- I'm sorry. I'm Mark. I'm one of Mr. Lamond's lawyers.
Mr. Rothstein was asking you questions as the head of this investigation of BLM banner burning, right?
A. I'm sorry?
Q. He asked you, you said you -- he said the -- I forget his

exact words, but you were in charge of that banner-burning investigation, is that right?
A. So I was the sergeant of this unit, so I oversaw the detectives that were assigned to the riot task force.
Q. So Mufti and Then working on this are working under you?
A. Yes.
Q. Okay. When this investigation began, it began right after December 12th, correct?
A. Yes.
Q. And at some point you started to become aware that maybe Mr. Tarrio was involved, is that right?
A. Yes.
Q. And is that because Mr. Lamond came forward and volunteered that he knew Mr. Tarrio and sent that first email?
A. We learned first about Mr. Tarrio from the text tip email.
Q. The text tip email from Mr. Lamond?
A. From my recollection, yes.
Q. You had the phone tip, but that didn't come until --
A. I'm sorry, the -- I'm assuming that we are talking about the phone tip that I was shown.
Q. So the phone tip comes in, and that same day you hear from Mr. Lamond that he can identify him?
A. So we received the tip that was shown to me on the screen and that's when we learned about him.
Q. Do you remember the date of that?

A. No, but if you pull it back up, I can show you or I can tell you.

Q. I'm going to ask you to pull that up for me.

Were you aware, as the sergeant of this investigation, that on December 18th of 2020 Mr. Tarrio posted on his certified -- excuse me, verified Parler post that he was the person who had burned the Black Lives Matter banner?

A. I don't recall the date specifically, but I do remember hearing about a post.

Q. I'll pull that up next for you.

THE COURT: Well, there's two different questions. There's when he posted it and when you became aware that he posted it. Do you know when you became aware that he posted it?

THE WITNESS: Not offhand specifically, just trying to recall a date, but I'm sure shortly after.

BY MR. SCHAMEL:

Q. The discussions you were just having with Mr. Rothstein about the various emails between you, Commander Parsons, Mr. Lamond about the photo identification, that was all after Mr. Tarrio's Parler post, was it not?

A. That I don't know, sir. I don't have the specific dates in front of me.

Q. We're trying to pull them up. The date of the emails you were just looking at with Mr. Rothstein, those were December

20th?

A. If you can pull them back up? I don't have them in front of me.

Q. Can I just do this? 4018. 4018, Bill. Page 30.

Do you see that in front of you, Captain? Looking first at the top, that top box, that's the email from Franklyn Then. That's the photograph that was at issue, correct? The original photograph?

A. It appears so.

Q. The date of that is December 19th?

A. December 19th.

Q. Okay. And then all of the emails that Mr. Rothstein just discussed with you where Mr. Lamond is following up and giving more information and he's provided with additional photos that he's identifying, those all come subsequent to that first email, correct?

A. If you can pull them back up, I can read the date for you.

Q. So, Bill, we'll go to the same exhibit, page 34.

Do you see that, in the bottom right-hand corner, shows you the date, 12-20, 6:02.

A. Yes.

Q. Pull up page 35.

This is the additional set of photos that Mr. Lamond then was able to positively identify Mr. Tarrio. That's on December 20th, correct?

A. Correct.
Q. Okay. Let's go to -- we're on the same exhibit, Bill, 4018, page 13.
Let's start with the top box. Do you see that?
A. I can see the top box where it says, "From Enrique Tarrio to Parler."
Q. Okay. Do you remember having seen the Tarrio Parler post on his verified parlor account?
A. It's been quite some time, but I do believe it was posted on the Parler account, right.
Q. In that he actually said this was not a hate crime, right? Take a minute to read it.
A. According to the text -- so in the text he states that the FBI was currently investigating this as a supposed hate crime.
Q. Right. Because the FBI had actually issued something on their verified Twitter account indicating that they were investigating a hate crime for the burning of the banner, right?
A. Are you asking or telling?
Q. I'm asking.
A. If you pull that up as well.
Q. We can do that next. Were you aware that MPD had issued a press release also, indicating that they were investigating this as a hate crime?
A. That I do not recall.

Q. Can you get those both ready for me, Bill.

While you're doing that -- before you leave this page, Bill -- look at the bottom, the other box, do you see that in the bottom of page 13, from Enrique Tarrio to *The Washington Post*, Mr. Tarrio tells *Washington Post*, in a telephone interview, that he burned the BLM banner. Bottom date, 12-18-2020.

A. Correct.

Q. Were you aware of that?

A. It's been a lengthy amount of time, sir, but --

Q. Were you aware of that before December 19th?

A. I don't believe I was.

Q. Were you aware of that before December 20th?

A. I'm not sure.

Q. So Mr. Tarrio, on two different mediums, has admitted that he was the person that burned the Black Lives Matter banner, right? Is that probable cause?

A. Possibly.

Q. Why wouldn't it be?

A. I don't know. I mean, people say a lot of things. They don't necessarily mean that they are true. These are statements that are being provided, that this person is making these statements.

Q. Okay. But on December 19th, you said you had focused your investigation on Enrique Tarrio, is that right?

A. That is correct.
Q. And on December 20th you were still trying to get a positive identification of Enrique Tarrio for burning the banner, correct?
A. That is correct.
Q. And this is on December 18th, in two different formats, a man verified as Enrique Tarrio on the Parler account and someone who has spoken to *The Washington Post* has said, "I burned the Black Lives Matter banner." So I'm asking you: Was that not probable cause?
A. So I'm not an expert in verifying anything that necessarily goes to *The Washington Post* or to Parler. So could I say that, being probable cause? I don't know if he actually wrote this or if someone else wrote this.
Q. Did you issue a subpoena or do anything to Parler to try to verify that?
THE COURT: Do you know when you found out that he posted on Parler?
THE WITNESS: I don't recall the date that we -- offhand, when we found out about this, no, ma'am.
BY MR. SCHAMEL:
Q. Are you a aware that Mr. Lamond actually forwarded that email to MPD that showed that he had done this on Parler? Do you remember seeing that?
A. If -- could you show that email?

Q. I'm looking for it. I want to show it to you. Give me one moment.

(Pause.)

While I'm looking for that, Mr. Hinger's got the next page I want to show you.

Look at the bottom of page 20 of 37 on that same exhibit. That's the email that came in and you're copied on it. You were part of the group of the "et al." Do you remember getting this?

A. The one at the bottom?

Q. Yes, ma'am.

A. Yes, I'm a part of the email distribution list on this one, at the bottom.

Q. And that's when he came forward and said let me help with the investigation, right?

A. Yeah. He just states, "Please let me know if you need anything related to this. I know him, so I can probably fill in any blanks you may have. I have attached his picture for your awareness."

THE COURT: It says, "Re: Phone tip." So was there an earlier email that got sent around saying we got a phone tip?

THE WITNESS: So I do not recall the actual phone tip. If that photograph can be pulled up? I do recall this one because I'm looped into this particular portion of the

email.

BY MR. SCHAMEL:

Q. Were you aware that on December 22nd Mr. Lamond also gave 100 percent positive identification of the podcast that Mr. Tarrio admitted to having burned the Black Lives Matter banner?

A. That I don't recall.

Q. You don't recall?

A. Uh-huh.

Q. Could you pull up, Billy, 4019, page 3.

MR. HINGER: 4019 or 4018?

MR. SCHAMEL: 4019, page 3.

I think the problem here, Your Honor -- I apologize. I just think my book is mislabeled on some of them. My apologies.

BY MR. SCHAMEL:

Q. Top right-hand corner. Take a look at that. Do you recognize that?

A. So the top right-hand corner is between Lieutenant Lamond and Commander Parsons.

Q. You didn't get that one?

A. I do not see myself on this email.

Q. I'm asking: Do you recall receiving it or receiving the information that Mr. Lamond had been able to identify Mr. Tarrio's voice?

A. That I don't recall.
Q. And just so we're clear, because we bounced around a little bit here, when Mr. Lamond received those additional photographs that the judge even asked you a couple questions about, those were from the same event?
A. The photographs from the bottom photograph, as well as the one that's vertically positioned on the right, those were from the banner burning.
Q. And once he received those, then you got the 100 percent identification, correct?
A. Well, those photos were sent from me to Commander Parsons, who then forwarded them to Lieutenant Lamond, and then that's when we received his reply back.
Q. So let me make sure -- and I'm not going to be focused so much on dates as I am on sequence. You get a phone tip, correct?
A. I get the email forwarded from Lieutenant Lamond in reference to the phone tip. I didn't receive the phone tip directly to me.
Q. So the first you heard about Tarrio was Lamond bringing it to your attention. You didn't know the phone tip had come in?
A. Well, the phone tip did not come in directly to us. As I mentioned before, the way the command information center works, they field tips that come in, be it phone, email, or text, and they're disseminated to the appropriate unit, be it CID or if

it's going to intelligence.
Q. I guess I didn't understand that when I was hearing you testify. So what you're saying is, that phone tip never even came into CID, it went to intelligence?
A. As far as I'm concerned, I believe that phone tip was -- that tip that was shown to me was forwarded to intelligence. That did not come directly to us, from my recollection.
Q. And so the first that you, the sergeant at CID, heard about it was when Mr. Lamond brought it to your attention?
A. From my recollection, yes.
Q. Were you already working the banner burning at that point?
A. By that time I believe I was. I don't remember the date on the phone tip offhand, but I believe we were already working that.
Q. Okay. Because the burning was on the 12th.
A. Correct.
Q. And this was a few days later?
A. Right.
Q. So Lamond brings you the phone tip when he also says, "I know Tarrio"?
A. His statement that's directly in the phone tip is the statement that we received.
Q. Gotcha. And then you have Then call Lamond, right?
A. Correct.
Q. Lamond says, "I can't do a positive ID from the photo where

they're crouching down," right?
A. So I was not privy to the direct conversation between the two of them. As I stated, Detective Then came into my office and had confusion with the identification.
Q. Okay. So then you reached out to Parsons?
A. Correct.
Q. Parsons reached out to Lamond?
A. Correct.
Q. Ultimately Lamond then got more photos?
A. Correct.
Q. All within the course of about a day?
A. Correct.
Q. And then he said, "From those photos, I'm confident"?
A. He states that he has 100 percent confidence in some of them, but then in the first paragraph -- I can't recall it verbatim, I'm sure you have it -- he speaks about it and then the later part he speaks a little bit more about his relationship.
Q. Page 35, Bill.
Would it help you to see it?
A. Sure.
Q. That's the one we're talking about?
A. Yes, um-hum.
Q. Okay. And then, so as soon as he go these additional pictures, there was no delay and he gave you the

identification?
A. I don't know exactly when we sent them over, but I sent the pictures over to Parsons and this was the response that we received from that.
Q. So it sounds like -- this is a blowup of the photo that's embedded on page 34 of 37, the December email between Lamond and Parsons. This is the photo that's at issue. We've seen smaller ones, but this is the photo that was the original photo, correct?
A. As far as I recall.
Q. All right. And you understand, and your belief is, the man on the far right holding the cup is Mr. Tarrio?
A. Based off of the patches and the can that's positioned within the vest.
Q. Okay. But not based on the face? You can't make it out from the face, can you?
A. His face, he's actually looking more so to the ground than he is forward.
Q. Okay. So, but from what he's wearing and the cup and the things that are with him, exactly like Mr. Lamond said, you can identify him, but not from the face?
A. His face is looking down. I could go based off of just the clothing and the placement of the items within the vest.
Q. Okay. And if you look at the three hands, there's three hands down below, right?

A. Correct.
Q. Isn't that Mr. Lamond -- Mr. Tarrio's hand in the far right of that photograph?
A. I'm sorry. Can you repeat that one?
Q. There's three hands, two with lighters and one without?
A. I see two flames, three hands.
Q. There's no lighter in Mr. Tarrio's hand, is there?
A. I can't say what's in his hand. I don't know what is in his hand.
Q. Certainly not a flame?
A. I don't see a flame.
Q. Okay. So other than not being able to identify the face, everything Mr. Lamond gave you in all the subsequent communications was accurate, correct?
A. As far as I know.
Q. And helped you get probable cause?
A. Well, we had probable cause that the item was burned. Our issue was trying to identify those who burned it.
Q. Okay.
A. So with probable cause we need both, as you know. So we needed identity of the individual who committed the crime.
Q. There's three individuals in this photo?
A. I agree.
Q. Was anybody ever prosecuted other than Mr. Tarrio?
A. Not to my knowledge, no.

Q. Did you ever get any other suspects named?
A. No.
Q. The only suspect you got named, Mr. Tarrio, originated when Mr. Lamond brought that to you, correct?
A. Correct.
MR. SCHAMEL: Thank you very much, Captain. And I apologize for the mistake at the beginning.
THE WITNESS: Not a problem.
THE COURT: All right. Any redirect?
Actually, we usually break at about 3:30. Does anybody need to do that now, or you want to finish? You want to do your redirect? All right. Well, I was actually looking at my staff here, but --
MR. ROTHSTEIN: Very brief.
THE COURT: Okay. We'll keep going. All right.
MR. ROTHSTEIN: Can we bring up Exhibit 1017. Can we go to the email at 2:39 Eastern.
THE COURTROOM DEPUTY: It's not displayed yet. You need to plug it. I'm not getting any feed from her computer.
I'm not getting any feed from her computer.

REDIRECT EXAMINATION

BY MR. ROTHSTEIN:
Q. All right. Do you recall being asked some questions about whether or not you only learned about the -- whether or not the phone tip had only gone to the intelligence division? Do you

recall being asked questions about that?
A. Yes, whether or not the -- where the phone tip came to.
Q. Right. And do you recall, Mr. Schamel hinted that you wouldn't have learned of this tip if --
MR. SCHAMEL: Objection. Characterization.
THE COURT: Well, we've all been characterizing each others questions for three or four days now. We're not going to start being fussy about that. Just ask the question.
BY MR. ROTHSTEIN:
Q. What's CID?
A. Criminal investigations division.
Q. That's different from the division that the defendant was in, right?
A. Yes.
Q. Okay. And CID was the division you were in, is that right?
A. That is correct.
Q. And do you see CID's mailbox on this phone tip?
A. So I do see the CID admin box on the phone tip.
Q. Okay. And this is before Mr. Lamond forwarded you the email where -- forwarded you this email with the tip, right? This is at 2:39 on December 18th. And then if you just go back to the defendant's email.
Do you see that?
A. I do.
Q. And that's at?

A. 19:49.
Q. So CID got the phone tip, right?
A. It went to the admin box, correct.
Q. Can you bring up -- one last question.
MR. ROTHSTEIN: One moment, Your Honor.
(Pause.)
MR. ROTHSTEIN: Nothing further, Your Honor.
MR. SCHAMEL: May I ask one question?
THE COURT: Just with respect to that.
MR. SCHAMEL: That's all.

RECROSS-EXAMINATION

BY MR. SCHAMEL:
Q. Captain, did you ever receive anything from the admin box at CID with that, or is the only place you got it from Lieutenant Lamond?
A. I do not recall receiving anything from the admin box.
MR. SCHAMEL: Thank you.
THE COURT: All right. You can step down. Thank you very much.
THE WITNESS: Thank you.
THE COURT: All right. We're going to take our break for about ten minutes.
(Recess from 3:49 p.m. to 4:07 p.m.)
THE COURT: All right. Mr. Rothstein, do you have any other evidence to introduce?

MR. ROTHSTEIN: No, Your Honor. At this time the government rests.

THE COURT: Okay. Mr. Schamel, do you have -- Ms. Jara, do you have a motion?

MS. JARA: Your Honor, we do have a motion. Very quickly, before we get into that, I just wanted to make the Court aware, Tarrio's lawyer, I believe, has to leave, right? tonight, and so --

THE COURT: Do you think we're going to finish his testimony between now and 5 o'clock?

MS. JARA: I -- that's a question for Mr. Schamel. I'm not taking this.

MR. SCHAMEL: I'm anticipating 20 minutes of direct and the government tells me about a half an hour of cross. And so, we would just -- what we were going to suggest -- I don't know if Your Honor has any flexibility beyond five. But if we could just -- unless Your Honor had a specific question that would somehow influence what we were putting on as relates to MGOA, we're just going to ask -- we talked to the government about putting it on for the morning.

THE COURT: It was my preference that we do it in the morning. It's my strong preference we do it in the morning because I've been sitting here all day and I think his testimony should not be broken up, if we don't finish, and I'm not going to ask my staff to stay late. So I thought when she

was saying the lawyer has to leave, she didn't mean leave D.C., she meant leave the courtroom.

MR. SCHAMEL: She meant leave D.C. He has a sentencing tomorrow in federal court in the Southern District of Florida, Your Honor.

THE COURT: Does he want to be here when his client testifies?

MR. SCHAMEL: I think he does. I don't know if you want to hear from Mr. Hassan?

THE COURT: So are you saying you want to do it tomorrow morning? You want to do the Rule 29 tomorrow morning?

MR. SCHAMEL: I was suggesting that we push the Rule 29 to tomorrow, unless Your Honor had any specific questions that you thought would somehow play into what was going to happen in the defense case. Sometimes at bench trials, many times judges ask, they have a specific question about a specific thing about one of the charges they're looking to toss on a Rule 29. But if not, we would just call Mr. Tarrio and put the Rule 29 tomorrow.

THE COURT: I was expecting to hear what you were -- where you thought the holes in the case were, which would prompt whether I have questions for the government or not. I would probably reserve -- I mean, I don't have a problem if you want to make your motion for the record now and then we defer the argument. But, I've watched everybody in this courtroom

since Monday. There hasn't been a single efficient, nonrepetitive direct or cross since we started.

So if you actually think we're going to do it with this -- your very important defense witness, I'll let you start. But I don't have a lot of confidence that you're going to finish.

MR. SCHAMEL: Your Honor, I'll make the motion, for the purposes of the record, on the Rule 29, ask the Court to permit us to defer argument until the morning. And I would like to call my first witness, if I may. And I will endeavor to get this done as quickly as possible.

Again, I would rely on Miss Ross, her recommendation, what she thinks she's going to ask. Are we at a hard stop at 5 o'clock?

THE COURT: Just about. I mean, it's not fair to the people that have been in this courtroom since 9 o'clock this morning.

MR. SCHAMEL: I understand.

THE COURT: And I know that the clerk's office doesn't particularly like me to hold everybody overtime.

MR. SCHAMEL: The marshals indicated the same thing.

THE COURT: The marshals, the same thing. It's not fair. What time does the bus leave to go back to D.C. jail?

MR. SCHAMEL: Mr. Tarrio is going to Virginia. He's going with just two marshals and a car.

THE COURT: Still, I, frankly, think that we're putting a lot -- is the lawyer still in the courtroom?

MR. SCHAMEL: He is, Your Honor.

THE COURT: Is there --

MR. SCHAMEL: May I have a moment? I'll speak to him.

THE COURT: Yes. I mean, I don't know if he's got associates here with him, but I -- you know, I've been saying this to you all day yesterday, when you said we're going to do it right at 3, now it's 10 after 4.

MR. SCHAMEL: As an accommodation, Your Honor, would it be possible, with the court's technology, to allow Mr. Hassan to listen to the testimony in realtime by telephone tomorrow from Florida, if he were to return to the Southern District this evening? I have not conversed with the government about their position about whether that would cause any issues.

I'm not suggesting he's going to participate, but as his counsel, some of the issues that were raised before -- I don't want this to go off the rails. And Mr. Tarrio has expressed a strong interest in having Mr. Hassan here, who did fly in this morning to be here.

THE COURT: All right. Mr. Hassan, you understand if you -- if we permit you personally to listen to this, there are rules that prohibit the broadcast of matters that were changed

during COVID so that we could have people phoning in. As a participant in the trial, I think I have the authority -- and I'm happy to exercise it -- to permit you to dial in personally from your office, or wherever you are, to listen to your client's testimony. But I can't permit you to gather people around to listen to it or share it with anybody else.

So can you dial in yourself, without sharing it with anybody else? I'm not -- I've got to enforce our court rules about this.

MR. HASSAN: May I approach?

THE COURT: Yes, please. Come right in.

I guess we had you by video before, not in person.

MR. HASSAN: Good afternoon, Judge. First and foremost, Judge, my apologies for any inconvenience this may have caused, Judge. But, unfortunately -- I flew up here this morning, Judge, for the express purpose of his testimony and --

THE COURT: Right. And no one told you his testimony was going to be this morning.

MR. HASSAN: I didn't perceive when it would be at some point today, Judge. I have a federal sentencing before United States -- United States versus Nancy Joanna Bowels, tomorrow morning before the Honorable Judge Scola in the Southern District of Florida. That matter is scheduled to start at 9:30. I estimate that to be no longer than 30 minutes and then, immediately thereafter, I can log in by phone and

listen to the testimony at that point in time.

THE COURT: All right. Would you want to start it later? I mean, if we actually -- you don't have time to come back, do you?

MR. HASSAN: I wouldn't be able to come back to Washington, D.C. and just be here for the testimony. So, Judge, if we can start --

THE COURT: Pick up tomorrow at 10:30 in the morning?

MR. HASSAN: That's what I was about to say. If we can start at 10:30, and that can accommodate and I can listen to it completely.

THE COURT: But then you need to be by yourself in a conference room and not with anybody else.

MR. HASSAN: Understood, Judge. I'll make -- that's not a problem, Judge.

THE COURT: All right. So as an officer of the court, you're assuring me that's what you're going to do?

MR. HASSAN: Absolutely.

THE COURT: Does anybody have an objection to proceeding in that manner at this point?

MR. SCHAMEL: There's not --

THE COURT: I just don't want to be -- they're doing their cross and the marshals start to get itchy and then there starts to be a problem. I want to do this in a not rushed, appropriate, complete fashion. This is your case, this is

important. I want to do it right.

MR. SCHAMEL: I apologize. I hadn't considered the idea of telephone until just a moment ago. So if Your Honor is fine with that, we're fine with that. And I did request an opinion of the government and they said they're fine with that.

THE COURT: We'll resume with the testimony of the -- we'll put the defendant's case on beginning tomorrow at 10:30 in the morning.

So, now, I could hear a little bit about your Rule 29 motion, since we're here, if you're prepared to tell me about that.

And you, sir, can be excused because we're not going to call your client this afternoon.

MR. HASSAN: Judge, may I be permitted to go into the facility?

THE COURT: I don't know. That's up to the marshals.

MR. HASSAN: I don't think the marshals will have a concern, but I just wanted to address it with the Court first, before I address it with the marshals.

THE COURT: Ms. Ross, do you have a preference about which way we should go here, about any of this?

MS. ROSS: No, Your Honor. I do think there's some housekeeping matters we can address now. The one thing that I did want to flag is, because I don't -- I know there's no jury here, but I don't think we ever, kind of, got issued final --

or, reached agreement on the final, quote, jury instructions that we would have in this case, or agreed to the elements that we had to prove here. So I think that could be helpful, perhaps, Rule 29 and certainly for closings, just to make sure --

THE COURT: We'll talk about that between the close of the evidence and closing.

I think I received, in the joint pretrial statement, you had the standard Red Book instruction for obstruction because it's the D.C. obstruction of justice, and then the standard federal false statements. So I think we're all pretty close as to what the elements are. And I've used the false statement statute in other cases, but we can confirm.

No, I think it's important for us all to be agreed, before you close, what the elements are. They probably don't need to put it on a PowerPoint and show it to me. All right. Okay.

MS. ROSS: Thank you, Your Honor.

THE COURT: All right.

MR. SCHAMEL: If I may, Your Honor. The only thing I'll add is that we've spent a lot time the last couple days going through our witness and paring it down. We're going to, obviously, let the government know this evening who else we may call tomorrow. But, to be candid, we have one or two possibilities, at most, so -- and then we have to, obviously,

discuss with Mr. Lamond if he wants to testify. But I think we're going to be done with this case for closings by midmorning Friday, is my estimation.

THE COURT: Okay.

MR. SCHAMEL: Even with a delayed start tomorrow to deal with that.

THE COURT: So if you have other potential witnesses, they need to be here tomorrow.

MR. SCHAMEL: Understood.

THE COURT: I am supposed to have a sentencing on Friday morning that I have been quite vehement about not postponing, so I'm not going to postpone it. However, I am not entirely certain whether I'm going to get a motion to continue it this evening, tomorrow, that morning. So I can't tell you -- I may very well have a sentencing in the morning on Friday, which would mean you would close after that's over.

MR. SCHAMEL: All I'm saying is unless I'm missing that the government has five or six or so people up their sleeve for some rebuttal case that we're not anticipating, this case will be done midmorning Friday.

THE COURT: I'm telling you, it probably won't. So, for what it's worth. I mean, your case, but not your closings and all that.

Mr. Rothstein, anything you want to add to this discussion before I let Ms. Jara argue her 29 motion?

MR. ROTHSTEIN: Yes, Your Honor. One point Mr. Schamel just made. We were told on Monday by Mr. Schamel that they were going to have an expert witness, Peter Newsham, the former chief of the Metropolitan Police Department. And then today we were told that they are going to call him as a fact witness.

Our understanding is that he left the department around December 20th, before most of the conduct here. And, so, we had asked for a factual proffer about the relevancy of his testimony because we may want to move in limine.

THE COURT: All right. Is he one of the one or two people that you're going to have? I don't think this is a big mystery anymore, we can talk about what it is.

MR. SCHAMEL: Yeah, he is one of the two people -- one or two people, we have to speak to him this evening, just to go through some of the things that we want to ask him about before we can make that factual proffer. Frankly, I don't know why I'd have to make a factual proffer. He was the chief of police of the D.C. Metropolitan Police Department during almost the entirety of the issues at issue in this case.

THE COURT: Okay. I'm just asking at this point. At one point you said he was an expert, another time you're saying he's a fact witness. Is he going to talk about the general orders, is that the point?

MR. SCHAMEL: On Monday, when -- because we didn't

have an expert, we didn't notice him as an expert, we didn't have him available. Based on some of the testimony that came in from the government's witnesses on Monday, we were considering whether we would call him as an expert. So I immediately let Mr. Rothstein know. I said, I don't know we're going to do it, but if we are, I want to let you know. I'm not going to -- I'm not sandbagging anybody here. He said, well, you have to give us a report. Well, if there is one, and there is not.

So I've been talking to him. I'm going to speak to him again this evening to make a determination if he's a relevant fact witness. I don't think it would be expert testimony about the general orders and things because he was the chief of police.

THE COURT: It would be factual testimony about the general orders --

MR. SCHAMEL: Correct.

THE COURT: -- the same thing we've been eliciting from various other witnesses, you want to elicit from your own witness?

MR. SCHAMEL: Exactly.

THE COURT: All right. Is there anything else you need to know?

MR. ROTHSTEIN: No, Your Honor. We just wanted to make sure that he wasn't just going to be testifying as to

hearsay, that was our main concern.

THE COURT: Well, we all know about the hearsay rule now.

Okay. Ms. Jara, your turn. Hurry, get to the lectern before anybody else grabs it.

I just want to say to the marshals, once the lawyer is finished, the witness is yours and you can take him back whenever you need to take him back and just have him here when we said tomorrow.

MS. JARA: Your Honor, at this time the defense moves for judgment of an acquittal because the government's evidence is insufficient to sustain a conviction on any of the four charges. So I'm going to attempt to break up this argument into two, the false statements and then the obstruction.

So beginning with the false statements claims, there's three of them, obviously, and one of them is a statement of fact, and it's whether or not Mr. Lamond informed Mr. Tarrio that Mr. Tarrio had an arrest warrant. The other two, one about whether or not the conversation was more one-sided, and whether or not Mr. Lamond tipped Mr. Tarrio off to the MPD investigation are opinions. They are what Mr. Lamond believed was happening and they're also what Mr. Lamond believed was being asked of him during the course of the interview.

And I think it's important here to keep in mind that

the context of the interview, as was testified to today by Agent Ricardi, was that they had told Mr. Lamond that there was -- that Mr. Tarrio had some information and they weren't sure how he got that information. So the purpose of the investigation -- or, the purpose of the interview with Mr. Lamond was to figure out how Mr. Tarrio got that information. Specifically, obviously, whether Mr. Lamond gave him that.

So with respect to the third false statement, which is the fact one, that Mr. Lamond said, quote, Didn't you know? inform him that he had an arrest warrant, meaning Mr. Tarrio. The government's evidence on that that they have presented to date is that there was a self-timer set while Mr. Tarrio was on a plane here to D.C., that that self-timer was set by Mr. Lamond. And then at about 30 minutes later Mr. Tarrio messaged one of his contacts that there was a warrant out.

There is no evidence, the government has not presented any evidence that Mr. Lamond sent a message at that time, as Ms. Cain testified. But, also, there is no evidence that Mr. Lamond actually told Mr. Tarrio about the arrest warrant. So with respect to that charge, it's not possible, we would argue, for the government to -- they have not proved that Mr. Lamond knowingly and willfully made a materially false statement to the AUSA investigators.

With respect to the other false statements, the two

opinions, I'll start with the one-sided. Again, if we look at that particular line of questioning, the agent asks him, "Would it be common for Mr. Tarrio to fish?" And in Mr. Lamond's response he says, "No, not really. He never really asked me questions about, like, you know, what we were doing or anything. It was more, you know, one-sided, with just him telling me, you know, what their plans were."

So he is simply answering the question of whether or not Mr. Tarrio usually fished. And I'm not going to belabor this point because we went through, I think, a day and a half of testimony where Ms. Hadley testified about all of the times where Mr. Lamond would reach out to Mr. Tarrio and Mr. Tarrio would tell him where he was going to be, where the protests were happening, who was going to be there, how many people.

THE COURT: I don't think the government's case is that he did not solicit information from Mr. Tarrio. I think the government put all those in evidence and they're in evidence and they are part of your argument that at all times he was doing his duty. But, the question was, on a parallel track, was he also answering questions that Tarrio put to him or giving Tarrio information? So the fact that there's evidence -- I don't think that the fact that there's evidence of him asking Tarrio what he was supposed to be asking Tarrio is contrary to -- I don't think it has anything to do with the question of whether that particular statement is true or false.

MS. JARA: Right. So I would just say, Your Honor, I think that it relates to the way in which Mr. Lamond got information from Tarrio. So if it was that Tarrio kept being, like, for example, Hey, what's happening here? Hey, what's going on with this investigation? Hey, can you tell me about this guy? Hey, can you tell me what's happening here?" Then if Mr. Lamond had said no, he wasn't fishing, then that might not necessarily be accurate, that might be a false statement.

But in this instance, with the question asked about whether or not he was fishing, the types of communications that they were having, I think, are relevant for that question about whether or not he was fishing. And if by Mr. Lamond saying, in response to a question like that, that it was one-sided, that that's the relevant inquiry on the false statement, for the first false statement claim.

THE COURT: Okay.

MS. JARA: With respect to the second opinion testimony -- or, I'm sorry, the second false statement, the "without tipping him off to the MPD investigation," again, this is an opinion.

THE COURT: That he tried to find -- "without tipping him off," that is an opinion about what? It's an opinion whether you were tipping someone off, as opposed to a fact?

MS. JARA: So, Agent Molnar asked, "What were those conversations like?" He's referring to the conversations from

December 12th to January 4th. And I think that the answer to that is Mr. Lamond was saying that it was part of it, that he was getting the intel, but it was also part of it that he was not tipping him off. To Mr. Lamond, he was not tipping him off.

None of the information that Mr. Lamond gave him, in Mr. Lamond's mind when he was answering that question, as is evidenced by what he says in the transcript, was not -- was either public, publicly available, or was going to become publicly available. So there was nothing that he was giving --

THE COURT: How is telling somebody something that is not yet public, but might be public later, how does that fit in the category of not being a tip-off?

MS. JARA: So let me rephrase that, Your Honor. When -- let's take, for example, the IDs. So I think what I mean to say is that it wasn't actually material, that's what I think I wanted to clarify on. So if we're thinking about the ID, when Mr. Lamond told Mr. Tarrio that he had IDed him, I think that based on Mr. Lamond's answer to this question to Agent Molnar, that Mr. Lamond did not believe that that was tipping off, because at that point Mr. Tarrio had confessed in numerous ways and Mr. Tarrio believed that he was -- that he had confessed to a crime and so he was going to be arrested and he was going to learn about who IDed him. So I don't think that necessarily --

THE COURT: So it wasn't a tip-off because it wasn't material to Mr. Tarrio or material to Mr. Lamond?

MS. JARA: No, it wasn't material to the investigation.

THE COURT: "Materiality" is a funny word to use because we've got it as an element of a false statement.

MS. JARA: Right, right. It wasn't necessary -- it didn't matter to the investigation.

THE COURT: Okay.

MS. JARA: For --

THE COURT: It was an irrelevant piece of information.

MS. JARA: Right, right. Yes, that was a better choice of words.

THE COURT: So he's free to share it?

MS. JARA: Yes. Based on what we've heard today -- or, I guess, over the course of four days, Mr. Lamond was free to share that with others. And I think that we get that from the testimony of, for example, like Mr. Ciapa, who testified that there was no definition about confidential, no definition about what law enforcement information was. I think that we get that from the testimony of -- I believe Carroll today testified, you know, it might have been improper as it relates to what other police officers said, but no one could point to a regulation, a policy, a statute, anything that indicated that

something like that couldn't be shared with Mr. Tarrio.

THE COURT: The question was -- the thing that I have to determine, whether it was false, was when he said, I was trying to find out information from Tarrio about Tarrio's involvement in the destruction of the banner without tipping him off to the MPD investigation, to what we knew what we had.

MS. JARA: Correct.

THE COURT: So whether what he is telling him is important or not, how does that bear on the truth or falsity of that statement?

MS. JARA: Just so I understand, when you say "he," do you mean Mr. Lamond?

THE COURT: Mr. Lamond. The allegation in the indictment is that Mr. Lamond was speaking falsely when he said: I, Mr. Lamond, tried to find out information from Tarrio about Tarrio's involvement in the destruction of the banner without tipping him off to the MPD investigation, and that that was false because he knew that he had been giving, allegedly, Mr. Tarrio information about the investigation.

So what you're saying is the things that he told Mr. Tarrio may have been about the investigation, but they weren't a big deal. Why -- how does that make the statement true?

MS. JARA: So I would actual say -- and apologies, Your Honor, perhaps my argument wasn't as clean as I wanted it

to be. I think that there were two things that I wanted say. The first is with respect to Mr. Lamond's statement, specifically about I was -- that was part of it, and the other part was I was trying to find out, without tipping him off to the MPD investigation. That is Mr. Lamond's response to a question of what were the conversations from December 12th to January 4th like with you and Mr. Tarrio.

And so that is Mr. Lamond telling Mr. Molnar that it is my opinion that from December 12th to January 4th, how our conversations were, what our conversations were like, to me, was that I was trying to get intel and not tip him off.

THE COURT: And you're saying that question, What did your conversations consist of? This is what they consisted of, calls for an opinion?

MS. JARA: Well, that's -- let me try again, Your Honor. That's not exactly what I am trying to say. What I am trying to say is the way that the question is phrased, What were those conversations like? it's the "conversations like" that I think calls for an opinion. And I think when Mr. Lamond answered that question, he was answering it as if Mr. Molnar was saying, you know, was it an aggressive -- were you guys having an aggressive conversation? Was he hesitant to give you information and so you felt a need to share in, like, a bit of a quid pro quo situation? Or was it more like, Oh, you know, what are you doing today? and then he just, you know, tells you

things? Or was it friendly? Was it cordial? That sort of thing.

THE COURT: Okay. Well, if that's what it was calling for, he certainly didn't answer they were just friendly, we got along great, we had a good relationship, he talked about the content of the conversations.

So the question is, was his characterization of the content of the conversations and not just the tone -- you're saying it's a characterization, it's not a fact. It's his personal opinion as to what the content of the conversation was?

MS. JARA: No. I would say it's his personal opinion about what the conversations were like, which is what Mr. Molnar asked him. When we're talking about -- and I think that that's evidenced by the rest of the --

THE COURT: I take the point that it's a vague question.

MS. JARA: Yes.

THE COURT: I'm trying to figure out, since you've now come up with multiple reasons why the answers -- I should find that the answers were truthful --

MS. JARA: Sure.

THE COURT: -- is whether you're saying that -- it's true that an answer to that question, What were those conversations like? could have been a characterization of we

had a very friendly and cordial relationship, I didn't have to extract information from him, he was a willing source. And that would have been a characterization/opinion.

MS. JARA: Um-hum.

THE COURT: And maybe that's what the officer was calling for, I don't know, but that wasn't what the answer was.

So it's still your position that what he said was just a generalized characterization that you can't really call true or false because -- Mr. Schamel is nodding now -- it's his characterization of it all.

MS. JARA: That's right. And I think that if you -- if the Court were to read the rest of his response, he actually is not -- he doesn't talk about the content of the conversations that he actually has with Mr. Tarrio in that response. He is talking about other things, like whether or not the MPD had pictures of him and that sort of thing. And it's not specifically about the contents, it's more about what was happening with the MPD investigation and what he thought or characterized the conversation. And so I think when you -- when we look at the response, which is -- my understanding is the only thing that's really in evidence to support the government's second charge, I don't think that it shows that Mr. Lamond was knowingly and willfully making a false statement to Mr. Molnar.

THE COURT: Okay. And those are elements as well, as

not just whether they are factually incorrect.

MS. JARA: Right.

THE COURT: And then you've already discussed whether he was making a false statement with respect to the warrant, and you're saying they haven't proved that he did it.

MS. JARA: Correct. That's correct, Your Honor.

THE COURT: Okay. All right. Let's go to obstruction of justice.

MS. JARA: On the obstruction of justice charge, I think there's a potential legal problem that the government has. And it's that they charged Mr. Lamond under D.C. code 22 -- 7216, right?

Sorry. The one thing we're talking about and I don't bring it.

Okay. So they charge Mr. Lamond under D.C. Code 22-722. And if we look at D.C. Court of Appeals opinions in 22-722, specifically, they charged him under the sixth and final part of that statute. And that part of the statute says that Mr. Lamond cannot obstruct -- he obstructed or impeded the due administration of justice with the intent to undermine the integrity of the investigation. And under the D.C. Court of Appeals opinions about what "in the due administration of justice" means or with respect to the integrity of the proceedings, the Court of Appeals has been very clear that the official proceedings that that part of the statute covers, that

the Section 6 covers, are like grand jury, council hearings, or various administrative agencies.

The Court specifically discussed, in a case, it's *Win versus U.S.*, 48 A.3d 181, about what is meant by official proceeding and due administration of justice under the statute. And in that case one of the things that it said is the -- there's another part of the statute in the obstruction piece under 22-722 that specifically discusses what happens in a criminal investigation context and what happens with those types of investigations.

And, in fact, earlier on in the statute, 22-721(3), criminal investigation is a defined term. And the Court goes on to explain that that really covers a police investigation. Whereas 6, Section 6, which is what the government is indicting -- or, is charging Mr. Lamond under, specifically focuses on more, like, administrative hearings. And the Court gives some examples, like if it were an MPD misconduct hearing, grand jury hearing, if it were, like, a D.C. council hearing, that sort of thing.

THE COURT: If that's an issue you're raising, I'm going to ask everybody to brief that. You don't have to do it by Friday, but you'll definitely have to do it by early next week.

MS. JARA: Understood.

THE COURT: But I just want to make sure, when you

say they're doing it under Subsection 6, when I look at the indictment, it only cites 22 -- D.C. Code 22-722. It doesn't cite a subsection. So what you're saying is the language that they're quoting, the due administration of justice in an official proceeding is only contained in that subsection?

MS. JARA: Yes, that's correct, Your Honor.

The other issue that I think that the government has is that they have provided insufficient evidence to support their claim. For the obstructed or impeded, the due administration of justice piece, I think -- there was a lot of testimony about what, I think, the government seems to think that that is. But what it ultimately comes down to is that there was not a rule, a statute, an MPD general order, anything that prevented Mr. Lamond from sharing this information. Mr. Lamond --

THE COURT: Do you need that?

MS. JARA: I don't think that you need that, but I think that when it's an MPD officer and you're trying to claim that he did something outside of his role, you have to define what his role is through the documents --

THE COURT: He's not even charged with doing something outside of his role as a police officer. He's charged with obstructing to impede or endeavoring to obstruct and impede. And let's put aside whether they think they've got him impeding the right thing, that's a different argument,

which I'm going to take seriously.

So I understand we've gotten a lot of general order information from both sides of what's in there and what's not in there --

MS. JARA: Yep.

THE COURT: -- and I'm going to get more. And the government can explain it, but I feel like that was part of their, perhaps, effort to prove the corruptly element, that maybe he was doing something that he knew he wasn't supposed to do.

But is it necessary that it be an actual violation of a general order, as opposed to just something that all the witnesses whose testimony at this point I'm supposed to give all the benefit of the doubt and the inferences at that stage, seem to say you just don't do that. Do I need a violation of a general order for them to prove their case beyond a reasonable doubt?

MS. JARA: I don't think you need a general order, but I do think you need some evidence of an impediment or an obstruction, and I don't think that we've heard that here.

THE COURT: Okay. Well, you have to impede or obstruct or endeavor to impede. So you don't have to be successful. You're saying there's none of that either?

MS. JARA: There's none of that either. I would say that's clear from Hadley's testimony, that's clear from Mufti's

testimony. I mean, even Mufti testified that Lamond was helpful in the investigation, that not only did Mr. Lamond ID him, but that he -- sorry, by "him," Tarrio -- but also Mr. Lamond said he knew Mr. Tarrio and that he could help if needed. You know, Mufti just never reached out.

So I think it's -- I don't think there is enough evidence here to give rise to an obstruction or an impediment. And I agree, Your Honor, I think that the stuff about the MPD general orders does go more to the intent piece of it. But I also don't think that they've provided enough evidence for that either.

THE COURT: Does it matter if you are being helpful on the one hand, yet holding valuable information in your pocket on the other?

MS. JARA: Your Honor, I would argue --

THE COURT: Allegedly.

MS. JARA: So I think that it could matter if there was evidence that you were withholding valuable information. But without any evidence that you're withholding valuable information, I don't think that it could amount to an obstruction charge here.

THE COURT: Okay. Is there anything else you want to say about the Rule 29 motion right now?

MS. JARA: There is not, Your Honor.

THE COURT: Okay. All right. Thank you.

MS. JARA: You're welcome.

THE COURT: Ms. Ross.

MS. ROSS: Your Honor, I'm happy to respond to each of her points, or if there is just somewhere you wanted to focus me?

THE COURT: Let's start with obstruction of justice. And I don't know if you knew that the statutory challenge was coming. Nobody moved to dismiss on that basis, but that doesn't mean that I still shouldn't be thinking about it. It's a question of whether you've proved what you allege. Have you looked into that issue? Do you know whether this is not the way to charge obstructing a criminal investigation, as opposed to a proceeding?

MS. ROSS: Your Honor, I admit, I did not know a statutory challenge was coming, and we certainly would be happy to brief it more. But if you look at the statute under the definition of official proceeding -- I won't read the whole thing, but it does say that, "An official proceeding means any trial, hearing, investigation, or other proceeding in a court of the District of Columbia."

And as you've heard over and over through the course of this trial, there was an investigation in the District of Columbia.

THE COURT: Well, that's one of those things where when you consider everything in the series and the end of the

series is, "or other proceeding in a court," is an investigation, a criminal investigation, included in that list?

MS. ROSS: It goes on to say -- I'm sorry. Of course I cut it off. I should have kept reading. "The District of Columbia or an agency or department of the District of Columbia government or grand jury proceeding."

THE COURT: Okay. Okay. All right. Well, I'm looking forward to receiving what both of you have to say on this, because certainly we haven't had enough time thinking about official proceedings for the past two years, but now we get to think about a different one.

Okay. So I'm going to put that one aside and wait until I hear from both of you. But I appreciate your directing me to the definition and I will start with the statute and go from there.

Even according to your own evidence, you've got the defendant doing some things that are -- admittedly, according to, I think, you, but certainly the witnesses -- helpful to what MPD is trying to do. And you have the things that you believe he knew that he wasn't saying. And so is that enough to get us to even impeding, endeavoring to obstruct or impede? I mean, it may have slowed it down, is that enough? Or it just may have made it not as strong as it could have been, is that enough to get you there?

MS. ROSS: You heard, again, ad nauseam testimony

about all the different ways that the defendant's action could have impeded this investigation. And, of course, "could have" is endeavored, right? And, so, you heard from, I think, every single law enforcement officer that came in here how the defendant's actions, by tipping Tarrio off, by leaking information, could have led to the destruction of evidence, it could have led to witnesses fleeing, and it certainly could have led to jeopardizing officer safety.

And one thing that you saw over and over again was a pattern. The defendant leaked information to Tarrio and then Tarrio passed it on to his associates, to other Proud Boys. And you saw in the photo blown up, that Mr. Schamel presented today, of Mr. Tarrio leaning next to the banner with other Proud Boys. Mr. Tarrio was not the only one who burned that banner. And because the defendant was tipping off Tarrio, who then passed it on to countless other Proud Boys, that evidence was likely destroyed and the law enforcement has no idea -- has no idea of knowing what that showed.

So certainly, at the very least, the defendant endeavored to impede. And there is certainly the likelihood that it was impeded, not just endeavored. But we have also presented a lot of evidence, ad nauseam, about how the defendant actually did impede the investigation. For example, the defendant destroyed communications with a person who confessed to the crime. The evidence that was in those

destroyed communications are not in the hands of law enforcement.

Now, Examiner Cain testified that she got lucky. There was one message that was set to self-destruct that she was able to view. And in that message the defendant was tipping Tarrio off. We saw that he said, "MPD asked me to identify you in a photo. They may be submitting an arrest warrant soon." It just goes to show you all of those destroyed communications, what is in them, it's evidence of a crime that law enforcement will never have.

THE COURT: Evidence of what crime? It seems to me that deleting his communications and -- I had a case before me that involved this very thing, of a police officer deleting his communications with a January 6 suspect, ultimately ended up impeding the investigation of the officer.

How did his -- let's assume that in those communications he's giving Tarrio information about what they're doing. Everything that you fear is in them is in them, and that's why he erased them. How did that impede the investigation of the flag burning, as opposed to making your case, at this moment, more difficult to prove?

MS. ROSS: Well, even -- we saw throughout the trial that the information went both ways, that Tarrio gave the defendant evidence that he had committed the crime, evidence that would have helped the investigation. So because we don't

have the evidence that was in those deleted texts, law enforcement never -- will never know whether Tarrio also committed -- or, also admitted to burning the banner in those destroyed communications.

But also, Your Honor, you know that the defendant actually impeded the investigation because you know Tarrio confessed to the defendant. You saw that. And nowhere in any of the emails with his chain of command, and not one single witness told you that Tarrio -- or, that the defendant told him that Tarrio confessed. That was withholding information.

And you heard from every single officer that was involved in the investigation that having that information would have allowed them to get a warrant -- or, to get the arrest warrant faster. That means they could have arrested Tarrio faster. That would have saved resources and it would have preserved the integrity of the investigation more. It would have given witnesses less time to destroy evidence, less time to flee, and it would have minimized the risk to officer safety. So that alone impeded the investigation.

And I could go through more examples, Your Honor, but it just goes to show you, there is not only an ad nauseam amount of evidence that he endeavored to impede the investigation, but I just gave you one example of the ways that he actually did impede it.

THE COURT: Okay. And the evidence that he had, in

fact -- early on Tarrio told Lamond that it had been him. We know they met at The Dubliner, which, along with Harry's bar, we all know, if we didn't know before, where they both are. We've been told a lot. So they met there, and then the evidence that he confessed in that communication is Tarrio's statements immediately thereafter.

MS. ROSS: To the group of Proud Boys, yes, Your Honor.

THE COURT: Okay.

MS. ROSS: And just -- maybe you don't want to hear more on that point, but you heard from Agent Hadley over and over again there was no evidence that the defendant -- so he confessed to the defendant on December 15th, you heard Agent Hadley's testimony that on December 15th and prior to December 15th there was no evidence that he met with anybody else at MPD or with anybody else that had any knowledge of the banner burning event.

THE COURT: I did hear that over and over. Okay.

MS. ROSS: And I would just add the point --

THE COURT: I'm completely clear on what he did not tell MPD. I'm just trying to figure out -- I just want to make sure I understood -- I know everything that supports your evidence of what did happen, which, I guess, takes us to the -- let's start with the last false statement, which is he said he didn't tell him about the warrant and that was false. And your

proof that that was false, I think, is largely circumstantial. They talk when he's on the phone -- on the plane, and then Tarrio is telling people, I just told, I just learned.

So since I would have to decide the Rule 29 motion based on what I have now and not necessarily what I might have at the close of the defendant's case or your rebuttal case, what is everything that you have that makes that statement false at this point?

MS. ROSS: Your Honor, the circumstantial evidence allows you to draw the evidence that the defendant told Enrique Tarrio about the arrest warrant. And I can just tick through at least some of the reasons how that circumstantial evidence proves that beyond a reasonable doubt, especially when considering the evidence viewed in light most favorable to the government.

I won't belabor this, but as you heard, the defendant was not in contact with anybody else who had knowledge about the banner burning. You saw there was a very limited window in which Mr. Tarrio would have heard about that warrant. He took the -- the plane took off at 12:55 and at 1:30 he told everyone, "Warrant was just signed," which means he heard about the warrant sometime between when he took off at 12:55 and 1:30. And you saw that the defendant went into his Telegram app, went into the specific chat with Tarrio, clicked on the self-destruct feature and changed the self-destruct timer from

30 seconds to 10 seconds. And you know he did that because he had an extra tip for Tarrio and he wanted to make sure he was the only one that saw it.

And when Tarrio bought internet on the plane and started to receive messages, at around 1:27, 1:28, he got that message that the defendant sent. And he immediately reached out to his contacts, his friends, and the Proud Boys. And he used the word "just" because he just found out. And the only person who had that information who the defendant was in contact with -- I'm sorry, the only person who had that information that Tarrio was in contact with was Tarrio [sic].

And just to add even more to it, you saw that one of Tarrio's associates asked Tarrio a question, "Are they going to take you on stage?" Tarrio was heading to the District for the attack on January 6, he was giving a speech. And when Tarrio responded to that he said, "I don't know if my contact will tell me that." It's the same contact that told him about -- that the warrant had been signed and it's the same person who he had been referring to as his contact every step of the way, and that was the defendant.

THE COURT: Okay. Can you address the arguments made with respect to the other two false statements, that the questions were sufficiently broad and vague and the answers were sufficiently broad and vague that you can't line them up and say as a matter of fact they're incorrect, false, knowingly

false.

MS. ROSS: I'm sorry. I think I understand your question. Is the question that the questions were sufficiently vague so the defendant couldn't have answered --

THE COURT: Well, that they kind of ask for a broad, vague category of information and he provided some different broad category of information, so if you put question -- first of all, do I even have to put question and answer together if he's in the middle of an answer, said something, asserted a fact and it was false?

But then what's your response to their argument that these questions -- whatever their argument is, where it finally landed, which is that the questions essentially were asking for a characterization and the characterization is not knowingly false because it's how the defendant characterizes what happened.

MS. ROSS: Your Honor made my first point for me, which is that the defendant volunteered the information himself. He added onto his answer. And as a 24-year veteran of the MPD, the defendant knew all too well that no lie to other -- in the course of a law enforcement interview is appropriate. He knew that was wrong. And when he volunteered that information, that he wasn't tipping Tarrio off, he knew that was a lie, regardless of the question. He volunteered that information.

THE COURT: Actually, I think the volunteer one was later, was that -- was the one about the warrant.

So what about with respect to the other two? When he's saying that the relationship was, you know, more one-sided, with him just telling me what their plans were, is that an opinion, a characterization that can't be true or false in the context of this interview?

MS. ROSS: No, Your Honor, that's incorrect. As Agent Ricardi came in here and told you, the defendant never once asked the agents to clarify. He understood what was being asked of him. Agent Ricardi also went so far as to say that these are commonly understood terms, there was nothing to misconstrue here.

The defendant understood the question. And he never said that this, you know, is my opinion or I'm not sure what you mean. The answer was very specific, and it was false. And I can go through the evidence that helps suggest it was false, but I'm not sure Your Honor needs that at this point.

THE COURT: Okay. Is there anything further you want to say about the other false statement we haven't discussed, that he tried to find out information without tipping him off?

MS. ROSS: Again, just -- I mean, nothing different than the other two responses, Your Honor, just that the -- it is clear the defendant understood the question, his answer was specific and -- specific. And if Your Honor needs me to, I'm

happy to go through the exhibits that very readily prove that his answer was false, if Your Honor needs me to.

THE COURT: All right. I think I've heard enough from both of you. This is -- under Rule 29(b), I am going to reserve decision, even though I am the factfinder and there are some judges that don't even do this if there's no jury, but I think it is helpful for you to be able to tell me, at the close of the government's case, why you think the government's case failed. And I think it's incumbent upon me, as you would under Rule 29, at some point to rule on that question before I go on to render a verdict, if I find that any of these were insufficient at this stage.

But I'm going to reserve on all of that at this point. And I do think it would be very helpful for you -- I don't think any of these other issues need to be briefed at this point, but certainly the statutory issue does need to be briefed. But we'll see what time we finish, when I figure out when I need the briefs. But I think I probably would say that I would want them by Monday or Tuesday, because I've learned, also, that the longer you wait after the trial to issue a ruling, the harder it is. So I want to do all this while it's fresh in my mind. The jury just gets to vote, they don't have to tell you why they decided the way they decided. I always think, you know, it's less work to have a bench trial, but not at the end.

All right. Is there anything else that we need to take up right at this moment?

MS. ROSS: No, Your Honor. I just was wondering -- sorry. I should have said, Yes, Your Honor. Just one quick question. I was wondering if you needed anything additional on the -- I don't know, for lack of better words, the jury instructions or the elements, or if you were just going to put something on the docket or if you needed anything else on that?

THE COURT: Well, you gave them to me in the joint pretrial statement. I don't recall if there were little objections, one or the other. I know I already kind of harmonized them for myself. I don't remember if I provided it to you. But certainly before closing I will make sure that you all know what I think the jury instructions are for these offenses. I think you have a general idea from the standard jury instructions from all of these. Okay.

Yes?

MR. ROTHSTEIN: I'm sorry, Your Honor. I think we had some discussion about the elements, so we can try to take a look if there's a transcript from the pretrial conference because I seem to remember --

THE COURT: There was some language that I took out, and I've been walking around with some that I thought were what I settled on. If I know they've already been settled, I'll share it with you before that break between your case and

closing. But I can't tell you off the top of my head if we have anything more to discuss or not. I don't think we do because I don't think it's really -- other than this issue about what the proceeding has to be, I don't think there's a lot of mystery about what you have to prove for false statement.

MS. ROSS: I agree with that, Your Honor. I think I remember kind of coming to a conclusion on those at the end of the pretrial conference way back in February, I think. So I think Your Honor --

THE COURT: For the first trial.

MS. ROSS: Exactly. Very long time ago. Thank you.

THE COURT: Anything further from the defense right now that we need to do?

MR. SCHAMEL: Two questions, Your Honor.

THE COURT: Yes?

MR. SCHAMEL: One, did I understand, so you want us here at 10:30 for Mr. Tarrio, is that what you said?

THE COURT: Correct. Because now we don't need to argue the motion beforehand and there's nothing else that's going to happen before he testifies.

MR. SCHAMEL: Okay. So 10:30.

Second question. Your Honor, has the full transcript of the entirety of the interview and --

THE COURT: I still have your copy of it. I

probably --

MR. SCHAMEL: You may have.

THE COURT: -- have my own copy in my exhibit binder in my chambers, so I can give this one back to you.

MR. SCHAMEL: That's fine. You may have that. I hadn't marked it. It was just a clean copy I had.

THE COURT: All right. Okay.

MR. SCHAMEL: So you can have a clean copy. And my request is -- I'm not going to tell Your Honor when to do things, but the sooner you can listen to the entirety of it, we would appreciate it.

THE COURT: All right. Thank you, everybody.

MS. ROSS: Thank you, Your Honor.

* * *

CERTIFICATE OF OFFICIAL COURT REPORTER

I, JANICE DICKMAN, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 25th day of January, 2026

__________________________________

Janice E. Dickman, CRR, CMR, CCR
Official Court Reporter
Room 6523
333 Constitution Avenue, N.W.
Washington, D.C. 20001

INDEX

WITNESSES:

JEFFERY CARROLL
Direct Examination by Mr. Rothstein............... 2
Cross-Examination by Mr. Schamel.................. 48
Redirect Examination by Mr. Rothstein............. 91

SEAN RICARDI
Direct Examination by Mr. Rothstein...............100
Cross-Examination by Ms. Jara.....................124
Redirect Examination by Mr. Rothstein.............138

FRANKLYN THEN
Direct Examination by Mr. Rothstein...............144
Cross-Examination by Mr. Schamel..................160
Redirect Examination by Mr. Rothstein.............174

NICOLE COPELAND
Direct Examination by Mr. Rothstein...............178
Cross-Examination by Mr. Schamel..................202
Redirect Examination by Mr. Rothstein.............216
Recross-Examination by Mr. Schamel................218

GOVERNMENT RESTS..........................................219

* * *

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America, | ) Criminal Action |
| | ) No. 23-cr-177 |
| Plaintiff, | ) |
| | ) JURY TRIAL |
| vs. | ) Day 4 |
| | ) |
| Shane Brian Lamond, | ) Washington, DC |
| | ) December 5, 2024 |
| Defendant. | ) Time: 10:43 a.m. |

TRANSCRIPT OF JURY TRIAL
HELD BEFORE
THE HONORABLE JUDGE AMY BERMAN JACKSON
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S

For Plaintiff: Rebecca G. Ross
Joshua Rothstein
UNITED STATES ATTORNEY'S OFFICE
610 D Street NW
Washington, DC 20530
(202) 252-6937
Email: Rebecca.Ross2@usdoj.gov
Email: Joshua.Rothstein@usdoj.gov

For Defendant: Mark E. Schamel
Ana L. Jara
VENABLE LLP
600 Massachusetts Avenue, NW
Washington, DC 20001
(202) 344-4631
Email: MESchamel@Venable.com
Email: ALJara@venable.com

Court Reporter: Janice E. Dickman, RMR, CRR, CRC
Official Court Reporter
United States Courthouse, Room 6523
333 Constitution Avenue, NW
Washington, DC 20001
202-354-3267

* * * * * * *P R O C E E D I N G S* * * * * * *

THE COURTROOM DEPUTY: We're back on the record with criminal case 23-177, *United States of America versus Shane Brian Lamond*. Counsel, state your appearance for the record.

MS. ROSS: Good morning, Your Honor. Rebecca Ross and Josh Rothstein on behalf of the United States. Joining us at counsel table are Special Agents Elizabeth Hadley and Paulina Murphy and paralegal Lisa Abbe.

THE COURT: All right. Good morning.

MR. SCHAMEL: Good morning, Your Honor. Mark Schamel, Ana Jara, William Hinger, here on behalf of Mr. Lamond who is present.

THE COURT: All right.

MR. SCHAMEL: We're ready to proceed when Your Honor is ready.

THE COURT: Okay.

THE COURTROOM DEPUTY: Your Honor, also on the line we have attorney Nayid Hassan.

THE COURT: Okay. All right. Good morning.

Before we begin with the defendant's case, the parties were asking yesterday about jury instructions and I went back and looked at my records and apparently back on September 23rd, I emailed the parties draft jury instructions based on what you had submitted to me in your pretrial statements way back in January. There were a few issues in

brackets that we talked about then at the pretrial conference and, subsequently, I created a set of jury instructions which I don't think I got to give out at the next pretrial conference because we postponed the trial.

So I have handed out to you the instructions that I believe accurately reflect the law and what you all provided to me and what we discussed and you can take a look at them, but that's what I think will be governing my deliberations in this case.

So, with that, Mr. Schamel, you can call your first witness.

MR. SCHAMEL: Thank you, Your Honor. We're going to call Mr. Tarrio. I believe the marshal is going to bring him out.

THE COURT: All right.

MR. SCHAMEL: For the record -- he'll state his name for the record.

THE COURTROOM DEPUTY: Mr. Tarrio, please raise your right hand.

ENRIQUE TARRIO,

was called as a witness and, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SCHAMEL:

Q. Good morning, sir.

A. Good morning.
Q. Would you please state your full name for the record, spelling it for the court reporter.
A. Enrique, E-N-R-I-Q-U-E. Last name Tarrio, T-A-R-R-I-O.
Q. Okay. And you also go by the name Henry Tarrio; is that right?
A. I mean, depends on who you ask. You ask the marshals, it's Henry. You ask the BOP, it's Enrique. So...
Q. Okay. I just want to make sure we're talking about -- you are the same person?
A. I am the same person.
Q. Okay.
A. There's no two people.
Q. Mr. Tarrio, I don't have a lot of questions.
My first question for you is: Do you know Shane Lamond?
A. Yes.
Q. And how do you know Mr. Lamond?
A. As a police officer for Metropolitan Police Department.
Q. Okay. And how is it you became acquainted with Mr. Lamond?
A. So, I believe in June or July -- July of 2019. I'm sorry if I get the dates mixed up.
July 2019, we put on an event at Freedom Plaza -- it was early July -- and I was head of private details for the speakers -- for security for the speakers that were at the event that day. There was two organizers for the event and one

of them had a falling out with the other one and left. So, she was the one that was in communication with MPD at the time. And at the time then, I assumed that role where I communicated with MPD -- I didn't know his name at the time -- because there was threats of an acid attack against not only some of the speakers but some of the attendees. So I also talked to the FBI Washington field office at the time about those threats and that's how I started communicating with the lieutenant.

Q. Okay. You said "we." The -- is the "we" in that group the Proud Boys?

A. No.

Q. Who --

A. The organizers of this event was -- one of them was Adrienna DiCioccio and the other one -- I can't remember her name, that's the one that exited --

Q. That's the one --

A. -- from the event and this happened before we held the event.

Q. Okay. And when -- again, when you said "we held the event," was that -- whose event was that?

A. Adrienna DiCioccio's.

Q. Okay.

A. But it was a big event, so there was multiple people involved in multiple aspects of it.

Q. Okay. And were you part of an organization at that point

doing security?
A. I was part of the Proud Boys, yes.
Q. Part of the Proud Boys?
A. Yes.
Q. Okay. And why exactly were you communicating with Lieutenant Lamond related to this event in July of 2019?
A. Because of threats that we were receiving, and then security, too.
We wanted to make sure that protestors were on one side -- at least I wanted to. I wanted protestors to be on one side and attendees for the event on one side, at least with like some type of barrier because in other events that I've attended they've thrown bricks, they've used slingshots with marbles -- not marbles, ball bearings to throw at attendees. So I respect their right to go ahead and protest, but for the safety of -- my objective is I wanted to make sure none of the people on our side were hurt.
Also, the people on their side, I didn't want them to get hurt because then somehow it gets blamed on us.
And "us," by all the people organizing this event that we're -- we're speaking about.
Q. In July of 2019?
A. In July of 2019.
Q. So, you started communicating with Mr. Lamond.
Did you have an awareness of what his role was at the

Metropolitan Police Department?
A. At that time I did not.
Q. Okay. Did you come to later?
A. Yeah. I remember Adrienna referring to him as "liaison," and then, also, I think after I contacted FBI Washington field office, there was -- I think that there was some type of joint call between the FBI Washington field office and Mr. Lamond.
I don't remember correctly, but I know that there was a -- like a joint effort to making sure -- the threat was credible, so they did investigate the threat. So...
Q. Let me take you forward to December 12th, almost six months later -- over six months later, December 12th of 2020.
Do you remember attending an even in the District of Columbia in December?
A. You mean a year -- a year and a half later?
Q. Oh, you're right. I'm sorry.
A. Yeah.
Q. Bad math. So, about 18 months later, December of 2020 --
A. Yes.
Q. -- do you remember attending an event in the District of Columbia?
A. Yes.
Q. Do you remember what event that was?
A. It went by the Million MAGA March at the time.
Q. Okay. And you were in communication still with Mr. Lamond

at that point?
A. Yes.
Q. Okay. And you attended that event?
A. Yes.
Q. And you attended that even with your -- with your group. Is that fair to call them "your group"?
A. With my group, yes.
Q. Okay. And at some point on December 12th there was an event -- there was an incident involving the burning of a Black Lives Matter banner.
Do you remember that?
A. Familiar.
Q. Okay. Did you become aware, at some point after that, of an investigation --
A. Yes.
Q. -- into that burning?
A. Yes.
Q. How did you become aware of that investigation?
A. It was all over Twitter. FBI -- I believe the Twitter handle was @FBIWO for FBI Washington field office. It was also on M -- the MPD Metropolitan Police Department Twitter account also and obviously people were retweeting it and me, as a Twitter-head, I was searching and that's what I found.
Q. Okay. You said a Twitter-head? Is that what you --
A. I'm a Twitter-head, yes.

Q. Okay.
A. Yes. Addicted to Twitter.
Q. Okay. And was Twitter the first place you found out about the investigation?
A. Yes.
Q. Okay. Did Mr. Lamond tell you about the investigation?
A. No.
Q. At some point, did you speak to Mr. Lamond at all about the investigation?
A. Yeah. I think much later on though.
Q. Okay. Do you recall meeting with Mr. Lamond on December 15th of 2020?
A. At -- at around that time, yes.
Q. During the --
A. I don't know the exact date, so I can't -- when you say "December 15th," I don't know -- I don't remember exactly the dates.
Q. All right. Well, let me ask you this: Where do you -- where did you live at the time? December of 2020, where was your permanent home?
A. Miami.
Q. So you came to D.C. for the purposes of this event?
A. Yes.
Q. Okay. While you were in D.C. for that event, did you also have an opportunity to meet with Mr. Lamond?

A. Yes.
Q. Okay. Did you talk to him at all about that event?
A. Yes.
Q. Okay. Let me ask you very clearly: Did you confess to him you had any involvement directly with the burning of the Black Lives Matter banner?
A. No.
Q. Do you recall sometime after meeting with Lieutenant Lamond that you told some of your, I'll call them "group," that you had confessed to a Metro D.C. officer?
A. I don't remember -- I have no recollection really of -- of saying that, but...
Q. Okay. Had you confessed to a Metropolitan police officer?
A. Absolutely not.
Q. Okay. At some point, did you confess to your involvement in --
A. Yes.
Q. -- that Black Lives Matter banner burning?
A. Yes.
Q. When?
A. The first time was on my live podcast. I don't remember what date that was, so don't quote me on it, but towards the end of the show I confessed to burning the Black Lives Matter banner and that was the first time I confessed.
Q. Okay. And you did so publicly on your -- on your podcast?

A. On my podcast.
Q. Is that an audio podcast only or video as well?
A. It is -- it is video podcast.
Q. So were you seen both on camera and heard?
A. Yes.
Q. Okay. I presume you weren't wearing any sort of coverings? You weren't in any kind of costume?
A. No, I don't cover my face or anything.
Q. What was the podcast called?
A. At the time it was called The War Boys podcast.
Q. That was your podcast?
A. That was the podcast with three of us, it was Ethan Nordean, my podcast, and Joseph Biggs.
Q. You went by the name Enrique Tarrio in that podcast?
A. I mean, that's my name, so yes, I did.
Q. I just want to make sure you were clearly identified --
A. By the marshals, that's my name.
Q. You clearly identified yourself on that podcast and confessed to having -- that was first time --
A. That was the first time, yes.
Q. There was a second time?
A. There was a second time.
Q. How was that?
A. Through my Parler account.
Q. Tell us what Parler is?

A. Parler is a social media Twitter alternative at the time. And I wrote -- I wrote a post, basically stating that I did, I did burn the banner, and that I -- at the time, it was -- I remember the Twitter -- going back to the Twitter account, it said it was -- they were investigating this as, like, some type of hate crime.

Q. Okay.

A. And I confessed and I said absolutely not, that this was not a hate crime. And I challenged law enforcement to come arrest me if they thought I did something wrong.

Q. Okay. That's the second time you confessed to this involvement?

A. That is the second time.

Q. Okay. Was there a third?

A. I don't remember. It's possible, but I -- I really don't remember. But publicly, like that, on -- at a scale, those are the two times I could remember.

Q. Did you remember giving an interview to *The Washington Post* around that time where you used credit for being involved in the burning of the Black Lives Matter banner?

A. Yes. I did multiple interviews where I did confess to it.

Q. Did you do those interviews on the record?

A. Yeah. Yeah.

Q. As Enrique Tarrio?

A. As Enrique Tarrio, yeah.

Q. Question about the Parler account before I forget.
A. Go ahead.
Q. Parler, did you have a verified Parler account?
A. I had a verified, gold verified account.
Q. What does that mean?
A. So Parler is a little bit -- I don't know if you know how Twitter works, but Twitter has one verification checkmark which verifies your identity. And Parler has multiple, and you have your typical red verification, which they check your ID, right, make sure you are who you are. And your user, your display name has to be your name.

But I had a step above that. It was a gold verification where not only did they check your ID, but they made sure that you were -- your account wasn't duplicated by somebody else, meaning you have more protection against somebody else creating an account that said Enrique Tarrio and pretending that they said something that you didn't say, which was a problem on Twitter if you weren't verified.
Q. Okay. You had that higher level of verification?
A. Yes, sir.
Q. That account had been in existence for some time?
A. I would say about two years, give or take.
Q. You were the person posting on your verified --
A. I was the person posting on my account.
Q. So, you've confessed on Parler, podcast and multiple

interviews?
A. Yeah.
Q. At that point did you then confess to Mr. Lamond?
A. No.
Q. Did you ever confess to Mr. Lamond?
A. No. I think the only thing I did is I sent a screenshot of my Parler post. I think that's --
Q. To Mr. Lamond?
A. Yes.
Q. The interactions that you had with Mr. Lamond between 2019 and late January of 2021 --
A. Um-hum.
Q. -- what was your purpose in having those interactions with Mr. Lamond?
A. I guess to tell you the purpose, there's -- I had objectives when we did come to whenever we went, specifically D.C., since you're asking about Mr. Lamond, was to keep my guys safe, right, no cuts, no bruises, none of that. I want them home in one piece, no issues. Number 2, protect Trump supporters from any assaults, batteries, anything that's going on. Number 3 is to promote our message. And number 4 is to have fun. And those objectives are in that order for a reason. One doesn't supersede another. And it's in that order.
So keeping everybody safe and out of trouble and out of danger was my number one concern, and communicating not only

with Mr. Lamond, but when I went to other cities, when I went to Portland, communicating with law enforcement was key to reaching those objectives because I can't keep people safe by myself if we're hosting an event, right, and there's no law enforcement presence because then what there is is anarchy. And people want to assault us, people want to assault Trump supporters, and then it becomes an issue. So working with law enforcement is the way that I put a buffer zone between us and other protesters and keep us away, keep us separate.

Q. Was it a personal relationship with Mr. Lamond?

A. No.

Q. Were you friends?

A. No.

Q. Was he a supporter?

A. I'm sorry?

THE COURT: Can you connect to the microphone?

MR. SCHAMEL: Am I too far? Apologize, Your Honor.

BY MR. SCHAMEL:

Q. My last question was, was he a supporter?

A. No.

Q. Was he a Proud Boy?

A. No.

Q. Did you ever believe him to be?

A. I want to correct something. I'm sorry.

Q. Yes?

A. I don't -- I can't tell you what Shane was or wasn't, you know. He definitely wasn't a Proud Boy. I'll tell you that. But like as to his state of mind, I can't -- but, yeah, go ahead, I'm sorry. Just wanted to correct that.
Q. Okay. Did you have similar relationships with, you said, law enforcement in other cities, right?
A. Yes.
Q. When you would communicate with Mr. Lamond about the issues around the events that you were staging -- is that what you called them, the events?
A. Yes.
Q. Did you fish for information from him?
A. Define "fish."
Q. I mean, were you trying to get him to tell you things, or were you just doing it for the reasons that you elicited?
A. I just needed to keep people safe and that was my only objective and that's it. There's --
Q. You told your followers you had a source at MPD?
A. Um-hum.
Q. Was that Mr. Lamond you were talking about?
A. No.
Q. Okay. Did you consider him a source at MPD?
A. No.
Q. Did he provide you information that we're not aware of?
A. No.

Q. The investigation into the -- I'll just call it the banner burning, okay?
A. I'm sorry. I didn't hear that.
Q. I said I'm going to call it the banner burning.
A. Yeah.
Q. I keep tripping over Black Lives Matter banner burning.
A. Yeah. Yeah.
Q. The banner burning investigation, it progressed? It was progressing? Were you aware it was progressing?
A. Yeah, I was aware of it pretty quickly after that.
Q. How so?
A. Well, multiple avenues.
Q. Okay.
A. I don't know if these are in order. I'm just going to say the ones and around the timeline. I believe shortly after my confession on Parler, Miami-Dade Police reached out. Two separate times.
Q. That's in Florida? Miami-Dade Police in Florida?
A. That's in Florida, yeah. They're the county police down in south Florida. They reached out. They -- I think they sent a quick text message saying, blah, blah, blah, do you want to talk or blah, blah, blah, and I declined.
Q. Talk about what?
A. The -- oh, I'm sorry, the banner. You know, they're investigating the banner, and I didn't want to talk to anybody.

Q. Any indication why -- because the banner had been burned in Washington, D.C., right?
A. Yeah.
Q. Did they indicate why they were contacting you?
A. They didn't indicate, but I will tell you that's kind of -- the fact that the banner was being burnt and law enforcement in my city was contacting me already told me that they were dead set -- I mean, they were dead set on doing something about it. And they did it again. They called me -- I think the second one was a call from Miami-Dade police asking the same thing.
THE COURT: Who is the "they" in that sentence when you said the fact that the Miami-Dade Police --
THE WITNESS: -- Miami-Dade Police, yeah.
THE COURT: -- showed you they were dead set at doing something about it, you thought the Miami Police were dead set?
THE WITNESS: I would -- yeah, I would assume so at that moment. That's how I felt at the time, I guess.
BY MR. SCHAMEL:
Q. You thought the Miami-Dade Police were investigating you?
A. No, no, no. Let me be clear here. Obviously I knew that law enforcement in Washington, D.C., in the District was investigating. And it was obvious to me, right -- maybe I'm wrong, but it was obvious to me that they contacted Miami-Dade PD because that's where I'm from. All right?
So I saw it as kind of odd. But they did -- like I

said, they did contact me again. Then I knew they were adamant so I knew something was -- I knew something was up. I didn't think that this was that serious of a crime. But those are the -- I guess -- I'm guessing those are the first two instances. There's also reporters that were calling me all the way from the moment I went public, more so when I went public on my Parler account.

And then --

THE COURT: I'm sorry. Somebody coughed over your last words so I wasn't sure what you said. You were getting calls from reporters more so after --

THE WITNESS: After my Parler post.

THE COURT: After your Parler post. Okay.

THE WITNESS: Yeah.

BY MR. SCHAMEL:

Q. You had more Parler followers than podcast followers?

A. Yeah, apparently.

Then shortly, I believe, after that is when a detective from the Metropolitan Police Department contacted me.

Q. Via text?

A. Via text, yes.

Q. Do you recall that Lieutenant Lamond had asked you for your phone number before you got contacted by the lieutenant?

A. It's very possible, yes.

Q. Knowing that MPD was going to call you in advance of your

call, did that change how you reacted to them in any way?
A. No. I think -- I think by the point that I did the Parler post, between -- I guess, between the podcast and the Parler post, I was dead set on getting arrested for burning the banner.
Q. That was your plan?
A. That was -- yes. That was my plan.
Q. That's why you confessed to it?
A. Yes.
Q. Okay.
A. I wanted to be arrested for burning the banner.
Q. At some point you were coming -- did you make plans to come back to D.C.?
A. Yes.
Q. In late December?
A. Yes.
Q. What were you coming back to D.C. for?
A. Well, one reason, there was an event going on in D.C. And I knew -- I can't tell you -- like, I wanted to go to D.C. to get arrested. It sounds weird, but yes, that was also one of the reasons why I wanted -- I wanted to get this over with.
Q. I'm sorry, you wanted to get this over?
A. I wanted to get this over with.
Q. The arrest?
A. Yes.

Q. Okay. Do you recall booking a flight in December 28th of '20?
A. I believe that was the date.
Q. Okay.
A. I believe that was the date.
Q. And when -- what was the date of the event you were coming to D.C. for?
A. I'm sorry?
Q. What was the event date in D.C.?
A. It was -- the event was going to be on January 6.
Q. Okay. And when did you plan to fly into D.C.?
A. I planned to fly into D.C. on January 4th.
Q. Why did you choose January 4th?
A. Because if -- I mean, I didn't know how it was going to happen, but if I was going to turn myself in or I was going to get arrested, I knew -- you might know more than I do on this, maybe I'm misquoting it, but D.C. is a no-bail state. So I knew that if I were to get arrested on the 4th of January, I knew that I would be released on the 5th of January and then I would be able to attend the event.
Q. So you specifically came to D.C. two days before the event in order to be arrested and processed --
A. Yeah.
Q. -- on the banner burning charge?
A. Yes.

Q. And were you aware whether it was a misdemeanor or a felony?
A. I believed it was a misdemeanor.
Q. Okay. And you consulted -- without telling us what those conversations were, had you consulted a lawyer to that point?
A. Yes.
Q. Okay. Were you aware, when you booked the flight on December 28th, whether or not there was a warrant for your arrest?
A. I'm sorry. Repeat.
Q. Were you aware on the 28th of December, when you booked the flight, of whether or not there was an active warrant for you?
A. No. But I figured.
Q. Okay. You -- you take the flight on January 4th?
A. Yes, I did.
Q. Okay. Had you had any contact --
A. Well, I want to correct the record.
Q. Please.
A. I went to go take the flight on the morning of the 4th.
Q. Okay.
A. I missed that flight. I did a little bit of partying that night and I overslept and I didn't make my flight in the morning and I think the next flight was later on, and I took that flight.
Q. On the same --

A. Luckily, yes. Because the -- that was impossible by Miami airport standards.

Q. Okay. So you were booked for the morning of the 4th to come to D.C.?

A. Yes.

Q. Missed the flight because you overslept?

A. Uh-huh.

Q. And you came later that day on standby for an available flight?

A. Yes.

Q. Okay. Did you communicate with Lieutenant Lamond about your flight plans?

A. Multiple times.

Q. Okay. Was there anything about that that was outside the ordinary of the communications you would have when you would come to D.C.?

A. Yes.

Q. How so?

A. So, up until that point, you know, I -- I was the one to tell Shane, hey, I'm coming into town or I would share my live location with him when I am in the town. Sometimes when I went alone -- because I was stabbed in D.C. on election night in 2020, so even me going by myself was a little dangerous. But most of the time it's for events that I go to D.C.

So, I -- it was odd to me that he kept asking me over

and over again that -- where I'm at, when's my flight, and at that point I started believing that Shane Lamond was going to be the person to arrest me at some point in D.C.
Q. And -- and yet you came anyway?
A. I -- I -- I'm a dedicated person.
Q. You're a?
A. Dedicated person.
Q. Did Mr. Lamond, at any point, tell you that there was a warrant that had been signed for your arrest?
A. No.
Q. Did you ever ask him pointblank if there was a warrant signed for your arrest?
A. No.
Q. Did you even discuss the existence of a signed warrant with Mr. Lamond before January 4th?
A. No.
Q. Okay. So you make the later flight on January 4th. You're on the plane. You paid for --
A. I'm sorry. Start again.
Q. You made the later flight --
A. Yes.
Q. -- on January 4th?
A. Um-hum.
Q. You were on the plane, you paid for internet service?
A. I -- yes. I -- yes, I did.

Q. Okay.
A. I usually do.
Q. Did you receive any messages, to your recollection, from Shane Lamond during your flight?
A. No.
Q. Did he send you a message telling you that there was a warrant for your arrest?
A. No.
Q. Do you recall, during the course of that flight, around 1:30 in the afternoon, sending messages to people saying that the warrant had just been signed?
A. Yes, I remember that.
Q. Okay. Well, had you just learned that the warrant had just been signed?
A. No.
Q. Then why did you send those messages?
A. I'm a dedicated person and I feel like -- here, I'll be honest.
Q. Please.
A. Well, I'm under oath.
I wanted to put up the circus tent, right, and the only way to do that is to push the message out as much as possible and that was the message I wanted to push out, through multiple avenues.
Q. What message?

A. The message that I was about to be arrested and this is real and it was going to happen and I was about to be arrested for burning a BLM banner, when so many American flags are burned in D.C. and nobody gets arrested for them. I wanted to show what the Department of Justice was and I was dedicated to that cause with everything in me.
Q. So you saw this as sort of a political statement?
A. Yes.
Q. And sending that message from the plane was to put up the circus tent --
A. Yes.
Q. -- and draw more attention to it?
A. Yes.
Q. Had anything changed from the time you got on the plane until you sent that message that changed your understanding about whether or not there was a warrant?
A. I'm sorry. Start over.
Q. Had anything changed during that flight that caused you to send that message?
Had you received any new information?
A. Not new information, no. A new feeling.
Q. Okay.
THE COURT: A new what?
THE WITNESS: A new feeling.
THE COURT: Feeling?

THE WITNESS: Feeling, yeah.

THE COURT: Okay. So on the plane you got a new feeling?

THE WITNESS: Yes.

THE COURT: Okay. Next question.

THE WITNESS: Well --

BY MR. SCHAMEL:

Q. Could you describe that? I'm not -- I'm not sure I understand.

A. So I was dedicated to what I was going to do and being on the flight, on a one-way flight, landing in D.C., was real. That made it real. And I was ready. I was ready to -- really what I wanted to do is turn myself in. I wanted to go into the station and turn myself in.

Q. Well, you had --

A. That's one of -- that was one of the ways that I was going to try to do it, yes.

Q. Okay. You were actually -- had a documentary filmmaker that was coming with you, didn't you?

A. And we -- actually, we -- we planned on how it was going to be filmed.

Q. How the --

A. In multiple -- through multiple avenues, but yes.

Q. How what was going to be filmed?

A. My arrest.

Q. What was your plan?
A. One of the plans was to fly into D.C., try to get to a police department early enough and show myself.
Another one was, I think later on -- because I was supposed to speak on some stages on January 6th, so another plan was they were probably going to arrest me on one of those stages, but...
I don't -- I think those were the two options and we weren't 100 percent sure of which one was -- what we wanted to do, but...
And when I say "we" here, I'm talking about -- not as, like, the decision of the documentary. I'm making the decision, but she's like, okay, but you got to tell me how you're going to do it because I want to film it.
Q. So, your plan was to come to D.C., get arrested, and have it filmed?
A. Yes.
Q. And that was your plan back in December 28th, when you booked that flight?
A. Yeah, I mean -- yeah, that's why I booked it on the 4th.
THE COURT: So who -- who's the other person in the "we"?
THE WITNESS: Oh, Amy Harris. She's a documentary -- photo documentarian and she was also recording video, so I'm guessing a regular documentarian.

THE COURT: Okay.

BY MR. SCHAMEL:

Q. So you take the flight in on January 4th and you land. What happens?

A. I'm sorry. Say that again.

Q. You land at January 4th at DCA?

A. Yeah.

Q. What happens after you land at DCA?

A. I walk out of the plane, with a little bit of paranoia, and there was a gentleman -- I was one of the last ones to -- to come off the plane. There was a gentleman on -- to my left and to me it was pretty obvious what he was. He was an undercover police officer.

And, yeah, I mean, that -- that's one of -- that's what happened.

And the reason why I knew that he was a police officer, he was -- he had everything 5.11.

Q. What's that mean, 5.11?

A. 5.11 is like a -- a brand that law enforcement uses -- well, usually law enforcement uses a brand of like shirts, pants. Some of the marshals have it on, I'm sure. Other marshals have 5.11 gear. They give law enforcement steep discounts. So, I saw that.

Another thing I saw was he had a wired earpiece on his ear and then his phone in his hands, but it wasn't

connected to his phone and he was talking, therefore, I knew he was on a second phone and he was on his lock screen, swiping on his locked screen.

So, I kind of figured that at that moment I -- it was possible that I was going to be arrested so I walked away from him and I went -- I noticed that he took a little while to come off the gangway -- close to the gangway. I went into the bathroom and instantly there was this gentleman coming out and I stopped him. I'm like, "Hey, can you go me a favor? There's a gentleman" -- and don't quote me on the color of the pants -- but I go, "There's a gentleman in khaki pants," because I think it was khaki, "and can you" -- "when you walk out, can you nod your head and tell me if he's looking at me?" And he looked at me kind of strange and he goes, "Okay." And he walked over and he looked and he nodded.

So I sat in the bathroom for about five minutes, made some calls, sent some messages. Then, I walked out and he was there.

So, at that point, again, another telltale sign that I was going to get arrested. So I zigzagged my way through DCA, and through the corner of my eye I was seeing him, that he was following me. So, if you've ever been DCA, the baggage claim is downstairs.

Q. Okay.

A. So, you have to take the escalator to go down. So I went

to the last escalator all the way on the right and I came down the escalator and instead of walking towards baggage claim, I made a U-turn and I stood behind the escalator and I waited for the gentleman to come down.

The gentleman came down and the first thing he did was look left and right. There's -- there's no left and right to look at. Then we made eye contact and he just kept moving forward.

I went to baggage claim -- I made some more calls. I went to baggage claim and another oddity was my bag was not on the turnstile. My bag was next to this little office that they had.

Q. Okay.

A. So I knew my bag -- they went through my bag. It didn't have the typical -- when TSA goes through your bag, they usually leave a -- leave a little ticket inside it.

Q. Right.

A. That ticket wasn't there.

Q. Who did you call?

A. I called -- I believe I called my sister to tell her I was going to get arrested and I called -- I'm going to say a friend of mine. I don't remember who, but I called a friend of mine at that point.

Q. Later -- and I'm going to jump forward and jump back. Okay? So track with me.

A. I'm sorry. Go ahead.
Q. After your release from jail, you met with a couple of individuals at a parking garage before you left D.C. on the 5th of January. Do you remember that?
A. How could I forget it?
Q. Okay. During that meeting, one of the things you say is that, "I knew I was getting arrested when I was at the airport." Is that what you're referring to?
A. If I remember the video correctly, yes. I knew I was going to get arrested at that point.
Q. Okay.
A. There was a whole bunch of tell signs. I mean, I confessed to it, Miami-Dade PD, Metropolitan PD, and then I had two reporters suggest that I was going to get arrested. I mean, it was obvious to me that I was going to get arrested at that point.
Q. And Mr. Lamond contacting you for your flight information?
A. Yeah.
Q. At that point had anybody told you that a warrant had been signed?
A. No.
Q. Had Mr. Lamond?
A. No.
Q. So what did you do after you made those couple phone calls and retrieved your bag?

A. I retrieved my bag. I think I smoked a couple cigarettes. I went upstairs. I took a couple selfies with people that were there. And then I called my Uber. Uber guy came by, parked in front of me, I jumped in the car, I wasn't arrested yet.
Q. Were you aware at this point -- were you aware of what the charge was?
A. Destruction of property.
Q. But did you know?
A. Oh. No. No.
Q. Did you have a belief of what you thought it was?
A. I believed it was going to be like a destruction of property charge. That's really what I believed it was going to be.
Q. Did you realize if it was going to be a misdemeanor or a felony?
A. A misdemeanor.
Q. That was your assumption?
A. That was my assumption. Just again, I'm not a lawyer, but I'm guessing a banner is worth less than $200. So in any case, that definitely is a misdemeanor.
Q. And were you aware about whether or not you could even be arrested in Virginia for that misdemeanor in D.C.?
A. I'm pretty sure I can't. And I was pretty sure I couldn't.
Q. At the time you were sure it was not extraditable?
A. Yeah.

Q. Okay. So you get in the Uber to where? Where is your destination?

A. My destination was the Phoenix Park Hotel.

Q. Where is that?

A. Just north of the Capitol by Grand Central Station.

Q. If I said Union Station; is that right?

A. Union Station. I always get those confused.

Q. And so you're coming into the District of Columbia. What are you doing while you're in the Uber?

A. So, immediately when I get in the Uber, I look back when we leave the airport, and I started seeing unmarked cars start piling up behind the Uber. And I already knew what that meant. I knew that I was going to get pulled over and I was going to get arrested.

Q. Okay. And were you?

A. Subsequently, yes.

Q. Okay. What were you doing in the back seat of the car when you were pulled over? Were you talking to anyone on the phone?

A. Maximized my message. I did call somebody. I called somebody that called me before asking me about the banner burning and somebody that I believed had a source within Metropolitan Police Department. So, it's his beat. He's -- I don't know if -- it's like his beat. He works, like, law enforcement, politics, blah, blah, blah. So I knew he would be the perfect person to call and he is a person that you could

tell anything to and he's just going to write it.

Q. This was a reporter?

A. This was a reporter, yes, so I decided --

Q. Why did you --

A. I'm sorry.

Q. Just so I understand, why did you call a reporter in the car to D.C.?

A. Because I knew I was about to get pulled over and I wanted him on the phone and I knew I needed to keep him on the phone until I got pulled over. And again, it was to maximize the message. That's objective number 3. I wanted to make sure that the message was out there.

Q. Part of your circus tent idea?

A. Yes.

Q. You were pulled over. You were arrested?

A. Um-hum.

Q. Processed and released?

A. Yes.

Q. Okay. And when you were released, I just alluded to a moment ago you went to meet with some people before you left the District of Columbia. Who was that?

A. I went to go meet, so obviously I needed a lawyer. And at the time it was, I was the chief of staff for Latinos for Trump, and we had a lawyer, Bianca Gracia, which was the president of Latinos for Trump, reached out to me and she told

me, "Hey, I got a lawyer for you, you need to meet him." And I was trying to get out of D.C. as soon as possible, but I did have to stop at the Phoenix Park to get -- the person who was driving me had her bags there -- not driving me, she was in the car, Amy Harris, a documentary filmmaker. She was in the car with me. So she needed to stop at the Phoenix Park.

And by coincidence -- not really by coincidence, because we always stay at the Phoenix Park Hotel. We had to stop there and she was getting her bags and we decided to go to the garage to speak with the lawyer. And at that point -- and I forgot what the lawyer's name -- don't quote me on it. But -- okay. You can't even quote me on it because I can't remember. To kind of --

THE COURT: You were going to meet --

THE WITNESS: I'm sorry. Go ahead.

THE COURT: -- a lawyer for you --

THE WITNESS: A lawyer for me, yeah.

THE COURT: -- in the garage. That's why you went to the garage?

THE WITNESS: Yes.

THE COURT: You weren't planning to meet anybody else there?

THE WITNESS: No.

THE COURT: All right. Go ahead.

THE WITNESS: So I was planning to meet the lawyer

and then after we met with the lawyer and talked with Bianca and stuff like that, we got in the car and we left because that was the order by the judge, to leave D.C.

BY MR. SCHAMEL:

Q. There were other individuals though in the garage, correct?

A. Yes, there was.

Q. Mr. Rhodes and some others?

A. Mr. Rhodes was in the garage, yes.

Q. You knew there was a documentary filmmaker there that was filming?

A. Yeah, of course.

Q. Because you had just ridden there with her?

A. I mean, I wanted her to capture the moment where I'm talking to the lawyer after my arrest, yes.

Q. And you were asked about the warrant. And do you remember saying not only "I knew in the airport," but you said something like "He contacted me in the air." Do you remember saying that?

A. I remember that from the video. And after looking at the video in my case, I don't know -- I don't know what the question -- what was asked of me, so I can't tell you what -- who I talked to because I did talk to a lot of people when I was on the plane. It's a two-hour flight. I'm a phone addict. It was probably a lot of messages there.

Q. Okay. Let me ask you very clearly.

A. Yes.

Q. Did Mr. Lamond contact you while you were in the air?

A. No.

Q. And did Mr. Lamond ever tell you that you had a warrant out for your arrest?

A. No.

Q. And I --

MR. SCHAMEL: Court's indulgence.

THE WITNESS: I'm sorry?

MR. SCHAMEL: Court's indulgence, just one moment.

THE WITNESS: Okay.

MR. SCHAMEL: Your Honor, I have no more questions. Thank you, sir.

THE COURT: All right. Cross examination.

MS. ROSS: Your Honor, can we take just a five-minute break?

THE COURT: All right. Given how long it's going to take everybody to get out of the courtroom and come back, we'll take a ten-minute break and begin with your cross when we come back.

MS. ROSS: Thank you, Your Honor.

(Recess from 11:31 a.m. to 11:48 a.m.)

THE COURTROOM DEPUTY: We're back on the record with criminal case 23-177, *United States of America versus Shane Brian Lamond*.

THE COURT: All right. Ms. Ross, you can proceed.

CROSS-EXAMINATION

BY MS. ROSS:

Q. Mr. Tarrio, you became a member of the Proud Boys in 2018; is that right?

A. No.

Q. When did you become a member of the Proud Boys?

A. 2017.

Q. And you became chairman of the Proud Boys in 2018, right?

A. I believe you're right, yes.

Q. November of 2018?

A. Yes.

Q. And in 2020 you were still the chairman of the Proud Boys?

A. In 2020 I was still the chairman of the Proud Boys, yes.

Q. There were Proud Boys who came to Washington, D.C. on January 6, 2021; is that right?

A. I will not comment on that.

THE COURT: Well, you are here. And you just got asked a question and you need to answer it.

MR. SCHAMEL: I would just object.

THE WITNESS: I will then -- I -- on my own behalf, I will be taking my Fifth Amendment right to -- I'm not answering anything for January 6. It's just not happening.

THE COURT: All right. Well, she asked -- you've already testified that you were here for an event --

THE WITNESS: But she -- sorry.

THE COURT: -- on January 6 on direct. You said you were here for -- you came here for an event on January 6. And she just asked you a question about that.

THE WITNESS: She asked -- repeat your question.

BY MS. ROSS:

Q. Mr. Tarrio, there are Proud Boys who came to Washington, D.C. on January 6, 2021; isn't that right?

A. I'm waiting -- sorry. I was waiting for her, Your Honor.

THE COURT: That's the question. Are you going to answer that question?

THE WITNESS: I don't -- I'm not going to answer that question.

THE COURT: All right. I think we need to have you step down and we need to have a conference at the bench.

MS. ROSS: Your Honor, should we approach?

THE COURT: At the bench, a bench conference at the bench.

We didn't have to do this during this trial before, but I think it's appropriate.

(Bench conference:)

THE COURT: All right. Now, first problem we have is that his lawyer is not here. Second problem we have is that he said he knows how to assert his Fifth Amendment privilege and not testify because he did that the last time we were supposed

to go to trial and he said that he would testify if we postponed the case. And then I said, okay, if he doesn't, we're going forward anyway. We'll see what happens.

So it surprised me a little bit when he met with his lawyer yesterday and he said he would testify. He's waiving his Fifth Amendment privilege and testifying. I don't know of any rule that let's him now pick and choose which questions he wants to answer.

Does anybody have any law that would support my doing anything other than ordering him to answer the question upon pain of contempt.

MR. SCHAMEL: May I?

THE COURT: Yes.

MR. SCHAMEL: Okay. I didn't know -- I'm sorry. I thought Ms. --

MS. ROSS: You're welcome to go first. You're welcome to go first.

MR. SCHAMEL: I generally think everything Your Honor just said is correct -- can -- can I be heard? Am I loud enough?

THE COURT: She will let us know if you aren't.

This is the thing that you need --

MR. SCHAMEL: Oh, I'm sorry. That's what I was looking for. I apologize.

I generally agree with everything Your Honor just

said. I think that's right. I'm candidly surprised, too, because I thought we had settled this. He had told us he was going to testify. He -- Your Honor postponed this so he would testify. He showed up to testify. It wasn't an issue.

THE COURT: I mean, he talked on direct, to be fair, about his objectives, what the Proud Boys were in town to do, what his role was, what he needed to talk to Lamond about, what he wasn't talking to Lamond about, what he was doing at the parking lot.

The fact that he came for -- he was coming for January 6, but he decided to also use it as an opportunity to maximize his message by getting arrested publically and making a show of it, I mean, it's -- I'm sorry.

(Open court:)

THE COURT: Okay. People in the audience, we are having trouble hearing each other up here. You all need to be quiet.

Thank you.

(Bench discussion:)

MR. SCHAMEL: A couple thoughts, Your Honor.

First of all, I generally agree with you about his message and things he's going to do. Your Honor made it very clear at the beginning of this case, before we even started this trial, this was not a case about January 6th. I didn't ask him anything about anything after January 5th.

The only issue was January 6th because he was coming for January 6th, so he came two days early. That's what's relevant. Whether or not other Proud Boys were coming to D.C. for January 6th has nothing to do with whether or not Mr. Lamond made a false statement or whether or not Mr. Lamond obstructed justice into the burning of the banner.

THE COURT: Okay.

MR. SCHAMEL: To the issue of -- if Your Honor wants to get into an issue of whether or not this is some sort of bias or something else, I just don't see how we are going past January 5th.

We've covered -- I've opened the door for their video that they want to play. We've put that all out there. But this is about what Mr. Tarrio testified to, not whether or not Mr. -- other Proud Boys came. He didn't say this was tied into January 6th, other than the travel plans.

THE COURT: His whole communications with Lamond between December 19 and January 5th and after, even the 7th and the 8th, have been part of this case and why he was talking to Lamond and what he was trying to get from him and who he was talking to on the plane and why.

We have messages to Boots on the Ground, we have messages to Ministry of Self-Defense, all of which relate to Proud Boy groups that he's communicating with and communicating with about the warrant and about the supposed non-Lamond MPD

source.

So, asking some questions about what he's doing here with the Proud Boys and why they're here and who is here, I think we've talked about context. I think this is context for his testimony.

I mean, where are you going with this?

MS. ROSS: I think it's context, Your Honor. I was going to go through his prior convictions, as well, and I -- you know, I think exactly like Your Honor said, he testified on direct about his objectives to coming, and his objectives to coming included the events on January 6th. He can't selectively answer -- or, he can't selectively choose what questions to answer about the January 6th event just because he doesn't like my question.

He waived the Fifth. He can't selectively invoke it. And so it's our position that if he's going to take the Fifth, then his entire testimony has to be stricken or he has to be ordered to answer the question and he has to be ordered to answer the question truthfully.

MR. SCHAMEL: I agree, Your Honor, that he has waived his Fifth as it relates to the topics that we have discussed here today.

THE COURT: No, no, no, no, no, no. No, no, no.

MR. SCHAMEL: But this is --

THE COURT: No. No. No. Because when we had the

hearing, I said he had a valid privilege because his relationship with Mr. Lamond came up in his January 6th trial and that that whole issue could come up again if there were a retrial and that is why I honored the privilege and granted your motion for extension, because I thought he had a legitimate privilege.

I still think he has a legitimate privilege. He walked -- his lawyer and you told me yesterday he agreed to waive it. He took the stand. He waived it.

MR. SCHAMEL: But what relevance does anything that happened after January 5th have to do with this trial --

THE COURT: Hold on one second.

MR. SCHAMEL: Sure.

(Open court:)

THE COURT: We've asked the people in the audience to keep it down and we actually meant it.

Thank you.

(Bench discussion:)

MR. SCHAMEL: There's nothing about what Proud Boys came, what Proud Boys did, or anything else that happened on January 6th.

THE COURT: You started asking him what he was using Lamond for and what he was telling Lamond and what he was asking Lamond, and there were other questions.

I mean, no, is she going to get to ask him in great

detail about his -- his planning in advance of January 6?

But why he was at the parking lot, that may not have been a complete answer.

MR. SCHAMEL: That's relevant. They can ask him that.

THE COURT: So, you know, I think the question -- if she goes too far and you object to the relevance, I'll -- you know, it has to be relevant, but some of it goes to bias and some of it undermines -- may undermine what he's already said about what his goals and objectives were --

MR. SCHAMEL: Right.

THE COURT: -- in Washington, D.C. So...

MR. SCHAMEL: Well, I only asked him as it related to his goals and objectives for this -- for surrendering on this charge. That's not what he answered.

THE COURT: He answered quite broadly about he has, you know, four goals and all that.

MR. SCHAMEL: Well, I think --

THE COURT: At any rate, I think we are all agreed that he either -- I'm going to order him to answer any question asked.

MR. SCHAMEL: I think we should let him speak to Mr. Hassan and Mr. Hassan should --

THE COURT: Oh, in the middle of his testimony? The lawyer who flew out of town?

MR. SCHAMEL: He still has a lawyer.

THE COURT: Why should he have -- but he doesn't get to do this mid-testimony. The lawyer -- you don't get to -- no witness gets to talk to their lawyer halfway through their testimony.

MS. ROSS: And he waived it in advance. There's nothing to discuss.

MR. SCHAMEL: If Your Honor is going to threaten him with contempt before he responds, he should speak to counsel.

If Your Honor is going to -- if Your Honor tells anybody in the courtroom that you're going to threaten them with contempt, that is absolutely they get notice to have counsel.

If Your Honor said to me I was going to have contempt -- you ordered me to answer something, before I responded I would be allowed to speak to counsel.

THE COURT: I'm not going to --

MR. SCHAMEL: At a minimum -- at a minimum, Your Honor, I would suggest -- look, it's the record. We're making the record we're making and I'm --

THE COURT: Even if the lawyer were sitting right there, do you think I would let him come up here and chat?

MR. SCHAMEL: I would let him -- he certainly would be heard by you.

THE COURT: Take a break and let him go chat?

MR. SCHAMEL: You wouldn't hear from him, his lawyer?

THE COURT: I wouldn't hear from the lawyer.

MR. SCHAMEL: If he was here in the courtroom? If Mr. Hassan was here and he said I want to -- I want to speak --

THE COURT: Right now we would take a break and let me talk to the lawyer?

MS. ROSS: He's already waived. There's nothing to discuss.

THE COURT: I mean, you said to me before he's already waived.

MR. SCHAMEL: I think he has.

MR. ROTHSTEIN: His lawyer represented to the Court yesterday that his understanding was his client was going to waive.

MR. SCHAMEL: Yes. I agree with all of that.

THE COURT: That was a waiver. There's no -- does anyone disagree that there's a valid waiver of his Fifth Amendment right on this record?

MS. ROSS: No.

MR. SCHAMEL: The only thing I would disagree with is the scope of it and the fact that we didn't -- and that maybe I should have asked him that.

THE COURT: There's no such thing as a half and half.

MR. SCHAMEL: He can waive to some topics but not others.

MR. ROTHSTEIN: No, he cannot.

THE COURT: He can, but he didn't because the only privilege he had was related to the impact of his testimony with respect to January 6th. He already pled guilty to the flag burning.

MR. SCHAMEL: Well, I still think he has a Fifth to the flag -- I've always thought he had a Fifth to the flag burning for a variety of reasons.

THE COURT: He pled guilty.

MR. SCHAMEL: But --

THE COURT: And he's -- you've already got him to admit he confessed to it. So he's already said he did it. So now we're past that.

MR. SCHAMEL: Well, it's actually --

THE COURT: But it wasn't the flag-burning Fifth Amendment privilege.

MR. SCHAMEL: It's actually more complicated than that.

THE COURT: All right. Mr. Hassan is listening, but I don't believe we can communicate with him.

MS. ROSS: He doesn't need to be heard, Your Honor.

MR. ROTHSTEIN: Your Honor, once he took the stand and started answering questions, he waived. I'm not aware of any case law that says that once a witness is up on the stand that has waived, they can go question by question and consult

counsel as to whether or not they should answer.

THE COURT: Right.

MR. ROTHSTEIN: The only --

THE COURT: They have a privilege, they don't -- I wouldn't have -- he wouldn't have testified. It's not like a deposition where you go question by question.

MR. SCHAMEL: I hear that.

THE COURT: And it's -- there's a very clear record from the last hearing that -- that I felt that all of this testimony, there was a legitimate privilege and his lawyer agreed and his lawyer met with him yesterday and had the opportunity to advise him about whether to testify or not and he waived. He told his lawyer he would testify.

And I'm happy to put him on and ask him if he had an opportunity to meet with his lawyer yesterday and discuss his Fifth Amendment privilege and whether he intended to assert it and waive it and did he tell his lawyer that he waived it.

MR. SCHAMEL: That -- I was just going to suggest, Your Honor -- I don't disagree --

THE COURT: I don't think I have to do that, but I will do that.

MR. SCHAMEL: Well, what I was going to suggest is that -- I don't disagree with Mr. Rothstein, it is not a -- he cannot waive or not waive per question. I agree with that.

THE COURT: Okay. Okay.

MR. SCHAMEL: But I do think, for the purposes of the record -- because, candidly, I didn't think this was happening. I wouldn't have put him on if this --

THE COURT: I'm not saying you're --

MR. SCHAMEL: No. I know that.

THE COURT: -- you engineered this.

MR. SCHAMEL: No, certainly --

THE COURT: He's been trying to engineer this all along. He's been trying to have it his way and not his way and he doesn't get to do that.

And that's what I said last time. I thought the whole game of, well, I'll do it after the election is over, the Fifth Amendment-related reason for that. It was not your doing and so I didn't hold it against you and I put the trial off.

MR. SCHAMEL: And I appreciate that you did and I appreciate what you just said, Your Honor.

I do think, however, when you ask the question is there any question about whether or not this is a valid Fifth waiver -- and if this is my fault, then I will take it. I did not make any inquiry of that because I felt comfortable this wasn't going to be an issue.

But given it's now become an issue, we have to remember we've never actually -- there has never been any voir dire from him. He's never even --

THE COURT: You didn't have to voir dire him. He's

represented by counsel --

MR. SCHAMEL: He hasn't been in the room.

THE COURT: -- who stood here and told me yesterday --

MR. SCHAMEL: I know.

THE COURT: -- his client is going to testify today, and it's on the record.

MR. SCHAMEL: Told him the same thing.

THE COURT: He came up here and spoke into the microphone.

MR. SCHAMEL: He did. Yes. All I'm suggesting -- I'm not an appellate lawyer or expert. I'm just telling Your Honor, Mr. Tarrio has never been in the room for these discussions, and I'm just anticipating what this would look like if, depending on where this goes, that he's never been in the room, so you may want to do some sort of inquiry on that issue, on this record.

THE COURT: Well, you don't want me to hold him -- if you're concerned about his rights in a contempt proceeding, that's another matter. I can also just excuse him as a witness and strike his direct.

MR. SCHAMEL: That's absolutely not what I want happening. I think it's crucial, and I think he told the truth.

THE COURT: Then I'm going to direct him to testify,

and if he doesn't, then what? We just go question by question, and then it's over?

MR. SCHAMEL: No. I think that is not the law. I agree with Mr. Rothstein. That is not the law.

THE COURT: So I direct him to testify and he says, no, I'm asserting my privilege, then we're not going to go through letting her do only half of her cross.

MS. ROSS: I think we would ask to strike the testimony.

MR. SCHAMEL: I'm still -- I don't care about Mr. Tarrio. I don't care about him. That's not what I'm concerned about. I care about my person, Mr. Lamond, and, Mr. Tarrio, reprehensible as he is, is the person that can give us the information that Mr. Lamond did not do what he's accused of doing.

THE COURT: Right. Which they're entitled to fully and fairly cross-examine.

MR. SCHAMEL: No argument whatsoever to that.

My problem is going down the road of what other Proud Boys came on January 6 has nothing to do --

THE COURT: She just asked -- she just asked if they were here.

MR. SCHAMEL: We'll stipulate there were Proud Boys here on January 6.

THE COURT: That's not the point. The point is he

has now told me he gets to choose which questions he gets to answer. You agree with the government and me that he doesn't. And that's what I'm going to tell him.

MR. SCHAMEL: I do think Your Honor should do some level of inquiry on this, certainly, before striking his testimony, and certainly before starting a contempt proceeding. I think there should be some level of inquiry --

THE COURT: I'm not going to start a contempt proceeding right now. He needs to understand that he's been ordered by the Court to testify. Does he understand that? If he still says he won't answer all the questions and he's going to pick and choose, then we need to excuse him again. We can have a conference, a phone conference that includes his lawyer. But what he wants to happen is not going to happen.

MR. SCHAMEL: I hear you, Your Honor. Again, I just --

THE COURT: Okay. All right. Let's bring him back.

MR. ROTHSTEIN: Thank you, Your Honor.

MS. ROSS: Thank you, Your Honor.

(Open court:)

THE COURT: All right. Let's bring the witness back.

(Witness returns to courtroom.)

THE COURT: All right. Mr. Tarrio, we were supposed to go to trial back in October.

THE WITNESS: Yes.

THE COURT: Do you recall at that time you informed the Court, through your lawyer, that you would assert your Fifth Amendment privilege if you had to testify at that time, but you were willing to testify on a later date? Do you recall that?

THE WITNESS: Very well, yes.

THE COURT: And at that time we postponed the trial because of your unavailability to the defense as a defense witness because of your assertion of the privilege at that time.

THE WITNESS: Yes.

THE COURT: And you did that after consulting with counsel?

THE WITNESS: Yes.

THE COURT: Okay. And then the trial was scheduled for today.

THE WITNESS: Yes.

THE COURT: Or, for Monday, for this week.

Now, you had the opportunity yesterday to meet with your lawyer; is that correct?

THE WITNESS: That is correct.

THE COURT: Your lawyer was here in this building meeting with you?

THE WITNESS: Yes.

THE COURT: And are you aware that he came into the

courtroom after he met with you?

THE WITNESS: Yes, ma'am.

THE COURT: And at that time Mr. Schamel was advised and the Court was advised that you were waiving your privilege and you were going to testify. Is that correct?

THE WITNESS: That is also correct, Your Honor.

THE COURT: Okay. And you had a full opportunity to consult with your lawyer about whether you should or whether you shouldn't.

THE WITNESS: Yes.

THE COURT: And you had a full opportunity to consult with your counsel about what that meant?

THE WITNESS: Yes.

THE COURT: Okay. What that meant is that you have to answer all the questions. You do not get to pick and choose. So you are being ordered now to answer the questions that are asked to you. If a question is objected to for some reason because it's irrelevant and I sustain the objection, you don't have to answer it. But if I overrule the objection, you have to answer my questions.

Are you intending now to answer all the questions asked, or are you still going to attempt to assert your Fifth Amendment privilege on a question-by-question basis?

THE WITNESS: Your Honor, I'm not arguing the timeline whether I decided to -- through my attorney, decided

to push this past election. I'm not negating that. But that also doesn't give free rein on January 6. I have a pending appeal on January 6, and you forcing me to --

THE COURT: Yes, that was the privilege --

THE WITNESS: But --

THE COURT: -- you asserted.

THE WITNESS: This case is not a January 6 case.

THE COURT: And that was the privilege yesterday you waived. So I'm not going to ask you everything that happened on January 6 or in your preparations for January 6.

THE WITNESS: She is.

THE COURT: She asked one question. That question, the objection that it was irrelevant is overruled. You have to answer that question. But I'm telling you right now that if she asks a question, you have to answer it. You're not getting to choose. You have waived your Fifth Amendment privilege.

THE WITNESS: Your Honor --

THE COURT: Fifth Amendment privilege always related to your conviction with respect to January 6. I understand that. There is some aspects of January 6 that you testified to on direct. There are some aspects of your being here in the days in advance of January 6 that you alluded to in your testimony and are relevant to this issue here, and if they are relevant -- and I decide if they're relevant, not you -- you must answer them. Do you understand that and do you intend to

do that?

THE WITNESS: I have questions.

THE COURT: You have questions?

THE WITNESS: Yes.

THE COURT: What do you want to ask me? You want to ask me or you want to ask --

THE WITNESS: I want to ask you.

THE COURT: All right.

THE WITNESS: So are you saying, Your Honor, that I have no Fifth Amendment right standing here in this box right now?

THE COURT: You had one --

THE WITNESS: No, not --

THE COURT: -- you waived it.

THE WITNESS: Do I have it?

THE COURT: You waived it.

THE WITNESS: I didn't waive it completely.

THE COURT: Says who?

THE WITNESS: I can't -- if --

THE COURT: There's not a half Fifth Amendment privilege.

THE WITNESS: I'll make an example. If she asks me, did I commit a crime on January 6, and you decide --

THE COURT: She's going to -- all she can ask you about what you did on January 6 is are you the same Enrique

Tarrio who was convicted of, and say the offense of which you were convicted, which goes to your credibility. She's not going to say: Did you, in fact, get together with Nordean or Biggs or anybody else and plan X, Y, and Z for January 6? But she may ask questions about why you were in the parking lot. She may ask questions about why you were talking to Mr. Lamond, what he was telling you, what you were telling him.

That's all grist and your lawyer knows it because we discussed it last time and that is why you invoked your privilege and that is why it was honored. And now you have waived it. So I'm telling you now, I don't think you get to ask me any more questions.

THE WITNESS: I'm not going to ask you. I was going to make a statement.

THE COURT: I don't think you get to make statements either.

THE WITNESS: Okay.

THE COURT: I'm telling you that if she asks a question and there's no objection as to relevance or if there's an objection as to relevance and it's overruled, you have to answer it, period. Do you understand?

THE WITNESS: I understand that I'm going to answer the questions she asks. I cannot tell you that I will not take my Fifth Amendment right, my constitutional right when I see fit. I will answer --

THE COURT: Okay. Well, if when you see fit --
THE WITNESS: Yes.
THE COURT: -- you disobey my order to answer the question, we'll have to figure out what I see fit.
THE WITNESS: I'm okay with that.
THE COURT: Well, it may involve --
THE WITNESS: I'm okay with that too.
THE COURT: -- the striking of this testimony. It may involve contempt. It may involve a lot of things.
THE WITNESS: I'm okay with it.
THE COURT: I'm not okay with it. This is not going to happen. If you start doing it, we're going to end this conversation. We're going to end your testimony.
THE WITNESS: We'll agree to disagree, Your Honor.
THE COURT: I'm sorry?
THE WITNESS: We'll agree to disagree.
THE COURT: Well, I'm just saying you're not in charge.
THE WITNESS: Okay.
THE COURT: Ask your question again, Ms. Ross.
BY MS. ROSS:
Q. Mr. Tarrio, there were Proud Boys who came to Washington, D.C. on January 6, 2021; isn't that correct?
MR. SCHAMEL: Objection.
A. I'm sure there was.

THE COURT: Overruled.

A. I'm sure there was.

BY MS. ROSS:

Q. January 6, 2021 was the date Congress was going to certify the 2020 election of President Biden, right?

MR. SCHAMEL: Objection.

THE COURT: All right. Can you come to the bench?

He doesn't need to go back there, but he may need to just step to the side.

THE COURTROOM DEPUTY: Just off the witness stand.

(Bench discussion:)

THE COURT: Now I'm curious where you're going relevance-wise.

MS. ROSS: My next question goes into his prior convictions.

THE COURT: Okay. Well, we all know what January 6th was.

MS. ROSS: Okay.

THE COURT: Let's just leave it and go into the convictions.

MS. ROSS: Okay.

THE COURT: All righty.

MR. SCHAMEL: I believe that --

THE COURT: What do you want to talk about?

MR. SCHAMEL: I just wanted to put something on the

record I thought you would want to know.

I was able to communicate with Mr. Hassan just now and he's able to hear everything. So I just wanted to make sure the record is clear that Mr. Tarrio's lawyer has been able to hear everything that's been happening, both in open court and at the bench.

I thought you would want that on the record.

THE COURT: All right.

MR. SCHAMEL: That's all.

(Open court:)

THE COURT: All right. The witness can return to the witness stand.

BY MS. ROSS:

Q. Mr. Tarrio, you were previously convicted of seditious conspiracy for the events that took place on January 6, 2021, here in Washington, D.C.; is that right?

A. That is correct.

Q. And you were also found guilty of obstruction of an official proceeding; is that also right?

A. That is correct.

Q. You were also found guilty of conspiracy to prevent members of Congress or federal officers from discharging their duties, right?

A. That is correct.

Q. And you were also found guilty of obstructing officers

during a civil proceeding, right?
A. Yes.
Q. And you were found guilty of obstruction of government -- of destruction of government property, a value over $1,000.
Was that another charge you were convicted of?
A. That was -- yes, I'm convicted of it.
Q. So you were found guilty of six counts related to January 6, 2021?
A. If that's a count, yeah.
Q. But that was not the only time you've been convicted of a crime, is it?
A. Absolutely not.
Q. So in 2012, you were indicted for your role in a scheme to rebrand and resell stolen diabetic test strips?
A. That is correct.
Q. You pled guilty to fraud in connection to that?
A. Yes, I did.
Q. You also pled guilty to another crime you committed here in D.C., right?
A. Absolutely.
Q. That related to the burning of a Black Lives Matter banner, right?
A. Yes, ma'am.
Q. You were arrested for that crime here in D.C.?
A. I believe it was in the District, yes.

Q. Arrested after you took a flight from Miami to National airport?
A. I'm sorry?
Q. You were arrested after you took a flight from Miami to National airport?
A. Yes.
Q. And when you landed in D.C., you were driving from the airport into D.C. when you were arrested?
A. I believe so. I'm not very familiar with D.C. But, yes.
Q. That was January 4, 2021?
A. That was on January 4th.
Q. And when you pled guilty, you admitted to burning the Black Lives Matter banner, right?
A. Yes, I did.
Q. So I want to talk more about your arrest for the Black Lives Matter banner in Old Bay, but first I want to talk about your relationship with the defendant.
You recognize him, right, sitting over there?
A. Yes, sir. Yes, ma'am. I'm sorry.
Q. That's Shane Lamond?
That's Shane Lamond?
A. Yes.
Q. And you knew he worked at the police department here in D.C.?
A. That is correct.

Q. Sometimes referred to as MPD?

A. MPD, yeah.

Q. And the Metro PD; is that right?

A. Yeah. I get it confused with Miami-Dade PD and other --

Q. Metro PD sounds right --

A. Yeah.

Q. -- too, right?

A. Yeah.

Q. Okay. So the defendant, he told you he supported the Proud Boys, didn't he?

A. I don't remember that.

Q. You testified the defendant wasn't a member of the Proud Boys, right?

A. No, he wasn't.

Q. So he didn't go through the Proud Boys initiation process, right?

A. Define "initiation."

Q. He wasn't -- he wasn't a member -- he didn't take the creed and yell out all the -- you know, the --

A. You don't have to -- I'm sorry. I'll let you finish.

Q. He was not a member of the Proud Boys, right?

A. No, he wasn't.

Q. So he didn't recite your creed and yell out while being punched by your fellow members, right?

A. You don't need to yell out and be punched by fellow members

to be a member, but, I mean...

To limit what you said, yes. He didn't take the oath, yes.

Q. But he still supported the Proud Boys?

A. I have no idea whether he did or didn't.

Q. Can we please pull up Government Exhibit 4025, please. And can we go to page 4.

Can we zoom in on the fifth message there, please. The second from the bottom.

We see here, Mr. Tarrio, that the defendant sent you a message on January 8th, 2021, and it says, "Great to hear. Of course I can't say it officially, but personally I support you all and don't want to see your group's name or reputation dragged through the mud."

That's what it says here, right, Mr. Tarrio?

A. I'm sorry. What was your name?

Q. Mr. Tarrio, what is written on this page, from the defendant to you, says, "Great to hear. Of course I can't say it officially, but personally I support you all and don't want to see your group's name or reputation dragged through the mud."

That is what is written right here, right, Mr. Tarrio?

A. I -- I don't -- I don't want to be an a-hole.

Q. Mr. Tarrio, it's a yes or no question.

Mr. Tarrio, it's a yes or no question.

A. I can't answer yes or no.

THE COURT: You can't answer yes or no whether he sent you that message?

THE WITNESS: I cannot.

THE COURT: Why not?

BY MS. ROSS:

Q. Mr. Tarrio, I'm sorry. My question was not whether the defendant sent the message.

MR. SCHAMEL: Objection.

BY MS. ROSS:

Q. My question --

THE WITNESS: The Judge asked me a question.

THE COURT: All right. I'm sorry.

MR. SCHAMEL: Objection.

THE COURT: Okay. I thought your question was: You received that message from Mr. Lamond? Wasn't that your question?

MS. ROSS: My question was: Is what it says here, that this message is from the defendant to you, and that it says, quote.

THE COURT: Okay.

MS. ROSS: That's a yes or no question.

THE WITNESS: I can't --

THE COURT: Can you answer?

THE WITNESS: I can't -- I can't verify that this

message came from anything.

If you want me to read off the screen, I will.

BY MS. ROSS:

Q. Mr. Tarrio, I did not ask you to verify anything. I just asked you if what it says on this page is that this message is from Shane Lamond to Enrique Tarrio, and that it says here, "Great to hear. Of course I can't say it officially, but personally I support you all and don't want to see your group's name or reputation dragged through the mud."

Is that what is written here, Mr. Tarrio?

A. You made an assertion that it says "Shane Lamond," that Shane Lamond sent this message.

I could only tell you that on the screen next to me it says, "Shane Lamond 869476955," and, "Enrique Tarrio 581" -- I don't even know if that's a phone number -- "Message ID 9, 'Great to hear.'"

Q. Okay. Mr. Tarrio --

A. Yes.

Q. Let me ask you this.

A. Go ahead.

MR. SCHAMEL: Objection. Wasn't he answering a question?

MS. ROSS: He's not answering the question, Your Honor.

THE COURT: All right. Well --

THE WITNESS: I'm seeing it on the screen.

THE COURT: All right. You asked him if it said what it says. He said, "Yes."

Why don't you ask your next question.

BY MS. ROSS:

Q. Mr. Tarrio, the number that's written there, 581632416, that's your Telegram ID, right?

A. I am familiar with none of those numbers. If it's a Telegram ID and that's what you say so, then by all means.

Q. And you would communicate with the defendant through Telegram. That's right?

A. I've communicated with Mr. Lamond by Telegram, yes.

Q. All right. Thank you. We can take that down.

At times you would also exchange iMessages with the defendant, right?

A. I can't tell you I'm very versed on how iPhone messaging works, so I'm guessing those are, like, text messages from iPhone to iPhone.

Q. You communicated with the defendant using text message; is that fair?

A. Yes, that's correct.

Q. And you would use your Google voice number sometimes to do that?

A. Possible. I'm not 100 percent sure, but it's possible.

Q. And sometimes you and the defendant would communicate over

the phone, phone calls?
A. That's typically, I think, calls. I don't answer too many text messages.
Q. It's your testimony here today that you don't answer very many text messages?
A. I mean, define "a lot" to me.
My work is on my phone. So sometimes I answer people, sometimes I don't.
Q. Mr. Tarrio --
A. If you're -- if you've gone through my -- through my messages, you'll see that there's millions of messages.
And I'm -- I'm not trying to be an a-hole. I'm just telling you what you consider a lot of messages is not what I consider a lot of messages. A bad day for me is literally thousands upon thousands of messages.
Q. If I were to tell you that you exchanged over 700 messages with the defendant, would you consider that a lot of messages?
A. No.
Q. Okay.
A. There's people I message thousands and thousands of times.
And I'm not saying that it's not a lot by anybody else's standard. I'm just saying by my standard.
Q. Okay. So when you just testified that you didn't really answer text messages, that was a lie?
A. I wasn't referring -- I wasn't referring to Shane or I

wasn't referring to -- I'm just saying, in general, what you consider lots of text messages, maybe in like your professional and personal life, I do it all day. But we're in the weeds here.

Q. That's why I need you to just listen to my question and answer my exact question, so we don't get off track.

A. Go ahead.

Q. So let's ask the next question.

Mr. Tarrio, you would also meet the defendant in person. Is that fair to say?

A. Yeah, there were times. And through marches, yes.

Q. And you would exchange audio messages through Telegram, as well; is that right?

A. I'm pretty sure that's correct.

Q. Okay. And one of the times that you met the defendant in person you met at a bar called The Dubliner, right?

A. Yes.

Q. The purpose of meeting at The Dubliner was so the defendant could share information with you that he did not want to text; is that fair to say?

A. No.

Q. Can we pull up Government Exhibit 4018, please, and go to page 5. And can we zoom in on the top three messages, please.

Mr. Tarrio, I'm just going to ask you what's written on this page here. We see here that it says that there was a

Telegram private chat on December 13th in which a message from Enrique Tarrio was sent to someone named Shane Lamond, and the question was, "What's the general consensus with D.C. Metro and my guys?" That's written here, right, Mr. Tarrio?
A. That's what it says on the screen, yes.
Q. And then go to the next message. We see that there is a message on this page from someone named Shane Lamond sent to somebody named Enrique Tarrio, and it says, "That's too complicated for a text answer. That's an in-person convo over beer." You see that, right?
A. Yeah, I see it.
Q. Then the next message from Shane Lamond to Enrique Tarrio?
A. Yes.
Q. I'm sorry. So we see you here on this page, right? Somebody named Shane Lamond answered a question from somebody named Enrique Tarrio that said, "What's the general consensus with D.C. Metro and my guys," right?
A. Yes.
Q. So you were asking the defendant for information, right?
A. I can't tell you one way or another whether I was asking the defendant information or not.
Q. So this message, it's asking for information regarding the D.C. police?
A. Are you generally asking?
Q. Yes.

A. It looks like -- it looks like the second bubble, somebody didn't want to type up an essay. That's what it looked like.
Q. The question -- that answer was in response to a question about the D.C. police, right, and their view on the Proud Boys; is that fair to say?
MR. SCHAMEL: Objection. Mischaracterizes the evidence.
THE COURT: Overruled.
She's asking you about the first bubble. Were you asking the defendant for information? I don't believe you've actually ever answered that question.
THE WITNESS: It says, "What's the general consensus with D.C. Metro and my guys?" That's what it says. I can't tell you what the person writing it -- or, what it means.
BY MS. ROSS:
Q. So defendant agreed to give you that information, didn't he?
A. I'm sorry. What are you talking about?
Q. In response, Shane Lamond said to you that he would give you that information over beer. Right?
A. I don't know who "you" is because I -- I would like to explain myself. But if you don't -- I mean, I'll answer your question.
Q. Can we zoom in on the bottom three messages on this page, please.

We see here, Mr. Tarrio, a message from Enrique Tarrio to Shane Lamond. "I'll be in town till Thursday." That's what it says, right?
A. The first message, yes.
Q. The second message we see from Enrique Tarrio to Shane Lamond, "We can go to the Dubliner." That's what it says, right?
A. That's what it says.
Q. In response a message from Shane Lamond to Enrique Tarrio that says, "Perfect. I won't be working tomorrow but how about Tuesday afternoon?" That's what it says, right?
A. Seems that way.
Q. So here we see that the defendant agreed to give you information; is that fair to say?
A. No. That's what it says on the screen.
Q. Okay.
A. That's from a Cellebrite extraction.
Q. Can we please -- Mr. Tarrio, you testified that you had met the defendant at the Dubliner, right?
A. Yes.
Q. So you met him at that bar?
A. Yes.
Q. Okay. Can we please go to page 8. And can we zoom in on the top three messages, please.
Page 8 of exhibit -- got it? Thank you.

I'm going to zoom in on the top three messages there, please.

We see here a message from Shane Lamond to Enrique Tarrio that says, "How about 4:30 tomorrow at Dubliner"; is that right?

A. That's what it says on the screen.

Q. And then a response from Shane Lamond to Enrique Tarrio, "Deal." Right?

A. Yes.

Q. All right. So now we're on to page 10.

Can we zoom in on the top three messages, please.

So we see the defendant -- we see a message from Shane Lamond to Enrique Tarrio, "On my way now." This is on December 15th, 2020, right?

A. Yes.

Q. And then another message from Shane Lamond to Enrique Tarrio that says, "Have a table in the room to the right when you walk in." Do you see that as well?

A. Yes.

Q. And then a message from Enrique Tarrio to Shane Lamond that says, "Going down," right?

A. Yeah.

Q. Did you write that text?

A. I don't know because I don't know who made this extraction, how it was made. In my case, the FBI -- which I don't know if

that was part of the thing. The FBI and the prosecutor, the lead prosecutor in the case put --

Q. Mr. Tarrio, Mr. Tarrio, it's a yes or no question.

THE COURT: No. He can go ahead.

You finish your answer.

THE WITNESS: Yeah, please. The lead prosecutor in my case in the FBI put up documents from Cellebrite extractions exactly like these, except the names were switched. Whether it was on purpose or not, I don't know. So I cannot -- I can't -- I really, I truly, I don't want to be an a-hole about this. I can't trust -- even the judge had to pull it off the screen and tell the jury that that was wrong. So, I cannot trust either the FBI or the Department of Justice to put these together in any accurate fashion. I can't.

So, I'm sorry, I can't verify anything that you're seeing on the screen. If you want me to mime what's on-screen and say, "Oh, do you see this on the screen?" I could do so. But if you want to ask me real questions about what happened at The Dubliner, I'll answer you without a problem. But I will not, under any circumstances, verify the information that is on the screen.

THE COURT: Did he tell you he got there and you said, "I'm coming down," and you met him where he said?

THE WITNESS: Yes.

THE COURT: Ask your next question. And you can

continue to show these, if you wish. I just want to make sure whether he remembered that or not.

BY MS. ROSS:

Q. So we've moved on to page 11.

Can we zoom in on the bottom three messages, please?

Looking here, we see a message that was sent to the Skull and Bones group. Do you see that?

A. I see that on the screen.

Q. Okay. And Skull and Bones, that was a group made up of various Proud Boys; is that right?

A. I want to -- I don't want to answer you probably, but that's my answer.

Q. You don't remember who was in the Skull and Bones group chat?

A. No.

Q. Okay. Mr. Tarrio, do you remember somebody writing, "Are you going to jail, Enrique?"

A. I can't tell you that I remember.

Q. That's what it says here on the page though, correct?

A. It says it on the screen, yes.

Q. And then do you see the next message -- do you remember telling the Skull and Bones group, "This might not be good"?

A. No, I don't remember that.

Q. That's what it says on the screen though, right?

A. That says it on the screen, yes.

Q. Next we see a message from Enrique Tarrio to that Skull and Bones group that says, "I admitted to burning the sign to an MDC officer." That's on the screen though, right?
A. That's on the screen, yes.
Q. Do you remember saying that?
A. I don't remember saying that.
Q. This was on -- it says here on the screen this was on December 15th, 2020, at 7:12 p.m.; is that right?
A. I'm sorry. Say that again. Repeat your question.
Q. Is says that this message from Enrique Tarrio to Skull and Bones group was sent on December 15th, 2020, at 7:12 p.m., right?
A. The bottom one. And I can't tell you whether it's sent or not.
Q. That's what it says on the screen, right?
A. That's what it says on the screen. Yes, it does.
Q. This was approximately three hours after you met the defendant at The Dubliner?
A. I can't tell you when this was made or -- I don't know what time I met at The Dubliner. I don't know -- I don't remember what time I met at The Dubliner. And I'm not going to verify what time this is or the timestamp on this.
Q. But you know that the defendant was an MDC officer, right?
A. Yes.
Q. So when you told defense counsel, when he was asking you

questions, that you never confessed to an MDC officer, that was a lie, right?
A. I'm sorry. Repeat that.
Q. So defense counsel got up here and he asked you if you ever confessed to a police officer about burning the banner and you said no. When you said no, that was a lie, right?
A. Not to my recollection, no, I don't. I don't remember saying that.
Q. So it's your testimony here today that you did not lie to defense counsel when you said you never confessed, but you lied to the Skull and Bones group chat?
A. I never said that. I just said I didn't remember. I don't know if you heard me.
THE COURT: You don't remember which? You don't remember testifying on direct --
THE WITNESS: No, no.
THE COURT: -- or you don't remember whether you sent this email or you don't remember whether you confessed to an MPD officer? What is it that you don't remember?
THE WITNESS: My belief is no. That's my belief, that I did not confess to an MDC officer.
BY MS. ROSS:
Q. So when you sent this message to Skull and Bones group chat that said, "I admitted to burning the sign to an MDC officer," it's your testimony that was a lie?

A. I can't tell you whether -- what message was sent where. I can't, and I'm not going to.

MR. SCHAMEL: May we approach, Your Honor.

THE COURT: All right.

(Bench discussion:)

MR. SCHAMEL: Is there maybe a way that -- he clearly has got some issue with the Cellebrite from his trial. I don't know what that is.

THE COURT: She's allowed to show him the exhibits.

MR. SCHAMEL: I'm not -- I'm not objecting.

THE COURT: Okay. And he's allowed to either be cute about it or answer it. That's his choice.

MR. SCHAMEL: True. And he's not my client. You're exactly right.

I was just thinking, sort of practically, as all of us here, maybe if we put our heads together, if the questions were: If you sent this, would that not be true?

MS. ROSS: Mr. Schamel, I'm not going to change my questions.

THE COURT: She doesn't need your guidance.

MS. ROSS: I've got to --

MR. SCHAMEL: I feel like we're going to be here all day.

THE COURT: We might. Which is kind of why we didn't do this yesterday between 4 and 5.

MR. SCHAMEL: Yes, Your Honor. Touché.

(Open court:)

BY MS. ROSS:

Q. Mr. Tarrio, you testified, when defense counsel was asking you questions, that the defendant was not a source. Do you remember that?

A. That the defendant was not a source?

Q. Correct.

A. Explain. I'm sorry, I don't -- I don't remember now the question that you're referring to.

Q. Mr. Tarrio, when defense counsel was up here asking you questions --

A. Yes.

Q. -- he asked you if the defendant was a source of information.

Do you remember that?

A. The defendant was a source of information? For me?

Q. Correct.

A. Yes, I remember you said that.

Q. Okay. And you said no?

A. No.

Q. Right. So your testimony is that the defendant was not a source of information for you; is that right?

A. Yeah.

Q. All right. We're going to talk about that a little bit

more.

The defendant gave you information about Metro PD's investigation into the banner burning. Isn't that fair to say?

A. I don't know.

Q. It's your testimony here today that you don't know if the defendant ever gave you information about the Black Lives Matter banner burning?

A. I can't remember.

Q. You can't remember?

A. It was four years ago.

Q. When the defendant gave you information about the Black Lives Matter banner burning, you would pass that information on to other Proud Boys, right?

A. I can't remember.

Q. You would pass that information on to friends, right?

A. I can't remember.

Q. Okay. You can't remember?

A. No, I really can't.

Q. Okay. Can we please go to Government Exhibit 4018 and go to page 22, please. And can we zoom in on the top four messages.

We see here a message from Enrique Tarrio to Shane Lamond that says, "So what do you think?"

You see that, right, Mr. Tarrio?

A. Yeah, I see the top message.

Q. Do you remember sending that message?
A. No.
Q. Okay. We see here next a response from Shane Lamond to Enrique Tarrio that says, "About which part? You clearing the air about the Biden gear or the BLM banner?"
You see that, right?
A. Yeah, I see it on the screen.
Q. Okay. Do you remember receiving that message?
A. Vaguely.
Q. Okay. Then this next message we see from Enrique Tarrio to Shane Lamond, "BLM banner."
You see that, right?
A. Yes.
Q. Do you remember sending that message?
A. I'm starting to vaguely kind of remember messages similar to these, but I can't verify whether this is -- this is them or not.
Q. We see the next message here says from Enrique Tarrio to Shane Lamond, "You think they'll make a stink of it?"
A. Yes.
Q. Do you see that?
A. I see it.
Q. Do you remember sending that message?
A. Possibly.
Q. Okay. This is at 4:52 on December 18th, that's what's

written there?
A. That's what's written there, yes.
Q. Okay. Can we please go to page 23 and zoom in on the top message.
So we see the response to that message here on December 18th, 2020, at 4:55 p.m., a message from Shane Lamond to Enrique Tarrio that says, "No, a bit of the opposite. I've been talking to CID about it."
Do you see that on the screen there, Mr. Tarrio?
A. Yes.
Q. And CID, that means criminal investigative division; isn't that right?
A. Caller ID. I mean, I have no idea what CID means.
Q. So here we see the defendant was talking to you about CID and the banner burning; is that right?
A. I can't tell you whether the defendant was talking to me here or not, but I do remember conversation.
Q. Okay. So you remember -- you remember receiving this message?
A. I don't remember receiving this message, no. I remember the gist of this being talked about.
Q. With the defendant?
A. Yes.
Q. Okay. So we see here that the defendant talked to you about the hate crime enhancement, right?

A. I'm not -- I'm not going to -- I can't answer that question because I don't know.

Q. You don't know. Okay.

A. I -- if you want me to read off the screen, by all means. If you want to ask me a question about what happened, I'll answer it.

THE COURT: Okay. Mr. Tarrio, she's the one in charge of what she asks you.

THE WITNESS: But I'm not understanding what she's trying -- I -- I can't answer her questions.

THE COURT: Well, some you can and some you can't.

THE WITNESS: Okay.

THE COURT: And you can answer when you can and you'll say you can't when you can't.

THE WITNESS: Okay. Perfect.

THE COURT: Ask your next question.

BY MS. ROSS:

Q. Mr. Tarrio, you remember having conversations with the defendant about the hate crime enhancement --

A. Yes, I do remember that.

Q. -- for the banner burning?

So you remember that.

And so he told you, we see here, "They wanted to know what I know about your group and if I think you all are racist."

Do you see that?
A. I don't -- I don't know about what's written on the screen.
Q. Okay. But that is what --
A. Now, you asked me a question -- you asked whether I remember the -- me asking if it was going to be a hate crime thing. I remember asking Shane if this is something that would amount to a hate crime.
I mean, I think asking a police officer what the law is, I think that would be wise.
Q. So we see here, what's written on the screen, that it continues.
"They wanted to know what I know about your group and if I think you all are racist."
And it continues, "I told them you are made up of a lot of Latinos and blacks, so not a racist thing. If anything, I said, it's political, but then I drew attention to the Trump and American flags that were taken by antifa and set on fire. I said all those would have to be classified as hate crimes, too."
That's what's written on the screen here, right?
A. Yeah. Whoever said this is a genius because that's right.
Q. And then we see it continues on, "It's not being investigated by FBI, though, just us, MPD."
Right?
A. That's what it shows on the screen, yes.

Q. And the defendant was an officer with MPD, right?
A. I've stated that multiple times, yes.
Q. This message, you shared this with other Proud Boys, didn't you?
A. I can't tell you one way or another.
Q. Can we zoom in on the bottom two messages on this page, please.
We see here on this page a message from Enrique Tarrio to Skull and Bones, on December 18th, 2020, 4:56.
So that's just three minutes after the previous message we just looked at, right?
A. Yes.
Q. Okay. And it says, "For our eyes only."
You see that on the page there, Mr. Tarrio?
A. I see it.
Q. Do you remember sending this message?
A. No.
Q. This next message we see here from Enrique Tarrio to Skull and Bones, sent at 4:56.
So that same minute, right?
A. Seems that way, yes.
Q. It says, quote -- and I'm sorry. I'll make this shorter.
That is a cut-and-pasted message that we just -- that is the same message that we just looked at, right?
A. I don't know if it's copy and pasted. It could also be

forwarded. But I can't tell you whether it's forwarded because there's no data.
Q. It's the same message we just looked at; is that right?
A. It seems to be, yes.
Q. And that was the same message that we saw from Shane Lamond to Enrique Tarrio, right?
A. It seems that way.
Q. And this same message that you got from -- and the same message that was sent from Shane Lamond, we see here from Enrique Tarrio to Skull and Bones; is that right?
A. Yeah, it seems that way. Yes.
Q. So it was sent three minutes later?
A. I don't know whether it's sent or not.
Q. In addition to information -- thank you. We can take that down.
In addition to information the defendant gave you about the hate crimes enhancement --
A. Yes.
Q. -- he also told you about evidence that MPD had in the BLM banner investigation. Isn't that fair to say?
A. I -- I don't remember.
Q. You don't remember the defendant telling you about evidence that MPD had in the BLM banner investigation?
A. I remember me telling him and showing him what I posted and I remember we -- me going back and forth with him through

multiple means, whether it's text messages or calls, but...

Q. Can we please go to page 24 of Exhibit 4018. And can we zoom in at the message sent at 4:58. The second one from the top, please.

We see here a message from Shane Lamond to Enrique Tarrio, "I don't think they have any pictures of you though."

Do you see that?

A. I see that on my screen, yes.

Q. Do you remember receiving this message?

A. No.

Q. But you shared this information with others, didn't you?

A. I can't tell you one way or another whether I did because I can't even tell you that I received this message.

Q. Okay. So we see the --

A. That's what's on the screen.

Q. So we see this at 4:58, right?

A. Yes.

Q. Okay. Can we pull up the next message, please.

And I'm sorry. Can we do the next two? I'm sorry.

So we see here at 4:58 p.m. -- that's the same minute as the previous message, right?

A. On this -- I guess on the screen, yes.

Q. Okay. We see a message from Enrique Tarrio to -- I'm sorry.

How do you pronounce that, Mr. Tarrio?

A. I'm sorry. What?
Q. What's written on the screen there "To," how do you pronounce that?
A. Mexizzachet?
Q. Okay.
A. I don't know.
Q. Okay, Mr. Tarrio.
So it says here, "So I just got word," right?
A. That's what it says on the screen. Yeah.
Q. And it says -- and then the next message, just one minute later, says:
From: Enrique Tarrio. "We're clear on the banner?"
Is that right?
A. Yeah. I see that.
Q. And that was just one minute after you got the message that said, "I don't think they have any pictures of you though," right?
A. I don't know if these are messages.
Q. The defendant was the source of that information, wasn't he?
A. Of what information?
Q. That MPD didn't have any photos of you.
A. I don't know.
Q. Okay. And then can we zoom in on the message, the second from the bottom, that says -- thank you.

This is at 5:16 p.m.

Do you see that?

So this is 18 minutes after the message from the defendant to Enrique Tarrio that said, "I don't think they have any pictures of you though."

18 minutes later sound right?

A. That's what's on the screen.

Q. Okay. And this message says:

From: Enrique Tarrio. To: Amy Harris Photo. "D.C. Metro just told me they won't be pursuing it?"

You see that, right?

A. I can't tell you whether this is a message or not.

Q. That's what's on the screen, right, Mr. Tarrio?

A. It's on the screen, yes.

Q. Do you remember sending this?

A. No.

Q. This is the information the defendant gave you that you then sent to Amy Harris, right?

A. I can't tell you whether I sent anything because I have no idea what you're talking about.

Q. So then we see in the next message on this page that Amy Harris wrote to Enrique Tarrio that asked, "What about the FBI?" You see it on the screen, right?

A. Yes.

Q. Do you remember this question?

A. I do not.
Q. Okay. Can we go to the next page, please, and look at the top there at 4:55 p.m.
Can we zoom in at the top there, please.
We see a message here from Enrique Tarrio to Amy Harris Photo, that says, "FBI isn't investigating." You see that, right?
A. Yeah, I see it.
Q. That information, that's information you got from the defendant, right?
A. Now, I vaguely remember a similar conversation. I don't remember -- I know it was on Twitter because I remember that the Metropolitan Police Department started pushing it out. I can't tell you whether defendant told me or not. But I do remember there being public posts about it on the actual Twitter account for MPD.
Q. You also learned about it from the defendant though, didn't you?
A. I can't tell you one way or the another.
Q. Can we go back to page 24, please.
I'm sorry 23, please.
Can we zoom in on that top message.
Looking at that last sentence of this message from Shane Lamond to Enrique Tarrio, it says, "It's not being investigated by FBI though," right?

A. Yes.
Q. Defendant also told you when MPD wanted to talk to you about the banner burning, didn't he?
A. I think I remember that.
Q. So he told you that the police wanted to talk to you?
A. Yes.
Q. All right. Can we please go to page 31 of this exhibit, please.
And can we zoom in on the second message there on the page.
So, Mr. Tarrio, we see here a message from Shane Lamond to Enrique Tarrio that says, "Police want to talk to you about the banner. Do you have a certain phone number you want me to give them?"
Do you remember this message, Mr. Tarrio?
A. I can't tell you I remember this message because, again, I'm going to keep telling you I can't verify what it is, but I remember Shane asking me this.
Q. So this was sent at 4:40 p.m., correct?
A. I'm sorry?
Q. This was -- I'm sorry. This was sent at 7:48 p.m., correct?
A. I can't tell you whether it's sent. I can tell you that that -- 7:48 is what's on the screen.
Q. And after the defendant told you that MPD wanted to talk to

you about the banner, you told other people, didn't you?
A. I'm pretty sure I did because when a police officer tells you that his department wants to talk to me, it's information from a police officer, so, yeah, I think that would be something that I probably shared, and I think I remember sharing. I don't remember where.
Q. Can we please go to page 36 of this exhibit.
And can we zoom in on the top two, please.
We see here a message, Enrique Tarrio to Oly, that says, "They don't have anything. Just confirmed. They're searching."
Do you see that on the screen?
A. That's on the screen.
Q. And so this is December 20th, at 2020, at 7:31 p.m., right?
A. Yes.
Q. So approximately three hours after the message we just looked at from Shane Lamond to Enrique Tarrio that said, "Police want to talk to you about the banner"; is that right?
A. I don't know about messages, and I -- honestly, I don't remember, on the last PDF you just sent, I don't remember the time on it. But I can't tell you that these are messages or not. I could just read it, what's -- off the screen.
Q. The "they" that's referenced here, that's MPD, right?
A. I have no idea what it -- that's a reference to.
Q. And after you sent this message to Oly, she gave you some

advice, right?
A. I have no idea.
Q. She told you to get a lawyer; is that right?
A. You're -- the line -- the question that you're asking, I can't answer because it's coming out of nowhere, so I don't know what you're -- it's in reference to. Again, I'm not using this as any kind of reference whatsoever, so I don't know if you want to ask me about Oly, but I can't answer --
Q. Do you remember having a conversation with Oly in which she told you to get a lawyer?
A. To get a lawyer? I remember her telling me that I should get a lawyer.
Q. Okay. Can we zoom on the bottom four messages on this page, please.
So we see here a message from Oly to Enrique Tarrio that says, "Do what Martin said. If you do that, they can't talk to you." And then a photo. And then another message that says, "Once they do this, they can't talk to you."
Do you see those messages, Mr. Tarrio?
A. I see what's on the screen.
Q. Okay. And, Mr. Tarrio, your phone number, it's 581632416 -- I'm sorry, that's your Telegram ID, right?
A. I have no idea what my Telegram ID is.
Q. Do you remember receiving these messages from Oly?
A. I remember talking about a lawyer. I don't remember

receiving --
Q. And, Mr. Tarrio --
A. -- messages. And these messages, I'm not referring to this.
Q. And, Mr. Tarrio, these messages were sent on December 20th, 2020; is that right?
A. I don't know. There's -- the document has dates on it, and it has those dates that you just mentioned.
Q. And that was before they reached out to you, right?
A. I don't remember the timeline. Maybe you could help with that.
Q. So we see here the word "they," right? "If you do that, they can't talk to you. Once they do this, they can't talk to you." You see that on the screen there, right, Mr. Tarrio?
A. I see that on the screen.
Q. And the "they," that's referencing the police, right?
A. I can't answer what anybody is referencing.
Q. Let's look at your response, Mr. Tarrio. It says:
From: Enrique Tarrio. To: Oly. "I don't think they can force me to talk to them regardless of legal representation. I'm going to get my lawyer to do it anyway." Do you see that?
A. I can't tell you what you're referencing because you're not giving me a reference point.
Q. It's on the screen there, Mr. Tarrio.

A. Do you want me to read off the screen?
Q. It says:
From: Enrique Tarrio. To: Oly. "I don't think they can force me to talk to them regardless of legal representation. I'm going to get my lawyer to do it anyway."
You see that on the screen?
A. Yes, that's on the screen.
Q. The "they," that's referring to the police, right?
A. I don't know what "they" is referring to. I'm not acknowledging anything that comes from Cellebrite, so that's --
THE COURT: Ms. Ross, do you have any more questions about this particular series of questions that you want to finish up before we do our lunch break?
MS. ROSS: No, Your Honor. It's a perfect time for a break.
THE COURT: Okay. We -- I'm scheduled to have a short status conference in another matter at 2 p.m., so I'm going to take that up at 2 p.m. and we'll resume at about 2:15. Thank you.
(Recess from 1:02 p.m. to 2:33 p.m.)
THE COURT: All right. Bring the witness back.
BY MS. ROSS:
Q. Mr. Tarrio, earlier today you testified that you exchanged messages with the defendant, right?
A. Yes.

Q. Telegram messages?
A. Yes.
Q. Regular text messages?
A. Regular, yes.
Q. Phone calls?
A. Yes.
Q. Met him in person?
A. Yes.
Q. So he was your contact, right?
A. He was a liaison.
Q. Right. He was your contact at MPD?
A. He was a liaison.
Q. And you referred to him as "My D.C. Metro guy," didn't you?
A. I don't -- I don't -- have no recollection of that.
Q. Okay. Can we please bring up Government Exhibit 2018 and go to page 6, please. And can we zoom in on the fourth and fifth box.

4018, I'm sorry. Page 6, please. Sorry.

And can we zoom in on the fourth and sixth -- fourth and fifth box, please.

We see here on December 14th, 2020, at 10:52 a.m., you sent the defendant an audio file that was unrecoverable, right?
A. I can't confirm anything that comes from Cellebrite.
Q. And we see here that same minute, so at 10:52 a.m., on December 14th, 2020, you sent a message to the Proud Boys that

said, "Just contacted my D.C. Metro guy."
Is that right?
A. Again, I can't confirm anything that comes from Cellebrite.
Q. The D.C. Metro guy that you're referring to here, that's the defendant, right?
A. I cannot confirm anything that comes from Cellebrite.
Q. The defendant, he was your contact at MPD. Wasn't he?
A. He was a liaison in MPD.
Q. So he's "your guy"; is that right?
A. He's my liaison in MPD.
Q. Do you remember sending this message, Mr. Tarrio?
A. No.
Q. Can we go to page 8 of Government Exhibit 4018, please. And can we zoom in on the top four boxes.
You confirmed that you met the defendant in person at times, right?
A. Yes.
Q. Including at The Dubliner?
A. Yes.
Q. So we see here, Jon 2A sent you a message. It was a Twitter link, right?
A. I cannot confirm anything from Cellebrite.
Q. Do you remember receiving this message?
A. I can't confirm anything from Cellebrite.
Q. That was not my question, Mr. Tarrio.

A. Yes, it is. You said, "This message."
Q. Mr. Tarrio, my question was: Do you remember receiving this message?
A. I can't confirm anything from Cellebrite.
Q. I'm not asking you to confirm anything from Cellebrite, Mr. Tarrio. I'm asking if you remember receiving this message.
A. I cannot confirm anything from Cellebrite.
I mean, I don't -- if you want to stand here and answer for me, that's fine. But my answer doesn't change.
Q. This next message we see here, we looked at these a little bit earlier. After receiving that message from Jon 2A -- so that was at 3:26 p.m. -- we see a message from the defendant to you asking about The Dubliner.
We looked at that a little bit earlier, right?
A. I could do this all day; but I can't confirm anything that's coming from Cellebrite.
Q. So this message was at 6:31, correct?
A. I can't confirm anything from Cellebrite.
Q. Okay. And then the next message we say -- we see you respond to the defendant, "Deal," at 6:51 p.m.
We looked at that a little bit earlier, too, right?
A. I can't confirm anything from Cellebrite.
Q. Okay. So then we see a little bit later, at 9:09 p.m., a message that you sent from -- a message you sent to Jon 2A. So responding to the message that we looked at where he sent you a

Twitter link?
A. Can't confirm anything from Cellebrite.
Q. Let me finish my question, Mr. Tarrio.
A. You said "message."
Q. It says here, "Yeah, I'm following this. Meeting with my D.C. Metro contact."
You see that on the screen, right, Mr. Tarrio?
A. Yes.
Q. The D.C. Metro contact -- do you remember sending this message?
A. I can't confirm anything from Cellebrite.
And, no, I don't remember anything from -- about that message.
Q. Okay. You don't remember sending this message?
A. I can't confirm anything from Cellebrite.
MS. ROSS: Your Honor, the -- the witness isn't answering my question.
THE COURT: Right. The question -- she's not asking you to confirm whether this is a message from your phone from Cellebrite at the time that it's supposed to be.
She asked you: Did you send a message saying, "Meeting with my D.C. Metro contact."
THE WITNESS: She didn't --
THE COURT: Do you remember sending that?
THE WITNESS: She did not say --

THE COURT: Do you remember sending this message? That was the exact question.

THE WITNESS: No.

THE COURT: Answer --

THE WITNESS: You can look at the record. She said "This message," meaning she's pointing --

THE COURT: Do you remember sending a message saying, "Meeting my --

THE WITNESS: No.

THE COURT: -- D.C. Metro contact"?

Do you remember? Yes or no.

THE WITNESS: No.

THE COURT: No.

Next question.

BY MS. ROSS:

Q. The D.C. Metro contact referred to here, that's the defendant, right?

A. I'm sorry. Say that again.

Q. The D.C. Metro contact that's mentioned here, that's the defendant, right?

A. I cannot confirm or deny -- I mean, I can't -- I'm sorry. Wrong wording.

I can't confirm anything from Cellebrite.

Q. That wasn't my question, Mr. Tarrio.

A. That was your question. You said "This contact."

MS. ROSS: Your Honor --

THE WITNESS: You're referring to the document that's on the screen and I will not refer to any document that's on the screen.

THE COURT: Did you ever refer to Shane Lamond as "My D.C. Metro contact"?

THE WITNESS: I don't remember. Probably. It's possible, yes.

THE COURT: All right.

BY MS. ROSS:

Q. So your answer is "yes"?

A. My answer is "possibly yes." Don't put words in my mouth, please.

Q. It's a yes or no question.

A. No, it's not. I said "possibly."

Q. It is a yes or no question, Mr. Tarrio.

A. Possibly.

Q. After these messages -- we looked at some messages earlier in you testimony, as well, from the day after this.

On direct defense counsel asked you if you ever confessed to burning the Black Lives Matter banner -- if you ever confessed to doing that to a Metropolitan police officer.

Do you remember that question?

A. Yes, I remember that question.

Q. And you responded to him, you said, "Absolutely not."

Do you remember that?
A. Yeah. Yeah.
Q. And can we go to page 11, please.
So this is the next day. So this is December 15th, the next day after the messages we just looked at.
And when I asked you about this message here, where you wrote to the Proud Boys, "I admitted to burning the sign to a MDC officer."
You said you didn't remember; is that right?
A. I can't confirm anything that's on Cellebrite.
Q. Did you send this message, Mr. Tarrio, that says, "I admitted to burning the sign to an MDC officer"?
Did you send that message?
A. You mean the one that's on the screen?
Q. Did you send it, Mr. Tarrio?
A. I can't confirm anything that came from Cellebrite. I'm sorry.
THE COURT: Did you send a message saying, "I admitted to burning the sign to a MDC officer"?
THE WITNESS: I don't remember that.
THE COURT: Did you tell anyone in the Proud Boys that you admitted burning the sign to an MPD officer?
THE WITNESS: No recollection.
THE COURT: So you can't say that you didn't?
THE WITNESS: I can't say I didn't, you're right.

THE COURT: I'm sorry?

THE WITNESS: You -- I can't say that I didn't. You -- you're correct in that.

THE COURT: Okay. All right.

BY MS. ROSS:

Q. In addition to referring to the defendant as your D.C. Metro contact, you often just referred to him as a contact, right?

"My contact," does that sound right?

A. I never said that I referred to him. I said possibly used that term.

Q. Did you also refer to him as "my contact"?

A. I don't -- I have no recollection.

Q. Can we please bring up Government Exhibit 4021, please, and go to page 2.

Can we zoom in on those top four messages, please.

We see here a message you sent to Mamafe that says, "My contact just called me. DA hasn't signed it yet. He says they want to take me on stage. This is going to be fun. They want a show, I'll give them one."

Did you send those messages, Mr. Tarrio?

A. I can't confirm anything that's come from Cellebrite.

Q. Did you send those messages?

A. I can't confirm anything that's come from Cellebrite.

MS. ROSS: Your Honor, he's not answering my question

again.

THE COURT: All right. Well, he's not going to admit sending these messages, so we'll have to make that determination based on other evidence in the record and we'll have to determine whether his testimony, with respect to this, is credible or not.

But you can also ask him if he sent those words, if you choose to, or you don't have to.

You can ask them that question, he's going to give you that answer. And you're welcome to ask him that for every single one. But if he says he's not going to answer, that's what we have on the record, for what it's worth.

BY MS. ROSS:

Q. Mr. Tarrio, did you send four messages to Mamafe that said, "My contact just called me. DA hasn't signed it yet. He says they want to take me on stage. This is going to be fun. They want a show, I'll give them one"?

A. I probably would say that the word -- the last words -- the last message is something that I would say. I have no recollection of the previous three.

Q. So it's your testimony here today that you don't remember sending four messages that said this?

A. I mean, four specific messages in thousands of messages, no, I can't. I wasn't prepared and I didn't look at my phone before this, so -- sorry, I can't answer your question like

that.

Q. But we do see on the screen it says, "My contact just called me," right?

A. I see that on the screen, yes.

Q. And then the messages that came after that contained information, right?

A. I can't confirm anything that came from Cellebrite.

Q. But your contact, that was the defendant, wasn't it?

A. My liaison, yes, and it is a contact, so that's --

Q. So we see here that these messages were sent at 6:55, right?

A. I can't confirm anything that came from Cellebrite.

Q. The defendant called you right before you sent these messages, didn't he?

A. I can't confirm anything that came from Cellebrite.

Q. Do you remember the defendant calling you on December 30th?

A. Yes. Yeah. I can say it's very, very probable and, yes, I think it happened.

Q. So the defendant called you on December 30th, right?

A. Yeah, I can say it.

Q. Can we go to page 1, please.

Can we zoom in on the second box, please.

So the defendant called you at 6:20 p.m.?

A. It could be.

Q. So that was 35 minutes before you messaged Mamafe, "My

contact just called me."

A. I can't confirm that, I don't know.

Q. This call here, it lasted 849 seconds. That's what it says on the screen, right?

A. I can't confirm anything from Cellebrite.

Q. That's what's written on screen, right, Mr. Tarrio?

A. Yes.

Q. That's a little over 14 minutes. Does that sound about right?

A. I'm not too good with math, but, yeah, that sounds pretty accurate.

Q. Do you remember talking to the defendant for a little over 14 minutes on December 30th, around 6:20 p.m.?

A. I don't remember, but it's very posable that that call did happen and it was for 14 minutes.

MS. ROSS: So then can we zoom in on the next three boxes, please.

BY MS. ROSS:

Q. Would you agree with me that a call that lasted a little over 14 minutes that took place at 6:20 p.m. would have ended about 6:34 p.m.? Simple math, right?

A. Yeah, I guess.

Q. All right. We see here at 6:35 p.m. you sent a message to Mamafe with an audio file that's not recovered. That's what's written on the screen, right?

A. I can't confirm anything from Cellebrite, but if you're asking me to read from the screen, that's what I see on the screen.

Q. Do you remember sending Mamafe a voice message one minute after hanging up with the defendant on December 30th?

A. If you're asking if I remember sending her a voice note, there's probably millions of voice notes that I send and probably thousands of them to her.

Q. Do you remember sending one at 6:35 p.m. on December 30th?

A. Not precisely.

Q. Then we see here, just three minutes later, what's on the screen here is from Enrique Tarrio to Ministry of Self-Defense, "Emergency voice chat," at 6:38. So that would have been approximately four minutes after you hung up with the defendant, right?

A. That's what it says on the screen.

Q. Do you remember sending this message, Mr. Tarrio?

A. No.

Q. Do you remember sending a message to the Ministry of Self-Defense group, "Emergency voice chat"?

A. That specific message, I don't remember, no.

Q. Have you ever started an emergency voice chat?

A. All the time.

Q. And by "emergency," would you say you meant that you wanted to talk to them immediately?

A. Yeah.
Q. And so this was four minutes after you hung up with the defendant, right?
A. Yes.
Q. He gave you information on that call?
A. I mean, every call there's an exchange of information. I could call my mom, and I get exchange of information. But, yeah, I guess.
Q. So then four minutes later you wanted to pass it on?
A. I don't -- I don't know.
Q. Well, it was an emergency, right?
A. I would say it's unlikely, but I don't -- you know what, I'm going to stick with I don't know because I don't want to speculate.
Q. But you said it was an emergency, right?
A. I don't know.
Q. There was important information that you got from the defendant that you wanted to convey?
A. No. I mean, I can't confirm anything because I don't have a timeline in front of me and we're going by what's on the screen, so I can't even tell you what's going on at what time or --
Q. So, Mr. Tarrio, you don't remember any of these messages I've showed you so far today?
A. Yeah, actually I've told you that I've remembered a couple

of them. Not messages that you've showed me, messages that you asked me about. I'm sorry.

So if you say messages you showed me, as of right now, I -- you've shown me PDFs that come from Cellebrite, and I can't confirm with you whether those are accurate.

Q. So of all the messages you've looked at today, you only remember a couple, right?

A. Well, you've only asked me about a couple specific messages. And, granted, most of these PDFs you've -- has been most of your line of questioning.

Q. Mr. Tarrio, you testified that you initiated a lot of voice chats with the Ministry of Self-Defense group, right?

A. Yes.

Q. Do you remember initiating any -- an emergency voice chat with the Ministry of Self-Defense group within a minute of hanging up with the defendant on December 30th, 2020?

A. I can't tell you yes or no. I don't know.

Q. All right. We're going to shift gears a little bit to the arrest warrant. Okay, Mr. Tarrio?

THE COURT: I'm sorry. I didn't hear what you just said.

MS. ROSS: We're going to shift gears a little bit to the arrest warrant.

THE COURT: To the arrest warrant.

BY MS. ROSS:

Q. All right. Mr. Tarrio, I'm going to ask you some questions about that.

When you were being asked questions on direct examination, you testified that nobody told you about the warrant; is that right?

A. Yes.

Q. Do you remember meeting defense counsel in Kentucky?

A. Yes.

Q. He flew to Kentucky, right?

A. Yes.

Q. And he met with you?

A. Um-hum.

Q. So he met with you while you were in jail there?

A. Yes.

Q. You had a conversation with him?

A. Yes.

Q. About when you learned about the arrest warrant, right?

A. I could possibly remember that, yes. That obviously came up, yes.

Q. And isn't it true that when you met with defense counsel, that you told him that members of the media told you about the arrest warrant?

A. Yes.

Q. You told him that, right?

A. Yes.

Q. And that's what defense counsel told us?
A. Well, do you want me to be specific?
Q. I asked you the question and you said yes, right? You told defense counsel that you learned about the arrest warrant from the media, right? That's what you told him?
A. I said that that's one of the methods that I learned, yes.
Q. And defense counsel told us that you learned about the arrest warrant from the media; is that right?
A. I would -- I don't know what he said to you.
Q. But your testimony here today is that you didn't actually learn about the arrest warrant from the media, right?
A. No, that's not my testimony at all.
Q. Okay. Your testimony here today was that you had a feeling you were going to be arrested, right?
That's what you said?
A. That's not what I said.
Q. You didn't say you had a feeling you were going to be arrested, Mr. Tarrio?
A. I said multiple things about how I figured that I was going to get arrested.
Q. You had a feeling that was one of the methods, right?
A. Yeah, you could say a feeling, yep.
Q. You had that feeling first on December 28th. That's what you said on direct examination, right?
A. Not first, no.

Q. Okay. You had a feeling on December 28th, right?
A. I had a feeling, yeah, of course.
Q. That's when you bought the plane ticket to fly to D.C.?
A. I'm guessing it's December 28th, in around December 28th, yes.
Q. And you booked your ticket to come on January 4th because you wanted to make sure you were at least in time for January 6, right?
A. Of course.
Q. And the purpose of coming was to create a circus. That's what you testified, right?
A. Yes, ma'am.
Q. The whole point in coming early was to create a circus?
A. That's one of the points, yes.
Q. You wanted the media to cover you were coming?
A. Yes.
Q. You wanted the media to cover that you were going to be arrested?
A. Of course.
Q. You wanted the media to cover that you were taking responsibility for the banner burning?
A. It's about the message.
Q. It was about the message?
A. Yep.
Q. You wanted that to be publicized?

A. Yes.
Q. But you didn't tell anyone that the arrest warrant had been signed until January 4th, even though you wanted to create a circus, right?
A. Um-hum.
Q. So your testimony is on December 28th you booked a ticket, right?
A. Yes.
Q. And you were coming on January 4th to create a circus?
A. Yes.
Q. But you didn't tell anyone that the arrest warrant had been signed until January 4th?
A. I didn't -- yes, you're right.
Q. So, you didn't tell the media until right before it was going to happen, right?
A. That's exactly when you tell them.
Q. Even though you wanted to create a circus?
A. Well, I was doing interviews all through the month of December after I admitted to burning the banner. So I did *Washington Post, USA Today, New York Post.* I mean, we'll be here all day if I was to tell you all the media I did about the banner.
I mean, you can imagine, I put it publicly, so they went ahead and -- actually, *Washington Post* wrote a front-page story on my post. So I think I was pretty successful at my

goal before January 4th. But I have a method.
Q. And in all those communications with *The Washington Post* and all those news outlets, never told them that you were going to be arrested on January 4th, right?
A. No.
Q. You testified earlier that you had a conversation with Bianca Gracia and Joshua Macias in the parking garage after you had been released, right?
A. Yes.
Q. Defense counsel asked you some questions about what you told them. Do you remember those questions?
A. I remember that.
Q. And he asked you -- he said you told him that "He texted me in the air."
Do you remember that?
A. I remember him asking about it, yes.
Q. And --
MR. SCHAMEL: Objection. Misstates. I said call.
THE WITNESS: Okay.
BY MS. ROSS:
Q. Do you remember that question?
A. Yes.
Q. And you said you misunderstood the question. Do you remember saying that?
A. That I misunderstood the question?

Q. From Joshua Macias and Bianca Gracia, right?
You must have misunderstood what they were asking, right?
A. Not really. Maybe I misspoke. I don't know what the question is.
I didn't know what the question that I was answering was, but if -- I'll let -- that's it.
Q. Do you remember telling Bianca Gracia and Joshua Macias, "He texted me in the air"?
A. I have seen it in the video. I don't remember it, but it happened because we're on video.
Q. That's what you told them, right?
A. In reply to the question that I don't know, yes, you're correct.
Q. Okay. Mr. Tarrio, is it your testimony that you don't remember what happened in the video?
A. I don't remember what happened in the video, no.
Q. Okay. But you remember what happened earlier that day?
A. I remember a lot of things from that day, yes.
Q. Okay. All right. Can we please bring up what's been marked as Government Exhibit 4034, please.
(Video played.)
Can we pause it right there, please.
That's you, Mr. Tarrio, in the plaid shirt?
A. Yes.

Q. And that's Joshua Macias?
A. Yes.
Q. And Bianca Gracia?
A. Yes.
Q. And you remember this, right?
A. Yeah, I remember. I mean, the generalization of being in the parking garage, yes.
MS. ROSS: Your Honor, the government moves to admit into evidence Government Exhibit 4034.
MR. SCHAMEL: No objection.
THE COURT: All right. It will be admitted.
(Government's Exhibit 4034, admitted.)
MS. ROSS: And can we please play this video.
(Video played.)
BY MS. ROSS:
Q. So in this video you admitted you heard about the warrant in the air, right?
A. I did, yes.
Q. Okay.
A. That's what it sounded like.
Q. Do you remember telling Ms. Gracia that you heard about the warrant in the air?
A. I'm going to tell you that I don't remember every conversation. But you did show me a video and I am telling you that I heard myself say something that sounded like that, yes.

Q. Okay. So you don't remember what was said in the garage, but you remember what text you received on the plane?
A. What -- I'm sorry?
Q. So you don't remember what you said in the garage, but you remember what text you received on the plane?
A. If you can show me how many texts I sent and received on the plane, I could probably answer that question a little bit better.
Q. But you said you never received a message from the defendant when you were on the plane, right?
A. No. I -- I -- from the defendant, yeah.
Q. So you don't remember that?
A. I don't remember that.
Q. Okay.
A. I remember there being a lot of messages on the plane, that's why I get WiFi. I don't get WiFi to Netflix, I get WiFi to message.
Q. So we see in this video, right, Mr. Tarrio -- can we go back to the video, please. Sorry.
(Video played.)
Can we pause it there.
So in this video we first heard Ms. Gracia say, "You knew what was happening."
That's what she said, right?
A. Was that in the middle of the video or was it just now?

Q. Can we bring up Government Exhibit 4034A, please.

MS. ROSS: And, Your Honor, at this time the government would move to admit Government Exhibits 4034A, B, C, D, and E, which are just smaller clips of a larger video.

THE COURT: All right. Any objection?

MR. SCHAMEL: No. No objection.

THE COURT: All right. They'll be admitted.

(Government's Exhibits 4034A, B, C, D, and E, admitted.)

BY MS. ROSS:

Q. All right. We're going to go through this line by line, Mr. Tarrio, starting first here.

Can we first play Government Exhibit 4034A?

(Video played.)

Ms. Gracia said, "You knew what was happening," right?

A. I really can't decipher what she says.

Q. In response to that you said, "I knew as soon as I got to the airport."

That's how you responded, right?

A. I'm sorry. Say that again.

Q. After Ms. Gracia said, "You knew what was happening," you responded to her. Didn't you?

MR. SCHAMEL: Objection as to what Ms. Gracia said. I think he said he couldn't hear it.

I couldn't either.

THE COURT: In response to her words --

THE WITNESS: Um-hum.

THE COURT: -- you said, "I knew as soon as I got to the airport"?

THE WITNESS: Can you play it again?

MS. ROSS: Can we please bring up Government Exhibit 4034B, please.

THE WITNESS: Wait, I don't --

THE COURT: It's on a different clip, your response.

THE WITNESS: Okay. Okay. Sorry.

Oh, I apologize. I thought you were asking about this video.

(Video played.)

BY MS. ROSS:

Q. In response to what Ms. Gracia told you, you responded, "I knew as soon as I got to the airport," right?

A. Can you -- can you play the full clip so I could --

Q. Sure. Can we bring back up Government Exhibit 4034, please.

And can we play that whole video, please.

(Video played.)

So you said, "I knew as soon as I got to the airport," right?

A. "As soon as I got in the air," I think is what I might have

heard.
Q. Okay. So you said, Mr. Tarrio, "I knew as soon as I got in the air," right?
A. That sounds, I guess -- that's what I heard, I guess.
Q. That's what you said?
A. That's what I heard that came out of there.
I don't want to tell you with 100 percent certainty, but it did sound like that. Yes.
Q. You didn't say, "I learned about it on December 28th," right?
A. No.
Q. You didn't say, "I learned about it when I was in Miami"?
A. No.
Q. You didn't say, "I learned about it when I was driving to the airport"?
A. No.
Q. You said, "I learned about it when I was in the air," right?
A. Yes.
Q. And that's when it happened, right?
You learned about it in the air?
A. No.
Q. That's what you said, Mr. Tarrio.
A. That's also what I said on the other messages, but I'm telling you that that's not what happened.

Q. So it's your testimony here today that you did not learn that a warrant for your arrest had been signed when you were flying from Miami to D.C.? That's your testimony?

A. That is my testimony.

Q. Okay. Can we please bring up Government Exhibit 4024, please, and go to page 2.

And can we zoom in on the bottom four messages, please.

So we see here a message you sent to Mamafe that says, "Warrant was signed."

And a warrant [sic] you sent to Avva that says, "Warrant for my arrest was just signed."

And a message you sent to the Proud Boys that said, "The warrant was just signed."

So it's your testimony here today that you lied to all of them about learning that the arrest warrant had just been signed?

That's your testimony?

A. I can't confirm anything from Cellebrite.

Q. Did you send these messages, Mr. Tarrio?

A. It's -- I'm pretty sure I did.

Q. Okay. So you sent a message to Mamafe that said, "Warrant was signed," right?

A. I'm pretty sure I sent a message relaying that information to multiple places.

Q. Okay. When you were on the plane?

A. When I was on the plane, yes.
Q. Okay. So it's your testimony here today that you lied to all of them, but you're telling the truth here today that you didn't learn about the warrant when you were in the air?
A. All these people have high followings, so I decided to tell them because I knew that they would project this message.
Q. Thank you. We can take that exhibit down.
Mr. Tarrio, it's your testimony here today that you -- that you repeatedly lied to your friends and your fellow Proud Boys, but you're telling the truth here today?
A. Yes.
Q. So you lied about confessing to burning the banner to an MPD officer?
A. I lied to what? I'm sorry.
Q. You lied about confessing to burning the Black Lives Matter banner to an MPD officer?
A. I'm not following that. Can you --
Q. When you -- when you messaged that you confessed to burning the banner to a MDC officer, that was a lie, right?
A. Yes.
Q. And you lied about having a source in the D.C. Metro, right?
A. I would say that's not accurate.
Q. It's a lie?
A. It's not accurate.

Q. And you lied about getting information from MPD about the status of the investigation?
A. Say that again.
Q. You lied about getting information from the police department about the status of the banner burning investigation?
A. One more time. I'm sorry.
Q. Mr. Tarrio, you lied to your friends and to the fellow Proud Boys when you told them that you were getting information about the Black Lives Matter banner burning investigation from a police officer at MPD?
A. Yes.
Q. And you lied to your friends and your fellow Proud Boys that he texted you while you were in the air about the arrest warrant, right?
A. It was a marketing ploy.
Q. So you lied to Joshua Macias and to Bianca Gracia when you said that you learned about the arrest warrant in the air?
A. That's about -- from what I remember, about 700,000 followers. So, yeah, I -- I did.
Q. So all of those --
A. I needed to -- it's about the message.
Q. So all of those were lies?
A. Marketing ploy, I would say, yes.
Q. So you lied repeatedly about all of that?

A. Um-hum.
Q. But it's your testimony that you're telling the truth here today in this court where you were convicted of seditious conspiracy?
A. Well, I wasn't convicted of perjury.
MS. ROSS: No further questions, Your Honor.
THE COURT: All right. Any redirect?
MR. SCHAMEL: If I may, Your Honor.

REDIRECT EXAMINATION

BY MR. SCHAMEL:
Q. Mr. Tarrio --
A. Yes.
Q. -- Ms. Ross asked you a number of questions about various documents that were up on the screen.
Do you recall that?
A. Yes, sir.
Q. And you said you had a problem with the Cellebrite record; is that right?
A. That is correct.
Q. Okay. And that's something from an unrelated matter, that you just had a problem with the accuracy of Cellebrite, correct?
A. Yes. From previous experience, yes.
Q. Okay. So I don't want to talk to you about Cellebrite records. I want to talk to you about your recollection.

A. Okay.
Q. You understand you're under oath?
A. Yes, sir.
Q. You understand you can be prosecuted for perjury if you're under oath, right?
A. Yes.
Q. That is certainly different than a message you send in what you call a marketing ploy to people with 700,000 followers, correct?
A. That's correct.
Q. Okay. And it's different to you, right?
A. It is. I don't want to be in jail any longer.
Q. You were asked a number of questions by Ms. Ross about whether or not Mr. Lamond was a member of the Proud Boys.
Do you remember being asked those questions?
A. I remember.
Q. I want to make sure we have some clarity on that issue. She asked you about some sort of initiation, things of that nature. Okay? Were you aware that Mr. Lamond ever joined the Proud Boys?
A. Absolutely not.
Q. Were you aware that he ever expressed an interest in joining the Proud Boys?
A. He never did.
Q. Does it surprise you, in his conversations with you, that

he would have told you he sympathized with the Proud Boys in order to further build rapport with you to get more information?

A. He wouldn't be the first officer that I talked to that tries to manipulate me in that way.

Q. Okay. They talk to you and say, "Hey, you know, I'm sort of with you and tell me what you guys have planned," right?

MS. ROSS: Objection, Your Honor. First of all, calling for speculation, and defense counsel seems to be testifying.

THE COURT: Right. It assumes facts not in evidence. It's leading, so --

BY MR. SCHAMEL:

Q. You've dealt with a number of officers in a number of police departments?

A. Yes, sir.

Q. Number of officers in a number of police departments, have they done anything similar to what Mr. Lamond did with you, as far as expressing an agreement with some of your positions?

MS. ROSS: Objection, Your Honor. He's asking for hearsay.

THE COURT: No. I don't think that's hearsay.

Have other officers told you they support you, that you've dealt with?

THE WITNESS: Yes.

BY MR. SCHAMEL:
Q. You were asked a number of questions about contact, and you said "liaison."
A. Yes.
Q. What's the difference?
A. The difference is liaisons are for specific things, and it's usually for -- well, in my case it's for events, right? So if I were to come back and do a rally in D.C., he's the liaison. That's the same thing I have with Portland Police Bureau, same thing I have with Austin Police, Miami-Dade Police. I could go on. I have contacts in all the places that we do host rallies.
Q. Do you refer to any of those liaisons as your contact?
A. I mean, it is a contact. I mean --
Q. Is there any significant difference to you between those two terms?
A. I mean, I have Pizza Hut under my contacts on my phone. So, contact is information. Contact information, a person that you can contact. That's it.
Q. Did you ever share any personal information with Mr. Lamond about your life?
A. Not that I recall.
Q. Ever share any with you?
A. I'm sorry?
Q. Did he ever share any with you?

A. No.
Q. Do you know anything about his family, his children, anything like that?
A. Technically, yes.
Q. You do?
A. Yes.
Q. From him?
A. No.
Q. From how?
A. Through my trial I had access to Cellebrite, and I was able to go through -- I had to go through a lot of information. I found out more about Mr. Lamond through there. But other than that, I don't know if he has kids. I don't know if he has a wife. I don't -- at the time. I don't know any of that.
Q. So when you get together at The Dubliner to have a beer, is that a social visit? And you're talking about what?
A. Well, I want to be clear. When you say, "Have a beer," I don't drink.
Q. Fair. Okay.
A. When I sit -- I'm sorry, are you asking for a specific instance or just in general?
Q. You met with Mr. Lamond on a couple of occasions?
A. Yes.
Q. Let's focus first on just The Dubliner, the 15th.
A. Okay.

Q. All right.
A. I don't remember the date. I'm sorry to cut you off.
Q. After the banner burning, during that D.C. trip --
A. Yes.
Q. -- you met with Mr. Lamond?
A. Yes.
Q. Tell the Court a little bit about that.
A. Well, first and foremost -- I guess, the beginning of the conversation where -- about the events of December 12th, not specifically about the banner, but just like events and the movements, the marches, and things like that. I had one of -- I had a friend of mine get stabbed, and I remember asking -- and this was what the conversation was about.

But I was talking to Mr. Lamond about not blocking a certain street because we had a big gathering at Harry's and I wanted MDPD, I think -- MPD to block off the north entrance to Harry's. Because that entrance wasn't blocked, a member of the Proud Boys -- well, multiple members of the Proud Boys got stabbed that day. So that was a big topic of the conversation because it was -- the banner was not as important as three of my guys getting stabbed.

That first objective that I had failed. It is the first time -- it was the first time that I failed miserably at that objective. And that's what I was talking about. And I was talking to him also because there was two white shirts that

I was working with on the ground that day also to try to get, you know, information on where counter-protesters were, to stay away from them, and to get that blockade going on the north side of Harry's.

Q. Let me ask you this question --

A. Go ahead.

Q. -- I'm sure the Court knows, but a white shirt is a?

A. White shirt is a lieutenant or higher within Metropolitan Police Department and other police departments where they usually wear a white -- usually long-sleeve shirt, and they'll have their rank on their collar. So, a higher ranking officer, captain. I think one of them was a captain, might not be sure. It was two bars. I might be wrong.

But that night in D.C., on the ground, I talked to those officers. And I'm relaying all this information to Shane at The Dubliner. I had -- one of my -- two of my guys were in the hospital. One was in the ICU. Okay? They cut him open from the top of the chest down to the bottom of the stomach.

So in matters of how pressing things were, I don't think the banner was a big pressing. Although, I did ask what kind of charges was some of this -- these -- would somebody look at in these instances. I remember that being a conversation. Now, I was also cautious -- oh, I'm sorry. I forgot a had a microphone.

I was also cautious, and I had somebody -- I had a

member of the Proud Boys that's a member of the Skull and Bones chat sitting inside the bar watching me, just in case because -- at that point, again, paranoia was kicking up, and I didn't know if -- it wasn't a high probability, but the probability was there of me getting arrested by Shane or any other --

Q. For what?

A. I mean, they brought a SWAT team to come and get me for a misdemeanor, so I don't think it would be surprising for anybody to arrest a Trump supporter in D.C. for anything and convict them of anything. I mean, it's pretty easy.

Q. My question for you is when you went and met with him at The Dubliner --

A. Yes.

Q. -- "he," being Mr. Lamond, you thought maybe you would get arrested. Was that for the banner burning?

A. It was a culmination of things. That -- those days were really, really intense. My anxiety was peaking. I had an anxiety attack in the middle of a march because I could not control the crowd. It was impossible to control that many people. So I was relying on MPD to kind of corral everybody and keep protesters away.

Three of my guys, again, three of my guys were stabbed. I was already stabbed. So that was a big -- that was a big thing for us, going into D.C., which is hard to tell the

guys that one of the main rules is try not to get stabbed because apparently it's a normal thing in D.C.

Q. Let me ask you a slightly different question.

A. Yes.

Q. And I want to be clear, I'm not -- let me do it a different way.

During the course of that conversation, you talked, you said, about some of your members getting stabbed?

A. Yes.

Q. Do you remember if Mr. Lamond inquired about whether or not you intended to come for the inauguration?

A. Yes.

Q. Is that one of your topics?

A. Yes.

Q. Do you remember what you told him?

A. Yeah, we were talking about -- again, I was freaked out about not being able to control the crowd. So for inauguration I wanted to kind of have a much smaller group where it wouldn't be as -- we had a lot of new members also come in, which were pretty unruly.

Q. Unruly?

A. Unruly, yes. So, for inauguration I wanted to come in normal, in like a smaller group, basically.

Q. Were there any plans to come -- so this is right after the election, correct?

A. Yes.
Q. Election was in early November. This is mid December?
A. Yes, yep.
Q. Between this mid-December date and the inauguration, was there any other event planned in D.C. at that time?
A. At that time, no.
Q. So you didn't have any other plans in the interim to be in D.C.?
A. No.
Q. Do you remember if Mr. Lamond showed you a flyer?
Did you raise your hand?
A. Yes.
Q. I'm sorry. I cut you off. I apologize.
A. You said if there's any other event. So there was -- I stayed there for Jeremy, and we --
Q. Is that the gentleman who was stabbed?
A. That was the gentleman who was stabbed. He was the only one still in the ICU. So when you say "event," we stayed there. A lot of us stayed there.
Q. Okay. Let me say it a different way. Were there any other rallies or demonstrations planned between the middle of December and the inauguration on the 20th of January?
A. No.
Q. At that time?
A. At that time.

Q. Okay. Do you recall during the meeting at The Dubliner whether or not Mr. Lamond showed you the flyer that had been distributed for -- with regard to the banner burning?

A. I can't say I remember.

Q. Do you remember having seen that flyer?

A. Yeah, I think so. I don't remember where, but I remember seeing it.

Q. Can you pull it up?

Bear with me for just one moment while we're pulling that up.

A. Yeah, go ahead.

MR. SCHAMEL: Your Honor, for your purposes, it's Exhibit 4018, page 8 of 37. It's the embedded link in the upper right-hand corner.

THE COURT: All right.

MR. SCHAMEL: I'll ask Mr. Hinger, he's pulling it.

THE COURT: It's not for my purposes, but when you show it to him, you can say that for the record. That would be good.

MR. SCHAMEL: I didn't know if you were looking at something else to pull up in advance, so I'm sorry.

Sorry. I didn't give him enough advance notice. I apologize.

(Pause.)

BY MR. SCHAMEL:

Q. While Mr. Hinger is pulling that up to refresh your recollection, Mr. Tarrio, let me ask you this -- oh, here we are.

MR. SCHAMEL: Your Honor, for the record, this is Exhibit -- Government Exhibit 4018, at page 8.

BY MR. SCHAMEL:

Q. Do you see that, Mr. Tarrio?

A. I can't confirm anything from Cellebrite.

Q. I'm not asking you to confirm anything from Cellebrite. I'm just asking you: Do you see the image in the middle of that upper right-hand corner box?

A. Yes.

Q. Okay. I'm not asking you to confirm whether anybody sent that or received that. I'm asking you, that image, does that image look familiar to you?

A. Yes, very familiar.

Q. Okay. And do you remember seeing a flyer like that after the banner burning for the investigation?

A. Yes. Yes.

Q. Do you remember -- okay. We'll move on.

Do you remember if Mr. Lamond asked you questions about a banner and the photographs in the banner when you were meeting?

A. Yes. I just -- vaguely, but I do remember --

Q. Okay. Do you remember if you told him whether or not you could identify the people in the photos?
A. Yes. I do remember that.
Q. What did you tell him?
A. I told him that I couldn't.
Q. Did you tell him why?
Do you recall?
A. Because I -- I -- I couldn't.
Q. You just didn't recognize them?
A. No.
Q. Okay. And at that juncture, did you tell Mr. Lamond that you had any involvement in actually burning the banner?
A. I'm sorry. Repeat.
Q. Did you tell Mr. Lamond that you personally were involved of the -- in the burning of the banner?
A. No.
Q. And you -- and did you tell him that at any point during the meeting at the Dubliner?
A. No.
Q. Okay. And you never told him that after that either, right?
A. No.
Q. Okay. As you sit here today, have you ever told Shane Lamond, personally, that you burned the banner?
A. No.

Q. But you did forward him your Parler posts and your various public confessions?
A. Yes. I mean, my -- my public post, I guess, spoke for itself.
Q. If after the meeting at The Dubliner you were to have sent messages to someone, right, saying, "I confessed," that wouldn't have been true?
A. That wouldn't have been true.
Q. Why would you have sent a message saying "I confessed to a police officer" if it were not true?
A. It depends on the situation.
Q. On December -- in the middle of December, right, after a meeting at The Dubliner, why would you have sent a message like that?
A. I could tell you generally. I used some of these chats as like a focus group, to kind of see what some of the reactions of the guys are. And I'm just speaking in general terms --
Q. Okay.
A. -- because it's important to me what they think.
So if I'm going to make a decision as crazy as saying publicly, "I committed a crime," I want to see what they say and -- because I could have just shut up, but -- that was an option. I could have just shut up, showed up on January 5th, and that's it. But I decided to make a circus of the thing.
Q. Of the -- of the banner burning?

A. Yes.
Q. And let me ask you a couple sort of different questions, if I may.
A. Okay.
Q. You were shown -- if you would have sent out a message to any of your group of various followers and it was something that you had gained from conversations with Mr. Lamond, what would be the purpose of that?
Why would you send that information out?
A. If I would send -- if -- if it was to relay, like, some type of information that I received from -- it would be -- it would really be at a -- maybe at an event where I relay information like, hey, we need to move north on this road or -- it would be information to kind of keep people away from each other and keep issues from occurring.
Like, I do remember one time where the Lieutenant said, "Hey, you guys are being disruptive in front of Harry's," and that's information that I relay to the -- to the guys.
I'm like, "Okay. You -- we either need to get out of here and disburse or we need to take it inside."
So those. That information is information that -- you know, maybe I'm wrong, but that's information that I'm supposed to be able to decipher and use.
Q. How about a message from Mr. Lamond saying, "The FBI is not investigating this, just MPD is." What was the value of

sending that to your followers?
A. Depending -- well, depending on the timing, too, because at one point I thought it was the FBI investigating the banner burning because that was the first one -- that's the first -- well, I guess that's the one that got the most traction on Twitter, but then later on I saw that it was -- it was MPD that was actually pushing it.
So is that real relevant information that he gave me that's not publicly available? I guess, I don't know. I'm not -- I'm not the judge/jury here to make that decision. So, whether it's wrong, I don't know.
Q. Okay.
THE COURT: Okay. That wasn't what he asked you. He asked you why would you tell your guys.
THE WITNESS: Oh, I thought you said "publicly."
BY MR. SCHAMEL:
Q. And I may have said publicly, but the Judge is right.
A. Can -- can we rephrase the question? I'm sorry. We -- sometimes I go on --
Q. All the time you seem to.
A. Sorry.
Q. Let me ask you: Why would you share some of those -- some of the information from your -- your sort of private chats and conversations with Lieutenant Lamond with your followers?
Was it to make it seem like you had a better connection

than you had?

THE COURT: Okay. Okay. Don't tell him why.

MR. SCHAMEL: Okay.

THE COURT: Why did you share information that you learned from Mr. Lamond with the Proud Boys?

THE WITNESS: This is going to -- this is going to sound like a set up.

Well, one of the reasons is to up my credibility with the guys.

BY MR. SCHAMEL:

Q. What do you mean by that?

A. If you've got -- if you've got an inside guy, you're the guy. You know what I'm saying?

So, it's -- there is times where -- and, again, I think it's more of a marketing ploy than -- I was basically asked if I was a liar by --

Q. Ms. Ross?

A. -- the prosecutor.

But, I mean, car commercials sometimes are a lie. They show you like these awesome scenes and that's what -- I believe in my message, I just -- I need to amplify it. So there's multiple ways to amplify it and there's multiple messages that, obviously, in this courtroom aren't shown. Obviously but there's multiple times where I do this on a regular basis. Okay?

Because, again, I believe in my message and there is a way to amplify that maybe might seem odd to some people, but it makes sense to me.

Q. But this isn't a car commercial, right?

A. This isn't a car commercial.

Q. And so what I'm trying to figure out is when you're getting some of this information in -- strike that. Let me ask a different way.

You're saying that you're doing things that you're not doing, like confessing. How does that, in any way, help your message?

A. What do you mean "confessing"?

Q. You -- if you sent a note out saying, "I confessed to Metro DC," and your testimony here is that did not happen, how does that increase your message, to send a message like that?

A. One of my members was in ear -- one of the members that was in that chat was in earshot of what -- like, was privy to most of the conversation. So he knows that -- exactly what was said and he knows that that wasn't said.

So, there's members of that chat that I want to probe on certain things. So it wouldn't be weird -- again, I don't remember those messages -- I know what messages you're talking about because they were on the screen. I don't remember those messages, I'm just telling you what generally happens.

THE COURT: Okay. Well, if he doesn't remember them,

then why he sent them -- he can't answer why he sent them. He had many chances on cross, he had many chances -- you've asked him three for four times. But if doesn't even remember sending them I don't see why he can -- how he can tell you why he sent them.

So I think you should ask your next question.

MR. SCHAMEL: I'm sorry?

THE COURT: Ask your next question.

MR. SCHAMEL: My next question.

BY MR. SCHAMEL:

Q. Do you recall being asked by Ms. Ross, by the government, about asking Lieutenant Lamond about what was the general consensus about the Proud Boys at MPD?

A. Yes, I remember that question.

Q. What were you seeking there?

A. I was trying to see what -- obviously, we're -- I'm going to go back to the stabbings.

I wanted to see what was -- we deal with a lot of these officers when we're on the street, so I kind of want to see what -- how they perceive us.

Q. But how is he going to know the general consensus of MPD?

A. I don't -- I don't know.

Q. You're just seeking his opinion?

A. Yes.

Q. Is that similar to when you're asking him is it going to be

a hate crime, just want to see what he thinks?

THE COURT: Are you just telling him what to say? Can you ask non-leading questions?

This is redirect. We need focused questions, not just repeating things maybe that you should have asked on direct.

You asked him some of this on direct, but you're up there giving one sentence after another after another and these are supposed to be questions.

BY MR. SCHAMEL:

Q. You were asked by Ms. Ross on cross-examination a question about a message that you may have sent that said, "We are clear on the banner."

Do you remember being asked those questions?

A. I remember that question, yes.

Q. Okay. Did there ever become a point where you believed that you were actually clear on the banner after your public confession?

A. No.

Q. Okay. Were you ever clear on the banner, that you're aware of?

A. I did four and a half months in D.C. jail for the banner, so I don't think that I was ever cleared of the banner.

THE COURT: Well, how did telling them that you were clear on the banner amplify your message?

THE WITNESS: It doesn't. It kind of sees what -- it's kind of me reading the room.

This is a very diverse group of guys and some of them clash with some of my ideas and I'm -- sometimes I'm liked by some of the guys and sometimes I'm not, so I do -- I have to probe.

BY MR. SCHAMEL:

Q. So when you -- if you had sent a message saying you're clear on the banner, you knew that was not true?

A. I knew that wasn't true.

Q. Okay. How about -- and Miss Ross asked you a question about whether or not you've ever sent a message saying that, "D.C. Metro just told me they won't be pursuing it."

Did that ever happen? Did anybody from D.C. Metro ever tell you that they won't be pursuing it?

A. No, they didn't. They pursued it. And my Uber.

Q. And your Uber you said?

A. They pursued my Uber, yes.

Q. You were asked a series of questions by Ms. Ross about whether or not you recalled Lieutenant Lamond reaching out to you before you heard from Detective Mufti, do you remember, that, from MPD?

A. Repeat that. I'm sorry.

Q. You were asked a series of questions by Ms. Ross about Lieutenant Lamond contacting for your phone number before you

were contacted by Detective Mufti.

Do you remember that?

A. Yes. I remember the series of questions.

Q. And then she asked if you had sent out messages talking about getting a lawyer and those types of things.

A. Um-hum.

Q. Do you generally recall those messages?

A. Yes.

Q. Okay. And at the time that Lieutenant Lamond had reached out to you to ask -- and Detective Mufti had reached out, is that before or after the two times Miami-Dade contacted you?

A. That was after.

Q. Okay. Did the fact that Lieutenant Lamond reached out to you impact in any way how you handled the call from Detective Mufti?

A. No.

Q. Is the way you handled the call from Detective Mufti almost the exactly the same as the way you handled it with the two Miami-Dade contacts?

A. Every police officer that contacted me about the banner, I told them that I was going to be invoking my Fifth Amendment right.

Q. And I want to be crystal clear on the Cellebrite piece. Your disagreements with Ms. Ross, you're not denying that those could be messages. You're just not confirming them?

A. I'm not denying that those could be my messages. I'm not confirming anything from Cellebrite, based on previous experiences.

Q. You were asked another question -- series of questions by Ms. Ross -- Court's indulgence.

You were asked --

THE COURT: Do you want water, Mr. Tarrio?

THE WITNESS: No. I'm good.

THE COURT: All right.

MR. SCHAMEL: I'm sorry?

THE COURT: I'm just -- he was grimacing and turning like his back hurt, so I asked him if needed some water and he said no.

THE WITNESS: I'm okay. Thank you.

BY MR. SCHAMEL:

Q. You were asked another series of questions by Ms. Ross about a series of messages where you put out that "He says they're going to take me on stage."

Do you remember that series of questions?

A. Yes.

Q. Okay. On direct you testified you had two plans when you came to D.C. on January 4th?

A. Yes.

Q. What were those two plans?

A. The first plan was to fly into D.C. on January 4th and

bring Amy Harris and another documentary filmmaker, Nick Quested, to follow me into a police station and say, "My name is Enrique Tarrio," and show them the Tweet that they're looking for this person. And I was going to ask them to -- if they were going to do anything to arrest me there in that -- that's plan number 1.

Plan number 2 was also a wild card because the only place that I would be publicly acknowledging that I would be at is on stages that were going to be set up on the National Mall and on -- I believe, next to the Capitol and then one next to the Washington Monument. There was multiple stages I was going to go to, so if I publically declared I was going to be there, then if they were going to arrest me, they would arrest me at one of these places. And I was actually going to lay low until I get on stage. And then if they were going to pick me up, they had no other choice but to pick me up while I was at the event.

Q. Did you ever talk about that plan with Lieutenant Lamond?

A. No.

Q. Did you ever talk to Lieutenant Lamond about this second part of the plan, the on-stage piece?

A. No.

Q. Did he ever suggest to you that that was a plan for MPD, to arrest you on stage?

A. No.

Q. So if you had sent out a message to various individuals -- your focus groups are what you call them -- indicating that maybe he had, would that have been true?
A. I'm sorry?
Q. If you had sent out a message saying that -- suggesting that Lieutenant Lamond had said MPD is going to take me on stage, would that have been true?
A. No.
Q. Why would you have said that?
A. I had -- I'm so sorry.
Q. Sure.
A. Rephrase -- not rephrase it. I got the first part of the question.
Q. If you sent that message, if you sent a message out that said that "they are going to take me on stage."
A. Okay.
Q. Okay. Why would you send that out if it were not true?
A. Because that is exactly what I said with trying to get the sentiment of the guys and seeing how they react to -- how they react to that idea. Some of them actually reacted negatively, so --
Q. Was that an idea that you thought might be fun?
A. I thought it would be.
Q. You thought it might make a show?
A. It might make a show.

Q. The minute -- Ms. Ross asked you a number of questions, Ms. Ross, about the Ministry of Self-Defense. The Ministry of Self-Defense, was that part of your promotion group that you were trying to promote ideas through?
A. No.
Q. What was that?
A. (No response.)
Q. I'll withdraw the question.
You were asked questions about an emergency voice chat. Do you remember being asked those questions --
A. Yes.
Q. -- about emergency voice chat on the 30th of December?
A. Yes, um-hum.
Q. Do you have any recollection of what that might have been about?
A. I do so many of those. I don't have a recollection. There was a lot of things going on that day. I think the very next day I was in front of a congressman's house protesting. But there's a lot of events that occurred from after Christmas all the way up until January 6.
Q. Do you recall ever doing an emergency voice chat as it related to your -- we'll call it marketing for your plans on the banner burning?
A. No.
Q. Do you know if you ever did an emergency voice chat that a

Mr. Bertino was a part of?
A. Yeah, I'm pretty sure that -- not in that specific chat. But, yes, emergency voice chats is a normal thing for me.
Q. You testified on direct and Ms. Ross asked you some questions on cross-examination about your use of the term "feeling." You had a feeling on the airplane.
A. Um-hum.
Q. Can you clarify that for us? I don't think it's clear.
A. Specifically on the airplane?
Q. Yeah. Why would you say, "I had a feeling on the airplane"?
A. Because it's -- it's -- I think I've said this before, but it's real. So I've done all this -- I guess, thinking of what I'm going to do, what's going to happen about the arrest, that when I wake up in the morning and I wake up late, and I miss my flight, I'm still in la-la land. But when I get on that plane, that plane is not going to turn around and go back to Miami. I can't second-guess it. That becomes real, you know. It turns your stomach. Okay. What's going to happen? You know?
In an extreme situation, are the cops going to shoot me when I'm driving down into D.C.? Again, I don't think that's going to happen, but, you know, all that goes through your head. And I think once I'm on the plane, the feeling was real. Like this is going to happen. At some point I'm 99 percent sure I'm going to get arrested.

Q. And when was the moment -- not the feeling, the moment you actually knew there was an arrest warrant for you?

A. I think just walking out the plane.

Q. You actually --

A. I'll take that back. I'll take that back. I think when I saw the cars piled up behind the Prius was when I actually found out that the warrant was signed.

THE COURT: Found out or figured out?

THE WITNESS: Figured out. Yeah, figured out. I'm sorry. Figured out that the warrant was signed because obviously there's fricking cops behind me with their lights on and my Uber driver is refusing to pull over.

BY MR. SCHAMEL:

Q. So when you were asked the questions about the video that you were shown --

A. Yes.

Q. -- you said you knew in the air -- I'm sorry, you knew in the airport. That's what you're saying. That's when you really felt it certain?

A. No.

Q. Okay.

A. So based on the video I was shown -- wait. Maybe I'm -- maybe it was two phrases that I said on that video.

Q. Two phrases. One is "I knew in the airport" and the other that he either called or texted in the air?

A. Okay.
Q. What did those mean to you?
A. Okay. So, one, I can't tell -- I really can't tell you which way because I don't know where the question is. I don't want to speculate as to me answering, but if -- if I -- the last one you could kind of -- I could piece it together where he told me on the plane. Well, I messaged with a million people on the plane, and that man right there is not one of them.
Q. And you messaged what from the plane?
A. When they showed me the video where I said I -- he told me on the plane or -- somewhere in that category is what I said. I don't remember saying it, but obviously I'm on video saying it so I said something along the lines. But I can tell you, sitting here, with a hundred percent certainty, that Shane Lamond did not tell me anything on that plane.
Q. And to be crystal clear, in the conversations and things and the communications you had with Mr. Lamond between the 30th of December, a couple days before you flew and getting on that plane, was there ever a time that Mr. Lamond told you that the arrest warrant had been signed?
A. No.
MR. SCHAMEL: Court's indulgence.
THE COURT: All right.
(Pause.)

MR. SCHAMEL: Thank you, sir.

Ma'am, I am done. I'll cede the witness.

THE COURT: All right.

THE WITNESS: I'm done?

THE COURT: I don't know yet.

MS. ROSS: Nothing else from the government. Thank you, Your Honor.

THE COURT: All right. The witness is excused.

THE WITNESS: Thank you.

THE COURT: All right. Mr. Schamel, you mentioned that you might have some short witnesses?

MR. SCHAMEL: I think that we did and that they're not available. So we're now -- what I'm going to ask the Court is take a brief recess. I think we have to make a determination with Mr. Lamond about what he is going to elect to do, whether he wants to testify.

I'll tell Your Honor, given everything that's happened today in the case, I think I need at least a half an hour to talk to him. And if he chooses to testify, I'm uncomfortable having him take the stand at 4:15. If he chooses not to testify and we waive, I think we'll be resting either way.

So either Mr. Lamond will be our final witness or he will not be our final witness and that was our final witness and we will rest. So I can't speak to the government on the

rebuttal case, but unless they have other witnesses, we either have Mr. Lamond or we don't and we're done.

THE COURT: Well, it's hard for me to ask the government if they have any rebuttal witnesses until they know if Mr. Lamond is going to testify. So, it's -- what time is it? It's quarter of four now. Could we resume at, say, 4:30 just to learn the answer to that question? He wouldn't have to start, but we would find out one way or the other. And then we can determine whether we are hearing rebuttal evidence tomorrow or not.

MR. SCHAMEL: I think that's perfectly fine. And we could also do the voir dire on that either way. We can get that out of the way. If he's going to testify, we can do that today. And, if not -- if that's all right with Your Honor.

THE COURT: All right.

MR. SCHAMEL: I'll have him prepare for that.

THE COURT: I do very limited voir dire on that. I don't think it's really necessary to inquire too deeply into the attorney-client relationship, but I understand some people think that's appropriate.

MR. SCHAMEL: I didn't know Your Honor's practice.

THE COURT: There's very basic questions. We're going to take a break now for 45 minutes. We'll resume at 4:30.

At that time we'll also figure out the rest of the

schedule of the events. I will say that I'm going to ask for briefs on the question of the charging issue that was raised in the Rule 29 to be filed on Tuesday.

MR. SCHAMEL: Understood.

THE COURT: And they should also address not only the substance of the legal issue, but whether, since there was a date by which motions that raised defects in the indictment were supposed to be filed and none were filed, and given rule 12, whether any of those issues fall within that and have been waived.

Mr. Rothstein?

MR. ROTHSTEIN: Yes, Your Honor. We would just ask that -- we're not entirely clear what their legal issue is that they are raising. We would like to respond to whatever they file, as opposed to having simultaneous briefings. So we respond the next day. They could file their brief on Tuesday and if we could file our response on Wednesday, that would be helpful.

THE COURT: All right. I thought they said enough that you have some idea where to go. But that's fine with me.

MR. SCHAMEL: We have no objection.

THE COURT: That's what we're doing, at least with respect to that. I think no matter what, it is most likely that we're going to have closings on Monday because, as I've told you, I have a sentencing tomorrow morning that's going to

take a while.

MR. SCHAMEL: It's going to take -- I'm sorry?

THE COURT: A while.

MR. SCHAMEL: I'm sorry.

THE COURT: In all likelihood we're going to end up doing our closings on Monday. But we'll confirm the schedule after we find out what's happening later today.

All right. I'll see you.

(Recess from 3:54 p.m. to 4:42 p.m.)

THE COURT: All right. Mr. Schamel, can you let me know what your position is as to whether your client is going to testify or not?

MR. SCHAMEL: Good afternoon, Your Honor. I've had an opportunity to speak with my client. I very much appreciate the time the Court gave us to have that final discussion. Mr. Lamond has elected to testify. I don't know whether you want to ask him any other questions, but I have, on numerous occasions prior today and again today, gone through his constitutional rights. He understands that he has an absolute right not to testify, but he has elected that he will testify. And whatever time Your Honor would like to start tomorrow morning after your sentencing, he will be available for testimony.

THE COURT: It's a little difficult for me to predict when the sentencing is going to come to its conclusion. They

tend to take at least, an hour and a half, to two hours because there's often a break between all of the allocution and the ultimate imposition of sentencing. And I think the better course would be to -- for me to do an early lunch break, because they're intense, and then instead of saying, well, we'll start at 12 and go for half an hour and then we'll pick up in the afternoon, let's just start at, say, 1.

MR. SCHAMEL: That's fine, Your Honor.

THE COURT: All right. Now, I don't know whether the government is going to have rebuttal evidence after -- are you calling any other witnesses?

MR. SCHAMEL: We're not. He will be the last witness and we will rest and renew our Rule 29, which I assume will just be included in the filing we're going to make on Tuesday.

THE COURT: Okay. I think I would probably still be inclined -- I'm hoping we can finish that between 1 p.m. and the end of the day. It seems like we could.

I want to remind everybody that I have seen every one of the messages a couple of times and they're going to be necessary for the cross-examination, they're going to be necessary for the direct, but they don't need to be read a loud multiple times during either the cross or the direct because -- and I'll have them after your closings also to study them afterwards, to the extent I don't have them memorized already.

So hopefully the government will be able to finish

its case on Friday and then we can set the openings for 9:15 on Monday morning, which ought to give us enough time. I don't usually set time limits, but I want to remind you that there is not a jury, that the evidence has been shown and reshown, and what I want to hear is the arguments based on the evidence. And they don't have to be as argumentative as making the same point -- after each message making the point of: And he didn't talk to another officer in that period of time, or: And that was not authorized. You can sum those up at various points. And the same thing with the defense.

I understand that you have arguments to make about what's been shown and what hasn't been shown. But some of the performative nature of a closing argument that you might think was persuasive with the jury is probably not necessary.

So, I would think that everybody -- I don't know how much time you each want, but I can't imagine that you would need more than, what? What do you think you would want?

MR. SCHAMEL: Mr. Rothstein and I talked about that exact topic with the time you gave us, and we thought no more than 40 minutes each, total. I actually think it's going to be closer to 25 or 35, at most.

THE COURT: Okay.

MR. SCHAMEL: I was pretty close on my estimate on my direct.

THE COURT: No, you weren't. His direct was more

than an hour and you said it was going to take 20 minutes.

MR. SCHAMEL: I think it took me 40 minutes. I think I was at 40.

THE COURT: No, you didn't. You said 20.

MR. SCHAMEL: I'll get a new watch.

THE COURT: I'm not going to hold you to that, but I think between 45 minutes and an hour. After an hour I might start throwing things.

MR. SCHAMEL: And that would be fair. I don't want to have anything thrown at me at work, like I do at home.

THE COURT: All right.

MR. SCHAMEL: But I will say, we have a hard stop. And Mr. Rothstein let us know --

THE COURT: You don't need to tell me anything more about that.

MR. SCHAMEL: Okay. Do you want -- other than my representations, do you need to hear from Mr. Lamond?

THE COURT: You're calling him, I don't think I have to do an inquiry about that.

All right. Anything further from the government right now?

MR. ROTHSTEIN: One thing, Your Honor, on the jury instructions that you had circulated earlier. We just had one edit under Count 1.

THE COURT: Okay.

MR. ROTHSTEIN: Under paragraph 1 of the elements, after "Black Lives Matter," to be consistent with the statutory language, we think it should say: Comma, conducted by an agency of Washington, D.C. And we believe that's consistent --

THE COURT: Okay. Well, you had in an official proceeding in Washington, D.C. Does the indictment say --

MR. ROTHSTEIN: I believe that that's from the language of the statute --

THE COURT: Okay.

MR. ROTHSTEIN: -- that is cited.

THE COURT: All right. I don't have the -- does anybody have the one -- the standard one in front of you?

MR. SCHAMEL: I don't have it, Your Honor. And, candidly, I haven't even had a chance to look at what was handed out this morning.

THE COURT: Tell me what it is you want to say.

MR. ROTHSTEIN: We I believe at the end, after "Black Lives Matter," comma, conducted by an agency of Washington, D.C.

THE COURT: All right. I will -- I don't think that was in your proposal.

MR. ROTHSTEIN: I think that we went back and looked at the statute, given --

THE COURT: Okay. I'll look at it.

MR. ROTHSTEIN: Yep.

THE COURT: And the defendant can let me know if they have an objection. And we will finalize the language between his testimony and the closings. And we'll leave it at that. I don't think that's one of the disputed elements.

MR. ROTHSTEIN: Yep.

THE COURT: Okay. Anything else?

MR. ROTHSTEIN: Nothing else from the government. Thank you, Your Honor.

THE COURT: Okay. All right. So what did I say? I'll see you all tomorrow at 1 p.m. then. Okay. Thank you.

* * *

CERTIFICATE OF OFFICIAL COURT REPORTER

I, JANICE DICKMAN, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 6th day of December, 2024

________________________________

Janice E. Dickman, CRR, CMR, CCR
Official Court Reporter
Room 6523
333 Constitution Avenue, N.W.
Washington, D.C. 20001

INDEX

WITNESS:

Enrique Tarrio
Direct Examination By Mr. Schamel................. 3
Cross-Examination By Ms. Ross..................... 39
Redirect Examination By Mr. Schamel...............126

EXHIBITS:

Government Exhibit 4034................................118
Government Exhibits 4034A, B, C, D, E..................120

* * *