**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

No. 25-3066

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

SHANE BRIAN LAMOND,

*Defendant-Appellant*.

Appeal from the United States District Court for the District of Columbia,
No. 1:23-cr-00177-ABJ-1 (Hon. Amy Berman Jackson)

**APPENDIX FOR DEFENDANT-APPELLANT**
**SHANE BRIAN LAMOND**
**Volume IV of V, pp. A1057-A1446**

ANDREW E. GOLDSMITH
RENO G. VARGHESE
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
agoldsmith@kellogghansen.com
rvarghese@kellogghansen.com

*Appointed Counsel for Defendant-Appellant Shane Brian Lamond*

May 8, 2026

# TABLE OF CONTENTS

Page

**Volume I**

Docket Sheet, *United States v. Lamond*, No. 1:23-cr-00177-ABJ-1 (D.D.C.) ..... A1

Indictment (May 18, 2023), Dkt. No. 1 ..... A23

Joint Pretrial Statement (Jan. 22, 2024), Dkt. No. 41 ..... A40

Exhibit 1: Government's Exhibit List, Dkt. No. 41-1 ..... A63

Exhibit 2: Government's Proposed Verdict Form, Dkt. No. 41-2 ..... A70

Exhibit 3: Defendant's Proposed Verdict Form, Dkt. No. 41-3 ..... A72

Notice of Filing (Nov. 5, 2024), Dkt. No. 80 ..... A74

Defendant's Waiver of Trial by Jury, Dkt. No. 80-1 ..... A75

Elements of the Offenses (Dec. 9, 2024), Dkt. No. 86 ..... A76

Judgment (June 10, 2025), Dkt. No. 110 ..... A79

Notice of Appeal (June 24, 2025), Dkt. No. 112 ..... A86

**Volume II**

(Transcript Volumes II-IV)

Transcript of Status Conference Held On September 24, 2024 [Redacted] ..... A87

Transcript of Jury Trial Day 1 Held On December 2, 2024 ..... A133

Transcript of Jury Trial Day 2 Held On December 3, 2024 ..... A397

**Volume III**

Transcript of Jury Trial Day 3 Held On December 4, 2024 ..... A632

Transcript of Jury Trial Day 4 Held On December 5, 2024 ..... A892

## Volume IV

Transcript of Jury Trial Day 5 Held On December 6, 2024 ............................A1057

Transcript of Jury Trial Day 6 Held On December 9, 2024 ............................A1225

Transcript of Jury Trial Day 7 Held On December 10, 2024 ..........................A1242

Transcript of Verdict Held On December 23, 2024. Dkt. No. 99 ....................A1314

Transcript of Sentencing Held On June 6, 2025, Dkt. No. 122........................A1389

## Volume V

(Admitted Trial Exhibits)

Exhibit 1004: Lamond Phone Forensic Report_Timeline ...............................A1447

Exhibit 1006: Forensic Examination Report (Manicini) 1B2 Part One Final, dated Feb. 2, 2023 ...................................................................A1484

Exhibit 1006A: Email from Shane Lamond to Commander Parsons FW: Subject in Photo, dated Dec. 20, 2020 ..........................................A1494

Exhibit 1006B: Email from Shane Lamond to Kelly O'Meara re: BLM signs, dated Dec. 13, 2020 .........................................................A1496

Exhibit 1006C: Email from Shane Lamond to Commander Parsons re: Podcast, dated Dec. 20, 2020 .........................................................A1498

Exhibit 1006D: Email from Shane Lamond to Franklyn Then re: Subject in Photo, dated Dec. 20, 2020...................................................A1500

Exhibit 1014: Email from Ahsan Mufti, re: Resubmission, dated Dec. 29, 2020 ....................................................................A1503

Exhibit 3002: Metropolitan Police, District of Columbia, General Order 201.26 – Duties, Responsibilities and Conduct of Members in the Department ...............................................................A1542

Exhibit 3003: Metropolitan Police, District of Columbia, General Order 201.36 – Sworn Law Enforcement Officer Code of Ethics ..........................................................................................A1554

Exhibit 3005: Metropolitan Police, District of Columbia, General Order 601.02 – Preservation of Potentially Discoverable Material ........ A1557

Exhibit 4001: Article: *Proud Boys Leader Says He Burned Black Lives Matter Banner Stolen from Church During Demonstrations in D.C.*, Wash. Post (Dec. 18, 2020) ........ A1560

Exhibit 4004: Parler Post by @NobleLead, dated Dec. 18, 2020 ........ A1563

Exhibit 4006: Timeline Final – Summary Chart of Communications 10.24.2019 - 1.27.2021 ........ A1564

Exhibit 4018: Summary Chart 11.14.2020, 730PM – 12.20.2020 ........ A1619

Exhibit 4026: Timeline – Summary Chart Shane Lamond's Contacts ........ A1656

Exhibit 5006: Shane Lamond Interview Transcript Held On June 2, 2021 ........ A1658

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America, | Criminal Action No. 23-cr-177 |
| Plaintiff, | |
| | JURY TRIAL Day 5 |
| vs. | |
| Shane Brian Lamond, | Washington, DC |
| | December 6, 2024 |
| Defendant. | Time: 1:03 p.m. |

---

TRANSCRIPT OF JURY TRIAL
HELD BEFORE
THE HONORABLE JUDGE AMY BERMAN JACKSON
UNITED STATES DISTRICT JUDGE

---

A P P E A R A N C E S

For Plaintiff: Rebecca G. Ross
Joshua Rothstein
UNITED STATES ATTORNEY'S OFFICE
610 D Street NW
Washington, DC 20530
(202) 252-6937
Email: Rebecca.Ross2@usdoj.gov
Email: Joshua.Rothstein@usdoj.gov

For Defendant: Mark E. Schamel
Ana L. Jara
VENABLE LLP
600 Massachusetts Avenue NW
Washington, DC 20001
(202) 344-4631
Email: MESchamel@venable.com
Email: ALJara@venable.com

---

Court Reporter: Janice E. Dickman, RMR, CRR, CRC
Official Court Reporter
United States Courthouse, Room 6523
333 Constitution Avenue, NW
Washington, DC 20001
202-354-3267

* * * * * * *P R O C E E D I N G S* * * * * * *

THE COURTROOM DEPUTY: We are back on the record with criminal case 23-177, United States of America versus Shane Brian Lamond.

Counsel, please state your appearance for the record.

MR. ROTHSTEIN: Good afternoon, Your Honor. Josh Rothstein on behalf of the United States. With me at counsel's table is AUSA Rebecca Ross, paralegal specialist Lisa Abbe, and FBI Special Agent Liz Hadley.

THE COURT: All right. Good afternoon.

MR. SCHAMEL: Good morning, Your Honor. Ana Jara, Mark Schamel, Bill Hinger on behalf of Lieutenant -- or, Mr. Lamond, who is present.

THE COURT: All right. Are you ready to proceed?

MR. SCHAMEL: We are, Your Honor.

THE COURT: All right. Call your next witness.

MR. SCHAMEL: Your Honor, the defense calls Mr. Lamond, Shane Lamond, to the stand.

BRIAN LAMOND,

was called as a witness and, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SCHAMEL:

Q. Good afternoon.

A. Afternoon.

Q. Make sure -- you've seen we've had problems with the microphone, so let's make sure we both do a good job, okay?
A. Absolutely.
Q. Sir, can you please state your full name for the record and spell it?
A. Yes, it's Shane Brian Lamond. First name is spelled S-H-A-N-E. Middle name B-R-I-A-N. Last name Lamond, L-A-M-O-N-D.
Q. And, Mr. Lamond, how old are you?
A. I am 48 years old.
Q. Okay. I have some questions just about your background.
Are you currently employed?
A. No, I am not.
Q. Okay. Previously you were employed in what way?
A. Yes, I was.
Q. In what way?
A. I was employed by the Washington, D.C., Metropolitan Police Department.
Q. Okay. For how many years?
A. For approximately 24 years.
Q. And when did you leave the police department?
A. Correction. I'm sorry. Twenty-three years.
Q. Twenty-three years?
A. Yes.
Q. When did you leave the police department?

A. May of 2023.
Q. And how did you leave the police department?
A. I retired.
Q. And I would like to walk you through a little bit -- actually, let me ask you a couple of questions.
Are you married?
A. Yes, I am; separated.
Q. Separated. Children?
A. Yes, two children.
Q. And where do you reside?
A. I'm sorry, say again.
Q. Where do you currently reside?
A. In Colonial Beach, Virginia.
Q. I would like to ask you some questions about your MPD background, if I may. Okay?
A. Sure.
Q. When did you come on the force?
A. I came on in April of 2000.
Q. What were your first duty assignments?
A. Upon graduating the Metropolitan Police Academy, I was assigned to the First District as a patrol officer.
Q. From the First District, where did you go?
A. In 2004 I was transferred to the crime scene search unit as a crime scene technician, crime scene search officer.
Q. Okay. And from the crime scene search, where did you go

next?
A. In 2005 I was promoted to sergeant and I was assigned to the Third District as a patrol sergeant.
Q. How long were you in the Third District?
A. For approximately four years.
Q. Okay. And from the Third District as a patrol sergeant, where did you go next?
A. In 2009 I was promoted to lieutenant and I was transferred to the Fourth District as a patrol lieutenant.
Q. A patrol lieutenant in the Fourth District?
A. Yes, that is correct.
Q. How long were you in the Fourth District?
A. Approximately eight years.
Q. Okay. And from the patrol district lieutenant in 2009 for eight years -- so that's 2017?
A. Yes, that's correct.
Q. Where did you go in 2017?
A. In September of 2017 I was transferred to the intelligence branch.
Q. Okay. And what was your role in the intelligence branch?
A. I was the lieutenant who oversaw the intelligence branch for the Metropolitan Police Department.
Q. And did you receive any specialized training before you were transferred to the intelligence branch?
A. No, I did not.

Q. And talk a little bit for the Court, so the Court understands, the circumstances of joining the intelligence branch. How did you come to be the lieutenant? What training you received on the job.
A. There was an existing lieutenant who was over there, was looking to get out because he was getting ready to retire soon. I was selected for the position and I shadowed him for approximately two weeks, and then -- at which time I was made the lieutenant of the intelligence branch. I did have an acting captain above me for a few months after that. However, he was taking a lot of leave because he was tending to a family member who had cancer.
Q. And then you were the lieutenant in charge of the intelligence branch then from 2017 until you retired in 2023?
A. That is correct, yes.
Q. Did you receive any specialized training on intelligence once you arrived at the intelligence branch? You said you didn't before. Did you get any after you got there?
A. No, did I not.
Q. Did you get sent to any schools or any sort of advanced training of any kind outside of MPD?
A. I attended one class, I believe it was 2018, by the FBI. I don't remember the exact name of the class, but it was -- something like intro to intelligence theory or something like that.

Q. From the FBI?
A. Yes, from the FBI.
Q. Tell the Court a little bit, what was your understanding of your duties as the lieutenant of the intelligence branch.
A. We had a couple of duties or missions. First was to investigate threats to law enforcement officers, as well as District of Columbia government officials. We were also there to assist our federal partner agencies, like Secret Service, FBI, Capitol Police, in investigating threats to federal government officials, as well as threats to, like, national landmarks.
It was to liaison and coordinate with other intelligence units, with other law enforcement agencies throughout the United States. At the time I was also in charge of monitoring and documenting criminal gang activity in the District of Columbia. As well as my unit was also responsible for the pawn unit, which issued and monitored the business licenses for pawn shops and secondhand dealers in D.C.
Q. So were you doing criminal investigations in the intelligence unit?
A. No, we were not doing criminal investigations.
Q. I don't think you mentioned, but were you doing anything related to First Amendment or protests intelligence?
A. Yes. Yes, we were also tasked with monitoring First Amendment demonstrations, such as protest, marches, parades, in

the District of Columbia for any type of criminal activity or terrorist activity planned or operated under the guise of lawful First Amendment demonstrations, as well as threats to those events.

Q. Threats to the demonstrations and the protests?

A. Yes, that is right.

Q. Were the duties of an intelligence lieutenant the same as the duties as a Fourth District lieutenant?

A. No. Totally different.

Q. Tell us a little bit about the difference?

A. As a patrol lieutenant I was responsible for being the watch commander for that shift. So anything that occurred during that shift I was responsible for, for responding to critical incidents, stabbings, shootings, and also to review and approve arrest reports.

Q. During your career -- I'm going to try to break it down between -- from when you came on duty to 2017, and then '17 to retirement in the intelligence division. Prior to the intelligence division, did you ever work with any confidential informants or sources?

A. No, I never did.

Q. Okay. When you came to the intelligence division, did you work with any confidential informants or sources?

A. Not confidential informants.

Q. But sources?

A. Yes, sources.
Q. What kind of work did you do with sources?
A. Just collecting information on First Amendment activities.
Q. And is it different, in your understanding, for the intelligence sources versus the criminal side sources?
A. Yes, it is.
Q. Can you tell the Court a little bit about your difference in the understanding of that?
A. Yes. Working a source involving criminal cases, such as like drugs, guns, we have a system to register those sources. And they can be different types, like paid informants, stuff like that. But as a First Amendment source, they did not have to be registered because that would be no different from anybody off the street who was just giving you information on a protest or a parade.
Q. And you said there was no training that you received when you entered the intelligence division. Was there any guidance? Was there like a handbook or any specialized guidance that you were given to run the intelligence section?
A. No, not that I'm aware of.
Q. Did you receive any guidance or training particularly to First Amendment protest work?
A. There was a MPD standard operating procedure on handling First Amendment demonstrations, but nothing, to my recollection, involving intelligence gathering with respect to

it.
Q. And other than the two weeks that you received as you sort of shadowed your predecessor, no other training?
A. No other formal training, that's correct.
Q. Did you ever receive any formal guidance or training on what to do with an intelligence source on the intelligence side?
A. No, I did not.
Q. Who was in -- I'm going to start in 2017. I would like you to just walk through your various supervisors from 2017 to 2023. Who was in your direct chain of command above you when you joined?
A. When I joined in September of 2017?
Q. Yes, sir.
A. Acting Captain Michael Pavlik was my immediate supervisor, followed by a civilian director, Tip White. I think he was there less than a week. And he was replaced with Commander Keith Deville.

And I should step back. Before -- the director, Assistant Chief Jeffrey Carroll was the assistant chief the entire time.
Q. So on the top of the org chart you had Assistant Chief Carroll?
A. That is correct, yes.
Q. All right. And then you said at some point there was an

acting captain above you?
A. Yes.
Q. And there was also some civilians who were above you?
A. One civilian, yes, above me. The civilian was replaced by Commander Keith Deville, with Assistant Chief Jeffrey Carroll still above him, followed by Inspector Michelle Ridlehoover.
Q. Go slower on that one, because I didn't get it. I don't know if the court reporter got it. What was that name?
A. Inspector Michelle Ridlehoover.
Q. Okay.
A. If I can just step back for one second. During Inspector Ridlehoover's tenure, Acting Captain Pavlik retired from the department. So Inspector Ridlehoover then became my immediate supervisor, followed by Assistant Chief Jeffrey Carroll.
THE COURT: Can you just go up the chain for me in terms of titles? You're lieutenant, and then --
THE WITNESS: Yes, Your Honor.
THE COURT: -- go through captains and inspectors --
THE WITNESS: Yes.
THE COURT: -- which at one time you had directly above you and one you had the other, and then where commanders and chiefs come in.
THE WITNESS: I understand it's confusing, Your Honor. Yes, so above lieutenant is captain, above captain is inspector, and then above inspector is commander or

director. If it's a civilian, it's a director equivalent. If it's a sworn member, it's a commander. And then above that would be assistant chief, and then you have the chief of police.

THE COURT: So the assistant chief is not just the assistant chief in charge of intelligence, but it's the assistant chief of police at that point?

THE WITNESS: Yes, ma'am. However, we had multiple assistant chiefs. In this case, Assistant Chief Jeffrey Carroll was the assistant chief in charge of the Homeland Security Bureau.

THE COURT: Okay. All right. Thank you.

Go ahead.

MR. SCHAMEL: Thank you, Your Honor.

BY MR. SCHAMEL:

Q. So and you said -- so Captain Pavlik retires?
A. Yes.
Q. Then who became your next immediate supervisor?
A. Next was Inspector Michelle Ridlehoover.
Q. How long was the inspector your commander?
A. I don't recall. I believe it was -- I'd say less than a year.
Q. Okay. And then after the inspector, who was your next supervisor?
A. It was Director Carolyn Montagna.

Q. Okay. And she remained your supervisor until you retired, correct?

A. No. Shortly after January 6th they reorganized the intelligence branch.

Q. Okay.

A. And she was moved over to a different -- or, she was concentrated on a specific division and then created the office of -- Office of Intelligence, and Commander Guillermo Rivera then became my immediate supervisor.

Q. And he was your supervisor until such time as you retired?

A. Until I was -- my police powers were revoked and I was suspended.

Q. Okay. As a lieutenant in 2017 until the time you left, how many individuals reported to you in the intelligence division?

A. For the entire division it changed, but I had approximately, I would say, eight detectives, maybe fourteen officers, I had four analysts and three sergeants.

Q. Okay. I want to draw your attention to 2019. Okay. What was going on in 2019? What were your duties, what was happening in the city in 2019 as lieutenant in charge of the intel division? Let's start in late -- summer of 2019.

A. Summer of 2019, we had a number of First Amendment demonstrations related to the George Floyd death in another state in the U.S.

Q. So, is it -- were demonstrations picking up?

A. Yes, absolutely.
Q. Did your focus of your duties as the intel commander change in 2019?
A. We became primarily focused on monitoring these First Amendment demonstrations and collecting intelligence related to them, because they were increasing in frequency, as well as, like, violence.
Q. I missed the last part. As well as?
A. As well as violence.
Q. As well as violence.
At some point did you become aware of the Proud Boys?
A. Yes, I did.
Q. How did you become aware of the Proud Boys?
A. In July of 2017, Washington, D.C., at Freedom Plaza, hosted an event, a First Amendment event, called the Demand Free Speech event. And Mr. Enrique Tarrio -- or, Henry is his legal name -- Henry Enrique Tarrio was coordinating with one of the event coordinators for security. And he had received social media threats about the Proud Boys, who he was the chairman or the president of at that time. The organizer relayed that to our special operations division, homeland security. Since the intelligence branch was tasked with investigating those -- those threats, I was placed in contact with Mr. Tarrio.
Q. Is that the first time you had ever met Mr. Tarrio?
A. Yes, it is.

Q. Was that a personal or professional connection?
A. It was a professional connection.
Q. Why would you be talking to Mr. Tarrio as the head of intel?
A. Well, again, we had to collect the intelligence on the threat against the Proud Boys, his group. And, also, there were -- Proud Boys were planning on coming into Washington, D.C. multiple times. So it was good to have a source to get information on these upcoming events by the group.
Q. So did you open a file on Mr. Tarrio as a source when you met him in July of 2019?
A. No, I did not.
Q. Why not?
A. Because we weren't -- we couldn't open a file on a, like, a First Amendment source.
Q. Now, let me just ask you this: What were your feelings at that time about the Proud Boys?
A. At this time I didn't know much about them. This was the -- my first experience with the Proud Boys in Washington, D.C., so I didn't know anything about them.
Q. Okay. Did you know -- strike that.
How about Mr. Tarrio? What were your feelings about Mr. Tarrio when you met him?
A. I knew nothing about him, so I had no feelings at the time.
Q. You heard it said that you're a Proud Boys sympathizer?

A. Yes, I have.

Q. Right now, what are your views about the Proud Boys?

A. That really upset me, see it --

MR. ROTHSTEIN: Objection, Your Honor. Relevancy. Asking him what his feelings are right now.

THE COURT: What is the relevance about his feelings right now?

BY MR. SCHAMEL:

Q. Okay. From 2020, you got to know more about the Proud Boys --

A. Yes.

Q. -- say, 2020 to 2021. What were your feelings about the Proud Boys?

A. Mr. Tarrio individually was a source of mine, a professional source. I don't support the Proud Boys and I'm not a Proud Boys sympathizer. I was greatly upset about the articles posted about me being a Proud Boys sympathizer or a double agent with them.

MR. ROTHSTEIN: Objection, Your Honor. Relevance.

THE COURT: Overruled. There were questions asked about it yesterday.

BY MR. SCHAMEL:

Q. Was there any reason, other than a professional reason, for you to engage with Mr. Tarrio?

A. No, there was not.

Q. How would you rate the level of importance of Mr. Tarrio as a source or contact for you, as a lieutenant in the intel division?
A. Extremely important.
Q. When you would meet -- you met with Mr. Tarrio?
A. Yes, I did.
Q. And you communicated with him in various Telegram and other messages, correct?
A. Yes, I did.
Q. Did you take notes of your meetings with Mr. Tarrio?
A. No, I did not.
Q. Why not?
A. Again, he was a First Amendment source, there was no requirement, there was no general order requiring the documentation of that.
Q. Did you -- what did you do with the information that he -- did you receive information from Mr. Tarrio?
A. Oh, yes, on many occasions.
Q. Okay. What would you do with that information?
A. I passed it on to the appropriate law enforcement entities or to my chain of command.
Q. Did others in the -- in your chain of command know that you were in communication with Mr. Tarrio?
A. Yes, they did.
Q. Is there any -- did it ever come up about whether you had

registered him or should register him?
A. No, that never came up.
Q. Approximately how many people -- between, let's say, July of 2019, when you met him, and, let's say, early January of 2021, how many people within the MPD chain of command that you dealt with do you believe were aware that you were dealing with Mr. Tarrio directly?
A. MPD chain of command, I would say probably around a dozen.
Q. How about other intel agencies, outside of MPD?
A. I would say probably another 12 to 20.
Q. You said you met with Mr. Tarrio and you communicated with him with some frequency, is that right?
A. Yes, that is correct.
Q. Why would you do that?
A. To gather intelligence on what the group's plans were when they were coming to Washington, D.C. for these demonstrations.
Q. Did you only discuss him coming to Washington, D.C.?
A. No. We discussed them going to other states for demonstrations as well.
Q. Did you ever develop a friendship with Mr. Tarrio?
A. No, I did not.
Q. Did you ever communicate with Mr. Tarrio in any personal capacity?
A. No, I did not.
Q. Did you ever socialize with him personally?

A. No, I did not.
Q. Did you ever contact him on a personal phone or computer or any personal devices?
A. Never.
Q. Did you ever talk to him about your family?
A. Never.
Q. His?
A. Never.
Q. I'm going to try to do this without showing you too many exhibits, okay? I'm going to ask you some questions. But if at some point you need to refresh any recollection, let me know and I'll pull them up. Okay?
A. Will do. Thank you.
Q. Do you recall how you addressed Mr. Tarrio in a lot of your communications?
A. Yes. I addressed him as brother.
Q. Why?
A. Because the Proud Boys, I came to learn, was kind of a fraternal organization, or group. They often referred to each others as brothers, so I did it to build a rapport and to kind of gain his trust.
Q. Did you consider him your brother?
A. No. Absolutely not.
Q. Did you ever exchange any gifts or cards or anything of value with Mr. Enrique Tarrio?

A. Never.
Q. Ever celebrate any, like, significant events? Like happy birthday card or anything like that?
A. Never.
Q. Did he with you?
A. No, he did not.
Q. Let's move forward a little bit to 2020, as your, sort of, communication and contact with Mr. Tarrio evolves. Okay?
A. Yes.
Q. Okay. Did you start talking to him more often?
A. Yes, I did.
Q. Okay. And how would you communicate with Mr. Tarrio?
A. Through text messages, on Telegram, and occasionally in person, when he was in town.
Q. Okay. Approximately how many times total do you recall meeting with Mr. Tarrio in person?
A. Meeting in person? Over those years, I would say -- I don't want to answer specifically, but I would say six to eight, possibly more.
Q. And do you recall about how many times you talked to him on the phone?
A. No. It was multiple times, but I don't --
Q. How about in various text or Telegram or other written communications?
A. Hundreds of times.

Q. At some point did you -- you said you started using Telegram?
A. Yes, that is correct.
Q. Did you use Telegram with anybody else that you were communicating with?
A. No, I did not.
Q. Is Mr. Tarrio the only person you used Telegram with?
A. Yes, I believe so.
Q. Had you used Telegram before your communications with Mr. Tarrio?
A. I don't believe so, no.
Q. Why did you start using Telegram?
A. Because that was his preferred method of communication.
Q. And how did you know that?
A. He told me.
Q. Were you aware -- do you remember exactly when you started using Telegram with Mr. Tarrio?
A. I don't. I know it was sometime in 2020, but I don't recall when.
Q. Do you know if there was an MPD policy on whether or not you could use Telegram in 2020?
A. There was none. There's no MPD policy.
Q. Okay. How about the function that allows you to set so that the chats disappear. Did you use that?
A. Yes, I did use it on occasion.

Q. Why did you do that?
A. Because I was mirroring his -- his use of it.
Q. Had he talked to you about that?
A. I believe so, yes.
Q. And were you aware there was an MPD as it related to that?
A. There was no MPD policy.
Q. And you weren't taking any notes of your meetings?
A. No, I was not.
Q. Did you have contacts with members of other groups like Mr. Tarrio or the Proud Boys?
A. Other groups, yes.
Q. Okay. Which other groups were you in communication with?
A. We attempted communications with groups like Shut Down D.C. I can't think of any others. We tried making contact with Patriot Front as well, but were unsuccessful.
Q. So was Mr. Tarrio sort of the only one you'd had any success in sort of establishing this kind of rapport with?
A. Yes, that's true.
Q. You've seen a lot of the exhibits the government has shown about things like ABRA. You know what ABRA is?
A. Yes, I do.
Q. There was an ABRA report that you sent to Mr. Tarrio? Do you recall that?
A. Um --
Q. I'll show you, if it helps.

A. That would help, yes. Thank you.
Q. Hold on one second. Let me go to a different one, first.
Bill, can you put up 4008, page 1.
Take a look at that top box there, with the image in it. Do you see that?
A. Yes, I do.
Q. Is that something you sent to Mr. Tarrio?
A. Yes, it is.
Q. Okay. What is that? What is that?
A. It's a symbol of what should be sights on a rifle, but the front sight is showing a "okay" symbol, which was used by right-wing extremists.
Q. Why did you send that to Mr. Tarrio?
A. There were two reasons. One, because the Proud Boys make that "okay" symbol, and I was wondering if it had anything to do with them. And, also, just -- well, really, for our intelligence gathering, to find out if they had anything to do with it or if they used that.
Q. Is that because you shared any sort of white supremacist -- is that you communicating that you were a white supremacist?
A. No, not at all. It was for intelligence gathering.
Q. You've met Mr. Tarrio in non -- we'll call them non-protest settings a couple of times, is that correct?
A. Yes, I did.
Q. Why did you do that?

A. Once again, it was to gain intelligence on First Amendment activities.
Q. Do you recall where you met him?
A. Yes. I met him at Harry's, which is a bar/restaurant. I've also met him once at The Dubliner, which is another restaurant in northwest D.C., and I've met him -- well, during these protests and such at various locations within D.C.
Q. Were those social visits or were those professional visits?
A. No, those were all professional visits.
Q. Did you ever buy him anything or purchase him a meal or anything like that?
A. I bought him a coke once at the Dubliner when we met.
Q. He ever buy anything for you or purchase anything for you?
A. No, he never bought anything for me.
Q. Let me ask you about the term "Law enforcement sensitive information." Are you familiar with that term?
A. Yes, I am.
Q. What is that to you?
A. It's -- to me, it's unclassified information, but it's for official law enforcement use.
Q. Did you ever share any law enforcement sensitive information that you're aware of with Mr. Tarrio?
A. Not that I'm aware of, no.
Q. How about the term "Need to know"? Do you know what that is?

A. Yes, I do.
Q. Okay. What is that to you?
A. Relates to having a legitimate need to have or use information, or to know information.
Q. Did you ever share -- did you ever have any need-to-know information you shared with Mr. Tarrio?
A. No, not that I'm aware of.
Q. Do you ever recall him asking for any need for know or law enforcement sensitive information?
A. No, he's never asked for either of those.
Q. You did share some things with Mr. Tarrio, though, did you not?
A. Yes, I did.
Q. Do you remember sharing with him a report about an ABRA investigation?
A. I would need to see it. I don't remember sharing an actual report. I do remember saying that I would look into one.
Q. Okay. Why would you do that?
A. Because it was of no value. It was public information that anybody could access. But I did it to establish that rapport and gain his trust so that he would continue to provide me with First Amendment intelligence.
Q. Okay. Let's move forward into December of 2020. Are things changing in the District of Columbia as it relates to First Amendment activity? December of 2020, post election.

A. Yes, absolutely.
Q. How so?
A. In December of 2020, it was right after the election, there were very many people who were upset with the results of the election. The Proud Boys and other right-wing groups were coming to D.C. and we were having violent confrontations between those groups, right-wing groups and counterprotestors, counterdemonstrations.
Q. Did you continue communicating with Mr. Tarrio about that?
A. Yes, absolutely I did.
Q. Why did you do that?
A. Because, again, as you mentioned, those protests were becoming increasingly violent, we were having stabbings, clashes in the streets. So at that point it was absolutely critical to get verified or credible intelligence on the activities of these groups.
Q. Okay. Now, you were interviewed -- I'm going to come back to that in a minute, but I want to talk to you a little bit about your interview in June of 2021. Do you remember being interviewed?
A. Yes, I do.
Q. Do you remember by whom?
A. Yes. It was Special Agent Bryan Molnar and Agent Sean -- or, Special Agent Sean Ricardi from the U.S. Attorney's Office, I guess investigators.

Q. Okay. I want to draw your attention to the exhibit that's in evidence and talk -- and walk you through a little bit about this, of your interview, if that's okay?
A. Yes.
Q. Take a look -- we'll start with page 4. I'll draw your attention to line 16.
Page 4, Bill. Thanks.
Do you remember being asked by Agent Molnar if Mr. Tarrio was a source?
A. Yes, I do.
Q. Okay. And what was your answer?
A. I said yes, he's a source of mine.
Q. Okay. Was that true?
A. Yes.
Q. Okay. Do you remember also -- go a little bit further down, line 20 and 21.
Do you remember talking about the number of conversations that you'd had after Mr. Tarrio's arrest on January 4th or 5th?
A. Yes, I do.
Q. And do you remember your answer?
A. Yes. I said we had one or two conversations.
Q. Okay. Is that true?
A. Yes, it is.
Q. What do you mean by conversations?

A. Conversations either on the phone or in person.
Q. Is "conversations" different than "communications"?
A. Yes, absolutely.
Q. Okay. Were you asked about communications during this interview? Do you recall?
A. No, I was not.
Q. Can you in fact have multiple communications with Mr. Tarrio after his arrest?
A. Communications, yes, absolutely.
Q. Take your attention to page 5, line 16. I'm sorry, line 14.
Do you remember being asked by Agent Molnar if you had been talking to Mr. Tarrio -- and it was at or around the time where Detective Mufti was in the investigation into the banner burning. Do you remember being asked that series of questions?
A. Yes, I do.
Q. What did you tell Agent Molnar?
A. I know him I know that he, meaning Mufti, had asked for contact information. I don't know if he was able to get ahold of Tarrio. He was really guarded. He, meaning Tarrio, was really guarded about, you know, who it went to.
Q. Did you in fact reach out to Mr. Tarrio after Agent Mufti asked you for his number?
A. Yes, I did.
Q. Why did you do that?

A. To find out what number he wanted me to provide.
Q. And when you did that, when you reached out to Mr. Tarrio, what was going on at that time as it related to the banner burning investigation?
A. MPD was actively investigating the banner burning incident on December 12th.
Q. Had Mr. Tarrio already confessed on Parler?
A. At that time I believe he had, yes.
Q. Let me stop and ask you a couple questions about the banner burning. Okay? Do you recall when that happened?
A. Yes, it was December 12th --
Q. Okay. And do you --
A. -- of 2020.
Q. Of 2020?
A. Yes.
Q. Do you recall meeting with Mr. Tarrio after the banner burning incident on December 12th?
A. Yes, I believe we met on December 15th.
Q. Okay. Where was that?
A. That was at The Dubliner restaurant.
Q. Why did you meet with him at The Dubliner?
A. Because we were -- we knew that there were going to be additional demonstrations, protests, so I met with him to gather intelligence on those upcoming demonstrations.
Q. And when you said "we," who do you mean? Who is the "we"?

A. Well, me. I went there alone.
Q. All right. But did anybody in your chain of command know you were meeting with Mr. Tarrio at The Dubliner on the 15th?
A. Yes, they did.
Q. Who?
A. Both Director Montagna and Assistant Chief Jeffrey Carroll.
Q. Had either Director Montagna or Assistant Chief Carroll asked you to do anything when you went to meet with Mr. Tarrio on the 15th?
A. Yes. There was a flyer that had been produced by the Metropolitan Police Department and disseminated publically on their website depicting a couple of photos that were taken of the banner burning, and I was asked to see if --
MR. ROTHSTEIN: Objection, Your Honor. It's calling for hearsay.
THE COURT: Well, he can say why he went.
You can say why you went. You can answer the question. So you went to do something with the flyer?
THE WITNESS: It was to gather intelligence related to upcoming demonstrations, but also to inquire if he recognized any of the individuals on the MPD flyer. Yes, Your Honor.
THE COURT: Okay.
BY MR. SCHAMEL:
Q. What was Mr. Tarrio's response when you asked him about the

individuals in the MPD flyer? Could he identify any of them?
A. No. He told me he didn't recognize anybody. But he told me he had thousands of people there.
Q. Did he tell you anything about whether or not he had been involved in the burning of the banner?
A. No, he did not tell me that he was involved at all.
Q. Did he ask you any questions about the banner burning?
A. Yes. He had asked he if -- like, what would happen -- what would be the charge for --
MR. ROTHSTEIN: Objection, Your Honor. Again, this is all hearsay. He's testifying to what Mr. Tarrio told him for the truth.
THE COURT: He's testifying -- he was asked: Did Tarrio ask you anything? And he's answering. So I don't think that's hearsay as to an out-of-court statement by Mr. Tarrio.
You can answer that question.
A. He asked me what would somebody be looking at, being like what type of charges, if somebody had committed the banner burning.
BY MR. SCHAMEL:
Q. Did you answer that question?
A. Yes, I did.
Q. Why? Why would you answer that question?
A. Because it was a general question.
Q. Did Mr. Tarrio confess that he had burned the banner during

that meeting?
A. No, he did not.
Q. I want to be perfectly clear. At any point ever, between December 12th of 2020 and June of 2021, did Mr. Tarrio ever confess to you in person, or on the phone, or in a chat, that he had burned the Black Lives Matter banner on December 12th?
A. No. At no point did he ever confess to me that he had burned that Black Lives Matter banner.
Q. Okay. I'm going to take your attention back to this -- your statement. Okay?
A. Yes.
Q. The transcript of your statement.
You indicated that -- it's Detective Molnar, right? Was it Detective Molnar?
A. I believe Special -- Supervisory Special Agent, or something like that.
Q. Okay. Molnar. And what was Mufti's title? He was Detective?
A. Yes, Detective Mufti.
Q. Okay. Detective Mufti. Do you have an idea why Detective -- or, did you ever learn why Detective Mufti came to you for Mr. Tarrio's phone number?
A. Yes, I did.
Q. Why? Why did he come to you, if you know?
A. He was the detective assigned to the BLM banner burning and

he wanted to reach out to Mr. Tarrio, to see if he would provide a statement or if he would speak to him about it.
Q. Okay. Let me take your attention to page 7, starting on line 19. Do you remember Special Agent Molnar asking you questions about whether or not you and Mr. Tarrio would ever meet?
A. If I can just read it for one second.
Q. Take your time.
A. Yes.
Q. And do you remember your answer?
A. Yes.
Q. Okay. And was that a truthful answer?
A. Yes, it was.
Q. Take you to page 8. Do you remember Special Agent -- I'm sorry, on line 2.
Do you remember Special Agent Molnar asking you if Mr. Tarrio was a source and if you registered him?
A. Yes, he did ask me. And I told him no, I did not.
Q. He asked you if you had documented it?
A. Yes.
Q. And what did you tell him?
A. I told him no.
Q. And those answers were true?
A. That is correct, yes.
Q. Do you remember -- and I'll take your attention to page 9,

starting at about line 14.

Do you remember Special Agent Molnar asking you if you had talked to Mr. Tarrio between the banner burning and January 4th of 2021?

A. Can you repeat the question.

Q. Do you remember if Special Agent Molnar asked you if you had -- if you had met and talked to Mr. Tarrio between the banner burning and January 4th?

A. Yes.

Q. Okay. What did you tell him?

A. I told him that -- that I had, yes.

Q. Was that true?

A. Yes, it is.

Q. Okay. And then do you remember -- I'll take you to page 10, starting with line 1, when you're talking to Special Agent Molnar about your communications with Mr. Tarrio. And do you remember your answer where you said: That was part of it, and the other part was I was trying to find out without tipping him off to the MPD investigation.

Do you remember that question and that answer?

A. Yes, I do. I do.

Q. Could you explain to the Court, what do you mean with this answer?

A. I meant that I had met with him to try and get information without providing any information of value related to the MPD

investigation into the Black Lives Matter burning.
Q. What do you mean nothing of value?
A. Any information that could have assisted the MPD investigation into burning the flag.
Q. Okay. Did you --
A. Or, the banner.
Q. -- ever provide -- I'm sorry, you were saying something, I cut you off.
A. Into the banner. I corrected myself from "flag" to "banner."
THE COURT: Now I'm confused. You said you were trying to get information without giving out information. But what were you trying to get information about?
THE WITNESS: On -- information on First Amendment demonstrations.
THE COURT: Okay. And you wanted to do that without giving information about?
THE WITNESS: Information of value in reference to the Black Lives Matter banner.
THE COURT: What do you mean, "information of value"?
THE WITNESS: Anything that's not publicly known or anything that -- that couldn't be used -- or, that would be critical to the investigation, to aid in the investigation, Your Honor.
THE COURT: Okay. Ask your next question.

BY MR. SCHAMEL:

Q. Let me ask you about that. At some point in your communications with -- when I say "communications," I mean both on the telephone, in person, and any kind of app or messaging. Okay? Just talking broadly. All right?

A. Yes.

Q. At some point in your communications you told Mr. Tarrio that the FBI was not handling the banner burning investigation. Do you remember that?

A. Yes, I do.

Q. Okay. And why did you think that was okay to tell him that?

A. Because I had had a colleague check with the FBI, who said that they were not investigating it. And if they weren't investigating it, that had no impact, in my mind, with the MPD investigation. Therefore, it was of no value to him.

Q. Okay. Do you remember you told Mr. Tarrio at some point that you had positively identified him from a photo? Do you remember telling him that?

A. Yes, I do.

Q. Okay. Why do you think it was okay to tell him that?

A. I was trying to retain him as a source who was providing critical information on First Amendment activities. He would have found out as soon as he was arrested because I was part of the identification process for the arrest warrant. So I was

trying to get ahead of it, to keep that -- the line of communications, that trust and that rapport I had built with him.
Q. Did you think either -- whether or not FBI was involved -- I'll go step by step.
Did you think that the information about whether or not the FBI was in the investigation was law enforcement sensitive?
A. No, I did not.
Q. Did you think it was confidential?
A. No, I did not.
Q. Did you think there was a problem with sharing that?
A. No.
Q. Okay. How about as it relates to the fact that you had identified him in a photo? Did you think that was law enforcement sensitive?
A. No, I do not.
Q. Do you think it was confidential?
A. No, I do not.
Q. Did you think that was a problem in telling him that?
A. No, I do not.
Q. Do you remember at some point you told Mr. Tarrio, in one of your communications, that you didn't think this was being investigated as a hate crime?
A. Yes, I do.
Q. Okay. Why did you think it was okay to tell him that?

A. Because that was my opinion. At the time that I told him that, that was my opinion. And -- I wasn't a part of the process to determine whether or not it would have been a hate crime. When I talked to him -- and that was also before the determination was made on whether or not this was going to be charged as a hate crime.

Q. So when you told him your opinion that it wasn't a hate crime, it hadn't even been decided?

A. That is correct.

Q. And who decides if it's a hate crime?

A. The U.S. Attorney's Office does.

Q. Okay. But you were on the committee that makes a recommendation, right?

A. Yes, I was on the committee that makes the recommendation for statistical purposes.

Q. Okay. Does the committee determine what the U.S. Attorney will charge?

A. No, it does not.

Q. And do you think there was any problem with you telling Mr. Tarrio your opinion that it was not a hate crime?

A. No, I don't.

Q. And let me be clear on all these three different things I've asked you about. All of these occurred before or after Mr. Tarrio had confessed through multiple mediums that he was the one that burned the banner?

A. They all occurred after he confessed on multiple platforms that he had burned the banner.
Q. At some point you communicated to Mr. Tarrio that there had been an anonymous tip to the MPD tip line?
A. That is correct.
Q. Okay. Did you think that was okay to tell him?
A. Yes, I did.
Q. Why did you think that was okay?
A. Because it didn't contain any information about witnesses or anything specific.
Q. Did you think --
A. It was of no value.
Q. It was no value.
Did you think that was law enforcement sensitive?
A. No, I did not.
Q. Did you think that --
THE COURT: Wait. The tip was of no value to MPD or the existence of the tip was of no value to Mr. Tarrio?
THE WITNESS: I believe the tip -- the existence of the tip was of no value to Mr. Tarrio because it contained no, like, identifying, like, witness information.
THE COURT: Okay.
THE WITNESS: Or anything he could do with it.
BY MR. SCHAMEL:
Q. Did you think it had any value to MPD, the fact a tip had

been made?
A. Oh, absolutely.
Q. And when you told Mr. Tarrio this information that you didn't think he could do anything with, had he already confessed through multiple mediums?
A. Yes, he had.
Q. Other than your conversation with Mr. Tarrio on the 15th at The Dubliner about -- you know, he asked -- when you showed him the flyer --
A. Yes.
Q. -- all your communications relating to the Black Lives Matter investigation occurred after his confession?
A. That is correct, yes.
Q. Did you ever tell Mr. Tarrio that an arrest warrant had been issued for him?
A. No, never. I never told him that an arrest warrant was issued for him.
Q. How about on January 4th while he was on an airplane, did you communicate to him that an arrest warrant had been issued for him?
A. No, I did not.
Q. Why would you tell Mr. Tarrio any of these things, whether they have value or no value?
A. Again, to continue that line of communication with him because, again, all of these protests that were going on were

becoming increasingly violent. They involved his people. The Proud Boys weren't ones who applied for parade permits or assembly permits. So the best source of information I could get was straight from the source, and that was Mr. Tarrio.

Q. Let me take you to page 11 of that same exhibit, the same transcript. Okay? And you were asked the question, starting on line 4, by Special Agent Molnar, about the photo that we've all seen in the trial of the individuals kneeling down lighting the banner. Okay?

A. Yes.

Q. And you were asked a series of questions about whether or not you had identified Mr. Tarrio in that particular photo. Okay?

A. Yes.

Q. Okay. My first question is: Was your answer to Special Agent Molnar true?

A. Yes. The answer was true.

Q. Okay. All right. Can you explain for the Court why you couldn't initially identify Mr. Tarrio in that photograph?

A. Yes. In the initial photograph, the individual is kneeling down, but it was kind of a side profile of his face, and so I couldn't see his full face. And from what I remembered of seeing him earlier in the day, I just -- I wasn't confident making a positive ID based on that photo alone.

Q. Okay. But let me ask you this: Was it you're honestly not

confident or you didn't want to identify him?
A. It was because I was honestly not confident and I didn't want to provide a bad identification.
Q. Prior to that was the phone tip, correct?
A. Yes, that is correct.
Q. And you're the one that forwarded it to now Captain Copeland?
A. Yes, I did.
Q. Okay. Through Parsons and others, right?
A. Yes, I sent it to multiple people, including captain Copeland.
Q. Why did you do that?
A. Because as soon as I found it, I sent it to them because I knew they were the ones investigating the banner burning and I wanted them to have all the information that I knew of.
Q. Okay. And --
A. And it was -- it was a confession --
Q. It was --
A. -- from Mr. Tarrio.
Q. Well, that's the second thing. The first thing was the tip.
A. Oh, yes. I'm sorry. Yeah, I got the two confused.
Q. That's okay. I sent the tip, right?
A. Yes.
Q. And did you do that for the purpose -- what purpose did you

do that?

THE COURT: Wait. I'm confused. You're saying he's the one who disseminated the existence of the tip within MPD? That was your question?

MR. SCHAMEL: When the -- I'm not sure how to answer that.

THE COURT: I thought you were talking about that he shared within MPD Mr. Tarrio's Parler confession. You were asking about that, and then you said, "First you shared the tip," and I didn't know he shared the tip.

MR. SCHAMEL: We got sideways with each other on that, Your Honor. So let me back up.

THE COURT: Let's back up.

BY MR. SCHAMEL:

Q. A tip came in from the MPD line, correct?

A. Yes, that is correct.

Q. You were on the distribution list for that tip?

A. Yes, I was.

Q. And when you got that tip, what did you do?

A. I forwarded it to multiple people in my chain of command in CID, and added in there that if anybody had any questions -- actually, can we back up? Rather than misspeaking, can we pull that tip up?

Q. Sure, we can pull that up.

(Pause.)

Bill, it's page 20 of 4018.

We're going to put that up on the screen for you there, Government Exhibit 4018, page 20 of 37.

Okay. Take a look at that. Is that what we're discussing?

A. Yes, it is.

Q. Okay. And where did you obtain that?

A. I obtained the phone tip from -- directly into my email. So when an anonymous tip comes in, I was within that distribution list, so I had that. And I believe I pulled that photo from social media, online.

Q. So that photo wasn't in the tip?

A. No, it was not.

Q. So you're adding more information to what you're forwarding to the group?

A. Yes, that is correct.

Q. Why did you send these individuals the phone tip and the photo and more information?

A. I wanted to forward the tip to them because, again, they were working on the investigation and I want to let them know and -- I mean, can I read?

Q. Sure.

A. I told them, "Please let me know if you need anything related to this. I know him, so I can probably fill in any blanks you may have. I have attached his picture for your

awareness."
Q. So now I want to go back to you've forwarded the tip, right?
A. Yes.
Q. Did you forward something else after that?
A. Yes, I did.
Q. And what was that?
A. I located Mr. Tarrio's confession to burning the banner on his Parler account and I found that and forwarded that on as well.
Q. Did anybody ask you to go find Mr. Tarrio's confession and forward it to them?
A. No, they did not.
Q. Did anybody ask you to find this tip and forward it to the people you forwarded it to?
A. No, I did it on my own.
Q. Did anybody ask you to go out and get this photograph of Mr. Tarrio, to identify him and say, "I could probably fill you in on any blanks. I've attached this picture for your awareness"? Anybody ask you to do that?
A. No, I did it on my own.
Q. Why did you do those tings?
A. To assist with the investigation.
Q. So then after that you were contacted by someone about a photo, is that right?

A. Yes, I was.
Q. That's the photo, the kneeling-down photo, correct --
A. That is correct.
Q. -- that we were discussing?
A. Yes.
Q. After you said you couldn't positively identify Mr. Tarrio from the photo, then what did you do?
A. Went back and looked at other photographs of Mr. Tarrio on that same day, compared that to the initial photograph that I was shown, and then comparing the photographs, I was able to make a positive identification based on various, like, patches on his -- I don't want to call it a uniform, but patches on the clothing he was wearing, a drink that he had. I was able to make a positive identification.
Q. And who was it that had asked you to make the original identification for that photo?
A. The original, I believe it was Detective Then.
Q. Detective Then?
A. Yes.
Q. Had Detective Then asked you to go out and get more information to help him with the identification?
A. No, he did not.
Q. Had anybody?
A. Not to my recollection, no.
Q. Why did you go out and get more photos, even things on AP

and other places, and send them in for further identification? Why did you do that?
A. Because I wasn't sure about the original identification, but I wanted to assist with the investigation. So if I had other means to assist me, such as other photographs, I got them and then I was able to make the identification and provide it to the detective working the investigation.
Q. So they could prosecute him?
A. Yes, absolutely.
Q. Okay. And so did they -- "they," anybody from the investigation, Copeland, Parsons, Then -- did any of them reach back out with additional photos from the flag burning -- or, banner burning?
A. I received additional photos. I don't remember who provided them or if I found them. But, yes, I did get additional photos.
Q. Okay. I'm just going to show you a couple -- I'm going to try to keep it minimum.
Page 34 of that same exhibit, Bill.
Take a look at that, which is dated 12-20-2020, at 6:02 p.m. Do you see that?
A. Yes, I do.
Q. Okay. And that's the email that you sent?
A. The original email, yes, that is correct.
Q. Okay. And were you trying to help the investigation or

hurt the investigation as it related to the identification of Mr. Tarrio in that picture?
A. I was there to help the investigation.
Q. Okay. Let me go to the next page, page 35.
While Mr. Hinger is pulling that up, did you speak to -- was it Commander Parsons?
A. At that time, yes, it was Commander Parsons.
Q. Did you speak to Commander Parsons in between that 6:02 email and the next one at 7:16 p.m. that Mr. Hinger has on the screen?
A. I believe so, yes.
Q. What did you do after you spoke to Commander Parsons?
A. If I could have one second?
Q. Please.
A. A second to review the email.
(Pause.)
I sent an email, positively identified the individual based on the multiple pictures that I had. And I also provided context on how I knew Mr. Tarrio.
Q. Had Detective Then asked you for that context when he called you previously?
A. Not that I -- not that I remember.
Q. Okay. This was just an expansion on the earlier email when you first brought it to their attention?
A. That's correct, yes.

Q. Why did you positively identify Mr. Tarrio with these additional photos at the banner burning?

A. Because I wanted to assist the MPD investigation in the prosecution of the banner.

Q. At any point in the photo -- in these exchanges and questions about photos, at any point did you pretend or deny knowing that it was Mr. Tarrio intentionally?

A. Intentionally, no, not at all.

Q. I'm going to take you to page 11 of the transcript, if I could.

Starting after -- right after the section we were just looking at that talked about the photo identification and what we've just discussed.

A. Yes.

Q. Take a look here, starting on line 18.

THE COURT: Are you back to the interview?

MR. SCHAMEL: 5006, Your Honor.

THE COURT: What page?

MR. SCHAMEL: I'm sorry, I thought I said. Page 11, Your Honor.

THE COURT: Thank you.

BY MR. SCHAMEL:

Q. Starting on line 18. Do you remember Special Agent Molnar asking whether or not you reached out to him about -- and you said: To who? To Tarrio on behalf of Mufti?

A. If I can have one second.
Q. Yeah. Yeah, please.
A. Can you ask your question again, now?
Q. I'll try. Do you remember that you were asked by Special Agent Molnar whether or not you had reached out to Mr. Tarrio on behalf of Detective Mufti?
A. Yes.
Q. And did you reach out to Mr. Tarrio on behalf of Detective Mufti?
A. Yes, I did.
Q. Is that what you told Special Agent Molnar?
A. Yes, it is.
Q. Had you told anybody at that point, when you were interviewed in June of 2021, that you had reached out to Mr. Tarrio to get the number for Special Agent Mufti?
A. Um --
Q. I'm sorry, for Detective Mufti. I bungled that one.
A. Can you repeat the question?
Q. Yeah, I did, because I got the titles wrong.
Had you told anyone else at MPD -- at the point of this interview, okay, before you were asked by Special Agent Molnar, had you told anyone else at MPD that you had contacted Mr. Tarrio for Detective Mufti?
A. Oh, not that I recall.
Q. Okay. It's the first time you'd been asked that?

A. Yes.
Q. And you answered it truthfully?
A. Yes, I did.
Q. Why did you reach out to him?
A. To get the phone number that Detective Then had asked me to get. And also see if he would confirm, he would tell me.
Q. Tell you what?
A. Whether or not he burned the -- let me back up.
Can you repeat the question?
Q. Why did you reach out to Mr. Tarrio on behalf of Detective Mufti and Then?
A. Again, to get the phone number.
Q. But you had phone numbers for Mr. Tarrio?
A. Yes, I did.
Q. Why didn't you just give them what you had, without contacting Mr. Tarrio first?
A. I wanted to know what phone number he wanted me to provide, to give a good contact number.
Q. To actually facilitate the contact?
A. Yes.
Q. Did you do that with any other purpose?
A. No, not that I --
Q. Did you tell Mr. Tarrio about what he should do when he heard from Detective Mufti?
A. No, not at all. No.

Q. Did you do that to help or hurt the investigation?
A. It was to help the investigation.
Q. Okay. On page 13, down at the bottom, it starts with a series of questions that go over on to the next page, starting on page 25 [sic]. Right? And this is -- this follows a discussion about what was happening with the warrant.
So take a minute to look at this page. I'll give you the whole page and the page before, if you need some context. We're talking about pages 12 and 13.
A. Okay. You want to continue on to the next page?
Q. Yep. Let Bill scroll so you can see it all.
I want to give you the context here before I ask you the questions.
A. Okay. I appreciate that.
Q. Series of discussions about the warrant, was it going to be a self-surrender, those types of things. Do you remember those questions?
A. Yes, I do.
Q. When you were discussing the warrant with Special Agent Molnar and he asked you about, at the bottom of page 13, "I believe it was without him knowing." Do you see that, starting on line 19?
A. Yep.
Q. Let's start with page 13, line 16. "And was a decision made with MPD to do it, kind of, without him knowing or try to

get him to turn himself in"? That's with Special Agent Molnar.
A. Yes, I see that.
Q. And then you answered, "I believe it was, yeah, without him knowing"?
A. Yes.
Q. That was your belief, that was a true answer?
A. Yes, that is correct.
Q. And he says, "Okay."
And then you say, "And that's handled from the Criminal Investigations Division, so at least I --"
And Molnar interrupts and says, "Made their determination."
And you said, "Yes, but I know that I didn't, you know, inform him that he had an arrest warrant," over onto the top of page 14. Do you see that?
A. Yes.
Q. Why did you say that?
A. Because they were looking into it and I told him I didn't tip -- or, I didn't tell him about an arrest warrant.
Q. And did you?
A. No, I did not.
THE COURT: How did you know they were looking into whether he'd been tipped off?
THE WITNESS: Um --
MR. SCHAMEL: I didn't hear Your Honor's question.

THE COURT: He said they were looking into it, that's why I told him. And I said how did he know that that's what the agents were looking into?

MR. SCHAMEL: That's why I asked him to look at the two previous pages, discussions about the warrant and the arrest process.

THE WITNESS: Yes, there was something earlier. Can we go back to page 12, I believe.

BY MR. SCHAMEL:

Q. I think what you're looking for is on page 14, starting with line 3.

Mr. Lamond: I don't know, I mean, I don't think they contacted him to see if he would like to turn himself in.

Agent Molnar: So I'll be honest, one of the concerns is that he was aware of the warrant.

THE COURT: That's on page 14?

MR. SCHAMEL: Page 14, yes.

BY MR. SCHAMEL:

Q. And on page 12 -- let me ask you this, too, Mr. Lamond. I don't think I asked you this already: At the time in June of 2021, what had you known -- before the interview with Special Agent Molnar, what did you know about the arrest of Mr. Tarrio on January 4th?

A. I knew that he was picked up -- the Metropolitan Police Department was waiting for him at the airport. They couldn't

arrest him there because there was a non-extraditable warrant. So they followed him, plain clothes officers followed him into the District of Columbia and he was arrested in the Third Street Tunnel. At the time of the arrest he was on the phone with a reporter.

Q. What was the significance of that, to your understanding?

A. That he knew he was going to be arrested.

Q. Was that something you were aware of, that that was -- well, let me ask you: What did that mean to you? At the time you were in this interview, what did that knowledge mean to you?

A. Somehow he knew about the warrant.

Q. Okay. Is that part of why you raised this?

THE COURT: Okay. Now --

MR. SCHAMEL: I'll move on.

MR. ROTHSTEIN: (Stands up.)

THE COURT: Sustained.

BY MR. SCHAMEL:

Q. Let me ask you to go to page -- take a minute just to go through, get some context, starting on page 16. Okay?

After the warrant conversation, do you remember what you and Special Agent Molnar started to discuss?

A. If I could just have one second here.

Q. Take as much time as you like.

Whenever you're ready, we can switch to page 17.

A. Okay, we can switch.

(Pause.)

Okay.

Q. Next, page 18.

THE COURT: What's the question pending?

MR. SCHAMEL: I was asking him what was the content.

BY MR. SCHAMEL.

Q. What were you discussing with Special Agent Molnar after the discussion about the warrant? What was the next topic?

A. We were talking about First Amendment demonstrations again.

Q. That goes on until page 21, is that right?

A. Yes, that is correct.

Q. And on page 21, starting on line 3.

Agent Molnar: Yes. So when he would reach out and ask questions, when he would be engaging, would he be -- would it be common for him to fish?

Do you see that?

A. Yes, I do.

Q. First question is: What do you think the word "fishing" -- what does that mean to fish? What was your impression? What did that mean to you when it was asked?

A. That he was looking to get information of value concerning how MPD was going to deal with these protests.

Q. The "he" in that being Mr. Tarrio?

A. That is correct, Mr. Tarrio.

Q. Special Agent Molnar is asking you what you thought Mr. Tarrio -- was Mr. Tarrio asking for information relating to First Amendment protests?

A. Yes, that is correct.

Q. At the time that you were asked this question, did you think this had anything to do with the banner investigation?

A. No, I did not.

Q. You were talking about First Amendment protests?

A. Yes.

Q. And your answer was, "No, not really. He never really asked me questions about, like, you know, what we were doing or anything. It was, you know, one-sided, with just him telling me, you know, what their plans were"?

A. Yes.

Q. When you answered that, what were you telling Agent Molnar?

A. That it was more one-sided. He was providing me information on First Amendment activities.

Q. Okay. Was that true, that answer, when you gave it?

A. Yes, it was.

Q. Did you get asked any questions during this -- these many minutes and pages about the banner burning?

A. No, I don't remember -- no.

Q. Was this area of questioning about January 6 and about First Amendment protests?

A. Yes.

Q. Take your attention to page 23.

MR. SCHAMEL: Line 19, page 23, Your Honor.

BY MR. SCHAMEL:

Q. Take a look at that for a minute, if you would.

Do you remember being asked by Agent Molnar, "Did he" -- I assume that's Mr. Tarrio -- "ever ask for information about people that attacked his people?" Do you remember that question?

A. Yes, I do.

Q. Do you see your answer? Do you remember your answer?

A. Yes, I do.

Q. Is that truthful?

A. Yes, it is.

Q. Did Mr. Tarrio -- do you recall Mr. Tarrio ever asking you for information about cases where -- or, information on the people that attacked his people?

A. Yes, I do remember him asking that.

Q. Do you remember Agent Molnar asking you that?

A. Yes, I remember Agent Molnar. Yes.

Q. Do you remember if Mr. Tarrio ever asked you that?

A. He asked about -- yes, one.

Q. And what did you do in that situation?

A. I told him that I wasn't the case agent and I referred him to the case agent.

Q. "He," you referred Mr. Tarrio?

A. Say again.

Q. You referred Mr. Tarrio?

A. Yes, that's correct.

Q. So you never gave Mr. Tarrio information on the criminal cases that involved people attacking Proud Boys?

A. No, I did not.

Q. Why not?

A. Again, it wasn't my investigation, so I provided it to -- or, I put him in contact with the people who were. And those were -- I mean, they were violent felonies, so I wanted him to be able to get that information.

Q. Okay. But the banner burning wasn't your investigation?

A. No, it wasn't.

Q. Is this different to you somehow?

A. Yes, absolutely.

Q. How so?

A. One was a misdemeanor destruction of property and this was -- this was a violent stabbing where the person was in the hospital for weeks. So it was a violent felony.

Q. And one had a confession and one did not?

A. That's correct, yes.

Q. And then on to the next page, on the top of page 24, where you say, starting on line 1, "Yeah, so he would ask me if, you know, they knew if arrests were made, but nothing beyond that. Like, no specifics about the case." Do you see that answer?

A. Yes, I do.
Q. Is that true?
A. Yes, it is.
Q. On page 25, line 16, Agent Molnar asked you, "Did you ever use any, like, apps, like Telegram or Signal, or anything like that?" Do you see that?
A. Yes, I do.
Q. Take a minute to look at line 16 through the end of the page. I have a couple of questions about that.
(Pause.)
A. Okay.
Q. Molnar asked you if you used Telegram or Signal and you said what?
A. "Yes. I think Telegram maybe, yeah."
Q. Why did you say "maybe"?
A. Because I had been communicating with the other law enforcement agencies using different apps. So I thought it was Telegram, but I wasn't 100 percent sure.
Q. Then he said, "Was that because you use Telegram?" And you said?
A. "Yes, exactly." Yeah, once he told me that, it refreshed my recollection, it was confirmed.
Q. So that was true?
A. Yes. Absolutely.
Q. As you sit here today, is that still true?

A. Yes, it is.
Q. Then he asked you if the Telegram was just between the two of you and you said what?
A. "Yeah, it was just between us." Yeah.
Q. Is that true?
A. Yes, it is true.
Q. Then you were asked a series of questions about how often you talked to him -- "him" being Mr. Tarrio -- onto the next page, on page 26?
A. Yes, if you could go to the next page.
Q. Take a look at that, starting on line 2. And just read right down to line 14.
A. Okay.
(Pause.)
Okay.
Q. Your answer, was that true?
A. Yes, it was.
Q. You're asked a question on page 27, line 4. Do you see that? "And did you guys meet before that?" Take a look from line 4 to line 10.
A. Okay.
Q. Do you see the question and the answer?
A. Yes, I do.
Q. Is it true?
A. Yes, it is true.

Q. Do you remember -- on page 29, line 25, going over to page 30, line 7. Take a moment to look at that.

A. I'm sorry, can you repeat the lines?

Q. Yeah. From the bottom of page 29, line 25 on 29 --

MR. ROTHSTEIN: Your Honor, objection as to relevancy. He's now actually going into things that we weren't allowed to bring up with Mr. Tarrio yesterday because they relate to after January 6th.

MR. SCHAMEL: Well, actually -- I'm sorry.

THE COURT: All right. Well, I know you want the answers that are in issue to be in the context of the entire interview, but what relevance does this part of the interview have right now?

MR. SCHAMEL: Two things, Your Honor. First and foremost, that every answer he gave during the entirety of that interview was true. I think that's relevant to whether or not these three alleged false statements are true. If the entire interview is true and one fact, right, the government claims the fact of whether he told them about the warrant, and the other two, sort of, opinions or discussions -- but if everything else is true, that goes to Your Honor making a determination, if Your Honor finds that the fact that the statement --

THE COURT: Okay. I understand that theory. What's the other relevance to this part of it?

MR. SCHAMEL: The other relevance is, if you look on page 30, right around -- starting at line 4, what I asked Mr. Lamond to look at, it says, "The Irish Times and the Dubliner, somewhere between November and January." He's answering truthfully that he met with Mr. Tarrio, and this is all before January 6th.

THE COURT: All right. You can proceed.

BY MR. SCHAMEL:

Q. Just take a look at the last line on 29 and those first seven lines on page 30.

(Pause.)

A. Okay.

Q. Okay. Now I would like to take you to page -- okay. Yes? Okay, you read it?

THE COURT: There's no question pending.

MR. SCHAMEL: Okay. I'm sorry. I jumped ahead. Sorry.

BY MR. SCHAMEL:

Q. That question and answer, is that true?

A. Can you repeat the question now.

Q. The question and answer between Special Agent Molnar and yourself. Okay? From the bottom of page 29 to line 7 on page 30, is that a true answer?

A. Oh, yes, it is.

Q. Okay. I'm going to take you to page 32 and 33. Starting

at the bottom of page 32, with the line from Agent Molnar, "Yeah. Well, there were problems." And I take you all the way down to line 12 on page 33. Just take a moment to read those, those lines.

(Pause.)

A. Okay.

Q. You read those?

A. Yes, I have.

Q. Okay. And when you say -- in your answer you say he asked about suspects and things of that nature and arrests. I told him it's not my investigation, go to detective.

Was that a true answer?

A. Yes, it was.

Q. And why did you do that in this one but not with the banner?

A. Because this was, once again, a violent felony offense, so I wanted him to be able to get the information, but it wasn't my information, so I gave it to him -- or, I put him in contact with the person who could give it to him.

Q. Did you consider -- did you consider this, what you're articulating here, the request from Mr. Tarrio, to be fishing?

A. Yes, because this -- yes, this wasn't involved with First Amendment activities.

Q. Okay. And did you provide anything to him of value or otherwise?

A. No, I did not. I just provided it with the detective, if I remember correctly.
Q. Do you remember being asked -- it's on page 34, if you want to see it -- being asked by Molnar about Tarrio asking where people would be released from the jail?
A. Yes, I do.
Q. And did you tell Tarrio where people would be released from the jail?
A. Yes. One of his people, yes, I did.
Q. Why did you do that?
A. Because that's publicly available information.
Q. Did you think that had any value?
A. No, I did not.
Q. Would you have given that to anyone?
A. Yes, if they would have asked.
Q. At the end of the investigation -- well, let me ask you this question before I do.
Page 35, line 24.
Do you remember it being asked if you still had the conversations between you and Mr. Tarrio?
A. Um --
Q. Bottom of 35.
A. Yes, I see the line. Can we zoom out? I would like to get additional context, what was said beforehand.
That's good. Thank you.

(Pause.)

Okay.

Q. You were asked if you had him, you said, "Probably not"?

A. Yes, that's correct.

Q. Is that truthful?

A. Yes, it is.

Q. Then at that point you were given a subpoena, is that right? Shortly thereafter?

A. Shortly thereafter, yes.

Q. And let me ask you: Did you -- were you somewhat reluctant to initially give over your phone?

A. Yes, I was.

Q. Why?

A. Because it wasn't my phone. It was property of the Metropolitan Police Department.

Q. And was there anybody from MPD in the room at the time?

A. No, there was not.

Q. Who was in the room?

A. It was Special Agent -- or Supervisory Special Agent Molnar and Special Agent Ricardi.

Q. So what did you ask?

A. I asked them if they had contacted MPD's general counsel.

Q. And they did what?

A. They placed a phone call to Agent Ciapa from Metropolitan Police Department Internal Affairs.

Q. Okay. And then what did you do?
A. They put him on speaker phone. I asked Agent Ciapa if -- or, he informed me that the chief in Internal Affairs was aware of the invest -- or, this interview and that I had to turn over my phone. I then asked Agent Ciapa if our general counsel had been contacted.
Q. Okay. And once he said to turn over the phone, what did you do?
A. I turned over my MPD cell phone.
Q. So you cooperated?
A. Yes, I did.
Q. Did you -- were you asked for your pass codes?
A. I believe I was later.
Q. Did you provide them?
A. Yes, I did.
Q. You've had a chance to go through the transcript and listen to your recording of the interview, correct?
A. Yes, I have.
Q. Is there anything that you saw or read that you sit here today and believe was not true when you said it?
A. No.
Q. Okay. As it relates to your cases with Mr. Tarrio, between 2019 and January of 2021, is there anything that you're aware of that you gave him that you, looking back, should not have given him?

A. No.

Q. Was there anything you would do differently as it relates --

MR. ROTHSTEIN: Objection, Your Honor. Relevance.

THE COURT: Yeah, I think "Anything you'd do differently," I don't think he needs to answer that. I think the last question was okay. Doesn't really matter what he would do the next time.

MR. SCHAMEL: I didn't hear the last part, Your Honor.

THE COURT: I think that question was irrelevant. The first one, he answered. Did you tell him anything you shouldn't have? And he said no.

MR. SCHAMEL: Okay. Court's indulgence.

(Pause.)

MR. SCHAMEL: I don't think I have any more questions for you, Mr. Tarrio. Thank you -- Mr. Lamond. I apologize.

THE COURT: All right. Why don't we do our break before we begin the cross-examination. So, we'll break for about ten minutes. The witness is entitled to a break, too. And we'll be back. Thank you.

(Recess from 2:29 p.m. to 2:48 p.m.)

THE COURT: All right. Mr. Rothstein, your witness.

CROSS-EXAMINATION

BY MR. ROTHSTEIN:

Q. Good afternoon.

A. Good afternoon, sir.
Q. Mr. Lamond, you served in the Metropolitan Police Department for approximately 23 years, correct?
A. That is correct.
Q. And you rose to the rank of lieutenant, right?
A. Yes.
Q. And you went to the police academy, right?
A. I did.
Q. And you received training on police procedures there, right?
A. I did.
Q. And you received training on MPD policies, right?
A. I did.
Q. And you were trained on the general orders, right?
A. Yes.
Q. And it's the responsibility of all police officers to know those general orders, right?
A. Yes.
Q. Okay. And you've been involved in criminal investigations, right?
A. Yes.
Q. During the course of your career you've been involved in criminal investigations, right?
A. Yes, I have.
Q. Hundreds?

A. In one -- one form or another, that's correct.
Q. And you've supervised investigations, right? You were a watch commander? You oversaw other individuals conducting investigations?
A. Actually, can you define what you mean by "investigations"?
Q. So you, as a watch commander, right, you supervise other police officers, right?
A. Yes, that is correct.
Q. Okay. And those other officers took police reports, right --
A. Yes.
Q. -- in the course of their conduct, right?
A. Yes, that is correct.
Q. Of their duties.
They interviewed witnesses, right?
A. Yes.
Q. They interviewed suspects?
A. Yes.
Q. And you knew the importance of collecting evidence, right?
A. Yes.
Q. And you knew the importance of preserving evidence, right?
A. Yes.
Q. And that included statements that were made by suspects, right?
A. Yes.

Q. And you understood that if statements that were made -- if police did not properly preserve communications by suspects to them, that could affect the investigation, right?
A. Yes, it could.
Q. And if a police officer destroyed communications with a suspect, that could affect the investigation, right?
A. Yes, it could.
Q. And you've conducted witness interviews, right?
A. Yes, I have.
Q. Because of that you knew that it was a crime to lie to law enforcement in the course of an interview, right?
A. Um -- can you repeat the question?
Q. Sure. You knew that when an individual is being interviewed by law enforcement, that it is a crime to lie to them, right?
A. I do not believe it's a crime to lie to a state officer -- or, like the Metropolitan Police Department.
Q. When you are speaking -- how about with a federal law enforcement officer? Did you know it was a crime to lie to a federal law enforcement officer?
A. To a -- yes. To a federal officer, yes.
Q. And you were asked some questions earlier and I just wanted to confirm your testimony, make sure I had it correct.
Is it your testimony that a police officer can decide what evidence is important in another officer's case? And if

they deem it isn't important, they can disclose it without telling the investigating officer?

MR. SCHAMEL: Objection. There's no testimony about evidence. It's about information.

THE COURT: Overruled. He can answer the question.

A. Would you mind, can you repeat the question?

Q. Sure. Is it your testimony that a police officer can decide what information or evidence is important in another officer's case and if they decide that it is not important, they can disclose it without telling the investigating officer?

A. I would say yes.

Q. And it's your testimony that a police officer can disclose the status of another law enforcement officer's investigation if they do not believe it is important, without informing that officer or getting permission from their chain of command?

A. Yes.

Q. Is there a policy or regulation that says that?

A. Can you go back and reread the question, please?

Q. Okay. Let me actually make it a little tighter.

Is it your testimony that a police officer can disclose what evidence is in another officer's case to the subject of that case without getting either permission from their supervising officer or disclosing it to the investigating officer?

A. I don't think it's unlawful.

Q. You think that you are permitted to do that?
A. Yes.
Q. And you think that --
A. Correction. I feel that it is not unlawful to do that.
THE COURT: Okay. Well, what wasn't -- that's what you answered, but his question was: Do you think it's permitted?
THE WITNESS: I see, Your Honor. Per the general order, no.
BY MR. ROTHSTEIN:
Q. And per the general order -- is it your testimony that per the general orders, that a police officer can disclose the status of another officer's investigation to the subject of the investigation without permission of their commanding officer or without disclosing it to the investigating officer?
A. Per the general order, no.
Q. Okay. In 2020 you were in charge of the HSB, Homeland Security Bureau, correct?
A. The intelligence branch within the Homeland Security Bureau, that's correct.
Q. And in that role you had interactions with Enrique Tarrio, correct?
A. Yes, that is correct.
Q. And he was the head of the Proud Boys, right?
A. At that time, yes.

Q. And you met with Mr. Tarrio in person, right?
A. Yes.
Q. And you exchanged text messages with him, correct?
A. Yes, we did.
Q. And you had phone calls with him, right?
A. Yes, we did.
Q. And at a certain point in time you began using Telegram to communicate, right?
A. Yes, that's correct.
Q. And with Telegram, you can make calls, right? You can call somebody through Telegram?
A. Yes, you can.
Q. And you can send chat messages through Telegram, right?
A. Yes, you can.
Q. And Telegram offers different levels of security for those conversations, right?
A. Yes, that's correct.
Q. And one of those levels is private, right?
A. Yes, that's correct.
Q. And one of the levels is secret, right?
A. I believe so, yes.
Q. And your understanding is that secret was above private, right?
A. Yes, I believe so.
Q. And you thought, in 2020, that Telegram was a safer way to

communicate than through iMessage, right?
A. I didn't know if there was a difference.
Q. You, in 2020 -- is it your testimony that in 2020 you didn't think that Telegram was a safer way to communicate than iMessage?
A. Well, define "safer." I don't understand your question.
Q. Sure. Did you believe that Telegram was more encrypted or offered a higher level of encryption than iMessage?
A. Yes, I did.
Q. Okay. And so by a higher level of encryption, less people could see that information, correct?
A. That's fair to say, yes.
Q. And you used private chats on Telegram to communicate with Mr. Tarrio, right?
A. Yes, we did.
Q. And you used secret chats to communicate with Mr. Tarrio, right?
A. Yes, we did.
Q. And Telegram has a feature that allows users to set a timer, right?
A. That is correct, yes.
Q. And you can destroy individual messages using that timer, right?
A. Yes, you can.
Q. And in order to do that, you have to go into Telegram,

right?
A. Yes.
Q. You have to go into the individual conversation, right?
A. Yes.
Q. And then for that particular user you can set if it's 10 seconds or 5 seconds or a minute or a day, right?
A. It wouldn't be for that particular user, it's for all the parties in the chat.
Q. Right. But for each chat -- if you and I are in a chat, I can set the timer for how long I want it to be for those messages to self destruct after being read, right?
A. Yes, that's correct.
Q. And you have to manually go in and change that timer, correct?
A. Yes, you do. That is correct.
Q. And you actually have to enable it to self destruct, right? You can have a Telegram conversation between you me and you that doesn't use the self-destruct timer, right?
A. That is correct, yes.
Q. And you've used that feature, right, the self-destruct timer?
A. Yes, I have.
Q. And you used the self-destruct feature for some of your communications with Mr. Tarrio, correct?
A. Yes, we both did.

Q. Right. And you said earlier that you used the self-destruct timer because he used it and you wanted to mirror him, right?
A. That is correct. We used, yep, the different features of Telegram, that is correct. I used it to mirror him.
Q. But you testified earlier that you used the self-destruct timer to mirror what he was doing?
A. Yes, that is correct.
Q. Okay. So your testimony is that he used a self-destruct timer first and then you used it to mirror him, right?
A. I believe so, yes.
Q. Okay. We'll get to that.
Now, you've done that before, right, where you've set it at various levels to self destruct, right? Sorry. Various time periods, 5 seconds or 10 seconds, right?
A. Yes, I have.
Q. Okay. And you adjusted the self-destruct timer so that some of your communications with Mr. Tarrio would delete even sooner, correct?
A. I don't recall exactly. I would have to see it.
Q. Okay. So you don't recall whether or not when Mr. -- if Mr. Tarrio had set it to 30 seconds, you never then got in and set it to 10 seconds?
A. It's possible. I would have to see it again.
Q. Okay. Because you wanted it to delete even sooner, right?

A. If that was the case, then yes.

Q. And on June 2nd, 2021, you were interviewed by investigators from the U.S. Attorney's Office, right?

A. Can you repeat the day?

Q. Yeah, June 2nd, 2021.

A. Yes, that is correct.

Q. And that was a voluntary interview, right?

A. Yes, it was.

Q. You understood you were required to tell the truth in response to the questions that were asked, right?

A. Yes.

Q. And, in fact, you knew it was a crime to lie to law enforcement officers during that interview, correct?

A. Yes, I did.

Q. And the agent, during the course of that conversation, asked you about the nature of your relationship with Mr. Tarrio, right?

A. Yes, I believe so.

Q. And during that interview you were asked about your contacts with Mr. Tarrio, right?

A. Yes, I believe so.

Q. And they asked you questions about conversations you had with Mr. Tarrio, right?

A. Yes, they did.

Q. So let's go to showing you Government Exhibit 5006, at 21.

And you were showed this -- do you recall seeing this exchange earlier, when Mr. Schamel was up here?
A. Yes, I do.
Q. And do you recall, during the interview, you described your interactions with Mr. Tarrio as being, "more, you know, one-sided, with just him telling me, you know, whether their plans were." Do you recall that? Or, sorry, "what their plans were."
A. Yes, I do.
Q. Okay. Directing your attention to November 4th, 2020, and showing you Government Exhibit 4011, at 4.
And do you see that Mr. Tarrio sent you a text message via iMessage at 12:58 p.m.? Do you see that?
A. Yes, I do.
Q. And he says, "Any word on catching these people?"
A. Yes.
Q. And that is Tarrio asking you about the status of the stabbing investigation, right?
A. I'm not 100 percent sure about the context, but that is possible, yes.
Q. Okay. And continuing on to page 5, Government Exhibit 4001 -- hold on one second.
Do you recall that Mr. Schamel was asking you some questions and you said, "When Mr. Tarrio would ask me about cases involving his individuals, I would refer him to the

officers that were involved in that. Because it wasn't my case, so I would refer to somebody else," right?
A. I remember him referring to a specific case.
Q. Yep. But your testimony was that you wouldn't provide him with the information, you would send him to the officer who was conducting that case, right?
A. Specific -- if he was looking for specific information, yes.
Q. Okay. Lisa, could you bring up page 5 of 4011.
Okay. Do you see that in response you said, "I haven't heard anything yet. I know detectives are working on a BOLO for the suspects and are pulling the security camera videos from the block. I'll keep you updated on the investigation." Do you see that?
A. Yes, I do.
Q. And nowhere in there did you say: I'm not the one conducting that investigation. I will put you in touch with detective so-and-so, right?
A. That's correct.
Q. So he asked you for information and you're providing it, right?
A. He's asking very general information, yes.
Q. Okay. And --
A. No specific information.
Q. Okay. And you say, "And so here" -- just so we all

understand, a BOLO stands for a "be on the lookout," right?
A. Yes, that is correct.
Q. And a BOLO is a document that the police create as part of their investigation, right?
A. Sometimes, yes.
Q. Okay. It's an investigative step that they take to try to solve a crime or capture a suspect, right?
A. Yes, it is.
Q. And security camera videos, that can be evidence, right?
A. Yes, it could be.
Q. And in the course of your many years being a police officer, you've collected security camera footage as evidence, right?
A. Yes.
Q. And the collection of security camera videos are a step that can be taken as part of an investigation, right?
A. Yes.
Q. So you told Tarrio you would keep him updated on that, right?
A. Yes, I did.
Q. And the -- and you told him you would keep him updated on the status of the law enforcement investigation, right?
A. Yes, I did.
Q. And you were able to provide him with that information because you were a police officer, right?

A. Yes, potentially.
Q. Right. You knew about the BOLO because you're a police officer?
A. Um-hum.
Q. You knew about them trying to pull the security camera because you were a police officer, right?
A. That's correct.
Q. And that's all information that you learned in the course of your duties?
A. Yes.
Let me take a step back. I don't know about this specific one, but that is the kind of normal way of investigating.
Q. Okay.
A. So I don't know if those things were done for the specific case.
Q. You said, "I know the detectives are working on a BOLO for it and they are pulling security camera videos from the block." So you're saying there you knew that was what they were doing?
A. It's possible that I didn't. I may have said that just because it's normal case -- or, that is the normal progression. I don't know --
Q. Lisa, can you move down the screen?
Sorry. You didn't say here, "They may be doing this." You said, "I know," right?

A. That is correct. However --
Q. Okay.
A. -- I may not have -- I may not have known if they were actually doing it. I may have been just giving him false information.
Q. You may have lied?
A. May have given him false information to continue our connection, our exchange -- not exchange, but collection of information.
Q. Okay. And November 7th, 2020, let's talk about that day. After the TV networks projected that Biden had won the election, you contacted the defendant, right?
A. I would need to see the message.
Q. Can we bring up Government Exhibit 4012, at pages 1 and 2.
Okay. And do you see at the top, at 1:07, you said, "Hey, brother, sad, sad news today. Are you all planning anything" -- "you all planning anything." Do you see that?
A. Yes, I do.
Q. You did that via iMessage, right?
A. Yes.
Q. That's what you were supposed to do, you were supposed to find out if they were planning things, right?
A. Yes, that is correct.
Q. I want to go down to the bottom. He responds to you, right?

And can we bring up the four iMessages, please.

Okay. And he responds to you with a video, right? And you say, "Nice, I wish I was there instead of here. Let me know if you do anything."

And you ask him where it is and say, "Thanks, brother," right? You would agree with me, that's all through iMessage, right?

A. That is correct, yes.

Q. Okay. And do you recall Mr. Schamel asked you some questions, well, why did you use Telegram with Mr. Tarrio? And you said that was his preferred method of communication, right?

A. Yes, that is correct.

Q. Okay. Can we bring up Government Exhibit 4006, at page 1 -- sorry, page 2.

Okay. And do you see at the top, the first communication you have with Mr. Tarrio is on October 24th, 2019, and that's via SMS, right? You would agree with me, that's correct?

A. Yes, that is correct.

Q. Okay. Can we go down to page 3, please. And you see the communications continue through November -- through November, right?

A. Yes, that's correct.

Q. And that's all through SMS, right.

A. Yes, it is.

Q. Okay. And then January through February at the bottom of the page, you would agree with me, again, all through SMS?
A. Correct.
Q. Not Telegram, right?
A. Yes.
Q. Lisa, keep going.
Page 4. This is still February, right? And then all the way down to May 2020, still use SMS, right?
A. Yes.
Q. Or Google voice message here?
A. That is correct, yes.
Q. Not Telegram?
A. Correct.
Q. Go to page 5, please.
Okay. And June of 2020, still Google voice message, Google voice calls, correct?
A. That's correct.
Q. No Telegram there?
A. There's one, but it's not between him and me.
Q. Right. But between the two of you. Sorry. Nothing between the two of you via Telegram?
A. That's correct.
Q. Okay. So we've seen October, November, December, January, February, March, April, May, June. Those nine months, all through iMessage, right?

A. That is correct.
Q. Okay. Or SMS or -- no Telegram?
A. That is correct, yes.
Q. Okay. Lisa, could you go to page 6, please.
Now, the first time that -- so in July, the beginning of July, still Google voice message, right?
A. In July -- beginning of July, that is correct, yes.
Q. Then you see there's -- you and Mr. Tarrio communicate once on the 3rd via Telegram private chat, once on the 4th, and then do you see again you communicate that way on the 8th. Do you see that?
A. Yes, I do.
Q. And in between you -- you don't use Telegram voice to call him, you have regular phone calls with him, right?
A. That is correct, yes.
Q. Okay. And on the 8th, you're the one that initiates the conversation via Telegram private chat, right?
A. Yes, that is correct.
Q. And that's you providing information about an ABC report, right?
A. Yes, it is.
Q. Okay. So, now, let's go forward. Can we go to the next page?
Okay. So now you see August here, right? August 2020, there's phone calls and iMessages?

A. Yes, I see that.
Q. September there's phone calls and iMessages, right? There's iMessages at the bottom of the page?
A. Correct, yes.
Q. Okay. So not -- you agree with me, no Telegram there?
A. Not between Mr. Tarrio and I.
Q. Right?
A. Correct.
Q. Page 8, please.
Rest of September here, beginning of October, Mr. Tarrio and you are both communicating; phone calls, iMessages. No Telegram, right?
A. That's correct.
Q. Can we go to the next page. Again, beginning of October, iMessage from him to you, from you to him, right?
A. That is correct, yes.
Q. Keep going.
More in October. Still iMessages, right?
A. That's correct, yes.
Q. Okay. Go to the next page. Continuing down. Keep going.
This is all October. Do you agree with me, it's still iMessages, right, between you and Mr. Tarrio?
A. That is correct, yes.
Q. Okay. Keep going, Lisa. Keep going. Keep going.
Keep scrolling until you get to -- then here, even the

end of October, still iMessages, right?
A. That is correct, yes.
Q. Okay. Go all the way down until you get to November 7, please. Page by page.
Okay. Stop right there.
Okay. So we just went through 20 pages of this spreadsheet, right? And that covered from -- I believe it was December of 2019, all the way to November of 2020, right?
A. Yes, that is correct.
Q. And we saw hundreds of iMessages there, right?
A. Correct.
Q. And we only saw four Telegram messages there, right?
A. This is correct, yes.
Q. Okay. And so, fair to say that was not the preferred method of communication during that time period, right?
A. Initially, that is correct.
Q. Okay. So for that -- all the way up to November 7th, 2020, that was not the preferred method of communication, right?
A. That is correct.
Q. Okay. And then it's correct, right, that on November 7, 2020, you are the one that initiated a Telegram chat with Mr. Tarrio, right?
A. According to this, that's correct.
Q. Okay. So you could have used iMessage, right?
A. I could have, yes.

Q. You could have used Google voice, right?
A. I could have, yes.
Q. You could have called them on the phone?
A. I could have, yes.
Q. Okay. But you went into your phone and you went into Telegram and you sent him a private chat, right?
A. Yes, that's correct.
Q. Okay. Now, on the 7th, at 2:10 p.m. -- could we bring up Exhibit 4012, at page 3.
And also, to be clear, there's no communication that we have, right, that's in this chart which you've seen, that shows Mr. Tarrio telling you, "Please communicate with me via Telegram," right?
A. Not in this chart that we've seen, no.
Q. Okay. You're not aware of any piece of paper anywhere in the world or communication where Mr. Tarrio told you to communicate with him via Telegram, right?
A. Written?
Q. Yeah.
A. No.
Q. Okay. And so you contacted him about an hour later, right? Previously we looked at iMessages that were at 1:11 p.m., right?
A. I believe so. We would have to go back to confirm that. That sounds correct.

Q. Lisa, go back to the bottom of page 2, please.

And do you see right here, 1:11 p.m., there's an iMessage there, right, from you to Mr. Tarrio?

A. Yes, that's correct.

Q. And now let's go forward.

And at 2:10 p.m., you didn't use iMessage, you used Telegram, right?

A. That is correct.

Q. And you could have communicated this information to him via iMessage, but you chose not to?

A. I could have, yes.

Q. And here you said, "Need to switch to encrypted alerts. Being sent to LE that Parler accounts belonging to your people are talking about mobilizing, taking back the country, getting people spun up. Just giving uh a heads up." Do you see that?

A. Yes, I do.

Q. And when you said, "Need to switch to encrypted," that was when you switched from communicating through iMessage to communicating with Telegram, right?

A. That is correct, yes.

Q. And because Telegram was encrypted?

A. That is correct.

Q. And you thought it would be harder for people to get those communications?

A. That's correct.

Q. And you believed it was -- so it was a more secure way to communicate with them?
A. Yes.
Q. "LE" stands for law enforcement, right?
A. That is correct.
Q. Okay. And so those were alerts that you were receiving because you were a part of law enforcement, right?
A. That is correct.
Q. And when you were giving him a, quote, Just a heads up -- sorry. And you were giving him, quote, A heads up that the alerts were being sent out, right?
A. Can you repeat the question?
Q. And you were giving him, quote, a heads up, unquote, that the alerts were being sent out, right?
A. Yes. Correct.
Q. And this wasn't about the banner burning, right?
A. No, it was not.
Q. This was about the activities of groups like the Proud Boys, right?
A. Yes, that's correct.
Q. What we had previously talked about, sort of First Amendment activities they may be involved in, right? Demonstrations, marches, right?
A. That's correct.
Q. And you said, "These are some of the posts. Looks like the

first one is a fake account claiming to be you." Do you see that -- sorry, going to -- sorry, page 4, Government Exhibit 4012.

A. Yes, I see that.

Q. You said, "These are some of the posts. Looks like the first one is a fake account claiming to be you," right?

A. Yes, that's correct.

Q. Okay. And that was the information that you were receiving in the law enforcement alerts, right?

A. Correct.

Q. And that's information you shared with Mr. Tarrio, right?

A. Yes, it is.

Q. And then he sends you an audio message and a photo, right?

A. Correct.

Q. And you didn't retain that voice message, right?

A. I did not.

Q. You didn't retain that photo, right?

A. I did not.

Q. And you responded, "Got your voice message. Just giving you a heads up. Please keep this between you and me," right?

A. I can't see that.

That is correct. I did say that.

Q. So this is you giving Tarrio information or, as you called it, a, quote/unquote, heads up, right?

A. Correct.

Q. And you asked him not to tell anyone that you had given him a heads up, right?
A. That's correct.
Q. You wanted him to keep it between the two of you?
A. Yes, I did.
Q. And that's why you did it over Telegram?
A. That is correct.
Q. And let's go to November 13, 2020.
I think we've talked about it earlier, you're familiar with a bar named Harry's, or what was a bar named Harry's, right?
A. Yes.
Q. That's in Washington, D.C., right?
A. Yes, it is.
Q. And it's a place where the Proud Boys used to gather, right?
A. Yes.
Q. Showing you Government Exhibit 4015, at page 3, and directing your attention to November 13, 2020.
And to be clear, this is before the December 12th banner burning, right?
A. That is correct, yes.
Q. This is when you're just involved in monitoring First Amendment activities, right?
A. Correct.

Q. And you, at 8:33 p.m. you asked Tarrio if he's still at Harry's, right?
A. Yes, I did.
Q. And you did that over iMessage, right?
A. I did.
Q. And at 8:34 he said still there, right?
A. He said, "Yes. Doing a show and I'll be back down."
Q. Okay. Yep. And that was over iMessage, right?
A. Yes, it was.
Q. And once he confirmed he was there, you wrote to him in Telegram, right?
A. I did.
Q. Okay. You could have written to him in iMessage, right?
A. I could have.
Q. But you went out of your iMessage communication, right?
A. Well, at that point I may not have been in it. But, in an iMessage.
Q. Okay. But you saw -- after 8:34 p.m. you saw his message saying, "Yes. Doing a show and I'll be back down," right?
A. Yes.
Q. And then you went out of that communication, right?
A. Yes.
Q. You went into your Telegram communication?
A. That's correct.
Q. Into the Telegram app, right?

A. Yes.
Q. And you wrote to him, "Just giving you a heads up. There's a lot of attention at Harry's right now. If it doesn't calm down, they're going to shut Harry's down," right? That's what you wrote, right?
A. Yes, it is.
Q. And then using iMessage you told Tarrio to check his Telegram, right?
A. Yes, I did.
Q. Because you were giving him information, right?
A. Yes.
Q. And you didn't want other people to know that, right?
A. I can't say that.
Q. Well, you said earlier that you used Telegram because it had a higher level of encryption, right?
A. Yes.
Q. And you understood that with a higher level of encryption, there was less of a chance of other people seeing those communications. Do you recall giving that testimony?
A. Yes, I do.
Q. Okay. So you went out of Telegram, you go back into your iMessage at 8:39 and you tell him to, "Check Telegram," right?
A. That is correct.
Q. And you told -- and Mr. Tarrio then sends you an audio message, right?

A. That is correct.
Q. And you didn't retain that audio message?
A. No, I did not.
Q. And you write to him, in response, "Sounds good. Just wanted to let you know. I heard ABRA already on the scene," right?
A. Yes, I did.
Q. And that was information that you were aware of because you were a law enforcement officer, right?
A. Yes, that's correct.
Q. Showing you Government Exhibit 4016, at page 1.
Now, I want to bring up the conversations at the top. November 14, 2020, Tarrio called you at 6:01 p.m. on the 14th, correct?
A. That is correct, yes.
Q. And that was a phone call?
A. Correct.
Q. That wasn't through Telegram?
A. No. It doesn't appear so.
Q. And you spoke for a minute and 54 seconds, right?
A. Correct.
Q. And then you called Tarrio a few minutes later, right?
A. That's correct.
Q. And that phone call was not through Telegram, right?
A. Correct.

Q. And you tried to call him again at 6:37 p.m., but it looks like you didn't connect, right?
A. That's correct.
Q. And again, that phone call was not through Telegram, right?
A. No, it was not.
Q. Okay. Now I want to take you forward to the 14th, at 6:45 p.m.
And at 6:45 p.m. that evening you went into the Telegram application, right?
A. Yes.
Q. And you sent Tarrio a Telegram private chat, right?
A. Yes.
Q. And there was nothing wrong with your iMessage at that point? You could have sent him this via iMessage, right?
A. Presumably, yes.
Q. Well, you're not aware of your iMessage being deleted from your phone, right?
A. No. No, no.
Q. And you wrote to him, "Antifa and your guys at 10th and E. We have both groups separated." Do you see that?
A. Yes, I do.
Q. Okay. And this wasn't about the banner burning, right?
A. No, it was not.
Q. This was about First Amendment activities, right?
A. Correct. Protest, yep.

Q. Okay. And you're providing him with information, right?
A. Yes.
Q. About where antifa is and where his guys are, right?
A. Yes.
Q. And that's information that you were aware of because of your position at MPD?
A. No. Anybody on scene would know that.
Q. Right. But somebody would only -- you knew that because you were a police officer and you learned that information as a result of it?
A. Yes.
Q. Right.
A. For me, that is correct.
Q. And then you wrote, "We cut your guy loose. Victim could not be located." Do you see that?
A. Yes, I do.
Q. When you say, "Cut your guy loose," you meant the police let him go, right?
A. Yes, it appears that way.
Q. And you told him that the police could not locate the victim of the crime, right?
A. That is correct.
Q. And that was information --
A. Correction. It appears that way, yes.
Q. And that was information that you had because of your

position with MPD, right?
A. Yes, that is correct.
Q. And no one at MPD authorized you to release that information, right?
A. Correct. I didn't check with anybody, that's correct.
Q. Nobody authorized you to release that information, right?
A. Yes, that's correct.
Q. And you could have sent those messages through iMessage, right?
A. Correct.
Q. But you didn't, you used Telegram, right?
A. That is correct.
Q. Because you were providing him with information?
A. I can't say that's why I used Telegram. But I sent those messages through Telegram.
Q. Okay. And that was the application that you had previously directed to Mr. Tarrio to because it was encrypted, right?
A. Correct.
Q. Page 2 of Exhibit 4016.
Do you see here, it says, "You guys attending the Straka event tomorrow morning," right?
A. Yes, I do.
Q. And it was later that evening you contacted him, right? Same evening, the 14th?
A. We would have to go back to see the date, but --

Q. Can you pull it up again? Go to the page before.
Do you see the 14th of November, 9:23 p.m., over here?
A. Yes. Now I see it.
Q. Now can we go back to where we were, page 2 of Exhibit 4016.
So later that evening you contacted Mr. Tarrio again, right?
A. Correct.
Q. Now, is that 10:22 p.m.?
A. Yes, it is.
Q. And that was over iMessage, right?
A. Correct.
Q. And the last method you contacted him through was Telegram, right?
A. Previously, yes, that is correct.
Q. But here you use iMessage, right?
A. Correct.
Q. And here you're asking him for information, right?
A. Correct.
Q. You're asking him if the Proud Boys were attending an event, right?
A. Yes, that is correct.
Q. And here you were seeking information from Mr. Tarrio, right?
A. Yes, that is correct.

Q. You didn't provide him with any police information here, right?
A. No, I did not.
Q. And this is all information you're seeking as part of your job as the head of HSP, right? Or, the intelligence unit of HSP, right.
A. That is correct, yes.
Q. You didn't ask him this over Telegram, right?
A. I did not.
Q. You could have, right? You just used --
A. I could have, yes.
Q. Okay. But here, where you're only seeking information from Mr. Tarrio, you asked it over iMessage, right?
A. Can you repeat the question?
Q. Yes.
A. I'm sorry.
Q. Here, where you're only seeking information from Mr. Tarrio, you used iMessage, right?
A. That is correct, yes.
Q. Okay. Let's go to December 11, 2020. Showing you Government Exhibit 4017, at page 6.

Okay. And so we previously saw you had just used a Telegram -- sorry, instant messenger with him.

We're going to go to December 11th.

Do you recall, on December 11, 2020, using Telegram

private chat and texting Tarrio, "Yep, I know. Cuban embassy called police on you. LOL," correct? Do you recall that?
A. I don't specifically remember sending it. But, I mean, I see it here, so that's -- that's fair to say, yes.
Q. Okay. And that was a call from the Cuban embassy to MPD complaining about the Proud Boys, right?
A. I don't know. Can we see the previous messages?
Q. Yep, you can.
There's an audio message?
A. Yeah.
Q. And then you say, "Yep, I know. Cuban embassy called the police on you." Right?
A. Yeah. I don't see a reference to the Cuban embassy with the message before.
But can you repeat your question?
Q. Yep. You told Mr. Tarrio that the Cuban embassy had called the police on the Proud Boys, right?
A. Yes. According to this, that's correct.
Q. And that was based on police information, right?
A. Yes, it is.
Q. That was information you had in your possession because you were a part of MPD, right?
A. Yes. Correct.
Q. Okay. And this wasn't related to the banner burning, right? This is before the banner burning, right?

A. That's correct.
Q. This is information that you're providing to the Proud Boys regarding their First Amendment activities in the District, right?
A. That's correct, yes.
Q. And no one at MPD authorized you to release that information, correct?
A. That's correct.
Q. And you passed the police information along to Mr. Tarrio via Telegram?
A. Yeah, according to this, yes.
Q. Okay. Showing you Government Exhibit 4018, at page 1.
Do you see, on December 12th, 2020, at 7:30 p.m., using Telegram private chat, you texted Tarrio, "We just locked up one of your guys at 14th and K," correct?
A. That is correct, yes.
Q. Okay. And you didn't use iMessage for that, right?
A. That's correct.
Q. You could have?
A. I could have, yes.
Q. And that is you providing Tarrio with information about a Proud Boy being arrested, right?
A. Yes.
Q. Okay. And this isn't related to the banner burning, right?
A. Correct.

Q. This is related to their First Amendment activities in the District, right?
A. That's correct.
Q. And you're providing Mr. Tarrio with police information, right?
A. That is correct, yes.
Q. And no one authorized you at MPD to release that information?
A. No, they did not.
Q. And you chose to send that via Telegram, not iMessage, right?
A. That's correct, yes.
Q. December 13, 2020, showing you Government Exhibit 4018, at page 4.
Okay. Do you see at December 13th, at 5:18 p.m., you used Telegram private chat, you sent Tarrio a Telegram private message saying, "On a brighter note, guy who stabbed your guys got locked up." Do you see that?
A. Yes, I see that.
Q. And you're informing Mr. Tarrio that an individual who stabbed a Proud Boy was caught and arrested, right?
A. That is correct, yes.
Q. You didn't direct him to the detectives that were on that case, right?
A. That's correct, I did not.

Q. You provided him with the information?
A. Yes, I did.
Q. Okay. And this isn't about the banner burning, right?
A. That's correct.
Q. Okay. This is regarding an altercation that had happened during First Amendment activities, right?
A. Correct. Yes.
Q. And you're providing him with police information?
A. Well, it's general information anybody on scene could have seen. But, yes.
I take it back. That is correct, yes.
Q. Police information?
A. Yes.
Q. No one authorized you to release that, right?
A. That is correct.
Q. You could have sent it over iMessage, right?
A. I could have, yes.
Q. But you chose to go into the Telegram application and send him that message through the encrypted app, right?
A. That's correct.
Q. And then following an audio message from Tarrio, you wrote, "I haven't pulled the report yet, but from what I learned on the scene it was only one person."
Do you see that?
A. Yes, I do.

Q. And the report you're referencing is a police report, right?

A. Correct.

Q. And what you learned on the scene was information you were aware of because of your position as a police officer, right?

A. Yes, that's correct.

Q. Okay. And, again, this is about -- not about the banner burning, this is about First Amendment activities, right?

A. Yes, that is correct.

Q. And you're providing him police information, right?

A. Yes, that is correct.

Q. No one at MPD authorized you to release this information either, right?

A. Yes, that is correct, nobody did.

Q. Page 5, Exhibit 4018.

Now directing your attention to Mr. Tarrio's Telegram chat message to you at 5:32 p.m. Do you see that?

A. Yes, I do.

Q. And Tarrio asks you, "What's the general consensus with D.C. metro and my guys," right?

A. Yes, I see that.

Q. Okay. And he's asking you a question and that's not about the banner burning, right?

A. Correct.

Q. That's about the general consensus with D.C. metro about

the Proud Boys, right?
A. That is correct, yes.
Q. Based on all of their First Amendment activities that had occurred in the District, right?
A. Correct, yes.
Q. Okay. And the general consensus, right, is what are MPD officers saying about the Proud Boys, right?
A. Yeah, how they feel about them.
Q. Right. What are you hearing from other officers about the Proud Boys?
A. That's fair to say, yes.
Q. Okay. That's communications with other police officers, right?
A. Yes, it is.
Q. Okay. So that's police information, right? What are individual officer saying to each other about the Proud Boys?
A. I don't think I would call it police information. It sounds like an opinion, like a collective opinion.
Q. So it's your testimony that discussions between police officers about the Proud Boys' activities in the District is not police information?
MR. SCHAMEL: Objection. That misstates his response.
THE COURT: All right. Well, you can ask that question.

BY MR. ROTHSTEIN:

Q. Is it your testimony that discussions between MPD officers about the Proud Boys' activities in the District is not police information?

A. I would say no. I would say it's an opinion. It's a collective opinion.

Q. Of the MPD?

A. Yes.

Q. And you responded, "That's too complicated for a text answer. That's an in-person convo over a beer," right?

A. That is correct, yes.

Q. And Tarrio and you then discussed meeting up for a drink later that week, right?

A. Yes, we did.

Q. All right. He says, "I'll be in town on Thursday, we can go to The Dubliner." You said, "Perfect. I won't be working tomorrow, but how about Tuesday afternoon," right?

A. That is correct, yes.

Q. I'm sorry. Just when we were talking about the consensus of MPD, I think you used the phrase "collective opinion," right? What's everybody at MPD talking about Proud Boys, right?

A. Yeah.

Q. That's based on internal discussions, right?

A. Yes, that's fair to say.

Q. Okay. So let's go back to this meeting with Mr. Tarrio.
You met up with him on December 15th, 2020, right?
A. I believe that was the date, yes.
Q. And I want to direct your attention to the -- okay. Let's go back a second.
I want to direct your attention to the evening of December 12th.
A. I'm sorry, what date?
Q. December 12th.
A. Okay. The banner burning date.
Q. Yes, exactly. That day the Proud Boys were in town for the Million MAGA March, right.
A. That's sounds correct.
Q. And that evening a BLM banner was torn down from a historic Black church, right?
A. That is correct, yes.
Q. And it was burned in the street by a group of individuals?
A. Correct.
Q. And you were aware that the Proud Boys and BLM were adversaries, right?
A. Yes. Or I was.
Q. They would skirmish with each other when they found each other in the city, right?
A. That is correct, yes.
Q. Oftentimes the Proud Boys were out looking for fights,

right?
A. Um --
Q. They were looking to find members of antifa or members of BLM because they wanted to engage in violence with them, right?
A. I would say both sides were looking for engagements.
Q. Okay. But you would agree with me that the Proud Boys were not here just to demonstrate, they were also here to engage in violence, right?
A. Assaults did occur. But I -- I can't say that they were here looking for fights.
Q. Okay. In December of 2020, was it your opinion that the Proud Boys were a pacifist group that was just coming to D.C. to express certain views?
A. No.
Q. Right. You knew that they engaged in violence, right?
A. I knew that -- yes.
Q. Thanks. And I want to show you Government Exhibit 4018, at page 1.
By December 13th, in the morning, you became aware that a BLM banner had been burned, right?
A. Yes.
Q. And there were some discussions that morning about whether the destruction of the banner should be investigated as a hate crime, right?
A. That is correct.

Q. And if a crime is charged as a hate crime, the penalties could be higher, right?
A. That is correct, yes.
Q. And MPD has a process for determining if something should be investigated as a possible hate crime, right?
A. Yes, that is correct.
Q. And there's a panel of people who make that determination, right?
A. No, the panel really doesn't determine whether or not it's going to be investigated as a hate crime.
Q. What does the panel discuss?
A. The panel meets and discusses possible crimes that are report -- or, initially identified as hate crimes to determine if it's going to be categorized as a hate crime for reporting purposes to the FBI.
Q. Right. But also whether or not -- there's discussion, is this -- should this be investigated as a hate crime, right?
A. No, because normally the hate crimes, we'll review these after the incident occurs.
Q. So it's your testimony that on the morning of the banner burning you didn't engage in a discussion about whether or not it should be investigated as a hate crime?
A. Oh, in this email, yes, I did. But this wasn't a regular meeting of the hate crimes committee.
Q. Right. It was because of what happened the night before?

A. Yes, that is correct.
Q. And just -- can you just blow this up, Lisa, right there?
THE COURT: Can I just ask a couple of questions? Because you've raised a new category of information.
Does whether -- when something gets charged, a charging decision, is the U.S. Attorney's Office.
THE WITNESS: That is correct, Your Honor.
THE COURT: So they decide if they're going to charge a hate crime?
THE WITNESS: That is correct, Your Honor.
THE COURT: But before somebody takes a case to the U.S. Attorney's Office and says, "Charge this," they investigate it at MPD?
THE WITNESS: That is correct, Your Honor.
THE COURT: And there's a decision within MPD, are we going to investigate this as a hate crime or not, correct?
THE WITNESS: I'm sorry, Your Honor. Can you repeat the question?
THE COURT: Is there an internal discussion within the -- whoever is investigating the crime, as to whether it should be investigated as a hate crime? Which is different from what the U.S. Attorney's Office ultimately decides after you bring it to them.
THE WITNESS: Yes, Your Honor. But it's not part of the hate crimes review committee.

THE COURT: Okay. That happens. And then there's a separate thing called the hate crimes review committee.

THE WITNESS: That is correct, Your Honor.

THE COURT: And that is for the purpose of keeping data for the FBI so the FBI knows how many hate crimes are happening in each jurisdiction?

THE WITNESS: Yes, that is correct, Your Honor. For statistical reporting purposes.

THE COURT: And that's the group you sat on?

THE WITNESS: That is correct, Your Honor.

THE COURT: So who would be in charge of deciding internally, are we going to investigate this as a hate crime? Just the investigator and their supervisor?

THE WITNESS: Yes, the Criminal Investigations Division, Your Honor.

THE COURT: All right. Next. Go on.

BY MR. ROTHSTEIN:

Q. Who is Kelly O'Meara?

A. Kelly O'Meara, I don't know if she still works there, but she works in the chief's office. I don't know what her exact title was.

Q. And do you see here, there's an email from her the morning after the banner burning, saying, "Are we all on board with saying that tearing down of the BLM signs would be investigated as a possible hate crime." Do you see that?

A. Yes, I do.
Q. And this wasn't a public discussion, right? This was an internal discussion?
A. That is correct.
Q. And you responded to that email, right?
A. Can we see it?
Q. Yep.
A. I don't want to speak out of turn.
(Pause.)
Q. You sent an email to Commander Parsons and others, right? And you were raising a concern about whether this should be investigated as a hate crime, right?
A. Would you mind, can we go back to the previous message?
Q. Yep. Can you please blow up both of them.
Ms. O'Meara says, "Are we all on board with saying that tearing down the BLM signs would be investigated as a possible hate crime?" And you're the first one that responds, right?
A. One of the people, yes.
Q. But you're the first on that responds, right?
A. Yes.
Q. And you say, "That's a very tricky question," right?
A. Yes, I did say that.
Q. And you note there that in the past when a gay pride flag was burned, that they've supported the offense being a hate crime, right?

A. That is correct, yes.
Q. And then you say, right in that second sentence there, that if he's charged -- "if this is a hate crime, then a lot of other things would have to be charged as a hate crime," right?
A. Yes, I did say that.
Q. So it's sort of like a slippery-slope argument? If you say this is a hate crime, then a lot of other things have to be a hate crime, right?
A. That's fair to say, yes.
Q. Okay. And at this point, following the BLM banner burning, you only communicated with Mr. Tarrio either in person or through Telegram, right?
A. Can you repeat the question?
Q. Following the BLM banner burning, you only communicated with Mr. Tarrio either in person or through Telegram, right?
A. Following the burning? I would have to see the master timeline.
Q. Okay. Can we just bring up 4006. And you can scroll from page 31 to 55.
(Pause.)
A. Slow down just a minute.
Q. Any communications with you and Mr. Tarrio are in orange that are not Telegram.
A. All right. We can keep scrolling then.
(Pause.)

You can go a little bit quicker, if you like.
Q. Yeah, keep going quick.
You don't see anything in orange, right?
A. No, I do not.
Q. Okay. Lisa, keep going, just a couple more pages.
(Pause.)
So you would agree with me, right, that you only communicated, after the banner burning, either in person or Telegram, right?
A. Yes, I would agree with you.
Q. You didn't have any regular telephone calls with him, right?
A. Any regular, that's correct.
Q. You stopped using iMessage to communicate, right?
A. Correct.
Q. And you believed Telegram was encrypted, right, at a higher level of security?
A. That's correct.
Q. In fact, we saw that on -- let's skip that.
Okay. Now going to Government Exhibit 4018, at page 6.
On December 14th, 2020, at 10:52 a.m., after the banner burning, Mr. Tarrio sent you an audio message via Telegram private chat, right?
A. That is correct, yes.
Q. And you knew that the banner that was burned was BLM,

right?
A. Repeat the question.
Q. Sorry. After the banner burning, you knew it was a BLM banner, right?
A. Yes, I did.
Q. And you knew that the Proud Boys were suspected of being involved, right?
A. At the time I -- I can't say for sure. Possibly, but I just -- I don't remember.
Q. Were there any other groups coming to D.C. that were having skirmishes with BLM, besides the Proud Boys?
A. Not that I'm aware of, no.
Q. Right. And you knew at that time that Mr. Tarrio was the head of the Proud Boys, right?
A. Yes, I did.
Q. Okay. And you did not retain this message, right?
A. Retain which message? I'm sorry.
Q. You didn't retain this audio message?
A. The audio message, no, I did not.
Q. You didn't document the communication, right?
A. I did not.
Q. You didn't provide the contents of it to the MPD detectives on the banner burning investigation, right?
A. That is correct.
Q. And you met up with Mr. Tarrio at The Dubliner on the

afternoon of December 15th, right?
A. That is correct.
Q. And at that point you knew that CID was investigating the burning of the BLM banner, right? Now we're going to the 15th, the next day.
A. Can you repeat the question?
Q. The banner burning happens on the 12th.
A. That's correct.
Q. December 15th you meet up with Mr. Tarrio at the Dubliner?
A. Yes, that is correct.
Q. By the time the 15th comes, you know that CID, the Criminal Investigative Division, is investigating the banner burning, right?
A. Yes, that's correct.
Q. And you knew the Proud Boys were suspects in the burning of the banner, right?
A. Yes, that's fair to say.
Q. And on the 15th Mr. Tarrio is still the leader of the group, right?
A. Yes, he is.
Q. You didn't record that meeting, right?
A. I did not.
Q. You didn't write a report of that interaction?
A. I did not.
Q. You didn't notify the CID detectives about what Mr. Tarrio

had said?
A. I did not.
Q. And you did, as you testified earlier, you did discuss the banner burning with them, right?
A. Yes, this is correct.
Q. You didn't even notify the CID detectives that that meeting had happened, right?
A. That's correct.
Q. In fact, you never notified them that that meeting had happened?
A. CID?
Q. Yeah.
A. That's correct.
Q. During your conversation with law enforcement on June 2nd, 2021, you were asked about the conversations with Mr. Tarrio about the banner burning, right?
A. I would like to see it.
Q. Sure.
A. If I could see it.
Q. 5006, at the bottom of page 9 and then page 10.
Do you see, Agent Molnar asked you, "Or let's say between his arrest and January 4th. Let me rephrase that. Between the banner burning thing --"
You say, "Yes.
"-- like, when they were there in December and then

January 4th."

"Yes, sorry."

"What were those conversations like? Were he prepping you for what was coming?"

And then you say, "That was part of it, and the other part was I was trying to find out without tipping him off to the MPD investigation," right?

A. Yes.

Q. And when you said, "trying to find" -- earlier you had said that "trying to find out" was you were trying to, at one point, confirm whether or not he had burned the banner, right?

A. Trying to get -- now more information on -- if he had any information on the incident.

Q. But you never told anybody at CID that you had communications with him about the incident, right?

A. CID, no.

Q. Well, you never told Jeff Carroll that you had communications with Mr. Tarrio about the banner burning, right?

A. Yes, I did.

Q. Your testimony is that you told Jeff Carroll that you had conversations with Mr. Tarrio on the 15th of December, at The Dubliner, about the banner burning? That's your testimony?

A. Yes. There's a text message.

Q. That you discussed the banner burning with him?

A. Yes.

Q. You're talking about the fliers, right?
A. Yes, that's correct.
Q. Whether you could identify anybody else in the fliers, right?
A. That is correct, yes.
Q. Okay. And you said in this -- and you noted that those conversations were, "without tipping him off to the MPD investigation," right?
A. Correct.
Q. I want to direct your attention to December 18th, 2020, and going back to Government Exhibit 4018, at 13.
Do you see there it says, "Did you see the crime solvers tip?"
A. Yes, I see that.
Q. And then going to page 14.
And Carolyn sent you a WhatsApp message asking if you saw the crime solvers tip, right? And then she forwarded you the WhatsApp message containing the tip, which stated that, "Henry Enrique Carrio, who is a member of the Proud Boys, is claiming responsibility for the destruction of property at the church"?
A. That is correct, yes.
Q. And you responded, "Oh, fuck." And later you texted her, "Yes. Remember what he told me," right?
A. If we could scroll into that message.

Yes, I see that.
Q. And the "he" there and Mr. Tarrio, right?
A. Yes, that is correct.
Q. And you had met with him three days earlier at The Dubliner, right?
A. Three days prior -- yes, that is correct.
Q. Government Exhibit 4018, at 15.
After learning about the tip, you reached out to Tarrio in Telegram secret chat, right?
A. Yes, I did.
Q. And you texted him, "Hey, brother. Did you call in an anonymous tip to MPD claiming responsibility for the banner burning," right?
A. Yes, that is correct. I did.
Q. And you asked him this over Telegram secret chat, right?
A. Correct.
Q. You could have done it over iMessage, right?
A. I could have, yes.
Q. You didn't?
A. I did not.
Q. You didn't tell anyone on the investigation team that you were going to reach out to him about the tip?
A. I did not.
Q. No one directed you to inform Mr. Tarrio about the tip, right?

A. That is correct.
Q. And you were only aware of the tip because of your position as an MPD officer, right?
A. That is correct, yes.
Q. Now, going to Government Exhibit 4018, at 17.
He responds, "I did more than that. It's on my social media," right?
A. Yes, he did say that.
Q. And where he says, "I did more than that," right, you didn't report to anyone on the investigation team that he had said, "I did more than that," correct?
A. That is correct, I did not.
Q. You didn't document this communication, right?
A. I did not.
Q. You didn't preserve this communication, right?
A. It was probably preserved on my phone.
Q. You sure?
A. No, I'm not sure.
Q. Right. Because all your -- you're aware that all your Telegram communications before January 6th that were on your phone were deleted, right?
A. Without -- without seeing my phone, no, I can't say for sure. I just don't see anything that says deleted, but --
Q. Okay. It's fair to say at this point he's a suspect, right?

A. At this point, yeah, I would say so.
Q. Okay. And you told me earlier that you understood, from your many years of being a law enforcement officer --
A. Actually --
Q. Let me finish my question.
A. Sure.
Q. You understood, from your many years of being a law enforcement officer, how important it was to preserve communications with a suspect, right?
A. Yes.
Q. And you told me that destroying communications with a suspect could hurt an investigation. Do you recall that?
A. Yes, I do.
Q. Okay. And you never told anyone that he said, "I did more than that," right?
A. Um --
Q. Sorry. You never told anyone on the investigative team, CID, that Mr. Tarrio had told you he did more than that, right?
A. Correct, I did not.
Q. And you were in the courtroom during Ms. Cain's testimony, right? The expert witness regarding --
A. Yes.
Q. And you heard her testify that all the communications in your phone were deleted from Telegram prior to January 6th. Do you recall that?

A. I don't remember hearing that. But I'm not saying it wasn't said, I just don't remember that being said.
Q. Okay. And you don't recall whether or not you ever deleted those communications?
A. No, I don't recall. No.
Q. Did you?
A. I don't remember deleting them.
Q. And you told -- sorry. Do you provide access to your phone to anybody else?
A. No, I do not.
Q. So if they were deleted from your phone, from your Telegram, then it would had to have been you that did it, right.
A. Yes, that's correct.
Q. And --
A. Barring any type of glitch or anything like that.
Q. Right. And you were asked some questions about your phone and whether or not you had communicated with Mr. Tarrio over your personal phone. Do you recall that?
A. Yes, I do.
Q. But you also used your work phone for personal, right?
A. Yes, I did.
Q. Right. And you told Tarrio that, "Someone called in an anonymous tip, saying that you claimed responsibility for it." Did you see that?

A. Yes, I do.
Q. The fact the tip was called in, that was police information?
A. Yes, it is.
Q. It was something you knew because of your law enforcement position, right?
A. That is correct, yes.
Q. It wasn't your case, right?
A. It was not.
Q. And, so, you were providing Tarrio with information related to the banner burning investigation, right?
A. Yes, you could say that.
Q. And Tarrio was concerned that this was going to be a hate crime, right?
A. Can you repeat the question?
Q. Did Mr. Tarrio express to you that he was concerned that this would be charged as a hate crime?
A. No, I wouldn't say he expressed the concern that it was going to be charged as a hate came. He said in his opinion it wasn't a hate crime and he wanted to see it play out.
Q. But whether it was a hate crime was something he was interested in, right?
A. Yes.
Q. You understood that if something is charged as a hate crime, it carries more serious consequences, right?

A. That is correct, yes.
Q. And you never told anybody on the investigative team that he had told you it wasn't a hate crime, right?
A. No, I did not.
Q. Okay. And this is a statement of a suspect, right?
A. Yes.
Q. That you didn't preserve, right?
A. Correct.
Q. That you didn't document?
A. Correct.
Q. And you would admit that if it wasn't on your phone when it was taken by -- when your phone was taken via the subpoena, that those messages weren't in Telegram, was because you deleted them, right?
A. I thought you told me before January 6 all the messages were deleted.
Q. Right. So if this communication was not on your phone when it was collected by MPD on June 2nd, 2021, it's because you deleted it, right?
A. I cannot say that, no.
Q. Okay. And you responded --
THE COURT: I don't think we have to ask him that for every one that wasn't there. We have the testimony it wasn't there, we have his answers to whether anyone else had access. And probably don't need to do it message by message.

MR. ROTHSTEIN: Sure. Understood.
THE COURT: All right.
BY MR. ROTHSTEIN:
Q. You responded, "I'm curious to see what happens, too. I will check with our CID people to see if they have you on video," right?
A. Yes.
Q. And CID is Criminal Investigative Division?
A. That's correct, yes.
Q. And they're the ones that were doing the banner burning?
A. Investigating -- yes, that is correct.
Q. And CID was reviewing video footage, right, as part of their investigation?
A. Yes, that is correct.
Q. And not only did you agree to find out information from CID, but two minutes later you provided Tarrio with information you had regarding the FBI and the Secret Service, right?
A. Yes, that's correct.
Q. Okay. And this was not about the banner burning, right?
A. That is correct, it was not.
Q. This is about First Amendment activities, right?
A. Yes, that is correct.
Q. And you were providing Mr. Tarrio with information about -- police information about First Amendment activities, right?
A. No.

Q. This is not police information?

A. No.

Q. You write here, also, "You've got the FBI and United States Secret Service all spun up over what was said on InfoWars the other night about PB dressing up as Biden supporters on Inauguration Day. Got an email first thing this morning." Do you see that?

A. Yes, I do.

Q. That was an email to your work account?

A. Yes, it was.

Q. That's information you learned because you're a police officer, right?

A. That I was a police officer, but what was -- what I received from the FBI and Secret Service social media post, or a link. It's public information that they sent to me.

Q. Right. But you are telling him that the FBI and the Secret Service are spun up over something, right?

A. Yes, that is correct.

Q. And you knew that because you were a police officer, right?

A. Yes.

Q. And you were telling him what they were spun up about, right?

A. Yes.

Q. And you knew that because you're a police officer?

A. Yes.

Q. And this is First Amendment activity --
A. Yes.
Q. -- information, right?
A. Yes.
Q. Okay. So you did provide Mr. Tarrio with information, police information about First Amendment activities, right?
A. That's fair to say, yes.
Q. Okay. And you also provided him with police information about the banner burning, right?
A. Which information are you referring to?
Q. Did you provide him with any police information about the banner burning?
A. Yes.
Q. Okay. So you did it for First Amendment and you did it for banner burning, right?
A. Yes, that is correct.
Q. And both times you did it over Telegram, right?
A. Yes, that is correct.
Q. And no one in MPD authorized you to release this information, right?
A. That is correct.
Q. Now, in fact, going to the bottom of page 18 of Exhibit 4018.
And you confirmed it was actually from the FBI, right? You say here, "LOL. Yep, that's exactly what O got from FBI

and United States Secret Service," right?
A. Yes.
Q. Going to page 19 of Exhibit 4018.
Mr. Tarrio says, "The video is out there," right?
A. Yes, he does.
Q. And you responded, "I think it was included," right?
A. Yes.
Q. In the information you received, right, from the FBI and the Secret Service?
A. Can you repeat the question, please?
Q. You said, "I think it was included." You're talking about the video, right?
A. I don't specifically recall. But, I mean, that's fair, based on these two messages.
Q. And you said, "I'm just going to let them all get freaked out." Do you see that?
A. Yes, I do.
Q. And you're referring to the FBI and the United States Secret Service, right?
A. Yes.
Q. And you're saying, I'm just going to let the Secret Service and the FBI get freaked out, right?
A. Yes.
Q. And then you refer to them as idiots, right?
A. Yes.

Q. And Mr. Tarrio responds, "LOL," right?
A. Yes, he does.
Q. And let's now go down.
Do you see that there's an audio message, 10:52 a.m. --
A. Yes, I do.
Q. -- on the 18th?
A. I do.
Q. And, Lisa, could you show them the ones that are at 10:11, 10:12, and 10:21.
Do you see all these audio messages that were unrecovered?
A. Yes, I do.
Q. Those are all communications that you had with Mr. Tarrio, right?
A. Those are all from him to me. But, yes.
Q. Right. And he was a suspect in a crime at that point, right?
A. Yes.
Q. Okay. And going to page 20 of Exhibit 4018.
And do you see here, a few hours after you spoke to Mr. Tarrio, promising that you would find out what evidence CID had, you inserted yourself into that investigation, right?
A. Can you repeat the question, please?
Q. Yes. A few hours after you spoke to Mr. Tarrio, you promised, you said I'll find out what evidence CID had, right?

A. I would like to see that message, if we could.

Q. Yep. Can we go to Exhibit 4018, at 17. Just go back to page 17, please.

And do you see where it says, "I'm curious to see what happens. I will check with our CID people to see if they have you on video," right?

A. Yes.

Q. And you're saying, "I'll see if they have you on video," right, burning the banner?

A. Right. I'm only saying I'll check with them about video.

Q. Right. Him burning -- a video of him burning the banner, right?

A. Yes.

Q. Okay. Now, at 2:46 p.m. that day, going back to page 20, you kept your promise, right? You reached out to CID. That's what that email is, right? You said, "Is anyone aware of the banner burning being investigated by the FBI as a possible hate crime," right?

A. Right.

Q. And that was something that you had discussed with Mr. Tarrio earlier, right? Mr. Tarrio said it wasn't a hate crime, right? And you said, "I'm interested to see how it plays out"?

A. Yes, he said that. And I asked, yeah, if it was being investigated by the FBI, that is correct.

Q. Okay. And nowhere in this email did you tell law enforcement that you had just spoken to Mr. Tarrio about the banner burning, right?
A. That is correct.
Q. Nowhere in this email did you discuss your conversations with him on December 15th about the banner burning, right?
A. Not to these individuals.
Q. Okay. And Parsons is overseeing CID at that point, right?
A. That is correct, yes.
Q. So the investigative team, you didn't disclose either of those pieces of information, right?
A. That is correct.
Q. Communications you had with the suspect?
A. That's correct.
Q. Let's go -- moving to page 22 of Government Exhibit 4018.
And on December 18, 2020, Mr. Tarrio texted you about the BLM banner burning investigation, right?
A. Yes, he did.
Q. And he asked you, "Do you think they'll make a stink of it," right?
A. Yes, he did.
Q. And going to page 23, Government Exhibit 4018.
And you just wrote here, "No, a bit of the opposite. I've been talking to CID about it. They wanted to know about your group and if I think you all" --

THE COURT REPORTER: Mr. Rothstein.

MR. ROTHSTEIN: Sorry.

BY MR. ROTHSTEIN:

Q. You've seen this message before, right? We've seen this --

A. Yes, I have.

Q. -- many times, right?

A. That is correct.

Q. You told him you talked to CID about the banner burning investigation, right?

A. Yes.

Q. You told him that CID -- that the Proud Boys -- you told him that you had told CID that the Proud Boys were not a racist thing. Do you recall that?

A. Yes, I do.

Q. And by telling him that, that it wasn't a racist thing, you were telling them the banner burning shouldn't be a hate crime, right?

When you told CID --

A. Yes.

Q. -- that the Proud Boys were not a racist thing, you were saying this shouldn't be a hate crime, right?

A. Well, we have different classifications for hate crimes. So just because it's not racist, doesn't mean it's not a hate crime.

Q. But it supported your argument, right, that it shouldn't be

a hate crime?
A. In that aspect, yes.
Q. And, in fact, you told them, right, that if you're going to investigate this as a hate crime, then there's a lot of other things you would have to investigate, right?
A. Correct.
Q. And you told him that the FBI was not investigating the case, right?
A. Yes, I did.
Q. Okay. And the FBI does not publicly disclose what cases they are not investigating, right?
A. Not investigating?
Q. Right.
A. I don't know. Yeah, I don't know.
Q. They don't put out a Twitter post, We are not investigating this, right?
A. I don't know. I've never seen -- I've never seen one, so I can't say affirmatively either which way.
Q. Because sometimes the FBI is investigating things and it's not public, right?
A. Yes, that is correct.
Q. And that was information you were aware of because of your position with law enforcement, right?
A. That is correct, yes.
Q. And no one at MPD authorized you to release that

information?

A. That is correct.

Q. So you told him that MPD was investigating the banner burning, right?

A. Yes, I did.

Q. So even if he didn't know before, he knew now that they were investigating, right?

A. Um --

Q. If Mr. Tarrio didn't know MPD was previously investigating it, based on your communication, he would know now, right?

A. Oh, he definitely -- he knew before.

Q. What I'm saying is if he didn't know before, he would know now?

A. Yes, that is correct.

Q. And Mr. Tarrio was very happy with that information, right? He said, "Ahh, okay." And then he said, "Awesome," right?

A. Yes, he did.

Q. And then you said, going to page 24, "I don't think they have any pictures of you though," right?

A. That is correct.

Q. And you're referring -- you're referring to the banner burning, right?

A. Correct.

Q. The "they" is CID?

A. Uhh --

Q. "They" don't have any pictures of you. That's CID, right?
A. Yes.
Q. And that was -- the pictures are evidence, right?
A. Yes, they are.
Q. You're having conversations with the suspect about what evidence they have against him, right?
A. Yes.
Q. And nobody asked you to disclose that, right? And you didn't tell CID that you were disclosing that, right?
A. That is correct.
Q. Page 31 of Exhibit 4018, December 19th.

THE COURT: Can we just have a brief bench conference about scheduling?

MR. ROTHSTEIN: Yep.

THE COURT: You're invited, too.

THE WITNESS: Your Honor, you want me to step --

THE COURT: That would be great. Thank you.

(Bench discussion:)

MR. SCHAMEL: I would just note, I was exactly 90 minutes.

THE COURT: I know you have a lot to do and I know you're doing it in a painstaking fashion. It may be a tad more painstaking than is necessary, as I believe I know all of your follow-up questions you're going to ask. And even the jury, by now, would know, and would have probably 25 minutes ago.

But putting that aside, I'm not going to stop you doing what you want to do.

MR. ROTHSTEIN: I have ten more minutes.

THE COURT: You think that's all there is?

MR. ROTHSTEIN: And then we can redirect and be done.

THE COURT: Do you really think we'll finish the redirect today? My point is, this is important. The defendant is on the stand. I don't care if we finish today or if we finish Monday. And if we finish Monday and you have conflicts in the middle of the day -- I'm not trying a case on Tuesday, I got rid of it. So we will furnish this case in an orderly fashion. And if you can't get this all done today, we don't have to get it all done today. I'm just wondering, are people thinking we're going to get it all done today? I am getting a little exhausted.

MR. ROTHSTEIN: Sorry.

THE COURT: It's not your fault. I had a sentencing from 9:30 to noon this morning. Those are intense experiences. It's not your pocket, but as the afternoon wears on -- I just want to get a sense of whether you think we're going to finish with this witness today. And I just want to let you know that you don't have to feel, because I scheduled openings for 9:15 Monday morning, that you must.

So, I mean, if you guys want to keep going until 5 o'clock, we can keep going until 5 o'clock. But if you're

still talking at 5 o'clock, then I don't want to do the redirect.

MR. ROTHSTEIN: Your Honor, I can be done at 4:25, if Mr. Schamel thinks he has less than a half hour.

MR. SCHAMEL: I don't.

THE COURT: You don't think you have less?

MR. SCHAMEL: I don't, Your Honor.

THE COURT: I don't think you do.

So what we're going to do is finish the cross and then we'll break.

MR. SCHAMEL: Okay. May I ask a question?

THE COURT: Yes.

MR. SCHAMEL: Do we think there's going to be a rebuttal case? Or do we think we'll be able to redirect and close.

MR. ROTHSTEIN: We think we're going to call Agent Hadley for maybe --

MS. ROSS: Nine questions. Less than two minutes.

THE COURT: We have to do the redirect, but then we may not have enough time to close, given the schedule that we had and when we had to be done. And I think we'll just figure that out at the time.

MR. ROTHSTEIN: Thank you, Your Honor. I apologize.

THE COURT: I'm not going to split the closings. I'm going to do them back to back.

MR. SCHAMEL: No, no. And what I was going to suggest -- if it's not my place -- because there's a commitment on Monday that can't be moved, and we have no problem with that, obviously, you have to do that. And you have a trial or something on Monday.

THE COURT: I don't.

MR. SCHAMEL: You have nothing on Monday. It's just us. Okay.

THE COURT: I have transferred it to another judge because, for some reason, it occurred to me that maybe we wouldn't be done.

MR. SCHAMEL: You saw that coming.

Should we just do everything on Tuesday? Does that make more sense? Because I -- I have a schedule -- I have nothing that's filled in next week that I can't move.

THE COURT: I think we would have the time to finish with him and the other agent on Monday and then on Monday afternoon we would all know exactly what the evidence is as you fine tune and shorten your closings.

MR. SCHAMEL: Yep.

THE COURT: All right. So that's what we'll do. We'll finish the cross and we'll finish up on Monday morning, we'll break until Tuesday for closings.

MR. SCHAMEL: Okay. That's perfect.

MR. ROTHSTEIN: Thank you, Your Honor.

(Open court:)

MR. ROTHSTEIN: Your Honor, may I just have one moment?

THE COURT: Yes.

(Off-the-record discussion between government counsel.)

MR. ROTHSTEIN: Where were we?

THE COURT: We were on: I don't think they have pictures of you, that one.

MR. ROTHSTEIN: Okay. Thank you, Your Honor.

BY MR. ROTHSTEIN:

Q. Page 31. Got it. Okay. Got it. Right. Thank you, Lisa.

Can we just bring up -- do you see, through Telegram secret chat, you sent Tarrio the message, "People want to talk to you about the banner. Do you have a certain phone number you want me to give them?" Do you see that?

A. I do, but it's not "people," it's "police."

Q. You could have told them this over iMessage, right?

A. Yes, I could have.

Q. And you chose to tell him this over an encrypted messaging application, Telegram, right?

A. Yes, I did.

Q. Okay. And you didn't tell anybody at CID that you were going to give him a heads up, right?

A. No, I did not.

Q. You had a telephone number for him at that point, right?
A. Yes. I believe I had two numbers for him. That's correct.
Q. Okay. So you could have just given those numbers to Franklyn Then, right?
A. Yes, I could have.
Q. You didn't have to ask Mr. Tarrio first, right?
A. That's correct.
Q. Let's go to page 33 of Exhibit 4018.
And direct your attention to December 20th, 2020, at 4:40 p.m. Do you see that?
A. Yes, I do.
Q. Okay. And just to be clear, when you reached out to Mr. Tarrio to tell him that the police wanted to talk to him, that's because you had just had a communication with Franklyn Then, right?
A. Yes, previously. That's correct, yes.
Q. And during your call with Mr. Then, or Detective Then, you never told him that you had met with Tarrio on December 15th and discussed the banner, right?
A. That is correct.
Q. And you never told him about any communications you had had with Mr. Tarrio about the banner burning before that, right?
A. Um --
Q. All the ones that we just looked at about CID, what they had, you never told him about any of that, right?

A. No, I did not.
Q. Now let's go to Government Exhibit four zero -- there it is. Okay.
Mr. Tarrio responded to your Telegram secret chat and said, "MDPD reached out. I'm going to use my Fifth. I'll be in D.C. on the 6th. If MDC wants to talk to me they can see me there. Are they pushing the hate crime thing?" Do you see that?
A. Yes, I do.
Q. So Mr. Tarrio was concerned about whether it was going to be a hate crime, right?
A. He was -- yeah, curious. Yes.
Q. Right. And that's -- the hate crime is about the banner burning, right?
A. Correct.
Q. And in response, you directed him to give you a call, right?
A. Yes, that's correct.
Q. Okay. And you notice here that all of this is through Telegram secret chat, right?
A. That's correct.
Q. That's a higher level of encryption than private, right?
A. Correct, yes.
Q. And you could have called him on the phone, right? Just regular pick up your iPhone, give him a call, right?

A. I could have.
Q. Mr. Tarrio says, "Through here." Do you see that?
A. Yes, I do.
Q. You have a call with him that lasted 411 seconds, like roughly six and a half minutes, right?
A. That's correct, yes.
Q. Okay. And that call occurred through Telegram, right?
A. Yes, that is correct.
Q. And at that time Mr. Tarrio was still a suspect, right?
A. Yes, he was.
Q. And you spoke with him about the banner burning, right?
A. I can't say. I don't remember what the phone call was about.
Q. Okay. You'll agree with me that what he had just talked to you about at 4:40 p.m. was the banner burning, right?
A. Yes, at 4:40, that is correct. Yes.
Q. And in response to that you said, "Give me a call," right?
A. Yes.
Q. So you probably discussed the banner burning with him, right?
A. It's possible, but I don't remember the conversation, so --
Q. Okay. So if Mr. Tarrio -- and Mr. Tarrio sent a message immediately after to the other Proud Boys saying, "They don't have anything. Just confirmed. They're searching. That's what they want to talk to." That wouldn't have been based on

information that you gave him?
A. I can't see it. If I could see the message.
Q. Yeah. Can you bring up --
Okay. You didn't record this call with Mr. Tarrio, right?
A. Not to my recollection, no.
Q. You didn't document the call?
A. No, I did not.
Q. You didn't report it to CID?
A. No, I did not.
Q. Didn't report it to Jeffrey Carroll?
A. No, I did not.
Q. No one authorized you to make it?
A. That is correct.
Q. Now, during the course of CID's investigation of the banner burning, they asked you to identify Mr. Tarrio, right?
A. Yes, they did.
Q. And in response to those requests, you never told any of them about your conversations, right?
A. That is correct.
Q. And you never discussed anything that he told you about the banner burning, right?
A. That's correct.
Q. Now can we go to page -- let's go to Exhibit 5006, page 5, line 16.

Yeah, that's fine.

And do you recall, you said, "I know he" -- this is about asking for the contact information, right, for the phone number?

A. Yes.

Q. You said, "I don't know if he was able to -- to get ahold of Tarrio." Do you recall that?

A. Yes, I do.

Q. And that was a lie, right?

A. No, it wasn't.

Q. You knew that Mufti had gotten in touch with Mr. Tarrio, right?

A. How -- in touch how?

Q. You said, "I don't know if he" -- he got "ahold" of him, right? He got in touch with him?

A. I don't know if he had any phone call with Mr. Tarrio.

Q. So you're saying here, where you said, "Got ahold," that means only a phone call, not a text?

A. When I was asked that question, yes, I interpreted "Get ahold of" as in a call, a conversation.

Q. All right. Go to Government Exhibit 4019, at page 2, please.

Can we blow this up.

On December 22nd, 2020, Tarrio sent you a snapshot of a text message from Detective Mufti to him about the banner

burning, right?
A. Um --
Q. Yeah, you can blow that up.
A. Yeah, if I could see it.
I can't read it, it's too blurry.
Q. Can you bring it up on 4006? December 22nd.
Do you see it says, "Detective Mufti" there?
Yeah, okay, blow that up.
Here's the content of that text. Do you see it says, "Detective Mufti, thanks for reaching out. At this point I haven't retained my attorney in this situation yet, but I won't need my attorney to inform you that I will be using my Fifth. Thanks." And then Mufti writes, "Received. Thanks." Do you see that?
A. Yes, I do.
Q. Let's go back to 4019, at page 2.
That's the text message, right?
A. Again, I can't read the text message, so I can't confirm it.
Q. And two minutes after you received that text message from Tarrio, you went in and you set a self-destruct timer at 8:10 a.m. for five seconds. Do you see that?
A. Yes, I do.
Q. You agree with me, that was two minutes after his conversation to you?

A. His text to me, yes.

Q. And that's the first time that either you or Mr. Tarrio had ever sent -- set a self-destruct timer, right?

A. I believe so, yes.

Q. Okay. So when you testified earlier that you only set a self-destruct timer to mirror what Mr. Tarrio was doing, that was not correct?

A. I don't -- I don't remember setting this timer. But, I mean, it's here. I just -- I don't recall doing it.

Q. Okay. And you knew at that time that he was a suspect, right? Still a suspect?

A. Yes, I did.

Q. And you're setting a self-destruct timer for a communication with him, right?

A. Again, I don't remember. But, I mean, it's here.

Q. Government Exhibit 4019, at page 3.

You sent a Telegram secret chat to Mr. Tarrio, right, that said, "Just a heads up. CID had me ID you from a photo you posted on Parler kneeling down next to the BLM banner, so they may be submitting an arrest warrant to the United States Attorney's Office, right?

A. Yes, that is correct.

Q. The heads up is giving him information so that he's aware?

A. Yes.

Q. CID is the individuals conducting the investigation, right?

A. Yes, that is correct.

Q. And -- sorry. Just want to go back one second.

Please go to Exhibit 1002, at page 3.

1002, at page 3.

Now, can you blow that up?

Okay. And do you see this -- the bottom of that?

A. Yes, I do.

Q. Okay. And so do you recall receiving the bottom of that communication from Mr. -- or, do you recall receiving this snapshot of the communication from Mr. Tarrio to you containing the reach-out from Detective Mufti?

A. Yes. Yes, I do.

Q. So Mufti got ahold of him, right?

A. No. I interpreted that as a conversation, a telephone conversation.

Q. Okay. Let's go back, back to Exhibit 4019, at page 3.

And there's a self-destruct timer here of 30 seconds, right?

A. Yes.

Q. And your IDing him was part of CID's investigation, right?

A. Yes, it was.

Q. The photo you're discussing is evidence, right?

A. Yes, that's correct.

Q. And you were aware of this information and the potential arrest warrant because of your position with MPD, right?

A. Of the submission, yes, that is correct.
Q. No one authorized you to disclose it?
A. No, they did not.
Q. You didn't tell CID you were going to disclose it?
A. No, I did not.
Q. Going to December 29th, 2020.

Showing him Exhibit 420 -- 4020, at page 1.

By December 29th, 2020, you were aware that there was an arrest warrant for him pending with the U.S. Attorney's Office for the destruction of the BLM banner, right?
A. That is correct, yes.
Q. And Ben Tyler reached out to you, right? He's from Virginia, right?
A. Can you repeat that?
Q. Ben Tyler is a law enforcement officer?
A. Yes, he is.
Q. And in response to him reaching out about ET, right, you say, "There is also an arrest warrant for him pending with the USAO for the destruction of the BLM banner," right?
A. Yes. Correct.
Q. Then you -- going to Exhibit 4020, at page 2, you reached out -- 4020, at page 2. Thanks.

You reached out to Leslie Parsons, who oversaw CID, right?
A. Correct.

Q. You said, "Any update on the warrant? Did the USAO approve it," right?

A. Yes.

Q. So you wanted to know whether or not the warrant had been signed, right?

A. Yes.

Q. And he tells you, "Not yet," right?

A. That is correct.

Q. And then he says -- you say, "Copy. Give me a call when it's approved and we can discuss how you want it served," right?

A. That's correct.

Q. But you weren't part of the arrest team, were you?

A. No, I was not.

Q. On December 29th, 2020, at 3 -- sorry.

Let's go to December 30th, 2020, at Exhibit 4020, at page 4.

On December 30th, 2020, you had two calls from Commander Parsons, right?

A. I'm sorry. Can you repeat?

Q. December 30th, you had two calls with Commander Parsons?

A. I see one here. I don't know if there's a -- are there any more messages here?

Q. A call that's 6 minutes and I believe there's another call that's 4 minutes and 57 seconds.

A. Okay.
Q. Do you see that?
A. Yes. Now I see two phone calls, yes.
Q. Right. And that's the day after the 29th, and you had just previously sent him a text message asking for a status of the arrest warrant, right?
A. Yes.
Q. Showing you Government Exhibit 4021, at page 1.

Now, about three hours later, right -- we just looked at 2:39 p.m., this is 5:56 p.m., Mufti sends an email saying, "I have the attached signed warrant," right? Do you see that?
A. I do.
Q. And then approximately 24 minutes later you had a call with Mr. Tarrio, right?
A. Yes.
Q. And you had that call through Telegram, right?
A. That's correct.
Q. You could have called him on the phone?
A. Yes, I could have.
Q. Okay. But you called him through Telegram, right?
A. I did.
Q. And that call lasted 14 minutes, right?
A. Um --
Q. 849 seconds, about 14 minutes?
A. I'll take your word for it.

Q. Okay. And nobody at CID directed you to have that call, right?
A. That is correct.
Q. Nobody that was involved in the arrest asked you to have that call, right?
A. That is correct.
Q. Your commanding officers didn't authorize you to have that call, correct?
A. That is correct.
Q. And at that time not only was the defendant a suspect, but you knew that they were submitting an arrest warrant for him, right?
A. Um --
Q. Sorry. At that time you knew Mr. Tarrio was a -- not just a suspect, but someone for whom they were submitting an arrest warrant for, right?
A. Submitting an arrest warrant?
Q. Yes.
A. That is correct, yes.
Q. You didn't record that call?
A. No, I did not.
Q. You didn't document that call?
A. No, I did not.
Q. Didn't notify CID?
A. No, I did not.

Q. January 1st, 2021, you knew by then that a warrant had been signed, right? By January 1st?

A. By January 1st, yes.

Q. And you knew that the warrant was signed for his arrest, right? It was an arrest warrant?

A. Yes, that is correct.

Q. Government Exhibit 4022, at page 1 and 2, please.

Okay. Can you bring up the part where it says, "Tight hold," please.

And, in fact, you reached out to John Donohue, right, from the Capitol Police, right?

A. That is correct, yes.

Q. And you said, "Tight hold on this, but I may lose him as a source soon," right?

A. Yes, I did say it.

Q. You said, "Our CID got a warrant for him for burning the banner," right?

A. Yes.

Q. "They're going to pick him up next week when he's in town, so he may not speak to me anymore," right?

A. Yes.

Q. And you had also discussed with Donohue that you had advocated that the banner burning was not a hate crime, right?

A. I don't recall that conversation.

Q. Sure. We'll bring it up.

A. I don't remember.

Q. Can you bring up where Donohue says, "Well" --

Lisa, it's right -- it's on the page before.

Yep. Going all the way down to -- right.

And Mr. Donohue says, "Well, if it's an US. Antifa walks away with an admonishment."

And then he says, "That's very weird. Especially in such a liberal town."

And you say, "That's what I said. They were contemplating making this one a hate crime. I said if that's the case, they would have to make all of the U.S.," right? That's a reference to the U.S. flags being burned?

A. That's correct.

Q. "Taken and burned by antifa hate crimes." Do you see that?

A. Yes, I do.

Q. And then, "They backed off." Do you see that, "They backed off then," after you said that?

A. Yes.

Q. And then you said, "In the end it's a misdemeanor charge so it won't go very far. But it was all very political." Do you see that?

A. Yes, I do.

Q. And that was the same position that Mr. Tarrio had, right? That this isn't a hate crime, right?

A. That is correct.

Q. Now I want to talk to you about the arrest of Enrique Tarrio.

January 1st, 2021, you reached out to a TSA contact, right?

A. On or about the 1st. That sounds -- that sounds right.

Q. Because in your job you had contact with all different law enforcement agencies?

A. Yes, including TSA. That's correct.

Q. Right. And you did that to see if they had access to Tarrio's flight information, right?

A. Yes, that is correct.

Q. Showing him Government Exhibit 4023, at 8.

You reached out to Charlie Cox, right?

A. Yes, that is correct.

Q. Okay. And you were doing that because John Haines wanted the arrival information, right?

A. Correct, yes.

Q. And John Haines was the one that was in charge of the arrest, right?

A. In charge -- yes, the arrest team, that is correct.

Q. Okay. You never had any conversation with Mr. Haines about a self-surrender, right?

A. No. That's correct.

Q. And Mr. Cox got you that information, right? He was able to tell you what flight Mr. Tarrio was on?

A. Yes, he did.

Q. Okay. So you knew if he went to TSA, they would know what flight he was on, right?

A. I didn't know, but I asked them and, yes, they were able to provide the information.

Q. Okay. So once they provided it to you, you knew if I reach out to TSA, they know what flight he's on, right?

A. Yes.

Q. And on January 2nd, 2021, at 7:09 p.m. here, we see that you got his flight info, right?

A. Yes, that is correct.

Q. And you did as you were instructed, you forwarded that on to Jeff Carroll and on to Leslie Parsons and John Haines, right?

A. Yes, that is correct.

Q. Okay. And none of those individuals told you to arrange a self-surrender, right?

A. That is correct.

Q. None of those individuals told you to disclose the status of the arrest warrant, right?

A. That is correct.

Q. None of them asked you to disclose that it was signed, right?

A. That is correct.

Q. And you never told any of them that you had been having

conversations with Mr. Tarrio about the status of his arrest warrant, right?

A. What do you mean by "the status"?

Q. Like, you never told any -- Carroll, Haines, Parsons, anybody on CID that you had discussions with Mr. Tarrio about whether this -- a warrant had been submitted, right?

A. Correct.

Q. Whether it had been signed, right?

A. That's correct.

Q. And you were tracking Mr. Tarrio's flight status that day, right?

A. Yes, I was.

Q. Okay. And you told that to Ben Tyler, right, that he had changed his flight? You knew at 9:38 a.m. that morning that he was on a different flight?

A. That sounds correct. I couldn't say for sure the time without seeing it.

9:38. So, yes, that is correct.

Q. So his flight is at 1 o'clock. At 9:38 a.m. you knew he had already changed his flight info?

A. Yes.

Q. Okay. And you knew that you could reach out to TSA and they would tell you what flight he was on, right? Because they had done it before.

A. Yes, that's correct.

Q. You had no reason to believe that TSA was going to tip off Mr. Tarrio, right?
A. No, not at all.
Q. And so you knew about when Mr. Tarrio's flight was going to take off, right?
A. The original flight?
Q. Right.
A. Yes, I knew the original flight.
Q. You knew that he had changed the flight, right? You just said there he changed his flight.
A. Yes, I -- that is correct, yes.
Q. Okay. And you knew that the arrest plan was that once he got to the airport in D.C. there would be -- from the moment he got off that plane he was going to be surveilled until he was arrested, right?
A. Yes.
Q. So once he got on that plane, he was going to be arrested, right?

Sorry. Once he got on that plane, he's headed to D.C., pretty sure he's going to be arrested once he gets off, right?
A. Can you repeat the question?
Q. You knew the arrest plan, right?
A. Yes.
Q. He gets to D.C., comes off the plane. From the moment he gets off that plane somebody is going to be following him,

right?

A. Yes, that is correct.

Q. Until the time of his arrest?

A. Yes.

Q. So you knew once he's on that plane and it's in the air, he's probably going to get arrested in D.C. later that day, right?

A. In D.C., yes.

Q. Okay.

A. That is correct.

Q. And you weren't actually assigned to be part of the arrest team, right?

A. I was not.

Q. You didn't provide any updates that morning to anybody on the arrest team about Mr. Tarrio's status, right?

A. I don't know for sure.

Q. Okay. You're not aware of any communications, any documents reflecting you advising Haines or advising anybody else about -- other than Mr. Tyler, who is not part of the arrest -- about Mr. Tarrio's status that day, right?

A. No documents. However, we were using a radio channel that day for the arrest, the coordination on the arrest. And I don't remember if I -- I told him over the radio of any changes.

Q. But you're not aware of any actual records?

MR. SCHAMEL: I'm sorry. I missed the question.

BY MR. ROTHSTEIN:

Q. You're not aware of any actual records? There's no emails, right?

A. That is correct, no emails.

Q. There's no text messages?

A. That is correct.

Q. Okay. And you're aware that if Mr. Tarrio knew about the arrest warrant, it could affect officer safety, right?

A. That's -- it's possible.

Q. It's something to consider, right?

A. I'm sorry?

Q. It's something that when you're deciding an arrest plan, that's things people consider, right?

A. Yes, it is.

Q. They consider officer safety, right?

A. Yes.

Q. They consider destruction of evidence, right?

A. Yes.

Q. Okay. They consider whether or not somebody is going to flee, right?

A. Yes.

Q. But you knew once he was on the plane, even if he knew about the warrant at that time, he couldn't flee, right? Because when he got to D.C., there was going to be somebody

following him.
A. He wouldn't have to. He doesn't enter D.C.
Q. But he was going to have somebody following him when he got off the plane, right?
A. Yeah, but they couldn't drag him into D.C. and arrest him.
Q. Okay. I'm just asking. You knew somebody was going to follow him once he got off, right?
A. Yes.
Q. And just to be clear, at no point in time did anyone authorize you to reached out to notify him there was an arrest warrant, right?
A. That is correct.
Q. You didn't inform CID or the Criminal Apprehension Unit that you were in communication with him at that time, right?
A. Repeat the question, please.
Q. You didn't informed CID or the Criminal Apprehension Unit that you were in communication with Mr. Tarrio on the date of his arrest, right?
A. I don't recall being in communication with -- the day of his arrest.
Q. Okay.
A. If --
Q. So you don't recall providing them any updates that you had been in touch with Mr. Tarrio that day, right?
A. That is correct.

Q. Showing you Government Exhibit 5006, at page 13.

And do you see here, this is when Agent Molnar was talking to you about the arrest, right? About the arrest warrant.

A. Yes, that is correct.

Q. Okay. And so, he says, "So they made their determination."

And then you say, "Yes, but I know that I didn't, you know, inform him that he had an arrest warrant," right?

A. Yes. That's correct.

Q. Nobody had asked you whether or not you had informed him, right?

A. That's correct.

Q. You just said that, "I know that I didn't inform him," right?

A. Yes.

Q. Okay. And during your -- now, prior to January 4th, 2021, your self-destruct timer was set to self destruct at 30 seconds, right?

A. We would have to go back.

Q. Okay. Sure. Showing you Government Exhibit 4023, at page 4.

Do you see that the self-destruct timer on January 1st was set to 30 seconds?

A. I do.

Q. Okay. And on -- showing you Government Exhibit 4024, at

page 2.

After Mr. Tarrio's flight took off, you went into Telegram, right?

A. Yes.

Q. And you set the self-destruct timer down from 30 seconds to 10 seconds, right?

A. That's correct, yes.

Q. And the last time that you had done that -- there's only one other time where you had reduced the time, to make it quicker for the messages to delete, right?

A. That sounds fair.

Q. And that's when Mr. Tarrio -- and we're going to bring up the exhibit, so you can see it -- Mr. Tarrio had reached out to you and sent you the screenshot that Detective Mufti had texted him. And you went into your phone and, for the first time, you set a self-destruct timer --

Lisa, that's two pages back.

Go back again. Yep.

Do you see there, Detective Mufti had reached out -- no, it's -- Mr. Tarrio sends you the screenshot of his conversation with Mr. -- with Detective Mufti and you, two minutes later, go into your phone and set a self-destruct timer to 10 seconds?

A. Yes, I saw that on there.

Q. Okay. And then the next time that you go into your phone and set the self-destruct timer is when Mr. Tarrio is on the

plane at 1:02 p.m., right?

A. Repeat the question, please.

Q. Okay. The next time that you went in to set a self-destruct timer was when Mr. Tarrio was on the plane at 1:02 p.m., right?

A. Yes, that is correct.

Q. And that's the only two times, during the course of all of your conversations with Mr. Tarrio, that you set a self-destruct timer, right?

A. Yes, I think so.

MR. ROTHSTEIN: Nothing further, Your Honor.

THE COURT: All right. I think we're going to break for the evening. We all need a break.

We will resume -- this is Friday, we'll resume Monday morning at 9:30. We'll complete the examination of Mr. Lamond. The defense will put on any other evidence it intends to introduce. The government will do any rebuttal case. And then, in all likelihood, we will break at that point, given other obligations other people have, and close on Tuesday morning.

All right. Thank you, everybody. Have a good weekend.

* * *

CERTIFICATE OF OFFICIAL COURT REPORTER

I, JANICE DICKMAN, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 8th day of December, 2024

________________________________

Janice E. Dickman, CRR, CMR, CCR
Official Court Reporter
Room 6523
333 Constitution Avenue, N.W.
Washington, D.C. 20001

**INDEX**

**WITNESS:**

Shane Lamond

Direct Examination By Mr. Schamel................. 2
Cross-Examination By Mr. Rothstein................ 68

* * *

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| United States of America, | ) | Criminal Action |
| | ) | No. 23-cr-177 |
| Plaintiff, | ) | |
| | ) | JURY TRIAL |
| vs. | ) | Day 6 |
| | ) | |
| Shane Brian Lamond, | ) | Washington, DC |
| | ) | December 9, 2024 |
| Defendant. | ) | Time: 9:34 a.m. |

TRANSCRIPT OF JURY TRIAL
HELD BEFORE
THE HONORABLE JUDGE AMY BERMAN JACKSON
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S

For Plaintiff: Rebecca G. Ross
Joshua Rothstein
UNITED STATES ATTORNEY'S OFFICE
610 D Street NW
Washington, DC 20530
(202) 252-6937
Email: Rebecca.Ross2@usdoj.gov
Email: Joshua.Rothstein@usdoj.gov

For Defendant: Mark E. Schamel
Ana L. Jara
VENABLE LLP
600 Massachusetts Avenue NW
Washington, DC 20001
(202) 344-4631
Email: MESchamel@venable.com
Email: ALJara@venable.com

Court Reporter: Janice E. Dickman, RMR, CRR, CRC
Official Court Reporter
United States Courthouse, Room 6523
333 Constitution Avenue, NW
Washington, DC 20001
202-354-3267

* * * * * * *P R O C E E D I N G S* * * * * * *

THE COURTROOM DEPUTY: We are back on the record in criminal case 23-177, *United States of America versus Shane Brian Lamond*.

Counsel, please state your appearance for the record.

MR. ROTHSTEIN: Good morning, Your Honor. Josh Rothstein on behalf of the United States. With me at counsel's table is AUSA Rebecca Ross, FBI Special Agent Liz Hadley, and paralegal specialist Lisa Abbe.

THE COURT: All right. Good morning.

MR. SCHAMEL: Good morning, Your Honor. Mark Schamel and Ann Jara with William Hinger, with Mr. Lamond, who is present.

THE COURT: Okay. When we broke on Friday afternoon, the cross-examination of Mr. Lamond had been completed. So he can return to the stand and you can proceed with your brief and punchy redirect.

MR. SCHAMEL: So brief. No exhibits, so brief.

THE COURT: Okay. All right. You can proceed.

MR. SCHAMEL: If I may, Your Honor.

THE COURT: Yes.

REDIRECT EXAMINATION

Q. Good morning, Mr. Lamond.

A. Good morning.

Q. You were asked a series of questions on Friday and I want

to ask you a couple of follow-up questions about those. Okay?
A. Okay.
Q. You were asked about whether or not you could disclose information you learned as a police officer to Mr. Tarrio.
Do you remember that?
A. Yes, I do.
Q. And could you?
A. Yes.
Q. Okay. What were the limits on what you could disclose?
A. There were no written limits, or written limits that I know of. I disclosed information that was just of -- of no value to -- to a person.
Q. No value to Mr. Tarrio?
A. That is correct, yes, sir.
Q. And by whose determination?
A. By my determination.
Q. And why did you provide any information to Mr. Tarrio?
A. It was all to -- to continue that -- that flow of information from him to me in reference to the First Amendment demonstrations.
Q. Were there things that you were aware of, that you become aware of as a police officer that you didn't tell Mr. Tarrio?
A. Yes, absolutely.
Q. Okay. Anything jump to mind that you can think of?
A. MPD -- like specific plans in addressing demonstrations, to

include demonstrations involving the Proud Boys, like whether or not we had plain clothes officers in the crowd. If we were gathering, like, covert or clandestine information on the group.
Q. And why didn't you disclose those things?
A. Oh, because that would have been sensitive information that -- that could give him an advantage.
Q. Do you believe you crossed the line on what you did disclose to Mr. Tarrio?
A. No, I do not believe so.
Q. Okay. Were you trying to obstruct the banner investigation?
A. Absolutely not.
Q. What were you trying to do?
A. I was trying to help the -- the investigation while continuing my -- my connection with Mr. Tarrio in order to obtain First Amendment intelligence.
Q. And when you say "help the investigation," do you mean with what you gave Mr. Tarrio or what you were doing internally at MPD?
A. With what I was doing internally with MPD, providing them with the -- Mr. Tarrio's public confession, the text tip, and volunteering any information I had on Mr. Tarrio to help them with the identification and -- and further their criminal investigation.

Q. And did -- and just to be clear, did Mr. Tarrio ever confess to you?
A. No, he never confessed to me.
Q. And did Mr. Tarrio -- did you ever tell Mr. Tarrio, at any time, that there was a -- a warrant had been signed for his arrest?
A. No, I did not at any time.
MR. SCHAMEL: Court's indulgence.
THE COURT: All right.
MR. SCHAMEL: Nothing further.
Thank you, Mr. Lamond.
THE WITNESS: Thank you.
THE COURT: All right. Thank you. You can step back to your seat.
Mr. Schamel, does the defense have any other evidence it wishes to introduce?
MR. SCHAMEL: At this juncture, Your Honor, we have no further evidence, we have no further witness, and we will rest.
THE COURT: All right. Does the government have any other evidence it intends to introduce?
MS. ROSS: Yes, Your Honor. The government has a brief --
THE COURT: Excuse me. Why are you standing up?
MR. SCHAMEL: I just want to make sure that we

acknowledge on the record that we're renewing our Rule 29 at the close of all the evidence.

THE COURT: Okay. All right. And for the same reasons you raised before?

MR. SCHAMEL: For the same reasons. And then at the conclusion of the government's rebuttal witness, Ms. Jara will be at the podium, if Your Honor has questions when we renew it again.

THE COURT: Okay. I think, since I'm asking for briefs on the issues that I had the most questions about, I don't need to hear further argument from either side with respect to the Rule 29 motion, but I will take it under advisement and the record will reflect that you renewed it at the close of your case.

MR. SCHAMEL: Thank you.

THE COURT: All right.

MS. ROSS: Thank you, Your Honor. The government has a very brief rebuttal case and would like to call Agent Hadley to the stand.

THE COURT: Okay.

THE COURTROOM DEPUTY: Do I need to do it again?

THE COURT: I think you should probably re-swear, since this is the first time --

ELIZABETH HADLEY,

was recalled as a witness and, having been first duly sworn,

was examined and testified as follows:

REBUTTAL DIRECT EXAMINATION

BY MS. ROSS:

Q. Agent Hadley, do you remember Tarrio testifying that he communicated with other officers?

A. I do.

Q. And that those officers expressed support for the Proud Boys in the same way the defendant did?

A. I do.

Q. Did you review Tarrio's phones for contacts with other law enforcement officers?

A. I did, as well as other FBI agents, yes.

Q. Between Election Day in November 2020 and January 4th, 2021, did you find any evidence that Tarrio had communicated with any other law enforcement officers?

A. I did not.

Q. Any evidence --

THE COURT: Can you tell me those dates again?

MS. ROSS: Between Election Day in November 2020 and January 4th, 2021.

THE COURT: Okay.

A. You said besides the defendant and Lieutenant Mufti, correct?

BY MS. ROSS:

Q. Yes.

A. Yes.
Q. Were Lieutenant Mufti and the defendant the only two law enforcement officers you found that contacted Enrique Tarrio?
A. Yes.
Q. And did you find any evidence that any law enforcement officers contacted Tarrio to express their support, besides the defendant?
A. No.
Q. And do you remember the defendant on direct examination testifying that he used Telegram to mirror Tarrio's use of Telegram?
A. Yes.
Q. Did you investigate Tarrio's use of Telegram?
A. Yes.
Q. And what did you learn?
A. I learned that he was a very prolific user of Telegram. However, the only person that he used the self-destruct feature within the timeframe that you mentioned was the defendant.
Q. So just to be clear, Agent Hadley, the only chat that the -- that Enrique Tarrio used the self-destruct feature with was with -- was the chat with the defendant?
A. That I found, correct.
MS. ROSS: Thank you. No further questions.
THE COURT: All right. Any cross?
MR. SCHAMEL: One moment, Your Honor.

(Pause.)

MR. SCHAMEL: Just a couple questions.

REBUTTAL CROSS-EXAMINATION

BY MR. SCHAMEL:

Q. Special Agent Hadley, you said that you looked at Mr. Tarrio's phone to determine whether or not he communicated with any other police officers; is that right?

A. Yes, his phone and toll records.

Q. Did you ever interview Mr. Tarrio?

A. No.

Q. Did you interview any of the undercovers that were working in the Proud Boys?

A. Can you be more specific?

Q. Mr. Bertino and some of the others that were working about whether or not Mr. Tarrio was in contact with other law enforcement officers?

A. Did -- could you be more specific about who I interviewed?

Q. Did you interview Mr. Bertino, Jeremy Bertino, the cooperator?

A. I did not. Other FBI agents did, but I did not.

Q. You were aware there were cooperators within the Proud Boys, correct?

THE COURT: Okay. What's the relevance of whether other people talked to law enforcement officers?

MR. SCHAMEL: I just want to -- I'm just trying to

find out --

THE COURT: The question -- she was asked on direct whether she had any other evidence that Mr. Tarrio talked to any other police officer.

MR. SCHAMEL: Correct.

THE COURT: So what's your question?

MR. SCHAMEL: I'm trying to find out if -- what investigation you did, beyond looking at Mr. Tarrio's phone, to determine if Mr. Tarrio was talking to any other police officers.

BY MR. SCHAMEL:

Q. Did you interview anybody about that topic?

A. Besides the police officers, no. The -- the police officers relevant to the investigation.

Q. Of Lamond?

A. That were involved with MPD, yeah.

Q. Okay. So, how many police officers, beyond those that we've heard testify, did you interview about whether or not they had talked to Mr. Tarrio?

A. I interviewed a TFO from the FBI that he had had previous contact with that was Portland.

I did not interview Bertino, but other FBI agents did and they were aware of my investigation and knew -- they were investigating all contacts he had with law enforcement.

Q. And you just -- you said you didn't find any, is what

you're telling us?

A. I didn't find any in the time period we talked about, correct.

Q. Okay.

MR. SCHAMEL: Thank you, Your Honor.

Thank you, Ms. Hadley.

THE COURT: All right. Can this witness step down?

MS. ROSS: Yes. No further question.

Thank you, Your Honor.

THE COURT: All right. Thank you, Special Agent Hadley.

Does the government have any other evidence it intends to introduce at this point?

MR. ROTHSTEIN: No, Your Honor.

At this time, the government rests.

THE COURT: Okay.

MR. SCHAMEL: Your Honor, we will, again, renew our Rule 29 motion for those stated reasons.

THE COURT: All right. Now, when we talked on Friday, we were anticipating that this wouldn't take long, and we also specified that we would do the closings tomorrow, to make sure that that all -- we got it all done within the timeframe we had. So that's what I'm planning to do. I'm not going to suddenly say to you, "Oh, well, it's 10 of 10, do you want to get started?" I'm not going to do that. I know you

were planning on speaking tomorrow. So we'll resume at 9:30 tomorrow morning.

I did go back and look at the standard jury instruction, the Red Book instruction, and it does, I believe, include the language of -- with an agency or department of the D.C. government. So I don't think that's an incorrect addition that you want to make to the instruction.

I do want to ask -- actually, I lied. I do have a question for Ms. Jara, which is one of the points you were making -- and I presume you'll be making it in writing tomorrow -- was you said he wasn't charged under the right section because this section, obstructing the due administration of justice, (f) which isn't specifically cited in the indictment but it's tracked linguistically in the indictment, only relates to proceedings and not investigations. Section (a) is threatening, intimidating or corruptly persuading a juror; (b) is threatening, intimidating or corruptly persuading a witness or officer; (c) is harassing another person; (d) is injuring a witness or his property; (e) is injuring a witness, juror, or court officer or damaging their property; and (f) is obstructing the due administration of justice. So, which would be the correct section?

MS. JARA: Your Honor, that will be in our brief, but I will just say that under the statute, the phrases, the "criminal investigation" versus just an "investigation,"

criminal investigation is the -- is a defined term and I believe that that is under Section 3 in the statute. But I'm not 100 percent sure on that, but that will be in our briefing.

THE COURT: What do you mean, Section 3? The statute has an (a), (b), (c).

MS. JARA: I believe it's (c) then, Your Honor. I would need to double-check that.

But, Your Honor, the point that I was trying to make was that a criminal investigation is a defined term in the statute, versus just investigation, which the D.C. Court of Appeals has defined in those cases, *Wynn* and its progeny. That's what I was specifically referring to, and I'll make sure to include in the brief, Your Honor, what specific section he could be charged under if that were the case, or if it's not the right statute at all.

THE COURT: Well, at the time you didn't say anything about the meaning of criminal investigation. What you said was he was charged under the wrong section of the statute, 22-722, because the part that says obstructing the due administration of justice, when it says "grand jury investigation, trial, hearing, investigation, other proceeding," those are supposed to be an adjudicative type proceeding and not just an investigation and so, therefore, they charged him under the wrong provision and I don't see any other provision.

MS. JARA: So, Your Honor, I believe that the

argument was about official proceeding, what was meant by that. And when Ms. Ross stood up and argued there was a definition of what official proceeding is in the statute itself, also in the statute itself there is criminal investigation and that's defined. And there's another part of that specific statute, 702, that specifically addresses criminal investigation misconduct.

THE COURT: Yes, injuring a witness, juror, or court officer. There are various -- so are you saying that just obstructing a criminal investigation is not covered by the statute at all or it's just that it's not covered by that last provision of the statute?

MS. JARA: It's not covered by the last provision of the statute.

THE COURT: So which provision of the statute covers it?

MS. JARA: Your Honor, we intend to brief that, but I believe that it is the part about obstructing the witnesses. I think that there is explanations about it in the jury instructions afterwards. Also, I believe there has been some case law on that as well. But I don't think that (a)(6) is the right one.

THE COURT: All right. I'll look forward to seeing what their argument is.

Mr. Rothstein.

MR. ROTHSTEIN: Your Honor, just at the end of that jury instruction, I think it needs to say that is the Metropolitan Police Department, to specify the agency. I know Your Honor is aware of it, but --

THE COURT: All right. Okay.

MR. ROTHSTEIN: Thank you.

THE COURT: Is there anything further that we need to take up before we adjourn for the day?

MR. ROTHSTEIN: Nothing from the government. Thank you, Your Honor.

MR. SCHAMEL: Nothing from us, Your Honor.

THE COURT: Well, that was short. But, fine, we all have time to absorb what we've heard so far and get ready for tomorrow. I will see you at 9:30 tomorrow morning.

* * *

CERTIFICATE OF OFFICIAL COURT REPORTER

I, JANICE DICKMAN, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 9th day of December, 2024

________________________________

Janice E. Dickman, CRR, CMR, CCR
Official Court Reporter
Room 6523
333 Constitution Avenue, N.W.
Washington, D.C. 20001

INDEX

WITNESSES:

Shane Lamond
Redirect Examination.............................. 2

Elizabeth Hadley
Rebuttal Direct Examination....................... 7
Rebuttal Cross-Examination........................ 9

DEFENDANT RESTS........................................ 5
GOVERNMENT RESTS AFTER REBUTTAL.......................11

* * *

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

United States of America, Plaintiff, vs. Shane Brian Lamond, Defendant.

Criminal Action No. 23-cr-177
JURY TRIAL Day 7
Washington, DC
December 10, 2024
Time: 9:35 a.m.

---

TRANSCRIPT OF JURY TRIAL
HELD BEFORE
THE HONORABLE JUDGE AMY BERMAN JACKSON
UNITED STATES DISTRICT JUDGE

---

A P P E A R A N C E S

For Plaintiff: Rebecca G. Ross
Joshua Rothstein
UNITED STATES ATTORNEY'S OFFICE
610 D Street NW
Washington, DC 20530
(202) 252-6937
Email: Rebecca.Ross2@usdoj.gov
Email: Joshua.Rothstein@usdoj.gov

For Defendant: Mark E. Schamel
Ana L. Jara
VENABLE LLP
600 Massachusetts Avenue NW
Washington, DC 20001
(202) 344-4631
Email: MESchamel@venable.com
Email: ALJara@venable.com

---

Court Reporter: Janice E. Dickman, RMR, CRR, CRC
Official Court Reporter
United States Courthouse, Room 6523
333 Constitution Avenue, NW
Washington, DC 20001
202-354-3267

* * * * * * *P R O C E E D I N G S* * * * * * *

THE COURTROOM DEPUTY: We're back on the record with criminal case 23-177, United States of America versus Shane Brian Lamond.

Counsel, please state your appearance for the record.

MS. ROSS: Good morning, Your Honor. Rebecca Ross and Joshua Rothstein on behalf of the United States. Joining us at counsel table are Special Agent Elizabeth Hadley and Paralegal Specialist Lisa Abbe.

THE COURT: Good morning.

MR. SCHAMEL: Good morning, Your Honor. Mark Schamel and Ana Jara and Bill Hinger on behalf of Mr. Lamond, all present at counsel table.

THE COURT: Is the government ready to proceed?

MS. ROSS: We are, Your Honor. Would it be possible to turn on the monitors?

THE COURTROOM DEPUTY: To turn it on?

THE COURT: Yes. Thank you.

MS. ROSS: I am hooked up to the podium. Thank you. Perfect.

As a lieutenant with the Metropolitan Police Department, it was the defendant's job to uphold the law. Instead, the defendant used his law enforcement position and access to obstruct justice and break the law. As you heard and saw, the defendant used his position to learn sensitive law

enforcement information about the Black Lives Matter banner-burning investigation. He then leaked that sensitive law enforcement information to the subject of the investigation, Enrique Tarrio.

The defendant purposely inserted himself into the banner-burning investigation so he was in a better position to protect Tarrio. And all the while the defendant was pretending to support the investigation, he was carefully curating what information he provided his chain of command, providing just enough to appear helpful, while withholding information that directly implicated Tarrio.

The defendant knew that doing this was a crime. He told you so himself. But it was also obvious the defendant knew it was a crime because of what he did when he got caught. He lied to cover it up. For these actions the defendant is charged with four crimes.

He is charged with one count of obstruction of justice for obstructing and impeding the banner-burning investigation, and he is charged with three counts of false statements for three of the lies he told Agent Ricardi during his June 22nd, 2021 interview to cover up all the ways he was obstructing the banner-burning investigation.

I'm going to briefly walk through the evidence that proves beyond a reasonable doubt that the defendant is guilty of each one of these offenses. I will also explain all the

reasons why Tarrio's testimony and the defendant's testimony are not credible.

Focusing first on Count 1, obstruction of justice. There was a criminal investigation into the burning of the BLM banner. Every witness came in here and told you that. The communications and the emails confirm it. There was also an investigation being conducted by a D.C. government agency, the MPD. And the defendant impeded the investigation.

The following facts are not in dispute: The defendant came in here and he told you, under oath, that he knew Tarrio was a suspect of a crime. He knew that deleting communications with a suspect of a crime was wrong. He knew it was wrong to delete communications with a suspect of a crime because it could impede the investigation.

The defendant also told you that he knew that setting the self-destruct timer in Telegram automatically deleted the messages in that chat. He did in fact set his Telegram communications with Tarrio to self-destruct and, as a result, he deleted communications with Tarrio, and that could have impeded the banner-burning investigation.

The defendant came in and testified to those things under oath. This is obstruction and the defendant is guilty of Count 1.

And the defendant's admissions, they corroborate the government's evidence. As you saw, the defendant inserted

himself into the banner-burning investigation, just as he told Tarrio he would. He reached out to the criminal investigative division and his chain of command and offered his help. But the defendant never told anyone he was inserting himself into the investigation to be helpful to Tarrio and to the Proud Boys, not to be helpful to MPD.

After inserting himself into the investigation, the defendant accomplished his mission. He learned a lot of information about the banner-burning investigation. And you saw how the defendant did in fact use that information to protect Tarrio and impede the investigation.

To give one example, on December 12, 2020 the defendant reached out to Tarrio and told him the police wanted to talk to him. The defendant testified that he did not need to ask Tarrio for his number. In fact, the defendant had been using the same numbers to communicate with Tarrio since October 2019. The only explanation for why the defendant told Tarrio the police wanted to talk to him was because he wanted Tarrio to stay one step ahead of the investigation. That is endeavoring to obstruct.

The defendant wanted Tarrio to be prepared. But that's not what MPD wanted. You heard it from Detective Then, he wanted to catch Tarrio off guard. He did not want Tarrio to be prepared. And as a seasoned law enforcement officer, the defendant knew this.

But, thanks to the defendant, Tarrio was prepared. Before Detective Mufti had a chance to contact Tarrio, Tarrio reached out to Oly. You saw the communications that Tarrio had with Oly about what to tell the police. Tarrio prepared and, as you saw, when Detective Mufti messaged Tarrio the next day, Tarrio told him he was taking the Fifth. The defendant accomplished his mission.

Tarrio was prepared and one step ahead, thanks to the information the defendant provided him. MPD could not catch Tarrio off guard. This is obstruction, and it's only one example.

Thanks to his role as a double agent, the defendant was a source of a lot of information for Tarrio and for the Proud Boys. As you saw, on December 25th, 2020 the defendant again reached out to Tarrio, but with the self-destruct timer set to 30 seconds. You heard from examiner Cain, it was a fluke she was able to recover this message. This time the defendant gave Tarrio a heads-up that he'd been asked to ID Tarrio. He told Tarrio the specific photo MPD had in their possession, the specific evidence that MPD had collected, and he told Tarrio that MPD was working on an arrest warrant. But this was not the only time the defendant leaked information about the arrest warrant.

On January 4th, 2021 the defendant told Tarrio that the warrant for his arrest had been signed. Both the defendant

and Tarrio told you that is not what happened. But as I will discuss shortly, those denials are not credible and fly in the face of all the contemporaneous evidence.

Even if you were to credit this testimony -- which, to be clear, you should not -- the defendant is still guilty of Count 1.

Through the course of the trial, you saw that the defendant endeavored to obstruct and did obstruct the banner-burning investigation in at least three big-picture ways. We just saw the first way. The defendant, he became the source.

Second, the defendant also used his law enforcement position to try to minimize Tarrio's criminal exposure. You saw that Tarrio was so confident that he had a D.C. Metro guy, a contact, an inside source who was going to protect him, that he had no problem fishing for information. He had no problem asking the defendant, "Do you think they'll make a stink of it?"

While on the stand, the defendant admitted to you that he was Tarrio's contact. And Tarrio called the defendant his liaison. No matter what you want to call it, the defendant was Tarrio's source of information. Rather than keeping MPD internal discussions internal, the defendant not only leaked those internal discussions to the main subject of the investigation, to the person he knew had committed the crime,

but he also told Tarrio exactly how he was influencing the banner-burning investigation, by advocating against hate crime enhancement. And Tarrio, he was never charged with that hate crime enhancement.

That brings us to the third big-picture way the defendant obstructed and impeded the banner-burning investigation. Because the defendant was protecting Tarrio, he withheld information, information that directly implicated Tarrio in the criminal conduct.

On December 15th, 2020, at The Dubliner, Tarrio confessed to the defendant that he had burned the banner. Tarrio confirmed this when he told this Proud Boys group chat, right after meeting the defendant, "I just confessed to burning a sign to an MDC officer." The MDC officer, that is the defendant. There is no one else it could be.

You heard from Agent Hadley, she could not identify a single MPD officer that Tarrio spoke to or met with on December 15th or before. There is zero evidence it was anybody else. That MPD officer, it is the defendant.

But because the defendant was carefully curating the information he provided MPD, he never told anyone that Tarrio had confessed. He did not want to implicate Tarrio and he did what he could to slow-walk the investigation. And it worked. As Detective Mufti told you, a confession would have allowed him to obtain an arrest warrant in the first instance.

Instead, he continued to investigate and build probable cause that Tarrio burned the banner.

Now, the defendant told you that he acted corruptly. He told you he acted with a wrongful purpose because he deliberately used Telegram to communicate with Tarrio, knowing it had a higher level of encryption and there was less of a chance that others would see those communications.

It is also clear the defendant acted with a wrongful purpose because of the way his communications with Tarrio changed. Before the November 2020 election and the banner burning, the defendant and Tarrio's relationship looked like a typical relationship between an officer and his source. And Tarrio was a helpful source of information. And the defendant would share that helpful information Tarrio provided with other law enforcement officers and with his chain of command, just as he was supposed to do.

At this time, the defendant and Tarrio communicated using normal text and iMessage and the information flowed generally one way; from Tarrio, the source, to the defendant, the MPD lieutenant. But then things changed. The defendant became the source. And because the defendant did not want anyone to know he'd become Tarrio's source, after the banner burning the defendant and Tarrio began communicating exclusively using Telegram.

The defendant wanted to hide the fact that he was

withholding information from his chain of command and leaking information to protect Tarrio. He wanted to hide the fact that he was obstructing the banner-burning investigation and, as you saw, over and over, there was a lot for the defendant to hide.

You heard testimony about the general orders. The defendant is not charged with a crime for violating MPD's general orders. The reason why you heard about the general orders is because they tell you what the defendant obviously knew. And even if not explicitly written in an order, it was quite clear from the testimony you heard that it was not part of the defendant's job to leak information about an investigation to the suspect of that investigation.

Even the defendant told you that he knew that would violate the general orders. This is why the defendant used Telegram and destroyed evidence. He wanted to cover up all the ways he was impeding the banner-burning investigation and protecting Tarrio.

In his communications with Tarrio, the defendant repeatedly referred to the police like the police were the third-party. But the defendant was the police and he knew better. The defendant's actions caused MPD's investigation to stall and take longer, wasting time and resources and delaying justice.

The defendant's actions jeopardized the integrity of the banner-burning investigation. As you saw, Tarrio was not

the only one who stole that banner. He was not the only one who burned it. The defendant's actions risked the destruction of evidence, witness flight, and jeopardized officer safety. The defendant obstructed and impeded and endeavored to obstruct and impede the BLM banner-burning investigation. He is guilty of Count 1.

That brings us to Counts 2, 3, and 4, the false statement counts. As an MPD lieutenant, the defendant was well aware it is always a crime to lie to law enforcement. What is not in dispute is the defendant knew it was a crime to lie to Agent Ricardi. He testified to that.

These statements were within the jurisdiction of the executive branch of the government of the United States. Because, as Agent Ricardi testified, he was investigating law enforcement leaks to Tarrio. Agent Ricardi is a federal agent within the purview of the Department of Justice, which is a branch of the executive. And Agent Ricardi came in here and he told you that he needed more information to identify suspects and for legal process. How, if the defendant had told him the truth, the investigation would have moved much faster, been more streamlined. The risk of harm to the integrity of the evidence would have been much less. The defendant's lies were material.

In Count 2 the defendant is charged with lying when he told Agent Ricardi that his relationship with Tarrio was

more, you know, one-sided, with just him telling you -- with him just telling me, you know, what their plans were. This is a lie. The defendant came in here and told you that he did not lie to Agent Ricardi because, with respect to this count, he thought they were only discussing First Amendment activity.

The interview was very clear. It covered many subject matters. But even if you credit the defendant's explanation that the question and his answer only concerned First Amendment activity, he still lied about it.

As you heard during his testimony, the defendant admitted over and over again to giving Tarrio information relating to First Amendment activity. He admitted that information was law enforcement sensitive and that he only had that information --

MR. SCHAMEL: Objection. I would object to the law enforcement sensitive information.

THE COURT: All right. I heard the evidence. You don't need to object.

MR. SCHAMEL: That's fine.

THE COURT: You can get up in your argument and tell me.

Go ahead.

MS. ROSS: He admitted that information was law enforcement sensitive and that he only had that information because he was an MPD officer.

I will not go through every example, but the defendant admitted during his testimony to giving Tarrio information relating to First Amendment activity on November 14th, 2020, December 12th, 2020, and again the next day, on December 13th, 2020.

You also saw in this chart that the defendant and Tarrio had an ongoing relationship, one that included over 700 messages, and went both ways. And you saw the communications between the defendant and Tarrio just over Telegram. There are communications here on both sides. You read these communications in detail, and they further prove the defendant lied.

This was not a one-sided relationship, it was not a one-way street. The information went both ways, even with respect to just First Amendment activity. This is not something the defendant had to lie about. Because the defendant gave such a clearly false answer, it shows that he understood the question and the materiality of the question. He knew it would implicate him as Tarrio's source and he wanted to cover it up.

When the defendant told Agent Ricardi that he had a one-sided relationship with Tarrio, that was a lie, and the defendant is guilty of Count 2.

In Count 3, the defendant is charged with lying when he told Agent Ricardi that he tried to find out information

from Tarrio about the BLM banner-burning investigation without tipping him off to the MPD investigation. Even the defendant came in here and testified he provided information to Tarrio about the banner-burning investigation and he was not authorized to do so.

The information the defendant told Tarrio of the BLM banner-burning investigation included that MPD had received an anonymous tip for his arrest, and included details about internal MPD discussions, such as whether MPD should investigate the banner burning as a hate crime. The defendant also tipped Tarrio off that MPD wanted to speak to him, that he'd been asked to identify Tarrio from a photo from the banner burning and that there was a warrant for his arrest.

Acting as a double agent the defendant inserted himself into the banner-burning investigation and then provided Tarrio with key updates about the investigation. When the defendant told Agent Ricardi that he was not tipping Tarrio off about the investigation, that was a lie. The defendant is guilty of Count 3.

That brings us to the last count, Count 4. In Count 4 the defendant is charged with lying when he told Agent Ricardi that he didn't inform Tarrio that he had an arrest warrant. This is also a lie.

First, you saw on January 4th, 2021 Tarrio took a plane from Miami to D.C. The plane took off at 12:55 p.m.

Then 7 minutes after the plane took off, at 1:02 p.m., the defendant went into his phone, opened the Telegram app, chose the specific Telegram chat he had with Tarrio, opened up the self-destruct feature and deliberately changed the self-destruct timer from 30 seconds to 10 seconds. Even the defendant testified that he did this because he wanted his message to delete sooner. The defendant wanted his message to delete sooner because he wanted to send Tarrio his biggest tip yet, that the warrant for his arrest had been signed.

A little before 1:30 p.m. Tarrio bought WiFi on the plane and he received the message that the defendant wanted to make extra certain nobody else would see; the message the defendant sent that told Tarrio that the warrant for his arrest had been signed.

Tarrio testified that he had a feeling -- a feeling -- that the arrest warrant had been signed. That so-called feeling, that was a lie Tarrio told to protect the defendant. The evidence shows Tarrio learned about the arrest warrant from the defendant, who reset the self-destruct timer to 10 seconds for no other reason than he wanted to destroy the evidence of his criminal conduct. Right after receiving the defendant's message informing him about the arrest warrant, Tarrio immediately began telling his friends and the Proud Boys the news.

Tarrio also shared the information about the arrest

warrant he received from the defendant with Bianca Gracia and Joshua Macias in the garage. He told them in the parking garage, quote, He texted me in the air and, quote, from the air was when I knew they signed the warrant.

Just as it had so many times before, the information here flowed from the defendant to Tarrio and then on to his associates. This pattern repeated itself over and over. And the information about the arrest warrant was no different.

Your Honor, we often tell juries not to check their common sense at the door of the jury room. The only logical inference to be drawn from all the evidence is that the defendant told Tarrio about the arrest warrant.

Before getting on the plane, Tarrio never mentions the arrest warrant to anyone. But immediately after receiving the defendant's message, he started to let everyone know. And he let Avva know his contact had told him. That contact, that's the defendant. Tarrio referred to the defendant as his contact over and over. Tarrio had only one contact. The defendant.

The defendant lied when he told Agent Ricardi he did not tell Tarrio about the arrest warrant. He is guilty of Count 4. The only evidence to suggest otherwise are the denials of Tarrio and the defendant, but those denials are not credible.

Your Honor should wholly discredit Tarrio's

testimony. At the risk of pointing out the obvious, Tarrio has a clear motive to lie in this court, the same one where he was convicted of seditious conspiracy for his role as a ringleader in the plot to use violence to overturn President Biden's 2020 presidential election.

Tarrio has no respect for our democracy, the government, or the rule of law. And he came in here with every intent to push his anti-government agenda by lying to protect the defendant, who had previously worked so hard to protect him.

In addition to having every motive to lie to protect the defendant, Tarrio's testimony is not credible because it was inconsistent and not supported by any evidence. On direct examination Tarrio was inconsistent at every turn. As just one example, Tarrio testified that he was so eager to be arrested for the banner burning that he wanted to put up the circus tent and push the message out as much as possible.

It makes no sense that Tarrio wanted to make the arrest for the banner burning this huge political statement, but would only let his friends and the Proud Boys and the media know moments before it was happening. He could not let anyone know sooner because Tarrio did not know until he received the defendant's Telegram message which, quote, He texted when Tarrio was, quote, in the air.

On cross-examination Tarrio testified that he was a

liar to all of his friends, family, and to the Proud Boys, but not to this Court. He told you that he lied when he told everyone that he had an MPD source. He told you he lied about receiving status updates about the banner-burning investigation from MPD. And he told you that he lied when he told Joshua Macias and Bianca Gracia that he learned about the arrest warrant in the air.

By telling you he lied he conveyed two points that are worth highlighting. First, he admitted to telling his associates all those things, despite earlier in his testimony claiming to not remember or downright refusing that he ever did so.

Second, after admitting he told his associates all those things, Tarrio claimed that he was lying to them. The idea that seconds and minutes after receiving information from the defendant he would make a conscious decision to immediately lie to those he trusted the most, to those who needed the information just as badly as he did, defies all logic. The defendant was not lying then. He was lying to you.

On redirect, Tarrio changed his story as he tried to fumble his way through the questions and remember the lies he had already told the Court. Tarrio's memory magically became clearer and he began to make concessions he would not make on cross. Highlighting yet again that Tarrio was on the stand to protect the defendant, defy the government, and ignore the oath

he took to tell the truth.

For example, on redirect Tarrio admitted that he would send information he received from the defendant and the Telegram secret chat on to the Proud Boys. On redirect, Tarrio also admitted to asking the defendant for information, including sending the message asking what MPD's general consensus of the Proud Boys were. On redirect Tarrio also testified that he lied to the Proud Boys and his friends because he was using them as focus groups and as a marketing ploy.

But it simply makes no sense that after being arrested and meeting Joshua Macias and Bianca Gracia in the garage, that he would continue to lie about the arrest warrant. There was nothing to test at this point. The arrest had already happened. There was no longer a need to push a narrative out. No media circus to come. Tarrio learned about the warrant in the air, after the defendant or, quote, he texted him.

Tarrio testified he is a liar -- and he is a liar -- but he did not lie to the Proud Boys, a group of his closest confidants. He did not lie to the Proud Boys, to his friends and to his family; he lied to you. Everything he told you defies reason and contradicts the evidence presented.

The defendant's testimony is also wholly unreliable. The defendant got up on the stand and tried to explain some of

the messages he sent. He tried to say that he was helping the investigation. But taking a step back, if a 23-year veteran of MPD really wanted to help a MPD investigation, would he have withheld information, leaked information, destroyed evidence? No. An experienced 23-year veteran of the force would have saved his messages, taken those messages straight to his chain of command, been completely forthright of the extent of his communications with Tarrio and asked the banner-burning investigative team how he could advance their common goal of arresting Tarrio and bringing him to justice. The defendant never did that.

The defendant wants you to believe he is guilty (sic) because, as he testified, the information he told Tarrio was not consequential and that it did not impact the investigation. For a 23-year veteran of the police force to sit there and tell you that he thought it was acceptable for him to decide what was consequential in somebody else's investigation is wholly not credible. He even told you that he wasn't allowed to do that.

For a 23-year veteran of the police force to sit there and tell you that there was nothing law enforcement sensitive about whether a case might be investigated as a hate crime is simply not credible. For a 23-year veteran of the police force to sit there and tell you that he thought there was nothing wrong with telling the suspect of an investigation

where the FBI was investigating is also simply not credible. And every officer came in here and told you how the information the defendant leaked was consequential. They know that and the defendant knows that.

The defendant testified that he was leaking this information and expressing support of the Proud Boys to build rapport with Tarrio. But rapport building does not require an officer to delete his messages and to not document conversations. Building rapport does not require a law enforcement officer to leak sensitive law enforcement information and to withhold exculpatory information about the suspect of an investigation.

The defendant was not rapport building. He was protecting Tarrio and obstructing the banner-burning investigation.

On cross-examination the defendant admitted over and over again he gave Tarrio information, he used Telegram to communicate that information, he knew he was destroying the messages that contained that information, and that that could impede the banner-burning investigation. The defendant knew what he was doing was wrong and he wanted to cover it up. And then to try to cover it up even more, he lied about it to Agent Ricardi and then to you.

The defendant was a lieutenant with the Metropolitan Police Department, it was his job to uphold the law. The

defendant had a relationship with Tarrio, and rather than using his relationship with Tarrio to advance the banner-burning investigation, to bring Tarrio to justice, the defendant made the choice to become a double agent. He made a choice to become a source for Tarrio and for the Proud Boys. He made a choice to obstruct and impede the banner-burning investigation. And that is why he lied, not once, not twice, but three times to Agent Ricardi.

Your Honor, you've heard a lot the last two days -- you've heard a lot throughout the course of this trial about the Proud Boys and Black Lives Matter. But this case is not about the defendant's political views, it's not about the Proud Boys or January 6. If any law enforcement officer engaged in the type of conduct charged in this case, we would be standing before you asking the same thing, to return a verdict, the only verdict consistent with the evidence, and find the defendant guilty of all counts.

THE COURT: All right. Thank you.

Mr. Schamel.

MR. SCHAMEL: Good morning, Your Honor.

THE COURT: Good morning.

MR. SCHAMEL: Can you hear me okay?

The government opened this case by calling Mr. Lamond a Proud Boys sympathizer who leaked sensitive information to Mr. Tarrio then lied about it. We just heard 40 minutes of the

same, that he knew it was a crime, that he betrayed his oath and he obstructed justice. The evidence and the testimony say otherwise.

Mr. Lamond never did anything intentionally to obstruct the investigation into Mr. Tarrio, the burning of the Black Lives Matter banner. And he certainly did not lie about it when he was questioned in June of 2021, and he didn't lie about it when he testified before Your Honor.

Context matters. That's how we started this case and we believe that's still the issue. Context matters, especially when we're talking about conversations, all we've heard over the last week about these conversations and the context as it relates to each of the four charges. What I would like to walk you through to start with is I would like to start a little bit on the false statement charges and then move to the obstruction.

In June of 2021, the interview. Now, we heard a lot just now in closing from the government about what he told Special Agent Ricardi. What he told Special Agent Ricardi. Special Agent Ricardi doesn't speak during this interview. He was questioned by Special Agent Molnar, who we did not hear from, so we don't really even know what Special Agent Molnar meant by some of the things he asked.

What we're left with is what's in the transcript, and we're left with what Lieutenant Lamond believed he was being

asked and how he was answering it. And he has been consistent through his testimony and what's in the transcript. And again, I would encourage Your Honor, the context matters.

And in the context of that investigation, right out of the gate, page 3, lines 6 through 16, Agent Molnar is very clear the purpose of the interview. Quote, we may -- that Mr. Lamond -- excuse me, Mr. Tarrio and the Proud Boys, quote, may have been getting information they shouldn't have had. That's what they were talking about.

So when we hear from the government, "He just offered that he didn't do this," it was the context of that conversation. He was being questioned, yes, about some other things at various times. It did sort of veer all over the place. But he was being questioned about what Mr. Tarrio knows. How did he know it? In fact, it was Agent Molnar who brought up social engineering. That's what their theory was, they were asking him, "Did he social engineer this"?

Agent Molnar told Mr. Lamond the purpose of the interview, they wanted to find out if it was socially engineered and he wanted to figure out, quote, who was talking to who, who may have talked to who, and who may have said things.

Every question that Mr. Lamond was asked, he answered truthfully. Some of the questions were vague, broad, unclear. Some of the answers also were vague, broad, and unclear. One

of the things that we just saw in all these minutes of the closing argument by the government is one-sided, one-sided, one-sided. I didn't hear Ms. Ross say one time the line above it. More one-sided. It's not -- he didn't say -- he was never asked, "Did you ever give Mr. Tarrio any information?" He was asked and he said, "It was more one-sided."

He explained to the agents, to help the investigators he answered the questions and he provided them with information he thought they would need to know about how to get to the root of what they were trying to find out about Mr. Tarrio. There is not a single statement in that transcript, in that interview, that is factually false.

For example, false statements in Charge 4, the government says Mr. Tarrio just sua sponte -- Mr. Lamond, excuse me, sua sponte says he didn't tell him about the warrant. He just brought that up.

But Molnar and Lamond are talking about Tarrio's arrest. And as you heard from Lamond during his testimony, Lamond and everybody at MPD were aware that when he was arrested, Mr. Tarrio was on the phone with a reporter. He didn't seem surprised. He seemed to know what was going on. Now, the government will have you believe, well, that's because, I think, quote -- Ms. Ross said, quote, it was the best tip yet.

So let's just talk about that for half a second. The

best tip is you have a misdemeanor non-extraditable warrant that was, quote, just signed for you. Now, we know that Lamond has known about that for days. On his questioning and cross-examination Mr. Lamond -- what you heard from Mr. Rothstein was he tried to make it look like, well, you told him, he couldn't do anything, he landed at National Airport. But those of us in D.C. know, National Airport is not in D.C.

If the idea here was he was tipping him off to the best tip yet, and he tells him on the plane -- which he didn't -- if he tells him on the plane and the idea is that Tarrio is going to avoid being arrested, Tarrio can get off that plane, walk up to any police officer, could have held a press conference in the lobby and said, "I'm Enrique Tarrio. There's a warrant out for me and you can't do anything about it."

He could have stood on the foot of the 14th Street bridge with a megaphone and they couldn't have done anything about it. He could have gotten back on a plane to Miami. They couldn't have done anything about it. He could have taken an Uber to a hotel, anyplace in Virginia, Maryland, or anyplace on planet earth not in the District of Columbia, and they couldn't have done anything about it. He got in the car and went into D.C., he got arrested. Entirely consistent with what he says throughout his conversations with Mr. Lamond and others.

And I ask Your Honor -- I'm just going to make a

couple of cites here. I'm not going to show you a lot of exhibits. I heard Your Honor loud and clear. I'm not going to, but I think there are some that are worth some attention. I'll give a quick list: Exhibits 1004 and 1004, Exhibit 1006-A, B, and C, 1007, 1008, 1014. The warrant application, I'm going to talk about that in a moment. 1017, 1018, 1020. Some of those are the exhibits that the government pulled portions of the chats out of. I think Your Honor should read the entirety of the chats.

Mr. Tarrio is saying from the beginning, he comes up with this cockamamy idea, he's going to put up his circus tent, he's going to come up to D.C. The guy's a -- he is what he is. We all know what he is. I don't think he's a liar, I don't think there's any evidence that he's a liar, that he's a perjurer, but he's going to come here and do his thing. And he says, "I booked a flight on December 28th." Why? He tells him, "I'm going a day early to deal with this thing."

There's another message where he says, "If I walk into the station on the 4th" -- exactly what he said -- he said he had two plans: Walk into the station on the 4th, lifted up his hands, or get taken on stage on the 6th.

In those exhibits you'll see in the messages where he claims, "My source said they're going to take me on stage on the 6th," that is bonkers. Somebody from law enforcement is going to suggest that they're going to arrest the head of a

right-wing, literally domestic terrorist group, on the stage in front of all of his followers while the Secret Service is there with the outgoing president of the United States? Nobody suggested that to him. That was his bone-head idea.

He was going to do something and that's what he does. That's why he's on the phone with the reporter, that's why he's telling his people that this thing came out.

With regard to the context, I think it's very important to look at the transcript, look at what's happening. I would draw your attention again to page 13 with the questions between Mr. Molnar -- Special Agent Molnar and Mr. Lamond about how the criminal apprehension was supposed to occur, what the plan was and why Mr. Lamond's answers make sense in that context.

When asked if the criminal apprehension unit made the decision to execute the warrant without Mr. Tarrio knowing, Lamond said yeah, that's what he did. And he didn't tell Tarrio about the arrest. He didn't tell him about the warrant. And he knew and was trying to help investigators figure out how Mr. Tarrio may have had that information.

I don't stand here before you and tell you that Mr. Lamond did a great job, that Mr. Lamond may not have actually been wrong in some of his assessments of what he could and couldn't share. But to say that he intentionally obstructed an investigation or intentionally lied, there's just

no evidence to support that.

There's no evidence the statement was untrue or Mr. Lamond knew the statement was untrue when he made it. In fact, only two people in the world know whether or not Mr. Lamond told Mr. Tarrio about whether or not there was a warrant. They both testified, they both were consistent about that.

The government offers an exhibit, and it's in there, we don't dispute it, that Mr. Lamond changed the setting. But we heard from Ms. Cain, and I believe we also heard from Special Agent Hadley, there's no evidence that any message was transmitted. There's nothing to support that an actual message was sent. There's no evidence. He changed the settings, that does not mean a message was sent.

And I ask Your Honor to go back and look at Ms. Cain from the FBI, the young woman from North Carolina, she was very clear about that. There's no evidence that a message was actually sent.

And when he was asked about his feeling -- he was asked a couple different ways by a couple different people -- Mr. Tarrio said it was a conglomeration of all these things. I'd been called by Miami-Dade twice, I'd had a text from Detective Mufti -- which I just would like to point out, the government said they were going to surprise him. MPD was going to surprise him. And because Mr. Lamond let him know, hey, MPD

wants to get in touch with you, which number? it somehow ruined the surprise. Some surprise. Take a look at the exhibit. "Dear Mr. Tarrio. I'm a police officer with the MPD. I'd like to speak to your lawyer about this banner-burning investigation."

"I don't have a lawyer. You don't have to hear from my lawyer, I'm going to invoke."

Where is the surprise? He didn't call him and tip him off that he was going to get a call or they thought it was so important they were going to fly down there and catch him on the sidewalk, like law enforcement often does, and say, Hey, did you burn the banner? and get the in-person confession. They texted him.

Everybody knew there was a banner burning. Everybody knew that the Proud Boys were at the root of it. From the night it happened -- we heard from the detective who ran the group, I think his name was -- it just went out of my head. The detective who was overseeing the investigation, had the plainclothes undercovers in the group. They didn't do anything that day. They collected evidence, they were there. They knew it was Proud Boys.

The flyer that Chief Carroll asked Mr. Lamond to show, Chief Carroll asked Lieutenant Lamond to show Mr. Tarrio when he met with him at The Dubliner, showed it was Proud Boys. This was no secret. Everybody knew that the Proud Boys were

scumbags, they were doing what they were doing and they were the ones that burned this banner. The question was which ones?

Tarrio went in, they have a conversation, he says I can't identify those people. Exactly what Lieutenant Lamond reported back. Walks out of it and that appears to be where he hatched his little scheme that he's going to make this into something. He asked, hypothetically, what would somebody be looking at here? Misdemeanor destruction of property. Lord knows, Lamond wishes he had taken that misdemeanor case a lot more seriously, he wouldn't be sitting in here.

It was a misdemeanor destruction of property. Mr. Tarrio sends that note out and says, "I confessed." He said, I didn't confess, Lieutenant Lamond didn't confess, and there's no evidence to suggest that he ever confessed. Because he doesn't say, when he's contacted, did you -- Lieutenant Lamond sends him the note and says, "Did you call in an anonymous tip?" He says, "I did better than that, I confessed." And he had. He had already confessed that morning, earlier that day on his Parler account. He then confessed on his podcast, and he confessed to every single person in the media who would question him about it.

So there was never a confession face to face. So we heard -- everybody asked, "Would that have helped?" Sure, it would have, if it had happened, but it didn't.

Ms. Cain -- I think I said a different name.

Ms. Cain was the government's expert, who testified that the forensic evidence indicated that there was no indication in the forensic evidence that a message was ever actually sent.

And I would further note, Your Honor, it makes no logical sense. Lamond knew as early as the 30th that there was a warrant. There were multiple communications between Lamond and Tarrio leading up to January 6. Everybody was worried. The Stop the Steal craziness, you know, Trump denying that he had lost, this was all coming. That's Lamond's focus. That's what he's looking at.

He's communicating with Tarrio. He knows for days; on the 30th, the 31st, the 1st. Lamond is trying to find out, because he was asked to, when is Tarrio flying in? He could have told him any of those times. If he's this double-agent sympathizer, he just tells Tarrio, "Hey, warrant's in, it's signed, don't come. Don't get on the plane. If you don't come to D.C. ever again, they can never arrest you."

But the government would have you believe he keeps that in his pocket from the 30th to the 4th. He doesn't call Tarrio. He knows Tarrio misses his flight at 9 o'clock in the morning. One of the exhibits I cited to Your Honor, I think it's 2005, Mr. Tarrio checked in, checked his bags, raced to the airport. And the gate agent has a note in there, and gate agent says, with some pretty amazing spelling, "Passenger arrived, we had already moved on to the list of people on

standby. Passenger was very angry that he missed the morning flight." Right? Because we all knew why he was going a day early, he told us, and he said it in all the messages. He missed the morning flight, he's at the airport when that flight takes off. He missed it. They close it, the gate, right in front of him. They put somebody in his standby seat and he argues with the gate attendant. Exhibit 2005.

He's at the airport for hours. Lamond's trying to figure out what flight he's on, they're trying to coordinate it. If Lamond is trying to warn the guy, he just missed his flight, "Hey, good thing you missed your flight. I was going to tell you, there's a warrant, it's been signed, you shouldn't come to D.C." He never told him. He never told him. There's no lie when he's asked by Special Agent Molnar and he tells him, "I didn't tell him. You're saying he found stuff out. I didn't tell him that."

There was a particular text message from Mr. Tarrio to some of his followers on the 1st of January where he talks about, "They'll have no choice but to pick me up on the 4th." He's talking about, "I'm going to walk into a police station on the 4th, they'll have no choice but to pick me up."

Now, I don't get how this is marketing. I don't understand how it is that this foolishness is "I'm going to raise this, I'm going to make a big show." I don't get 90 percent of the stuff that Tarrio does. But that's what he was

doing. It all bears out, it plays itself out in there. And he's not running from this.

So we don't have to speculate: Would he flee? The guy confessed 15 different ways; never to Lieutenant Lamond. The guy was coming to D.C. to deal with this. We have that contemporaneously with him booking his flight, why he's coming. He's got this cooky idea, "Maybe I'll get arrested on stage." That didn't come from Lieutenant Lamond. Yeah, he was lying to his followers.

He explained in his testimony, he knew they were going to be arrested -- that he was going to be arrested. He said a number of reporters were asking him about being arrested. He said Miami-Dade had come to see him twice. He said Mufti had reached out. Lamond was asking a lot of questions about his flight plans. For the first time ever, Shane was asking him for actual information. "When are you landing?" He may be a lot of things, I don't know that Tarrio is stupid.

He put two and two together, that's his feeling. So he said this is how we're going to maximize it. You talked about what happened in the airport, and he got on the phone with a reporter and he was on the phone with a reporter when he got arrested.

In the second charge of false statements, it's the, "You know, more one-sided, with just him telling me, you know,

what their plans were."

Lamond was answering Molnar's questions, his ambiguous and vague question about whether or not it was common for Tarrio to fish. Ricardi really wasn't clear on what that meant. Ricardi didn't ask the question. We never heard from Molnar, we don't know. We can take a reasonable --

THE COURT: We don't know what he meant by, "Did he ever fish?"

MR. SCHAMEL: We don't know in the context of that discussion exactly what he meant by "fish." What we do know is how Lamond took it, because we heard from Lamond. Lamond told us what he thought it meant. And he thought, in the context of the discussion at that point, he was being asked about protests and demonstrations and what we were doing or anything. They were not, at that moment, talking about the banner burning.

Had Molnar asked a follow-up question, Did you ever tell Mr. Tarrio anything about the banner-burning investigation? Lieutenant Lamond would have said, Yeah, just like he said on the stand here, like he said since day one, "I told him things, they weren't valuable, they didn't matter." He made a decision. If he's wrong, that's not a crime.

There's nothing -- we heard a lot of talk at the beginning of this trial from the first few witnesses, Your Honor will recall, need to know, it was under seal, law enforcement sensitive. The only thing we ever saw anything

close to a definition of was in one general order, which was the ethics order, that's basically taken from the International Chiefs of Police, and it says, "Confidential or given in confidence," without definition.

And I thought we got a lot of truthful testimony on cross-examination from Mufti, from Ciapa, and from the others when they were asked questions about, well, what does that exactly mean? We didn't get the same answer from anybody. And none of it matters, except for what Lieutenant Lamond thought.

Now, if this was a trial board and you were asking, Could you have shared the things that he shared? Should he have shared the things that he shared? it might be a different analysis. The question here is: Did Lieutenant Lamond believe that he was sharing things of value and was he doing so for the purposes of obstructing the investigation?

And when he got asked about fish and what that meant, that he never felt that Tarrio fished to the extent he was asking anything at all. And it was certainly clear from the evidence at trial that it actually was more one-sided. Lamond was getting things of value from Tarrio about where they were going to be, what they were going to be doing, and the things he was giving in return really didn't matter. Didn't matter if the FBI was in it or not. It was an MPD investigation, it was ongoing.

Didn't matter that he'd identified him. The guy had

already confessed 15 different ways. Didn't pack the investigation, say I positively identified you. Everybody knew there were a thousand photos and a thousand cameras and the guy had confessed. We have to put --

THE COURT: Where does the concept that you can share things of value -- that aren't of value, in your mind, where does that come from? What is the basis for that in any of the rules that he talked about?

MR. SCHAMEL: There's nothing -- it's not. He doesn't have to prove that he could do it, they have to show he couldn't.

THE COURT: I just want to know why it makes sense, how it even comes to that?

MR. SCHAMEL: How he even comes to that?

THE COURT: Yeah.

MR. SCHAMEL: Because he believed at the time that he was doing what he was doing that they already had this tight case, it was locked up. Remember, Lamond -- we heard from Captain Copeland, but for Lamond she wouldn't have even known that there was a phone tip. He pulled it off -- she said, remember, on redirect, she was shown the emails and said, Well didn't this go to the admin box? And she said, "Yes, it did." Your Honor gave me one question on recross, and I said, "Did you ever get it from the admin box?"

THE COURT: You said you only had one question.

MR. SCHAMEL: Did I ask two?

THE COURT: I don't know, but I never gave you just one question.

MR. SCHAMEL: Your Honor permitted to ask a follow-up recross and I asked, "Was with ever anyone else that forwarded that to you?" And she said, "No." She said, "No."

So putting yourself where Lamond was, Your Honor -- to answer your question, putting yourself where Lamond was while he was communicating with Tarrio in the lead-up to January 6 -- because this is what it is, right? Trump has lost the election, things are out of hand in mid-December, things are getting worse, more -- basically riots are coming. Nobody could anticipate how bad it would be on the 6th, but that's what's coming.

He's the head of intel and he's trying to gather information on that. He doesn't tell Tarrio, "Hey, I'm the one that brought the phone tip in." He doesn't tell Tarrio, "I went and gave 100 percent identification to your podcast." He doesn't tell Tarrio, "I sent in the first thing. I couldn't identify you from the photo, so I went out on my own, I found more photos of you at the event and I sent those in. Then I finally found a photo where it was clear and then I 100 percent identified you." Everything he is doing and every single person that was asked said he advanced the investigation.

So he's advancing the investigation. And,

Your Honor, I would really encourage you to review -- it's 1014, which is the warrant application. Because in the warrant application you'll see all the things that were there that came from Lamond first. He didn't inject himself in the investigation in order to sidetrack it. He injected himself in the investigation to help them.

It was sort of embarrassing, Captain Copeland said they didn't even know he'd confessed. First thing they knew of a confession they got from Shane Lamond. The only photographic identification, 100 percent accuracy that that was Tarrio in the photograph, Shane Lamond.

Captain Copeland sat up there and said even now, sitting in court four years later, knowing that it was Tarrio, knowing that Tarrio had pled guilty and been to prison for it, she couldn't positively identify that photo that was shown to Lieutenant Lamond. She couldn't identify him sitting there on the stand during her testimony. He went out and within 24 hours he had gotten more things in to put it together and show.

And, Your Honor, I'm going to talk about it in a second, but there was a series of questions about whether or not there was going to be an application for an affidavit. There was actually an email that says exactly that, that they were seeking an affidavit from Lieutenant Lamond. So he wanted to be 100 percent before he signed that affidavit. He then became 100 percent certain and they decided they didn't need it

because at that point he had already provided for them all of these other ways that they knew that Tarrio had confessed.

So if you look at the interactions between Mr. Tarrio and Mr. Lamond going back to February of 2020 -- and, again, Exhibit 1003 -- you'll see that it is more one-sided. And there's nothing untrue about Mr. Lamond answering that vague question in the way he answered it.

And I would also encourage, Your Honor -- I tried to go through them on his direct examination -- when you read the transcript, look at every single objective question. I think there's only one of the three false statements that actually is one. "Did you give him the warrant?" That's a -- did you or did you -- did you not? It's a very simple, straightforward, objective question. Doesn't inquire interpretation. It's not vague, it's not anything. His answer is, "I did not," and there's no evidence that he did.

The other two are vague, they're ambiguous. It's unclear, but his answer is, in fact, truthful when he gave it.

Exhibit 1002, it talks about a lot of the information that Mr. Lamond was receiving. There was a lot of different things Mr. Lamond was getting information about; the Portland protests, he was feeding information out to law enforcement about the Michigan protests. He was finding out about who was coming to various different protests and sharing them with law enforcement around the country.

That's what Mr. Lamond was doing and that's why he felt and was justified in sharing stuff that really didn't impact the investigation in any way. By the time he's telling Tarrio anything he's telling him about the investigation, if you look at the timeline, Tarrio has confessed multiple ways. He doesn't harm it at all.

The last false statement is the question about, "That was part of it?" And the answer -- his answer was, "That was part of it, and the other part I was trying to find out, without tipping him off to the MPD investigation." Again, I'd ask Your Honor to go through the entirety of that exchange, the back and forth.

THE COURT: I promise you that I already have and I will again --

MR. SCHAMEL: Thank you, Your Honor.

THE COURT: -- review the entire transcript and you probably don't need to ask me again.

MR. SCHAMEL: I won't. Fair. Fair, Your Honor.

There's no record -- there's no evidence in this record that that statement, in the context of the character relationship, is untrue. There's nothing in this record that suggests that's untrue.

What does tipping off mean? Well, he clearly wasn't tipping him off to the investigation because the investigation started the day after the burning. At least publicly, with the

MPD and FBI Tweets that everybody talked about. There was news articles all over the place. So this is not a clandestine investigation into something that nobody knows is happening, "Oh, we found out the money is missing from the bank, now we've started an investigation."

This was an event attended by thousands of people, it was televised around the country and around the world. Sort of embarrassing, humiliating moment for America that we had that going on, but it was, everybody knew about it. There were hundreds of people, including multiple law enforcement officers there during that banner burning. He didn't tip him off to that, Tarrio did.

THE COURT: Hundreds of law enforcement officers?

MR. SCHAMEL: I said, "Hundreds of people, including law enforcement officers." I was not suggesting hundreds of law enforcement officers.

Mr. Lamond testified "tipping" means alerting Mr. Tarrio to the investigation and giving him valuable information. And he doesn't feel like -- he still doesn't feel like he was giving him anything of value. Whether or not Mr. Tarrio was going to be investigated for a hate crime, Tarrio wanted to know and Lamond told him his opinion. And Lamond told him what he had said in the context of the internal discussions about it.

Again, the list of exhibits I've given Your Honor,

you'll see the full exchange as it relates to the questions that were put before the Court and the exhibits that the government sort of cherry-picked out. Mr. Lamond, when he talks about whether or not they would have to charge all these other crimes, other hate crimes, is an exchange with one of the supervisors at the MPD. And he is raising this issue and she responds, "Yeah, actually" -- the exhibit is in there, "actually, that's probably true."

And it's interesting because if you look at the paperwork that is contained, there's a *Jencks*/Lewis document that's attached to the warrant application in Exhibit 1014. On October 29th, when Detective-now-Lieutenant Mufti submitted the warrant application to the U.S. Attorney's Office he submitted it as a destruction of property hate crime. So as of the 29th of December the final decision had not been made.

We're not privy to the internal workings of the U.S. Attorney's Office and the papering of the case and how the decision was going to be made, whether or not it was going to be a hate crime. But when Lamond is saying, yeah, it's not going to be a hate crime -- which, again, has no value to the investigation, doesn't do anything -- when Lamond is telling that, that's his opinion. It wasn't even true. It hadn't been determined because on the 29th, when the second warrant application goes in, Mufti submits it as a destruction of property/hate crime.

Nobody knew until the prosecutor, the AUSA made the decision about whether or not it was going to be submitted as a hate crime. We don't know if he actually did submit it as a hate crime, but then the judge could have said it's not a hate crime. We don't know the inner workings of that. That's not in this record, that's not evidence that was provided to the Court. But we do know on the 29th of October it was submitted to the U.S. Attorney's office from MPD as a hate crime.

So the fact that Lamond is telling him, yeah, it's not going to be a hate crime, whether it was or wasn't has no bearing. But it wasn't. We don't know, it wasn't decided.

THE COURT: The ultimate affidavit in support of the arrest warrant that was signed is not an exhibit?

MR. SCHAMEL: The ultimate application as part of the Exhibit is 1014, Your Honor. It's a big exhibit. And in that is the warrant. It's got the full -- there's, like, a six- or seven-page narrative and attached to the back of it is -- it looks like, and I'm presuming -- I can just tell you what the document is. The document looks like one of those computer programs where you have to click through a number of things; have you ever been, you know, told you're on the Lewis List? Have you ever been told you're not credible? all the things a detective has to do.

And in the top there's a box and the detective has to fill in what's the nature of the warrant being sought? And

Detective Mufti types in there -- because he's the one that signs it -- types in there: Destruction of property, hate crime.

THE COURT: All right. I don't think that was the question I asked. But, okay, all right. Go on.

MR. SCHAMEL: There was a lot of testimony from people like Chief Carroll that we shouldn't do this, this is not how it's done, he looks like he's writing to a friend. We're not arguing with any of that. Maybe he shouldn't have. Maybe it would have been better -- certainly would have been better if he would have done a better job of retaining all the messages he had with Mr. Tarrio so he wouldn't be standing before the Court accused of these things.

But the opinions of those officers, while we heard them, are not supported by any regulation, any rule, any law. There's nothing that says when you're talking to an intel source, to somebody who is involved in an investigation, that you can't share things that you don't believe to be of value. He didn't talk about the undercovers. There's a lot of things he didn't talk about, and that would be a different analysis.

And I think when we heard from Chief Carroll, he made it clear that he knew, going back to November of 2020, that Mr. Lamond had Mr. Tarrio as a source. Government seems to have abandoned this idea that he had to be registered. They've sort of given up on that. But that he knew he was a source and

he knew he was going to meet with him in person while the Proud Boys were already suspects on December 15th, and he specifically asked Mr. Lamond to ask Mr. Tarrio to look at the flyer that showed a group of Proud Boys involved in the banner burning and ask him what he knew about it. So this idea that Lieutenant Lamond couldn't talk to Mr. Tarrio about the banner burning because it was an open investigation and the Proud Boys of which he was the president, or the leader, is bunk.

Chief Carroll said it. Now, Chief Carroll doesn't like it when he looks back at some of the ways that Mr. Lamond communicated. He seemed to be offended by some of the things Mr. Lamond said about, "I respect your organization. I can't say this publicly, but I support you guys," that's the clandestine services. He's in intel.

There's nothing improper about a police officer lying to a source, telling them they agree with them, they think whatever terrible thing that they do is great in order to get intelligence. The chief may find it offensive, but that's the job. Chief Carroll, "We just don't do that." But, "We just don't do that" is opinion of that's not what we should do, that is not a crime.

I think the government has abandoned this idea that even talking about whether or not it was a hate crime is a problem because it was in every press release, it was everywhere, and the whole world knew it. But again, if it was

an issue, it certainly wasn't until the warrant was finally signed. And we don't know that it's not a hate crime until December 30th, when the warrant comes back from the Court to the U.S. Attorney, to Detective Mufti for distribution.

And there's no evidence that after that happened there's ever any discussion about whether or not it's a hate crime. I don't think it's matter. There's nothing in this record to suggest that it would. But it's not in this record.

As far as willfulness, Mr. Lamond testified when he answered the questions about the communications with Mr. Tarrio from December 12th to January 4th, he was describing the nature of his relationship with Mr. Tarrio. He didn't think he was doing anything wrong in disclosing information. And he was looking at what other officers had said, noting about the, "We don't do that." Lamond is saying, "Look, I don't know who did it, I don't know how he has this information about the warrant, but it wasn't me."

Sorry. I'm trying to cut out a couple things that I jumped through. All right.

THE COURT: I didn't bring anything to throw.

MR. SCHAMEL: I'm sorry?

THE COURT: I didn't bring anything to throw, so I guess you're okay.

MR. SCHAMEL: Oh, then I'm safe.

THE COURT: I also know how much time has gone by.

MR. SCHAMEL: It's an hour, it's been a little bit over an hour since Ms. Ross started, so I don't think I've used a full hour.

THE COURT: All right.

MR. SCHAMEL: To talk now about the obstruction of justice. There's no evidence from the government for beyond a reasonable doubt Mr. Lamond obstructed justice under 22-722. It's not even close. Ms. Ross says that Mr. Lamond slow-walked the investigation. That was her term during her closing. Slow-walk the investigation. The same morning that Mr. Tarrio posts his communication is the same morning that the phone tip came in and the same morning that one person at MPD did anything to further the investigation of Mr. Tarrio; Mr. Lamond.

Nobody else even got the phone tip that we are aware of. There's no evidence here, other than Mr. Lamond and his civilian supervisor. There's no indication that anybody else at MPD was aware that this anonymous phone tip came into the call center. If he's slow-walking this investigation, does he then pull it off the tip line, forward it to the people that are doing the investigation, include a picture that he went and found on the internet, and say "I know Tarrio" --

THE COURT: You're saying he pulled it off the tip -- he got --

MR. SCHAMEL: He received it.

THE COURT: He got the email saying we got this tip.

MR. SCHAMEL: Everybody did. It went out to a whole group of people.

THE COURT: Okay.

MR. SCHAMEL: There's no evidence that anybody at the CID ever saw it, was aware of it. Captain Copeland testified that she didn't get it from anybody other than Lieutenant Lamond. And other than Lamond and his supervisor discussing it and Lamond forwarding it to the civil invest -- the criminal investigation division, with a picture that he found of Tarrio and a statement, "I know him. I can help," nobody else did anything that morning. That's what set it off. That's what focused them from Proud Boys general to Tarrio specific.

Shane Lamond is the first person that helped CID focus on Mr. Tarrio. He reached out to Tarrio to ask him, Did you call in this thing? And Tarrio is, like, Yeah, I did better than that, I actually made a confession. Lamond went and found the confession and sent it to the criminal investigators that are working on it. That's slow-walking the investigation? If he's obstructing the investigation, he is the least effective obstructor in the history of obstruction.

The government claims that Mr. Lamond corruptly obstructed or impeded, or endeavored to obstruct or impede the MPD investigation by the things that he said and the things

that he did internally with MPD. We have to remember about -- and I think it's worth remembering, Mr. Lamond's testimony about the training he received. He'd never worked sources, he'd never worked confidential informants, and he spent two weeks shadowing his outgoing supervisor to learn what he was supposed to do in the intel section.

And let's not forget, in December and January of -- December of 2020 and January of 2021, we were in unprecedented times. We were in unprecedented times. The president of the United States had lost the election decisively and was fomenting civil unrest. Far right groups were coming to our city and causing massive problems as part of that. Yeah, he's a 23-year-veteran, with no training. You heard from various MPD officers, there's no job description, there's no oversight. Did he do the best job? No. We had January 6. They all failed. But that's not obstruction. He's not obstructing.

He was trying to get information, giving things that he didn't think mattered to get more information, at the same time he's helping the criminal division put together the case that they would not have had but for him. Now, maybe they would have gotten there eventually, maybe somebody would have figured out that there was a podcast, maybe somebody would have figured out that there's a verified Parler account, both of which turn to be quite important.

You know how we know they turn out to be quite

important? They're in the narrative of the warrant application. The narrative in 1014 of the warrant application is the information that Shane Lamond provided to the investigation. You pull Shane Lamond's involvement into the banner-burning investigation away, Copeland says they never even know there's a phone tip. So when would they start focusing on Tarrio? They don't know that he has confessed, and it's in *The Washington Post*. So why would they have figured out Tarrio? They don't know about the podcast. They had nobody else who could positively identify his voice without Lamond. One questions whether or not without Lamond MPD could have even put together enough for a warrant to arrest him on January 4th.

Gathering intelligence is not the same as putting together evidence in a criminal case. And, admittedly, Lamond seemed far more focused on gathering intelligence and trying to do his intelligence job than he was on the misdemeanor warrant and his communications with Mr. Tarrio. That doesn't make him a double agent. Sure as heck doesn't mean he obstructed justice.

We talked about the hate crime text. I think it's of no moment, particularly given the timing and where we were in the timeline. Talked about some of the things that folks -- the ID text. Again, at the time that he tells him, so what? I IDed you. He's already confessed, he's on video, audio, and

his verified account. He's confessed. He told him about that. Lamond didn't think it matters. If, in hindsight, that's wrong, we still haven't seen what general order that violates. We certainly haven't seen the law it breaks, and it's not consistent with obstruction.

The anonymous tip. Lamond calls and asks him about the anonymous tip after Tarrio has confessed, earlier that morning, and asks him. Tarrio does not confess to him then. He certainly doesn't say, oh, yeah, you remember, I told you at The Dubliner, because he'd never told him. There's no evidence that he ever told him. And that's the only thing that Lamond could have had that potentially was withheld, except it just didn't happen. It's not a fact. It didn't happen.

The government wants to believe it because they are going to sort of cherry-pick which of Tarrio's statements to his followers and the kooks that he worked with have bearing. That one apparently is true, but all the things about coming in on January 4th, those aren't true. He never did this. There's no evidence that he did.

There's no confession. We talked about that. And there's no evidence that there was. There's no evidence that Mr. Lamond disclosed anything about the arrest plan. There's no evidence that he did anything to impede Mr. Tarrio's being arrested. We talked about all the ways he could have, if that was actually what he was trying to do.

There was a question with whether or not he destroyed evidence. And I think it's important to know that the government would have you believe that because when they obtained the phone after the interview on June the 2nd there was no communications in Mr. Lamond's phone, that he destroyed them. Mr. Lamond said he didn't know. We don't know, candidly, if that's even the same phone he had in January. It was six months later. And it doesn't make a lot of sense if he's only communicating with one other person on the planet through Telegram, one person.

The only person that Mr. Lamond's ever -- there's any evidence that he ever communicated with on Telegram was Mr. Tarrio. And so if the government wants you to believe that on June 2nd he had wiped clean all of the conversations with Mr. Tarrio, one would assume he would have also wiped off the app. Just take off the app. Take off the app and it's over. But the app is on the phone.

Yes, he set those delays. And, frankly, that's the one thing he did that if he could go back, he wouldn't be here. To have all those communications, to have just sent an email or had a conversation with somebody to say, hey, I'm talking about this. Had he thought that through, he would have avoided all this problem, he would have avoided being called, essentially, a traitor and a fraud and a liar. His career wouldn't have been destroyed, he wouldn't be standing in federal court facing

criminal charges. But as he testified, he did it because he was communicating with Tarrio and he thought that was what he was focused on, he wanted to gather information about the First Amendment issues and wasn't focused on what was happening for this sort of misdemeanor on the side.

I think we heard from a number of different officers who truthfully stated just how helpful Lamond was to the investigation. As I said, I think that warrant application makes it crystal clear. Mr. Lamond does nothing to harm the investigation of Mr. Tarrio. In fact, just the opposite. What Mr. Lamond was doing, in good faith, mistaken as it may have been and, frankly, sloppy, is not obstruction of justice.

The questions he was asked, the answers he gave were truthful. And reaching out to CID and pushing this investigation, I think, is the best indicator of what his state of mind was and what he was trying to do at the time he was involved in December through January of 2020 and 2021.

The things that he did, the things of his involvement was the opposite of jeopardizing the integrity of the investigation. Because of his involvement the investigation went faster, Tarrio was arrested, and Tarrio pled guilty. And when he was questioned, he did the best with the questions that were given to him to answer truthfully and his testimony here is to be believed.

And so, Your Honor, I'm not asking and we would never

ask that anybody bless this and say that he did great things or that he was a wonderful officer or he's a banner of what we should be doing as police officers running intel. But to think that there is evidence beyond a reasonable doubt to support that this man was intentionally misleading Special Agent Molnar or that he was doing things intentionally to corruptly impede that investigation, it's just not true.

So, Your Honor, I don't think this is a close call. Mr. Lamond is not guilty of these four charges, and there really is only one verdict here. Thank you, Your Honor.

THE COURT: Thank you.

All right. Do we need to take a ten-minute break before we do the --

THE COURT REPORTER: (Shakes head.)

THE COURT: No? You're good. Okay.

MR. ROTHSTEIN: Your Honor, I was going to ask you if we could take ten minutes.

THE COURT: You want the break. All right. We'll take a ten-minute break.

(Recess from 11:00 a.m. to 11:15 p.m.)

THE COURT: All right. All right. Mr. Rothstein.

MR. ROTHSTEIN: Thank you, Your Honor. Your Honor, the defendant asked the Court to ignore contemporaneous evidence, to ignore inculpatory statements, to ignore common sense, and to simply take the word of well-known truth-teller

and upstanding citizen Enrique Tarrio, who was convicted of six felonies in this court, including seditious conspiracy and obstruction of justice. Notably, as he pointed out, not perjury, but that's probably because he didn't testify in that case. And to also take the word of the defendant, who lied on the stand repeatedly. And, Your Honor, I would like to focus the Court's attention on those lies.

First, he lied on the stand about why they used Telegram on direct examination. The defendant said that they used Telegram because that was Tarrio -- that was Tarrio's preferred method of communication. But as Your Honor saw, for months, for almost 11 months, they mostly used iMessage, other than four Telegram messages back and forth and it wasn't until November 7 that they began using Telegram again. Not because Tarrio initiated it, because the defendant did. Because that's when he wanted to provide him with law enforcement information.

And, Your Honor, we asked the defendant about that on the stand. And the testimony is at page 84 and 88 of the transcript. Then the defendant had testified on direct that he only used the self-destruct timer because Mr. Tarrio had used it first and that he was just simply mirroring Mr. Tarrio's communication patterns.

But -- and we brought this up on cross-examination, at page 77, when I asked, "You said earlier you used the self-destruct timer because he used it and you wanted to mirror

him?" And he said, "That's correct." But then, Your Honor, we pointed out the first person to ever use the self-destruct timer in any conversation was the defendant, after Detective Mufti had contacted Mr. Tarrio and Mr. Tarrio provided a copy of that communication to the defendant.

The defendant also lied, Your Honor, about -- he said oh, if Tarrio reached out about other cases, I would simply direct him to the detectives on those cases for information. But there was no evidence of that. And, in fact, the defendant was the one who was providing him with information about other investigations, when a Proud Boys had been stabbed, when they'd been involved in skirmishes. So that was also a lie.

And on direct examination the defendant tried to say that with respect to the question about it being -- about the flow of communications and his response to it being one-sided was, well, that wasn't about the banner burning, that was about the First Amendment activities, as if he hadn't been providing First Amendment information to Mr. Tarrio. But on cross-examination the defendant repeatedly admitted that he provided that information to Mr. Tarrio.

And at page 130 of the transcript he was asked, "So you did provide Tarrio with information, police information about First Amendment activities, right?" And he said, "Yeah, that's fair to say." And then at the bottom I said, "So did you did it for First Amendment and you did it for banner

burning, right?" And he said, "Yes, that's correct." So his explanation of, well, the one-sided was just about when they were asking about the First Amendment, I didn't understand that it was about the banner burning, he knew that that was a lie. He was providing First Amendment information, he was providing information about the banner burning.

Page 91 in the transcript. We asked him about the law enforcement alerts that he was receiving. He admitted that that was about -- that was not the banner burning, that that was about First Amendment activity and he admitted he provided it to Mr. Tarrio.

Page 102, information about the call from the Cuban embassy. Page 102 and 103, "This is information that you're providing to the Proud Boys regarding their First Amendment activities in the District, right?" The defendant said, "Yes, that's correct."

At page 104 and 105, when a Proud Boy was stabbed, prior to the banner burning, First Amendment activities, he said -- I said, "This is regarding an altercation that happened during the First Amendment activities, right?" The defendant said, "Yes."

Page 107 and 108, "Based on all of their First Amendment activities that had occurred in the District, right?" "Correct, yes." This is about a consensus of metro -- of MPD regarding the Proud Boys. And the defendant admitted that was

related to First Amendment activities.

Again, at page 128, Your Honor, we said, "Not only did you agree to find out information from CID, but two minutes later you provided Tarrio with information you had regarding the FBI and Secret Service, right?"

"Yes, that's correct."

"And this wasn't about the banner burning, right?"

"That's correct, it was not."

"This was about First Amendment activities?

And he said, "Yes, that's correct."

So the defendant's claim that he only said it was one-sided because he misunderstood the context of the question, it's simply not borne out by the evidence and his testimony.

Also, with regard to the false statement about "without tipping them off," the defendant repeatedly was providing Mr. Tarrio with information about the banner burning. And he said he was doing that because he wanted to gather information from Tarrio that he thought would be helpful to the investigation.

But what the evidence showed was he didn't provide any of those communications. The meeting on the 15th where Mr. Tarrio confessed. And we know he confessed because he contemporaneously told the other Proud Boys that he did. He didn't just say, "I discussed the banner burning," he said, "I confessed."

So, "without tipping him off," but the defendant admitted that, quote, but you never really told anybody at CID that you had communications with him about the incident, right? That's at page 120, Your Honor, he said, "CID, no." If he was trying to be helpful, he would have provided that information to CID.

About the tip, the fact that the tip was called in, that was police information, he says, "Yes, it is." And at the bottom I said, "And you were providing Tarrio with information related to the banner-burning investigation, right?" And he said, "Yes, you could say that."

At page 133, defendant says, "I will check with our CID people to see if they have you on video." And he admitted that's what he said. And then he admitted below, he says, "Right. I'm only saying I'll check with them about video." And he admits that that's what he was going to do, the video about the banner burning. That's not him collecting information, that's him providing information. He's not assisting the investigation, he is assisting Mr. Tarrio.

Again, here at page 143 and 144, "And you never told him about any communications you had with Tarrio about the banner burning before that, right?" And this is regarding -- and the defendant says that he did not. And this is regarding the communication with Franklyn Then and where he calls him to ask him how he knows Tarrio and for the identification.

And the defendant could have said, "I met with him on the 15th, we discussed the banner burning." He didn't. He was resistant to giving information about how he knew Mr. Tarrio and he certainly wasn't offering information that could have assisted Detective Then. And Detective Then testified that he walked away from that call not really understanding how they knew each other and getting the feeling that the defendant didn't want to identify Mr. Tarrio in the photo.

So, Your Honor, it's simply not credible that he was trying to find out information without tipping them -- without tipping him off. He was providing him realtime updates, what evidence they had, the status of the warrant. That's not collecting evidence, that's providing evidence.

Your Honor, part of what the defendant has argued is that he was just trying to build rapport with Mr. Tarrio. But, building rapport does not mean using Telegram so others in law enforcement can't see the messages. Building rapport doesn't mean using self-destruct timers to destroy communications with a suspect. Building rapport is not withholding information of value that could have assisted other detectives. And it's certainly not providing updates on what information they have against the subject.

That's just simply not what you do to build rapport. And the detective -- or, the defendant knew better. He was a long-time, 24-year veteran of the MPD. So we simply do not

believe that this was just to build rapport. There was a correct way to do that without providing police information. Even if he wanted Tarrio to think that he was empathetic to the cause, he didn't make those statements when he was trying to gather the information, he did it after January 6.

Your Honor, in addition, the defendant admitted that he knew that destroying communications -- the importance of preserving communications with the subject and he knew that destroying communications with a subject could impede an investigation. He testified to that right at the beginning of his cross-examination. And that's at page 70 and 71, Your Honor.

We asked him, "And you understood that if statements were made, if police did not properly preserve communications by suspects to them, that could affect the investigation, right?" He said, "Yes, it could."

Then I asked, "And if a police officer destroyed communications with a suspect, that could affect the investigation, right?" And he said, "Yes, it could."

So he knew that his destruction of communications with Mr. Tarrio, once he knew he was a suspect, could impede the investigation. And, Your Honor, at page 72 and 73, we asked, "Is it your testimony that a police officer can disclose what evidence there is in another individual's case, another officer's case?" And Your Honor chimed in and asked him, "Do

you think it's permitted?" And regardless of whether or not you think it's unlawful. And the defendant said, "I see, Your Honor. Per the general order, no."

So the defendant knew. And if Your Honor looks at the definition of "corruptly," that's all we need. The defendant knew that he was not to provide that information. It doesn't have to be unlawful, he just has to know that it was improper.

Moving on, Your Honor, at page 118 and 119 of his --

THE COURT: You don't have to -- you can tell me, do you remember the testimony when I asked this and he answered that? You don't necessarily have to -- I never even knew there was a transcript. I know you sat here, I listened, I took copious notes.

MR. ROTHSTEIN: I know. I was just trying to make --

THE COURT: I know, but your reading off the screen isn't half as effective as your telling me what you want to tell me. You're welcome to use it, if it helps you, but I don't think it's necessarily helping me.

MR. ROTHSTEIN: Sure. Thank you, Your Honor.

Your Honor, regarding the obstruction point, as we pointed out, he knew that having discussions -- he knew that -- regarding the obstruction, regarding the hate crime, he was providing Mr. Tarrio with realtime information about what MPD was considering. And these were discussions that Mr. Tarrio

would not have otherwise been privy to. And we know this was helpful to Mr. Tarrio because Mr. Tarrio immediately, when he gets the information, responds to the other Proud Boys and says, "We need to get ahead of this hate crime, per my contact at MPD." And then he puts out the Tweet where he says this is -- this wasn't a hate crime. So we know that that information was useful because Mr. Tarrio was acting on it.

We know that the defendant knew he was obstructing justice because he had a call with the suspect. He knew -- he testified that he knew, when he had those calls through Telegram, for which there otherwise wouldn't have been a record, that he knew Tarrio was a suspect at that point. He knew the importance of documenting communications with a suspect. And he didn't. And nor did he ever alert anyone, Franklyn Then, Detective Mufti, Detective Copeland, Leslie Parsons, even Jeffrey Carroll. He never says to them, "Hey, I'm having communications with Mr. Tarrio about the banner burning.

None of that -- I know defense counsel keeps pointing to the arrest warrant, but if you look at the arrest warrant, you don't see anything about communications between Lamond and Tarrio about the banner burning. That all would have helped speed up the investigation. And it's important to look at the timeline of that investigation, Your Honor, because they were trying to get a warrant beginning on the morning of the 13th.

They were investigating. They didn't get a warrant until the 29th or the 30th.

And it's interesting that defense counsel keeps saying that, oh, well, the communications between Mr. Tarrio and Officer Lamond were not that important because Mr. Tarrio had already confessed publicly. But they are still important because there were other suspects that were involved. There was an ongoing investigation and I don't think that there's any detective or any law enforcement officer that would say that communications with a suspect are not important and should not be provided. So we simply don't think that that's credible.

Your Honor, regarding Telegram, the defendant, we asked him about the encryption in the cross-examination. He admitted multiple times that he used Telegram because he wanted less people to see it. It's one thing for Mr. Tarrio to say, "I didn't want people to see my communications." He's the criminal. The defendant is the police officer. He should not -- if he thinks that he's doing everything above board, he should not be concerned that other people are going to see these communications.

It simply doesn't make sense that the defendant is the one setting the self-destruct timer. He should be the one, not only if he's going to use Telegram, preserving those communications, taking a snapshot of them, making a written report, in some way document those communications that were

with a suspect. So we think that that is relevant.

Also, the defense counsel said that, well, if Mr. -- if the defendant really wanted to cover up all the Telegram messages, he would have deleted the app. But what he left out and what was in the testimony, is actually what the defendant did was not only did he set the self-destruct timer on certain important communications after Mufti reaches out, and about the warrant, but he deleted all of the Telegram communications with Mr. Tarrio prior to January 6th.

He didn't delete all of the communications with Mr. Tarrio because he left the ones that occurred after January 6th, when they started a new chat. So he deleted the communications that were inculpatory. And, so, I simply don't think that that argument holds much weight.

Your Honor, regarding the arrest warrant, you know, it's interesting, Mr. Tarrio's testimony is just simply not credible because if Your Honor looks at the pattern of communications, whenever he received relevant information from the defendant, he did the same thing. He would send a chat out to other Proud Boys when it was about the hate crimes enhancement, immediately sends a chat out to the other Proud Boys. When it's about the arrest warrant being submitted, he starts an emergency chat.

It's the same pattern of communications over and over again. And Mr. Tarrio did that again on the 4th. He gets on

the plane, he sets a self-destruct timer. It was already at 30 seconds. There was something in the communication that he was going to send that he did not want anyone to see and that's why he sets it down to 10 seconds. If he was just finding out whether or not Mr. Tarrio was on the flight, why would he set that timer down from 30 seconds to 10 seconds? It's because he had important information.

And now defense counsel is arguing, well, he didn't actually send a text. It is simply not credible because every other time he went into Telegram, he sent a text message, that he goes in, goes through the trouble of clicking on the application, clicking on the chat, reducing the timer to 10 seconds and then decides not to send anything. And then it just so happens that Mr. Tarrio's immediate reaction after that is to tell everybody that there is an arrest warrant. The defendant is the only person that he was communicating with that day that knew an arrest warrant had been signed. So, we simply do not believe, Your Honor, that that is credible either.

Defense counsel also keeps arguing that the defendant sent photos from the burning to aid in the investigation. That's not true. Your Honor saw the evidence. He sent an AP photo and a news article photo of the defendant that day. The people who sent the photos from the actual banner burning was Detective Then, and he said that he could -- the defendant said

that he could not identify Tarrio in that photo. And then in response, he gets that call from Leslie Parsons, and following the call from Leslie Parsons, Nicole Copeland sends two additional photos of Tarrio at the banner burning and that's the one where the defendant IDs him.

But it's important to note that in that photo Tarrio is not burning the banner. He's not actually committing a crime. He's just standing there. The defendant never identified Tarrio in the photo where he's actual kneeling down with the lighter in his hand. So we believe that's also important to clarify.

Defense counsel also tried to minimize the testimony of Jeffrey Carroll, that Jeffrey Carroll is just testifying about the way things should be. But Jeffrey Carroll was the defendant's supervisor and he's saying that none of this was -- if it was on the up and up, it was never reported to him. There was a process if he wanted to disclose it, which would have been to get Jeffrey Carroll's authorization, and that -- just as the defendant is a 24-year veteran, so is Jeffrey Carroll, and they all know that this is not the way things are done. You don't interfere in somebody else's investigation, you don't tell a suspect what evidence they have against them. That's just simply not the way that it's done and a 24-year veteran of law enforcement knows that.

So, Your Honor, we believe that based on all of this

evidence, if you look at the text message communications where we believe that is where Mr. Tarrio is telling the truth because he's not in court testifying, he's talking to his fellow Proud Boys. He has no reason to lie. And one of the most damning pieces of evidence, Your Honor, is when they're in the garage, at that point the arrest warrant's happened. He's not putting up a circus tent, or whatever he called it, he's talking to his close friends and he says, "I learned in the air." And that's because he did, he did learn in the air, when the defendant used Telegram to tell him there was an arrest warrant. And he says, "He texted me from the air." He, the defendant, texted him. It's very clear. His MPD contact, his source, the person he got information from throughout the entire period of the banner-burning investigation.

So, Your Honor, we believe the evidence shows that the answers that the defendant gave to law enforcement during the interview were false. Never asked for a follow-up, he never looked confused, according to the testimony. And when they wanted to get his phone at the end of, it he resisted.

So we believe that there is evidence that he is guilty of each of the false -- three false statement counts and we believe that there is overwhelming evidence, Your Honor, beyond a reasonable doubt, that the defendant obstructed the investigation. If he wanted Mr. Tarrio to be arrested immediately, he would have told law enforcement on the 15th

about the confession, he would have told law enforcement between the 15th and the 19th about all the communications he was having, he would have told law enforcement when Tarrio said it was strange that they didn't have him on video burning the banner. That's an important piece of information. He would have recorded those communications. He would have said to somebody at CID, hey, I'm going to get Tarrio on the phone, you can sit here, we'll record the communication, I'll see if I can get anything inculpatory from him during that call. He never did that. He used Telegram, for which there would be no record of the call.

So, Your Honor, he was not trying to assist the investigation, put up his hand so that he could collect intelligence and provide it back to Enrique Tarrio, because that's who he was serving, starting from the banner burning on, he was serving Enrique Tarrio. He was, as we said in opening, he was a double agent for the Proud Boys. And he admitted, even after January 6th, after all those officers fought at the Capitol to push back against the Proud Boys and the other insurrectionists, the next day he sends a text to Tarrio saying he sympathized with their cause.

So, Your Honor, we believe there's evidence beyond a reasonable doubt, and we ask that the Court return a verdict of guilty on all four counts.

THE COURT: Thank you.

Thank you, everybody. I have the case under advisement. I'm looking forward to receiving the memorandum on the legal issue that's up in the air, but now I need to take everything I've heard, the arguments, the communications, all the evidence and go over it. And when I'm prepared to set a date to give you my verdict, that's when I will set a date for giving you my verdict.

So thank you, everybody.

MR. SCHAMEL: Your Honor, may I have one question?

THE COURT: Okay.

MR. SCHAMEL: Today -- I know that we're turning in the briefs today, but you didn't identify it as 5 o'clock. Is after 5 o'clock fine? We're just going to go back and finish it.

THE COURT: I understand that anytime a judge issues an order and calls for something to be due on a particular date, that it's going to arrive somewhere between 11:30 p.m. and midnight. And only if it's something that I need before that time do I say by 5 p.m. So I didn't give you a cutoff. It would be helpful, I'm sure, to the government, that is seeking to reply to it, if they got it sometime during the business day, but if they don't and they need more time, they know how to ask for it.

MR. SCHAMEL: I think we can make 5 o'clock, if that's what you're -- I just wanted to make sure.

THE COURT: Okay, then make 5 o'clock.

MR. SCHAMEL: I'll do my best.

* * *

CERTIFICATE OF OFFICIAL COURT REPORTER

I, JANICE DICKMAN, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 1st day of February, 2026

/s/__________________________________

Janice E. Dickman, CRR, CMR, CCR
Official Court Reporter
Room 6523
333 Constitution Avenue, N.W.
Washington, D.C. 20001

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

United States of America, ) Criminal Action
) No. 23-cr-177
Plaintiff, )
) VERDICT
vs. )
) Washington, DC
Shane Brian Lamond, ) December 23, 2024
) Time: 9:38 a.m.
Defendant. )

---

TRANSCRIPT OF VERDICT
HELD BEFORE
THE HONORABLE JUDGE AMY BERMAN JACKSON
UNITED STATES DISTRICT JUDGE

---

A P P E A R A N C E S

For Plaintiff: Joshua Rothstein
Rebecca Ross
United States Attorney's Office
601 D Street NW
Washington, DC 20530
(202) 252-7164
Email: Joshua.rothstein@usdoj.gov
Email: Rebecca.Ross2@usdoj.gov

For Defendant: Mark E. Schamel
Ana L. Jara
600 Massachusetts Avenue NW
Washington, DC 20001
(202) 344-4631
Email: Meschamel@venable.com
Email: Aljara@venable.com

---

Court Reporter: Janice E. Dickman, RMR, CRR, CRC
Official Court Reporter
United States Courthouse, Room 6523
333 Constitution Avenue, NW
Washington, DC 20001
202-354-3267

* * * * * * *P R O C E E D I N G S* * * * * * *

THE COURTROOM DEPUTY: We are on the record with criminal case 23-177, *United States of America versus Shane Brian Lamond*.

Counsel, starting with the government, please state your appearance for the record.

MR. ROTHSTEIN: Good morning, Your Honor. Josh Rothstein on behalf of the United States. With me at counsel table is AUSA Rebecca Ross, FBI Special Agent Liz Hadley, and Paralegal Specialist Lisa Abbe.

THE COURT: Has baby arrived or baby on the way?

MR. ROTHSTEIN: I'm just hoping before the new year. But it's on the way.

THE COURT: Good morning.

MR. SCHAMEL: Mark Schamel. I'm joined by my colleague, Ana Jara, by video. I appreciate that.

THE COURT: The ruling is going to be whether the government proved the four charges brought beyond a reasonable doubt. I understand that the defendant was particularly chagrined by the suggestion that he was a double agent, a sympathizer to the Proud Boys, or any of the more damning characterizations that have appeared in the press, such as that he was corrupt. And I want to say at the outset, that's not part of this case. It's not what the government has to prove, it's not what it has proved. It's not part of the findings to

be made or my reasoning underlying the findings. There's no suggestion that the defendant stood to benefit personally from any of the alleged conduct.

I do note that to the extent it's in the record there, it's only there by virtue of the defendant's own statements made in secure, encrypted chats with Enrique Tarrio. In particular, one from January 8th. And the defense suggested that he was just saying he supported the Proud Boys to create rapport and to gain more information. But that statement wasn't made at a time when he was trying to gain information. It was made two days after one of the worst attacks on democratic institutions in U.S. history and not followed up with any questions. And it was also consistent with kind of the us-versus-them chummy tone, the LOLs used throughout his conversations with Tarrio, commiserating about the election, disparaging antifa and Black Lives Matter.

But even if the defendant meant, "Personally, I support you all sincerely," it's not clear what that means. It could mean that he simply shared Tarrio's support for Trump's candidacy. He wasn't alone in that. It could mean that he agreed the election might have been unfair. It could mean that he shared Tarrio's dismay over the more destructive Black Lives Matter protests, the taking down of Confederate statues. In short, that he agreed with many things that fall far short of the far-right white supremacist views with which the Proud Boys

have also been associated.

So I want to assure the defendant that as the sole factfinder in this case, all of that, as far as I'm concerned, is just noise, rhetorical icing on the government's case, and not the basis for my decision, although I've given all -- and also, given all the care we took throughout the trial to keep the more odious stuff out of the case, I'm not sure why the defense counsel decided to inject it back in by using words like "terrorists" and "scumbags" when talking about the Proud Boys in his closing. But I just want the defendant to know that none of that has anything to do with him and that's not what I'm going to be thinking about when I rule.

Another introductory matter I wanted to bring up before I rule is I don't think it escaped anyone's attention that Enrique Tarrio was an awful witness. He was one of the worst I've had the opportunity to sit next to during my tenure on the bench. He saw his appearance as an opportunity to advance his own agenda, whatever that may have been, possibly to use as an opportunity to attack the legitimacy of his January 6 conviction and advance his effort to obtain a pardon. Maybe just to reassert his leadership of and loyalty to the group after being depicted in the press as a potential turncoat or snitch. And he was flippant, grandiose and obnoxious, despite his repeated claim that that was what he didn't want to be.

I will take up whether his testimony on specific points was credible or gave rise to a reasonable doubt when I have to address those points in connection with the relevant counts. But while I may have questions about the decision to call him as a witness, I also want to assure the defendant that I am not holding Tarrio's disrespectful attitude towards these proceedings, or any court proceedings, against him. And I'm not attributing that attitude to the defense team. That was Tarrio's personal performance.

And, also, while Tarrio's attempt to reassert his Fifth Amendment privilege mid-testimony was legally unsupported, in the end -- probably due more to the subject matter of the questions than his acceding to my instructions -- he didn't do it again. And that episode which, again, I understand was not engineered by the defendant, does not bear heavily on my assessment of his credibility and it doesn't bear at all on my assessment of the defendant's credibility.

Before I go on to the counts, there is a pending motion that I have to address first. At the close of the government's case, the defense argued that the defendant had been charged under the wrong statute and that the decision of the D.C. Court of Appeals in *Wynn versus United States*, 48 A.3d 181, from the D.C. Court of Appeals in 2012, requires a finding that the D.C. obstruction of justice provision underlying the indictment, Section 22-722(a)(6), does not cover the

circumstances alleged in this case. The defendant elaborated on this contention in a written motion styled as a motion for judgment of acquittal, Docket 90, arguing, quote, The government has not proven, and cannot prove as a matter of law, Mr. Lamond guilty of obstructing an official proceeding in the due administration of justice because no such proceeding exists."

Section 22-722(a)(6) provides that, quote, A person commits the offense of obstruction of justice if that person corruptly, or by threats of force, any way obstructs or impedes or endeavors to obstruct or impede the due administration of justice in any official proceeding. Official proceeding is defined as any trial, hearing, investigation, or other proceeding in a court of the District of Columbia or conducted by the Council of the District of Columbia or an agency or department of the District of Columbia government, or a grand jury proceeding. And that's at 22-721-4.

Count 1 charges that between December 13th, 2020, and January 4th, 2021, defendant willfully and knowingly did corruptly obstruct and impede and endeavor to obstruct and impede the due administration of justice in an official proceeding, that is, the investigation and prosecution of destruction of property arising from the December 12th, 2020, burning of a banner that read "Black Lives Matter" in Washington, D.C. And as the government explained in its

opposition at Docket 91, it's undisputed that the Metropolitan Police Department is a District of Columbia agency and that it conducted an investigation into the burning of the banner.

The defense maintains that under *Wynn*, though, the investigation and prosecution of a crime by MPD cannot constitute the due administration of justice in any official proceeding as a matter of law.

In *Wynn*, officers responding to the scene of a shooting observed and arrested three individuals for making efforts to hide firearms. They saw a man crouching next to a car who had one gun at the car when they approached and then he and two other men fled to an apartment where they hid another gun. All three were convicted of obstruction of justice under Section 22-722(a)(6).

On appeal of the obstruction convictions, the D.C. Court of Appeals held that the language of Section 722(a)(6) did not encompass an initial police response to the scene of a crime. That's a quote from page 191.

First, the Court considered the meaning of "official proceeding," which is statutorily defined as any trial, hearing, investigation, or other proceeding in a court of the District of Columbia or conducted by the Council or an agency, as I just read. The Court chaffed at giving the definition its literal meaning and observed that on its face the term "official proceeding" suggests a formal event. Following that

logic, the Court noted that any proceeding -- that the word "proceeding" may comfortably be used to describe investigations by a grand jury, the Council, or various administrative agencies -- that's at page 189 in Wynn -- without addressing the Metropolitan Police Department specifically.

The *Wynn* court also took note of the legislative history of the provision. Prior to 1993 "official proceeding" was only defined as any trial, hearing, or other proceeding in any court or any agency or department of the District of Columbia government. And *Wynn* observed that this language was meant to capture proceedings in which rights, issues, or other matters are adjudicated, as well as investigatory proceedings, such as grand jury proceedings. That's *Wynn* at 190.

Since the terms "investigation conducted by the Council of the District of the Columbia" and "a grand jury proceeding" were the ones that were all added in 1993, the *Wynn* court opined that "investigation" was inserted, quote, with the clear intention of adding formal investigations by the grand jury and the Council.

I'm not sure I agree with that, given the structure of the provision as amended, by that's what it said.

The Court acknowledged, though, that the term "official proceeding" standing alone could conceivably include an initial police investigation of a street crime. It said that at 191. But since the statute prohibits obstructing or

impeding the due administration of justice in any official proceeding, the Court also went on to consider the meaning of "due administration of justice."

The *Wynn* court observed that the term "due administration of justice" is, quote, used primarily, if not exclusively, to describe the proper functioning and integrity of a court or hearing. And, therefore, it held that officers, quote, rushing to the scene of the crime of a street shooting and responding to an emergency situation, close quote, were not engaged in the due administration of justice and the obstruction of justice convictions were overturned for that reason.

I think the defense mischaracterizes *Wynn* when it tells the Court that the case, quote, forecloses the literal reading of "investigation" in 22-722 to include a routine criminal investigation by the MPD as an official proceeding in the due administration of justice, which it said at page 3, citing *Wynn* at 191. And it also said it excludes, quote, routine investigations police undertake, on page 5 of its motion. But *Wynn* didn't go that far. It's quite a leap to get routine police investigation out of, "officers rushing to the scene" and "emergency situation."

Moreover, *Wynn* does not control this case because while the discussion may have been wide-ranging, the Court's holding was addressed to the narrow circumstances before it.

It said, quote, We conclude that the Council did not intend for the due administration of justice in any official proceeding to include an initial police response to the scene of the crime. That's what it says on page 191, not "routine criminal investigation."

And the Court repeatedly made references to the unique set of facts before it. It said, quote, It is unclear what a "proceeding," much less "an official proceeding," would mean in the context of a rapidly unfolding MPD response to the sound of gunshots. It said that at page 189.

This case does not present those problems. It's not at all analogous to the initial police response to a crime and the *Wynn* Court's worried observations about and the principles derived from the fact pattern before it don't govern here.

In this case, the crime, or crimes, as there were multiple banners burned, were complete as of December 12th and there were no arrests made on the scene for that. As of December 13, nothing was rapidly unfolding and no one was in hot pursuit. The police did not know the identity of the individuals involved and they initiated a cool-headed investigation to try to figure that out. And this was not simply routine follow-up by uniform patrol officers in one of the city's districts. The matter was being handled by the citywide Special Riot Task Force and the citywide Criminal Investigation Division.

In addition to deciding who should be arrested, the investigators had to determine the nature of the charge or charges. Should it be subject to the hate crime enhancement? And since the incident received a great deal of publicity, this was a high priority, high profile investigation being overseen at the highest levels of the department, up to and including the chief.

So from December 13 through Tarrio's arrest on January 4, this was an ongoing investigation by a D.C. agency into whether charges and which charges would be brought in court and against whom. And since no one had been apprehended in the immediate aftermath of the offense, it was going to be necessary to submit applications for arrest warrants to D.C. Superior Court in order to bring charges. There could be no prosecution without first presenting evidence to the Court.

Thus, the MPD's investigation and official proceeding underway between September 13th and January 4th directly implicated and the withholding of information and/or unauthorized disclosures of information could well impede the due administration of justice, which *Wynn* defined to include the proper functioning and integrity of a court.

This holding is consistent with the handful of cases that have addressed the official proceeding requirement after *Wynn*. The cases cited by the defendant are not helpful as they arose in circumstances comparable to *Wynn*. In *Jenkins versus*

*the United States*, 113 A.3d 535, from the D.C. Court in 2015, the defendants were convicted of obstructing for, quote, attempting to dispose of firearms. Two other individuals had tossed the firearms while fleeing the police and the defendants later returned to the area to retrieve them.

All the opinion had to say was that under *Wynn* the government now concedes, and we agree, that the evidence doesn't support those convictions, citing *Wynn*. And in *Mobley versus United States*, 101 A.3d 406, two defendants were convicted for obstruction where one defendant threw a gun while fleeing the police and the other subsequently went to look for it. The Courts reversed the convictions under *Wynn* because the any-official-proceeding requirement was not met, again citing *Wynn*.

The government also cites to cases, but they aren't particularly helpful either, as both arose under a different statute, D.C. Code Section 22-723, tampering with physical evidence. That statute says, "Tampering with physical evidence if, knowing or having reason to believe an official proceeding has begun or knowing that an official proceeding is likely to be instituted, a person alters, destroys, mutilates, conceals, or removes an object with intent to impair its integrity or its availability for use in the official proceeding."

In *Mason versus United States*, 17 A.3d 182, the defendant was convicted of tampering for setting two getaway

cars on fire immediately after a robbery in order to destroy the physical evidence. On appeal the defendant argued that after *Wynn* a police investigation could not satisfy the official proceeding requirement. The Court did find that the definition of "official proceeding" under Section 22-721-4, the same one that we're bound by, includes an MPD investigation by its plain language, and that holding is helpful here. But that's only the first portion of the question before the Court.

*Mason* made it clear that *Wynn* involved a different statute, which included the "due administration of justice" language not present in the tampering statute. So the *Mason* Court's work was over with official proceeding, but this Court's is not. And the same is true of *Taylor versus United States*, 267 A.3d 1051.

There have been two other post-*Wynn* cases, though -- one cited by the government -- in which convictions under 722(a)(6) were affirmed. In -- I don't know how it's pronounced -- *Decuir*, D-E-C-U-I-R, *versus United States*, 285 A.3d 512, while the defendant was in jail in connection with a murder, he called his girlfriend and, using coded language, told her to tell somebody else to move his firearms to prevent law enforcement from finding them. The Court held that defendant's communications with another person to prevent law enforcement from locating firearms during their investigation of a homicide fell within the meaning of 722(a)(6).

In *Brown versus United States*, 89 A.3d 98, from 2014, the Court of Appeals considered whether a defendant's untruthful statements during a police interview constituted obstruction. The defendant had been present during an argument in which a person was shot. After the shooter was arrested, the defendant told the police that he didn't know the shooter's name or identity, which law enforcement later learned was a lie.

That defendant appealed his conviction for obstruction, arguing that his untruthful statements to detectives were not made in any official proceeding. The Court held that even though the defendant's untruthful statements were not made during the grand jury investigation of the shooting, they fell under Section 722(a)(6) because the defendant knew, one, that the shooter had already been arrested and, two, that lying to detectives could obstruct or impede the due administration of justice in an official proceeding, that is, a pending criminal prosecution that involved details about the shooting. And they cited Section 722(a)(6), emphasizing that a criminal pending prosecution is unquestionably covered by the definition of official proceeding. Because the defendant knew that law enforcement was investigating the shooter and lied about information that would identify him, the Court upheld his conviction under 22-722.

The allegations against Lamond are more analogous to

those in *Decuir* and *Brown* than a suspect fleeing the scene and tossing a gun. Since, as in *Decuir*, the alleged failures to disclose this information -- his knowledge of information connecting Tarrio to the banner burning occurred during the course of a criminal investigation that Lamond was well aware was underway and, as in *Brown*, the withholding of information and destruction of communications with Tarrio made evidence unavailable for the prosecution of that case, the available authority supports a finding that this case involves the due administration of justice in an official proceeding.

And even if I'm incorrect about that, there's another fundamental problem with the defendant's motion. Federal Rule of Criminal Procedure 12(b)(3) lists the motions that must be made before trial and it includes a motion alleging a defect in the indictment, including failure to state on offense. On July 19th, 2023, I entered a scheduling order directing the defendant to file any motion alleging a defect in the indictment by August 21st, 2023. The scheduling order is at Docket 21.

In August the defense requested an extension of that deadline, to September 21, 2023, and I granted it. The defense did not then, or ever, file any motion challenging the indictment at any time before the December 2024 trial. Nor did the defendant ever file a motion for a bill of particulars under Federal Rule of Criminal Procedure 7(f), complaining that

he was not on notice of the essential facts constituting the offense charged.

So the defense understood the theory underlying the case, but didn't test it when the government could have cured it. Therefore, the motion was filed way too late and it can be denied for that reason as well.

The defendant took the position that the motion was not late, it's a motion for judgment of acquittal under Rule 29 that turns upon the sufficiency of the evidence. But mere labeling doesn't alter the essential nature of the defendant's motion, which began by asserting, quote, The government has not proven, and cannot prove as a matter of law, Mr. Lamond guilty of obstructing an official proceeding in the due administration of justice.

Therefore, the motion is plainly alleging a legal defect in the indictment and it's denied on the merits because it does allege an offense that falls under Section 22-722(a)(6) as a matter of law and also because it was not filed until the trial was over. And if this was more properly characterized as an evidentiary determination, the evidence viewed in the light most favorable to the government was sufficient to establish that what the defendant allegedly obstructed was the due administration of justice in an official proceeding for all the reasons I've just listed.

So that takes care of the motion for judgment of

acquittal and we can move on to the ruling on individual counts.

Since I reserved the Rule 29 motion at the close of the government's case, I will briefly address the sufficiency of the evidence for purposes of Rule 29 as to each count and then I will address whether the counts have been proved beyond a reasonable doubt.

I'm going to take up the false statement counts first, beginning with Count 4, and then return to Counts 2 and 3, and then back to the obstruction count.

The standard I will be applying for the motion of judgment of acquittal is set out in *United States versus Davis*, 562 F.2d 681, at 683, from the D.C. Circuit in 1977. It's only when there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt that the judge may properly take the case from the jury.

Put another way, as the Circuit said in *United States versus Weisz*, 718 F.2d, at 437, citing *U.S. versus Singleton*, 702 F.2d 1159, from the Circuit in 1983, a District Court may grant a motion for judgment of acquittal only when a reasonable juror must necessarily have had a reasonable doubt as to the defendant's guilt. And in evaluating a motion for judgment of acquittal, as everyone knows, the Court should consider the evidence in the light most favorable to the government. That's *United States versus Wahl*, 290 F.3d 370, at 375, from the

Circuit in 2002. The standard was also set out in *U.S. versus Treadwell*, 760 F.2d 327, at 333, from the Circuit in 1985.

There is one more preliminary issue that I want to touch on that bears on all these counts and that is the MPD General Orders. It's important to emphasize the defendant is not on trial for the violation of MPD General Orders or the Rules of Ethics, and it's not necessary to find, for the purpose of any charge, whether he did or did not violate any of them. But their existence does bear on whether he made false statements knowingly and willfully, and also on the element of the obstruction of justice charge that the defendant acted knowingly and corruptly, with consciousness of wrongdoing when he allegedly interfered with the ongoing MPD investigation.

The defense devoted considerable time to mudding the waters by quibbling with witness after witness about the definition of, quote, confidential, law enforcement sensitive, need to know, whether these documents were classified, even though the witnesses were not using those words as defined terms or terms of art, but as general ways to talk about someone giving out information he was supposed to keep close. And even though none of the MPD rules introduced as background for these offenses actually use any of those words, except "confidential," with a small c. So all of that was largely beside the point.

What do the MPD rules that have been introduced

actually say? Government's Exhibit 3002 is the general order entitled Duties, Responsibilities, and Conduct of Members of the Department. Under Section 5, Rules and Responsibilities, Subsection A, "Members shall," and then in paragraph 16 under that, "Members shall not interview subjects or suspects or conduct any investigation or initiate any inquires into the case of another member without the consent of that member or authorization from the commanding officer." There are no exceptions and there are no vague terms subject to interpretation.

Government's Exhibit 3003, the MPD Sworn Law Enforcement Officer Code of Ethics. Section 3, Regulations, begins, "Sworn members shall abide by the following MPD law enforcement officer code of ethics," which includes, in the second paragraph, "I will be exemplary in obeying the law and regulations of my department. Whatever I see or hear of a confidential nature or that is confided to me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty."

It has nothing whatsoever to do with classified material, although we heard a lot of questions about it. And it has nothing to do with whether material was sealed and it has nothing to do with whether material was stamped or labeled "confidential." It says, "Matters of a confidential nature." And "confidential" isn't a defined term, it's not in quotes,

it's not capitalized. It's plain English.

And if that one word is somehow subject to interpretation and insufficiently clear, the second part of the sentence, "or whatever that is confided to me in my official capacity," is clear as day.

The defense scoffed in the closing that it's not a general order, it's just a rule of ethics. Well, does that matter? The section begins with the admonition that all sworn MPD officers shall follow them. It doesn't suggest that they're aspirational or that they're suggestions. They are rules. And the rules begin with this introduction: "Ethics is defined as a code, system, or body of moral principles or good conduct, particularly a system for a group of people or a profession, such as law or medicine. Ethics deals primarily with values, what is good, what is bad, what is right and what is wrong. The responsibility to act ethically rests with every sworn law enforcement officer when he or she goes about his or her professional duties and in his or her personal life."

The Metropolitan Police Department derives its authority from D.C. Official Code Section 5-127.04. "With this authority sworn law enforcement officers investigate other people, abridge normal liberties and use force when necessary. Therefore, it's imperative that sworn law enforcement officers of the MPD epitomize the highest degree of ethical behavior when serving people who work and visit Washington, D.C."

So I think it's fair to consider even ethical rules when we must consider if the defendant acted with an understanding or an awareness that what he was doing was wrong.

Finally, there's Government's Exhibit 3005, General Order 601.02 regarding preservation of potentially discoverable material. Under that, Section 2 as to the policy is broad. It says, "The policy of the Metropolitan Police Department is to preserve all materials which may constitute evidence or may otherwise be pertinent in a subsequent criminal judicial proceeding." It includes any written statement. It's pretty cut and dried and we can't quibble over the fact that it doesn't call out specifically statements transmitted over a social media application.

So that is part of our background. And I'm going to turn now to Counts 2, 3, and 4.

The elements of making a false statement, each of which the government must prove beyond a reasonable doubt as to each count, are that the defendant made a materially false statement or representation, that in doing so he acted knowingly and willfully, and that the materially false statement or representation was made in a manner within the jurisdiction of the executive branch of the government of the United States.

With respect to the first element, a statement is false if it was untrue when made and known at the time to be

untrue by the person making it. A statement is material if it has the natural tendency to influence or is capable of influencing the decision of the decisionmaker to whom it's addressed.

With respect to the second element, an act is done knowingly if it's done purposefully and voluntarily, as opposed to mistakenly or accidently. A false statement is made knowingly if the defendant knew that it was false. A person acts willfully if he acted with the knowledge that his conduct -- that is, in answering untruthfully, not the conduct being discussed -- was unlawful. I don't believe there's any dispute as to whether the defendant knew it was unlawful to make a false statement to a federal investigator. This case turns on whether his statements and answers were false or knowingly false.

With respect to the third element, the office of the United States Attorney for the District of Columbia within the U.S. Department of Justice is a part of the executive branch of the government of the United States. Not an element that's in dispute.

Finally, the government does not need to prove that the defendant had a purpose to mislead the federal agency or that it was in fact deceived or misled. It's not relevant whether the statements actually influence the actions of the agency.

So starting at the bottom of the indictment, Count 4. Count 4 alleges that the defendant committed this offense on June 2nd, 2021, when he stated in an interview conducted by federal law enforcement officers, that is, the special agents assigned to the U.S. Attorney's Office, that he, quote, didn't, you know, inform Tarrio that Tarrio had an arrest warrant.

Under Rule 29, resolving all inferences in favor of the government, the evidence was sufficient, given the inferences supported by the chronology. In accordance with the FAA and American Airlines records that were introduced in evidence, Government's Exhibit 2007, the plane took off at 12:55 p.m. The defendant goes into his Telegram application at 1:02 p.m., opens up the ongoing higher-level-of-encryption secret chat with Tarrio and resets the self-destruct timer that would be applicable to the next message for 10 seconds. The last setting had been for 30 seconds.

Tarrio, on the plane, has to sign up for WiFi, shown on Government's Exhibit 2008, and has to get to the altitude where it actually works and he can send and receive messages, and that happens at 12:28 p.m. By 1:30 p.m. he's on and his very first outgoing message is a private chat with someone whose name on Telegram is Mamafe. It's someone who appears to be close to him. I think Agent Hadley testified at one point that she was a girlfriend, but who was and wasn't isn't quite clear. But, he tells that person, "Warrant was signed."

At 1:30 p.m. Tarrio has another Telegram private chat -- still the same minute -- with someone who's referred to on Telegram as Avva, or Avva, who also appears to be a girlfriend -- she refers to Tarrio as "babe" -- and he tells her, "Warrant for my arrest was just signed." And when she responds, "Will they take you on stage?" He says, "I don't know if my contact will tell me this," giving rise to the inference that the information about the warrant came from his contact.

I need to say here, with respect to this and every other reference by Tarrio to his "contact," or his "MPD contact," there is no evidence of any other contact. Tarrio tried to quibble for a while that the defendant was his liaison, not his contact, but he eventually said that the two things were, as they are, the same. And the government has established beyond a reasonable doubt, repeatedly, that the defendant was the contact that Tarrio was referring to every single time because he wasn't talking to any other police officer, at least through any of these applications or messages.

At 1:31 p.m. Tarrio opens up his private chat on Telegram with the Ministry of Self Defense group within the Proud Boys and says, "The warrant was just signed." And he keeps sending more messages just like that to Bianca TuVoz, Skull and Bones, another Proud Boys group, and Jacob Engels.

He's arrested, he has his hearing. He gets released from court, he ends up in a parking lot at the Willard on the evening of January 5th and we see him, on video, report to members of his close circle, "He texted me in the air."

Therefore, resolving all inferences in favor of the government, there was enough evidence for a reasonable juror to infer that Lamond's statement that he didn't tell Tarrio was false and that the defendant, given the circumstance of the interview and knowing what was at stake, made the statement knowingly and willfully.

So since I found that the government got over that hurdle, I have to issue my verdict. And having reviewed the entire record, including the entire transcript and audio recording of the interview, as well as all of the messages between the defendant and Enrique Tarrio, assessing the defendant's answer within the context of the interview and within the context of the questions that immediately preceded the statement, I find the defendant guilty of Count 4.

Is the evidence circumstantial? Yes. But that doesn't receive less weight and there are other circumstances, in addition to the ones that I just listed. I agree with the government's characterization of this information as being volunteered and I agree that that fact supports a finding of willful misleading.

Yes, the defendant was told broadly at the start of

the interview, in the transcript, Government's Exhibit 5006, at page 3, that the agents had been brought in because, quote, there's been some information that's been developed that it appears that Tarrio and some of the others may have been getting information that they shouldn't have had.

The information was not further identified at that point though and nothing at all was said about the warrant or Tarrio's arrest. We don't get to his arrest until the bottom of page 12, or 10 minutes and 38 seconds into the interview, when the agents ask what was the game plan? Lamond explains that he knew Tarrio was coming to D.C. but not when, so he reached out to TSA and passed that information on. And actually he was asked to do that, so he's sugarcoating it a little bit.

But at any rate, in the transcript, at page 13, on line 16, the question is asked by Agent Molnar, "And was the decision made with MPD to do it, kind of, without him knowing or to try to get him to turn himself in?"

Mr. Lamond, "I believe it was, yeah, without him knowing."

Agent Molnar: "Okay."

Lamond: "And that's handled from the criminal investigation division, so at least I" -- Molnar sort of talks over him -- "so they made their determination?"

Mr. Lamond: "Yes. But I know that I didn't, you

know, inform him that he had arrest warrant."

Agent Molnar: "No."

Lamond: "And I don't know, I mean, I don't think they contacted him to see if he'd, like, turn himself in."

So the defendant was the first one to bring up the subject. He offers up that he didn't tell Tarrio about the warrant when that question wasn't on the table. It supports the finding that he was deliberately trying to mislead. I note that "I don't think they contacted him to see if he would like to turn himself in" is also somewhat misleading, since he knew that that wasn't what they were doing.

The defendant's testimony on the stand that he stated, "I didn't tell him because the agents brought it up first" wasn't helpful because the agents didn't tell Lamond that one of their concerns was that Tarrio was aware of the warrant until after he volunteered that he didn't tell him. That happens on page 14 of the transcript.

In general, the case did not improve for the defendant with the presentation of a defense. The defense made the questionable judgment to call Enrique Tarrio as a witness and, in effect, sponsor him as credible and didn't seem to have spent sufficient time with him in advance to have an idea of what he was going to say. Neither his explanation of these exchanges, nor the defendant's, make any sense and neither give rise to a reasonable doubt.

Before I assess the credibility, though, I want to review what the texts themselves say and we need to back up a bit to put it in context. If you look at Government's Exhibit 4018, on December 21st and 22nd, Lieutenant Mufti has transmitted a request for a warrant to the U.S. Attorney's Office. And what does Lamond do? He tells Tarrio.

December 25th, 12:14 p.m., there's a Telegram secret chat with a self-destruct timer set to 30 seconds. And he writes, quote, Just a heads up, CID had me ID you from a photo posted on Parler, kneeling down next to the BLM banner, so they may be submitting an arrest warrant to the USAO, close quote. This was volunteered, not in response to any question from Mr. Tarrio.

The fact that he is giving a heads-up regarding this critical piece of information, as yet completely unknown to Tarrio, supports the notion that he continued to update Tarrio as he learned more. Defendant acknowledged on cross-examination that this was absolutely information he learned by virtue of his duties as an MPD officer, that it wasn't his case, and that it wasn't his information to share.

Putting aside whether I agree that there's some exception to the rules that would say it's okay for an officer leaking the information, who hasn't told the officer running the investigation that he's doing it, to determine in his own interests, in his own judgment, whether the material is -- the

information is material or would be useful to the suspect and then share it, that exception couldn't possibly apply here.

We heard testimony that this investigation was being handled at the highest levels of MPD as a priority, high-profile case and there was no plan to let Tarrio know a warrant was forthcoming; there wasn't ever and there certainly wasn't at that point. And it was new and important information which Tarrio immediately put to use.

After that, on December 28th, at 5:41 p.m., American Airlines' records show that Tarrio bought the ticket for January 4th. There's no evidence that he changed his flight, although that may have been a change in his original plan. Now that he knows, his goal is to take care of the matter on the 4th so he's out on the 5th and doesn't miss whatever he had planned that he wasn't telling Lamond about for the 6th. The holding of -- having a big circus tent about the banner wasn't the only thing on his mind, and the information was most certainly of value to him.

On December 30th, at 6:20 p.m., the defendant calls Tarrio on Telegram for 14 minutes. At 6:38 Tarrio immediately leaves a voicemail from Mamafe. At 6:38 he immediately convenes an emergency voice chat with the Ministry of Self Defense, and at 6:55 he sends a message to Mamafe saying, "My contact just called me. DA hasn't signed it yet." We know from records that Tarrio's contact did just call him and we

know from the other evidence that as of that time Lamond didn't know the warrant had been signed. It's not until December 31st, at 7:10 p.m., that Carroll tells Lamond to call John Branch with Tarrio's arrival information. And it's on January 1st when Lamond is telling other police that the U.S. Attorney's Office got the warrant, so we know he knows by then.

And, yes, as the defense notes, he didn't tell Tarrio on the 1st or the 2nd or the 3rd. But then we have the events I already described beginning immediately after Tarrio takes off, precisely timed. It's true, because there are no more messages exchanged in that now-deleted chat after the one just after Tarrio took off, the forensic examiner can't know for certain that he sent a message after he went to the trouble to go in and set the timer to self-destruct. But the factfinder can draw reasonable inferences and it's reasonable to think why would you bother to go into the chat and set the timer if you weren't about to send something?

Tarrio testified for the defendant and denied that Lamond called him on the plane and passed on information about the warrant. But his explanation for why he immediately reached out not only to members of the Proud Boys, but to close friends or relatives or girlfriends to tell them something that didn't happen was illogical and incredible. Why would he be lying to his inner circle?

First of all, the attempt to explain away those

messages is inconsistent with the fact that every other time in the record he attributed something to his contact, it was also immediately after the defendant told him that very thing. It's a pattern. Lamond and Tarrio talk and Tarrio immediately disseminates what he learned. For example -- and there are more than just these -- on December 18th, at 4:55, Lamond tells Tarrio what he's been telling MPD internally about the Proud Boys, whether they're racist, whether the banner burning should be considered a hate crime. That's at 4:55.

At 4:56 Tarrio pastes Lamond's message directly into a group chat with Scull and Bones. At 4:58 Lamond says, "I don't think they have pictures of you." And this doesn't come out of the blue because at 10:06 a.m. that same day, after Tarrio told him he'd called in the tip and claimed responsibility on his social media, too, Lamond said, "I will check with our CID people to see if they have you on video." Within the same minute after Lamond says, "I don't think they have pictures of you," Tarrio advises his group chat, "I just got word, we're clear on the banner." Then he promptly spins it for reporter Amy Harris, "D.C. Metro just told me they won't be pursuing it. FBI not investigating it."

Tarrio testified, "Well, I'm just using people as a focus group, to test how they would react to my plans for how I was going to deal with my arrest." But the message regarding the warrant doesn't discuss options, it just makes an

announcement. The warrant has been signed. And that certainly doesn't explain telling his close friends on January 5th, after he was arrested and after he was released.

Did he send this text out because he had a feeling before he got on the plane that he would get arrested and that's how he knew, not because of the message he got from Lamond? Maybe he did have a feeling, but not just because he was so intuitive, we know that Lamond told him that MPD was seeking a warrant on December 25th. Did he text it out because he was looking forward to it and wanting to make a big show of it? That's inconsistent with all the stuff he offered about being shadowed in the airport and then hiding in the men's room and asking other people to check on the guy outside.

Is that how he knew there was a warrant issued? He said that, too, in his testimony. But all that happened after he sent the messages, after he landed. So it isn't how he knew for sure at 1:30, although it may have been an additional reason he started calling reporters from his car later, along with the fact that he could see somebody tailing his Uber.

In the end, there was no reason to attribute the information to his MPD contact, if that wasn't where he got it. And I note that my assessment of Tarrio's credibility is based not only on the fact his story doesn't make sense, it's also based on his manner of testifying, his demeanor on the witness stand, which gave me little reason to find him worthy of

belief. So I find the defendant guilty of Count 4.

Count 2 alleges that the defendant made a false statement, in violation of Section 1001, on June 2nd, 2021, when he stated in the interview, conducted by federal law enforcement officers, that his relationship with Enrique Tarrio, quote, was more, you know, one-sided, with just him telling me, you know, what their plans were, close quote.

Under Rule 29, resolving all inferences in favor of the government at the close of the government's case, the entire set of messages themselves was sufficient to support a finding that this statement was knowingly and willfully false.

With respect to the verdict with respect to this count as well, I've reviewed the entire record, including the transcript and recording of the interview, as well as all of the exchanges between the defendant and Tarrio. Assessing defendant's answer within the context of the entire interview, as well as within the context of the exchanges that immediately preceded the statement, which were as follows:

Transcript of page 21, the agent's question was: "So, when he would reach out and ask questions, when he would be engaged, and when he would be -- would it be common for him to fish?"

And the answer was: "No, not really. He never really asked me questions about, like, you know, what we were doing or anything. It was more, you know, one-sided, with just

him telling me, you know, what their plans were."

The defendant has tried to suggest that there was something vague about the question. The cross of the agent tried to establish, unsuccessfully, that words like "fish," "one-sided," "tip-off," even "conversation" are just too vague to understand and that they call for an opinion and not a factual response, so the answers can't be false.

But the defendant understood perfectly. He asked for clarification at some points in the interview, but didn't say here, "What do you mean?" And when you listen to the video, you hear the question and you hear him say, right away, "No, not really." He just started to answer it. And on cross he acknowledged that he knew what it meant.

The defense says, well, look at the context. If you go backwards and start at page 16, from pages 16 through 20, the discussion with Special Agent Molnar was turned more towards the defendant's intelligence gathering, what we've been loosely calling the Proud Boy's First Amendment activities in D.C. In particular, what happened on January 6th. So that's what the fishing question was about.

That ignores the fact that immediately before the question both the defendant and the special agent, sort of talking over each other, agree at the same time to, quote, get back to, close quote, what they'd been talking about before. You can hear it on the audio, at Government's Exhibit 1016-A,

and you can see it in the transcript at page 20, line 25, through page 21, line 21. And that's where the question comes.

So it was a straightforward question. It had nothing to do with January 6th or First Amendment activities and had everything to do with Lamond's ongoing interactions with Tarrio before then.

And the defendant's answer was plainly, and I find, willfully false because the defendant mischaracterized the communications and the messages before the agents revealed they had his messages with Tarrio -- that happens on page 34 -- and did so in an effort to control the narrative and advanced his whitewashed version of the events.

In response to, "Did Tarrio fish?" He could have just said, "No, not really." But then he decides to bolster that with an affirmative statement, "He never asked me for information." But we know that Tarrio certainly did fish, so that was false. And the government has proved beyond a reasonable doubt that the relationship was not one-sided, with Tarrio providing information and not the other way around, because the evidence includes a series of undeniable communications where the defendant is giving Tarrio information and not the other way around.

Even if you put the call in the air aside, we've just discovered the revelation, on December 25th, where Lamond reached out and told the defendant that MPD was seeking a

warrant. But it started before that. Just after the Proud Boys were in town for July 4th of 2020, Lamond tells Tarrio in a Telegram private chat that an ABC violation report had been filed against Harry's and the agency was looking into it.

Government's Exhibit 4011, on November 3rd, 2020, Election Day, Lamond meets with Tarrio at Harry's and he lets Tarrio know afterwards that his guys are attracting attention walking down the middle of the street and there were stabbings later that evening.

So on November 4th, Tarrio asked for information about whether anyone has been caught yet. Lamond says, "I know the detectives are working on a BOLO for the suspects and are pulling security camera videos from the block. I'll keep you updated on the investigation."

November 5th, Tarrio asked whether the police have any leads on who stabbed Bev, a member of the Proud Boys, part of their group, and the defendant responds, "I checked with our detectives. They have some additional video, but haven't identified the suspects yet."

Government's Exhibit 4012, on November 7th, other intel officers are seeking information for Lamond regarding political activities planned in other states and Lamond passes on what he knows, which is part of his job, as was established during the trial. But then, on November 7th, at 2:10 p.m., Lamond writes to Tarrio on Telegram. "Need to switch to

encrypted. Alerts are being sent out to law enforcement that Parler accounts belonging to your people are talking about mobilizing and taking back the country, getting people spun up. Just giving you a heads up."

At 2:12 Tarrio responds with an unrecovered voice message. The defendant then sends Tarrio copies of the posts that these law enforcement officers are looking at and the defendant then responds to Tarrio's message from 12 minutes after 2, "Got your voice message. Just a heads-up. Please keep this between you and me." He doesn't ask Tarrio anything. He's giving him a heads-up.

Government's Exhibit 4015, on November 13th Lamond updates Tarrio, and not the other way around, about where he's been and what he's seen regarding the Million MAGA March in D.C. and he later switches to Telegram to warn Tarrio that the Proud Boys are again attracting too much attention at Harry's. After some violence on November 14th, Lamond reports back to Tarrio on Telegram, "We cut your guy loose. The victim couldn't be located."

On December 12th, the night of the banner burning, at 7:30 p.m., defendant tells Tarrio on Telegram, "We just locked up one of your guys on 14th and K." And Tarrio replies, "Two of my guys got stabbed." But defendant corrects him, "I'm hearing it may be a total of four."

On December 13th, 5:07 p.m., Lamond says to Tarrio,

"Shut Down D.C. is going after Harry's against, urging people to report them to ABRA," the Alcohol Beverage Regulatory Agency. Another communication that Lamond isn't asking a First Amendment question, he's giving information. There's more back and forth and then at 5:17 that afternoon Lamond says, "Just a heads-up that the group is telling followers to call ABRA and complain regarding the Proud Boys and Harry's."

5:18 p.m., Lamond tells Tarrio, "On a brighter note, the guy who stabbed your guys just got locked up." Tarrio's auto response with any question is not recovered, but Lamond's reply suggested that Tarrio was asking for information because at 5:27 he says, "I haven't pulled the report yet, but from what I learned on the scene last night, it was only one person."

December 13th, 5:32, they're talking about the events of the night before and the arrest, and Tarrio asks Lamond, "What's the general consensus with D.C. Metro and my guys?" If that's not fishing, I don't know what fishing is. To which the defendant does not reply, "Oh, I can't talk about that with you." But, rather, he says, "That's too complicated for a text answer. That's an in person convo over a beer." And that was the genesis of the meeting at the Dubliner, not any effort on Lamond's part to gain First Amendment information or any other information from Tarrio. It's after he already tells his team that he's meeting with Tarrio at a bar and his boss says,

"Ekk," that Carroll says, "Let's see if he can identify the people in the flyer."

So now we're up to December 14th, 10:52 a.m., there's an unrecoverable audio file of a Telegram call from Tarrio to Lamond. And per the pattern, immediately after that call, when it's still 10:52, Tarrio texted a group text to Cuffs and Gashes and says, "Just contacted my D.C. Metro guy." Later the defendant responds, at 12:46 a.m., to Tarrio, "Just heard your message. He will be released at the ramp of Third and C. The ramp is at the underpass between MPD HQ and the Department of Labor on Third Street." The defendant here is answering a question posed by Tarrio and giving him information.

We heard, during the trial, that this was not the usual place prisoners get let out and not information that's ordinarily published. And the record reflects that Tarrio immediately sends out the information to Cuffs and Gashes.

On December 18th, at 10:06 a.m., using Telegram, after Tarrio tells Lamond, at 7:30 that morning, that he called in the tip to MPD about the banner burning and took responsibility on Parler and wants to see how it plays out. Lamond responds, "I'm curious to see what happens, too. I'll check with our CID people to see if they have you on video." And, at 10:08 a.m., Lamond also says, "Also, you've got the FBI and U.S. Secret Service all spun up on what was said on InfoWars the other night about the Proud Boys dressing up as

Biden supporters on inauguration day. Got an email first thing this a.m.," and then he has a smily face emoji.

He confirms for Tarrio that a video that Tarrio had identified is the one that the FBI and the Secret Service have. And in a very chummy fashion he says, "I'm going to let them get all freaked out. They're idiots."

Later, on Telegram, on December 18th, Tarrio is most definitely fishing and the flow is most definitely not one way. At 4 o'clock p.m. Tarrio asks Lamond, "So what do you think?" And when the defendant asks, "About what?" Tarrio clarifies he's talking about the banner investigation and not Inauguration Day.

And he says, "You think they'll make a stink of it?" And the defendant responds, "No, a bit of the opposite. I've been talking to CID about it. They wanted to know what I know about your group and if I think you all are racist. I told them that you were made up a lot of Latinos and Blacks so not a racist thing. If anything, I said it's political, but then I drew attention to the Trump and American flags that were taken by antifa and set on fire. I said all those would have to be classified as hate crimes too. It's not just being investigated by FBI though, just us."

And Tarrio says, "Ahh, okay, awesome." And that same day, December 18th, when Lamond told Tarrio he would check with CID if they had any video. At 4:48 p.m. the defendant tells

Tarrio, in a private chat, "I don't think they have any pictures of you."

December 19th, 7:48 p.m., Lamond tells Tarrio, "The police want to talk to you about the banner, which number should I give them?" And then on December 21st and 22nd, when Lieutenant Mufti is sending proposed arrest warrants to the U.S. Attorney's Office, that's when, at 2:14 p.m., on December 25th, Lamond sends the message saying, "Just a heads-up, CID had me ID you from a photo, so they may be submitting a warrant to the USAO."

When he first gets wind that something may be up on January 6th, the defendant asked Tarrio, which was consent with his job duties, if they were planning anything. He gets an answer that certainly didn't turn out to be accurate. But while doing his job with that question, he's also sharing, on December 19th, at 11:12 a.m., what, quote, we think, close quote, internally about other information, including a post attributed to antifa. And even after the banner burning investigation and after January 6th, Tarrio asks if MPD is looking for someone he's associated with and the defendant says he'll check. He does, and he tells Tarrio she's not on the FBI list. And he tells Tarrio what charges the government is going to be bringing for January 6th.

So a review of all the messages reveals that Lamond's answer to the agents was false, and it was material, as it bore

directly on what they told him they were looking into. But was it knowing, was it willful?

The defense argued in closing, well, Lamond only told Tarrio things he thought didn't matter and he sincerely thought it was okay. So even if that understanding was wrong, he wasn't knowingly lying when he said it was a one-sided relationship. But he wasn't asked if he was giving out information he shouldn't give out, he was asked a factual question, "Did Tarrio seek information from you?" And he didn't answer that truthfully.

The defense argued, well, it was the agent's fault. The problem was he didn't ask straight out, "Did you pass on information?" Lamond surely would have answered that direct question directly. But the agent did ask him directly, "Did he ask you for information?" And the defendant chose to answer him directly, "No, he never asked me questions about what we were doing. It was one-sided, with just him telling me and not the other way around." The agent didn't need to ask the question, "And would you answer him?" because Lamond had already volunteered his answer.

Another indicator that the false statement was made willfully was the presence of other self-serving false statements in the interview. For instance, he volunteered a good bit more than the question called for at transcript page 33 when he ensured the investigators that if Tarrio asked a

question about an ongoing MPD case, he'd refer it to the case detective.

Question: "So did you guys discuss the incident with his guys being stabbed?"

Lamond: "No. Not at that time, no. Because when that happened, I think that was -- that was either October or early November. It was before -- it was before the November rally when it happened."

Molnar: "Um-hum."

Mr. Lamond: "Like I said, he had asked, you know, if there are any suspects identified. And just asking, you know, if there were arrests made on it. And I told him, you know, it's not my investigation. I actually referred him to the case detective."

Agent Molnar: "Who was -- do you remember who that was?"

Mr. Lamond: "No, I don't. I'd have to look it up."

The agent: "I'll look it up. It's fine."

Lamond: "But -- and that was, you know, after that when he realized, you know, I'm not on that case. Then I'm assuming he went directly with the detective because we didn't talk about the stabbing any more after that."

I don't see a single message in the entire collection of messages in which the defendant does that. But his offering that up, when it wasn't even asked, does suggest that he

understood quite well that that was what he was supposed to do.

And after he was shown that exchange during cross-examination, he tried to harmonize the inconsistency on redirect by saying, "Oh, well, those were felonies, so that's why I had to refer him to the case agent. The banner burning was a misdemeanor investigation." But I don't see that distinction in the rules anywhere.

It's also relevant to me, when considering whether the defendant's false statements were willful, is the fact that he was not very credible and not particularly forthcoming about how he communicated with Tarrio. The agent asked him, on page 25 of the transcript, "So how would you talk to him?" Mr. Lamond goes, "Either by phone or -- I'm trying to think. Never by email. I can't remember. I think sometimes it was by text, too. I don't remember."

And the agent says, "Did you ever use any, like, apps, like Telegram or Signal, or anything like that?"

Lamond says: "Yes. I think Telegram, maybe, yeah."

Molnar: "Was that because he used Telegram?"

Then Lamond answers crisply: "Yes. Exactly. Yeah."

The audio makes it even worse than reading the cold transcript. He understands the question, "How would you talk to him?" And says, "Answers by phone." But then there's a lot of hemming and hawing and um-hum, let me think. And then when the agent prompts him, "Did you ever use apps like Telegram or

Signal?" He takes a while to answer and he says it, "Yes. I think Telegram?" like it's a question; "Telegram? Maybe."

Come on. This was only five months after Tarrio's arrest, before which the defendant, and not Tarrio, initiated the use of Telegram. As Special Agent Hadley testified, there were 149 Telegram communications between November 7th and December 12th, and 244 messages, 80 percent of which were the more securely encrypted secret chats, between December 12th and January 7. Yet despite that, and despite his own use of the self-destruct feature and his later deletion of the entire chat, he can't come up with Telegram when asked with a straightforward question about how they communicated? This was not someone trying to be truthful in an interview.

And he told the investigating agents, on the transcript at page 4, that he had one or two conversations with Tarrio after his arrest. But the records reflect they communicated on the 7th, 8th, 9th, 12th, 13th, 16th, 19th, and 27th. This could be literally true because those were electronic communications and not face-to-face conversations, but I'm not sure that sort of legalistic hair-splitting is the way people go about telling the truth. At the very least, it's misleading and disingenuous and just another indication that the defendant wasn't fully forthcoming.

In short, heeding the defendant's repeated call that I review the entire interview in its entirety gives rise to the

distinct impression that the defendant, who was unaware at the start that the agents had already seen his communications with Tarrio, was knowingly and willfully trying to use the investigation to control the narrative, nip any investigation in the bud by misleading the agents, and I find him guilty of Count 2.

Count 3 alleges that the defendant made a false statement, in violation of Section 1001, on June 2nd in the interview, that when he said he spoke to Tarrio, quote, without tipping him off to the MPD investigation, close quote. This occurs in the transcript on page 9, at line 19.

Question: "So did you talk to him before the 4th or, let's say, between his arrest and January 4? Let me rephrase that. Between the banner burning thing?"

Lamond says, "Yes. Like, when they were there in December and then January 4th."

"What were those conversations like? Was he prepping you for what was coming?"

The answer: "That was part of it." Although if he's referring to January 6, letting Lamond know what was coming was definitely not part of it, although asking was. And the other part was, "I was trying to find out, without tipping him to the MPD investigation." And he goes on to discuss how Mufti came to him and asked if he could identify Tarrio in the photos on social media.

Pursuant to Rule 29, resolving all inferences in favor of the government, the evidence was sufficient at the close of the government's case, given the many messages in which the defendant is very much giving information or tipping Tarrio off about the status and inner workings of the MPD investigation into the banner burning.

In addition to the messages I've already mentioned, on December 19th, at 7:48 p.m., after the defendant got a message from Franklyn Then, at 6 p.m., who asked for Tarrio's phone number, Lamond messages Tarrio and says, "Police want to talk to you about the banner. Do you have a certain phone number you want me to give them?" But the defendant had Tarrio's phone numbers. This was a tip off. And given the number of others, the evidence reasonably supported an inference that that was knowing and willful. And so the Rule 29 objection is overruled.

As for the verdict, assessing, again, the defendant's answer within the context of the entire interview and the exchanges that immediately preceded the statement, this statement was belied by all of the exchanges I just listed in connection with Count 2, not to mention the tip off the police were submitting a warrant application to the U.S. Attorney's Office that I discussed in connection with Count 4.

As noted before, I have to consider this in the context of other questionable statements, such as on page 11 of

the transcript where he tells the investigators proudly that he was able to positively identify Tarrio once he got more photographs than the initial one.

Question: "And then did you reach out to him?"

Answer: "To who?"

Question: "To Tarrio on behalf of Mufti?"

Answer: "Yeah, I reached out to him, yeah, to see if he would tell me whether or not he was there. And he was not, he wouldn't confirm that."

The review of the photos for Detective Then and Parsons occurred on December 19th and 20th. And I don't recall any messages reflecting that Lamond tried to get confirmation from Tarrio after that. He'd already received it. The defendant then backpedaled a little bit and explained that he did talk to Tarrio before the podcast admission. So he's talking about the Dubliner meeting. And he says, "And Tarrio said, you know, if I was there, but he would never commit." And then Mufti reached out to me and then we had another conversation afterwards, but we didn't talk about the banner and whether he did it."

By the time he's done it's not quite clear what he's saying, but Mufti never asked him to reach out to Tarrio and both before and after Lamond looked at the photographs he'd been talking to Tarrio about the banner case. The defendant's repeated dissembling during the interview adds force to the

conclusion that the statement underlying Count 3 was knowingly false, and I find him get of that count as well.

Which brings us to Count 4 -- I'm sorry, Count 1. Count 1 charged the defendant with obstruction of justice, in violation of D.C. Code Section 22-722.

The elements of the offense of obstructing justice, each of which the government must prove beyond a reasonable doubt, are:

One, that on or about December 13th, 2020, through on or about January 4th 2020, defendant Lamond corruptly obstructed or impeded or endeavored to obstruct or impede the due administration of justice in an official proceeding in Washington, D.C. That is, the investigation of prosecution of a charge of destruction of property arising from the December 12th, 2020, burning of a banner that read Black Lives Matter conducted by an agency of the District of Columbia government, that is, the Metropolitan Police Department.

The second element, defendant Lamont did so with the intent to undermine the integrity of the investigation and prosecution.

The term "corruptly" means that the defendant must use unlawful means or have a wrongful or an unlawful purpose, or both. The defendant must act with consciousness of wrongdoing, with means with an understanding or awareness that what the person is doing is wrong or unlawful. The government

need not prove that the defendant successfully obstructed or impeded the due administration of justice.

For purposes of Rule 29, I find, based on all the revelations and exchanges I just described, that if you resolve all inferences in favor of the government, a jury could find the defendant guilty beyond a reasonable doubt.

As for the verdict, the messages supplemented by the testimony of the MPD officers left in the dark support a finding that Lamond withheld information regarding Tarrio's early acknowledgment of his participation in the banner burning, as well as his other communications with Tarrio from the officers investigating it. It also supports a finding that he provided information to Tarrio about what was going on inside the investigation that he had no business providing, and that he did both with the intent to undermine the investigation or prosecution and with the wrongful purpose and full understanding that what he was doing was wrongful.

In sum, I find that the government has proved all the elements of this charge also beyond a reasonable doubt.

If you read all of the conversations between Tarrio and Lamond and Lamond and the rest of the Metropolitan Police Department in chronological order, taking note of when Lamond chooses to use Telegram and in what manner, it leads to the firm conclusion that whatever the relationship had been before, after the banner burning the defendant was not using Tarrio as

a source, it was the other way around.

With respect to my finding that he withheld information, the government's core allegation was that he withheld Tarrio's confession on December 15th. The evidence supports a finding that Tarrio did admit his role in the banner burning when they met at the Dubliner on December 15th and Lamond never shared it. They met at 4:30, we don't know for how long. But Lamond was free to be texting Jeffrey Carroll by 5:52. And shortly thereafter, on the same day, at 7:10 p.m., after a member of the Skull and Bones chat group started a conversation with, "Are you going to jail, Enrique?" I note this was before he posted on Parler, Tarrio tells his inner circle, "This might not be good. I admitted burning the sign to an MPD officer."

Why do I credit that text from Tarrio? He's talking to the people he trusts. He had just, in fact, met with an MPD officer and it doesn't make sense he would say that so promptly to these people if he hadn't. The defense wants me to ignore that obvious implication. He called Tarrio as a defense witness and on direct he denied confessing to Lamond. But he was much squishier on cross. He belligerently insisted he couldn't verify the timing of anything recovered from his phone or that he'd actually sent any of the messages, including that one. But he agreed he knew Lamond was an MPD officer and he eventually said he believed he didn't confess to an MPD officer

and he didn't remember sending the messages saying he did. That watered down what he said on direct, but neither was particularly persuasive.

The other reason I find his message in real time more credible than his denial here at trial is, for one thing, it's the same pattern I've already outlined. Lamond and Tarrio talked and Tarrio immediately disseminates the information. As I noted earlier, for example, on December 14th, 10:52 a.m., there's an unrecoverable audio file of a call between Tarrio and Lamond. And immediately after that, it's at 10:52, Tarrio sends a group text to Cuffs and Gashes, "Just contacted my D.C. Metro guy." And when the defendant responds at 12:46 with information as to where the person being discussed will be released, Tarrio immediately sends out that information to Cuffs and Gashes.

And as noted already, on December 18th, at 4:55, when Lamond tells Tarrio what he's been telling MPD internally about the Proud Boys, by 4:56 Tarrio's got it pasted into a group chat with Scull and Bones, verbatim. And at 4:58 Lamond says, "I don't think they have pictures of you." Within a minute Tarrio is telling the group chat, "I just got word we're clear on the banner."

On December 19th, at 7:48 p.m., Lamond tells Tarrio on Telegram, "Police want to talk to you about the banner." He responds, at 4:40 p.m., "I'll take the Fifth. You can tell

them I'll be in D.C. on the 6th. Are they still pursuing the hate crime?" And Lamond calls him -- tells him to call. And just after they talk on the phone, December 20th, Tarrio tells Oly, his sister, "They're searching, that's why they want to talk to me."

While Tarrio voices no difficulties remembering, when he testified on direct, that he didn't tell Tarrio -- I'm sorry. Let me start again.

On direct Tarrio had no difficulties remembering that he didn't tell Lamond that he'd burned the banner at The Dubliner. But another problem with his credibility is that in addition to simply refusing to answer questions regarding the words on the text on the screen in front of him, was his professed inability to remember anything about what they did discuss at The Dubliner or what he told others on cross.

Yet his cross-examination was followed by a complete miraculous cure for his amnesia as soon as redirect began, when the witness offered up a detailed narrative stream of consciousness, that ultimately even counsel had to interrupt, about all the things they talked about on that very date and time. Yet, funny, not one post-meeting text mentioned any of those subjects. The only thing he told his gang immediately after he finished talking to Lamond was that he'd confessed. So the fact that Tarrio testified that he did confess to Lamond wasn't as persuasive to me as the statements he made to his

closest confidants immediately afterwards.

Another reason I credit the statement Tarrio made in real time, when he had no motive to lie, is it was consistent with the rest of the record.

The Dubliner meeting was on December 15th. But what happens on December 18th? At 7:25 a.m. Caroline Montagna reaches out to Lamond and says, "Did you see the Crime Solvers tip?" She tells him it came in at 1:45 a.m. that day. And the text exchange with Montagna continues through 7:39. Defendant's first thought, while still texting his bosses, "Tarrio called it in himself." And at 7:34 a.m. he switches to Telegram, "Hey, brother, did you call in an anonymous tip to MPD?"

From the start he's sharing information from there is such a tip. And that question could support an inference that he already knew Tarrio did it, or why would he be asking? He suggested to Montagna he suspected it was Tarrio because the name Henry was included. But she brushed that off, "Oh, that name has been used publicly before," and she sent him a number of place where it was.

But at any rate, at 9:30 a.m. Tarrio responds to Lamond: "I did more than that, it's on my social media."

9:30 a.m., Lamond: "I gotcha. Someone called in an anonymous tip saying that you claimed responsibility for it."

10:05 a.m., Tarrio: "This wasn't a hate crime and I

want to see it play out."

10:06 a.m., Lamond: "I'm curious to see what happens, too. I'll check with our CID people to see if they have you on video."

Tarrio's admissions are not received as if they're new information. Lamond doesn't express any shock, surprise, or concern. Doesn't ask, "So did you do it? Why are you telling me? No. He says, "I'll check to see if they have you on video." Seems like he already knew.

For all these reasons, I believe that Tarrio did tell Lamond he burned the banner when they met on December 15th. But that finding is not necessary to the finding that the defendant is guilty of obstruction of justice because we have the conversations I just described shortly thereafter, on December 18, that plainly reflect a shared understanding that it was indeed him.

So even if Tarrio candidly said, on the 15th, "Well, if I was there, this is what happened," and even if he didn't straight up confess, or if one were to conclude that Lamond didn't know for sure until 10 o'clock in the morning on the 18th, he knew by then. Yet none of what was said to him then or after gets passed along to CID. None of it is preserved or memorialized. In fact, the communications are deliberately filtered through a communications channel that would keep them private and Lamond deletes them later.

And then we have the whole performance of the defendant looking at the photograph of Tarrio and not being able to say anything helpful at first. He saw him on December 12th, he saw him on the 15th, but then he told Then, "Well, I'd seen him at prior protests." So that's how Lamond treats his fellow investigators who trust and assume and should be able to assume that their follow officers are passing on all the information they know.

But how is he treating the suspect? Lamond is avowing to look into it and to pass on more information. And following that, what we've seen, as I've already detailed, is Lamond giving information out a lot more than taking anything in.

And defense offered up multiple theories for why this was okay, but none of them withstands scrutiny. Theory number one is Lamond was helping the investigation, so how can you find he was trying to impede it? That argument, I have say, had some force at first blush, but ultimately it didn't hold up.

For instance, the defendant asserted repeatedly that Lamond was the one who circulated the information about the tip within MPD, so he's helping and not impeding, and it points to when it came in, although there's no evidence it was sent to him, and a text from the defendant regarding the tip on December 18th at 2:50 p.m. But Montagna sent it to him on

12-18 at 7:25 in the morning.

And I have to say, these types of questions and arguments were repeatedly accompanied by the defense counsel's failure to actually bring up any document on the screen or to use actual dates in any of the questions.

Lead counsel was at the lectern with a massive trial binder and he and his partner and the paralegal who were here for that -- was here for this very purpose were all equipped with laptops, with exhibits loaded on them, and there were a large number of additional binders and boxes all stacked up in the courtroom. He promised many a witness he would show them that document that he was questioning them about and paraphrasing after the break, but he never did.

Maybe he just forgot to show the documents to the case agent when he stormed away from the lectern in a huff after I sustained a hearsay objection. But the team was obviously competent and prepared. And it happened so consistently that over the course of the trial it appeared that the failure to be specific was strategic and the defense was trying to keep it vague and not discuss the messages in order.

The best example was announcing to Mr. Lamond, when they got to the point in the direct when they would discuss the messages with Tarrio, "We're going to try to do this without exhibits." And now that I've reviewed them in order, it's clear that the exhibits and the chronology didn't favor the

defense.

Did he provide some helpful informational along the way? Sure. Commander Carroll asked him to ask Tarrio about the inauguration and he does on December 15th and passes information back. But he also passes along a lot of Tarrio's self-serving stuff about how the group just got out of control on the 13th. Getting in fights is, you know, what he just doesn't want to have happen again, even though it seemed to be a big part of what the Proud Boys were doing.

Does the defendant tell Carroll on December 15th that he just asked, but Tarrio can't identify the people in the flyer? There's a dispute about whether what the defendant provided in response to my minute order was in evidence and I couldn't find where it was admitted. But if it is, that was the flyer, it's strange that Tarrio didn't know who was on the end of the very same banner, lighting that end when Tarrio is there with a lighter getting ready to light his end. Maybe he didn't. There was quite a crowd of Proud Boys who heeded his call to descend on D.C., but if they were looking at that photograph together, that would have been an opportune time for Tarrio to have told the defendant he was there too.

On December 18th, yes, as the defendant likes to point out, it is Lamond who sends the others in MPD, David Hong and Leslie Parsons, the Parler post at 2:46 p.m. However, in this same message Lamond is trying to gain information. He

sends the post, "Is anyone aware of whether the banner burning is being investigated by the FBI as a possible hate crime?" which is something Tarrio wrote in his post and something Tarrio wanted to know. And Hong answers at 2:47 p.m., "Humm, I talked to my contact, Special Agent Gano, but he advised their office would unlikely take the case federal." And he later added, "They're assessing it." And Tarrio ends up telling Amy Harris, at 5:16 that day, "FBI isn't investigating."

Helping isn't necessarily inconsistent with the obstruction of justice charge, if he did other things that could slow the investigation at the same time or if he leaked information that could affect the integrity of the investigation. The defense suggestion that it's a binary choice is an artificial construct.

Also, the communications relied upon in isolation to show he was helpful present a different picture when they're viewed in the context of what he and Tarrio are saying to each other at the same time. He says to MPD, when he sends the Parler post on December 18th, "As you may be aware, the current chairman of the Proud Boys, Tarrio, just publically admitted that he was responsible for its destruction." Okay. Sure, he told them that.

As the defense has pointed out, he didn't hide the fact that he had a source in the Proud Boys. But what he didn't tell them is that they'd discussed it among themselves

and they were continuing to discuss the banner burning case among themselves and that Tarrio had confirmed it to him directly, at the latest, that morning. And he didn't tell them they were in regular communication at the time.

It's not excusable just because Mufti didn't ask a question that he had no reason to believe about something that was going on. He's got the misimpression that all the contacts were in the past because the defendant created that impression.

Continuing the helpful theme, the defense says that the defendant couldn't possibly identify Tarrio on that one photo, it was a side view. And he went and he looked at some other photos and then he did identify him, so he's not obstructing justice. But, no, we have Mufti's testimony that when the defendant passed along Tarrio's post, with the photo attached, Lamond said he couldn't identify Tarrio in that photo. But he neglected to say that he could put him on the scene.

The entire interaction with Detective Franklyn Then was problematical and different from the way counsel and the defense characterize it. Detective Then gets asked to deal with Lamond from Mufti on December 19th, at about 6 p.m. He's been told that the defendant knows Tarrio well. So he sends the picture clip from the video. And the defendant doesn't say, well, it could be him, you know, he's got the facial hair and the backwards cap, but it's hard to say, given the way his

head is turned. He gives the impression he hardly knows him at all and couldn't possibly identify him. And this does in fact impede the investigation because his response was so unexpected and so peculiar it completely confounded Detective Then.

He goes to his boss and she's confound too, so they have to convene a meeting with Parsons, and Parsons has to call the defendant and talk to him and send more pictures. It's only after all of that that Lamond sends the message to Parsons, on December 20th, in which he says he believes the person in the photo, who has the same patches on his vest as Tarrio does in the other photo and the same hat he saw Tarrio wearing that day, to be Tarrio.

Another email to Parsons about having reviewed more photographs says, "It appears to be the same guy." That is only helpful if you take it out of context. Appears to be the same guy is not helpful when you know it's the same guy, when you spoke to him directly about it two days before and he told you, yeah, I called in a tip, yeah, I put it in my social media, I want to see how it plays out. It's an effort to appear to be helpful when confronted with the facts he couldn't deny without being truly forthcoming.

The defense touts the fact that Lamond dug up a photo and sent it to them on December 19th, but then said that wasn't a helpful photo because it wasn't from the crime scene, it wasn't from that day, it was just a publicly-available photo.

Something else I need to address here is the defense posed many questions to various officers as to whether they had probable cause even without Lamond's truthful information, whether they needed what they got from him. That's beside the point, given the elements of obstruction of justice. But in any case, a U.S. Attorney's Office may want more than the bare minimum. They may want more to satisfy the judge who is going to get the warrant. But are they sure themselves, not just that they have enough to establish probable cause, but they have a winnable case. They're going to have to prove it beyond a reasonable doubt.

So it's beyond debate that the warrant affidavits and the case would have been stronger and it would have closed sooner if MPD knew and the U.S. Attorney's Office knew and the Superior Court judge presented with the warrant knew that Lamond was talking to Tarrio directly about his involvement. And the discloses to Tarrio are going on at this very same time.

When Lieutenant Then reaches out to Lamond because he's been tasked with getting Tarrio's phone number, Lamond lets Tarrio know the call is coming and Tarrio is ready, he takes the Fifth.

On December 25th Lamond tells Tarrio that MPD is seeking a warrant. After he tells Tarrio that Mufti is seeking an arrest warrant, the two have a 14-minute conversation on an

encrypted app -- conversation with a person who has now unquestionably moved from subject to suspect -- that was entirely unauthorized and was never preserved. It was directly contrary to MPD's interest because once it got real, Tarrio could have changed his mind about showing up, could have fled, he could have tampered with witnesses.

But he helps Tarrio instead and Tarrio immediately puts that information to use. He books the flight on the 4th, he tells people that so when he's arrested, he can be out on the 5th and ready to do whatever he's got planned for the 6th.

On December 29th, it's not his case, but the defendant is poking around, trying to gets an update on its status. He sends a text at 3:56 p.m. to Leslie Parsons, "Any update on the warrant?" "Not yet." Defense says, "Give me a copy when approved and we can discuss how you want it served." Mufti resubmits the warrant on the 29th. It's still not signed. Parsons' on this email, but not the defendant.

The next day, when he hasn't heard from Parsons, there are a number of calls from the defendant to him. Seems to be eager to find out. 5:56 p.m., the Court sends the signed warrant to Mufti, who sends it AUSA Courtney, but there's no evidence that the defense knows at that point.

So at 6:20 p.m. the defendant calls Tarrio. Tarrio immediately again disseminates information, convenes an emergency chat with the Ministry of Self Defense, who Tarrio

didn't want to tell us about, and has an emergency chat. He tells Mamafe, "My contact just called me. DA hasn't signed yet." It's later, when Courtney forwards the warrant back to Mufti, Parsons, Coplin, and Godin, MPD, not the defendant, which is Government's Exhibit 1013, at approximately 7 p.m. It's possible someone told him then, but we know at least by December 31st, at 7:10 p.m., Carroll texts him and tells him to call John Branch with Tarrio's arrival information.

At that point Lamond is telling others in his police officer group, "I'm about to lose my source when he's arrested for the flag." So we know he knows now that there's a warrant.

Lamond also brags that he told MPD that if it was charged as a hate crime, that would make all the U.S. flags taken and burned by antifa hate crimes and they backed down. There's questionable logic behind that, but the defendant is proud of it. Meanwhile, Tarrio continues to spread the word and attribute it to his contact, "No hate crime. Misdemeanor." And he uses the information to plan.

On January 1st, at 1:46, he tells people, "If I walk into the station on January 4th, they'll have to lock me up." Tarrio tells others, on January 1st, "They can't sign it until Monday." That's what he seems to think. Possibly that's what he discussed with Lamond on the phone, but there's no direct evidence to attribute that to the defendant.

On January 1st Lamond is legitimately helping. He

passes along Tarrio's flight information gleaned from TSA, not from Tarrio. And it's true, there's no evidence he gets back to Tarrio again until January 4th. But that's the message he sets to self-destruct immediately after the plane takes off, that Tarrio immediately reports out as a message from his contact that the warrant was signed.

So I don't think those two to three days of not tipping Tarrio off are so inconsistent with the picture as a whole that I can't find him guilty of obstruction of justice. And this was on top of the general orders and rules of ethics. And there was considerable testimony as to why these disclosures were problematical.

Defendant offered up one theory after another to account for or minimize the revelations, but they're inconsistent with the general orders and the testimony of extremely credible other officers.

There was no mistaking how Commander Carroll felt when presented with the communications. His decorated shoulders slumped and he looked physically pained. He testified that these disclosures were not consistent with police procedures, they were not consistent with police objectives, and they were not consistent with how a police officer is supposed to act.

Among the excuses that were offered, the defendant testified that in his judgment it was okay to tell a suspect in

someone else's case he's been identified because the suspect will find out eventually. As other witnesses more credibly attested, that's simply not how criminal investigations operate. Information is closely held while the investigation is still unfolding.

Well, the defense says, it's okay to tell something I learned on the job that will become public later. Well, that's laughable, especially in the context of an arrest warrant. They said, well, there's no general order against disclosing the existence of a warrant. There's no rule that says only certain officers can do it.

The defense asks witnesses multiple questions about how the fact that a warrant is being sought or even obtained might be knowable to other officers and other officers might be involved in the execution of a warrant. Or sometimes suspects themselves are informed so that they can turn themselves in. But none of that, while that may be true, is license to inform someone else's suspect. It was not Lamond's decision to make.

MPD witness John Haines, another commander, was quite clear about that as a general principle and with respect to this case in particular. A warrant doesn't have to be sealed. It doesn't have to be stamped "confidential" for the rules to apply. It's okay to give out information to another officer's suspect if it's just a misdemeanor? There's no basis for that distinction either. The fact that MPD made an early

investigative decision to put out a flyer with a photo doesn't make Lamond sharing information okay.

What about this is all just rapport building that an intelligence officers understands, but we civilians, even regular MPD, can't quite wrap their minds around it. That argument might have been persuasive if it was combined with Lamond's asking Tarrio questions, but the disclosures were not. It might be more persuasive if he was still using his work email to communicate, but he wasn't. Instead, during January 18th to January 7th, a pretty critical time for the country, we're not seeing a lot of valuable intel being collected from Tarrio. And the frequency of when Lamond uses his Telegram platform changes completely.

Well, are there just a different sent of rules for an experienced intel officer? Are they trained differently? That might be an explanation if what he was using Telegram for and what he was deleting and what he was not memorializing were the intelligence-gathering communications, but it's not. He used his work text message function for those and they remain.

No general order prohibited the use of Telegram, I'm told. So what? The point isn't whether it was permitted or not, but what its use reveals about Lamond's state of mind, his desire to keep the communications separate, to keep them secure and to facilitate being able to delete them.

The defendant understood that, too. He took the

trouble to tell me, on direct, that he started using Telegram because it was Tarrio's preferred method of communication. But the record doesn't bear that out. The first use was by Lamond, in July of 2020, and he told me he used self-destruct to mirror Tarrio, but that didn't turn out to be true either. It's okay to share information if there's enough evidence to convict the guy anyway? If I think it's justified because he already confessed? Again, it was not Lamond's decision to make. It's okay to tell something if I don't think it's valuable information? There is no such exception.

Jeffrey Carroll said sharing information backwards is not done. All of the other witnesses were quite clear that information gained in the course of a law enforcement investigation is supposed to be closely held. Counsel argued in closing there's no regulation that says you can't share things with an intelligence source that you don't think would be of value. Well, there's no regulation that says you can't share law enforcement information with someone on an airplane either.

Of course there's no regulation that covers every self-serving justification someone can come up with afterwards, when someone does something that's plainly wrong. Rules and regulations aren't written that way. That level of specificity is not needed when you have a rule that says don't talk directly to the suspect in someone else's case, period. That's

like saying, well, there's no law that says you can't steal from someone you know well, that you don't think would find that item to be important to them. That doesn't matter. All the rule sayings is don't steal, and that's good enough.

So the next element I have to find is did the defendant do this corruptly? How do we know beyond a reasonable doubt that he knew all this was wrong? As Commander Carroll observed when he was shown one of these communications, Lamond and Tarrio were, quote, talking about the police as a third-party. But Lamond is the police, and he really summed it up with that. We've seen repeated violations of general orders and rules of ethics, sharing law enforcement information, sensitive information, information gained through his duties at MPD, information that the police asked him to identify Tarrio, what evidence the MPD had, that they were considering the hate crime enhancement and based on what factors, that a warrant application had been submitted to the U.S. Attorney's Office, the status of the warrant, other operational information, such as where they would be an arrest in connection with the stabbings.

Do the regs have the force of law? No. But as Sergeant Gary Ciapa, now in internal affairs, explained, MPD employees learn them, are expected to know them, and implement them. And the evidence shows that Lamond knew. It shows that during the interview with the agents he tells them, "Oh, yes, I

referred Tarrio to the officer in charge of those stabbing investigations, when he knew perfectly well that he didn't. And it became quite clear on cross that the defendant knew exactly what the problem was when he asked, "Can a police officer disclose what the evidence is in another officer's case without getting permission?" And he answered, "It's not unlawful."

But that wasn't the question. When the question was rephrased he agreed, "It's not permitted." His word choice was telling and I think it shows that he knew it was wrong. Given the defendant's years of experience as an MPD officer, I find his supposedly genuine understanding of his rules, his description and treatment of them as a matter of opinion, open to interpretation, and the interpretation he offered up at trial to be strained and incredible. I base that not only on the substance of his testimony, but his manner of testifying, his demeanor on the stand.

He understood the rules quite well on cross, but the version offered on direct and in closing were a concoction, a strained, post hoc, reverse-engineered effort to explain away what can't be explained away. And it stood in stark comparison to what other MPD witnesses, whose rectitude was palpable, had to say. And it makes no sense and only serves to bolster the finding that he knew then and he knew now that it was wrong.

If the defendant was so sure in real time, if he

actually believed at the time that it was okay to pass along information that he didn't think was of value, if he actually felt justified, as counsel said in closing, in sharing the information since Tarrio had already confessed publicly and he wasn't harming the investigation, why is he using Telegram and why does he delete the whole chat later?

We have the critical fact in this case that the defendant never provided any documentation of his communication with Tarrio concerning the banner, not the text messages or the Telegram messages, not even his communications after the defendant went from being a subject to suspect to an accused with outstanding warrant.

We also have the fact that as of December 13, the day after the banner burning, the defendant communicated with Tarrio exclusively on Telegram and within the app, using the more secret, secure, quote, Secret Chat function that has end to end encryption. And that is revealing, since we have a very long period when he was regularly using the ordinary text function on his work phone to communication with Tarrio concerning upcoming protests in D.C., as he was supposed to do, and then we see him setting the self-destruct feature before passing along information.

For example, when Tarrio sends him a screenshot of his text communication from Mufti when Mufti reached out to him, Lamond sets the timer on his next message, 26, for

self-destruction in 5 seconds and the next three messages, 27, 28, 29, are missing because the next one we see is when Tarrio resets the timer for 30 seconds.

And finally, after Tarrio's arrest, as we learned from the senior digital forensic examiner, with 12 years of experience with the FBI, who was qualified as an expert in digital forensics and counsel referred to as "the young lady from North Carolina" in closing, Lamond deleted all of it. Not the app itself, but he went into the app and deleted the ongoing secret chat with Tarrio that he initiated on January 18th and utilized through January 4th.

So, no, I can't find that any of it was appropriate, and I do not believe at that time that the defendant thought it was appropriate. The evidence, therefore, establishes the corruptly and consciousness of guilt element beyond a reasonable doubt as well.

In sum, I find the defendant guilty of all counts.

We need to set a sentencing date. And I don't believe there's any reason why we would not permit the defendant to remain on the same conditions as before. Is that the government's position?

MR. ROTHSTEIN: Yes.

THE COURT: All right. So the defendant will remain on the same conditions of bond as before. And we would need, I guess, approximately 90 days to get to a sentencing date.

MR. SCHAMEL: Did Your Honor say 90, nine zero?

THE COURT: Ninety, yes.

THE COURTROOM DEPUTY: March 24th, that would be 90 days.

THE COURT: I could do it on March 28th, or two days the following week as well.

MR. ROTHSTEIN: Your Honor, the government would prefer March 28th, if possible.

THE COURT: Does that work for you, Mr. Schamel?

MR. SCHAMEL: It actually does not. It is school spring break. We have something planned that week. We return on that Saturday.

THE COURT: Okay. How about April 2nd or 3rd?

MR. ROTHSTEIN: That works for the government.

MR. SCHAMEL: For the defense.

THE COURT: We'll set this down for sentencing on Thursday, April 3rd, at 9:30 in the morning.

All right. Is there anything else I need to take up on behalf of the government right now?

MR. ROTHSTEIN: Nothing else, Your Honor. Thank you.

THE COURT: All right. And, Mr. Rothstein, best of luck to you and your family. Hope everything goes well and everybody stays healthy.

Mr. Schamel, anything further on behalf of you or Mr. Lamond?

MR. SCHAMEL: I think, as a matter of law, I have to renew my motion. But other than that, that's all.

THE COURT: All right. So the record will reflect that.

I'll have sentencing memoranda be due on March 21st and --

MR. SCHAMEL: Can you say that date again?

THE COURT: March 21.

MR. SCHAMEL: Two-one?

THE COURT: Yes. Mr. Schamel, I think if you're going to have letters from people in support of Mr. Lamond, it's preferable to me, instead of having them sent directly to the Court, if you gather them and make them an attachment to your sentence memoranda, because I docket everything I get and it makes it easier that way. And if you can take off their addresses.

MR. SCHAMEL: That's what we always do. We anonymize them and make them an exhibit at the end.

THE COURT: All right. That's great. Thank you very much, everybody.

MR. SCHAMEL: Thank you, Your Honor.

* * *

CERTIFICATE OF OFFICIAL COURT REPORTER

I, JANICE DICKMAN, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 27th day of February, 2025

________________________________

Janice E. Dickman, CRR, CMR, CCR
Official Court Reporter
Room 6523
333 Constitution Avenue, N.W.
Washington, D.C. 20001

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America, | ) Criminal Action |
| | ) No. 23-cr-177 |
| Plaintiff, | ) |
| | ) SENTENCING |
| vs. | ) |
| | ) Washington, DC |
| Shane Brian Lamond, | ) June 6, 2025 |
| | ) Time: 9:37 a.m. |
| Defendant. | ) |

---

TRANSCRIPT OF SENTENCING
HELD BEFORE
THE HONORABLE JUDGE AMY BERMAN JACKSON
UNITED STATES DISTRICT JUDGE

---

A P P E A R A N C E S

For Plaintiff: Joshua Rothstein
Rebecca Ross
United States Attorney's Office
601 D Street NW
Washington, DC 20530
(202) 252-7164
Email: Joshua.rothstein@usdoj.gov
Email: Rebecca.Ross2@usdoj.gov

For Defendant: Mark E. Schamel
Ana L. Jara
600 Massachusetts Avenue NW
Washington, DC 20001
(202) 344-4631
Email: Meschamel@venable.com
Email: Aljara@venable.com

For Probation: Sherry Baker

---

Court Reporter: Janice E. Dickman, RMR, CRR, CRC
Official Court Reporter
United States Courthouse, Room 6523
333 Constitution Avenue, NW
Washington, DC 20001
202-354-3267

* * * * * * *P R O C E E D I N G S* * * * * * *

THE COURTROOM DEPUTY: We are on the record with criminal case 23-177, United States of America versus Shane Brian Lamond. For probation we have Ms. Sherry Baker.

Counsel, starting with the government, please approach and state your appearance for the record.

MS. ROSS: Good morning, Your Honor. Rebecca Ross and Joshua Rothstein for the United States. And joining us at table are special agents Elizabeth Hadley and Paulina Murphy, and paralegal Lisa Abby.

THE COURT: Good morning.

MR. SCHAMEL: Good morning. Mark Schamel, Ana Jara on behalf of Mr. Lamond.

THE COURT: We're here for Mr. Lamond's sentencing. Mr. Schamel, the final revised presentence report was filed in this case on April 8th. Have both you and your client had an opportunity to review it?

MR. SCHAMEL: We reviewed the presentence investigation report. To the extent we had anything to raise, we raised it in our sentencing memoranda, Your Honor.

THE COURT: I understand there are disputes with respect to the sentencing guidelines that I'll have to get to, but I don't believe there are any factual disputes to be resolved, is that correct?

MR. SCHAMEL: I think the factual disputes at the

trial that Your Honor is fully aware of.

THE COURT: I can tell you right now that for purposes of what the facts are, what I said when I ruled are what I think the facts are and I don't need the probation office, that wasn't at the trial, to tell me what the facts are.

MR. SCHAMEL: That was our view. Your Honor gave a pretty lengthy verdict, so we thought you had a clear understanding of what you believed the facts to be.

THE COURT: All right. So I'm going to accept the presentence report, with those caveats, as undisputed and as part of my findings of fact for sentencing. There are some legal disputes with respect to the guideline calculations to be resolved and I'll take those up in a minute.

I just also wanted to say on the record that I've received other materials concerning the defendant, including the government's memorandum in aid of sentencing, the defendant's memorandum in aid of sentencing, and a number of attachments, including a letter from Justin Scanlon, a friend and colleague of the defendant who has known him since 2017; Daren DeMarco, another friend and colleague, also known him for about that same period of time. Ben Santamaria, a colleague who he worked with from about 2016 to 2020.

I received beautifully written and moving letters from the defendant's 23-year-old daughter and his 18-year-old

daughter. I received a letter from his sister, Nicole Lamond. I received a remarkable letter from Brooke Lamond, someone the defendant was married to at one point but to whom he showed incredible loyalty and support at a time when she was struggling with a devastating illness, and she has known him since 2011.

I received a letter from a former MPD colleague and now romantic partner, Carolyn Montagna, who has known the defendant since 2017. And Matthew Bromeland, who has known the defendant personally and professionally for nearly a decade and a half.

I also received Exhibit 6 and 7, some medical records from April of this year, and a recent submission, that I think was docketed yesterday, with additional medical information.

I want to assure the defendant and anyone who is here who sent me any of those letters that I read all of them and that I appreciated all of them.

I want to start by dealing with the guidelines -- you look like you want to say something.

MR. SCHAMEL: I'm just going to say one thing in addition to yesterday's submission.

I'm having my knee replaced on Monday. I'm having a little trouble.

Yesterday, late in the day, after our submission, we learned that Mr. Lamond is having a procedure for the -- what

was outlined in the submission.

THE COURT: One of the injections?

MR. SCHAMEL: Correct, on June 10th.

THE COURT: June 10th?

MR. SCHAMEL: Yes, on Tuesday.

THE COURT: All right. In a criminal case there's a statute that tells me what I'm supposed to think about when I sentence someone, it's 18 U.S. Code § 3553. It states a number of important factors, all of which I'm going to consider later. But, the advisory sentencing guidelines and what they recommend are one of the factors that I must consider in determining the appropriate sentence for this offense. I'm required to calculate what the guidelines would recommend in every case, so I'm going to begin with that calculation, but I want to assure everyone that that is only one part of the analysis.

They are also not particularly helpful in this case because the lead count, the D.C. charge of obstruction of justice, is based on the D.C.'s own set of guidelines which are voluntary and which don't bind this Court in any way. So we have that issue, and we also have the problem that while the presentence report contained the information that it often does where it sets out the average sentences for people charged under the same federal guidelines, that doesn't take the obstruction of justice into account. So that information wasn't really relevant in terms of looking at this sentence.

So what do we have here? Count 1 was obstruction of justice, in violation of 22 D.C. Code § 722. For that offense the maximum term of imprisonment is three years and the -- minimum term of imprisonment of three years and the maximum term is 30 years. However, when D.C. says the minimum term, that's not a mandatory minimum, the defense is correct about that. That is what they call a statutory minimum.

A sentence must be imposed as the D.C. guidelines recommend, but it may be suspended. However, the fact that there is a statutory minimum tells you something about what the D.C. council thought about the importance of that offense. And while a court may suspend a statutory minimum and remain compliant with the statute, only certain suspended or split sentences are compliant with the D.C. guidelines, which, I emphasize once again, are voluntary and apply to Superior Court and they don't apply here.

Count 1 under the D.C. guidelines is classified as a Master Group 5, or M5, offense. The guideline range for group 5 offenses for someone with a criminal history score A, which is someone basically with no prior criminal record, like the defendant, is 36 months to 84 months. A sentence in this range also allows for a term of imprisonment or a compliant what they call a long split.

A long split under the D.C. guideline manual Section 3.4 is a sentence where the amount of time to be served after a

portion of the entire prison term is suspended still falls within the range of the prison sentences in that box. Their guidelines have a grid, like our guidelines have a grid, such that the time initially served and not suspended is the lower number in the box.

So if I was going to impose a sentence that is compliant with the D.C. guidelines, both the amount of time imposed and the portion to be served initially must fall within the prison range in the applicable box. And the box on the guideline applicable to this offense is a white box -- some of them have shading colors to them -- and, therefore, as far as I can tell, the D.C. voluntary guidelines, if we were sitting in Superior Court, would call for a sentence of at least 36 months.

However, even the Superior Court judges are not bound by those guidelines and we're not bound by the D.C. voluntary guidelines. They're just that, guidelines. But that's what they are in this case, I believe.

Counts 2, 3, and 4, the defendant was convicted of making a false statement, in violation of 18 U.S. Code Section 1001(a)(2). Each of those carries a possible maximum sentence of up to five years, and they were grouped for guidelines purposes. The base offense level under the sentencing guidelines, we go to section 2B1.1 of the guidelines, which is essentially the broad section. He starts out at a level 6.

And whether it gets adjusted upward or downward from there is a matter of dispute.

One adjustment proposed by the probation office and the government is under section 3B1.3, which is whether -- did he abuse a position of trust in the commission of this offense? That would require us to go up two levels. The guideline says if the defendant abused a position of public or private trust or used a special skill in a manner that significantly facilitated the commission or concealment of the offense, you increase by two levels.

So I have some questions for the government about that.

I understand your position that the defendant occupied a position of public trust and that he abused a position of public trust, but how did that facilitate the commission or concealment of the offense? Which offense are you talking about?

MS. ROSS: Your Honor, the very fact that he was a lieutenant with the MPD is the reason why he was able to commit these offenses. His position facilitated all, quite frankly, four of the charges.

THE COURT: Okay. I don't understand how his position facilitated lying to the special agent.

MS. ROSS: Because he was -- because he had to lie to cover up his crimes, Your Honor. Had he not been in that

position of trust, he never would have been able to insert himself into the investigation and obstruct it and then he never would have had to lie to the federal law enforcement who interviewed him about those offenses.

THE COURT: Okay. I think that -- I'm not sure that really falls within what the guidelines are saying. When it says facilitating the offense, I think it's clear, if you look at application note 1, that they are talking about making the detection of the offense or the defendant's responsibility for that offense more difficult. And that would be saying did he use his position of public trust to impede his conviction for the federal offenses? I don't think this applies to the obstruction of justice offense, so I don't see how he was using his position to facilitate -- it may have been to motivate, but I don't see how he used it to accomplish making false statements to the federal agents.

Is there anything else you want to say about that?

MS. ROSS: The only other thing I'll say on that is -- that is fair, Your Honor, the only other thing I will say is that because he was in a position of trust, because he was a law enforcement officer, he knew exactly what to say to the investigators who were interviewing him and how to try to cover up his crimes even more. But that being said, Your Honor, I do agree with you that the crux of where he was able to use his leadership position was in committing the first offense,

Count 1.

THE COURT: All right. Well, if the answer to the question was yes, if he used a position of trust to facilitate the commission of the offense, you would increase it by two levels. If not, we're still at level six. I don't think it applies.

Does the defense want to be heard on that particular issue?

MR. SCHAMEL: I think Your Honor has it right.

THE COURT: All right. I think -- the government's memorandum really conceived of the issue as to whether the defendant used his position of public trust to facilitate the cover-up of the banner burning. I'm not sure that's the issue. The defense argued that he didn't impede the investigation of the banner burning, but that's exactly what the offense of conviction is for. But I think with respect to whether that applies here, he didn't abuse his position of public trust in a manner that significantly facilitated the commission or concealment of the offense, that is, the federal false statement counts.

As for the obstruction of justice, the offense was an abuse of his position of trust, but I'm not sure that the converse is true, that an abuse of his position of trust facilitated it. It's kind of one and the same. So I don't believe it applies and we're still at level 6.

But then we have another potential guideline enhancement under 3C1.1, which is should there be a two-level enhancement for the obstructing or impeding the administration of justice? That provision says if, one, the defendant willfully obstructed or impeded or attempted to obstruct or impede the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction -- again, not somebody else's investigation, but his investigation -- and the obstructive conduct related to the defendant's offense of conviction in any relevant conduct or a close-related offense, increase the offense level by two levels.

Here, I think this applies because defendant's false statements, his lies to the FBI, willfully impeded or attempted to impede the federal investigation into his obstruction of the banner-burning investigation. Also, the deletion of his Telegram messages falls into that category. I am not, though, as the government requested, including his testimony as a basis for this enhancement, even though there were aspects of it that I found lacked candor.

I can't find by a preponderance of the evidence that his obviously self-interested and self-serving testimony, which seemed to have been reverse-engineered to come up with some theory to justify the information he provided Mr. Tarrio, and which even the government characterized as a transparent

attempt to minimize or justify his conduct, falls within the category of a, quote, significant further obstruction that occurred during the prosecution of the obstruction offense itself.

However, the application note for this guideline enhancement gives you examples of what kind of conduct could be covered. (d) is destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding. And (g), providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense.

So we do have that. We have -- I found him guilty of making material false statements to people who were investigating the obstructs of justice offense, so I believe that the two-level enhancement applies, which would bring us to a level 8. Do you want to say anything about that Mr. Schamel?

MR. SCHAMEL: I would very much, Your Honor.

THE COURT: All right.

MR. SCHAMEL: If I understand the two reasons Your Honor has just given for that two-point enhancement, I would like to make a couple points.

First, on the issue of whether or not there was a destruction of the Telegram messaging, there's no evidence in

this record that Mr. Lamond actually affirmatively destroyed the Telegram messaging. There was discussion that when his phone was later reviewed and when investigation went into the Telegram messaging, it was not there. But this record does not support that he affirmatively deleted it. Certainly not that he affirmatively deleted it when he believed he was under some type of investigation or administrative proceeding.

THE COURT: That part, as I was just reading through everything, may be true. As I understand the evidence, he deleted them and thought they were gone from his phone, which is why he was a little surprised by the interview with the agents because he didn't realize they had them. But we don't know if he knew he was under investigation for obstructing the banner-burning investigation at the time he deleted his messages. It may just be evidence that bears on his intent and his knowledge. I don't remember the timing. The government can tell me when they think the timing was.

So what about, though, providing false statements to a law enforcement officer?

MR. SCHAMEL: So, again, I think we have a problem where, sort of, we stopped some of the testimony and there's some gaps in the testimony. I understand, very much like what Your Honor just said about the deletion, you may try to infer and maybe divine his intent, but the reality is at the time he was being questioned he didn't know that he was under

investigation.

We don't even have any information in this record, as I recall from the trial testimony of the non-interviewing agent who was present, that this was an investigation into Mr. Lamond at the time he was questioned. It appears -- and you look at it in totality -- Your Honor has read it as many times, I'm sure, as I have -- that this was initially an investigation into Tarrio. Mr. Tarrio, I don't believe, had even been indicted yet for his role on January 6 when Mr. Lamond was being questioned about Mr. Tarrio's communications with Mr. Tarrio and the things he told Mr. Tarrio. This record has a gap.

THE COURT: The interview didn't have anything to do with January 6.

MR. SCHAMEL: It had to do with Mr. Tarrio.

THE COURT: It had to do with his communications with Mr. Tarrio.

MR. SCHAMEL: Correct.

THE COURT: It was the sole subject of the conversation?

MR. SCHAMEL: I don't recall, Your Honor --

THE COURT: Okay.

MR. SCHAMEL: -- anything in this record that would support the idea that at the time those agents sat down with Mr. Lamond, that he, Mr. Lamond, was the subject of

investigation and that he, Mr. Lamond, knew that there was an investigation into him for anything. And absent that, I don't know how the -- anything he would have said, which is actually the substance of the actual charge against him, the alleged false statements, I don't know how that would increase as an enhancement under this factual.

I think, if Your Honor wanted to have an evidentiary hearing and put some of that in, when they opened an investigation into Mr. Lamond, when the agents went from U.S. Attorney's Office to interview Mr. Lamond, did they go to interview him as a subject of investigation? That would be the first threshold question. The second threshold question: Did he know that he was the subject of investigation and, therefore, made a false statement? Because I think it's two different ways to view the false statement. I think it goes to what Your Honor said initially, which is it may go to intent, it may go to you divining what you believe he was trying to do, but I don't believe it goes to him obstructing the investigation into him. I just don't think that's here in this record.

THE COURT: All right. Ms. Ross?

MS. ROSS: Your Honor, contrary to what Mr. Schamel just said, the record was very clear that there was an open investigation into leaks to Mr. Tarrio. And Mr. Ricardi, Agent Ricardi, got up there and he told you that he said there was an

open investigation. They had messages indicated somebody named Shane was leaking information. There was an open investigation at the time and by lying to Agent Ricardi about that he obstructed the investigation.

THE COURT: For this enhancement to apply, does the person have to know that there's an investigation? Now, he's sitting there being interviewed by FBI agents who are investigating something and they're asking him about his personal conversations and he is not being truthful to them. So is that enough or does he have to know exactly what they're investigating, as opposed to trying to mislead them, knowingly trying to mislead them, which is what I found him guilty of? Is that enough to meet the elements of this enhancement?

MS. ROSS: Yes, Your Honor. Yes, Your Honor, that is enough. And not only that, but in the interview it's clear that Mr. Lamond recognized that he was potentially the subject of the investigation. Based on the transcript, he starts to say something along the lines of: I'm starting to get the feeling I'm the subject, or something to that effect, and then he attempts to not -- to withhold his phone. He does not want to willingly give it up, in fact.

And so it shows that he became aware that he was potentially the subject of an investigation, which is enough to satisfy the elements. And not only that, Your Honor, but having recognized and kind of acknowledged that he was the

subject of an investigation, never tried to attempt to go back and clarify his statements, hence the obstruction.

THE COURT: All right. Okay. I think that with respect to this enhancement, that this does fall within the enhancement of providing materially false statements to a law enforcement officer in an attempt to obstruct or impede the investigation of his communications with Mr. Tarrio and whether that impeded the banner-burning investigation. So I will add the two level enhancement here.

We're now at a level 8. He is a zero-point offender, which means he has no prior criminal history at all. And I don't believe that any of the disqualifying circumstances in section 4C1.1(a)(1} through (11) apply. There's no violence in this case, no bodily injury. It's not a sex offense. There's no firearms, no financial harm, it's not a hate crime. Therefore, I believe he fully earns the two-level reduction as a zero-point offender, which brings us back to an offense level of 6.

His criminal history category, with no criminal history, puts him in category I. Therefore, the sentencing guidelines themselves would recommend a sentence of zero to six months for the false statement offenses. And, frankly, it would have been the same if I'd included neither enhancement or both enhancements. So while there's some disagreement from the government as to one and some disagreement from the defendant

as to the other, the guidelines range would have come out the same under any of those scenarios.

But that is only for the federal false statement counts. As I started at the beginning, the D.C. guidelines point us to a voluntary guideline of 36 months for the obstruction of justice counts. I don't believe either party has filed a motion for a downward departure from the guidelines for any reason. So that is how the guidelines inform what we're doing today, but that's not the only thing that's informing what we're doing today.

So now we're at the point where I want to hear from the parties. Would the government like to speak regarding the appropriate sentence in this case?

MS. ROSS: Yes, Your Honor.

Your Honor, this court should sentence the defendant to 48 months imprisonment. As Your Honor is well aware, the evidence in this case and the government's sentencing memorandum lays out all the reasons why the defendant's egregious conduct and the section 3553(a) factors support a 48-month term of imprisonment. There are just a couple things I want to highlight.

I'm going to start just by briefly highlighting the main reasons supporting a 48-month sentence, then I will discuss the defendant's sentencing memorandum and his most misleading and incredulous arguments to explain why his request

for probation should be wholly rejected.

Then I will discuss how the sentencing enhancement for obstruction under section 3C1.1, that we just talked about, Your Honor, also supports an increased sentence under the section 3553(a) factors, which they show how obstruction here is more troubling. He was in a position of trust and he abused that trust. And then, finally, I will touch just briefly upon the letters offered in support.

So, first, Your Honor, I know we filed a lengthy sentencing memorandum here, but I want to just discuss and highlight the reasons why a 48-month sentence is appropriate. The defendant was a trusted leader in MPD. Instead of using that trusted position to seek justice, he used it to obstruct justice. The defendant used his trusted leadership position to insert himself into an active investigation. Not to help his colleagues bring the offender to justice, but to help the offender. Rather than using a source to acquire important evidence, the defendant became the source.

There is no doubt that as a 23-year veteran of the police force, he knew this was wrong. The defendant, he knew it was criminal and he did it anyways. Then the defendant lied to cover it up, not just to federal law enforcement agents, but also to this Court on the stand. This is egregious conduct which requires a significant sentence, including for the purposes of general deterrence, to send the message that no one

is above the law. If the message is sent that a lieutenant with the Metropolitan Police Department is not going to be held responsible for these actions, then there will be serious consequences.

So now, Your Honor, I want to focus on the defendant's sentencing memorandum. Throughout the entire memoranda the defendant continues to minimize his actions, deflect responsibility, and ignore the evidence. He claims that his actions were, quote, not an egregious obstruction, betrayal, or anything of the sort. He claims that his actions did not risk officer safety or jeopardize the integrity of the banner-burning investigation.

He claims he acted, quote, sloppy and, quote, ineffective. He claims he simply strayed from the ideal, that he was a poorly-trained intel officer who became too chummy and too chatty with a source. These claims defy all logic and underscore the defendant's complete lack of remorse and refusal to accept responsibility.

You heard witness after witness come in here and tell you that there was simply no reason to use Telegram, to destroy communications with the source, with the subject, to not document meetings and conversations with a source and the suspect of a crime, and to withhold important information, including a confession, from his colleagues.

They told you that not only did these actions betray

MPD policies and their training, but also all common sense. The defendant was a lieutenant, he was in a leadership position. This was not some mistake. And the defendant continues to ignore all the ways his actions were not only wrong, but criminal.

Second, the defendant claims that there was nothing in this case that risks officer safety or jeopardized the integrity of the banner-burning investigation. He claims that he was responsible -- that he was responsible -- for bringing Mr. Tarrio's confessions to the attention of MPD, identifying Mr. Tarrio in the photos of the banner burning, identifying his voice in podcasts and coordinating his travel. He claims there was never any confidential, sensitive, or important information in the communications he had with Tarrio. He claims the resolution of the banner-burning investigation would not have been without him.

These claims were contradicted over and over again. As MPD witness after MPD witness came in here and told you they had to work harder and longer to identify Tarrio, to gather evidence and build probable cause because of all the useful information and evidence that the defendant never provided them.

The defendant conveniently neglects that he knew Tarrio took responsibility for posting the confession on his social media, that Tarrio was concerned about the hate crime

enhancement, that he knew Tarrio had confessed, that Tarrio had personally confessed to him. MPD was able to bring Tarrio to justice not because of the defendant, but in spite of the defendant.

The fact that the defendant fails to realize that only further underscores the importance of a sentence that reflects the seriousness of his actions, as is necessary pursuant to the section 3553(a) factors.

Despite the defendant's assertions in his sentencing memorandum, the nature and circumstances of his crimes warrant a 48-month term of imprisonment. The defendant claims that the only person he hurt in the commission of this crime was himself. This could not be further from the truth.

While it is true that the defendant did not use violence to obstruct the banner-burning investigation, the defendant's obstruction was egregious. He used his position and the faith and the trust that the public and his colleagues placed in him to deliberately insert himself into an ongoing investigation, to help the culprit at the center of that investigation. He used his position to repeatedly, over several weeks, learn sensitive law enforcement information that he would in turn share with the culprit he knew committed the offense and then withheld information that he learned from the culprit that would have helped bring the culprit to justice immediately.

This particular abuse of trust, this particular type of obstruction has a lasting impact on the public perception of the honor and integrity of this district's police force. The defendant yet again attempts to minimize his action and deflect responsibility by asserting that this trust can be restored if MPD simply changes its policies. There was nothing wrong with those policies when the defendant committed his crimes. They were clear. The defendant's attempts to suggest otherwise are nothing more than his selfish, last ditch efforts to escape a fair and just punishment and yet again blame others for his own criminal conduct.

Furthermore, Your Honor, a review of the *Riley* and *Frederiksen* cases indicate why the defendant's arguments in favor of a probationary sentence are meritless. Both cases are easily distinguishable. The defendant's conduct is far more egregious and the consequences far more serious.

First and foremost, the case involving Frederiksen, which the defendant conveniently glossed over, is from the District of Kansas and involved a state trooper who lied about his own illegal conduct in an illegal cash poker game. Frederiksen was not charged with using his law enforcement position to obstruct an investigation into a different suspect's wrongdoing.

Second, unlike *Riley* and unlike *Frederiksen*, the defendant actively inserted himself into an ongoing

investigation on behalf of the suspect of that investigation. He was working for the suspect. He pretended to help the investigation, but all the while he was working to undermine it.

While Riley, similarly, deleted evidence and withheld evidence from law enforcement, Riley did not purposely use an encrypted messaging platform to communicate with the suspect. He did not lie to his colleagues when asked about the suspect's role in the criminal conduct and did not subsequently lie to obstruct an investigation into his own criminal conduct. The defendant's reliance on those two cases to suggest he should be sentenced to probation once again defies all logic.

In short, Your Honor, nothing in the defendant's sentencing memo indicates he recognizes the gravity of his actions and the harm they caused. Quite the opposite. The defendant clearly minimizes, deflects, and ignores facts in evidence. This further emphasizes the need for him to be sentenced to a 48-month term of imprisonment.

Furthermore, as I mentioned before, as a lieutenant with MPD, a trusted leader in the department, it is necessary for the general purposes to -- for the purposes of general deterrence to send a message that no one is above the law. If a police officer obstructs justice and lies to cover it up, there will be serious consequences.

And just to recap, Your Honor, I know we talked about

the applicable sentencing enhancement here, but that sentencing enhancement only further underscores why a serious sentence is appropriate here. It further emphasizes the egregiousness of the defendant's conduct, that he abused his trust in him and lied to cover it up. This is a factual aspect of the section 3553(a) factors and shows why a greater sentence is necessary than a typical obstruction case. It was not typical. The defendant continued to obstruct justice.

Now, Your Honor, I want to touch briefly upon the statutory minimum sentence. And I know Your Honor talked about it and recognized that the D.C. guidelines are voluntary and that they do, however, impose a statutory minimum of three years imprisonment. But that manual was written by the sentencing commission that is in charge of protecting the citizens of this district. There's nobody better equipped to know the applicable sentences and how they should apply in this district and they made clear that there is a statutory minimum in this case. And, Your Honor, and this Court should recognize that that sentence would serve a purpose here.

And finally, Your Honor, turning to the letters provided to this Court by the defendant, I just want to touch upon the medical documents the defendant provided. Just briefly, nothing in there indicates that the Bureau of Prisons would not be able to accommodate ongoing treatment for the defendant's back pain. The Bureau of Prisons is more than

equipped to handle much more serious conditions. And if Your Honor needs additional argument on that point, I'm happy to go into more detail.

But, if not, Your Honor, the only other thing I want to say about the letters in support that the defendant provided is that they are simply more evidence of the defendant's lies and concealment. What those letters all tell you is that the defendant knew the rules. As Ben Santamaria told you, the defendant, quote, understood the need to cooperate with other law enforcement agencies and was very clear about the need to protect people's rights and the need to enforce the law within the confines of the law.

The defendant was experienced, knowledgeable, and clearly knew right from wrong. But he decided not to operate within the confines of the law to help Tarrio, he decided to help himself instead.

In sum, there's no getting around how serious a crime the defendant committed here. By deliberately and repeatedly acting to obstruct the banner-burning investigation, by then covering up his obstruction, by lying and concealing material facts from federal law enforcement officers, and by continuing to deny the truth and perjure himself in this court, the defendant demonstrated he did not care about what was right, he did not care about what was just. The defendant only cared about helping Tarrio and helping himself. And he is yet to

recognize the wrongfulness of what he did and the seriousness of what he did.

He's not given the Court any reason to think he recognizes the severity of his betrayal of his badge and his fellow MPD officers and in the faith the public placed in him. He has not recognized the outrageousness of a police officer, of a MPD lieutenant leaking to a suspect details of the investigation, even as it unfolds against that very suspect. That is why a period of probation is inadequate. Anything less than incarceration under the guidelines does not recognize the severity of what the defendant did and continues to do here.

This Court should sentence the defendant to 48 months imprisonment, the only sentence that is consistent with the purposes of sentencing here.

And if there's anything else, Your Honor, I'm happy to answer any questions.

THE COURT: I don't have any questions. Thank you.

Mr. Schamel, would you like to speak on the defendant's behalf?

MR. SCHAMEL: I'm almost inclined not to, Your Honor. You've been doing this longer than I have, you know how this works. I'm not here to argue with you about the facts of the case; we fundamentally disagree.

But as it relates to the issues at sentencing, what Your Honor is supposed to do in a 3553, with all due respect to

Ms. Ross and the egregiousness and all the adjectives we heard, the statute in D.C. was written during the '80s and '90s, where people were killing witnesses in murders left, right, and center. This is not a case that is more egregious than was anticipated by the D.C. council when they passed this statute, the non-mandatory three-year statute.

To say that general deterrence -- which I agree is probably the only thing, really, here that would even lean towards considering a jail sentence -- but to say that the general deterrence is not satisfied by being in every single news organization outlet, internet, online chat room in this region and across the world to be humiliated, to be publicly pillored -- pilloried. I mean, the press releases from the government and the statements from the government -- I mean, just today, you would think that he was obstructing justice and helping somebody kill someone and leaking evidence about a murder or getting somebody to escape.

This was a misdemeanor flag burning that the gentleman who was ultimately prosecuted and pled guilty to it, all the evidence in that warrant application in some way, shape, or form came from Mr. Lamond. Mr. Tarrio admitted to newspaper articles, online, in a podcast, he admitted to everybody about this misdemeanor. So I just want to take the rhetoric on this down about 100 degrees.

Shane Lamond lost his career, he lost the ability to

go out and work in law enforcement. I can tell you, personally I've talked to a number of different sources that would like to hire him, they cannot because he has now been found guilty of a felony.

And when I hear prosecutors -- I know Your Honor has heard it a lot, but I hear prosecutors talk about jail, jail, jail, jail, from people who most likely have never stepped foot in one. That is not the only way. It's not hitting somebody harder and that's how we make -- make things change, make things different. I've been doing this for a long time. I've never met anybody that thought they were going to get caught. I never met anybody that was deterred by any sort of sentence. It's an absurd idea. I was thinking about that last night when I was sitting in the D.C. jail waiting to meet with a client. Is that going to make a difference for Shane Lamond?

Under 3553, what is necessary, but not more than necessary? That's why the Supreme Court struck down the mandatory guidelines, which, let's all agree, Your Honor, even if you put all four of those, the one they disagree with and the one we disagree, we're still in a probation world. Right? That's why it's with Your Honor. I disagree greatly that the D.C. council knows better than anybody. I don't think the council numbers know better. I think the practitioners tend to know, particularly the practitioners on the bench.

Shane Lamond has been destroyed. He doesn't recover

from this. If Your Honor says, You know what? I think he needs to have probation, I think it needs to be long, I think he needs to have certain conditions, I think he needs to have home detention, he doesn't skip out of here and life is grand. He never escapes from this. No matter what happens.

But we live in interesting times. I understand one of Your Honor's colleagues the other day refused to put somebody in jail because of all the people that are getting pardons. He has not gotten one, and I don't think he's going to. So if even it's in the back of your mind that I'm going to send a message, I'm going to teach him, and maybe he's not going to have to serve it. He's going to serve what Your Honor sentences him to. He's not getting a free pass here.

THE COURT: Wait. Are you suggesting that I would factor into what I think the appropriate sentence is whether he might get pardoned or not? I assure you that that's not a factor.

MR. SCHAMEL: I know that everybody in this courthouse is aware of what's happening with pardons.

THE COURT: That is not a factor.

MR. SCHAMEL: Okay.

THE COURT: I'm going to do my job, whichever way I think is the right sentence. What happens after that is somebody else doing their job as they see fit. But that has not affected my doing what I have to do in this courtroom, and

it's not going to.

MR. SCHAMEL: I appreciate that, Your Honor.

THE COURT: So you can take that off your list of things to talk about.

MR. SCHAMEL: I raise it because one of your colleagues the other day --

THE COURT: I'm not sure he said quite what you said. So, anyway, go on.

MR. SCHAMEL: He's done today. This has happened. The general deterrence, the coverage, everything that has happened to him has been significant. But putting Shane Lamond in a cage for 6 months or 12 months or 36 months or the 48 months that they want him to go, doesn't matter. And I take it by Your Honor's reaction you don't think he's going to go in a cage, he probably gets a camp. Maybe. But I'm not the Bureau of Prisons and I don't know where they're going to assign him and I don't know what his designation would be and I don't think he should be sitting incarcerated for this for the purposes of general deterrence. And short of that, the only thing that would remain is punishment, and he in fact has been punished significantly.

So unless Your Honor has any questions from me, Mr. Lamond has prepared a statement.

THE COURT: I don't have any further questions for you, unless there's anything you want to say.

MR. SCHAMEL: I'm go to ask Mr. Lamond to come up. And I'm going to ask Your Honor to give him a sentence that does not involve incarceration.

THE COURT: Mr. Lamond, this is your opportunity, if there's anything you would like me to consider before I impose sentence in this case. You can join your counsel at the lectern and speak.

THE DEFENDANT: Thank you, Your Honor. Good morning, Your Honor. I've heard the Court's verdict in my case. And while I respectfully disagree with its findings, I understand how you could come to those conclusions. In retrospect, I agree with the Court and the prosecution that I made numerous errors, and in hindsight I would have done things differently.

I was not trying to make excuses for my actions during the trial. Instead, I was trying to explain my actions because my heart was truly in the right place and I never intended to do anything that would negatively impact our department or the city. I love my police department, I love my city, and I was doing everything in my power to keep everyone safe, from the protestors to law enforcement, to the citizens of the District of Columbia.

This has, as Mr. Schamel mentioned, cost me everything; my dream career that I worked all my life for, my reputation, my financial stability, and professional colleagues who I considered friends. It's affected my family and friends

as well. Many of them received messages disparaging me. They've all seen the news articles. I have family who live in France. It went as far as France because my uncle in France texted my mom, emailed my mom and said, you know, What's going on here? Never thought it would go international with this. But all these articles were portraying me as something that I was not. My elderly mother in particular, I'm her primary caretaker. This has caused immeasurable stress emotionally and physically on her.

This incident has also cost my ability to help others, which is something I've tried to do my entire life. I know one of my character letters mentioned me wanting to help two girls who were stranded on the highway with a flat tire. It's just something I've always done in my life. I want to help other people. That's why I joined the police department, that's why I joined the military prior to the police department.

Moving forward, I'll find some way to continue to help others, albeit not in a law enforcement capacity. But that's who I am. Unfortunately, at 49 years old, I'm at a crossroad and, frankly, I'm broken at this point. I respectfully request you take into account the totality of the circumstances and understand that I was doing everything that I felt in my heart was the right thing to do to keep the peace during these violent, unprecedented times. I thought that

building rapport, sloppy as I now see I was, was doing my job.

I'm asking the Court for grace and to impose a period of probation in lieu of incarceration so I can move forward with my life and continue to take care of my mother, my family, and to help others. Thank you, Your Honor.

THE COURT: Thank you very much.

What I want to do now is take a short break. I like to have an opportunity to absorb everything that I've just heard and factor it into what I'm going to do and what my thoughts were before I came in. So we'll stand down and, I think -- I always say it's going to be approximately 15 minutes and it turns out to be longer. So do with that information what you will. I'll come back when I'm ready.

(Recess from 10:27 a.m. to 11:01 a.m.)

THE COURTROOM DEPUTY: We are back on the record with criminal case 23-177, United States of America versus Shane Brian Lamond.

THE COURT: All right. Mr. Schamel and Mr. Lamond, you can return to the lectern.

As I said at the beginning of this sentencing and of every sentencing, there are a number of factors that I have to consider under the sentencing statute. And I'm going to go through all of them and that tends to take some time, but I'm going to do that in your case as well.

The first factor I'm supposed to consider is the

nature and circumstances of the offense. And I have to say, before I get into that, that I was a little surprised by the tone of the defense sentencing memorandum, which was a full-throated attack on both the prosecution and the verdict, it was not the whisper of today.

The memo is accusatory and disdainful about the findings made at the close of the evidence. In support of a lenient sentence the memorandum told me, quote, it is clear that the Court has viewed every interaction and communication between the two men through a lens of disbelief, close quote. Basically saying that I was biased from the start.

It ignores the lengthy statement that I made at the start of the verdict, when I assured the defendant that I would not hold against him his own post-January 6 statement of solidarity with Tarrio, which has been the source of so much of the negative publicity, and that I told him I would not hold Tarrio's bizarre performance on the witness stand against him.

I find the sentencing memorandum and the way it was constructed, along with some of counsel's other somewhat striking efforts to lecture me or take to the lectern to tell me how to organize these proceedings or manage the courtroom to be a questionable strategy on the part of counsel. But I'm not going to hold that against the defendant either, as he has been respectful throughout and that isn't a factor to be considered in this proceeding.

I explained the grounds for the verdict fully when it was rendered. I wasn't expecting to have to repeat myself today, but after reading the memorandum, apparently it's necessary.

I reject the notion that this was a predetermined outcome because of what I might or might not have thought about the defendant or what I might have thought or not thought about the Proud Boys or that I prejudged the defendant's testimony. I knew nothing about the defendant and what, if anything, he had revealed to Mr. Tarrio until I began reviewing the documents in connection with the pretrial conference and the evidentiary objections. Even then I hadn't seen them all and I certainly didn't understand the full nature of the Telegram evidence.

I was not yet familiar with the chronology which the defense kept trying to obscure, but which turned out to be of considerable importance in this case. I had not closely followed the Proud Boys' trial. I had my own cases to try. I didn't know what the evidence was regarding Mr. Tarrio's role in planning the activities that took place after he had to leave town.

So I didn't walk into this courtroom with preconceived notions about these people. It was the government's burden to prove the charges. The defendant didn't have to prove anything. He didn't have to say anything. He

didn't have to put on any witnesses. But I listened to all the evidence that was introduced. And I did have something very specific and very clear against which to measure the defendant's interview with the FBI special agents and against which to measure his testimony and Tarrio's testimony, and it certainly wasn't some preconceived lens or notion on my part.

I measured the interview with the FBI and Mr. Lamond's testimony and Mr. Tarrio's testimony against what they said and did at the time in writing. It was the number and timing and content, or the deliberate destruction of the content of the actual Telegram communications between the two in the record. That is what drove the case, that is what drove the verdict, and that was the record, after all, that Mr. Lamond tried to erase.

It's plain that Lamond did not expect the FBI to have those conversations because his answers to the agent's questions about them were directly contradicted by that evidence and he was quite flustered when he suddenly realized that they had them. And that record, and nothing else, is why he was found guilty of the three counts of making false statements.

Count 2, he was asked the question, "So when he would reach out and ask questions, when he would be engaging, would he be -- would it be common for him to fish?"

Answer, "No, not really. He never really asked me

questions about, like, you know, what we were doing or anything. It was more, you know, one-sided, with him just telling me, you know, what their plans were."

The defense to that was, well, the question wasn't clear. Who knows what "fishing" means? But there was nothing even the tiniest bit confusing about the agent's question that prompted that answer. The answer was responsive. It showed Mr. Lamond clearly understood it. The problem which led to his conviction of that count was not the question, it was the answer because the answer was entirely inconsistent with the messages themselves.

I went through the entire set of messages in which Mr. Lamond was passing information to Tarrio when I issued my very detailed verdict. It included all the times Lamond was, quote, giving Tarrio a heads-up and not asking him questions, all the times Tarrio was asking questions. It's all in the record. The finding that he was knowingly untruthful was supported by other instances when he was untruthful as well.

Mr. Lamond told the FBI agents interviewing him that when Tarrio asked a question about the banner-burning investigation, quote, I told him, you know, it's not my investigation. I actually referred him to the case detective. Well, that was a very interesting thing to say to the officers because it was absolutely not true. There was not a single message in which that happened, but it shows that Lamond knew

exactly what he was supposed to have done.

And then we have the point where he was asked, Well, how did you communicate with Tarrio? And, gosh, he just couldn't remember. I'm trying to think, was it phone? Was it text? And then when the agents offer up, Well, did you use an app like Telegram? He goes, Yeah, maybe. This is not a person telling the whole truth and nothing but the truth.

Then there was Count 3, he was asked the question, "What were the conversations like when you spoke to Tarrio between the banner burning and January 4th? Was he prepping you for what was coming?" Answer, "That was part of it." Well, that was interesting because there surely was not much of that at all. Mr. Tarrio was quite tight-lipped. And then Mr. Lamond he goes on, he goes, And I spoke to Tarrio without tipping him off to the MPD investigation.

I don't know why he volunteered that because it was contrary to the evidence of his providing regular updates, especially concerning MPD's efforts to get a warrant, which the defendant then tried to justify on the grounds that, well, it's okay to share information about a warrant because that's information that's going to be public eventually. That is absolutely not the way police treat information about having a warrant for someone, and certainly Mr. Lamond knows that.

He also said that Lieutenant Mufti, who was in charge of that investigation, had asked him to reach out to Tarrio,

but that wasn't true either.

Then there was Count 4, where the defendant was being questioned about the circumstances of Tarrio's arrest. And when he was asked if CID had determined that they weren't going to try to get him to turn himself in, the defendant then volunteered, "Yes, but I know that I didn't inform him that he had an arrest warrant." And I found that to be false, too.

He had been telling Tarrio all along when the lieutenant in charge of the investigation had submitted warrant applications to the U.S. Attorney's Office. "Just a heads up." And as of the evening before, when Lamond was as yet unaware it had been signed and he told Tarrio it hadn't been signed, and Tarrio, true to the pattern that we'd seen throughout, immediately informed other members of the Proud Boys what defendant had told him.

So that was the background for the next morning, where we have the investigation that, shortly after Tarrio took off on January 4th, Mr. Lamond opened up a chat with the highest level of encryption, set the self-destruct timer so the message would only last 10 seconds after it was read. That's not the way police officers communicate with other people's suspects.

Then immediately after the plane reached the altitude where Tarrio would have had WiFi access to the message, Tarrio started telling people on the ground that the warrant was

signed, and he refers to talking to his contact. The defense tells me in its memorandum, quote, Lamond could have done a better job when he was confronted by federal agents about his contacts with Tarrio, close quote. That is quite the understatement.

He lied to the federal agents, when he was a sworn law enforcement officer himself. The memo says he could have memorialized his communications with Tarrio. Actually, the evidence showed he should have. But he chose to encrypt them and sometimes immediately destruct his communications with Tarrio in real time and, worse, deleted anything that was left afterwards.

The memo sayings Mr. Lamond explained that he didn't tell Mr. Tarrio anything he thought was valuable or useful. And that's the same sort of tortured excuse that fell short at trial. He wasn't supposed to be chatting up someone else's suspect about the subject of their investigation at all. It wasn't his choice to make. The general orders don't have a misdemeanor exception, they don't have a, oh, sometimes he's your source exception, and they don't have a sometimes you get to decide if it's important or not exception.

The verdict in this case was based on the chronology, based on the defendant's own messages. The fact that even he knew they were damning is borne out by the fact that he saw fit to encrypt them and then to erase them and then to lie about

them later.

The memorandum asked me for lenience because, quote, Mr. Lamond learned through this case that his sloppy work and inattention to detail cost him everything. That is not what the evidence showed and not what he was convicted of and not what is causing the consequences.

On top of the three charges of making false statements to federal agents -- something fundamentally contrary to his oath and obligation as a law enforcement officer -- he was also found guilty beyond a reasonable doubt of obstructing his own department's investigation into the destruction of a banner that belonged to a church in the very city Lieutenant Lamond was supposed to serve.

He stuck his nose into it to pass on his views why it shouldn't be a hate crime, knowing that was Tarrio's key concern. And I think it would have mattered to the people you were discussing that with, if they had been told that you were chatting with Tarrio about that very same issue.

You met with Tarrio on December 15th at the Dubliner. Immediately after that meeting Tarrio told his own people he'd just admitted burning the banner to a D.C. police officer. I found that more credible than either man's later denials because their communications from that point on reflected a shared understanding that Tarrio was involved.

On December 18th Tarrio set Lamond a message that

said this wasn't a hate crime and I want to see it play out. And the defendant says I'm curious to see what happens, too. I will check with our CID people to see if they have you on video. What does that tell you? It tells you that the two of them plainly know at that point that he was there.

Yet Lamond doesn't tell MPD he is withholding that information from his own department and, worse, he's not just passively waiting but he's poking around to get information from his colleagues to share with Mr. Tarrio. That's why they met at the Dubliner in the first place, not to gather information from him, not because someone sent him, Tarrio asked Lamond the day after the banner burning and other events of December 12th, What's the general consensus with D.C. Metro and my guys? The defendant doesn't say I can't talk to you about that. He doesn't say that's someone else's case, he says, "That's an in-person convo over a beer."

Yes, as the defense point out, he lets his supervisor know that he's going and he lets her know about Tarrio's public Parler post taking credit. And, yes, eventually, on December 20th, he grudgingly says, when he's asked to look at the photos of the banner burning for a second time, said, Yeah, based on what the person in the photos is wearing, I believe that's the same guy. It appears to be the same guy. But that information comes a little late and it's a little incomplete.

So the verdict was based on the evidence. And so,

no, I cannot accept the suggestion in the memorandum that he contributed significantly to the successful arrest and prosecution of Enrique Tarrio. It's not so meaningful to let your colleagues know, Hey, there's a post on Parler in which he takes responsibility, when he didn't ever tell MPD that he had discussed it with Tarrio directly. It's not so helpful to give the police information if he is passing information about what they're doing and what they're thinking to Tarrio at the very same time. It's not consistent with any of the police ethical rules he testified about in court, unless you twist them until they're unrecognizable.

The defense emphasizes that I have to understand that all this chitchat with Tarrio, all this sharing of information, all of it was in service of a larger goal, to gather information from him. And I agree that to some extent the chumminess, the going for a beer, despite the supervisor's "Eek," passing information on about Harry's Bar and what the ABC Commission was up to, all that was consistent with trying to cultivate a source, trying to learn where the various groups were going to be to prevent conflict the next time they all came to town. And maybe he got a little information about where and when they were going to march when they were in town in November and December.

But the memorandum has the temerity to say this all happened -- all of this -- because Lamond was working hard to

potentially try and stop what happened on January 6. According to the defense, he, quote, only sought, albeit in a sloppy and ineffective way, to gain information and intelligence that would help stop the violent protestors coming to D.C. in late 2020 and early '21, close quote. That is a grandiose and largely unsupported statement.

We've had the benefit of seeing everything the two were saying to each other during the period between the banner burning and January 6. And Tarrio was certainly not telling Lamond anything about what the Proud Boys -- and certainly not about the particular subgroup he was in communication with called the Ministry of Self-Defense -- he was not talking about what they were planning. That's not Lamond's fault, if Tarrio was keeping his cards close to the vest, but it turned out he didn't gather much of any intelligence.

But I want to emphasize that's not what he's on trial for and not what he's being sentenced for. That's not the problem. If Tarrio stonewalled him, he stonewalled him. The problem was the evidence that showed that Lamond, who had made the decision to use Telegram pretty much exclusively during that period, isn't asking questions at all. The defense says it was a sloppy and ineffective way to get information, but where's the information of his trying to gain information? The record shows at that point that Tarrio was using Lamond as a source and not the other way around, and the defendant was

happy to help him out.

I do agree with the defendant, though, that he didn't harm any person and he didn't enrich himself with his conduct, whatever his motive may have been, and I do not think there's enough evidence for us to decide what it was. It was not to benefit himself.

So that's the nature and circumstances of the offense. I'm also supposed to think about the history and characteristics of the defendant. And I firmly agree with his sister Nicole that the events in this case do not reflect his character in its entirety. The man standing in front of me, a decorated veteran who served this country with distinction, six years in the U.S. Air Force. He also served as a respected law enforcement officer, rising to the level of lieutenant in the Metropolitan Police Department, and being awarded medals along the way, for approximately 20 years. I haven't been informed of any disciplinary issues whatsoever. This was a job that he loved and he performed with honor, and I believe that.

He takes care of others in more deeply personal ways as well. Not only his daughters, who wrote about it beautifully, but his 82-year-old mother. He's not just the kind of adult son who calls on the weekends, but he is the one who takes her to her medical appointments, maintains her home, handles everyday tasks. And that's not the first time he's stepped up in that way either.

I was told the remarkable story of his standing by his ex-wife when she was diagnosed with cancer. He took care of her, got her to her treatments, and he took care of her children when she was unable due to the effects of those treatments and her illness. And he's been there as a loving, involved father for his daughters. There's people who make a show of it and people who do it for real, and I think what you've given them is very real. So that all speaks in your favor as a human being.

But a lot of that also cuts both ways. Who a person is and whether they surely should have known better is a fundamental aspect of the history and characteristics of the defendant and it bears on the seriousness of the offense and promoting respect for the law and deterrence. Here, we know that Lieutenant Lamond was trained better than this and that he knew better than this. And he revealed his own understanding of his own wrongdoing when he deleted all the messages and he tried to cover it up when he met with the officers. Had he not compounded the offense with lying to the special agents, I don't know if we would be here; we might not, I can't say. But he revealed his understanding again in his testimony during the trial when he tried to offer up a series of flimsy reasons why what he did was okay. And they simply did not hold up.

Given the combination of the conduct underlying the obstruction of justice conviction and then his attempt to slip

it past the FBI with a series of lies, I have a real concern that a sentence of mere probation would not suffice to address the seriousness of an offense like this, committed by a person with arrest powers, a person sworn to uphold the law.

He repeatedly dishonored the badge and the organization to which he belonged and that is how he hurt someone or something other than himself. He hurt the reputation of the Metropolitan Police Department and its image in this community. He does have some letters from law enforcement officers attesting to his character, but the testimony of some who were witnesses and who were deeply troubled by his conduct is part of the record as well and, frankly, it's very hard to forget. Their disappointment in the messages they were asked to read was palpable. As Commander Carroll put it succinctly, but powerfully, Tarrio and Lamond were talking about the police as a third-party, but Lamond was the police.

I'm required to impose a sentence that's sufficient, but not greater than necessary, to accomplish a number of purposes that are set out in the statute. I have to consider the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. I'm supposed to also deter you and other people from similar criminal conduct in the future. I'm supposed to protect the public from further crimes

committed by you. I don't think deterring you or protecting the public from you are factors for consideration today.

I'm also supposed to think about the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, which means your sentence has to be fair when you compare it to sentences that other people got. The guidelines were supposed to serve this function, but they're really not helpful here because they don't deal the lead count and we haven't been given information about how to group these offenses in an appropriate way.

What is sufficient and not greater than necessary is always a difficult call, and it's a very difficult call in this case. I acknowledge that the defendant has lost a great deal, and I don't doubt that much of what he's experienced falls within the category of punishment. I also acknowledge the seriousness of sentencing a law enforcement officer to prison, even if the word "cage" was hyperbole, even if he will be eligible to serve it at a camp. I don't sentence him to serve time lightly. The risks to the defendant under those circumstances are real.

For those reasons and all the other factors I've listed, I think that the government's proposal of 48 months for this offense for this person is excessive. On the other hand, I'm not sure that I agree what's happened has been enough yet

to reflect the seriousness of the offense or to promote respect for the law.

I do not agree with counsel's suggestion that deterrence would be the only thing that could possibly justify incarceration here because, so far, neither the defendant's testimony or his sentencing presentation reflect any contrition whatsoever. It's all the FBI agent didn't treatment me fairly, the prosecutors didn't treat me fairly, the press didn't treat me fairly, the Court didn't treat me fairly.

I agree with the prosecution that while he's sorry for what happened to him and he's sorry for what happened to his family, he's really yet to express understanding or remorse or acknowledgement that his own actions that the prosecutor was talking about today, that what I'm talking about today is the reason he's in this position.

I realize that the defendant went to trial and will appeal and, therefore, he was not going to express remorse for what he did to the presentence report writer and I'm not going to hold that against him because that's what any defense attorney worth his salt would advise. But the entire attitude throughout has been how dare they bring these charges. And the remorse expressed, being truly sorry for doing a sloppy job, for not being attentive to detail, that is so far off the mark that I still have a serious concern about the need to send a strong message to fulfil the statutory purposes.

I do have to consider parity with other defendants, though. And I do agree that in some ways the *Riley* case is comparable. It's definitely closer than anything else we've been shown. That gentleman urged a fishing buddy -- he was a Metropolitan Police Department member, he urged a fishing buddy, or would-be fishing buddy, to take down posts about his activities on January 6 to avoid arrest.

The jury actually hung on the obstruction of justice count, obstructing the grand jury investigation of that guy. But then when he found out that the friend had told the FBI that he'd talked to a guy from MPD, he also deleted all of his communications with that person to obstruct the FBI investigation of himself for obstructing the other investigation. He was convicted of that. He lost his job. The same punishment that you have had to suffer. And he was a canine officer and he also lost his dog, which was particularly painful to him. It was actually very excruciating.

I note that he was convicted of the federal obstruction of justice count, which had a maximum 20 years of imprisonment as a potential sentence. His guidelines then put him at level 14, with a recommended sentence of 15 to 21 months. And I said in that case, I have to say, that all the consequences that have flowed so far have been the consequences of his own actions and there's no one else to blame.

I don't see that deterring him or protecting the

community from him as a basis for serious sanction. I think the offense was sufficiently unique that it's not clear how strongly I have to act to deter others, but I do feel that the defendant's proposal does not fully recognize the seriousness of the offense or promote respect for the law. And I can't just say, Oh, well, no need for any additional consequences imposed by me. Twelve months probation with no special conditions is more like -- more like what you would see in misdemeanor cases.

So that's what I said to Officer Riley. I didn't think probation was appropriate in his case, and there all we had was the deletion of the messages, no lies afterwards to federal law enforcement officers. So all of what I said to him applies to you, too, only more so.

But there were significant personal circumstances presented in sealed medical records that had a significant bearing on the sentence and that was why a term of probation was recommended and imposed. So this defendant is not necessarily in the same position and I still have the same concerns that I just can't let pass.

Therefore, in an exercise of my discretion, after consideration of all the statutory factors, the sentence to be imposed is as follows:

It is the judgment of the court that you are hereby sentenced to a period of 18 months incarceration on Count 1

and six months on each of Counts 2, 3, and 4, to run consecutive to each other, but all concurrently with the sentence on Count 1.

I find by clear and convincing evidence that this defendant is not likely to flee or pose a danger to the public and I will permit him to voluntarily surrender when the place to serve the sentence has been designated. Given what I've been told about his medical procedure, I will direct that his designation be no earlier than June 15th. I also think it is particularly important in this case to wait until he's designated to a federal prison, as I find it would be inappropriate and unduly harsh for him to be detained in the interim in D.C. jail under all the circumstances.

You are further sentenced to serve an 18-month term of supervised release. I find at this point the defendant does not have the ability to pay a fine and I will not order him to pay a fine. You are required to pay a $100 special assessment on each federal count, for a total of $300, and a special assessment on the D.C. charge of between $100 and $5,000. I will make that one an additional $100, for a total of $400. The financial obligations for Count 1 are immediately payable to the D.C. Superior Court for deposit into the Crime Victims Compensation Fund. If you change your address, you have to notify the Budget and Finance Office of the D.C. court of the change until such time as the financial obligation is paid in

full.

The obligations for Counts 2, 3, and 4 are immediately payable to the Clerk of this court. Within 30 days of any change of address you have to notify that court of the change until such time as the obligation is paid.

Special assessments are immediately payable and while incarcerated you can make payments on them through your participation in the Bureau of Prisons' Inmate Financial Responsibility Program.

Within 72 hours of release from custody you must report in person to the probation office in the district to which you are released. I will transfer supervision to the district in which you reside if it's not the District of Columbia, but I will not transfer jurisdiction of this case to another court.

While you're on supervision, having been convicted of a felony, you shall not possess a firearm or other dangerous weapon, you shall not use or possess an illegal controlled substance, and you shall not commit another federal, state, or local crime.

You're going to have to abide by the general conditions of supervision adopted by the probation office. They were in the presentence report in paragraph 171, on page 28, so you're on notice of them. As well as the following special conditions: You must submit to the collection and use

of DNA identification information either while you're incarcerated or at the direction of the probation office.

You must perform 200 hours of community service at the direction and under the supervision of the probation office, which must approve the type and location of the service in advance, and verify that the hours have been completed.

Mr. Schamel, are there any objections to the special conditions?

MR. SCHAMEL: Not the special conditions, Your Honor. I just would ask for designation delay because, as Your Honor has identified, he does take cure of his mother and has a lot to set up. So I would ask, instead of June 15th designation, August 18th designation to give us that opportunity.

THE COURT: All right.

MR. SCHAMEL: As I indicated to the Court, he has a June 10th medical appointment and he has some other things to get lined up.

THE COURT: Well, August 1st -- I mean, can we do July 1st? That gives him a month. July 15th?

MR. SCHAMEL: It gives him 24 days. But, yeah, I mean --

THE COURT: I don't know how long it's going to take --

MR. SCHAMEL: My understanding -- I defer to probation. I think it's 60 to 90 days, sometimes, to get a

designation.

THE COURT: I think it's been more like 30 lately. How long do we think it's going to take? I think it may take a little longer in this case to find an appropriate place.

THE PROBATION OFFICER: Good afternoon, Your Honor. Sherry Baker from the probation office.

Your Honor, anywhere from four to six weeks?

THE COURT: Weeks, okay.

THE PROBATION OFFICER: Um-hum.

THE COURT: All right. All right. Under the circumstances, given his compliance with all his conditions to date, and given the need to put his affairs in order and the need to make an appropriate designation, which I hope the Bureau of Prisons will do very carefully, I will order that he must report when designated, no earlier than August 1.

The probation office is ordered to release the presentence investigation report to any appropriate agencies -- though there's not going to be any treatment involved -- in order to execute the sentence of the Court.

Mr. Lamond, you have the right to appeal the sentence imposed by this Court on your conviction. If you choose to file an appeal, you must file any appeal within 14 days after the Court enters judgment. If you're unable to afford the cost of appeal, you may request permission from the Court to file an appeal without cost to you.

Are you asking for any particular place that he be designated, Mr. Schamel, other than as close as possible to his family? Is there a place --

MR. SCHAMEL: Yes, Your Honor. I'm asking for a recommendation of Cumberland. They have a camp and it's one of the few placements accessible to his family.

THE COURT: All right. I will make that recommendation in the judgment and commitment order.

Anything further from the government?

MS. ROSS: Nothing, Your Honor. Thank you so much.

MR. SCHAMEL: I know it will be in the J and C order, but I just didn't really understand. It's the DDC Act to Superior Court was also $100?

THE COURT: Yes.

MR. SCHAMEL: It's two separate $100 payments?

THE COURT: It's three $100 payments for federal court, one for each felony offense, and then $100 payment to Superior Court. So it's $400 total.

MR. SCHAMEL: Got you. Thank you. That's what I didn't track, Your Honor.

THE COURT: Thank you.

* * *

CERTIFICATE OF OFFICIAL COURT REPORTER

I, JANICE DICKMAN, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 3rd day of August, 2025

________________________________

Janice E. Dickman, CRR, CMR, CCR
Official Court Reporter
Room 6523
333 Constitution Avenue, N.W.
Washington, D.C.  20001