ORAL ARGUMENT NOT YET SCHEDULED

BRIEF FOR APPELLEE

———————————————

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

No. 25-3066

———————————————

UNITED STATES OF AMERICA,                            Appellee,

v.

SHANE LAMOND,                                        Appellant.

———————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————

JEANINE FERRIS PIRRO
United States Attorney

CHRISELLEN R. KOLB
DANIEL J. LENERZ
REBECCA ROSS
* MARY C. FLEMING
D.C. Bar # 1048019
Assistant United States Attorneys
* Counsel for Oral Argument
601 D Street, NW, Room 6.232
Washington, D.C. 20530
Mary.Fleming@usdoj.gov
(202) 252-6829

Cr. No. 23-177 (ABJ)

# CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), appellee hereby states as follows:

## Parties and Amici

The parties to this appeal are appellant, Shane Lamond, and appellee, the United States of America.

## Rulings Under Review

This is an appeal from the judgment entered by the Honorable Amy Berman Jackson on June 10, 2025, following Lamond's convictions for obstruction of justice and making false statements (Appendix for Appellant ("A") 79-85). Appellant argues that the obstruction-of-justice statute does not apply to his conduct, and, separately, that the evidence was insufficient to support his convictions.

## Related Cases

Appellee is unaware of any related cases.

## STATUTES AND REGULATIONS

Pursuant to D.C. Circuit Rule 28(a)(5), appellee states that all pertinent statutes and regulations are contained in the Addendum to the Brief for Appellant.

# TABLE OF CONTENTS

INTRODUCTION ........................................................................... 1

COUNTERSTATEMENT OF THE CASE........................................... 2

The Trial ...............................................................................3

The Government's Evidence .....................................................3

A.  Lamond's Job Duties...........................................................3

B.  Overview of Lamond and Tarrio's Communications............3

C.  The Substance of Lamond and Tarrio's
Communications. ...............................................................5

1.  Prior to November 7, 2020—the date Joe Biden
was announced as the election winner. .........................5

2.  November 7 to December 12, 2020—the date of the
banner burning. ...........................................................6

3.  December 13, 2020, to January 4, 2021—the date
of Tarrio's arrest...........................................................8

4.  January 7 to 27, 2021.................................................16

D.  Impropriety of Lamond's Conduct.....................................17

1.  MPD Policies ..............................................................17

2.  Lamond's Conduct.......................................................18

E.  Lamond's Interview with Federal Agents..........................21

The Defense Evidence............................................................22

Lamond's Motion for Judgment of Acquittal ..................................24

The Trial Court's Ruling and Verdict ...........................................24

SUMMARY OF ARGUMENT..........................................................25

ARGUMENT ..................................................................................27

    I.   Lamond's Statutory Challenge is Waived and, In Any Event, Cannot Satisfy Plain-Error Review. ............................27

        A.   Standard of Review ..........................................................27

        B.   Argument .........................................................................30

            1.   D.C. Code § 22-722 ....................................................30

            2.   The obstruction statute applies to the banner-burning investigation. ..............................................33

            3.   Even assuming § 22-722(a)(6) requires obstruction of a court proceeding, that requirement is satisfied. ...................................................................45

            4.   Any error was not plain. ............................................48

    II.  Lamond's Convictions Were Supported by Sufficient Evidence. ..................................................................................50

        A.   Standard of Review ..........................................................50

        B.   The Evidence was Sufficient to Show Lamond's Corrupt Intent Under § 22-722(a)(6). ...............................50

        C.   The False-Statement Counts ............................................59

            1.   Counts Two and Three ...............................................59

            2.   Count Four .................................................................64

            3.   Count One does not infect Counts Two through Four. .........................................................................67

CONCLUSION ..............................................................................68

# TABLE OF AUTHORITIES*

**Cases**

*Ali v. Fed. Bureau of Prisons*, 552 U.S. 214 (2008)................................34

*Arthur Anderson LLP v. United States*, 544 U.S. 696 (2005)........... 51, 58

*Brown v. United States*, 89 A.3d 98 (D.C. 2014).............................. 47, 51

*Crutchfield v. United States*, 779 A.2d 307 (D.C. 2001) .........................35

*Decuir v. United States*, 285 A.3d 512 (D.C. 2022)..................... 46, 47, 51

*Haili v. United States*, 260 F.2d 744 (9th Cir. 1958).............................40

*Hall v. United States*, 343 A.2d 35 (D.C. 1975) ............................... 28, 40

*Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242 (2010) .............34

*Hawkins v. United States*, 119 A.3d 687 (D.C. 2015) .............................51

*Jennings v. United States*, 351 A.3d 1075 (D.C. 2026)...........................49

*Loving v. IRS*, 742 F.3d 1013 (D.C. Cir. 2014) ............................... 27, 33

*Mason v. United States*, 170 A.3d 182 (D.C. 2017)..................... 34, 35, 44

\* *Pugin v. Garland*, 599 U.S. 600 (2023) ................................ 38, 39, 45, 46

*Smith v. United States*, 357 A.2d 418 (D.C. 1976)...................... 30, 38, 40

*United States v. Barry*, 938 F.2d 1327 (D.C. Cir. 1991) ........................38

*United States v. Bowline*, 917 F.3d 1227 (10th Cir. 2019) .....................28

\* *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024). 26, 29, 35-37, 42, 49

*United States v. Burroughs*, 810 F.3d 833 (D.C. Cir. 2016) ...................29

\* *United States v. Chapin*, 515 F.2d 1274 (D.C. Cir. 1975)........... 60, 61, 62

---

\*    Authorities upon which we chiefly rely are marked with asterisks.

*United States v. Cohen*, 301 F.3d 152 (3d Cir. 2002)..............................48

*United States v. Davis*, 183 F.3d 231 (3d Cir. 1999)..............................48

*United States v. Doost*, 3 F.4th 432 (D.C. Cir. 2021) ............................64

*United States v. James*, 764 F.2d 885 (D.C. Cir. 1985) ..........................58

*United States v. Jefferson*, 974 F.2d 201 (D.C. Cir. 1992) ......................50

\* *United States v. Laureys*, 653 F.3d 27 (D.C. Cir. 2011)........................49

*United States v. Lucas*, 67 F.3d 956 (D.C. Cir. 1995) ............................50

*United States v. Mejia*, 597 F.3d 1329 (D.C. Cir. 2010) .........................55

\* *United States v. Milton*, 8 F.3d 39 (D.C. Cir. 1993)...............................60

*United States v. Peyton*, 745 F.3d 546 (D.C. Cir. 2014)....................28, 29

*United States v. Reveron Martinez*, 836 F.2d 684 (1st Cir. 1988) ..........62

\* *United States v. Sampol,* 636 F.2d 621 (D.C. Cir. 1980) ........................60

*United States v. Scoratow*, 137 F. Supp. 620 (W.D. Pa. 1956) ...............39

*United States v. Sutton*, 801 F.2d 1346 (D.C. Cir. 1986)........................50

\* *Vermont v. O'Neill*, 682 A.2d 943 (Vt. 1996)....................................40, 46

*Wynn v. United States*, 48 A.3d 181 (D.C. 2012) .................. 40, 41, 44, 47

**Other References**

18 U.S.C. § 1001(a)(2)......................................................................................2

18 U.S.C. § 1503 (1948) ....................................................... 30, 39, 40

18 U.S.C. § 1503(a) ...........................................................................39

D.C. Code § 22-721(a)(4).......................................................... 34, 42

D.C. Code § 22-721(4) ......................................................................47

D.C. Code § 22-722 ......................................................................2, 30

D.C. Code § 22-722(a)(2).................................................................43

D.C. Code § 22-722(a)(6)......................... 24-28, 30, 33-34, 40-47, 48, 50

D.C. Code § 22-722(a)(3)(B).................................................... 37, 40

D.C. Code § 23-113 ...........................................................................47

Fed. R. Crim. P. 12(b)(3)  ..............................................................25, 28

Fed. R. Crim. P. 12(c)(3)..................................................................28

Code of Law for D.C., ch. 19, § 862 (Mar. 3, 1901) ...............................30

Committee on the Judiciary, Council of the District of Columbia,
    Report on Bill 9-385 (May 20, 1992) .............................................31

Committee on the Judiciary, Council of the District of Columbia,
    Report on Bill 10-268 (Oct. 26, 1994)................................. 32, 37, 38

D.C. Law 4-164 §  502, 29 D.C. Reg. 3976 (1982) ...........................31, 35

D.C. Law 9-268 §  2(c), 39 D.C. Reg. 5702 (1993) .................................31

D.C. Law 10-256 § 3, 42 D.C. Reg. 20 (1995)..........................................31

S. Rep. No. 912, 90th Cong., 1st Sess. 20 (1967) ....................... 30, 31, 38

# GLOSSARY

A           Appendix for Appellant

BLM         Black Lives Matter

Br.         Appellant's Opening Brief

CID         Criminal Investigations Division

D.C.        District of Columbia

Ex.         Government Exhibit

MPD         Metropolitan Police Department

PDS         Public Defender Service

SA          Appellee's Supplemental Appendix

## ISSUES PRESENTED

I.    Whether appellant Shane Lamond waived his argument that the District of Columbia's obstruction statute, D.C. Code § 22-722(a)(6), does not apply to the conduct charged, and, alternatively, whether Lamond can show plain error where he raises a complex statutory-interpretation question the answer to which is not clearly established, and in any event, the statute by its plain terms applies to Lamond's conduct.

II.    Whether the evidence was sufficient to show (a) Lamond's corrupt intent for purposes of the obstruction charge, and (b) that Lamond made false statements to investigators.

## INTRODUCTION

Shane Lamond, a lieutenant and 24-year veteran of the Metropolitan Police Department ("MPD"), repeatedly leaked internal information about an MPD investigation to the investigation's subject—Henry "Enrique" Tarrio, leader of the Proud Boys. Among other things, Lamond told Tarrio about the investigation's status, MPD's internal deliberations, the FBI's involvement, that an arrest warrant was likely forthcoming, and that the warrant had been signed. Lamond used Telegram to communicate with Tarrio, knowing that Telegram's encryption would make it harder for the communications to be intercepted. Lamond also deleted his communications with Tarrio, rather than preserving them as MPD policy required. Lamond did not tell detectives investigating Tarrio about these communications, even when asked. Nor did Lamond tell detectives that Tarrio had privately confessed to him.

Lamond knew that his conduct was wrong and risked impeding MPD's investigation and the impending prosecution. His colleagues and superiors universally testified to that effect. Lamond's attempts to cover his tracks by using Telegram and deleting messages further evidenced

his knowledge of wrongdoing. And then, when interviewed by federal agents about his relationship with Tarrio, Lamond lied about the nature of that relationship and his communications with Tarrio.

For this conduct, Lamond was appropriately convicted of obstruction of justice and making false statements to investigators. His challenges to those convictions should be rejected.

## COUNTERSTATEMENT OF THE CASE

By indictment filed May 18, 2023, Lamond was charged with one count of obstruction of justice, D.C. Code § 22-722, and three counts of making false statements, 18 U.S.C. § 1001(a)(2) (A23-39). On December 23, 2024, after a bench trial, the Honorable Amy Berman Jackson found Lamond guilty on all counts (A1385). On June 6, 2025, Judge Jackson sentenced Lamond to a total of 18 months of incarceration to be followed by 18 months of supervised release (A80-81, 1440-41). Lamond timely appealed (A86).

## The Trial

### *The Government's Evidence*

### A.    Lamond's Job Duties

Lamond was the lieutenant in charge of MPD's intelligence branch (A635-36). Lamond was responsible for MPD's intelligence operations, including intelligence related to First Amendment activities like protests, rallies, and demonstrations in the District of Columbia (A636-37).

### B.    Overview of Lamond and Tarrio's Communications.

In July 2019, Lamond met Tarrio, the national leader of the Proud Boys (A192, 342-43). Tarrio and other Proud Boys regularly attended rallies, protests, and other events in D.C. (A343, 609). From October 24, 2019, to January 27, 2021, Lamond and Tarrio were in regular contact and met in person several times (A307, 401, 427, 454-55). They communicated more than 600 times by phone calls, text messages,[1] and Telegram messages (A523). Telegram is an application through which

---

[1] As used herein, "text messages" collectively refers to SMS messages (standard text messages), iMessages (text messages between iPhones), and Google Voice messages (a third-party phone application) (see A299-300, 309, 326). Tarrio's Google Voice messages transmitted to Lamond's phone as SMS messages (A326).

users can make calls and send messages through private or secret chats (A294-95, 328). Secret chats use a higher level of encryption and offer a self-destruct feature that, if enabled, automatically deletes messages after they are read (A304-06, 461).

At first, Lamond and Tarrio primarily communicated through phone calls and text messages (A522; Appellee's Supplemental Appendix ("SA") 5). They began using Telegram regularly after November 7, 2020—the date it was widely reported that Joe Biden won the 2020 presidential election (A408, 415, 440-41). After December 12, 2020—the date that Tarrio burned a Black Lives Matter ("BLM") banner stolen from a church in D.C.—Lamond and Tarrio used Telegram exclusively (A437, 441-43). On December 18, 2020—the date Tarrio publicly admitted to the banner burning—Lamond sent the first Telegram secret chat to Tarrio; thereafter, Lamond and Tarrio used Telegram secret chats or calls exclusively (A460-61, 1598-1618).

On December 22, 2020, Lamond applied the self-destruct feature to his chat with Tarrio, which later made it impossible for law enforcement to recover the subsequent messages (A305-06, 318-23, 329; SA1-4). Additionally, Lamond's Telegram messages with Tarrio prior to January

4

7, 2021, and some Telegram calls, had been deleted from Lamond's phone (A302-03, 312, 328-29).[2] Many audio messages sent through Telegram chat had been deleted and were unrecoverable (A303-04).

### C. The Substance of Lamond and Tarrio's Communications.

#### 1. Prior to November 7, 2020—the date Joe Biden was announced as the election winner.

From October 24, 2019, to November 6, 2020, Lamond and Tarrio communicated almost exclusively through text messages and phone calls (SA5). During this period, they exchanged only four messages by Telegram, which Tarrio initiated by sending the GPS coordinates to Harry's, "a bar frequented by the Proud Boys" (A374). Lamond responded that an alcohol violation report had been filed for Harry's and he would inform Tarrio of the potential sanctions "[a]s soon as [he] find[s] out" (A374-75). Tarrio then switched back to texting Lamond (A1570).

Over the next several months, Lamond and Tarrio communicated using text messages and phone calls (A408-09). Lamond sometimes

---

[2] Law enforcement was able to recover from Tarrio's phone Telegram messages where the self-destruct feature had not been applied (A302-03).

provided Tarrio with information. For example, on November 3, 2020, Lamond texted Tarrio that his group at Harry's was "starting to attract attention" (A403). On November 4 and 5, in response to Tarrio's inquiry, Lamond provided information about MPD's investigation into the stabbing of Proud Boys members, including that "detectives are working on a [be on the lookout] for the suspects and are pulling the security camera videos" (A404). Lamond promised to "keep Tarrio updated on the investigation" (*id.*).

### 2.  November 7 to December 12, 2020— the date of the banner burning.

On November 7—the date it was widely reported that Biden won the presidential election—Lamond texted Tarrio, "Hey, brother. Sad, sad news today. You all planning anything?" (A408, 412-13.) Lamond then switched to Telegram private chat: "Need to switch to encrypted. Alerts are being sent out to [law enforcement] that Parler accounts belonging to your people are talking about mobilizing and 'taking back the country,' getting people spun up. Just giving you a heads up[.]" (A414-15.) Lamond sent some of the Parler posts, adding: "Please keep this between you and me" (A416).

Over the next month, Lamond and Tarrio communicated by text messages, phone calls, and Telegram (A1585-93). For example, on November 13, Lamond met Tarrio at Harry's (A426-27). Lamond texted Tarrio about the logistics of the meet up, but switched to Telegram to say: "Just giving you a heads up there's a lot of attention at Harry's right now. If it doesn't calm down they are going to shut Harry's dow[n.]" (*Id.*) Two minutes later, Lamond texted Tarrio, "Check telegram" (A427).

On November 14, Lamond told Tarrio through Telegram that "Antifa and your guys at 10th and E. We have both groups separated." (A428-29.) A few hours later, Lamond sent another Telegram message: "We cut your guy loose. Victim could not be located." (A428-29.) Shortly after that, Lamond switched to text message to ask Tarrio about the Proud Boys's plans, in response to a message from Assistant Chief Jeffrey Carroll asking if Lamond had "[a]ny idea when the Proud Boys are leaving the city from social media" (A429).

On December 9, Lamond wrote via Telegram, "Hey brother. I'm sure you've heard, antifa is calling the hotels, urging them to cancel reservations for Trump supporters this weekend. Will you have guys staying at Harrington again? That's one of them on the list." (A434.) On

7

December 11, in response to an unrecovered Telegram audio message from Tarrio, Lamond wrote, "Yep, I know. Cuban Embassy called police on you. LOL." (A436.) When Tarrio informed Lamond of his plans for the evening, Lamond responded via Telegram that "Antifa should be staying up at BLM Plaza," and "Do you want me to let our uniformed officers know that or keep it to myself?" (*Id.*) Only after Tarrio responded with an unrecovered audio message did Lamond convey the Proud Boys's plans to MPD (A436-37).

On December 12, Tarrio and other Proud Boys attended a protest (A437-38). That evening, Lamond, using Telegram, told Tarrio, "We just locked up one of your guys" (A440). Tarrio responded by text message that two Proud Boys had been stabbed; Lamond answered, "I'm hearing maybe a total of four. I'm up at 11th and F now." (*Id.*)

That evening, Tarrio participated in the theft and burning of a BLM banner from a historically Black church in D.C. (A437).

### 3.    December 13, 2020, to January 4, 2021—the date of Tarrio's arrest.

MPD's Criminal Investigations Division ("CID") immediately began investigating the banner burning (A158-60). Although not part of CID, Lamond was part of MPD's hate-crime committee (A214-16). The

morning after the banner burning, Lamond participated in an email discussion regarding a possible hate crime (A444-45). Lamond responded:

> That's a very tricky question and one that I was thinking about this morning. We have supported this offense in the past with the burning and destruction of gay pride flags and such. However, wouldn't that also mean that a lot of the criminal offenses (assaults, the stabbing on 11th Street) reported yesterday connected to the event would be possible hate crimes? (*Id.*)

From that point forward, Lamond and Tarrio used Telegram exclusively (A443). On December 13, Lamond messaged Tarrio that the "guy who stabbed your guys got locked up," and Lamond had not "pulled the report yet, but from what [he] learned on the scene last night, it was only one person" (A446-47). Tarrio then asked, "What's the general consensus with D.C. Metro and my guys?" (A447.) Lamond answered, "That's too complicated for a text answer. That's an in-person convo over a beer." (*Id.*) Lamond and Tarrio agreed to meet at the Dubliner restaurant on December 15 (A448).

On December 14, Lamond told his boss, Director Carolyn Montagna, that he was "having drinks with [Tarrio] tomorrow afternoon to discuss some things with him" (A450). Director Montagna responded,

"Eek[.] Is that smart? To do social?" (A1596; A450-51.) Lamond responded, "It's fine. Only the two of us and at a low key place – NOT Harry's." (A1596; A450-51.)

Also on December 14, Tarrio sent Lamond an audio message via Telegram and then told a Proud Boys group chat that he had "[j]ust contacted my D.C. Metro guy" (A449). Lamond responded to Tarrio's audio message by describing the location where an arrested Proud Boys member would be released from jail (A451). Separately, another individual messaged Tarrio that MPD was soliciting information about banner-burning suspects (A451-52). Tarrio replied, "Yeah I'm following this…meeting with my DC metro contact" (A1596; A451-52).

As planned, on December 15, Lamond and Tarrio met at the Dubliner restaurant around 4:30 p.m. (A454). At 7:11 p.m., Tarrio messaged a Proud Boys group chat: "This might not be good. I admitted to burning the sign to an MDC officer. I told them to take me in." (A456-57.) There was no evidence that Tarrio spoke to an officer other than Lamond (A456). That evening, Lamond messaged Assistant Chief Carroll that Tarrio was "not happy with what happened on Saturday" and could not identify anyone from photographs of the banner burning (A455).

10

On December 18, Tarrio publicly admitted that he had burned the BLM banner in a social media post and a Washington Post interview (A457-59). He denied that it was a hate crime (*id.*). On the same day, MPD received an anonymous tip that Tarrio was claiming responsibility for destroying the banner (A460). When Director Montagna asked Lamond if he had seen the tip, Lamond replied, "Oh fuck! What? The tip? Yes! Remember what he told me?" (A460.)

Lamond then initiated the first Telegram secret chat with Tarrio, and from that point forward, used only secret chats to communicate with Tarrio (A461). The following exchange occurred:

> Lamond: Hey brother, did you call in an anonymous tip to MPD claiming responsibility for the banner burning?
>
> Tarrio: I did more than that. It's on my social media.
>
> Lamond: I gotcha. Someone called in an anonymous tip saying that you claimed responsibility for it.
>
> Tarrio: This wasn't a hate crime. And I want to see it play out.
>
> Lamond: I'm curious to see what happens too. I will check with our CID people to see if they have you on video.
>
> Lamond: Also - you've got the FBI and USSS all spun up over what was said on InfoWars the other night about [Proud

11

> Boys] dressing up as Biden supporters on Inauguration Day. Got an email first thing this morning 🫨 .[3]

Tarrio:    [three unrecovered audio messages]

Tarrio:    Lol...just searched. I never said this haha [unrecovered image]

Tarrio:    [unrecovered audio message]

Lamond:    Lol yep that's exactly what o [sic] got from FBI and USSS

Tarrio:    The video is out there

Lamond:    I think it was included. I'm just going to let them get all freaked out. They're idiots. (SA2; A461-62.)

Soon after, Lamond emailed his colleagues that Tarrio "just publicly admitted" responsibility for the banner burning (A464). In the same email, he asked whether the FBI was likely to investigate the incident as a hate crime (*id.*). At 2:51 p.m., Lamond learned that the FBI was not intending to get involved (A1600; A464). At 3:33 p.m., Tarrio messaged a Proud Boys group chat, "We got the jump on the narrative for the banner burning. This should make it next to impossible for them to use the 'hate crime' enhancement. As per my contact at DC metro[.]

---

[3] After this message, Lamond sent four additional messages that were deleted (A317-18).

12

This stays in here." (A1600; A466.) Approximately 40 minutes later, Tarrio asked Lamond if he thought "they'll make a stink of" the banner burning (A467). Lamond replied:

> No, a bit of the opposite. I've been talking to CID about it. They wanted to know what I know about your group and if I think you all are racist. I told them you are made up of a lot of Latinos and blacks so not a racist thing. If anything I said it's political but then I drew attention to the Trump and American flags that were taken by Antifa and set on fire. I said all those would have to be classified as hate crimes too. It's not being investigated by FBI though. Just us (MPD). (A1601; A467-68.)

Tarrio copied Lamond's message and sent it to a Proud Boys group chat, noting, "For our eyes only" (A468-69). Lamond then sent Tarrio another message: "I don't think they have any pictures of you though" (A469). Tarrio messaged others that he "just got word[,] [w]e're clear on the banner," "D.C. Metro just told me they won't be pursuing it," and "FBI isn't investigating" (A469-70).

On December 19, Detective Franklyn Then called Lamond to ask whether he could identify Tarrio in a photo of the banner burning (A781). Lamond said he could not and had several phone calls with Detective Then and MPD Commander Leslie Parsons (A475, 782-83, 806). About five minutes after these calls, Lamond messaged Tarrio, "Police want to

talk to you about the banner. You have a certain phone number you want me to give them?" (A475-76.)

On December 20, Tarrio asked if MPD was "pushing the hate crime thing" (A478). Lamond and Tarrio then had a seven-minute call (*id.*). Shortly thereafter, Tarrio messaged a confidant, "They don't have anything. Just confirmed…they're searching[.] That's why they want to talk[.]" (A1605; A481.) Tarrio proceeded to discuss a response strategy (A481-82). On the same day, Lamond tentatively identified Tarrio in the banner-burning photo, after Commander Parsons called Lamond twice (A478-79).

On December 21, the lead banner-burning detective, Detective Ashan Mufti, reached out to Tarrio (A483). Tarrio invoked his right to remain silent (*id.*). The next day, Tarrio sent Lamond a screenshot of his text messages with Detective Mufti (A484). Lamond immediately applied the self-destruct feature to the Telegram chat, which was the first time either Lamond or Tarrio had done so (*id.*). Although subsequent messages could not be recovered, one message that Lamond sent on December 25 was obtained due to a glitch (A319-20). That message read, "Just a heads up, CID had me ID you from a photo you posted on Parler

14

kneeling down next to the BLM banner, so they may be submitting an arrest warrant to the US Attorney's Office" (A485-86).

On December 28, Tarrio booked a January 4, 2021, flight to D.C. (A486). Tarrio was traveling for the January 6 inauguration and planned to arrive early so that, if arrested, he would be released in time to participate in inauguration-related protests (A487).

On December 30, Lamond had a 14-minute phone call with Tarrio (A490).[4] Afterwards, Tarrio initiated an "Emergency voice chat" with a "Ministry of Self-Defense" group (A491). After the emergency voice chat, Tarrio explained to someone who had missed the call: "Info stays here," "[i]t's just the misdemeanor, not the hate crime," "it hasn't been solid yet," and "[t]hey want the arrest" (A493). Tarrio then messaged a romantic partner that his "contact just called [him]," and "DA hasn't signed it yet" (A492).

By January 1, 2021, Lamond knew that an arrest warrant for Tarrio had been signed (A494). On January 4, Tarrio's flight to D.C. took off at 12:55 p.m. (A503-04). At 12:58 p.m., Tarrio stopped sending and

_____

[4] Unbeknownst to Lamond, the arrest warrant was signed approximately 25 minutes before this call (A490).

receiving messages (A508). At 1:02 p.m., Lamond changed the self-destruct timer for his Telegram chat with Tarrio from 30 seconds to 10 seconds (A504-05, 1611, 1614). Tarrio purchased wireless internet on the flight, and at 1:28 p.m., he resumed sending and receiving messages (A506-08). Starting at 1:30 p.m., Tarrio messaged multiple people that the arrest warrant had been signed (A508-11). When someone asked where he would be arrested, Tarrio responded he did not "know if [his] contact will tell [him] that" (A509). After Tarrio's flight landed, he was arrested as he entered D.C. (A570). Tarrio had high-capacity magazines in his luggage (A626).

Immediately after Tarrio was released from custody, he met with confidants in a parking garage (A598-600). In a video of the meeting, Tarrio can be heard saying, "I knew as soon as I got to the airport…He texted me in the air," and "From the air is when I knew they signed the warrant" (SA, Government Exhibit (Ex.) 4034 at 00:15–:26; A1008-09).

### 4.    **January 7 to 27, 2021**

On January 7, Lamond told Tarrio by Telegram that he had "checked on [Tarrio's] charges and the Poss of High Capacity Mags is a felony" (A514). Lamond later wrote:

> Looks like the feds are locking people up for rioting at the Capitol. I hope none of your guys were among them…Of course I can't say it officially, but personally I support you all and don't want to see your group's name or reputation dragged through the mud[.] (A516.)

### D.    Impropriety of Lamond's Conduct.

### 1.    MPD Policies

As a 24-year MPD veteran, Lamond was expected to know and follow MPD general orders (A238-39). The orders provided that officers are to "ke[ep] ever secret" information "of a confidential nature, or that is confided in [them] in [their] official capacity"; not to "conduct any investigation or initiate any inquiries into the case of another member" without permission; and to "preserve all material which may constitute evidence or may otherwise be pertinent in a subsequent criminal judicial proceeding" (A239-41, 244; see also A247, 1545, 1555, 1557-58). Officers are expected to recognize confidential information based on their training and experience (A256). Confidential information includes "anything…that could compromise a criminal investigation," including collected evidence, arrest warrants, and police reports (A281-82; see also A224 ("Any communication that is related to the department or criminal investigations is not open for public[.]"); A628 ("You can't disclose police

17

investigations to people outside of the police department.")). Officers are required to "respond truthfully when questioned by superior officers in matters relating to the official business of the MPD" (A1545-46; A240).

## 2.    Lamond's Conduct

Assistant Chief Carroll testified that the information Lamond provided to Tarrio was unauthorized, inconsistent with police objectives, and violated MPD policy (e.g., A638, 643-47, 652-69, 674-78). In general, Lamond was supposed to be obtaining information—not giving Tarrio information about arrests or MPD's plans for "how we're going to handle [the Proud Boys] or prevent them from interacting with [other groups]" (A643-44). That was "law enforcement information [that] shouldn't be disseminated outside of law enforcement"; the information should flow "one way" (A644, 647).

Lamond was not authorized to discuss the banner-burning investigation with Tarrio (A652-53, 671-72). Particularly once Tarrio became a subject, Lamond should have preserved his communications with Tarrio and notified detectives (A652, 821). Tarrio's confession to Lamond would have established probable cause and Lamond's suppression of that confession delayed MPD's ability "to obtain an arrest

18

warrant" because officers initially "didn't know who the offenders were" (A778, 820). "[T]he faster [the police] can get information, the faster [they] can act on it because evidence can be lost, folks can change their mind as far as cooperating, and [the police] can lose witnesses" (A779).

Even after Tarrio publicly confessed, his confessions to Lamond would have aided the probable-cause determination (A177). It is difficult to present a social-media post as a "100 percent confession" because "people can start claiming my account was hacked, [or] someone else has access to my account" (A803-04). However, "a confession to law enforcement" is generally reliable, powerful evidence (*id.*; see also A166-67, 228-29, 813). Tarrio's confessions to Lamond were "critical" information and would have been included in the arrest-warrant application (A166; see also A778).

By informing Tarrio of the anonymous tip, Lamond could harm the investigation by tipping off Tarrio that "there are other people out there who are recording him" (A655). Lamond's discussions with Tarrio about the hate-crime enhancement improperly disclosed internal deliberations, which could "present problems for the case later on" (A691), made worse by the fact that Tarrio forwarded that information to other Proud Boys

19

(A659-61). Indeed, Tarrio was not the only one suspected of being involved in the banner burning (A667, 795).

By telling Tarrio that MPD did not have any pictures of him, Lamond impeded the investigation by informing Tarrio that "it may be difficult for [MPD] to identify him" (A661). Telling Tarrio that MPD wanted to talk to him, that Lamond had identified Tarrio in a banner-burning photo, and that an arrest warrant was forthcoming each risked causing Tarrio or other suspects to avoid contact, flee, or destroy evidence (A170-72, 617-18, 662, 666-67). Notifying a suspect that he is about to be arrested also poses a safety risk for the arresting officers (A618).

The arrest warrant was confidential and disclosed within MPD only on a "need-to-know basis" (A170). Lamond's conversations with Tarrio about the arrest warrant should not have occurred, and, at the very least, should have been documented (A668-69, 687-88). Lamond never told anyone at MPD about these conversations, including that he messaged Tarrio immediately before his arrest (e.g., A673-74). Lamond's communications with Tarrio after he was arrested were likewise highly improper, not the least because Tarrio had the right to counsel and any communications should have gone through his attorney (A676).

20

As Assistant Chief Carroll summarized, Lamond informed Tarrio of "the inner workings of the entire investigation, [which] allows him to help get rid of evidence, it allows him to do everything" (A664). Lamond "talk[ed] about the police as a third-party[,] [but] Lieutenant Lamond is the police" (*id.*).

### E.    Lamond's Interview with Federal Agents

On June 2, 2021, federal agents interviewed Lamond about his relationship with Tarrio (A735-36). At the outset, the agents explained that "Tarrio, and some of the others" may have been "getting information that they shouldn't have had" (A1660). The agents were "trying to figure out who talked to who" and "who may have said things" (*id.*).

Among other things, Lamond stated that his conversations with Tarrio were more "one-sided with [Tarrio] just telling me, you know, what their plans were" (A1678; see also A742; SA, Ex. 1016A). Lamond stated he was "trying to find out [information] without tipping [Tarrio] off to the MPD investigation" (A1667; see also A747; SA, Ex. 1016D). Lamond also stated that he did not "inform [Tarrio] that he had an arrest warrant" (A1670-71; see also A749; SA, Ex. 1016E at 1:30–:35).

Lamond was "amicable, jovial" "towards the beginning of the interview," but towards the end, Lamond recognized that the interview had taken a turn and "became visibly much more apprehensive" (A753).

### *The Defense Evidence*

Tarrio testified that, although he told his followers he had a source at MPD, he did not mean Lamond (A907). Tarrio met with Lamond on December 15, 2020, but did not confess to the banner burning (A900-01). Tarrio had "no recollection" of sending messages afterward that he had confessed to an officer (A901). Lamond never told Tarrio that the arrest warrant had been signed, and Tarrio lied when he sent messages to that effect (A915-16). He sent the messages after he got a "new feeling" during the flight that he would be arrested or turn himself in (A916-18).

On cross-examination, Tarrio refused to acknowledge any messages shown to him and did not independently recall most of them (A967, 1001-02; e.g., A990-97). Tarrio generally did not recall whether Lamond gave him information about the banner-burning investigation (e.g., A973-81). Tarrio considered Lamond a "liaison"—not a "source" or "contact"—but it was "possible" that he at times referred to Lamond as his "D.C. Metro contact" (A989-90, 994). As to the parking-garage meeting after his

22

arrest, Tarrio lied when he said that, while in the air, he knew that the warrant had been signed (A1013-15).

Lamond testified that Tarrio was a "professional source" (A1072). Lamond used Telegram because Tarrio preferred it (A1077). Lamond used the self-destruct feature because he was "mirroring [Tarrio's] use of it" (A1077-78). Lamond did not share with Tarrio any sensitive law-enforcement information (A1080-81). At the Dubliner meeting, Tarrio "did not tell [Lamond] that he was involved" in the banner burning (1087-88).

Lamond told Tarrio that the FBI was not investigating the banner burning because that information was "of no value to [Tarrio]" (A1092). Lamond told Tarrio that he had identified Tarrio in a photo to "try[ ] to retain him as a source" (*id.*). Lamond's messages to Tarrio about the hate-crime enhancement merely expressed his opinion (A1094). Lamond thought it was okay to tell Tarrio about the anonymous tip to MPD because it was "of no value" to Tarrio (A1095). Lamond never told Tarrio that an arrest warrant had been issued (A1096).

On cross-examination, Lamond agreed that he had violated MPD policies, that preserving communications with a suspect is important yet

he did not do so, and that he was not authorized to share information about the investigation with Tarrio (A1129, 1173-74, 1178-80, 1183, 1186, 1192-93, 1202, 1207, 1209-10). Although he did not recall deleting his Telegram chat with Tarrio, Lamond was the only person with access to his phone (A1181). Lamond knew that Telegram used a higher level of encryption than text messages, making it more difficult for others to see the messages (A1131). On November 7, 2020, Lamond initiated a Telegram chat to give Tarrio "a heads up" because he wanted that message to be confidential (A1149).

## Lamond's Motion for Judgment of Acquittal

When moving for judgment of acquittal at the close of the government's case, the defense argued for the first time that D.C. Code § 22-722(a)(6) does not apply to obstruction of police investigations (A871-72).

## The Trial Court's Ruling and Verdict

The trial court denied Lamond's motion for judgment of acquittal (A1336, 1346, 1360, 1363). The court rejected Lamond's argument that D.C. Code § 22-722(a)(6) did not apply to his conduct (A1320-28). This

24

claim was made "way too late," as legal defects in the indictment must be raised before trial (A1328-29 (citing Fed. R. Crim. P. 12(b)(3)). Lamond's claim also failed on the merits (A1320-28).

The court found Lamond guilty on all four counts (A1385). The court painstakingly reviewed the evidence supporting each element of each count (A1336-85). The court discredited Lamond's and Tarrio's testimony, finding that their explanations of their conversations did not "make any sense" and did not "give rise to reasonable doubt" (A1340; see also A1343, 1378-79, 1383).

## SUMMARY OF ARGUMENT

Lamond waived his argument that D.C. Code § 22-722(a)(6) "does not reach the conduct charged." Although he was required to raise it pretrial, Lamond waited until the government rested its case to raise this argument, and he has not demonstrated good cause for his untimeliness. Even if the Court disagrees, Lamond's challenge should be reviewed only for plain error, which Lamond cannot demonstrate because the answer to his statutory challenge is not clear or obvious. That alone is fatal to his claim.

25

Regardless, the district court correctly concluded that § 22-722(a)(6)'s proscription against obstructing "the due administration of justice in any official proceeding" encompassed Lamond's obstruction of MPD's banner-burning investigation. The statute applies to "any official proceeding," which is defined to include "any" MPD investigation. The phrase "due administration of justice" does not compel a different result, as that phrase refers to judicial, quasi-judicial, and adjunct investigative proceedings. *United States v. Brock*, 94 F.4th 39, 48 (D.C. Cir. 2024).

Lamond's convictions were supported by sufficient evidence. As to the obstruction count, the evidence showed that Lamond acted corruptly. As an experienced officer, he knew it was wrong to share confidential law-enforcement information with the public, much less with the subject of an investigation. He also knew that sharing investigative information with Tarrio risked impeding the investigation and prosecution. Yet Lamond leaked information and then tried to cover it up by strategically using Telegram and deleting messages with Tarrio, instead of preserving them as he knew was required.

As to the false-statement counts, the evidence showed that Lamond's statements to federal agents were false. The agents' questions,

26

and Lamond's answers, were not vague, much less so vague that the factfinder could not reasonably discern the meaning of the exchanges. A factfinder could reasonably conclude that Lamond lied when he told agents that "[i]t was more, you know, one-sided with [Tarrio] just telling me, you know, what their plans were" (Count Two), and that he tried to learn information "without tipping [Tarrio] off to the MPD investigation" (Count Three). As to Count Four, the evidence was sufficient to show that Lamond told Tarrio about the signed arrest warrant, rendering false his contrary assertion.

## ARGUMENT

### I. Lamond's Statutory Challenge is Waived and, In Any Event, Cannot Satisfy Plain-Error Review.

#### A. Standard of Review

Lamond argues (at 22) that D.C. Code § 22-722(a)(6), "does not reach the conduct charged." This Court ordinarily reviews questions of statutory interpretation de novo. *Loving v. IRS*, 742 F.3d 1013, 1016 (D.C. Cir. 2014). However, a motion alleging "a defect in the indictment" must be raised before trial "if the basis for the motion is then reasonably

27

available." Fed. R. Crim. P. 12(b)(3). An untimely motion may be considered only "if the party shows good cause." *Id.* 12(c)(3).

Lamond's challenge is waived. *See United States v. Peyton*, 745 F.3d 546, 551 (D.C. Cir. 2014). It was untimely made and Lamond did not demonstrate good cause for that untimeliness. *See id.*; *United States v. Bowline*, 917 F.3d 1227, 1229, 1234-36 (10th Cir. 2019) (2014 amendments did not change "good cause" requirement for a court to review untimely claims). Lamond argues (at 23) that the indictment alleged obstruction of an investigation *and* prosecution, so "[o]nly after the government failed to prove any prosecution did Lamond's challenge become timely." Not so. Lamond's challenge was "reasonably available" before trial. Fed. R. Crim. P. 12(b)(3). A pretrial challenge, if successful, would have precluded the government from proceeding at trial on a theory that Lamond violated § 22-722(a)(6) by obstructing MPD's investigation. Lamond was not permitted to sit back and watch the government present its case, waiting until the end of trial to allege a defect in the indictment that, had it been timely raised, would have materially affected the government's presentation. *See Hall v. United States*, 343 A.2d 35, 37 (D.C. 1975) ("To permit a case to go to trial

28

without first raising an alleged defect in the indictment or information can result in a complete waste of the time of the trial court, the parties, counsel, witnesses and jurors.").

Contrary to Lamond's claim (at 23), the district court did not implicitly find good cause to grant relief from Lamond's waiver. The court said the opposite—that Lamond's claim failed because it was made "way too late" (A1328-29). Nor did the court's decision to alternatively reach the merits of Lamond's claim establish good cause. "Good cause" refers to the party's "reason for not [timely] raising the argument." *Peyton*, 745 F.3d at 551. Lamond does not identify any legitimate reason here.

If this Court reaches the issue notwithstanding Lamond's waiver, plain-error review applies. *See United States v. Burroughs*, 810 F.3d 833, 838 (D.C. Cir. 2016). "Under the 'difficult' plain-error standard, this [C]ourt will reverse" only if the district court "committed a 'clear or obvious' error that affected a defendant's substantial rights and 'seriously affects the fairness, integrity[,] or public reputation of judicial proceedings.'" *United States v. Brock*, 94 F.4th 39, 48 (D.C. Cir. 2024) (citation omitted).

## B.    Argument

The district court did not err in interpreting § 22-722(a)(6) to apply to Lamond's obstruction of the banner-burning investigation and prosecution. In any event, any error was not plain. Lamond's conviction should be affirmed.

### 1.    D.C. Code § 22-722

As first codified in the D.C. Code of 1901, the obstruction-of-justice statute prohibited

> corruptly, by threats or force, endeavor[ing] to influence, intimidate, or impede any juror, witness, or officer in any court in the District in the discharge of his duties, or by threats or force, in any way obstruct[ing] or imped[ing] or endeavor[ing] to obstruct or impede the due administration of justice therein.

Code of Law for D.C., ch. 19, § 862 (Mar. 3, 1901).

This language was "similar though not identical to" language in the later-enacted federal obstruction-of-justice statute, 18 U.S.C. § 1503 (1948). *Smith v. United States*, 357 A.2d 418, 420 (D.C. 1976). In 1967, in response to federal courts limiting § 1503 "to those obstructions occurring during the pendency of formal court proceedings," Congress amended the D.C. statute to expressly "provide protection to witnesses at all stages of criminal proceedings." *Id.* (citing S. Rep. No. 912, 90th Cong., 1st Sess.

30

20 (1967)). The amendment was intended "to discourage the use of the 'pendency' of judicial proceedings as a determinative consideration in prosecutions for obstruction of justice." *Id.* at 421 n.6.

In 1982, the D.C. Council amended the statute to proscribe five categories of obstruction of justice. D.C. Law 4-164, § 502, 29 D.C. Reg. 3976 (1982). It expanded the statute again in 1993 "to encompass the wide-range of activities used by criminals to impede justice." Committee on the Judiciary, Council of the District of Columbia, Report on Bill 9-385, at 2 (May 20, 1992). The Council's Judiciary Committee emphasized the serious need to address the "[c]orruption, intimidation, and even murder of witnesses" during "the course of an investigation or prosecution to which they are connected." *Id.* The resulting statute largely mirrored its present-day form, except that it omitted the prohibition against "corruptly, by threats of force endeavoring to obstruct or impede the due administration of justice in a District of Columbia court," which had existed in prior versions of the statute. D.C. Law 9-268, § 2(c), 39 D.C. Reg. 5702 (1993).

In 1995, the Council added subsection (a)(6) as a catch-all provision. D.C. Law 10-256, § 3, 42 D.C. Reg. 20 (1995). As U.S. Attorney Eric

31

Holder explained in his testimony before the Council, the amendment would provide an additional tool to address "the negative effect which intimidation, threats, influence, violence, and corruption can have on our system of justice." Committee on the Judiciary, Council of the District of Columbia, Report on Bill 10-268 (Oct. 26, 1994), Statement of Eric Holder at 10-11 (hereinafter, "Holder Statement"). Subsection (a)(6) would be "particularly useful in those situations where money or something else of value is offered to a police officer in exchange for not filing a report or not pressing charges." *Id.* D.C. corporation counsel and the Public Defender Service ("PDS") likewise understood that subsection (a)(6) could apply where a grand-jury or judicial proceeding was not pending. Indeed, PDS was concerned that, because an early draft of subsection (a)(6) lacked a mens rea requirement, the provision would apply to "the citizen who offers to pay a neighbor for a broken window, who might be charged with obstructing juvenile justice because the neighbor interpreted the offer as a bribe not to press charges against the defendant's child." *Id.*, Statement of Jo-Ann Wallace at 15 (hereinafter, "PDS Statement"); *see also id.*, Statement of Robert Rigsby at 7-8 (hereinafter, "Rigsby Statement").

In its current form, § 22-722(a) provides that "[a] person commits the offense of obstruction of justice if that person" commits one of the listed acts, detailed in five subsections. § 22-722(a)(1)–(5). The sixth and final subsection prohibits "[c]orruptly, or by threats of force, any way obstruct[ing] or imped[ing] or endeavor[ing] to obstruct or impede the due administration of justice in any official proceeding." § 22-722(a)(6). "Official proceeding" is defined to mean "any trial, hearing, investigation, or other proceeding in a court of the District of Columbia or conducted by the Council of the District of Columbia or an agency or department of the District of Columbia government, or a grand jury proceeding." § 22-721(4).

### 2. The obstruction statute applies to the banner-burning investigation.

Lamond argues (at 22) that his obstructive conduct "predated any judicial proceedings," and therefore did not obstruct or impede "the due administration of justice in any official proceeding." To the contrary, § 22-722(a)(6)'s plain language, structure, and legislative history demonstrate that the statute applies to MPD investigations like the banner-burning investigation. *See Loving,* 742 F.3d at 1016.

33

Section 22-722(a)(6)'s plain language prohibits conduct that in "*any* way obstructs or impedes or endeavors to obstruct or impede the due administration of justice in *any* official proceeding" (emphasis added). "Official proceeding" includes "*any*…investigation…conducted by…an agency or department of the District of Columbia government." D.C. Code § 22-721(a)(4) (emphasis added). "[MPD] is an agency of the District government." *Mason v. United States*, 170 A.3d 182, 190 (D.C. 2017). Thus, "[b]y its plain language,…an 'official proceeding'…include[s] an MPD investigation." *Id.* at 191. Moreover, both § 22-722(a)(6) and the definition of "official proceeding" repeatedly use the word "any." "[R]ead naturally, the word 'any' has an expansive meaning, that is, one or some indiscriminately of whatever kind." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 218 (2008). Section 22-722(a)(6)'s plain text encompasses the obstruction of an ongoing MPD investigation, such as occurred here.

Lamond nonetheless argues (at 24) that "'[d]ue administration of justice' narrows the statute to proceedings in which justice is being adjudicatively administered." That requirement is not in the statute's text. *See Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010) ("We must enforce plain and unambiguous statutory language

34

according to its terms."). Indeed, prior versions of the statute limited the provision to conduct that obstructed the due administration of justice *in court*. *E.g.*, D.C. Law 4-164, § 502, 29 D.C. Reg. 3976 (1982). The Council chose to omit that requirement and replace it with the broadly defined "official proceeding," which unquestionably includes police investigations. *See Mason*, 170 A.3d at 191; *Crutchfield v. United States*, 779 A.2d 307, 328 (D.C. 2001) ("official proceeding" is defined "broadly"). Had the Council intended to omit all MPD investigations from the statute's scope, it could have said so in plain terms instead of, as Lamond urges, including MPD investigations in the broad definition of official proceeding, but then somehow narrowing that definition by use of the term "due administration of justice."

Moreover, as this Court has recognized, the "due administration of justice" does not refer only to court-like proceedings. "[T]he plain, natural, and ordinary meaning of the phrase 'administration of justice' is the governmental process of investigating, determining, and enforcing the legal rights of persons." *Brock*, 94 F.4th at 51. It encompasses "judicial, quasi-judicial, and adjunct investigative proceedings." *Id.*

35

Dictionary definitions support this conclusion. For example, "*Black's Law Dictionary* has consistently defined the phrase 'administration of justice' as '[t]he maintenance of right within a political community by means of the physical force of the state' or 'the state's application of the sanction of force to the rule of right.'" *Brock*, 94 F.4th at 51 (quoting *Administration of Justice*, Black's Law Dictionary 45 (7th ed. 1999)). "And it further defines 'due administration of justice' as "'[t]he proper functioning and integrity of a court or other tribunal and the proceedings before it in accordance with the rights guaranteed to the parties.'" *Id.* (quoting *Due Administration of Justice*, Black's Law Dictionary 54 (11th ed. 2019)). "Obstructing justice" applies "'to obstructing the administration of justice in any way—as by hindering witnesses from appearing, assaulting process server[s], influencing jurors, obstructing court orders or criminal investigations.'" *Id.* at 52 (quoting Obstructing Justice, *Black's Law Dictionary* 972 (5th ed. 1979)); *see also id.* ("obstruction of justice" includes "'furnishing false information in or otherwise impeding an investigation or legal process'") (quoting *Obstruction of Justice*, Merriam-Webster's Dictionary of Law 337 (1996)). Thus, while the "administration of justice" includes pending

36

"judicial or quasi-judicial" proceedings, it also includes "related investigations conducted by government officials." *Id.* at 52.

Lamond's proposed limitation also cannot be squared with the statutory structure. Subsection (a)(6) is a catch-all provision that is broader than the statute's specific provisions, which proscribe, among other things, preventing or hindering an arrest, cooperation with police investigations, or reporting a crime to the police. D.C. Code § 22-722(a)(3)(B)–(C), (a)(4). It would be anomalous to read the catch-all provision so narrowly that it did not apply to swaths of conduct, like obstruction of police investigations, that the statute specifically prohibits.

The legislative history likewise demonstrates that § 22-722(a)(6) applies to formal police investigations. D.C.'s obstruction-of-justice statute was intended to be broad. Over the years, the Council repeatedly expanded it in response to the proliferation of obstructive conduct that interfered with the District's system of justice—not just grand-jury, court, or agency proceedings (see pp. 30-33 above). Subsection (a)(6) was intended to cover any gaps left by the rest of the statute. *See* Holder Statement at 9-11. Stakeholders understood that it would apply to

37

conduct that obstructed police investigations. *See id.*; Rigsby Statement at 7-8; PDS Statement at 15. Lamond's proposed interpretation would exclude from Subsection (a)(6)'s scope the exact scenario that it was intended to capture—obstructive conduct not specifically contemplated by § 22-722(a)(1)–(5).

Lamond's interpretation would also belie common sense. "Obstruction often do[es] occur…in the investigatory stage," and "[t]here is no logic to the distinction between obstructions of investigations and obstructions of ongoing proceedings." *Smith*, 357 A.2d at 421 n.6 (quoting S. Rep. No. 912, 90th Cong., 1st Sess. 20 (1967)); *see also United States v. Barry*, 938 F.2d 1327, 1333-34 (D.C. Cir. 1991) (it would be "counterintuitive, even absurd" if the obstruction-of-justice sentencing enhancement did not apply "to a defendant who attempts to obstruct an investigation" simply because the investigation or prosecution was not yet underway). "[I]ndeed, obstruction of justice is often 'most effective' when it prevents 'an investigation or proceeding from commencing in the first place.'" *Pugin v. Garland,* 599 U.S. 600, 606 (2023) (citing Brief for Attorney General 15)). And there is little difference between conduct that

38

obstructs a grand jury investigation—to which § 22-722(a)(6) plainly applies—and obstructing a police investigation.

Lamond makes three arguments to support his position that the "'administration of justice'…requires a judicial proceeding" (Appellant's Opening Brief ("Br.") 22). None is persuasive.

*First*, Lamond argues (at 24-26) that § 22-722(a)(6) should be interpreted identically to 18 U.S.C. § 1503 because both statutes prohibit obstruction of "the due administration of justice." Because courts have generally limited § 1503 to obstructions occurring during court proceedings, Lamond claims that the Council intended to borrow that judicial construction as to § 22-722(a)(6).

However, § 1503 specifically prohibits "endeavor[ing] to influence, intimidate, or impede" jurors or court officers in the discharge of their duties. 18 U.S.C. § 1503(a). It "is only one obstruction offense among the many obstruction offenses in Title 18," each of which targets specific obstructive conduct. *Pugin*, 599 U.S. at 608. Thus, as used in § 1503, the phrase "due administration of justice" is "qualified and limited by the enumeration of specific judicial functions…in the preceding portion of the section." *United States v. Scoratow*, 137 F. Supp. 620, 621-22 (W.D. Pa.

39

1956); *see also Haili v. United States*, 260 F.2d 744, 746 (9th Cir. 1958) (same).

The D.C. Council departed from the federal statute by enacting a broader prohibition of multiple types of obstructive conduct, including obstruction of police investigations. *See* D.C. Code § 22-722(a)(3)(B), (4). Indeed, in response to federal courts' interpretations of § 1503, Section 22-722 was deliberately broadened to apply beyond "those obstructions occurring during the pendency of formal court proceedings." *Smith*, 357 A.2d at 420; *see also Hall*, 343 A.2d at 39 (§ 1503 is more narrowly drafted than D.C.'s obstruction statute). Lamond's superficial claim that § 22-722(a)(6) and § 1503 should be interpreted identically ignores this statutory context. *See Vermont v. O'Neill*, 682 A.2d 943, 946 (Vt. 1996) (explaining interpretive canon that the legislature intends to adopt the meaning of a statute of origin is inapplicable "where it leads to a result inconsistent with legislative intent").

*Second*, *Wynn v. United States*, 48 A.3d 181 (D.C. 2012), does not support Lamond's interpretation (cf. Br. 27-28). While *Wynn* recognized that "the term 'official proceeding' standing alone conceivably could include an initial police investigation of street crime," the court

40

ultimately held that "the due administration of justice in any official proceeding" does not include "an initial police response to the scene of a crime." *Wynn*, 48 A.3d at 189, 191. As the district court correctly found, *Wynn*'s reasoning is limited to its facts (A1323-24). *Wynn* left open the possibility that § 22-722(a)(6) may apply to an MPD investigation that has developed beyond "a preliminary street investigation." *Id.* at 189; *see also, e.g., id.* at 186 ("incipient police investigation"), 189 ("rapidly unfolding MPD response"), 190 ("police officers responding to the scene of a crime"). Indeed, there is no principled distinction between "a formal process where evidence is elicited through testimony or produced in response to subpoenas," and the formal, deliberate police investigation at issue in this case. *Id.* at 189.

Additionally, *Wynn* did not meaningfully interpret the phrase "due administration of justice." *Wynn*'s observation that the phrase "is used primarily, if not exclusively, to describe the proper functioning and integrity of a court or hearing" was based only on a handful of prior opinions involving disparate circumstances, none of which interpreted the phrase. *Wynn*, 48 A.3d at 191. In any event, *Wynn*'s observation that the "due administration of justice" is used "primarily" in reference to

41

courts or hearings is not inconsistent with this Court's detailed analysis showing that the phrases "obstructing justice" and "due administration of justice" largely focus on judicial and quasi-judicial proceedings, but are not limited to such proceedings and also encompass related investigations. *Brock*, 94 F.4th at 317-18.

*Third*, Lamond argues (at 27-28) that § 22-722(a)(6) cannot be read to include police investigations because § 22-721(3) separately defines "criminal investigation," while § 22-722(a)(6) "uses the more limited phrase 'the due administration of justice in any official proceeding.'" Lamond's argument is backwards—"official proceeding" as used in subsection (a)(6) is broadly defined to include myriad proceedings including "any…investigation." D.C. Code § 22-721(a)(4). As discussed, "the due administration of justice" does not change that result. Subsection (a)(6) is thus intentionally broader than "criminal investigation," which makes sense given that subsection (a)(6) is a catch-all provision.

Contrary to Lamond's argument (at 27-28), there is no illogical superfluity in the statute's separate use of these two terms. In addition to its use in the catch-all provision, the term "official proceeding" is used

42

throughout Sections 22-722 and 22-723 to proscribe efforts to obstruct civil, administrative, and criminal proceedings. *See* D.C. Code §§ 22-722(a)(2), (a)(2)(B)–(D), (a)(3)(A), (D), 22-723. The term "criminal investigation" is used in § 22-722(a)(4), which proscribes efforts to injure or threaten persons who have cooperated in such investigations by giving information to a "criminal investigator" (defined in § 22-721(a)(2)). And subsection (a)(6) does not swallow subsection (a)(4). Unlike subsection (a)(6), subsection (a)(4) contains no temporal limitation. It thus applies even after the conclusion of a criminal investigation—for example, where an individual retaliates against a witness after the fact. At the same time, Section (a)(6) applies to conduct like Lamond's—impeding a criminal investigation by leaking information—that Section (a)(4) fails to capture.

Relatedly, Lamond argues (at 28) that because § 22-723 does not use the phrase "due administration of justice," that somehow means that § 22-722(a)(6) does not apply to police investigations. Not so. Section 22-723 prohibits evidence tampering in connection with an "official proceeding." Section 22-723 does not generically proscribe obstruction of

"the due administration of justice in any official proceeding" because it already specifically identifies the obstructive acts—evidence tampering.

Nor would reading Section (a)(6) to apply to police investigations "blur [the] line" between Sections 22-722(a)(6) and 22-723 (Br. 28). The statutes have different requirements. For example, for evidence tampering under § 22-723, the defendant must alter, destroy, mutilate, conceal, or remove "a record, document, or other object"; § 22-722(a)(6) broadly criminalizes obstruction done in "any way." At the same time, § 22-723 requires successful completion of the prohibited act, while § 22-722(a)(6) proscribes "endeavor[ing]" to obstruct." Also, unlike § 22-722(a)(6), tampering requires that the defendant be the one who makes the object unavailable. *See* § 22-723 ("that person" alters/destroys/etc. evidence). Moreover, § 22-723 applies even to incipient police investigations, whereas § 22-722(a)(6) does not. *See Mason*, 170 A.3d at 191; *Wynn*, 48 A.3d at 191.

In any event, particularly where a statute includes a catch-all provision, "redundancies are common in statutory drafting—sometimes in a congressional effort to be doubly sure, sometimes because of congressional inadvertence or lack of foresight, or sometimes simply

44

because of the shortcomings of human communication." *Pugin*, 599 U.S. at 609 (citation omitted). "[T]he better overall reading of the statute" sometimes "contains some redundancy." *Id.*

For all of the foregoing reasons, the better reading of § 22-722(a)(6) is that it applies to official police investigations like the banner-burning investigation in this case.

### 3. Even assuming § 22-722(a)(6) requires obstruction of a court proceeding, that requirement is satisfied.

As the district court held, even if § 22-722(a)(6) does not apply to police investigations, Lamond also endeavored to obstruct the banner-burning prosecution, which unquestionably falls within the statute's scope (A1324, 1328, 1363). In the district court, Lamond conceded that interference with a future prosecution would violate § 22-722(a)(6) (Def's Mem. at 7, *United States v. Lamond*, No. 23-cr-177 (Dec. 10, 2024), ECF 90). Lamond also conceded that "affirmatively warn[ing] [ ] Tarrio of his impending arrest" would have "interfered with [ ] Tarrio's prosecution, an official proceeding" (*id.*). Accordingly, Lamond has waived any

argument that § 22-722(a)(6) does not apply to such conduct, and at a minimum, this argument should be reviewed for plain error.

Lamond's argument (at 29-31) that the prosecution must have been *pending* at the time of the obstructive acts lacks merit. Lamond again relies on federal courts' interpretation of § 1503, which, as discussed, is materially different from § 22-722. There is no pending-proceeding requirement in § 22-722(a)(6)'s text, and the statute's structure and legislative history demonstrate that the provision is not limited to prosecutions, much less pending ones (see pp. 33-45 above). *See O'Neill*, 682 A.2d at 946 (rejecting argument that state obstruction statute should be read coterminously with § 1503; "common sense dictates that present conduct can obstruct the administration of justice in future proceedings"); *see also Pugin*, 599 U.S. at 604-05 (obstruction of justice "includes offenses where an investigation or proceeding is pending, but is not [so] limited").

Moreover, as the district court noted, there is little practical difference between this case and cases where a defendant acted to impede an investigation while a court or grand-jury proceeding was technically pending (A1326-28). In *Decuir v. United States*, the defendant instructed

46

others to hide evidence "to impede the police's investigation and pending criminal charges against him." 285 A.3d 512, 522 (D.C. 2022). In *Brown v. United States*, the defendant lied during a police interview about not knowing the name of the shooter who was being investigated. 89 A.3d 98, 102-03 (D.C. 2014). Although in both cases a prosecution was pending, *Brown* and *Decuir* recognize that a defendant can obstruct justice even if the obstructive act did not occur *in* a court-like proceeding. Particularly where the statutory language does not require a pending prosecution, there is no basis to read such a limitation into the statute.

At a minimum, Lamond's obstructive acts continued after the judicial issuance of the warrant for Tarrio's arrest, which is a "proceeding in a court of the District of Columbia." D.C. Code § 22-721(4). The judicial issuance of an arrest warrant is "a formal event" as contemplated in *Wynn*, 48 A.3d at 189. It is the culmination of an investigation and the commencement of a prosecution—not merely an investigative step (*cf.* Br. 30). *See* D.C. Code § 23-113 ("A prosecution is commenced when…a

47

complaint is filed before a judicial officer empowered to issue an arrest warrant").[5]

Finally, Lamond's concern (at 26) that obstructing a police investigation will almost always potentially affect an "'imminent' judicial proceeding" is unfounded. Many police investigations do not result in judicial proceedings, and the government would have to prove that the defendant corruptly or by threats or force endeavored to obstruct a judicial proceeding—not merely the investigation. In any event, Lamond's concern (at 26) about a "boundless construction" does not make sense where § 22-722 already explicitly applies to obstruction of police investigations. *See* § 22-722(a)(4).

### 4.    Any error was not plain.

Even if this Court determined that § 22-722(a)(6) did not apply to Lamond's conduct, Lamond would not be entitled to relief because any

---

[5] For this reason, *United States v. Davis*, 183 F.3d 231 (3d Cir. 1999), which involved a wiretap, is inapposite (cf. Br. 30). Wiretaps are "an investigative method used by the executive branch." *Davis*, 183 F.3d at 240. Lamond also relies (at 30) on *United States v. Cohen*, 301 F.3d 152, 157 (3d Cir. 2002), but the Third Circuit there declined to decide whether an arrest-warrant application qualifies as a judicial proceeding under 18 U.S.C. § 1503.

error was not plain. For an error to be "plain," it must be "clear or obvious" rather than "subject to reasonable dispute." *Brock*, 94 F.4th at 48. Generally, an error is plain only if it contradicts binding precedent. *United States v. Laureys*, 653 F.3d 27, 32 (D.C. Cir. 2011). "[I]ssues of first impression present plain error only when they tread upon a well-established constitutional or legal principle." *Id.* at 33 (quotations omitted).

The district court's ruling did not contravene binding authority or a well-established legal principle. Lamond raises a complex question of statutory interpretation that, as evidenced by the discussion above, is subject to reasonable dispute. Indeed, the D.C. Court of Appeals recently recognized that "whether a person can be convicted of obstructing justice for interfering with a police investigation" is an open question. *See Jennings v. United States*, 351 A.3d 1075, 1106 (D.C. 2026). Accordingly, any error was not plain and does not entitle Lamond to reversal. *See Laureys*, 653 F.3d at 32 (affirming conviction on alternative ground that district court's interpretation of the statute of conviction was not plainly erroneous).

49

## II.  Lamond's Convictions Were Supported by Sufficient Evidence.

### A.  Standard of Review

When reviewing a sufficiency challenge, this Court views the evidence "in the light most favorable to the government, allowing the government the benefit of all reasonable inferences that may be drawn from the evidence." *United States v. Sutton*, 801 F.2d 1346, 1358 (D.C. Cir. 1986). The Court will affirm if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Jefferson*, 974 F.2d 201, 205 (D.C. Cir. 1992). This is a "highly deferential" standard. *United States v. Lucas*, 67 F.3d 956, 959 (D.C. Cir. 1995).

### B.  The Evidence was Sufficient to Show Lamond's Corrupt Intent Under § 22-722(a)(6).

Lamond argues (at 33) that the evidence was insufficient to support his conviction for obstruction of justice under § 22-722(a)(6) because the evidence failed to show that he acted corruptly. As the district court explained (and Lamond does not dispute):

> The term "corruptly" means that the defendant must use unlawful means or have a wrongful or an unlawful purpose,

50

or both. The defendant must act with consciousness of wrongdoing, [which] means with an understanding or awareness that what the person is doing is wrong or unlawful. (R1362.)[6]

The evidence showed that Lamond acted corruptly. Knowing that MPD was investigating the banner burning with an eye toward criminal prosecution, he repeatedly leaked information that advantaged Tarrio and risked impeding the investigation and prosecution. For example, Lamond revealed internal, non-public deliberations about the hate-crime enhancement, which was of particular interest to Tarrio (A462, 466-68, 477-78, 493, 593-94). Lamond warned Tarrio about forthcoming MPD outreach, enabling Tarrio to discuss his response strategy with a confidant (A481-82). Lamond told Tarrio that MPD did not "have anything" and was simply "searching," which is valuable information to a suspect anticipating police contact (A481; see also A469 (telling Tarrio MPD did not "have any pictures of [him]")). Lamond kept Tarrio informed

---

[6] *See Brown*, 89 A.3d at 104 ("corruptly" connotes "wrongdoing") (citing *Arthur Anderson LLP v. United States*, 544 U.S. 696, 705-06 (2005)); *Hawkins v. United States*, 119 A.3d 687, 701 (D.C. 2015) ("corruptly" requires "consciousness of wrongdoing"; it means to act "knowingly and dishonestly" and "with an improper purpose"); *Decuir*, 285 A.3d at 522 ("'The term "corruptly" indicates an "intent to undermine the integrity of [a] pending investigation."'").

about the investigation's progress and potential arrest warrant, including telling Tarrio that the warrant had been signed (A492, 506-08).

Additionally, Lamond withheld incriminating information and otherwise worked against the investigation. For example, he did not tell anyone at MPD about Tarrio's confession at the Dubliner (A169, 778, 819-20).[7] When speaking to investigating detectives, Lamond downplayed his relationship with Tarrio, giving the impression that his contact with Tarrio was in the past (A163, 168). He did not tell detectives that he had discussed the investigation with Tarrio or provide records of those communications (A176-77, 783, 789-90). Lamond also advocated against the hate-crime enhancement that would have increased Tarrio's criminal exposure (A444-45, 495).[8]

---

[7] Lamond argues (at 41) that, while Tarrio may have said something inculpatory during the Dubliner meeting, it "did not rise to a direct confession." After the meeting, Tarrio messaged others that he confessed, which the court credited because Tarrio was "talking to the people he trusts," "had no motive to lie," and "it doesn't make sense" that Tarrio would say that he confessed "so promptly to these people if he hadn't" (A1364-65, 1367).

[8] Lamond argues (at 9 n.3) that he had "no role in deciding" whether Tarrio's conduct was charged as a hate crime. Why would Lamond bother to opine on it if his opinion had no sway? Indeed, Lamond later suggested to both Tarrio (A467-68) and another law-enforcement official that his

(continued . . . )

Lamond's corrupt intent is further evidenced by his selective use of Telegram, his application of the self-destruct feature, and the later deletion of his entire message thread with Tarrio. On November 7, 2020, Lamond initiated a Telegram chat, telling Tarrio they "need[ed] to switch to encrypted" before "giving [Tarrio] a heads up" about law-enforcement alerts about the Proud Boys (A414, 1144-49).[9] Lamond admitted that he used Telegram because of its higher level of encryption, making it more difficult for the messages to be intercepted (A1149). Over the next month, Lamond generally used Telegram to share information with Tarrio, but used text messages when asking for information (A1150-64).

After the banner burning on December 12, Lamond and Tarrio used Telegram exclusively (A1172). And after MPD received a tip that Tarrio was responsible, they used only Telegram secret chats (A461, 1598-1618). It was Lamond who first applied the Telegram self-destruct feature; he

---

opinion carried weight (A495 (Lamond writing that MPD "backed off" the hate-crime enhancement when he opined on it)).

[9] Lamond argues (at 6 n.2) that Tarrio first initiated a Telegram conversation in July 2020. That conversation consisted of four Telegram messages, and Tarrio then switched back to text messages (A1569-70). It was Lamond who used Telegram starting in November when sharing law-enforcement information, precisely because he knew it was "encrypted" (A1144-49).

did so after Detective Mufti contacted Tarrio about the banner burning (A1204-05).[10]

MPD officials testified that Lamond's conduct was wrong, unauthorized, and violated MPD policies (see pp. 17-21 above). It slowed the investigation, risked the loss of evidence and witnesses, allowed Tarrio to strategize, and posed a safety risk to arresting officers (*id.*). Lamond himself destroyed potential evidence by deleting his messages with Tarrio (A302-03, 312, 328-29). And Tarrio disseminated Lamond's messages to Proud Boys and others, which further risked the destruction of evidence, as Tarrio was not the only person involved in the banner burning (A667, 795).

Lamond strains credulity by claiming (at 37-38) that he was simply cultivating a relationship with Tarrio. Lamond's unilateral decision to provide investigative information to Tarrio was egregious. As the district court found:

> There was no mistaking how Commander Carroll felt when presented with the communications. His decorated shoulders slumped and he looked physically pained. He testified that these disclosures were not consistent with police procedures,

---

[10] Tarrio was a "prolific user of Telegram," but only used the self-destruct feature with Lamond (A1232).

they were not consistent with police objectives, and they were not consistent with how a police officer is supposed to act. (A1378.)

A reasonable factfinder could conclude that Lamond, an MPD lieutenant with decades of experience, knew his conduct was wrong and risked impeding the investigation and prosecution, as his colleagues repeatedly testified. *See United States v. Mejia*, 597 F.3d 1329, 1341 (D.C. Cir. 2010) (factfinder may "infer that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted").

Lamond's five remaining counterarguments lack merit.

*First*, Lamond claims (at 39) he had no incentive to undermine the banner-burning investigation or prosecution. Lamond need not have personally benefitted to be guilty of obstruction. In any event, in his own words, he "personally [ ] support[ed]" the Proud Boys and did not "want to see [the] group's name or reputation dragged through the mud" (A516). He also spoke disparagingly of groups in conflict with the Proud Boys and criticized law enforcement who were "all spun up" over Proud Boys rumors (A430-31, 462).

*Second*, Lamond's claim (at 39) that he "advanced the banner-burning investigation" is specious. Lamond was a double-agent—he

performed his job to some degree, but simultaneously obstructed the investigation in the ways described above. Lamond argues (at 39) that when meeting with Tarrio at the Dubliner, he asked Tarrio to identify suspects at Assistant Chief Carroll's request. This is true, but his report back to Assistant Chief Carroll was false. Instead of relaying that Tarrio had just confessed (or at a minimum, had said something inculpatory (see n.7, above)), Lamond repeated Tarrio's self-serving statement that he could not identify anyone (A1597). Lamond claims (at 39) that he "circulated Tarrio's admissions" on December 18, but these were public admissions. And Lamond used his email about Tarrio's public admissions to find out whether the FBI would pursue a hate crime, information he then passed to Tarrio (A464, 466).

Lamond argues (at 39) that he tentatively identified Tarrio in a photo of the banner burning, which was included in the arrest-warrant application. However, Lamond did so only after superiors became involved. Initially, Lamond told Detective Then that he could not make an identification (A782-83, 806). Detective Then was baffled; he had been told that Lamond knew Tarrio well, yet Lamond did not provide any information (*id.*). Detective Then thought that Lamond perhaps "just

56

didn't want to ID" (A783). Detective Then talked to his boss, Sergeant Copeland, who in turn called her boss, Commander Parsons (A785, 817-19). Commander Parsons called Lamond several times, and only then did Lamond tentatively identify Tarrio in the banner-burning photo (A800-01). Lamond was simultaneously telling Tarrio that MPD did not "have anything" and wanted to talk to him because they were "searching" for information (A481). After identifying Tarrio in the photo, Lamond told Tarrio that, too (A485-86).

*Third*, for similar reasons, the fact that Lamond helped with Tarrio's arrest to the extent he obtained Tarrio's flight information does not undermine his corrupt intent (Br. 39). While assisting with the arrest, Lamond also told Tarrio about the arrest warrant (A508-10). That Lamond waited a few days to tell Tarrio about the signed warrant is irrelevant; tipping off Tarrio was unquestionably improper. Tarrio (and others) still had time to destroy evidence, Tarrio could have changed his mind about entering D.C. to avoid arrest, and this tip-off posed a safety risk to arresting officers. Even Tarrio admitted there was a difference between publicly admitting to the crime from afar and anticipating an imminent arrest while on his way to D.C. (A918).

*Fourth*, the district court did not treat Lamond's violation of MPD General Orders "as the principal proof of corrupt intent" (Br. 33). The court "emphasize[d]" that Lamond was "not on trial for the violation of" the General Orders, but noted that they "bear on whether" Lamond acted "knowingly and corruptly, with consciousness of wrongdoing" (A1331). The court applied the correct legal standard, and considered not only Lamond's knowing violation of MPD policies, but also his colleagues' testimony as to how very wrong Lamond's conduct was, Lamond's "strained, post hoc, reverse-engineered effort" to explain his conduct, his strategic use of Telegram, and his deletion of his communications with Tarrio (A1382-85). This analysis was not flawed.

*Finally*, the court was entitled to consider Lamond's destruction of his communications with Tarrio as proof of corrupt intent (*cf.* Br. 41-42). Destroying evidence shows knowledge of wrongdoing. *See United States v. James*, 764 F.2d 885, 889 (D.C. Cir. 1985). In citing *Arthur Anderson*, Lamond conflates his obstructive acts that impeded the banner-burning investigation and prosecution with the deletion of messages to protect himself. In *Arthur Anderson*, the obstructive act was the destruction of documents. 544 U.S. at 698. Thus, the government was required to show

58

a nexus between the destroyed documents and an "official proceeding." *Id.* at 708. Here, the obstructive acts consisted of Lamond giving law-enforcement information to Tarrio and concealing evidence that incriminated Tarrio. Separately, Lamond deleted text messages to hide that wrongful conduct, demonstrating consciousness of wrongdoing.

### C.    The False-Statement Counts

### 1.    Counts Two and Three

Lamond argues (at 42) that his statements to investigators were too indefinite to give rise to false-statement convictions as a matter of law. Count Two alleged that Lamond falsely stated that his relationship with Tarrio "was more, you know, one-sided with him just telling me, you know, what their plans were" (A37).[11] Count Three alleged that Lamond falsely stated that he tried to learn information from Tarrio about the

---

[11] Agent Molnar: So, when [Tarrio] would reach out and ask questions-when he would be engaging, would he be--would it be common for him to fish?

Mr. Lamond: No, not really. He never really asked me questions about, like, you know, what we were doing or anything. It was more, you know, one-sided, with just him telling me, you know, what their plans were. Like, he would never tell me where the group was staying…. But he would normally tell me, like, where he was planning on staying at. (A1678.)

banner-burning "without tipping him off to the MPD investigation" (A38).[12]

While some questions may be "so vague as to prohibit the government from even attempting to prove that the defendant knowingly answered falsely," Lamond's exchanges here "do not fall into that category." *United States v. Chapin*, 515 F.2d 1274, 1279 (D.C. Cir. 1975). "[M]ere vagueness or ambiguity in the questions is not enough to establish a defense to perjury. Almost any question or answer can be interpreted in several ways when subjected to ingenious scrutiny after the fact." *Id.* (citation omitted). Indeed, questions that are too vague as a matter of law generally arise only in "extreme" circumstances. *Id.* Even where a term is susceptible to more than one meaning, this Circuit has treated that as a jury question. *See United States v. Milton*, 8 F.3d 39, 45 (D.C. Cir. 1993) (meaning of "claim"); *United States v. Sampol,* 636 F.2d 621, 655 (D.C. Cir. 1980) ("[I]t was within the province of the jury to

---

[12] Agent Molnar: "[W]hen they were there in December and then January 4th….What were those conversations like? Were he prepping you for what was coming (verbatim)?

Mr. Lamond: That was part of it, and the other part was I was trying to find out without tipping him off to the MPD investigation. (A1667.)

decide the construction given the question by the defendant and determine whether the answer was false.").

As to Count Two, Lamond argues (at 45) that his use of "one-sided" could refer to who sought information more often, who benefited more, or "the overall tenor of the exchanges." As the fact-finder, the court reasonably interpreted this statement to refer to the flow of information (A1348). Lamond was clearly talking about which way information flowed. The details he added support that interpretation (A1678 (Tarrio "never really" asked questions, "just" said what their plans were, and would tell Lamond where he was staying)). This makes sense in context. The question was whether Tarrio would "fish," which Lamond agrees (at 45) means asking for information.[13] Moreover, the subject of the interview, which Lamond knew, was Tarrio and others "getting information that they shouldn't have had" (A1660). *See Chapin*, 515 F.2d

---

[13] Lamond claims (at 45-46) that the investigator's use of the word "fish" was vague, but his only quibble is that the investigator did not specify the detail of information he had in mind. That cuts against Lamond. The question was broad and called for an affirmative answer if Tarrio sought information.

61

at 1280 (investigation's purpose, known to the defendant, informed meaning of the questions).

Viewed in the light most favorable to the verdict, the evidence showed that Lamond's statement was false. The flow of information was not "more…one-sided," and Tarrio did not "just" tell Lamond his plans (A1678). Lamond repeatedly gave Tarrio law-enforcement information related to the Proud Boys' First Amendment activities, the banner-burning investigation, Tarrio's warrant, Tarrio's charges, and January 6. His statement to the contrary was false.

The court did not err in considering Lamond's other false statements and lack of candor to inform its verdict on Count Two (*cf.* Br. 49).[14] *See Chapin,* 515 F.2d at 1280 ("perjury cases" are "susceptible to proof by circumstantial evidence"); *United States v. Reveron Martinez,* 836 F.2d 684, 690 (1st Cir. 1988) ("The jury's conclusion appears all the more reasonable in view of the circumstantial evidence that appellant was trying to cover up [relevant facts]."). In any event, the court looked

---

[14] Lamond refers (at 49) in part to the court's sentencing analysis. There, the court correctly noted that Lamond lied and mischaracterized when he told agents he referred Tarrio to case detectives, and was cagey about his use of Telegram (A1426-27; A1682, 1690).

to the totality of Lamond's conduct to inform whether he made the charged false statements willfully—an element Lamond does not challenge on appeal (A1355-58).

As to Count Three, the district court reasonably understood Lamond's statement—"without tipping [Tarrio] off to the MPD investigation"—to mean providing information "about the status or inner workings of the MPD investigation into the banner-burning" (A1360). As the court found, Lamond unquestionably gave Tarrio information about MPD's banner-burning investigation, making his statement false (*id.*).

Lamond testified that he meant he wanted to avoid providing information of value to Tarrio, meaning "information that could have assisted the MPD investigation" (A1090-91). But even under Lamond's own interpretation, the evidence showed that Lamond knowingly gave Tarrio such information (see pp. 18-21, 51-52, 54). This is in stark contrast to the "typical fundamental ambiguity case, the defendant offers an interpretation of the question where, if his interpretation had been

63

correct, his answer would have been truthful." *United States v. Doost*, 3 F.4th 432, 444 (D.C. Cir. 2021).[15]

### 2.     Count Four

Count 4 charged that Lamond falsely stated that he "didn't, you know, inform [Tarrio] that he had an arrest warrant" (A38). Lamond argues (at 53) that the evidence was insufficient to prove that this statement was false. To the contrary, as the court found, the circumstantial evidence showed that Lamond told Tarrio about the arrest warrant while Tarrio was flying to D.C. on January 4, 2021 (A1338).

Tarrio's plane took off at 12:55 p.m. and he ceased sending messages at 12:58 p.m., showing that he lost cell service around that time (A503-11). At 1:02 p.m., Lamond changed Telegram's self-destruct timer for his chat with Tarrio from 30 to 10 seconds (A1611, 1614). Although no message was recovered due to the self-destruct timer, the reasonable

---

[15] Lamond argues on appeal (at 51) that "tipping him off" could have meant "[n]ot mentioning the investigation, "not materially compromising it," or not "alerting [Tarrio] to arrest plans." The third interpretation is implausible because Lamond stated he did not want to tip Tarrio off "*to the MPD investigation*" (A1667 (emphasis added)). In any event, as discussed, Lamond knowingly did all these things.

inference was that Lamond messaged Tarrio and wanted to make extra sure no one else saw it.

Tarrio purchased internet on the plane and his cell service was restored around 1:28 p.m. (A507-08). A reasonable inference is that Tarrio then received Lamond's message that an arrest warrant had been signed because, at 1:30 p.m., Tarrio started messaging multiple people exactly that (A508-10). Indeed, immediately after Tarrio was arrested and released, he told his confidants in a parking-garage meeting, "He texted me from the air," and "From the air is when I knew they signed a warrant" (SA, Ex. 4034 at 00:15–:26; A1008-09). As the district court found, Tarrio's explanation that he had simply lied to Proud Boys and close friends or relatives "was illogical and incredible" (A1343).

Tarrio's messages showed that he received this information from "[his] contact" (A509). As the district court found, there was no evidence of a "contact" other than Lamond (A1337). There was no evidence from review of Tarrio's phone or otherwise that Tarrio was talking to any other law-enforcement officer, other than Tarrio's brief exchange with Detective Mufti in which Tarrio invoked his right to remain silent (A456, 466, 492, 1231-32). Tarrio's messages repeatedly referred to Lamond, and

only Lamond, as his "contact," his "DC metro guy," and "DC metro" (A449, 451-52, 466, 470, 492). The district carefully analyzed this evidence in rendering its guilty verdict (A1336-46).

That Tarrio "already expected an arrest in Washington" does nothing to dispel the foregoing (Br. 55). Tarrio expected an arrest because, as discussed, Lamond inappropriately kept him updated on the developing investigation. Tarrio used that information to go to D.C. early so that he would be arrested, or turn himself in, and be released before January 6 (A487). Tarrio's messages in the days leading up to January 4 showed he did not know the warrant had been signed (e.g., A492). In his own words, he found out while "in the air" (SA, Ex. 4034 at 00:15–:26).

Lamond also claims (at 55) the district court "mischaracteriz[ed]" Lamond's interview when it found that Lamond's statement was volunteered and not directly responsive to the question asked. The court's interpretation was not unreasonable. During questioning about whether MPD planned to arrest Tarrio "without him knowing," Lamond spontaneously added that he "didn't, you know, inform him that he had arrest warrant," when no one had asked him that (A1670-1671; 749-50).

66

The court's judgment on Count 4 was supported by sufficient evidence and should be affirmed.

### 3.    Count One does not infect Counts Two through Four.

Contrary to Lamond's argument (at 58), a reversal on Count One does not require reversal of the false-statement counts. Lamond does not explain how Count One infected the other counts other than to generally complain that the court considered all the evidence before it, which it was permitted to do. The court independently, carefully, and painstakingly analyzed each of the false-statement counts (A1336-62). There is no basis to conclude that Count One infected the court's verdict on those separate counts.

Moreover, Lamond makes only two challenges to Count One. The first is a purely legal question as to whether the obstruction statute applies to police investigations. The answer to that legal question would not affect whether Lamond lied when he made specific statements to investigators about his conversations with Tarrio.

Lamond's second challenge to Count One is that the evidence failed to show his corrupt intent. The false-statement counts have a different mens rea: knowingly and willfully. The district court appropriately

67

analyzed Lamond's intent as to each false-statement count, and Lamond does not challenge the mens-rea element on appeal. Lamond's "infection" claims is unsupported and meritless.

## CONCLUSION

WHEREFORE, the judgment of the District Court should be affirmed.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

CHRISELLEN R. KOLB
DANIEL J. LENERZ
REBECCA ROSS
Assistant United States Attorneys

|                    /s/                    |
|---|

MARY C. FLEMING
D.C. Bar # 1048019
Assistant United States Attorney
601 D Street, NW, Room 6.232
Washington, D.C. 20530
Mary.Fleming@usdoj.gov
(202) 252-6829

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I HEREBY CERTIFY pursuant to Fed. R. App. P. 32(g) that this brief contains 12,992 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1), and therefore complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). This brief has been prepared in 14-point Century Schoolbook, a proportionally spaced typeface.

/s/
_____
MARY C. FLEMING
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused a copy of the foregoing Brief for Appellee to be served by electronic means, through the Court's CM/ECF system, upon counsel for appellant, Andrew E. Goldsmith, Esq., and Reno G. Varghese, Esq., on this 17th day of July, 2026.

/s/
_____
MARY C. FLEMING
Assistant United States Attorney
